RECEIVED IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
2007 JAN 30  P 2: 36        SOUTHERN DIVISION

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT

| | |
|---|---|
| WILLIE McCRAY, #183709 | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) CASE NO.  1:06-CV-1107-WKW |
| WILLIE THOMAS, et al., | ) |
| | ) |
| Respondents. | ) |
| | ) |
| | ) |

**ANSWER**

Comes now Respondents, by and through the Alabama Attorney General,

following this Court's order of December 21, 2006, and answer McCray's §2254

petition, as follows:

1.  Respondents admit McCray was convicted of one count of felony murder

and one count of theft of property in the first degree on October 24, 2000, in the

Houston County Circuit Court after McCray had been granted a new trial.  (Exhibit

A; Vol. IV, R. 499)  See McCray v. State, 738 So. 2d 91 (Ala. Crim. App. 1998).

McCray was sentenced to ninety-nine years on the felony murder conviction, and

twenty years on the first degree theft conviction.  (Exhibit A; R. 505-506).  His

incarceration is the lawful result of these convictions and sentences.

2.  Respondents aver the instant §2254 petition is barred by the one-year period of limitation of 28 U.S.C. 2244(d).

3.  Respondents deny McCray is entitled to any of the relief he has requested.

## PROCEDURAL HISTORY

4.  On October 24, 2000, McCray was sentenced in the Houston County Circuit Court to ninety-nine years for felony murder and to twenty years for theft of property in the first degree. (Exhibit A; R. 505-506)  McCray filed written notice of appeal on October 25, 2000.  In his brief to the Alabama Court of Criminal Appeals, McCray raised the sole issue, whether the trial court erred by failing to instruct the jury on the lesser included offense of manslaughter because the evidence supported a heat-of-passion provocation by the victim.  (Exhibit A; C. 121; Exhibit B)

5.  The State filed its brief, and on November 21, 2001, the Alabama Court of Criminal Appeals affirmed McCray's convictions and sentences.  (Exhibits C and D).  On December 5, 2001, McCray filed his application for rehearing that was denied December 21, 2001, and the certificate of judgment was issued on January 8, 2002, without McCray having filed a petition for certiorari to the Supreme Court of Alabama .  (Exhibits E, F and G).

6.  McCray filed a Rule 32 petition for post-conviction relief

2

challenging his two convictions for felony murder and first degree theft of property in the Houston County Circuit Court, on February 3, 2006. (Exhibit H; C. 3) McCray alleged in the petition that the trial court lacked jurisdiction to render the judgment or to impose the sentence because he was originally indicted for capital murder and his indictment was improperly amended to felony murder without his consent. (Exhibit H; C. 3, 7; 11-14) The circuit court conducted an evidentiary hearing on the Rule 32 petition on April 14, 2006, and denied the petition after the hearing. (Exhibit H; R. 3-16; C. 27) Written notice of appeal was filed on May 21, 2006. (Exhibit H; C. 34)

7. Counsel for McCray filed an "Anders" brief with the Alabama Court of Criminal Appeals on July 19, 2006, and that court issued an order on August 16, allowing McCray twenty-one days to file his pro-se issues. (Exhibits I and J). McCray filed his brief containing his pro se issues on September 4, 2006; and on October 27, 2006, the Alabama Court of Criminal Appeals affirmed the circuit court's dismissal of McCray's Rule 32 petition. (Exhibit K and L). McCray did not file applications for rehearing or certiorari; and on November 17, 2006, the Alabama Court of Criminal Appeals issued the Certificate of Judgment. (Exhibit M).

McCray filed this instant §2254 petition on December 14, 2006 (§2254 petition, p. 1)  His petition is time-barred under §2244(d).  McCray has not established grounds for equitable tolling.

### One-Year Period of Limitation Under Title 28 U.S.C. §2244(d)

8.  McCray's petition is barred by the one-year period of limitation of Title 28 U.S.C. §2244(d).  McCray's direct appeal ended with the issuance of the certificate of judgment on January 8,  2002, well after the effective date of the Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1212 (1996) codified in Title 28 U.S.C. §2244(d).  The one-year period of limitation applicable to his case ran from January 8, 2002, because McCray did not seek certiorari review in the Alabama Supreme Court.  Therefore,  McCray's petition, to be timely, should have been filed no later than January 8, 2003.  It was, in fact filed, no earlier than December 14, 2006, which was more than three years and eleven months after the expiration of the one-year period.

Under Title 28 U.S.C. §2244(d)(2), the legislatively-created one-year period of limitation may be tolled for "The time during which a properly filed application of State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending…:.  McCray filed a Rule 32

4

petition on February 3, 2006, over three years after the one-year limitation period prescribed by §2244(d)(1) had expired; therefore, his petition was not pending as required by the provision of Title 28 U.S.C. §2244(d)(2) for purposes of tolling the requisite time period.  See <u>Webster v. Moore,</u> 199 F. 3d 1256, 1259 (11th Cir. 2001).

McCray's §2254 was filed more than three years late, and he has not alleged any extraordinary circumstances or shown actual innocence to excuse the tardiness of the filing.  McCray's §2254 petition is time-barred.

WHEREFORE, THE PREMISES CONSIDERED, Respondents pray for the dismissal of the instant §2254 petition for the reasons stated.

Respectfully submitted,

Troy King
Attorney General

_Daniel W. Madison_

Daniel W. Madison
Assistant Attorney General

## Exhibit List

Exhibit A          McCray's direct appeal of his convictions;

Exhibit B          McCray's brief on appeal;

Exhibit C          State's brief in Court of Criminal Appeals;

Exhibit D          Alabama Court of Criminal Appeals memorandum
                   opinion affirming McCray's convictions;

Exhibit E          McCray's application for rehearing;

Exhibit F          Alabama Court of Criminal Appeals order denying
                   rehearing;

Exhibit G          Certificate of Judgment of Affirmance;

Exhibit H          McCray's Rule 32 petition for post-conviction
                   relief;

Exhibit I          McCray's Counsel's "Anders" brief filed on
                   appeal of denial of Rule 32;

Exhibit J          Alabama Court of Criminal Appeals' order
                   allowing pro se issues;

Exhibit K          McCray's pro se appeal and issues;

Exhibit L          Alabama Court of Criminal Appeals memorandum
                   opinion affirming dismissal of petition;

Exhibit M          Certificate of Judgment of Affirmance.

## CERTIFICATE OF SERVICE

I hereby certify on this 30th day of January, 2007, I served a copy of the foregoing on McCray, by placing the same in the United States Mail, first class, postage prepaid and addressed as follows:


Willie McCray
AIS #183709
Elmore Correctional Facility
P. O. Box 8
Elmore, Alabama    36025


*Daniel W. Madison*
Daniel W. Madison
Assistant Attorney General

ADDRESS OF COUNSEL:
Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, Alabama 36130-0152
(334) 242-7300
226544/MCCRAY
-001

COURT OF CRIMINAL APPEALS NO. _CR-00-0241_

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

## FROM

CIRCUIT COURT OF ___HOUSTON___ COUNTY, ALABAMA

CIRCUIT COURT NO. ___CC-94-791___    Volume  I

CIRCUIT JUDGE ___Jerry White___

e of Conviction / Order Appealed From: ___MURDER___

tence Imposed: ___99 years, $20,000.00 Fine, $50.00 Victim Compensation and___
Restitution

dant Indigent:  [X] YES  [ ] NO

W.illie C. McCray
_____    NAME OF APPELLANT

Honorable Joe Lewis        794-0759
(Appellant's Attorney)          (Telephone No.)
P. O. Box 536
(Address)
Dothan,        Alabama        36302
(City)        (State)        (Zip Code)
V.

STATE OF ALABAMA
_____    NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)



5839
4 vol



VOL. I

CLERK'S INDEX

CASE ACTIONS                                                          1 - 24

INDICTMENTS                                                          24 - 28

CERTIFICATE OF JUDGMENT, REVERSED AND REMANDED                       29

CASE TO BE SET FOR TRIAL AS SOON AS POSSIBLE                         30

TRANSPORT ORDER                                                      31

MOTION TO WITHDRAW                                                   32

MOTION TO WITHDRAW GRANTED, NEW COUNSEL APPOINTED                    33

EX PARTE MOTION FOR EXTRAORDINARY EXPENSES FOR AN INVESTIGATOR       34 - 36

MOTION TO PROCEED EX PARTE                                           37

ORDER FOR EXTRAORDINARY EXPENSES FOR AN INVESTIGATOR                 38

MOTIONS ARE GRANTED                                                  39

MOTION TO WITHDRAW                                                   40

MOTION TO WITHDRAW GRANTED, NEW COUNSEL APPOINTED                    41

MOTION TO WITHDRAW                                                   42 - 43

MOTION TO WITHDRAW GRANTED, NEW COUNSEL APPOINTED                    44

SPEEDY TRIAL SET FOR HEARING                                         45

TRANSPORT ORDER                                                      46

TRIAL SET                                                            47

DEFENDANT'S REQUEST FOR EXTRAORDINARY EXPENSES - INVESTIGATOR        48 - 50

MOTION FOR A BOND HEARING                                            51

HEARING SET                                                          52

MOTION FOR COMPLETE RECORDING AND TRANSCRIPT OF ALL PROCEEDINGS      53

MOTION FOR RECORDING GRANTED                                         54

TRIAL RE SCHEDULED                                                   55

MOTION FOR RULING ON REQUEST FOR EXTRAORDINARY EXPENSES              56

TRIAL SET                                                            57

MOTION FOR EXTORADINARY EXPENSED GRANTED                             58

BAIL SET                                                             59

CLERK'S INDEX CONTINUED

MOTION FOR EXTRAORDINAY EXPENSES                                      60 – 61

MOTION TO CONTINUE TRIAL                                             62 – 63

MOTION GRANTED                                                           64

MOTION TO RELEIVE C. CAPPS DENIED                                       65

ORDER ON APPOINTMENT OF COUNSEL AND PRO-SE ORDER                        66

MOTION FOR BOND REDUCTION HEARING                                       67

MOTION FOR BOND REDUCTION HEARING DENIED                                68

ORDER FOR A FREE TRANSCRIPT                                             69

TRIAL SET                                                               70

MOTION FOR DISCOVERY OF INBORNATION NECESSARY TO RECEIVED            71 – 72
A FAIR TRIAL

MOITON TO SUPPRESS                                                   73 – 74

ORDER , MOTION FOR DISCOVERY GRANTED, MOTION TO SUPPRESS TO BE
HEARD PRIOR TO TRIAL, ATTORNEY CAPPS TO ASSIST DEFENDNT IN THE          75
CASE

MOTION TO REVEAL THE IDENTITY OF INFORMANTS AND REVEAL ANY          76 – 77
DEALS, PROMISES OR INDUCEMENTS

MOTION TO INSPECT EXAMINE AND TEST ALL PHYSICAL EVIDENCE                78

MOTIONS GRANTED                                                         79

COUNAL ALREADY APPOINTED, NO NEW COUNSEL WIL BE APPOINTED               80

MOTION TO CLARIFY APPOINTMENT OF COUNSEL                                81

C. CAPPS IS ATTORENY FOR DEFENDANT                                      82

ORDER TO RELEASE EXHIBITS                                               83

DEFENDANT'S MOTION TO RELEASE TRIAL EXHIBITS                            84

NOTICE TO DEFENANT OF REQUEST FOR ADDITIOAL PENALTY                     86

MOTION TO QUASH TRIAL JURY DENIED                                       87

DEFENDANT'S REQUESTED JURY INSTRUCTIONS                             88 – 113

JUDGMENT, SENTENCING, NOTICE OF APPEAL                             114 – 116

MOTION TO WITHDRAW AS COUNSEL OF RECORD                            117 – 118

CLERK'S INDEX

MOTION FOR NEW TRIAL                                                     119 – 120

NOTICE OF APPEAL                                                         121

HEARING SET                                                             122

ATTORNEY CAPPS ALLOWED TO WITHDRAW, NEW COUNSEL APPOINTED               123

CLERK'S NOTICE OF APPEAL                                                124 – 125

DOCKETING STATMENT                                                      126 – 127

COURT REPORTER'S TRANSCRIPT ORDER                                       128

MOTION FOR NEW TRIAL CONTINUED                                          129

MOITON FOR NEW TRIAL DENIED                                             130

REQUEST AND ORDER FOR TIME EXTENSION                                    131 – 133

COURT REPORTER'S INDEX OF EXHIBITS                                      134 – 137

STATE'S EXHIBIT NUMBER 11 AND 12                                        138

STATE'S EXHIBIT NUMBER 13 AND 14                                        139

STATE'S EXHIBIT NUMBER 15 AND 16                                        140

STATE'S EXHIBIT NUMBER 17                                               141

STATE'S EXHIBIT NUMBER 18                                               142

STATE'S EXHIBIT NUMBER 19                                               143

STATE'S EXHIBIT NUMBER 20                                               144

STATE'S EXHIBIT NUMBER 21                                               145

STATE'S EXHIBIT NUMBER 22                                               146

STATE'S EXHIBIT NUMBER 27 AND 30                                        147

STATE'S EXHIBIT NUMBER 33 AND 34                                        148

STATE'S EXHIBIT NUMBER 36                                               149

STATE'S EXHIBIT NUMBER 37                                               150

STATE'S EXHIBIT NUMBER 46                                               151

STATE'S EXHIBIT NUMBER 78                                               152

CLERK'S INDEX

STATE'S EXHIBIT NUMBER 79                           153 - 154

STATE'S EXHIBIT NUMBER 82                           155

STATE'S EXHIBIT NUMBER 83                           156

STATE'S EXHIBIT NUMBER 85                           157

COURT REPORTER'S TRANSCRIPT                         1 - 512

CERTIFICATE OF COMPLEITON                           670

A L A B A M A   J U D I C I A L   I N F O R M A T I O N   S Y S T E M

CASE ACTION SUMMARY
CIRCUIT CRIMINAL

CASE: CC 94 000791

JUDGE: MAC CH

IN THE CIRCUIT COURT OF HOUSTON COUNTY

STATE OF ALABAMA                           VS        MCCRAY WILLIE C
                                                     % HOUSTON COUNTY JAIL
CASE: CC 94 000791 00                                P O DRAWER 6406
                                                     DOTHAN              AL  36302-0000

DOB: 03/11/59  RACE: B  SEX:  M  HT:   600   WT: 145  HR:   BLK  EYE: BRO
SSN: 265455968     ALIAS NAMES:

CHARGE1: MURDER CAPITAL                     CODE1: CMUR LIT:MURDER CAPITAL  TYPE:F
CHARGE2:                                    CODE2: 0000                    TYPE:F
CHARGE3:                                    CODE3: 0000                    TYPE:F
MORE?:          OFFENSE DATE: 08/07/93      AGENCY/OFFICER: 0380100DEVANE

DATE WAR/CAP ISS:   /  /                    DATE ARRESTED: 10/04/93
DATE     INDICTED: 09/02/94                 DATE   FILED: 09/15/94
DATE     RELEASED:   /  /                   DATE HEARING:   /  /
         BOND AMOUNT:    $500,000.00        SURETIES:                K. Nemish appt
                                                                     Sam Hugganbotham
DATE 1: 10/12/94  DESC: ARRG       TIME:   0900 A
DATE 2:  1/11/94  DESC: TRIAL      TIME:   0800 A
3-13-95 8-28-95    Sam Smith (A)   Kenneth Hoppen   A ATWELL  JENNIFER LYNN  TYPE:
DEF ATY: LAMBERT MATTHEW C   Ron Smalley (A)  Chris Capps (A)
PROSECUTOR: VALESKA, DOUGLAS A                         GRAND JURY: 000169

OTH CSE: 9300226400       CHK/TICKET NO: 93 3030
COURT REPORTER:           SID NO: 000000000           DEID: PAM
DEF STATUS: JAIL     JURY DEMAND:

     DATE          ACTIONS, JUDGMENTS, CASE NOTES

                              10/12   19 94
          This day in open court came the State of Alabama by its
          District Attorney and the Defendant (in his own proper person
          and with his attorney, and the Defendant being arraigned on
          the indictment in this case) (waiver arraignment) enters a
          plea of (not guilty) (not guilty by reason of mental disease or
          defect) This case is hereby set for trial during the
          term of Court. Defendant is granted _____ days to file any
          additional pleas or motions.
                                     Michael Crespi
                                                    JUDGE

10-12-94  Motion To Dismiss The Indictment On Account
          Of Discrimination In The Selection Of Grand
          Jury Foreperson and Motion For Discovery
          Of Grand Jury Foreperson Data. Motion
          To Dismiss Indictments, Motion For Protection
          and Discovery Of Evidence.

RECIPROCAL DISCOVERY ORDER

10/17, 19 94

2

Within 14 days of this order, the State and Defendant will make
available for inspection and copying all materials discoverable under
the Alabama Rules of Criminal Procedure. In addition, the State will
make any exculpatory materials available to the defense. The State
will make its materials available at the District Attorney's office
and the defense will do likewise at defense counsel's office.

Michael Crespi
CIRCUIT JUDGE

(10-20-94 n DA+
ML)

11-1-94- Order Setting Scheduling Conference on (In File)
11-23-94, and regarding discovery.

11-23-94 Order. (In File)

1-6-95  Motion to Suppress. Motion to Suppress Line-up. Motion for Ruling on Independant
Fingerprint expert. Motion for Ruling on Motion for Protection and Discovery of
Evidence.

1-10-95- Order setting Hearing on evidence & fingerprint
Motions for 1-25-95 at 8:00 a-m (In File.)

1-20-95-Motion To Renew Motion For Speedy Trial.

1-23-95 Motion set for hearing on Feb. 21, 1995
at 9:00 a.m. Notify L. Little, Judge
(1-24-95-n-ML, JA + DA.)

2-1-95- Order regarding Grand Jury notes + Jurors.
2-1-95- Order regarding fingerprint expert. (These
Orders In File.)

2-2-95--District Attorney's Response to order for protection and discovery
of evidence.

2-3-95 - Response noted by Court. No further action is
necessary at this point - L. Little, Judge
(2-6-95 N: DA, ML + JA)

3-95 - Defendant has 20 days to file written briefs
on the Motion to Suppress - Case set for trial
for the week of August 7th, 1995. Defendant has 10 days
to object to this date - Clerk is directed to - notify -
summons A panel of jurors for this trial - Notify
L. Little, Judge (4-11-95 n: DA ml + JA)

| State of Alabama Unified Judicial System | CASE ACTION SUMMARY CONTINUATION | Case Number CC 94 791 |
|---|---|---|
| Form C-7 Rev. 2/79 | | ID    YR    Number |

Style: State of Alabama vs. Willie McCray　　　　Page Number _2_ of ____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 4/7/95 | Trial date re-set for August 28, 1995 at 8:00 A.M. Notify C. Lawson Little, Judge (4-7-95 N-ML, Da, Dsta & Dsfce) |
| 4-25-95 | Brief In Support Of Motion To Suppress |
| 5-1-95 | Defendant's Motion to Suppress denied. Clerk to notify counsel and/or parties. C. Lawson Little, Judge (5-1-95 N-ML, Ja #-Da) |
| 7-17-95 | Conference by Defendant and attorney set for July 24, 1995 at 3:00 p.m. Clerk to notify. C. Lawson Little, Judge (7-18-95 N-Ja, ML & Da) |
| 7-28-95 | Motion For N-Parte Hearing |
| 7-31-95 | Motion for ex-parte hearing denied. Clerk to notify C. Lawson Little, Judge (7-31-95 N-ML & Da, + Da.) |
| 7-10-95 | Motion To Sequester Jury |
| 8-11-95 | Motion to Sequester Jury is denied. Notify C. Lawson Little, Judge (8-11-95 N. DA, JA & ML) |

8-21-95 - Motion to disclose aggravating Circumstances for Mitigation.

8-21-95 - Motion To Disclose Certified copies of Any & all Prior convictions.

8-21-95 - Motion in Limine.

8-23-95    Motions will be heard prior to trial on August 28, 1995 at 8:00 a.m. Notify. C. Lawson Little, Judge

(8-24-95-M-ML, Jr & DC.)

8-24-95 - Motion In Limine.

8-28-95 - Motion To Change Venue / Motion To Continue. Motion To Exclude Witness.

9-6 _____, 19 95

Defendant questions having been indicted and arraigned upon an Indictment on a charge of Capital Murder and heretofore having plead not guilty thereto, issue joined on said plea. Thereupon comes a jury of good and lawful men and women, to wit, Jerry L. Tadlock and eleven others, who being duly empannelled, sworn and charged by the Court according to law, before whom the trial of this cause was entered upon and continued from day to day and from time to time, said Defendant, Willie C. McGray, being in open Court with his attorney at each and every stage and during all the proceedings in this cause, now on this the 6th day of Sept, 19 95; said jurors upon their oaths do say:

"WE, THE JURY, FIND THE DEFENDANT GUILTY OF Felony Murder AS CHARGED IN THE INDICTMENT."

L. Little
JUDGE

9-6-95 - Presentence Investigation Ordered - Sentencing set for Sept 22, 1995 at 9. A.M - No Bond - Notify - L. Little, Judge

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 94 000791.005
JUDGE ID: CLL

ATE OF ALABAMA                    VS    MCCRAY WILLIE C

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|------------------------------|

**9-21-95** MOTION FOR RESTITUTION ORDER.

9-22- 95

The Court therefore adjudges the Defendant guilty of
_____ Murder

The Defendant and his Attorney being in open Court and
being asked by the Court if he has anything to say why the
Sentence of Law should not be pronounced upon him says
nothing. It is therefore considered by the Court and it is the
Judgment and sentence of the Court that this Defendant be
imprisoned in the penitentiary of the State of Alabama for
a period of **life without parole.**
Defendant is further ordered to pay a Fine of 20,000.00.
Restitution in the amount of _____ to _____
and a victim compensation assessment of $50.00.
Defendant is given credit for days spent incarcerated pending
trial.

L. Little
JUDGE

**9-22-95** Oral Notice of Appeal is given - Hon. Matt
Swann & Hon. Jennifer Tatwell are
allowed to Quit McCray - Hon. Kathleen Nemish
is Appointed as counsel for defendant for
Appeal. A free Transcript is ordered & The
Clerk is directed to prepare The
necessary documents for Appeal & Transmit
Them to The Alabama Court of Criminal Appeals
Notify - L. Little - Judge
(9/26-95 N.DA, MS, JA & KN)

**9-27-95** Mailed Clerk's Notice of Appeal to CCA, AG, DA, CR, Deft, and K. Nemish.

**10-6-95** Filed Motion to stay time for filing a Motion for
New Trial

Over

CC-94-791   Willie C. McCray          MURDER

10-10-95   Filed Order regarding Motion to Stay time.  (See Order in File)  Motion Granted
           and the Clerk's Record on Jury Strikes and Occupation and Voir Dire is to be
           part of record.   *N: CCA, AG, DA. KN.*

10-16-95   Filed Amended Transcript Order.

10-16-95 - *Filed order regarding Ex parte Jackson*

10-20-95 - *Filed Motion to appellant Co-Counsel*

10-20-95   Motion to Appoint Appellant Co-Counsel is granted.   Clerk
           to notify.                *Jmeson Little, Judge*

   *10-20-95 N: CCA, AG, DA, Dept.*
           *KN. DH.*

8-1-96    Filed Motion for Order Granting Overhead Expenses.

8-2-96    Filed Order Motion for Overhead Expenses is granted:  N: DA, ML.

8-7-96    Mailed Transcript to CCA, AG, and called Kathleen Nemish's Office to pick up their Copy.

8-21-96   Motion to Suspend the Rules to Extend Time for Motion to Supplement or Correct Record.

*8-30-96 Filed Motion for New Trial.*

9-6-96    Filed Order, Hearing set 10-10-96 at 9:00 A. M.  N:  CCA, AG, DA, K. Nemish.

9-20-96   Filed Motion to be able to Utilize Finger print Funds of $500.00
          Motion for Voice Expert, Motion for Subpoena List.

*9-25-96 - Motion for Subpoena List granted - all
witnesses to be subpoenaed with exception of
Jim Parkman ~~Hughes~~ + Jennifer
Atwell - No showing has been made
why they are needed - Motion for funds
of Finger Print Expert & Voice Expert
are denied - Notify - J. Little, Judge*

   *9-24-96 N: KN: DA. Dept.*

10-1-96   Motion for Immediate Transport. (10-1-96) Typed order in file. N: DA, KN, & SO

*10-10-96 Motion for New Trial denied - Notify -*
   *10-11-96 N: CCA, AG, DA, CR, KN. DH.*          *J. Little, Judge*
*10-10-96 - See Order of 10-10-96 -*
   *10-16-96 - See Order of 10-11-96 w C.R. ...*  *S. Little & Taylor, ... 10/17 N: CCA AG DA ...*

State of Alabama
Unified Judicial System

Form C-7  Rev. 2/79

CASE ACTION SUMMARY
CONTINUATION

Case Number

CC-94-791

| ID | YR | Number |

Style:
Willie C. McCray

Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|------|-------------------------------|
| 10-28-96 | Mailed Supplemental Transcript to CCA, AG, and called K. Nemish to pick up her transcript. |
| 8-28-98 | Filed Opinion- Reversed & Remanded for New Trial. |
| 11-20-98 | Filed Notice - Application for Rehearing overruled. 39(K) Motion Denied |
| 6-15-99 | Filed Certificate of Judgment, Judgment is Reversed and Remanded for Further Proceedings. |
| 6-17-99 | See Order on CC-94-792. |
| 6-18-99 | N: DA. K. Nemish |
| 6-22-99 | Motion To Withdraw |
| 6-24-99 | Motion to Withdraw granted - Hon Tom Smith is appointed as new trial counsel - Notify (Seta Judge) (6-28-99 X KN JS, DK) |
| 8-30-99 | Ex parte motion for extraordinary expenses for an investigator |
| 8-30-99 | Motion to proceed exparte |
| 9-3-99 | Above Motions are granted - Notfy - (Order attached) 9-3-99- N DA. Tom Smith |
| 10-14-99 | Motion to Withdraw |
| 10-28-99 | Motion to withdraw is granted. Hon. Tom Brantley is appointed to atty for Deft - Notify - (Seta Judge) (11/01/99 X JS, JB, DK) |

ROBERTS & SON, INC., P. O. BOX 1607, BIRMINGHAM, ALABAMA 35201  TELEPHONE 822-312

11-9-99  Motion To Withdraw.

1-9-99 - Motion to Withdraw granted Hon Tom Brantley is allowed to withdraw. Hon Chris Capps is appointed as Defendant's counsel. Notify. J. Little, Judge

(11-10-99  Notifd Tom Brantley, Capps, + DA)

1-12-99 Request for Speedy Trial is set for Dec 21, 1999 at 9 a.m. - Notfy J. Little, Judge

(11-12-99 N- CC, DA)

11 12 99 Pick up Order (In File)

12-21-99    Case set for ~~hearing~~ trial during the April 10th, 2000 criminal term of court.  Notify. J. Little, Judge

12-29-99 N: DA  CC, TB, Def J. Little, Judge

(1-24-2000-N- DA Bg)

2/2/2000- Motion for a Bond Hearing.

2-3-2000—Motion set for April 6, 2000 at 9:00 AM. (See Judge Little's order on case CC-94-792).   (2-1-2000- N- CC, DA)

2-3-2000  Motion for conplete recording and transcript of all proceeding.

2-8-2000 Motion for Complete recording is granted- J. Little, Judge

(2-8-2000-N CC, DA.)

3-9-2000 - Case rescheduled for trial on 5-15-2000 at 9:00 A.M. Notify J. Little, Judge  (3-13-2000-N-CC, DA, Paty + Judy)

ACROS49   A L A B A M A   J U D I C I A L   I N F O R M A T I O N   C E N T E R

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 1994 000791.00
JUDGE ID: CLL

...TE OF ALABAMA                    VS     MCCRAY WILLIE C

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|-------------------------------|
| 3-15-2000 | Motion for ruling on request for extraordinary expenses. |
| 3-20-2000 | Case to be heard on 5-15-2000 before Judge Jimmy White. Notify _____ Clerk, Judge |
| | March 21, 2000 - Motion for extraordinary expenses granted. Notify _____ White, Judge (3-21-2000 N-CC, DA, Judge & Attorney) |
| | April 6, 2000 - Bail set at $500,000 (4-6-2000 N-CC DA + Jail - Johnson) Jury Jim White Judge |
| 5-2-2000-- | Motion for extraordinary expenses. |
| 5-2-2000-- | Motion to continue trial. |
| | May 3, 2000 - Motion for extraordinary expenses and to continue trial granted. Notify _____ White, Judge |
| 5-4-2000 | inoyd C. Capps + DA |
| | June 13, 2000 - Motion to relieve Christopher Capps of appointment denied. Notify _____ White, Judge |
| | June 14, 2000 - To clarify order of June 13 Defendant will be allowed to proceed pro se but Mr Capps will not be relieved of appointment. Mr Capps will continue to advise defendant throughout trial. Notify White, Judge (6-14-2000 N-CC DA Deft at Jail) |
| | 7-27-2000 - Motion for Bond Reduction hearing. |
| | August 8, 2000 - Motion for bond reduction denied. Notify _____ (8-9-2000 N-Deftor CC, White, Judge DA) |

8-9-2000 - Order for Deft to Receive a
Copy of Transcript at State Expense.

September 12, 2000. This case is hereby set
for trial on October 23, 2000    Notify Deft
D.A. and Chris Capps.    White, Judge
(9-13-2000-N- CC, DA & Deft (Jail)
Yes Judy & Patsy.

8-31-2000-Motion for Discovery & Information necessary
to receive a fair trial.

9-13-2000- Motion to Suppress.

September 19, 2000 - Motion for discovery granted.
Motion to Suppress will be heard prior to trial.
Chris Capps directed to assist Deft in whatever
way is needed. On motion of defendant Capps is lead
counsel    Notify    White, Judge
(9-20-2000-N- CC, DA, Deft at Jail)

9-6-2000    Motion to reveal the Identity of Informants and reveal any deals, promises, or inducements

9-7-2000    Motion to inspect, examine, and test all physical evidence

Sept 26, 2000. Motion to reveal identity of informants, if any,
etc. Granted. Motion to inspect granted    Notify
White, Judge
(9-29-2000-N-Deft. DA +

October 4, 2000 - Christopher Capps (already appointed)
to represent defendant in this case. No additional
attorney will be appointed. Notify.    White, Judge

10-5-2000 notify C Capps, DA + deft at jail

10-5-00    Motion to Clarify Appointment of Counsel.

October 10, 2000. Chris Capps will represent defendant
at trial. An appointed atty and take future motion to be filed by
attorney. Notify (10/10/2000-N- CC DA) White, Judge

10/10/00 The Clerk of the Court is ordered to release trial
exhibits to the D.A.    H. Fields, Judge

10-16-00 N. DA. CC.

11

ACR0369   A L A B A M A   J U D I C I A L   I N F O R M A T I O N   C E N T E R

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 1994 000791.00
JUDGE ID:   JMW

ATE  OF  ALABAMA                    VS   MCCRAY WILLIE C

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|------------------------------|

10-19-2000    Defendant's motion to release trial exhibits.

10-23-2000    *Notice To Defendant Of Request For*
*Additional Penalty*

October 23 2000 - Defendant moves for trial
jury to be Quashed under Batson vs
Kentucky After hearing motion denied

October 24 is 2000

Defendant heretofore having been indicted and arraigned upon
an indictment on a charge of  Felony Murder
and heretofore having plead not guilty thereto, been placed on
said plea. Thereupon comes a jury of good and lawful men and
women, to-wit,  Margie Wade
and eleven others, who being duly empanelled, sworn and
charged by the Court according to law, before whom the trial
of this cause was entered upon and continued from day to
day and from time to time, said Defendant, being in open Court
with his attorney at each and every stage and during all the
proceedings in this cause, now on this date said jurors upon
their oaths do say:

"WE, THE JURY, FIND THE DEFENDANT GUILTY OF
Felony Murder
AS CHARGED IN THE INDICTMENT."

_____
JUDGE

October 24 19 2000

In accordance with the verdict of the jury, Defendant is
hereby adjudged guilty of  Felony Murder
as charged in the indictment.  Defendant being asked if he
had anything to say why the sentence of law should not be
pronounced upon him, the Defendant says nothing but pre-
sentence report is requested by  and report completed
Hearing set for  10  at  M.

_____
JUDGE

(over)

*October 24, 2000*

The Court therefore adjudges the Defendant guilty of *Felony Murder*.

The Defendant and his Attorney being in open Court and being asked by the Court if he has anything to say why the sentence of Law should not be pronounced upon him says nothing. It is therefore considered by the Court and it is the judgement and sentence of the Court that this Defendant be imprisoned in the penitentiary of the State of Alabama for a period of *99 years*

Defendant is further ordered to pay a Fine of *$20,000 (See below)*

restitution in the amount of _____ to _____

and a victim compensation assessment of *$50⁰⁰*

Defendant is given credit for days spent incarcerated pending trial.

JUDGE

*October 24, 2000 - Defendant ordered to pay restitution a follows: $19,659⁶⁵ to $10,000 to Ala Crime Victims Commission; $1295⁰⁰ to Laura Scott; St. Joe Container Co.; $238⁰⁰ to Dr. J.W. McLeod, $165⁸⁰ to SE Ala Med Ctr; Amounts; $345⁰⁰ to Radiology*

*Judge*

*October 24, 2000 - Defendant given oral Notice of Appeal. Deft allowed time to arrange for Chris Capps appointed to represent defendant on Appeal. No bail.*

*Judge*

```
10-25-2000  Motion by counsel to withdraw as attorney of record
10-25-2000  Motion for New Trial
10-25-2000  Notice of Appeal
```

*10-24-2000*   PENITENTIARY TRANSCRIPT
                MAILED TO DOC

*10-31-2000   Motion for New Trial set for hearing on 11-21-00 at 1:15 pm Notify*   *J. White, Judge*

*11-1-00 N: CCA. AG, DA, CR, Deft, Chris Capps.*

```
11-1-00  Filed Order dated 10-31-00 appointing     Joe Lewis     Counsel on Appeal.
11-1-00  Mailed Clerk's Notice of Appeal to CCA, AG, DA, CR, Deft, and Chris Capps.  Joe Lewis
```

*Nov. 21, 2000. Motion for new trial continued to Dec 14, 2000, 9:00 A.M. Notify.*   *White, Ju*

*11-21-00 N: CCA, AG, DA, Deft, CC*

*December 14, 2000 - Motion for new trial denied*   *White, Judge*

| State of Alabama<br>Unified Judicial System | **CASE ACTION SUMMARY**<br>**CONTINUATION** | Case Number |
|---|---|---|
| Form C-7        Rev 2/79 | | CC-94-791        13 |

Style:  Willie C. McCray

Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 2/8/01 | Request and Order for time extension |
| 3/8/01 | Request for Time Extension. |
| 4/5/01 | Request for Time Extension. |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

A M A   J U D I C I A L   I N F O R M A T I O N   C E N T E R

CASE ACTION SUMMARY
CIRCUIT CRIMINAL                                CASE: CC 94 000792 00

CIRCUIT COURT OF HOUSTON COUNTY                      JUDGE: MAC CLL

ALABAMA                    VS              MCCRAY WILLIE C
                                           % HOUSTON COUNTY JAIL
94 000792 00                               P O DRAWER 6406
                                           DOTHAN            AL 36302-0000

DOB 03/11/59   RACE: B   SEX:  M  HT:  600  WT: 145  HR:  BLK EYE: BRO
SSN 265455968    ALIAS NAMES:

CHARGE1: THEFT OF PROP 1ST              CODE1: TOP1 LIT: THEFT OF PROP 1STYPE: F
CHARGE2:                                CODE2: 0000                        TYPE: F
CHARGE3:                                CODE3: 0000                        TYPE: F
MORE?:            OFFENSE DATE: 08/07/93  AGENCY/OFFICER: 0380100DEVANE

DATE WAR/CAP ISS:                       DATE ARRESTED: 10/04/93
DATE    INDICTED: 09/02/94              DATE    FILED: 09/15/94
DATE    RELEASED:   /  /                DATE  HEARING:   /  /
         BOND AMOUNT:        $750.00              SURETIES:

DATE 1: 10/12/94 DESC:  ARRG    TIME:  0900
DATE 2: 11/14/94 DESC:  TRAL    TIME:  0800
3-13-95 & 2-8-95
DEF/ATY: LAMERE MATTHEW C           TYPE: A  ATTY: JENNIFER LYNN      TYPE: A
PROSECUTOR: VALESKA, DOUGLAS A

OTH CEE: 9300226500     CHK/TICKET NO: 93 3046           GRAND JURY: 000194
COURT REPORTER            SID NO: 00000000
DEF STATUS: JAIL    JURY DEMAND:                              OPID: PAM

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|------|-------------------------------|

10/14  1994

This day in open court came the State of Alabama by its
District Attorney and the Defendant (in his own proper person
and with his attorney, and the Defendant being arraigned on
the indictment in this case) (waives arraignment) enters a
plea of (not guilty)(not guilty by reason of mental disease or
defect) This case is hereby set for trial during the
term of Court. Defendant is granted _____ days to file any
additional pleas or motions.

_____
JUDGE

10-12-94  Motion To Dismiss The Indictment On
Account Of Discrimination In The
Selection Of Grand Jury Foreperson
and Motion For Discovery Of Grand Jury
Foreperson Data. Motion To Dismiss
Indictment. Motion For Protection and
Discovery Of Evidence.

RECIPROCAL DISCOVERY ORDER                                    15

10/17 ,19 94

Within 14 days of this order, the State and Defendant will make
available for inspection and copying all materials discoverable under
the Alabama Rules of Criminal Procedure. In addition, the State will
make any exculpatory materials available to the defense. The State
will make its materials available at the District Attorney's office
and the defense will do likewise at defense counsel's office.

_michal crespi_
CIRCUIT JUDGE    (η DA ∨ ML 10-20-94)

11-1-94  Order setting Scheduling conference on
11-23-94  & regarding evidence (On File)

11-23-94  Order. (On File.)

1-6-95  Motion to Suppress. Motion to Suppress Line-up. Motion for Ruling on Independant
Fingerprint Expert. Motion for Ruling on Motion for Protection and Discovery of
Evidence.

-9-95-  Order Setting hearing on evidence & Fingerprint
Motions for 1-25-95 at 8:00 a.m. (On File.)

1-20-95-  Motion to Renew Motion for Speedy Trial.

1-23-95 - Motion set for hearing on Feb 26, 1995 at
9:00 AM. Notify - S. Little, Judge.
(1-24-95-η - ML, J & DA.)

2-1-95-  Order regarding Grand Jury notes) & Jurors.
2-1-95-  Order regarding Fingerprint expert. (These
Orders in 1st. File.)

2-2-95--District Attorney's Response to order for protection and
discovery of evidence.

2-3-95 - Response is noted by court. No further action is
necessary at this point. S. Little, Judge
(2-6-95 N. DA, ML & JA)

4-3-95 - Defendant has 20 days to submit written briefs on the
Motion to Suppress- Case set for trial for the
week of August 7th, 1995 - Defendant has 10 days
to object to this date - Notify - S. Little, Judge.

| State of Alabama Unified Judicial System | | Case Number |
|---|---|---|
| | CASE ACTION SUMMARY CONTINUATION | Case Number |
| Form C-7 Rev. 2/79 | 16 | CC 94 792 |
| | | ID    YR    Number |

Style: State of Alabama vs. Willie McCray

Page Number __2__ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 4/7/95 | Trial date reset for August 28, 1995 at 8:00 A.M. Notify C. Lawson Little, Judge |
| | (4-7-95-N-Ja ML DA & Judge) |
| 4-25-95 | Brief In Support Of Motion To Suppress. |
| 5-1-95 | Defendant's Motion to Suppress denied. Clerk to notify counsel and/or parties. C. Lawson Little Judge |
| | (5-1-95-N-ML DA & d.A.) |
| 7/17/95 | Conference requested by Defendant and attorneys set for July 24, 1995 at 3:00 p.m. Clerk to notify. C. Lawson Little, Judge |
| | (7-18-95 N-ML Ja + NA) |
| 7-28-95 | Motion for Ex Parte Hearing. |
| 7-31-95 | Motion for Ex Parte hearing denied. Clerk to notify. C. Lawson Little, Judge |
| | (7-31-95 N ML Ja + DA) |
| 8-10-95 | Motion To Sequester Jury. |
| 8-11-95 | Motion to Sequester Jury denied. Clerk to Notify. Lawson Little, Judge |
| | (8-11-95 N DA + ML & JA) |

17

8-21-95-Motion To Disclose aggravating Circumstances for Mitigation.

8-21-95- Motion to Disclose Certified copies of any & all Prior convictions.

8-21-95- Motion In Limine.

8-23-95    Motions will be heard prior to trial on August 28, 1995 at 8:00 a.m. Notify.

(8-24-95 N-M LJa & Da.)  C. Lawson Little, Judge

8-24-95- Motion In Limine.

8-28-95- Motion To Change Venue / Motion To Continue. Motion To Exclude Witness.

9-6 _____, 19 5

Defendant heretofore having been indicted and arraigned upon an indictment on a charge of Theft of Property, 1st degree and heretofore having plead not guilty thereto, issue joined on said plea. Thereupon comes a jury of good and lawful men and women, to-wit, Jerry L. Tadlock and eleven others, who being duly empannelled, sworn and charged by the Court according to law, before whom the trial of this cause was entered upon and continued from day to day and from time to time, said Defendant, Willie C. McCray, being in open Court with his attorney at each and every stage and during all the proceedings in this cause, now on this the 6th day of Sept 19 95; said jurors upon their oaths do say:

"WE, THE JURY, FIND THE DEFENDANT GUILTY OF
Theft of Property 1st degree
AS CHARGED IN THE INDICTMENT."
                                    Little

9-6-95 at Pre-sentence investigation under. Hearing set for Sept 22, 1995 at 9 A.M. No Bond- Notified Little. Tadco

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 94 000792.00
JUDGE ID: CLL

STATE OF ALABAMA                    VS    MCCRAY WILLIE C

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|------------------------------|
| 9-21-95 | MOTION FOR RESTITUTION ORDER. |

9-22 '95

The Court adjudges the Defendant guilty of *Theft of Property, 1st Degree* the Defendant and his Attorney being in open Court and being asked by the Court if he has anything to say why the sentence of law should not be pronounced upon him says nothing it is therefore considered by the Court and it is the judgement and sentence of the Court that this Defendant be imprisoned in the penitentiary of the State of Alabama for a period of *life* Defendant is further ordered to pay a fine of *$20,000.* restitution in the amount of _____ to _____ and a victim compensation assessment of *50* Defendant is given credit for days spent incarcerated pending trial. _____

| 9-22-95 | Oral Notice of Appeal is given.  Hon. Matt Lamere and Hon. Jennifer Atwell are allowed to withdraw.  Hon. Kathleen Nemish is appointed as counsel for defendant for appeal.  A free transcript is Ordered and the Clerk is directed to prepare the necessary documents for appeal and transmit them to the Alabama Court of Criminal Appeals.  Clerk to notify. _Gerson Little Judge_  (9-26-95 N. DA, ML, JA + KN) |
| 9-27-95 | Mailed Clerk's Notice of Appeal to CCA, AG, DA, CR, Deft, and K. Nemish. |
| 10-6-95 | Filed Motion to stay time for filing a Motion for New Trial. |
| 10-10-95 | Filed Order regarding Motion to Stay Time.  (See Order in File)  Motion Granted, and the Clerk's Record on Jury Strikes and Occupation and Voir is to be part of Record.  N: CCA, AG, DA, KN |
| 10-16-95 | Filed Amended Transcript Order. |
| 10-16-95 | Filed Order from CCA regarding Ex Parte Jackson |

CC-94-792   Willie C. McCray        TOP I                        19

9-20-95- Filed Motion to Appellant Co-Counsel.

10-20-95   Motion to Appoint Appellant Co-Counsel is granted.   Clerk to
           notify. Vanessa Little, Judge
10-20-95 N: CCA, AG, DA, Sgt. KN, DH

  8-7-96  Mailed Transcript to CCA, AG, and called Kathleen Neimish's to pick up her Copy.
  8-21-96  Motion to Suspend the Rules to Extend Time for Motion to Supplement or Correct Record.

8-30-96   Filed Motion For New Trial.

9-6-96  Filed Order, Hearing set 10-10-96 at 9:00 A. M.   N:  CCA, AG, DA, K. Nemish.

9-20-96   Filed Motion to be able to Utilize Finger Print Funds of $500.00
          Motion for Voice Expert, Motion for Subpoena List.

9-25-96.  See Ct's Order of 9-25-96 -
          notify - J. Little, Judge

    1-96   Motion for Immediate Transport. (10-1-96)  Typed Order to Transport in file. N:DA,KN,SC

10-10-96 - Motion for New Trial Denied - Notify -
10-11-96 N: CCA, AG, LDA, CR, KN, DH                       J. Little, Ju

10-10-96 Clerk to supplement record with
         all motions filed before remand
              to Grand jury - Notify - J. Little Judge
         (CC 93-973)
              & 974)   10-11-96 N: DA, DH, KN.

10-16-96 - Defendant's Motion to Supplement Record
           is granted - Notify - J. Little Judge
           (see Order of 10-10-96)        10-17-96  N: CCA, AG, DA, DH, KN

  1-?8-96  Mailed Supplemental Transcript to CCA, AG, and called K. Nemish to pick up her copy.

8-28-98 Filed Opinion - Reversed and Remanded for New Trial

11-20-98 Filed Notice - Application for rehearing overruled.
          39(K) Motion Denied

| State of Alabama Unified Judicial System | CASE ACTION SUMMARY CONTINUATION | Case Number |
|---|---|---|
| Form C-7     Rev 2/79 | | CC-94-792     20 |

tyle:

Willie C. McCray

Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 6-15-99 | Filed Certificate of Judgment, Judgment is Reversed and REmanded for Futher Proceedings. |
| 6-17-99 | Case is to be transfered to formal trial calendar for it to be set As soon As it is ready for all parties to be retried — J. Taylor Judge |
| | 6-18-99 N: DA. K. Nemish |
| 6-22-99 | Motion To Withdraw. Motion to withdraw granted — Hon Tom |
| 6-24-99 | Smith Appointed new trial counsel — (notify) Judge |
| | (6-28-99 — N T3 KN DA) |
| 8-30-99 | Ex parte motion for extraordinary expenses for an investigator |
| 8-30-99 | Motion to proceed ex parte. |
| 9-3-99 | See Order on CC. 94-791 |
| 10-14-99 | Motion to Withdraw. |
| 10- | See Order on cc 94 791 |
| 11-8-99 | Motion To Withdraw . |
| 11-9-99 | Motion To Withdraw granted Hon. Tom Brantley, is allowed to withdraw, Hon. Chris Capps is appointed to represent Defendant. Notify J. Steele Judge |
| 11-10-99 | notfd T. Brantley, C Capps ENA |
| 11-12-99 | See Order on cc 94. 791. |
| 11-12-99 | Pick up Order. (In 1st File) |

CC-1994-792    Willie C. McCray                                    21

12-21-999  Case set for ~~hearing~~ Trial during the April 10th, 2000 Criminal Term of Court.

12-29-99 N: DA, CC, TB. JB                          /s/ L. Little , Judge

( 1-24-2000-N-PATSY)


2-2-2000    Motion for a Bond hearing.

2-3-2000  Motion set for April 6, 2000 of 9 AM -
                Notify - (for Judge)
            (2-4-2000-N- CC, DA).

3-9-00  Case rescheduled for trial on
            5-15-2000 at 9 AM. Notify.  /s/ Judge
        (3-13-2000-N-CC, DA, Patsy
                    & Judge)

5-2-2000--Motion for extraordinary expenses.

5-2-2000--Motion to continue trial.

May 3, 2000 - Motion for extraordinary expenses and
    Motion to continue granted. Notify.    Clerk, Judge

5-4-2000 Uncert C. Capps + DA
June 13, 2000 - Motion to release Christopher Capps
    of appointment denied. Notify.    Clerk, Judge
June 14, 2000 - To Clarify order of June 13 -
    Defendant will be allowed to proceed pro
    se but Mr Capps will not be relieved.
    Mr Capps will continue to advise defendant
    throughout trial.   Notify.    Clerk, Judge
        (6-14-2000-N-CC, DA, Deft at Jail) and Clerk J
August 8, 2000 - Motion for bond reduction denied Clerk J
            (8-10-2000-N-CC, DA
                & Deft at Jail)
8-9-2000 Order for Deft to Receive a copy of
    Transcript at State Expense. (In St file)
Sept 12, 2000 - Case set for trial Oct 23, 2000. Notify

ACR0367    A L A B A M A    J U D I C I A L    I N F O R M A T I O N    C E N T E R    22

## CASE ACTION SUMMARY
### CONTINUATION

CASE: CC 1994 000792.00
JUDGE ID:   JMW

~TE OF ALABAMA                        VS    MCCRAY WILLIE C

DATE                ACTION, JUDGMENTS, CASE NOTES

9-13-2000 - Motion To Suppress

8-31-2000 - Motion for Discovery of Information
Necessary to Receive a Fair Trial.

Sept 19 2000 - *illegible handwriting*

(9-20-2000 D - C.C. D.A. Deft at Jail)

9-6-2000     Motion to reveal the Identity of Informants and reveal any deals, promises,
             or Inducements

9-7-2000     Motion to inspect, examine, and test all physical evidence

Sept 26, 2000 *illegible handwriting*
(9-29-2000 D - CC DA)

October 4, 2000 - *illegible handwriting*

10-5-2000  *illegible* Capps, DA + deft at Jail

October 23, 2000 - *illegible handwriting*

(over)

October 24 2000

Defendant heretofore having been indicted and arraigned upon an indictment on a charge of _Theft of Property_ 1st degree and heretofore having plead not guilty thereto, issue joined on said plea. Thereupon comes a jury of good and lawful men and women, to-wit, _Margie Wade_, and eleven others, who being duly empanelled, sworn and charged by the Court according to law, before whom the trial of this cause was entered upon and continued from day to day and from time to time, said Defendant, being in open Court with his attorney at each and every stage and during all the proceedings in this cause, now on this date said jurors upon their oaths do say:

"WE, THE JURY, FIND THE DEFENDANT GUILTY OF _Theft of Property 1st degree_ ~~Felony~~ ~~Surrender~~

AS CHARGED IN THE INDICTMENT."

_____
JUDGE

October 24, 2000

In accordance with the verdict of the Jury, Defendant is hereby adjudged guilty of _Theft of Property_ 1st degree as charged in the indictment. Defendant being asked if he had anything to say why the sentence of law should not be pronounced upon him, the Defendant says nothing but ~~pre-sentence report is requested~~ by _and requests immediate sentencing_

~~Hearing set for_____ 19___ at____ M.~~

_____
JUDGE

October 24, 2000

The Court therefore adjudges the Defendant guilty of _1st degree Theft of Property 1st degree_

The Defendant and his Attorney being in open Court and being asked by the Court if he has anything to say why the sentence of Law should not be pronounced upon him says nothing. It is therefore considered by the Court and it is the judgement and sentence of the Court that this Defendant be imprisoned in the penitentiary of the State of Alabama for a period of _20 years_ Defendant is further ordered to pay a Fine of _$10,050_ ~~restitution in the amount of_____ to___~~, and a victim compensation assessment of _$50.00_, Defendant is given credit for days ~~spent~~ incarcerated pending trial.

_____
JUDGE

24

ACR0369  A L A B A M A   J U D I C I A L   I N F O R M A T I O N   C E N T E R

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 1994 000792.00
JUDGE ID: JMW

STATE OF ALABAMA                    VS    MCCRAY WILLIE C

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|------------------------------|
| | *October 24 2000. Defendant gives notice of appeal. Defendant allowed free transcript. Chris Capps appointed to represent defendant on appeal. No bail. Jimmy M White Judge* |
| 10-26-2000 | PENITENTIARY TRANSCRIPT MAILED TO DOC |
| 10-31-00 | *See Order on CC-94-791 (See Order appt Joe Lewis on file* |
| 11-1-00 | N: CCA, AG, DA, CR, Deft, C Capps |
| 11-1-00 | Mailed Clerk's Notice of Appeal to CCA, AG, DA, CR, Deft, and Chris Capps. *+ Joe Lewis* |
| | *Nov 21 2000. Motion for new trial continued to Dec 14, 2000, 9:00 A.M. White, Judge* |
| 11-21-00 | N: CCA, AG, DA, Dft, CC |
| | *December 14 2000 — Motion for new trial denied. White, Judge* |
| 12-14-00 | Notified: D.A, Deft, Atty Joe Lewis, A.G, CCA, CK |
| 2/8/01 | Request and Order for Time Extension |
| 3/8/01 | Request for Time Extension |
| 4/5/01 | Request for Time Extension |

Grand Jury No. ___169___                                    Case No. _CC-94-791_

---

**INDICTMENT**

The State of Alabama }                    CIRCUIT COURT
HOUSTON COUNTY                    TWENTIETH JUDICIAL CIRCUIT

                                    August     Term, 19 94

   The grand jury of said county charge that, before the finding of the indictment,

   Willie C. McCray

whose name is otherwise unknown to the Grand Jury,

   did ~~intentionally~~ cause the death of Michael Scott by shooting

   him in the face and causing his death at the time he was in the

   course of committing a robbery, the property of Higdon Grocery

   Company, Inc., a corporation, doing business as Country Market,

   in violation of 13A-5-40 (a) 2 of the Code of Alabama, against
                         6 (a) 3
   the peace and dignity of the State of Alabama.


                                    Douglas Albert Valeska
                                    District Attorney

---

THE STATE OF ALABAMA
Houston County

THE CIRCUIT COURT

Twentieth Judicial Circuit

THE STATE
vs.

Willie C. McCray

S.I.D. No.

D.A.

CAPITAL MURDER

Witnesses:     Stan Devane
               PD
               Dothan, Al   93 08 3593

               Jeff Clark
               1809 S Oates # 1706
               Dothan, Al

               Debbie Shelton
               1702 Alexander Dr
               Dothan, Al

               Linda Hughes
               419 E Main
               Dothan, Al

               Billy McBride
               419 E Main
               Dothan, Al

               (Over)

Continued Witnesses

Marietta Prevost
ABI
Motgomery, Al    09  1156. 1293

#169

## A TRUE BILL

_____
Foreman of the Grand Jury

Presented to the presiding Judge in open court
foreman of the Grand Jury, in the presence of
14    Grand Jurors and filed in open
court by order of the court on this the 2nd
day of September , 19 94 .

_____ Clerk

## INDICTMENT

### NO PROSECUTOR

Upon the arrest of Defendant let him be
admitted to bail on giving bond in the sum of

No Bond _____ Dollars
with security to be approved by the Sheriff.

This 2nd day of Sept 19 94

_____
Judge Presiding

Grand Jury No. _____170_____

Case No. _AC-94-992_

---

## INDICTMENT

The State of Alabama }
HOUSTON COUNTY }

CIRCUIT COURT     27
TWENTIETH JUDICIAL CIRCUIT

August     Term, 19 94

The grand jury of said county charge that, before the finding of the indictment,

Willie C. McCray

whose name is otherwise unknown to the Grand Jury,

did knowingly obtain or exert unauthorized control over a motor vehicle, to-wit: 1984 Chevrolet Monte Carlo, the property of Frank Edwards with the intent to deprive the owner of said motor vehicle, in violation of 13A-8-3 of the Code of Alabama, against the peace and dignity of the State of Alabama.

Douglas Albert Valeska
District Attorney

---

THE STATE OF ALABAMA
Houston County

THE CIRCUIT COURT

Twentieth Judicial Circuit

THE STATE

vs.

Willie C. McCray

S.I.D. No.

D.A.

THEFT OF PROPERTY, 1ST DEGREE

Witnesses:     Frank Edwards
815 S Appletree
Dothan, Al

Stan Devane
PD
Dothan, Al   93 08 02478

Marietta Prevost
ABI
Montgomery, Al

#170

## A TRUE BILL

_[signature]_

Foreman of the Grand Jury

Presented to the presiding Judge in open court
foreman of the Grand Jury, in the presence of
the Grand Jurors and filed in open
court by order of the court on this the 2nd
day of _September_, 19 __.

_[signature]_ Clerk

## INDICTMENT

### NO PROSECUTOR

Upon the arrest of Defendant let him be
admitted to bail on giving bond in the sum of

_750_ Dollars

with security to be approved by the Sheriff.

This _2nd_ day of _Sept._ 19 __

_[signature]_

Judge Presiding

29

THE STATE OF ALABAMA —— JUDICIAL DEPARTMENT

THE COURT OF CRIMINAL APPEALS

CERTIFICATE OF JUDGMENT

Criminal Appeals Case CR-95-0015

Willie C. McCray v. State of Alabama (Appeal from Houston Circuit Court: CC-94-791; CC-94-792).

Whereas, the Record and Proceedings of the Circuit Court of said County, in a certain cause lately pending in said Court between Willie C. McCray, Appellant and the State of Alabama, Appellee, wherein by said Court, it was considered adversely to said appellant, were appealed to the Court of Criminal Appeals.

Now, the appeal in this cause having been duly submitted and considered, it is hereby certified that on the 28th day of August, 1998, the judgment of the court below is reversed and the cause remanded for further proceedings.

Witness, Lane W. Mann, Clerk,
Court of Criminal Appeals, this
11th day of June, 1999

Clerk
Court of Criminal Appeals
State of Alabama

**FILED**

JUN 1 5 1999

JUDY BYRD, CLERK
HOUSTON CO., AL

30

| 6-17-88 | Case is to be transferred to formal trial calendar for it to be set As soon As it is ready for all parties to be retried — [signature] |

31

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | IN THE CIRCUIT COURT OF |
| | ) | |
| PLAINTIFF, | ) | HOUSTON COUNTY, ALABAMA. |
| | ) | |
| VS. | ) | CRIMINAL DIVISION |
| | ) | |
| WILLIE C. MCCRAY, | ) | CASE ACTION CC 94-791 |
| | ) | CC 94-792 |
| DEFENDANT. | ) | |

## ORDER

TO:  LAMAR GLOVER, HOUSTON COUNTY SHERIFF

AND THE STATE OF ALABAMA, BOARD OF CORRECTIONS

You are hereby requested to pickup and transport, WILLIE C. MCCRAY, confined by the Board of Corrections under safe and secure conduct to the Circuit Court of Houston County, Alabama, at Dothan, for the following purpose:  For the Defendant to be held in the Houston County Jail until trial date is scheduled.

Immediately afterward, you are requested to arrange for the transport of the above-named person back into the custody of the Board of Corrections, State of Alabama.

DONE AND ORDERED this the 21st day of June, 1999.

FILED

JUN 2 1 1999

JUDY BYRD, CLERK
HOUSTON CO., AL

C. LAWSON LITTLE, CIRCUIT JUDGE
20th JUDICIAL CIRCUIT OF ALABAMA

6-21-99
copy to So.
Bd Corr
K N.

*q. 16* 32

| | |
|---|---|
| STATE OF ALABAMA | * IN THE CIRCUIT COURT FOR |
| Plaintiff, | * HOUSTON COUNTY, ALABAMA |
| vs. | * |
| WILLIE C. MCCRAY, | * CRIMINAL DIVISION |
| Defendant. | * CASE NO. CC-94-791/792 |

## MOTION TO WITHDRAW

COMES NOW, KATHLEEN M. NEMISH, the undersigned attorney, and files this Motion to Withdraw, and as grounds therefor, states as follows:

1.    The undersigned was appointed by this Court to represent the defendant, WILLIE C. MCCRAY in his appeal of the above-styled cause;

2.    The Court of Criminal Appeals on August 28, 1998, issued its Judgment reversing and remanding this matter to the Houston County Circuit Court for further proceedings.

WHEREFORE, the undersigned prays this Honorable Court will enter an Order allowing her to withdraw as attorney of record for the Defendant in the above-styled cause.

Respectfully submitted this 22nd day of June, 1999.

**FILED**

JUN 22 1999

*JUDY BYRD, CLERK*
*HOUSTON CO., AL*

KATHLEEN M. NEMISH (NEM-001)
Attorney for Defendant
207 W. Troy Street
Dothan, Alabama 36303
(334) 793-7771

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing has been furnished to the District Attorney by placing a copy of same in his box at the Houston County Courthouse, and by U. S. Mail to the Defendant, properly addressed and postage prepaid, this 22nd day of June, 1999.

33

6-24-59 Motion to Withdraw granted - Hon Tom
Smith is appointed as new trial counsel - ratify

_State Judge_

IN THE CIRCUIT COURT OF HOUSTON COUNTY

| | | |
|---|---|---|
| STATE OF ALABAMA | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | CC-94-791, 792 |
| | ) | |
| WILLIE C. MCCRAY | ) | |
| DEFENDANT. | ) | |

## EX PARTE MOTION FOR EXTRAORDINARY EXPENSES
## FOR AN INVESTIGATOR

COMES NOW the Defendant by and through his undersigned counsel, and moves this Honorable Court pursuant to the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I. § § 1, 5, 6, 7, 8, 9, 11, 13, 15 & 16 of the Alabama Constitution and applicable state law, for an order authorizing the expenditure of extraordinary expenses to secure investigative services and expenses, subject to application for additional funds if needed:

In support of said motion the Defense shows the following to this Honorable Court:

a.    The Defendant has been charged with Capital Murder and Theft of Property First Degree.

b.    The Defendant will receive the Death Penalty if convicted.

c.    The circumstances of this alleged crime have been investigated by the local authorities and will include employment of state and possibly federal agencies, including employment of experts on the local, state, and federal level if the District Attorney sees fit.

d.    The State has relied and will rely in the future on the evidence gathered by the State investigators, and the District Attorney will be able to consult with their investigators as he sees fit. However, because of the Defendant's indigence, his attorney will not have the advantage nor will the Defendant have any way to meet or to counteract this advantage.

e.    That the Defendant has been determined indigent by this Honorable Court.

f.    In order for him to receive a full and fair trial of all relevant issues in his case, the Defendant requires the services of an investigator, as well as expenses for such investigation as may be conducted by counsel.

g.    That defense counsel has an ethical, legal and constitutional duty to conduct a

36

thorough inquiry into all aspects of this case. In order to do this, a comprehensive investigation must be undertaken and records and other documentary evidence must be obtained. Because the Defendant is indigent, the investigation required by law can be undertaken and completed only upon allocation of adequate resources by this Honorable Court.

h.   That time constraints place a heavy burden on the undersigned counsel and could substantially prejudice the Defense if counsel has to investigate all aspects of this case himself. Counsel is a sole practitioner and as such is responsible to his other clients and must maintain his business to stay in practice.

i.   Defense counsel does not have the expertise in criminal investigation work to investigate the facts and circumstances surrounding the alleged crime with which the Defendant is charged. Because of the large number of legal issues that must be researched and possibly briefed, defense counsel does not have time to locate and interview all of the potential witnesses that will be essential to providing the Defendant with an adequate defense. If the Defendant were not indigent, his attorney would advise the hiring of such an expert.

j.   There are witnesses to be located and interviewed as well as a through investigation into the crime scene and the manner of State's investigation. This case is expected to require a trial. In the event of trial, an investigator will be essential in keeping the volume of information and witnesses organized for the Defense.

k.   That the services of an investigator are the most cost-effective way to conduct the investigation. The investigator can locate and interview witnesses at a lower hourly rate than would be paid to an attorney.

l.   That preparation for the trial of this case requires investigation not only the circumstances of the alleged crime and the alleged role played by the Defendant, but also the facts and circumstances surrounding the Defendant's arrest.

m.   That in accordance with the mandates of *Dubose v. State*, 662 So.2d 1189 (Ala. 1995) and *Ake v. Oklahoma*, 470 U.S. 68 (1985), as well as the law already set forth in this motion, it is apparent that the Defendant has a constitutional right to assistance of an investigator. The principles of *Ake* flow from the underlying tenet of equal protection clause, expressed over thirty years ago when stated in *Griffin v. Illinois*, 351 U.S. 12, 19 (1956), the late Mr. Justice Black of Alabama, in announcing the Court's judgement wrote:

" In criminal trials a State can no more discriminate on account of poverty than on account of religion race or color. Plainly, the ability to pay costs in advance bears no rational relationship on the Defendant's guilt or innocence and could not be used as an excuse to deprive a defendant of a fair trial.... There can be no equal

justice when the kind of trial a man gets depends on the amount of money he has."

n.    The State of Alabama grants an accused the right to put forth a defense. It would be constitutional error to refuse to allow the defendant to present as complete an adequate a defense as a more prosperous defendant solely because of his inability to hire an expert investigator. See *Bodie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L. Ed. 2d 130 (1971).

o.    That a person with financial means on trial with the possibility of receiving Life Without the Possibility of Parole would most certainly undertake the investigation outlined herein in order to properly prepare and present his case.

WHEREFORE, premises considered, the Defendant respectfully requests the following relief:

a.    that he be allowed to proceed on the motion *ex parte*;

c.    that this Honorable Court enter an order granting this motion;

d.    that this Honorable Court grant any other relief that is just and proper under the circumstances of this motion.

The Defendant demands a hearing on this motion, should the Court desire proof of the allegations set forth and adequate time for the defense to hire an investigator should the Defendant's motion be granted.

Requested on this the ___ day of _____, 1999.

**FILED**

AUG 30 1999

Judy Byrd
Houston Co., AL

Thomas S. Smith
Attorney for Defendant
188 N. Foster St., Suite 101
Dothan, AL 36303
(334)702-1744

## CERTIFICATE OF NONSERVICE

The undersigned hereby certifies that a copy of the foregoing was **not served** upon the District Attorney on this the ___ day of _____, 1999.

Thomas S. Smith

IN THE CIRCUIT COURT OF HOUSTON COUNTY

37

| | |
|---|---|
| STATE OF ALABAMA | ) |
| PLAINTIFF, | ) |
| | ) |
| VS. | )    CC-94-791, 792 |
| | ) |
| WILLIE C. MCCRAY | ) |
| DEFENDANT. | ) |

### MOTION TO PROCEED EX PARTE

COMES NOW the attorney for Defendant and requests that he be allowed to proceed ex parte in seeking approval of the attached motion.

Requested on this the ___ 28th day of _August_, 1999.

Thomas S. Smith
Attorney for Defendant
188 N. Foster St., Suite 101
Dothan, AL 36303
(334) 702-1744

### CERTIFICATE OF NONSERVICE

The undersigned hereby certifies that a copy of the foregoing was **not served** upon the District Attorney on this the 28th day of _August_, 1999.

Thomas S. Smith

FILED

AUG 3 0 1999

Judy Byrd, CLERK
HOUSTON CO., AL

pending

38

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

| | |
|---|---|
| SATE OF ALABAMA<br>    PLAINTIFF, | )<br>)<br>) |
| VS. | )<br>)   CC-94-791, 792<br>) |
| WILLIE C. MCCRAY<br>    DEFENDANT. | )<br>) |

ORDER FOR
EXTRAORDINARY EXPENSES
FOR AN INVESTIGATOR

    Defendant's Ex Parte Motion For Extraordinary Expenses For an Investigator as requested has been taken into consideration, and it is due to be granted. It is hereby Ordered that the Defendant be granted extraordinary expenses for an investigator.

    Done on this the 3 day of Sept, 1999.

_____
Circuit Judge

39

| 9-3-99 | Above Motions are granted - Notify - [signature] |

✓ 40

| | |
|---|---|
| STATE OF ALABAMA | ) IN THE CIRCUIT COURT OF |
| PLAINTIFF | ) HOUSTON COUNTY, ALABAMA |
| | ) |
| VS. | ) CASE NO.  CC-94-791, 792 |
| | ) |
| WILLIE C. MCCRAY | ) |
| DEFENDANT. | ) |

## MOTION TO WITHDRAW

COMES NOW, Thomas S. Smith, appointed counsel for the above Defendant, pursuant to Rule 6.2, *ARCr.P*, and moves this Honorable Court to allow him to withdraw as appoined counsel and in support hereof shows as follows:

1.  Counsel and the Defendant have basic differences as to the strategy and philosophy in the preparation and execution of the defense in this case.

WHEREFORE, counsel request that this Honorable Court allow him to withdraw.

**FILED**

OCT 1 4 1999

*Judy Byrd*
JUDY BYRD, CLERK
HOUSTON CO., AL

Thomas S. Smith, SMI-183
Attorney for Defendant
188 N. Foster St., Suite 101
Dothan, Alabama  36303
(334) 702-1744

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing on the District Attorney's Office by delivering a copy of the same to his box located in the Houston County Courthouse this the 14th day of *October* , 1999.

Thomas S. Smith

12-13-99 at 8:30AM
CLL

41

| 10-28-99 | Motion to withdraw is granted. Hon. |
| | Tom Bratley is appointed to ellig for |
| | Deft - Notify - Hall Judge |

42

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | IN THE CIRCUIT COURT OF |
| | ) | |
| PLAINTIFF, | ) | HOUSTON COUNTY, ALABAMA |
| | ) | |
| VS. | ) | CRIMINAL DIVISION |
| | ) | |
| WILLIE C. MCCRAY, | ) | CASE NUMBER CC-94-791, 792 |
| | ) | |
| DEFENDANT. | ) | |

## MOTION TO WITHDRAW

COMES NOW the undersigned counsel and hereby moves this Honorable Court for an Order allowing him to withdraw as counsel for the Defendant; and, as grounds therefore would show:

1.  That the undersigned counsel has represented Karen Scott, the wife of the deceased victim in this case, in an unrelated matter in the past;

2.  That therefore a conflict exists.

WHEREFORE, premises considered, the undersigned counsel prays that Your Honor will grant this motion for the grounds stated.

Respectfully submitted,

**THOMAS K. BRANTLEY, P.C.**

**THOMAS K. BRANTLEY**
**BRA040**
**OF COUNSEL**
**401 NORTH FOSTER STREET**
**DOTHAN, ALABAMA 36303**
**(334) 793-9009**

FILED

NOV 08 1999

JUDY BYRD CLERK
HOUSTON CO., AL

43

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing Motion upon the Honorable Douglas Valeska, District Attorney, by placing a copy of same in the United States Mail, properly addressed and postage prepaid, on this the __5__ day of _____,
1999.

_____
OF COUNSEL

44

1-9-99 - Motion to Withdraw granted
Hon Tom Brantley is allowed
to withdraw. Hon Chris Capps
is appointed as Defendant's
counsel. Notified ___ L. Stahl, Judge

45

1-12-99   Request for Speedy Trial is set for
Dec 21, 1999 at 9 Am - Notify - [signature]

46

IN THE CIRCUIT COURT FOR THE
COUNTY OF HOUSTON
STATE OF ALABAMA
CRIMINAL DIVISION

STATE OF ALABAMA      *
     PLAINTIFF      *

VS               *      CASE NO. CC-94-791
                           CC-94-792

WILLIE C. MCCRAY      *
     DEFENDANT.      *

TO:   LAMAR GLOVER, HOUSTON COUNTY SHERIFF

     AND THE STATE OF ALABAMA, BOARD OF CORRECTIONS

     You are hereby requested to pickup and transport, WILLIE C.
MCCRAY, confined by the Board of Corrections under safe and
secure conduct to the Circuit Court of Houston County, Alabama,at
Dothan, for the following purpose: For the Defendant to attend a
scheduled hearing before this Court on DECEMBER 21, 1999 at 9:00
a.m.

     Immediately afterward, you are requested to arrange for the
transport of the above-named person back into the custody of the
Board of Corrections, State of Alabama.

     DONE AND ORDERED this the 12th day of November, 1999.

                         C. LAWSON LITTLE, CIRCUIT JUDGE
                         20th JUDICIAL CIRCUIT OF ALABAMA

12-99 Pick up Order (On File)

12-21-99    Case set for hearing during the April 10th, 2000 criminal
            term of court.

48

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA                    *

vs.                                 *

WILLIE C. McCRAY                    *

      Defendant.                 *      Case No. CC-94-791

## DEFENDANT'S REQUEST FOR EXTRAORDINARY EXPENSES -- INVESTIGATOR

Comes now the defendant and moves the Court to require the State of Alabama to provide

the defendant's counsel with adequate funds with which to hire an investigator trained in criminal

work to aid the defendant's counsel in the preparation of his defense. The amount of funds needed

will vary from a low estimation of $1,000.00 to a high estimation of $2,000.00, depending on the

amount of work necessary. The defendant sets forth following grounds in support of his motion:

      1.     The defendant is an indigent incarcerated and awaiting trial in the jail of Houston

County, Alabama.

      2.     The defendant is charged with Murder.  Important evidence will be lost if funds are

not approved for the hiring of a criminal investigator to begin gathering evidence for defendant's

defense.

      3.     Numerous pieces of physical evidence have been turned over to the state crime

laboratory. This evidence has a bearing, directly and indirectly, on the guilt or innocence of the

defendant.

      4.     The defendant currently has on file an affidavit of substantial hardship.  If the

defendant were not an indigent and could afford to hire a private criminal investigator, his attorney

would advise the hiring of such an expert. Only with the use of an expert criminal investigator can the defendant obtain an adequate defense and a fair trial.

     5.     The State of Alabama has had a large number of criminal investigators investigating the alleged crime, taking statements from witnesses and has submitted numerous pieces of physical evidence to chemists, micro analysts, and other specialists for analysis. Many of these experts will be subpoenaed as witnesses for the State. Many of these witnesses are located in widely disparate areas of Alabama.

     The State has relied and will rely in the future on the evidence gathered by the State investigators, whereas, because of the defendant's indigence, his attorney will not have this advantage nor will the defendant have any way to meet or to counteract this advantage.

     6.     *Griffin v. Illinois*, 351 U. S. 12, 76 S. Ct. 585, 100 L. Ed. 2d 891 (1956), is the cornerstone of the constitutional right of the accused to be free from financial circumstances which would hinder his defense. There the late Mr. Justice Black of Alabama, in announcing the Court's judgment, wrote:

> In criminal trials a State can no more discriminate on account of poverty than on account of religion, race, or color. Plainly, the ability to pay costs in advance bears no rational relationship to a defendant's guilt or innocence and could not be used as an excuse to deprive a defendant of a fair trial. . . . There can be no equal justice where the kind of trial a man gets depends on the amount of money he has. Id., at 17-19.

     The State of Alabama grants an accused the right to put forth a defense. It would be constitutional error to refuse to allow the defendant to present as complete and adequate a defense as a more prosperous defendant solely because of his inability to hire an expert investigator. See *Bodie v. Connecticut*, 401 U. S. 371, 91 S. Ct. 780, 28 L. Ed. 2d 113 (1971); *Tate v. Short*, 401 U. S. 395, 91 S. Ct. 668, 28 L. Ed. 2d 130 (1971).

Wherefore the defendant requests the Court approve extraordinary expenses in the amount of $2,000.00 for the hiring of a criminal investigator or in the alternative demands a hearing on this motion, should the Court desire proof of the allegations set forth to allow adequate time for the defendant's attorney to hire an investigator should the defendant's motion be granted.

Respectfully submitted,

J. Christopher Capps (CAP-006)
Attorney at Law

207 West Troy Street
Dothan, Alabama 36303
(334) 793-7771

**FILED**

FEB 2 2000

JUDY BYRD, CLERK
HOUSTON CO., ALA.

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the District Attorney by placing a copy of same in his box in the Houston County Courthouse this the 1st day of February, 2000.

Of Counsel

51

# IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA | * | |
| vs. | * | |
| WILLIE C. McCRAY | * | |
| Defendant. | * | Case No. CC-94-791 |

## MOTION FOR A BOND HEARING

The attorney for the defendant in the above cause respectfully asks this Honorable Court to set a bond for the defendant. The charge in this case is Murder and no bond has been set for the defendant.

1.    The defendant requests a hearing be set in this matter as he has been incarcerated in the Houston County Jail since on or about **October 4, 1993**.

**FILED**

FEB 2 2000

*Judy Byrd*
JUDY BYRD, CLERK
HOUSTON CO., AL.

Respectfully submitted,

*J. Christopher Capps*

J. Christopher Capps (CAP-006)
Attorney at Law

207 West Troy Street
Dothan, Alabama 36303
(334) 793-7771

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the District Attorney by placing a copy of same in his box in the Houston County Courthouse this the 1st day of February, 2000.

*J. Christopher Capps*

Of Counsel

52

2-3-2000 Motion set for April 6, 2000 of 9 AM —
Notify - [illegible] Judge
[illegible]

## IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

| | |
|---|---|
| STATE OF ALABAMA,<br>　　　Plaintiff, | * |
| | * |
| | * |
| vs. | *　　CASE NO. CC-94-791 |
| | * |
| WILLIE C. McCRAY, | * |
| 　　　Defendant. | * |

### MOTION FOR COMPLETE RECORDING AND
### TRANSCRIPT OF ALL PROCEEDING

     **COMES NOW** the Defendant, **WILLIE C. McCRAY**, in the above stated case, and moves the Court for an Order directing the Court Reporter to take down and record all hearings on all motions, the arraignment, all objections, all bench conferences, all jury voir dire, opening statements, closing arguments, all testimony and each and every proceeding involved in pre-trial and trial in the above stated case, including all conferences held between the District Attorney of the State of Alabama and any Circuit Court Judges concerning the above entitled case when the defendant or defense counsel is not present; and

     Defendant further requests that the Occupation List of the Jury Venire and the Clerk's Strike List each be made a part of the record.

**FILED**

FEB 0 3 2000

JUDY BYRD, CLERK
HOUSTON CO., AL

_J. Christopher Capps_
**J. CHRISTOPHER CAPPS (CAP006)**
**ATTORNEY FOR THE DEFENDANT**
**207 W. TROY STREET**
**DOTHAN, ALABAMA 36303**
**(334) 793-7771**

### CERTIFICATE OF SERVICE

     I hereby certify that I have served the District Attorney, Doug Valeska, attorney for the State, with a copy of the foregoing Motion for Complete Recording by hand-delivering a copy of the same to his office in the Houston County Courthouse, on this the 2nd day of February, 2000.

_J. Christopher Capps_
**OF COUNSEL**

54

-8-200. Motion for Complete recording is granted -

55

3-9-2000 - Case rescheduled for trial on
5-15-2000 at 9:00 A.M. Notify
J. Kale, Judge

56

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,        *
    Plaintiff,        *
                         *
vs.                       *        CASE NO. CC-94-791
                         *
WILLIE C. McCRAY,         *
    Defendant.        *

## MOTION FOR RULING ON REQUEST FOR EXTRAORDINARY EXPENSES

    COMES NOW the Defendant, **WILLIE C. McCRAY,** in the above stated cause, and moves the Court for an Order allowing the undersigned to hire a private investigator in the above referenced matter and states the following:

    1.  That the undersigned filed a Request for Extraordinary Expenses on or about February 1, 2000.

    2.  That this case is set for trial on May 15, 2000, at 9:00, and further investigation is needed to adequately represent the Defendant.

    **WHEREFORE,** the undersigned prays that this Honorable court will grant his Request for Extraordinary Expenses so that investigation in this matter can begin immediately.

J. CHRISTOPHER CAPPS (CAP006)
ATTORNEY FOR THE DEFENDANT
207 W. TROY STREET
DOTHAN, ALABAMA 36303
(334) 793-7771

MAR 15 2000

## CERTIFICATE OF SERVICE

    I hereby certify that I have served the District Attorney, Doug Valeska, attorney for the State, with a copy of the foregoing Motion for Complete Recording by hand-delivering a copy of the same to his office in the Houston County Courthouse, on this the 15th day of March, 2000.

OF COUNSEL

57

3-20-2000 | Case to be heard on 5-15-2000 before
| Judge Jimmy White. Notify. J. Stark, Judge

58

March 21, 2000 - Motion for extraordinary expense
Granted.

59

April 16, 2000.    Bail Set at $500 000

## IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA,<br>　　　Plaintiff, | *<br>*<br>* | |
| vs. | *<br>* | CASE NO. CC-94-791 |
| WILLIE C. McCRAY,<br>　　　Defendant. | *<br>* | |

## MOTION FOR EXTRAORDINARY EXPENSES

COMES NOW the Defendant, **WILLIE C. McCRAY**, in the above-stated cause, and moves this Honorable Court to require the State of Alabama to provide the defendant's counsel with adequate funds with which to hire an independent fingerprint expert to review the latent fingerprints recovered from the crime scene with those known prints taken from the defendant. The defendant sets forth the following in support of this motion:

1.　　The defendant is indigent incarcerated in the Houston County jail.

2.　　The defendant is charged with the offense of Murder.

3.　　The defendant believes the State will introduce testimony from Marietta Prevost, a Certified Latent Print Examiner with the Alabama Bureau of Investigations.

4.　　The defendant is entitled to funds to hire an independent expert of his own choice to examine the fingerprints in this matter.

**WHEREFORE,** the undersigned prays this Honorable court will grant his Request for Extraordinary Expenses and order the State of Alabama to provide funds for said independent examination .

**FILED**

**MAY   2 2000**

**J. CHRISTOPHER CAPPS (CAP006)**
**ATTORNEY FOR THE DEFENDANT**
**207 W. TROY STREET**
**DOTHAN, ALABAMA 36303**
**(334) 793-7771**

## CERTIFICATE OF SERVICE

I hereby certify that I have served the District Attorney, Doug Valeska, attorney for the State, with a copy of the foregoing Motion for Extraordinary Expenses by hand-delivering a copy

61

of the same to his office in the Houston County Courthouse, on this the 2nd day of May, 2000.

_____
**OF COUNSEL**

62

## IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    *
      Plaintiff,                    *
                            *

vs.                    *    CASE NO. CC-94-791
                            *

WILLIE C. McCRAY,                    *
      Defendant.                    *

### MOTION TO CONTINUE TRIAL

    **COMES NOW** the Defendant, **WILLIE C. McCRAY**, in the above-stated cause, and moves this Honorable Court to continue the trial of this matter currently scheduled for May 15, 2000, and as grounds therefore states the following:

    1.     The defendant is charged with the offense of Murder.

    2.     The defendant believes the State will introduce testimony from Marietta Prevost, a Certified Latent Print Examiner with the Alabama Bureau of Investigations.

    3.     The defendant is in the process of retaining a latent print examiner to review the evidence in this matter.

    4.     That said independent examination will not be completed by the scheduled trial date.

    5.     That several witnesses have not yet been located and additional time is necessary to locate said witnesses.

    6.     That the State is not opposed to a continuance in this matter.

    **WHEREFORE**, the defendant prays this Honorable court will grant this motion and continue the trial of this matter until the next available trial term.

**FILED**

MAY 2 2000

JUDY BYRD, CLERK
HOUSTON CO., AL

*J. Christopher Capps*
**J. CHRISTOPHER CAPPS (CAP006)**
**ATTORNEY FOR THE DEFENDANT**
**207 W. TROY STREET**
**DOTHAN, ALABAMA 36303**
**(334) 793-7771**

63

## CERTIFICATE OF SERVICE

I hereby certify that I have served the District Attorney, Doug Valeska, attorney for the State, with a copy of the foregoing Motion to Continue by hand-delivering a copy of the same to his office in the Houston County Courthouse, on this the 2nd day of May, 2000.

OF COUNSEL

64

May 31 2000 - Motion for extraordinary expenses and
1 to continue trial granted. ____ Acting Judge

65

Aug 13 2000 - Motion to relieve Christopher
Copps of appointment denied. Notify.
Abt Judge

66

June 14, 2005 - To clarify order of June 13,
Defendant will be allowed to proceed pro
se but Mr. Capps will not be released,
Mr. Capps will continue
as standby defendant throughout trial. Notify
to advise defendant _____ White Judge

7-26-00

<u>In the Circuit Court In and for Houston County, Alabama.</u>

Willie C. McCray,
Petitioner,

:                Case No# CC-94-000791

    vs

State of Alabama,
Respondent,

Motion for Bond Reduction Hearing

Come now the aforsaid Petitioner, Pro'se, In the above style cause, and moves this honorable court with a written Notice for Bond Reduction  <u>Alabama Rules of Court.</u> Rule 7.72

Willie McCray

**FILED**

JUL 2 7 2000

Judy Byrd
JUDY BYRD, CLERK
HOUSTON CO., AL.

6

August 8, 2005, Motion for bond reduction denied. Holley, Colt, Judge

IN THE CIRCUIT COURT FOR THE
COUNTY OF HOUSTON
STATE OF ALABAMA

CRIMINAL DIVISION


STATE OF ALABAMA            *

    PLAINTIFF            *

VS                         *     CASE NO. CC-94-791, 792

WILLIE MCCRAY              *

    DEFENDANT.            *


# O R D E R


Upon the Defendant's request, the Court Reporter is directed to provide a transcript to the Defendant at the State's expense. The Clerk is directed to notify all parties and/or counsel of this Order.

Done this 3RD day of August , 2000.


FILED

AUG 9 2000

Judy Byrd
JUDY BYRD, CLERK
HOUSTON CO. AL

_____
C. LAWSON LITTLE, CIRCUIT JUDGE

(8-10-2000- to CC, DA
& Quer)

September 12, 2000. This case is hereby set
for trial on October 23, 2000. Notify Dept.
D.A. and Chris Capps.

Culita, Judge

FILED

AUG 31 2000

Judy Byrd
JUDY BYRD CLERK
HOUSTON CO., AL.

CC-94 791

State of Alabama,                In The Circuit Court of
                Plaintiff        *       Houston County, Alabama

    vs.                          *       Case no. CC-94-791-792

Willie McElroy,                  *
                Defendant.       *

Motion For Discovery of Information
Necessary To Receive A Fair Trial

Come now the defendant in the above case and moves this
Hon. court to take notice of the Following Reason, the
defendant Respectfully moves this Hon. court pursuant to
the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments
to the united States constitution, and Article 1, Sections 1, 5,
6, 7, 8, 9, 11, 13, 15, and 16 of the Alabama constitution to order
the following specific discovery of information necessary
to a fair trial, and any other discovery as this Honorable
court should deem necessary.

1. The names, addresses, and phone numbers of all persons
the prosecution proposes to offer as witnesses at the trial or
at any hearing of this case.
and any person with knowledge of any facts and circumstan-
ces surrounding the crime or the defendant.

2. The names and addresses of all persons who have given
recorded statements, or oral statements, to the prosecution or
any law enforcement officer, and complete copies of any state-
ment see Jurek v. Texas 428 U.S. 262, 276.

72

I need addresses and phones of all persons

1. Jebb Clark

2. Sara Dodson

3. Walter Shebbield

4. Danny Somes

5. Eric Gribbin

6. Lorenzo Martin

7. Keithland Reeves Jr.

8. Keithland Reeves Sr.

9. Officer Ron Cosgrove with the Gainesville Georgia Police Department member of the Gainesville S-W-A-T Team,

10. Larry Edwards and his sister at the corner of Johnson and Matt Street in Gainesville Georgia.

FILED

AUG 3 1 2000

Judy Byrd
RUDY BYRD, CLERK
HOUSTON CO. AL

Respect Fully Submitted

Willie McCray

Willie McCray

Houston County Jail

114 N. Oates Street

Dothan, Alabama. 36303

| State of Alabama | * | In The Circuit court of |
| Plaintiff | * | Houston County, Alabama |
| vs. | * | Case No. CC-94-791-792 |
| Willie McElray | * | |
| Defendant. | * | |

Motion To Suppress

Come now the defendant in the above case and moves this
Honorable court to suppress the know inked fingerprints of the
defendant which were obtained as the result of the unlawful stop
search, seizure and arrest of the Defendant in the State of Georgia.
and as grounds therefore shows as follows:

1. There was an illegal stop, search, seizure and arrest of the
Defendant while riding in an automobile that belong to
Darin Sutin who was present at the time. Mr. Sutin also
wrote the DA. office and told the Investigator that what every
was found in his car that he was Totaly responable for it.
And there was no traffic violation invaled that cause the illegal stop.

2. As a result of said illegal stop, search, seizure and arrest
the Defendant's fingerprints were obtained by officers in the
State of Georgia.

3. The illegally obtained fingerprints were then used as the
basis for the arrest in the above referenced case.

Wherefore the premises considered the Defendant respectfully
requests this Honorable court to suppress the illegally obtained
known inked fingerprints of the Defendant. The Defendant further
moves this Honorable court to Suppress any and all evidence

obtained subsequent to the use of said illegally of said illegally obtained evidence by the State of Alabama as being the "fruit of the poisonous tree".

Willie McCray

Filed: 9-12-2000
Judy Byrd, Clerk

Willie McCray
164 N. oatse Street
Dothan, Alabama. 36303

now the comes defendant and moves this Honorable court to issue a copy of so said motion to suppress to the Honorable Douglas A. Valeska, District Attorney of Houston County.

Dated this 5th day of September 2000

Willie McCray
of counsel

SEP       2000

75

September 19, 2000 - Motion for discovery granted.
Motion to Suppress will be heard prior to trial.
Chris Capps directed to assist Deft in whatever
way is needed, Oky motion of defendant Capps is heard
Counsel
White, Judge

State of Alabama            *        In The circuit court of
    Plaintiff           *        Houston county, Alabama
vs.                          *        Case no. CC-99-□ 791-792
Willie McCray               *
    Defendant.          *


## Motion to Reveal The Identity of Informants And Reveal Any Deals, Promises or Inducements

Comes now the defendant willie McCray requests this Honorable court for an order directing the state to reveal the identity of all confidential informant, to reveal any promises or understandings (explicit or implicit) with any witness or informant, and to reveal whether any threats or inducement of any mixture whatsoever have been made regarding any witness or informant. This motion is made pursuant to the Sixth, Eight and Fourteenth Amendments to the united States constitution, Rule 16 of the Alabama Rules of criminal Procedure and Article 1 sections 1, 5, 6, 7, 8, 9, 11, 13, 15, and 16 of the State constitution of Alabama, more specifically, the Defendant requests this court to order the State or reveal the following facts and information:

1. The full name and address of each confidential informant upon whose statements the investigation of the accused was predicated and all the ~~present~~ information ~~███████████~~ that was related to law enforcement officials.

2. All records, notes memoranda, and documents in the possession of the State relating to the grant of immunity, promises, consideration, threats or any other inducements to any individual to obtain information or testimony about this crime by the State and any of its law enforcement or other agencies.

Due process requires that the aforementioned items be revealed to the Defense Giglio v. United States, 405 U.S. 150 (1972); Napue v. Illinois, 360 U.S. 264 (1959); Brady v. Maryland, 373 U.S. 83 (1963) United States v. Pitt, 717 F.2d 1334 (11th cir. 1983) Ex parte momb 557 So.2d 832 (1989); Ex parte Geeslin, 505 So.2d 1246 (Ala. 1986).

Willie McCoy

164 N. octa St

Dothan, AL 36303

I Willie McCray, certify that a copy of the foregoing motion to Reveal The eldentity of Informants and Reveal any Deals. Promises or Inducements has Been furnished to the Houstion Co D.A.s office and to the circuit court clerk.

Dated this 5-th day of September, 2000

Respectfully Submitted

Willie McCoy

Petitioner, Pro Se

SEP 2000
FILED
Judy Byrd
JUDY BYRD, CLERK
HOUSTON CO., AL

| State of Alabama | * | In The circuit court of |
| Plaintiff | * | Houston county, Alabama |
| US: | * | Case no. CC-791-792 |
| Willie McCray | * | |
| Defendant. | * | |

### Motion To Inspect, Examine And Test all Physical Evidence

Come now the defendant, Willie McCray, requests this Honorable court to issue an order compelling the State of Alabama to produce all physical evidence in its possession and control, collected by the State and investigating officer.

The Defendant therefore requests that the court order the State to produce the physical evidence specified herein, with such production to be arranged with Willie McCray Within thirty days from this date, and set a reasonable time and place for the inspection, testing and photographing of the evidence.

1. All physical evidence in this case.

SEP 2000
FILED
JUDY BYRD, CLERK
HOUSTON CO., AL.

Willie McCray
164 N. Cotse Street
Dothan, Al. 36303

I, Willie McCray, certify that a copy of the forgoing Motion To Inspect, Examine And Test all physical Evidence has been furnished to the Houston co. D.A.S office and to the circuit court Clerke.

Dated this 6th day of September, 2000

Respectfully Submitted
Willie McCray
Petitioner, Pro-Se.

79

Sept 26, 2000. Motion to reveal identity of informant of any
etc. Granted. Motion to suppress granted on left
Cole, Judge

80

October 4. 2000. Christopher Coggs already appointed to represent defendant in this case. No additional attorney will be appointed. Notify.

White, Judge

81

### IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA
### CRIMINAL DIVISION

**STATE OF ALABAMA**                               *

**vs.**                                            *

**WILLIE C. McCRAY**                               *

        **Defendant.**                         *     **Case No. CC-94-791**


## MOTION TO CLARIFY APPOINTMENT OF COUNSEL

        Comes now, J. Christopher Capps, attorney and requests this Honorable Court clarify his appointment as counsel for the defendant, Willie C. McCray, and states the following:

    1.    The undersigned was appointed by this Court to represent the defendant, Willie C. McCray, November 9, 1999;

    2.    On or about June 13, 2000, the defendant, pro se, filed his motion to release the undersigned as court appointed counsel;

    3.    On or about June 14, 2000, the court ordered as follows, "Defendant will be allowed to proceed pro se but Mr. Capps will not be relieved. Mr. Capps will continue to advise defendant throughout trial ";

    4.    That since the Order of June 14, 2000, the defendant has proceeded pro se, acting as his own attorney;

    5.    The undersigned has made himself available to the defendant and has answered each and every request made by the defendant;

    6.    That on September 19, 2000, the court ordered the undersigned "to assist defendant in whatever manner needed";

    7.    That the undersigned received a letter dated September 29, 2000, from the defendant wherein the defendant indicated that it is impossible for him to represent himself and that he has filed two motions for counsel.

    8.    That the trial in this matter is scheduled for October 23, 2000, and the undersigned requests clarification as to the status of his appointment so he may be properly prepared for trial.

Wherefore the undersigned requests this Honorable Court clarify whether the defendant continues to represent himself in a pro se manner and if the undersigned remains advisory counsel only.

Respectfully submitted,

J. Christopher Capps (CAP-006)
Jackson, Rhodes, Moulton & Capps
P.O. Box 7122
Dothan, Alabama 36302
792-6213

**FILED**

OCT 5  2000

JUDY BYRD, CLERK
HOUSTON CO., AL.

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the District Attorney by placing a copy of same in his box in the Houston County Courthouse this the 4th day of October, 2000.

Of Counsel

83

October 10, 2005 - Chris _____ _____ will represent _____
at trial. _____ Attorney and take future motion to be filed by
_____ Attorney. _____ White, Judge

84

18-8/5/00. The Clerk of the Court jis, ordered to release non exhibits to the D.A. _A. Little_, Judge

85

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA
CRIMINAL DIVISION

STATE OF ALABAMA                    *

vs.                                 *

WILLIE C. McCRAY                    *

    Defendant.                      *       Case No. CC-94-791

**FILED**
OCT 19 2000
JUDY BYRD, CLERK
HOUSTON CO., AL

### DEFENDANT'S MOTION TO RELEASE TRIAL EXHIBITS

    **COMES NOW**, the Defendant, Willie C. McCray, and moves this Honorable Court for an

Order directing the Circuit Clerk to release Defendant's previously admitted trial exhibits to defense

counsel as same are necessary for the October 23, 2000, criminal jury trial.

                            Respectfully submitted,

                            J. Christopher Capps (CAP-006)
                            Jackson, Rhodes, Moulton & Capps
                            P.O. Box 7122
                            Dothan, Alabama 36302
                            792-6213

### CERTIFICATE OF SERVICE

    I hereby certify that I have served a copy of the foregoing upon the District Attorney by
placing a copy of same in his box in the Houston County Courthouse this the 18th day of October,
2000.

                            Of Counsel

| STATE OF ALABAMA | * | IN THE CIRCUIT COURT OF |
| V. | * | HOUSTON COUNTY, ALABAMA |
| WILLIE C. MCCRAY | * | CASE NO. CC 1994-791 |

## NOTICE TO DEFENDANT OF REQUEST FOR ADDITIONAL PENALTY

Comes now the State of Alabama, pursuant to §13A-5-6 of the Code of Alabama, and notifies the defendant that the State intends to seek an additional penalty for the commission of a felony in which a firearm or deadly weapon was used or attempted to be used.

This 23rd day of October 2000.

**FILED**

OCT 23 2000

*Judy Byrd*
JUDY BYRD, CLERK
HOUSTON CO., AL

Douglas Albert Valeska
Douglas Albert Valeska
District Attorney

## CERTIFICATE OF SERVICE

I, Douglas Albert Valeska, District Attorney, hereby certify that I have this date served a copy of the foregoing on Chris Capps, attorney for defendant, by handing him a copy of the same in open court on this 23rd day of October 2000.

Douglas Albert Valeska
Douglas Albert Valeska
District Attorney

87

A L A B A M A    J U D I C I A L    I N F O R M A T I O N    C E N T E R
CASE ACTION SUMMARY

October 23 2000 - Defendant moves for trial
jury to be Guarded under Baton vs
Kentucky. After hearing motion denied

88

STATE OF ALABAMA,                    *    IN THE CIRCUIT COURT OF

V.                                   *    HOUSTON COUNTY, ALABAMA

WILLIE C. MCCRAY                     *    CRIMINAL DIVISION

      DEFENDANT.                    *    CC-94-791
                                          CC-94-792

### DEFENDANT'S REQUESTED JURY INSTRUCTIONS

COMES NOW the Defendant, WILLIE C. MCCRAY, and respectfully requests this Court

to read the following Jury Charges to the Jury and to instruct the Jury that said charges are correct

propositions of law and should be considered by the Jury in their deliberations as part of the law in

this case.

I hereby certify that a true and correct copy of the attached Jury Charges have been served

upon Counsel for the State in open court this __24th__ day of OCTOBER, 2000.

J. CHRISTOPHER CAPPS
Attorney for Defendant

P.O. Box 7122
Dothan, Alabama  36302
(334) 792-6213

*89*

| | | |
|---|---|---|
| STATE OF ALABAMA, | * | IN THE CIRCUIT COURT OF |
| V. | * | HOUSTON COUNTY, ALABAMA |
| WILLIE C. MCCRAY, | * | CRIMINAL DIVISION |
| DEFENDANT. | * | CC-94-791 & 792 |

### REQUESTED INSTRUCTION #1

I charge you, members of the jury, based on the evidence, you must find WILLIE C.
MCCRAY not guilty.

GIVEN  _____            REFUSED  ___✓___

*Albritton, Judge*

90

STATE OF ALABAMA,                 *    IN THE CIRCUIT COURT OF

V.                                *    HOUSTON COUNTY, ALABAMA

WILLIE C. MCCRAY,                 *    CRIMINAL DIVISION

　　　　DEFENDANT.                 *    CC-94-791 & 792

## REQUESTED INSTRUCTION #2

　　　I further charge you that, if you believe the evidence, you must find WILLIE C. MCCRAY

not guilty.

GIVEN _____               REFUSED _____

_White, Judge_

91

STATE OF ALABAMA                    *    IN THE CIRCUIT COURT OF

V.                                  *    HOUSTON COUNTY, ALABAMA

WILLIE C. MCCRAY,                   *    CRIMINAL DIVISION

      DEFENDANT.                    *    CC-94-791 & 792

### REQUESTED INSTRUCTION #3

Circumstances, no matter how strong, which merely arouse a suspicion of guilt cannot serve

as a basis for convicting WILLIE C. MCCRAY.

GIVEN _____✓_____              REFUSED _____

White, Judge

92

| | | |
|---|---|---|
| STATE OF ALABAMA | * | IN THE CIRCUIT COURT OF |
| V. | * | HOUSTON COUNTY, ALABAMA |
| WILLIE C. MCCRAY, | * | CRIMINAL DIVISION |
| DEFENDANT. | * | CC-94-791 & 792 |

## REQUESTED INSTRUCTION #4

Circumstances merely consistent with guilt or causing suspicion thereof are insufficient to justify conviction of WILLIE C. MCCRAY.

GIVEN _____✓_____          REFUSED _____

*White, Judge*

93

STATE OF ALABAMA                    *    IN THE CIRCUIT COURT OF

V.                                  *    HOUSTON COUNTY, ALABAMA

WILLIE C. MCCRAY,                   *    CRIMINAL DIVISION

      DEFENDANT.              *    CC-94-791 & 792

### REQUESTED INSTRUCTION #5

Members of the jury, for circumstantial evidence to be sufficient to justify a conviction, the circumstances proved must not only be consistent with the hypothesis that the Defendant is guilty but inconsistent with the hypothesis that WILLIE C. MCCRAY is innocent, and inconsistent with every other rational hypothesis except that of guilt.

GIVEN ____✓____                     REFUSED _____

                                                                _White, Judge_

| | | |
|---|---|---|
| STATE OF ALABAMA | * | IN THE CIRCUIT COURT OF |
| V. | * | HOUSTON COUNTY, ALABAMA |
| WILLIE C. MCCRAY, | * | CRIMINAL DIVISION |
| DEFENDANT. | * | CC-94-791 & 792 |

## REQUESTED INSTRUCTION #6

You cannot convict WILLIE C. MCCRAY on mere possibilities, surmise, suspicion, or speculation, however strong they may be. A verdict of guilty based upon mere possibilities, surmise, suspicion or speculation, would violate the oath that you the members of this jury have taken. If, after carefully and fairly reviewing the facts, you are not satisfied of WILLIE C. MCCRAY's guilt, then you have a reasonable doubt and WILLIE C. MCCRAY should be found not guilty.

GIVEN _✓_____          REFUSED _____

_White, Judge_

95

| STATE OF ALABAMA | * | IN THE CIRCUIT COURT OF |
| V. | * | HOUSTON COUNTY, ALABAMA |
| WILLIE C. MCCRAY, | * | CRIMINAL DIVISION |
| DEFENDANT. | * | CC-94-791 & 792 |

### REQUESTED INSTRUCTION #7

Members of the jury, if you are not convinced beyond a reasonable doubt, that WILLIE C.

MCCRAY intentionally caused the death of Michael Scott, you must find him not guilty.

GIVEN _____          REFUSED ___✓___

*Ashita, Judge*

96

| STATE OF ALABAMA | * | IN THE CIRCUIT COURT OF |
| V. | * | HOUSTON COUNTY, ALABAMA |
| WILLIE C. MCCRAY, | * | CRIMINAL DIVISION |
| DEFENDANT. | * | CC-94-791 & 792 |

### REQUESTED INSTRUCTION #8

Members of the jury, if you find that from the evidence that WILLIE C. MCCRAY recklessly caused the death of Michael Scott, then you must find WILLIE C. MCCRAY not guilty of Murder but may find him guilty of Manslaughter.

GIVEN _____          REFUSED __✓___          _Whitey Judge_

97

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,　　　　　*
　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　*　CASE NO.:　CC 94-791
VS.　　　　　　　　　　　　*　　　　&　CC 94-792
　　　　　　　　　　　　　　*
WILLIE C. MCCRAY,　　　　　*
　　　　　　　　　　　　　　*
　　　DEFENDANT.　　　　　　*

## DEFENDANT'S REQUESTED JURY CHARGE NO. 9

I charge you, members of the jury that the burden of proof is always on the prosecution and never shifts to the Defendant.


____✓____ GIVEN　　　　　_____ REFUSED

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

98

STATE OF ALABAMA.                    *
                                     *
VS.                                  *     CASE NO.:      CC 94-791
                                     *               &   CC 94-792
WILLIE C. MCCRAY,                    *
                                     *
         DEFENDANT.                  *

## DEFENDANT'S REQUESTED JURY CHARGE NO 10

I charge you, members of the jury that the Defendant is presumed innocent at all stages of the trial until guilt is proven beyond a reasonable doubt.

___✓___ GIVEN         _____ REFUSED

White, Judge

99

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,　　　　　　＊

　　　　　　　　　　　　　　　＊

VS.　　　　　　　　　　　　　＊　　CASE NO.:　　CC 94-791
　　　　　　　　　　　　　　　＊　　　　　&　　　CC 94-792

WILLIE C. MCCRAY,　　　　　　＊

　　　　　　　　　　　　　　　＊

　　DEFENDANT.　　　　　　　　＊

## DEFENDANT'S REQUESTED JURY CHARGE NO. 11

I charge you, members of the jury that the Defendant is presumed to be innocent until the evidence convinces you the jury, beyond a reasonable doubt that he is guilty; and if upon a consideration of all the evidence, you the jury have a reasonable doubt growing out of all the evidence, you must find the Defendant not guilty.

✓ GIVEN　　　　　＿＿＿ REFUSED　　　　　White, Judge

J.- 100

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
VS.                                  *    CASE NO.:    CC 94-791
                                     *          &      CC 94-792
WILLIE C. MCCRAY,                    *
                                     *
       DEFENDANT.                    *

## DEFENDANT'S REQUESTED JURY CHARGE NO. 12

I charge you, members of the jury that the burden is never on the Defendant to establish his innocence or to disprove a fact necessary to establish a crime of which he is charged, but in this case if any or all of the evidence, after considering all of the same, raises in your mind reasonable doubt as to the guilt of the Defendant, you should find this Defendant not guilty.

✓
__ __ GIVEN        _____ REFUSED

- 101-

## IN THE CIRCUIT COURT OF
## HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
VS.                                  *      CASE NO.:      CC 94-791
                                     *              &      CC 94-792
WILLIE C. MCCRAY,                    *
                                     *
       DEFENDANT.                    *

### DEFENDANT'S REQUESTED JURY CHARGE NO. 13

I charge you, members of the jury that you are instructed that the burden is on the State to convince you of the Defendant's guilt to the exclusion of every reasonable doubt and by evidence which overcomes the presumption of fact, that the law surrounds the Defendant with, that he is innocent of a crime.

_____ GIVEN        _ _ REFUSED

91

STATE OF ALABAMA        \*    IN THE CIRCUIT COURT OF

V.        \*    HOUSTON COUNTY, ALABAMA

WILLIE C. MCCRAY,        \*    CRIMINAL DIVISION

      DEFENDANT.        \*    CC-94-791 & 792

## REQUESTED INSTRUCTION #3

Circumstances, no matter how strong, which merely arouse a suspicion of guilt cannot serve as a basis for convicting WILLIE C. MCCRAY.

GIVEN   ✓         REFUSED _____

White, Judge

92

STATE OF ALABAMA                    *    IN THE CIRCUIT COURT OF

V.                                  *    HOUSTON COUNTY, ALABAMA

WILLIE C. MCCRAY,                   *    CRIMINAL DIVISION

       DEFENDANT.                   *    CC-94-791 & 792

### REQUESTED INSTRUCTION #4

Circumstances merely consistent with guilt or causing suspicion thereof are insufficient to justify conviction of WILLIE C. MCCRAY.

GIVEN  __V____                REFUSED _____

_Clerk, Judge_

93

STATE OF ALABAMA                    *    IN THE CIRCUIT COURT OF

V.                                  *    HOUSTON COUNTY, ALABAMA

WILLIE C. MCCRAY,                   *    CRIMINAL DIVISION

      DEFENDANT.                    *    CC-94-791 & 792

### REQUESTED INSTRUCTION #5

Members of the jury, for circumstantial evidence to be sufficient to justify a conviction, the circumstances proved must not only be consistent with the hypothesis that the Defendant is guilty but inconsistent with the hypothesis that WILLIE C. MCCRAY is innocent, and inconsistent with every other rational hypothesis except that of guilt.

GIVEN _____ ✓

REFUSED _____

_Ashtin, Judge_

94

STATE OF ALABAMA       *    IN THE CIRCUIT COURT OF

V.       *    HOUSTON COUNTY, ALABAMA

WILLIE C. MCCRAY,       *    CRIMINAL DIVISION

      DEFENDANT.       *    CC-94-791 & 792

## REQUESTED INSTRUCTION #6

You cannot convict WILLIE C. MCCRAY on mere possibilities, surmise, suspicion, or speculation, however strong they may be. A verdict of guilty based upon mere possibilities, surmise, suspicion or speculation, would violate the oath that you the members of this jury have taken. If, after carefully and fairly reviewing the facts, you are not satisfied of WILLIE C. MCCRAY's guilt, then you have a reasonable doubt and WILLIE C. MCCRAY should be found not guilty.

GIVEN   ✓ _____          REFUSED _____

                                       *White, Judge*

95

STATE OF ALABAMA                  *    IN THE CIRCUIT COURT OF

V.                                *    HOUSTON COUNTY, ALABAMA

WILLIE C. MCCRAY,                 *    CRIMINAL DIVISION

         DEFENDANT.               *    CC-94-791 & 792


### REQUESTED INSTRUCTION #7

Members of the jury, if you are not convinced beyond a reasonable doubt, that WILLIE C.

MCCRAY intentionally caused the death of Michael Scott, you must find him not guilty.



GIVEN  _____          REFUSED  ✓ _____

_White, Judge_

96

| STATE OF ALABAMA | * | IN THE CIRCUIT COURT OF |
| V. | * | HOUSTON COUNTY, ALABAMA |
| WILLIE C. MCCRAY, | * | CRIMINAL DIVISION |
| DEFENDANT. | * | CC-94-791 & 792 |

## REQUESTED INSTRUCTION #8

Members of the jury, if you find that from the evidence that WILLIE C. MCCRAY recklessly caused the death of Michael Scott, then you must find WILLIE C. MCCRAY not guilty of Murder but may find him guilty of Manslaughter.

GIVEN _____          REFUSED ___✓___          _White, Judge_

97

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,

VS.

WILLIE C. MCCRAY,

    DEFENDANT.

\*
\*
\*    CASE NO.:   CC 94-791
\*             &amp;   CC 94-792
\*
\*
\*

## DEFENDANT'S REQUESTED JURY CHARGE NO. 9

I charge you, members of the jury that the burden of proof is always on the prosecution and never shifts to the Defendant.

✓ GIVEN      _____ REFUSED        _White, Judge_

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

98

STATE OF ALABAMA,                    *
                                     *
VS.                                  *    CASE NO.:    CC 94-791
                                     *              &  CC 94-792
WILLIE C. MCCRAY,                    *
                                     *
    DEFENDANT.                       *

## DEFENDANT'S REQUESTED JURY CHARGE NO. 10

I charge you, members of the jury that the Defendant is presumed innocent at all stages of the trial until guilt is proven beyond a reasonable doubt.

✓ GIVEN    _____ REFUSED

White, Judge

99

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                  *
                                   *
VS.                                *     CASE NO.:     CC 94-791
                                   *            &      CC 94-792
WILLIE C. MCCRAY,                  *
                                   *
    DEFENDANT.                     *

## DEFENDANT'S REQUESTED JURY CHARGE NO. 11

I charge you, members of the jury that the Defendant is presumed to be innocent until the evidence convinces you the jury, beyond a reasonable doubt that he is guilty; and if upon a consideration of all the evidence, you the jury have a reasonable doubt growing out of all the evidence, you must find the Defendant not guilty.

✓ GIVEN        _____ REFUSED            White, Judge

100

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,　　　　　*

　　　　　　　　　　　　　　　*

VS.　　　　　　　　　　　　*　　CASE NO.:　　CC 94-791
　　　　　　　　　　　　　　　*　　　　　&　　CC 94-792

WILLIE C. MCCRAY,　　　　　*

　　　DEFENDANT.　　　　　　*

## DEFENDANT'S REQUESTED JURY CHARGE NO. 12

　　I charge you, members of the jury that the burden is never on the Defendant to establish his innocence or to disprove a fact necessary to establish a crime of which he is charged, but in this case if any or all of the evidence, after considering all of the same, raises in your mind reasonable doubt as to the guilt of the Defendant, you should find this Defendant not guilty.


　✓ GIVEN　　　　＿＿ REFUSED　　　　　White, Judge

- 101-

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,　　　　*
　　　　　　　　　　　　　　*
VS.　　　　　　　　　　　　*　　CASE NO.:　　CC 94-791
　　　　　　　　　　　　　　*　　　　　　&　　CC 94-792
WILLIE C. MCCRAY,　　　　*
　　　　　　　　　　　　　　*
　　DEFENDANT.　　　　　　*

## DEFENDANT'S REQUESTED JURY CHARGE NO. 13

I charge you, members of the jury that you are instructed that the burden is on the State to convince you of the Defendant's guilt to the exclusion of every reasonable doubt and by evidence which overcomes the presumption of fact, that the law surrounds the Defendant with, that he is innocent of a crime.

✓ \_\_\_\_ GIVEN　　　\_\_ \_\_ REFUSED　　　　　　　　White, Judge

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

102

STATE OF ALABAMA,        *

                             *

VS.                       *     CASE NO.:    CC 94-791

                             *               &     CC 94-792

WILLIE C. MCCRAY,     *

                             *

     DEFENDANT.        *

## DEFENDANT'S REQUESTED JURY CHARGE NO. 14

I charge you, members of the jury that there is a legal presumption of innocence which is to be regarded as a matter of evidence by you the jury to the benefit of which the accused is entitled.

____ GIVEN      ____ REFUSED

103

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,           *

                               *

VS.                        *    CASE NO.:    CC 94-791

                               *                  &amp;    CC 94-792

WILLIE C. MCCRAY,       *

                               *

      DEFENDANT.          *

## DEFENDANT'S REQUESTED JURY CHARGE NO. 15

I charge you, members of the jury that if you have a reasonable doubt as to the Defendant's guilt growing out of the evidence or any party of it, then you must find the Defendant not guilty of ~~Capital~~ Murder.

_____ GIVEN        _____ REFUSED

104

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
VS.                                  *     CASE NO.:     CC 94-791
                                     *              &    CC 94-792
WILLIE C. MCCRAY,                    *
                                     *
    DEFENDANT.                       *

## DEFENDANT'S REQUESTED JURY CHARGE NO. 16

    I charge you, members of the jury if any member of your number has a reasonable doubt as to the guilt of the Defendant growing out of any part of the testimony upon consideration of all of the testimony, then you must find the Defendant not guilty.

_____ GIVEN          _____ REFUSED

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

105

STATE OF ALABAMA,                    *
                                     *
VS.                                  *    CASE NO.:    CC 94-791
                                     *            &    CC 94-792
WILLIE C. MCCRAY,                    *
                                     *
        DEFENDANT.                   *

## DEFENDANT'S REQUESTED JURY CHARGE NO. 17

I charge you, members of the jury that circumstances which merely arouse suspicion of guilt will not serve as a basis for conviction.

✓ ____ GIVEN          ____ REFUSED

*White, Judge*

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

106

| | | |
|---|---|---|
| STATE OF ALABAMA, | * | |
| | * | |
| VS. | * | CASE NO.:    CC 94-791 |
| | * | &    CC 94-792 |
| WILLIE C. MCCRAY, | * | |
| | * | |
| DEFENDANT. | * | |

## DEFENDANT'S REQUESTED JURY CHARGE NO. 18

I charge you, members of the jury that the presumption of innocence with which the Defendant enters into the trial is a fact in the case which must be considered with all the evidence and it is not to be disregarded by you.

___✓___ GIVEN          _____ REFUSED

_Cathto, Judge_

107

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,　　　　　　*
　　　　　　　　　　　　　　　*
VS.　　　　　　　　　　　　　*　　CASE NO.:　　CC 94-791
　　　　　　　　　　　　　　　*　　　　　&　　CC 94-792
WILLIE C. MCCRAY,　　　　　　*
　　　　　　　　　　　　　　　*
　　　　DEFENDANT.　　　　　　*

## DEFENDANT'S REQUESTED JURY CHARGE NO. 19

I charge you, members of the jury that if there is a reasonable probability that the Defendant in this case is innocent arising from the evidence, there is a reasonable doubt as to his guilt.

✓ GIVEN　　　　　____ REFUSED　　　　　White, Judge

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,         *

                              *

VS.                        *    CASE NO.:     CC 94-791

                              *               &     CC 94-792

WILLIE C. MCCRAY,       *

                              *

     DEFENDANT.         *

## DEFENDANT'S REQUESTED JURY CHARGE NO. 2D

I charge you, members of the jury, that a person commits the crime of manslaughter if he recklessly causes the death of another person.

To convict, the State must prove beyond a reasonable doubt each of the following elements of manslaughter:

     1.    That Michael Scott is dead; and

     2.    That the defendant, Willie C. McCray, recklessly caused the death of Michael Scott by shooting him.

A person acts recklessly with respect to a res/ circumstance when he is aware of and consciously substantial and unjustifiable risk that the result the circumstance exists. The risk must be of such nat that disregard thereof constitutes a gross devi; standard of conduct that a reasonable person would observe in the situation.

If you find from the evidence that the State has proved beyond a reasonable doubt each of the above elements of the offense of manslaughter, then you must find the Defendant not guilty of

103

Murder but may find him guilty of Manslaughter.

_____ GIVEN        √ _____ REFUSED

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
VS.                                  *     CASE NO.:     CC 94-791
                                     *              &    CC 94-792
WILLIE C. MCCRAY,                    *
                                     *
    DEFENDANT.                  *

## DEFENDANT'S REQUESTED JURY CHARGE NO. 21

    I charge you, members of the jury that embraced within the offense of .. **MURDER** as charged in the indictment is the lesser included offense of **MANSLAUGHTER**. If after your consideration of the evidence or lack of evidence you are not satisfied that the defendant is guilty of the principle offense of

    **MURDER** as charged in the indictment, you must next consider the evidence as to the lesser included offense of **MANSLAUGHTER** and determine whether the defendant has been proved guilty of such lesser included offense beyond a reasonable doubt. If you find from your consideration of all of the evidence, that the State has proved each of the necessary elements of the lesser included offense of **MANSLAUGHTER** beyond a reasonable doubt, then your verdict should be that you find the defendant guilty of the offense of **MANSLAUGHTER** embraced within the charge contained in the indictment.

\_\_\_\_\_ **GIVEN**          \_\_✓\_\_ **REFUSED**

_White, Judge_

111

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
                                     *
VS.                                  *       CASE NO.:       CC 94-791
                                     *                  &    CC 94-792
                                     *
WILLIE C. MCCRAY,                    *
                                     *
    DEFENDANT.                       *

## DEFENDANT'S REQUESTED JURY CHARGE NO. 22

I charge you, members of the jury, that a person commits the crime of Criminally Negligent Homicide if he causes the death of another person by criminal negligence.

A Defendant acts with criminal negligence if he acts "without due caution". In other words, a Defendant is guilty of Criminally Negligent Homicide when it plainly appears that neither death nor great bodily harm was intended, but death is accidentally caused by some unlawful act.


_____ GIVEN        ✓ _____ REFUSED

_Whitley, Judge_

112

# IN THE CIRCUIT COURT OF
# HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA,       *
                  *
VS.                  *    CASE NO.:     CC 94-791
                  *              &amp;     CC 94-792
WILLIE C. MCCRAY,    *
                  *
     DEFENDANT.      *

## DEFENDANT'S REQUESTED JURY CHARGE NO. 23

I charge you, members of the jury, that a person commits the crime of manslaughter if he causes the death of another person under circumstances that ordinarily would constitute murder, except that he causes the death due to a sudden heat of passion caused by provocation recognized by law, and before a reasonable time for the passion to cool and for reason to reassert itself.

To convict, the State must prove beyond a reasonable doubt each of the following elements of manslaughter:

1. That Michael Scott is dead;

2. That the defendant, Willie C. McCray, caused the death of Michael Scott by shooting him.

3. That in committing the act which caused the death of Michael Scott the defendant acted with intent; and

4. That in so acting the defendant was lawfully provoked to do the act which caused the death of the deceased by a sudden heat of passion before a reasonable time for the passion to cool and for reason to reassert itself.

"Intentionally" and "lawfully provoked" as used in this

*113*

instruction have the same meaning as previously explained in the instruction on murder.

If you find from the evidence that the State has proved beyond a reasonable doubt each of the above elements of the offense of manslaughter, as charged, then you shall find the defendant guilty of manslaughter.

If you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of the offense of manslaughter, then you cannot find the defendant guilty of manslaughter.

\_\_\_\_\_ **GIVEN**         \_\_\_\_\_ **REFUSED**

*Aht, Judge*

Defe____nt heretofore _____ been ___ ____ arraigned upon
an indictment on a charge of ___ _Felony Murder_
and heretofore having plead not guilty ____ ____ plead to
said plea. Thereupon comes a jury of good and lawful men and
women, to-wit _Margie Wade_
and eleven others, who being duly empanelled, sworn and
charged by the Court according to law, before whom the trial
of this cause was entered upon and continued from day to
day and from time to time, said Defendant, being in open Court
with his attorney at each and every stage and during all the
proceedings in this cause, now on this date said jurors upon
their oaths do say:

"WE, THE JURY, FIND THE DEFENDANT GUILTY OF
_Felony Murder_
AS CHARGED IN THE INDICTMENT."

_[signature]_
JUDGE

_October 24_ _2000_
In accordance with the verdict of the jury, Defendant is
hereby adjudged guilty of _Felony Murder_
as charged in the indictment. Defendant being asked if he
had anything to say why the sentence of law should not be
pronounced upon him, the Defendant says nothing but pre-
sentence report is requested by ____

Hearing set for ___ 10 at ___ M.

_[signature]_
JUDGE

_October 24_, _2000_
The Court therefore adjudges the Defendant guilty of
_Felony Murder_
The Defendant and his Attorney being in open Court and
being asked by the Court if he has anything to say why the
sentence of Law should not be pronounced upon him says
nothing. It is therefore considered by the Court and it is the
judgement and sentence of the Court that this Defendant be
imprisoned in the penitentiary of the State of Alabama for
a period of _99 years_
Defendant is further ordered to pay a Fine of _$20,000_
restitution in the amount of _____ to ___ _(see below)_
and a victim compensation assessment of _$50_
Defendant is given credit for days spent incarcerated pending
trial.

_[signature]_
JUDGE

*115*

October 24, 2000.
Defendant ordered to pay restitution as follows:
$19,659.65 to
$10,000 to Ala Crim Victims Commission
St. Joe Container Co.; $1295.00 to Kevin Scott;
$165.80 to SE Ala Med Ctr.; $238.00 to Dr. J.W. McLeod
$345.00 to Radiology    Amounts    Amy M. White,
Judge

October 24, 2000. Defendant given oral notice of
appeal. Deft. allowed time to answer
Chris Capps appointed to represent defendant on
appeal.    No bail.    Amy M. White
Judge

*116*

October 24 _2000_
, 19

Defendant heretofore having been indicted and arraigned upon
an indictment on a charge of _Theft of Property_ *1st degree*
and heretofore having plead not guilty thereto, issue joined on
said plea. Thereupon comes a jury of good and lawful men and
women, to-wit, _Margie Wade_ ,
and eleven others, who being duly empanelled, sworn and
charged by the Court according to law, before whom the trial
of this cause was entered upon and continued from day to
day and from time to time, said Defendant, being in open Court
with his attorney at each and every stage and during all the
proceedings in this cause, now on this date said jurors upon
their oaths do say:

"WE, THE JURY, FIND THE DEFENDANT GUILTY OF _Theft of Property_
~~Felony Murder~~ _1st degree_
AS CHARGED IN THE INDICTMENT."

_Jerry M. White_
JUDGE

October 24 _2000_
, 19

In accordance with the verdict of the Jury, Defendant is
hereby adjudged guilty of _Theft of Property_ *1st degree*
as charged in the indictment. Defendant being asked if he
had anything to say why the sentence of law should not be
pronounced upon him, the Defendant says nothing ~~but pre-~~
~~sentence report is requested,~~ by _and requests immediate_
~~Hearing set for~~ _10_ at _M._ _sentencing_

_Jerry M. White_
JUDGE

October 24 _2000_
, 19

The Court therefore adjudges the Defendant guilty of
_Theft of Property_ *1st degree*
The Defendant and his Attorney being in open Court and
being asked by the Court if he has anything to say why the
sentence of Law should not be pronounced upon him says
nothing. It is therefore considered by the Court and it is the
judgement and sentence of the Court that this Defendant be
imprisoned in the penitentiary of the State of Alabama for
a period of _20 years_
Defendant is further ordered to pay a Fine of _$10,750_
~~restitution in the amount of_____to_____~~
and a victim compensation assessment of _$50.00_ ,
Defendant is given credit for days spent incarcerated pending
trial.

_Jerry M. White_
JUDGE

**FILED** 117

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

OCT 25 2000

JUDY BYRD, CLERK
HOUSTON CO., AL

| | | |
|---|---|---|
| State of Alabama | * | |
| vs. | * | |
| Willie C. McCray, | * | |
| Defendant. | * | Case Number: CC-94-791 & CC-94-792 |

### MOTION BY COUNSEL TO WITHDRAW AS ATTORNEY OF RECORD

J. Christopher Capps, Attorney of Record for defendant, Willie C. McCray, respectfully moves the Court for permission to withdraw as Attorney of Record, and as grounds, respectfully shows to the Court the following:

1. The defendant is without funds to employ the undersigned counsel, or any other attorney for that matter as he has been declared indigent since his incarceration on or about October 4, 1993.

2. The defendant has been incarcerated unable to make bond since approximately October 4, 1993.

3. The undersigned has, within the time allowed by law, filed a Motion for New Trial on behalf of the defendant and Notice of Appeal.

Wherefore, the undersigned counsel respectfully prays that the Court permit him to withdraw as Attorney of Record and that the Court appoint another attorney to prosecute the defendant's Motion for New Trial, and should that motion be denied, the appeal.

Respectfully submitted,

J. CHRISTOPHER CAPPS (CAP-006)
Attorney at Law
P.O. Box 7122
Dothan, Alabama 36302
(334) 792-6213

### CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the Honorable Doug Valeska,

*118*

District Attorney for Houston County, by placing same in his box in the Houston County Courthouse, Dothan, AL. 36303, this the 25th day of October, 2000.

Of Counsel

*119*

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

# FILED

**State of Alabama**                     *          OCT 25 2000

**vs.**                                  *

                                         *          *Judy Byrd*
**Willie C. McCray,**                    *          JUDY BYRD, CLERK
                                                    HOUSTON CO., AL
**Defendant.**                           *     Case Number: CC-94-791 & CC-94-792

## MOTION FOR NEW TRIAL

The defendant, Willie C. McCray, respectfully moves this Court to grant a new trial, on the following grounds, separately and severally:

1.      The verdict of the jury is contrary to the great weight of the evidence in this case.

2.      The verdict of the jury is not supported by the evidence in this case beyond a reasonable doubt.

3.      The evidence produced upon the trial of this case is insufficient to support a verdict.

4.      The evidence produced upon the trial of this case is insufficient to support a finding beyond a reasonable doubt and to a moral certainty of the defendant's guilt.

5.      The verdict of the jury is contrary to the law.

6.      The judgment of the Court is contrary to the law.

7.      The verdict of the jury is contrary to the great weight and preponderance of the evidence of this case.

8.      The judgment of the Court is contrary to the great weight and preponderance of the evidence of this case.

9.      The evidence produced upon the trial of this case is insufficient to support a verdict.

10.     The Court erred in refusing to instruct the jury on Manslaughter.

11.     The Court erred in overruling the defendant's motion for judgment of acquittal made

*120*

at the close of the State's case.

12.    The sentence imposed on the defendant is so excessive as to constitute cruel and unusual punishment in violation of the state and federal constitutional provisions against cruel and unusual punishment.

13.    The sentencing of the defendant is a violation of the state and federal constitutional provisions against cruel and unusual punishment in that the sentence is disproportionate to the offense.

14.    The sentencing of the defendant is a violation of the due process provisions of the federal Constitution in that the sentence is disproportionate to the offense for which defendant was convicted.

Respectfully submitted,

J. CHRISTOPHER CAPPS (CAP-006)
Attorney at Law
P.O. Box 7122
Dothan, Alabama 36302
(334) 792-6213

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the Honorable Doug Valeska, District Attorney for Houston County, by placing same in his box in the Houston County Courthouse, Dothan, AL. 36303, this the 25th day of October, 2000.

Of Counsel

FILED

OCT 25 2000

*Judy Byrd*
JUDY BYRD, CLERK
HOUSTON CO., AL

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

State of Alabama      *

vs.      *

Willie C. McCray,      *

     Defendant.      *     **Case Number: CC-94-791 & CC-94-792**

## NOTICE OF APPEAL

Notice is given that Willie C. McCray, defendant, appeals to the Alabama Court of Criminal Appeals from the judgment of conviction and sentence entered on October 24, 2000.

The offense for which defendant was convicted consists of Felony-Murder and Theft of Property, First Degree.

A Motion for New Trial was filed October 25, 2000.

That the Defendant has been incarcerated in the Houston County Jail since on or about October 4, 1993, and as such is indigent and in need of a free transcript of the proceedings to pursue said appeal.

Respectfully submitted,

J. CHRISTOPHER CAPPS (CAP-006)
Attorney at Law
P.O. Box 7122
Dothan, Alabama 36302
(334) 792-6213

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the Honorable Doug Valeska, District Attorney for Houston County, by placing same in his box in the Houston County Courthouse, Dothan, AL. 36303, this the 25th day of October, 2000.

Of Counsel

10-31-2000

Motion for New Trial set for hearing
on 11-21-00 at [illegible] for new sentence
1:15 p.m. Notify [illegible]   J. White, Judge

122

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA          123

State of Alabama                          *

vs.                                       *

Willie C. McCray,                         *

      Defendant.                     *     Case Number: CC-94-791 & CC-94-792

## ORDER

    The motion of J. Christopher Capps, Esquire, Attorney of Record for the defendant, Willie C. McCray, to withdraw as Attorney of Record has been read and considered;

    For good cause shown, it is hereby Ordered that J. Christopher Capps, Esquire, is relieved as Attorney of Record for the defendant, Willie C. McCray. _____Joe Lewis_____, Attorney at Law, is hereby appointed to prosecute the defendant's Motion for New Trial, and if that motion is denied, to prosecute the defendant's appeal, if any.

    This the 31st day of October, 2000.

                                        Jerry White
                                        Circuit Judge

**FILED**

NOV 1 2000

JUDY BYRD, CLERK
HOUSTON CO., ALA.

11-1-00
N: J.L. C.C.
CK. Dept

ACR37    NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS     124
ALABAMA JUDICIAL DATA CENTER
BY THE TRIAL COURT CLERK
IN THE CIRCUIT COURT OF HOUSTON COUNTY
STATE OF ALABAMA VS MCCRAY WILLIE C          JUDGE: JERRY M. WHITE

APPEAL DATE: 10/24/2000

INDIGENCY STATUS:
   GRANTED INDIGENCY STATUS AT TRIAL COURT:           __X__ YES    _____ NO
   APP. TRIAL COUNSEL PERMITTED TO W/D ON APPEAL:     __X__ YES    __X__ NO
   INDIGENT STATUS REVOKED ON APPEAL:                 __X__ YES    _____ NO
   INDIGENT STATUS GRANTED ON APPEAL:                 __X__ YES    _____ NO

DEATH PENALTY: NO

APPEAL TYPE: STATE CONVICTION       Joe Lewis  appointed on Appeal

THIS IS AN APPEAL FROM A CONVICTION.

DATE OF CONVICTION: 10/24/2000          DATE OF SENTENCE: 10/24/2000

YOUTHFUL OFFENDER STATUS: DENIED

CO/CASE NUMBER: 38/CC 1994 000791.00
CODE: MURD   CONVICTION: MURDER          ACTION: CONVICTED
                                         STATUTE: 13A-006-002

SENTENCE:   CONF: 99 YRS 00 MOS 000 DAYS
SENTENCE:   PROB: 00 YRS 00 MOS 000 DAYS     LIFE: NO   LIFEWO: NO

POST-JUDGMENT MOTIONS FILED:    DT FILED         DT DENIED    CON BY AGREE
_X_ MOTION FOR NEW TRIAL       10/25/2000      _____Hearing set 11-21-00__
___ MOTION FOR JUDG. OF ACQUIT _____         _____     _____
___ MOTION TO W/D GUILTY PLEA  _____         _____     _____
___ MOTION FOR ATTY TO W/DRAW  _____         _____     _____
___ OTHER

COURT REPORTER(S):               WOODALL, CARLA H.
ADDRESS:                         C/O HON. LARRY ANDERSON
                                 DOTHAN       , AL  36302

APPELLATE COUNSEL #1:            Hon Joe Lewis
ADDRESS:                         P. O. Box 536   , AL  36302
PHONE NUMBER:                    Dothan, Alabama
                                 794-0759
APPELLATE COUNSEL #2:            _____
ADDRESS:                         _____
                                 _____
PHONE NUMBER:                    _____

APPELLANT (PRO SE):              MCCRAY WILLIE C
ADDRESS:                         % HOUSTON COUNTY JAIL
                                 DOTHAN       , AL  363020000
AIS #:                           000183709

APPELLEE (IF CITY APPEAL):       _____
ADDRESS:                         _____
                                 _____

I CERTIFY THAT THE INFORMATION PROVIDED            OPERATOR: STW
ABOVE IS ACCURATE TO THE BEST OF MY             PREPARED: 11/01/2000
KNOWLEDGE AND I HAVE SERVED A COPY OF
THIS NOTICE OF APPEAL ON ALL PARTIES TO
THIS ACTION ON THIS _1st_ DAY OF _November_, 2000    CIRCUIT COURT CLERK

ACR371
ALABAMA JUDICIAL DATA CENTER
NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
BY THE TRIAL COURT CLERK
IN THE CIRCUIT COURT OF HOUSTON COUNTY

125

STATE OF ALABAMA VS MCCRAY WILLIE C          JUDGE: JERRY M. WHITE
```
| APPEAL DATE: 10/24/2000                                                    |
|---------------------------------------------------------------------------|
| INDIGENCY STATUS:                                                         |
|    GRANTED INDIGENCY STATUS AT TRIAL COURT:      __X__ YES  _____ NO      |
|    APP. TRIAL COUNSEL PERMITTED TO W/D ON APPEAL: __X__ YES  _____ NO     |
|    INDIGENT STATUS REVOKED ON APPEAL:            _____ YES  __X__ NO      |
|    INDIGENT STATUS GRANTED ON APPEAL:            __X__ YES  _____ NO      |
|                                                                           |
| DEATH PENALTY: NO                                                         |
|                                                                           |
| APPEAL TYPE: STATE CONVICTION    Joe Lewis  appointed on Appeal           |
|---------------------------------------------------------------------------|
| THIS IS AN APPEAL FROM A CONVICTION.                                      |
|                                                                           |
| DATE OF CONVICTION: 10/24/2000      DATE OF SENTENCE: 10/24/2000          |
|                                                                           |
| YOUTHFUL OFFENDER STATUS: DENIED                                          |
|                                                                           |
| CO/CASE NUMBER: 38/CC 1994 000792.00                                      |
| CODE: TOP1   CONVICTION: THEFT OF PROP 1S    ACTION: CONVICTED            |
|                                              STATUTE: 13A-008-003         |
| SENTENCE:   CONF: 20 YRS 00 MOS 000 DAYS                                  |
| SENTENCE:   PROB: 00 YRS 00 MOS 000 DAYS         LIFE: NO  LIFEWO: NO     |
|---------------------------------------------------------------------------|
| POST-JUDGMENT MOTIONS FILED:    DT FILED     DT DENIED    CON BY AGREE    |
| _X_ MOTION FOR NEW TRIAL        10/25/2000   _hearing set 11-21-00___     |
| ___ MOTION FOR JUDG. OF ACQUIT  _____     _____     _____     |
| ___ MOTION TO W/D GUILTY PLEA   _____     _____     _____     |
| ___ MOTION FOR ATTY TO W/DRAW   _____     _____     _____     |
| ___ OTHER                                                                 |
|---------------------------------------------------------------------------|
| COURT REPORTER(S):              WOODALL, CARLA H.                         |
| ADDRESS:                        C/O HON. LARRY ANDERSON                   |
|                                 DOTHAN        , AL  36302                 |
|                                                                           |
| APPELLATE COUNSEL #1:           Joe Lewis                                 |
| ADDRESS:                        P. O. Box 536                             |
|                                 Dothan, Alabama   36302                   |
| PHONE NUMBER:                   794-0759                                  |
|                                                                           |
| APPELLATE COUNSEL #2:           _____         |
| ADDRESS:                        _____         |
|                                 _____         |
| PHONE NUMBER:                   _____         |
|                                                                           |
| APPELLANT (PRO SE):             MCCRAY WILLIE C                           |
| ADDRESS:                        % HOUSTON COUNTY JAIL                     |
|                                 DOTHAN        , AL  363020000             |
| AIS #:                          000183709                                 |
|                                                                           |
| APPELLEE (IF CITY APPEAL):      _____         |
| ADDRESS:                        _____         |
|                                 _____         |
|---------------------------------------------------------------------------|
```

I CERTIFY THAT THE INFORMATION PROVIDED                     OPERATOR: STW
ABOVE IS ACCURATE TO THE BEST OF MY              PREPARED: 11/01/2000
KNOWLEDGE AND I HAVE SERVED A COPY OF
THIS NOTICE OF APPEAL ON ALL PARTIES TO
THIS ACTION ON THIS _1st_ DAY OF _November, 2000_        _Judy Byrd_
                                                 CIRCUIT COURT CLERK

126

| State of Alabama<br>Unified Judicial System<br>Form ARAP-26 (front)    8/91 | COURT OF CRIMINAL APPEALS<br>DOCKETING STATEMENT | Criminal Appeal Number<br><br>CR - 00-241- |
| --- | --- | --- |

**A. GENERAL INFORMATION:**

☒ CIRCUIT COURT  ☐ DISTRICT COURT  ☐ JUVENILE COURT OF    Houston    COUNTY

Willie C. McCray    , Appellant

v.  ☒ STATE OF ALABAMA    ☐ MUNICIPALITY OF

| Case Number<br>CC 94 - 791,792 | Date of Complaint or Indictment<br>09/02/94 | Date of Judgment/Sentence/Order<br>10/24/00 |
| --- | --- | --- |
| Number of Days of Trial/Hearing          Days | Date of Notice of Appeal<br>Oral: 10/24/00 | Written: 10/25/00 |

Indigent Status Requested:  ☒ Yes  ☐ No          Indigent Status Granted:  ☒ Yes  ☐ No

**B. REPRESENTATION:**

Is Attorney Appointed or Retained?  ☒ Appointed  ☐ Retained.    If no attorney, will appellant represent self?  ☐ Yes  ☐ No

| Appellant's Attorney (Appellant if pro se) (Attach additional pages if necessary)<br>Joseph W. Lewis | Telephone Number<br>(334) 794-0759 |
| --- | --- |
| Address<br>P.O. Box 536 | City<br>Dothan | State    Zip Code<br>AL        36302 |

**C. CODEFENDANTS:** List each CODEFENDANT and the codefendant's case number.

| Codefendant | Case Number |
| --- | --- |
| Codefendant | Case Number |
| Codefendant | Case Number |

**D. TYPE OF APPEAL:** Please check the applicable block.

1 ☒ State Conviction   4 ☐ Pretrial Order   7 ☐ Juvenile Transfer Order   10 ☐ Other (Specify)
2 ☐ Post-Conviction Remedy   5 ☐ Contempt Adjudication   8 ☐ Juvenile Delinquency
3 ☐ Probation Revocation   6 ☐ Municipal Conviction   9 ☐ Habeas Corpus Petition

**E. UNDERLYING CONVICTION/CHARGE:** Regardless of the type of appeal checked in Section D, please check the box beside each offense category for which the appellant has been convicted or charged as it relates to this appeal. Also include the applicable section of the Code of Alabama for State convictions.

1 ☒ Capital Offense - § 13A-5-40   6 ☐ Trafficking in Drugs - § _____   11 ☐ Fraudulent Practices - § _____
2 ☒ Homicide - § 13A-6-2   7 ☐ Theft - § _____   12 ☐ Offense Against Family - § _____
3 ☐ Assault - § _____   8 ☐ Damage or Intrusion   13 ☐ Traffic - DUI - § _____
4 ☐ Kidnapping/Unlawful    to Property - § _____   14 ☐ Traffic - Other - § _____
   Imprisonment - § _____   9 ☐ Escape - § _____   15 ☐ Miscellaneous (Specify):
5 ☐ Drug Possession - § _____   10 ☐ Weapons/Firearms - § _____    - § _____

**F. DEATH PENALTY:**

Does this appeal involve a case where the death penalty has been imposed?  ☐ Yes  ☒ No

**G. TRANSCRIPT:**

1. Will the record on appeal have a reporter's transcript?  ☒ Yes  ☐ No
2. If the answer to question "1" is "Yes," state the date the Reporter's Transcript Order was filed.    11/08/00
                                                                                                        (Date)
3. If the answer to question "1" is "No":
    (a)  Will a stipulation of facts be filed with the circuit clerk?  ☐ Yes  ☐ No
    (b)  Will the parties stipulate that only questions of law are involved and will the trial court certify the questions?  ☐ Yes  ☐ No
NOTE:  If the appeal is from the district or juvenile court and the answer to question "1" is "No," then a positive
          response is required for question 3(a) or 3(b).

Form ARAP-26 (back)    8/91    COURT OF CRIMINAL APPEALS DOCKETING STATEMENT

**H. POST-JUDGMENT MOTIONS:** List all post-judgment motions by date of filing, type, and date of disposition (whether by trial court order or by the provisions of Rules 20.3 and 24.4 (ARCrP)):

-127

| DATE OF FILING | | | TYPE OF POST-JUDGMENT MOTION | DATE OF DISPOSITION | | |
|---|---|---|---|---|---|---|
| Month | Day | Year | | Month | Day | Year |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**I. NATURE OF THE CASE:** Without argument, briefly summarize the facts of the case.

Appellant was charged with capital murder. Appellant was tried in the Circuit Court of Houston County, and convicted of felony murder.

**J. ISSUE(S) ON APPEAL:** Briefly state the anticipated issues that will be presented on appeal. *(Attach additional pages if necessary.)*

Appellant counsel has not had an oppurtunity to review the record on appeal, so the issues to be presented on appeal are unknown at this time.

FILED

NOV 8 2000

JUDY BYRD, CLERK
HOUSTON CO., AL.

**K. SIGNATURE:**

11/08/00
Date

*[signature]*
Signature of Attorney/ Party Filing this Form

125

**REPORTER'S TRANSCRIPT ORDER — CRIMINAL**
See Rules 10(c) and 11(b) of the
Alabama Rules of Appellate Procedure (A.R. App.P.)

| | |
|---|---|
| State of Alabama<br>Unified Judicial System<br>Form ARAP- 1C    8/91 | Criminal Appeal Number<br>CR - 00-241 |

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

☒ CIRCUIT COURT ☐ DISTRICT COURT ☐ JUVENILE COURT OF __Houston__ COUNTY

__Willie C. McCray__, Appellant

v.  ☒ STATE OF ALABAMA   ☐ MUNICIPALITY OF ____

| Case Number<br>CC 94-791 | Date of Judgment/Sentence/Order<br>10/24/00 |
|---|---|
| Date of Notice of Appeal<br>Oral: 10/24/00   Written: 10/25/00 | Indigent Status Granted:<br>☒ Yes ☐ No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, CODE OF ALABAMA 1975).

_____ Signature    _____ Date    _____ Print or Type Name

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

MARK PROCEEDINGS REQUESTED:

COURT REPORTER(S)
Carla H. Woodhall
c/o Hon. Larry Anderson
Dothan, AL 36302

A. ☒ TRIAL PROCEEDINGS - Although this designation will include the judgment and sentence proceedings, a transcript of the organization of the jury and arguments of counsel must be designated separately.

B. ☒ ORGANIZATION OF THE JURY - This designation will include voir dire examination and challenges for cause. Note that in noncapital cases the voir dire of the jury will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

C. ☒ ARGUMENTS OF COUNSEL - Note that in noncapital cases the arguments of counsel will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

ADDITIONAL PROCEEDINGS REQUESTED    DATE    **FILED**

D. _____
E. _____    NOV 8 2000
F. _____
G. _____    Judy Byrd, CLERK
HOUSTON CO., AL

**IMPORTANT NOTICE:** The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT STATUS HAS NOT BEEN REVOKED; OR (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

_Joseph W. Lewis_    11/08/00    Joseph W. Lewis
Signature    Date    Print or Type Name

**DISTRIBUTION:** Original filed with Clerk of Trial Court and copies mailed to: (1) Clerk of the Court of Criminal Appeals, (2) the District Attorney (3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and (4) to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript.

129

Nov. 21, 2000. Motion for new trial continued to
Dec 14, 2000, 9:00 A.M. Notify.    White, Jr

December 14, 2000. *[handwritten text, illegible]*

*[handwritten signature, illegible]*

130

| | REQUEST FOR LOCAL EXTENSION OF TIME TO COMPLETE THE REPORTER'S TRANSCRIPT | $\nu$    131 |
|---|---|---|

Willie C. McCray                                   v.    State of Alabama

**Appellant's Name**                                    **Appellee**

Trial Court Case No. __CC-94-791__        **Notice of Appeal Date** 10-24-2000

On appeal from the: [X] Circuit Court of
                    [ ] District Court of  }  ____Houston____ County
                    [ ] Juvenile Court of

I, ____Carla H. Woodall____, a court reporter in the above referenced case, hereby request a __28__ day extension to complete the transcript in said cause for the reasons I have set out below. Currently this transcript is due on Feb. 8, 2001____, and with this extension the transcript will be due on March 8, 2001.

REASONS: _____

_____Due to time spent in court as well as other transcripts on appeal._____

_____

_____

_____

_Carla H. Woodall_                    _2-8-2001_
Court Reporter                         Date

===================================================================

**TRIAL COURT ACTION**

[✓] Upon consideration of the above request, I hereby grant a __28__ day extension to complete said transcript, thus extending the transcript's due date to _3-8-2001_. Upon granting this request, I direct the court reporter to file this order with the Clerk of this Court and to mail or fax a copy hereof to the Clerk of the Court of Criminal Appeals at the address noted below by no later than the transcript due date in effect immediately preceding this order.

[ ] The above referenced request for a local extension is denied.

_Larry K. Anderson_                    _2-8-01_
Judge's Signature                      Date

**Note:**    Pursuant to Rule 11(c) of the Alabama Rules of Appellate Procedure, local extensions cannot total more than 28 days and cannot be to a date more than 84 days from the date of the notice of appeal.

===================================================================

The Clerk of the Court of Criminal Appeals        Fax (334) 242-4689
P. O. Box 301555
Montgomery, Alabama 36130-1555

MOTION TO COURT OF CRIMINAL APPEALS FOR EXTENSION OF TIME TO FILE TRANSCRIPT

132

TO:   The Clerk of the Court of Criminal Appeals            Fax: (334) 242-4689
      P. O. Box 301555
      Montgomery, Alabama 36130-1555

Criminal Appeals Case Number        CR _____ - _____

Willie C. McCray _____   v.  State of Alabama _____
**Appellant's Name**                    **Appellee**

Trial Court Case No. CC-94-791    Notice of Appeal Date 10-24-2000

On appeal from the: [X] Circuit Court of
                    [ ] District Court of  } Houston _____ County
                    [ ] Juvenile Court of

I, Carla H. Woodall _____, a court reporter in the above referenced case,
hereby request a 28 day extension to complete the transcript in said cause for the reasons
I have set out below.  Currently this transcript is due on 3-8-2001 _____, and with this extension
the transcript will be due on _____.

REASONS: _____
    – Time spent working on other appeals
    – Time spent in court
    – Currently 6 months pregnant with twins
    – Courthouse being remodeled and office having
       to be moved home

**FILED**

MAR 0 8 2001

_Carla H. Woodall_____        3-8-2001 _____     _Judy Byrd_____
Court Reporter                          Date                     JUDY BYRD, CLERK
                                                                 HOUSTON CO., ALA.

==================================================================
**Note:**   Rule 11(c) of the Alabama Rules of Appellate Procedure prohibits an appellate court from
granting an extension if the request is not received by the clerk of the appellate court within the time
originally prescribed or before the expiration of an extension previously granted.  Based on internal
policy of the Court of Criminal Appeals, no more than two 28-day extensions will be granted.

# MOTION TO COURT OF CRIMINAL APPEALS FOR EXTENSION OF TIME TO FILE TRANSCRIPT

✓
133

TO:   The Clerk of the Court of Criminal Appeals
       P. O. Box 301555                              Fax: (334) 242-4689
       Montgomery, Alabama 36130-1555

Criminal Appeals Case Number        CR ____-____

Willie C. McCray                   v.  State of Alabama
Appellant's Name                        Appellee

Trial Court Case No. CC-94-791   Notice of Appeal Date 10-24-2000

On appeal from the:  [X] Circuit Court of
                     [ ] District Court of        Houston      County
                     [ ] Juvenile Court of

I, Carla H. Woodall , a court reporter in the above referenced case,
hereby request a  28  day extension to complete the transcript in said cause for the reasons
I have set out below.  Currently this transcript is due on April 5, 2001 , and with this extension
the transcript will be due on 5-3-2001 .

REASONS: _____

  - Time spent working on appeals
  - Time spent in court
  - Inconvenience of office having to be moved home
     due to courthouse renovations
  - Currently 6½ months pregnant with twins

                                                    FILED

                                                  APR 5 2001

Carla H. Woodall              April 4, 2001        Judy Byrd
Court Reporter                Date                 JUDY BYRD, CLERK
                                                   HOUSTON CO, AL

Note:   Rule 11(c) of the Alabama Rules of Appellate Procedure prohibits an appellate court from
granting an extension if the request is not received by the clerk of the appellate court within the time
originally prescribed or before the expiration of an extension previously granted.  Based on internal
policy of the Court of Criminal Appeals, no more than two 28-day extensions will be granted.

13H

(Clerk's printed form) - (Clerk's form)                                      (CIVIL / CRIMINAL)

COURT REPORTER'S INDEX OF TRIAL EXHIBITS — ARAP RULE 11(c)

IN THE CIRCUIT COURT OF ___Houston___ COUNTY
Dothan / ALABAMA — COUNTY SEAT

APPELLANT· __Willie McCray__

VS.                                                              appellant

STATE OF ALABAMA - or -

ACTION (Case)
No. CC-94-791-792
[ ✓ ] State Criminal
[ ] Civil (Law)
[ ] City Appeal (Crim.)
[ ] Civil (Equity)

appellee

TO:    (name) __Judy Byrd__                    OF CIRCUIT COURT OF __Houston__ COUNTY.
FROM: (name) __Carla H. Woodall__    COURT REPORTER OF  20TH  JUDICIAL CIRCUIT OF ALABAMA

REPORTER'S INDEX TO EXHIBITS

The following EXHIBITS were received by the Court Reporter in above Action and same have been properly marked and identified. Where capable said exhibit(s) have been assembled herein (in flat file); where incapable of being assembled herein such exhibit(s) placed in suitable separate container. This index includes all exhibits (herein assembled or separately housed - or - other, as indicated) and further indicates those offered, admitted or not admitted into evidence, etc.,:

[NOTE: (✓) check appropriate]

| Party | Exhibit No. | BRIEF DESCRIPTION OF EXHIBIT | (✓) Admitted Yes | (✓) Admitted No | Iden. Only (✓) | With-drawn (✓) | Released By Court To Party (✓) | Original Replaced By Copy (✓) | In File (✓) | In Con. (✓) | REMARKS, etc. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SX | 1 | Fettuccini | | | | ✓ | | | | | |
| SX | 2 | bag w/ bullets | | | | ✓ | | | | | |
| SX | 3 | light cover | | | | ✓ | | | | | |
| SX | 4 | paper towels | | | | ✓ | | | | | |
| SX | 5 | baseball cap | | | | ✓ | | | | | |
| SX | 6 | bag w/ cap | | | | ✓ | | | | | |
| | 7 | sign | | | | ✓ | | | | | |
| SX | 8 | eagle sign | | | | ✓ | | | | | |
| SX | 9 | eagle sign | | | | ✓ | | | | | |
| SX | 10 | defendant's clothes | | | | ✓ | | | | | |
| SX | 11 | photo | ✓ | | | | | | | | |
| SX | 12 | photo | ✓ | | | | | | | | |
| SX | 13 | photo | ✓ | | | | | | | | |
| SX | 14 | photo | ✓ | | | | | | | | |
| SX | 15 | photo | ✓ | | | | | | | | |
| SX | 16 | photo | ✓ | | | | | | | | |
| SX | 17 | photo | ✓ | | | | | | | | |
| SX | 18 | screwdriver | ✓ | | | | | | | | |
| SX | 19 | paper towel | ✓ | | | | | | | | |
| SX | 20 | map | ✓ | | | | | | | | |
| SX | 21 | tag | ✓ | | | | | | | | |
| SX | 22 | duct tape and plastic | ✓ | | | | | | | | |
| SX | 23 | photo | | | | ✓ | | | | | |
| SX | 24 | photo | | | | ✓ | | | | | |
| SX | 25 | photo | | | | ✓ | | | | | |

NOTE: ARAP RULE 11(c)...Reporter shall file all exhibits with trial Court Clerk within 14 days (2 weeks) of date of the Notice of Appeal in Criminal and Civil Actions, assembled in a flat file (not shuck) and if incapable then assembled in a suitable container...with index.

1) ABOVE INDEX RECEIVED & FILED __Nov 15 2000__
2) EXHIBITS IN FILE &/OR CONTAINER VERIFIED (except as noted)

/S/ __Judy Byrd__
CLERK · REGISTER - or - AUTHORIZED ASST.
CLERK'S OFC. [ ] — REGISTER'S OFC. [ ]

DATED THIS 15 DAY OF __November__, 19 2000

/S/ __Carla H. Woodall__
COURT REPORTER
1 of 4 pages        20TH  JUDICIAL CIRCUIT

ck's printed form] [Clerk's form]                                           (CIVIL / CRIMINAL)

COURT REPORTER'S INDEX OF TRIAL EXHIBITS—ARAP RULE 11(c)                    135

IN THE CIRCUIT COURT OF __Houston__ — COUNTY

__Dothan__ / ALABAMA —COUNTY SEAT

APPELLANT · __Willie McCray__

VS.                                               ACTION (Case)
                                        appellant    No. CC-94-791-792
STATE OF ALABAMA - or -                          [✓] State Criminal
                                                 [ ] Civil (Law)
                                                 [ ] City Appeal (Crim.)
                                        appellee  [ ] Civil (Equity)

TO:   (name) __Judy Byrd__ ─┤ OF CIRCUIT COURT OF __Houston__ COUNTY.

FROM: (name) __Carla H. Woodall__ COURT REPORTER OF 20TH JUDICIAL CIRCUIT OF ALABAMA

**REPORTER'S INDEX TO EXHIBITS**

The following EXHIBITS were received by the Court Reporter in above Action and same have been properly marked and identified. Where capable said exhibit(s) have been assembled herein (in flat file); where incapable of being assembled herein such exhibit(s) placed in suitable separate container. This Index includes all exhibits (herein assembled or separately housed - or - other, as indicated) and further indicates the ie offered, admitted or not admitted into evidence, etc.,.: -.

[NOTE: (√) check appropriate]

| Party | Exhibit No. | BRIEF DESCRIPTION OF EXHIBIT | Admitted Yes | Admitted No | Iden. Only (√) | With-drawn (√) | Released By Court To Party (√) | Original Replaced By Copy (√) | In File (√) | In Co... | REMARKS, etc. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SX | 26 | photo | | | ✓ | | | | | | |
| SX | 27 | photo | ✓ | | | | | | | | |
| SX | 28 | photo | | | ✓ | | | | | | |
| SX | 29 | photo | | | ✓ | | | | | | |
| SX | 30 | photo | ✓ | | | | | | | | |
| SX | 31 | photo | | | ✓ | | | | | | |
| SX | 12 | photo | | | ✓ | | | | | | |
| SX | 33 | photo | ✓ | | | | | | | | |
| SX | 34 | photo | ✓ | | | | | | | | |
| SX | 35 | photo | ✓ | | | | | | | | |
| SX | 36 | Winn Dixie bag | ✓ | | | | | | | | |
| SX | 37 | photo | ✓ | | | | | | | | |
| SX | 38 | photo lineup #184 | | | ✓ | | | | | | |
| SX | 39 | live lineup photo | | | ✓ | | | | | | |
| SX | 40 | photo | | | ✓ | | | | | | |
| SX | 41 | photo | | | ✓ | | | | | | |
| SX | 42 | photo | | | ✓ | | | | | | |
| SX | 43 | photo | | | ✓ | | | | | | |
| SX | 44 | photo | | | ✓ | | | | | | |
| SX | 45 | photo | | | ✓ | | | | | | |
| SX | 46 | fingerprints | ✓ | | | | | | | | |
| SX | 47 | shell casing | | | ✓ | | | | | | |
| SX | 48 | shell casing | | | ✓ | | | | | | |
| SX | 49 | shell casing | | | ✓ | | | | | | |
| SX | 50 | bullet | | | ✓ | | | | | | |

NOTE: ARAP RULE 11(c)...Reporter shall file all exhibits with trial Court Clerk within 14 days (2 weeks) of date of the Notice Appeal in Criminal and Civil Actions, assembled in a flat file (not stuck) and if incapable then assembled in a suitable ainer...with index.

1) ABOVE INDEX RECEIVED & FILED    DATED THIS 15 DAY OF November, 19 2000
2) EXHIBITS IN FILE &/OR CONTAINER VERIFIED (except as noted)    __Nov 15 2000__

/S/ __Judy Byrd__                          /S/ __Carla H. Woodall__
CLERK-REGISTER - or - AUTHORIZED ASS'T.              COURT REPORTER
CLERK'S OFC. [✓] — REGISTER'S OFC. [ ]       2 of 4 pages    20TH JUDICIAL CIRCUIT

(Printed form)   (Clerk's form)                                    (CIVIL / CRIMINAL)

## COURT REPORTER'S INDEX OF TRIAL EXHIBITS — ARAP RULE 11(c)

IN THE CIRCUIT COURT OF __Houston__ COUNTY

__Dothan__, ALABAMA — COUNTY SEAT

136

Appellant: __Willie McCray__

_____ appellant

STATE OF ALABAMA - or -

_____ appellee

ACTION (Case)
No. CC-94-791-792
[✓] State Criminal
[ ] Civil (Law)
[ ] City Appeal (Crim.)
[ ] Civil (Equity)

(name) __Jody Byrd__ OF CIRCUIT COURT OF __Houston__ COUNTY.

IM: (name) __Carla H. Woodall__ COURT REPORTER OF 20TH JUDICIAL CIRCUIT OF ALABAMA

### REPORTER'S INDEX TO EXHIBITS

The following EXHIBITS were received by the Court Reporter in above Action and same have been properly marked and identified. Where capable said exhibit(s) have been assembled herein (in flat file); where incapable of being assembled herein such exhibit(s) placed in suitable separate container. This index includes all exhibits herein assembled or separately housed - or - other, as indicated) and further indicates those offered, admitted or not admitted into evidence, etc...

[NOTE: (✓) check appropriate]

| Exhibit No. | BRIEF DESCRIPTION OF EXHIBIT | (✓) Admitted Yes | (✓) Admitted No | Iden. Only (✓) | With-drawn (✓) | Released By Court To Party (✓) | Original Received By Court (✓) | In File (✓) | In Con't. | REMARKS, etc. |
|---|---|---|---|---|---|---|---|---|---|---|
| 51 | bullet | | | ✓ | | | | | | |
| 52 | bullet | | | ✓ | | | | | | |
| 53 | metal clip | | | ✓ | | | | | | |
| 54 | photo | | | ✓ | | | | | | |
| 55 | photo | | | ✓ | | | | | | |
| 56 | photo | | | ✓ | | | | | | |
| 57 | photo | | | ✓ | | | | | | |
| 58 | photo | | | ✓ | | | | | | |
| 59 | photo | | | ✓ | | | | | | |
| 60 | photo | | | ✓ | | | | | | |
| 61 | photo | | | ✓ | | | | | | |
| 62 | diagram | | | ✓ | | | | | | |
| 63 | slides | | | ✓ | | | | | | |
| 64 | slides | | | ✓ | | | | | | |
| 65 | slides | | | ✓ | | | | | | |
| 66 | photo | | | ✓ | | | | | | |
| 67 | photo | | | ✓ | | | | | | |
| 68 | photo | | | ✓ | | | | | | |
| 69 | photo | | | ✓ | | | | | | |
| 70 | photo | | | ✓ | | | | | | |
| 71 | photo | | | ✓ | | | | | | |
| 72 | photo | | | ✓ | | | | | | |
| 73 | photo | | | ✓ | | | | | | |
| 74 | photo | | | ✓ | | | | | | |
| 75 | photo | | | ✓ | | | | | | |

NOTE: ARAP RULE 11(c)...Reporter shall file all exhibits with trial Court Clerk within 14 days (2 weeks) of date of the Notice of Appeal in Criminal and Civil Actions, assembled in a flat file (not shuck) and if incapable then assembled in a suitable container...with index.

ABOVE INDEX RECEIVED & FILED __Nov 15, 2000__   DATED THIS 15 DAY OF __November__, 2000

EXHIBITS IN FILE &/OR CONTAINER VERIFIED (except as noted)

/S/ __Judy Byrd__
CLERK - REGISTER or - AUTHORIZED ASS'T.
CLERK'S OFC. [ ] — REGISTER'S OFC. [ ]

/S/ __Carla H. Woodall__
3 of 4 pages   20TH JUDICIAL CIRCUIT   COURT REPORTER

U's printed form)  (Clerk's form)                                        (CIVIL / CRIMINAL)

### COURT REPORTER'S INDEX OF TRIAL EXHIBITS — ARAP RULE 11(c)

137

IN THE CIRCUIT COURT OF ___Houston___ COUNTY

___Dothan___ ALABAMA—COUNTY SEAT

APPELLANT · ___Willie McCray___

VS.                                                    appellant

STATE OF ALABAMA · or ·

ACTION (Case)
No. CC-94-791-792
[ ✓ ] State Criminal
[ ] Civil (Law)
[ ] City Appeal (Crim.)
[ ] Civil (Equity)

appellee

TO: (name) ___Judy Byrd___  OF CIRCUIT COURT OF ___Houston___ COUNTY.

FROM: (name) ___Carla H. Woodall___ COURT REPORTER OF 20TH JUDICIAL CIRCUIT OF ALABAMA

### REPORTER'S INDEX TO EXHIBITS

The following EXHIBITS were received by the Court Reporter in above Action and same have been properly marked and identified. Where capable said exhibit(s) have been assembled herein (in flat file); where incapable of being assembled herein such exhibit(s) placed in suitable separate container. This Index includes all exhibits herein assembled or separately housed · or · other, as indicated) and further indicates those offered, admitted or not admitted into evidence, etc...:·

[NOTE: (√) check appropriate]

| Party | Exhibit No. | BRIEF DESCRIPTION OF EXHIBIT | (√) Admitted Yes No | Iden. Only (√) | With- drawn (√) | Rec'd By Court To Party (√) | Original Restored By Court (√) | In File (√) | In Con't. | REMARKS, etc. |
|---|---|---|---|---|---|---|---|---|---|---|
| SX | 76 | photo | | | ✓ | | | | | |
| SX | 77 | photo | | | ✓ | | | | | |
| SX | 78 | tape | ✓ | | | | | | | |
| SX | 79 | waiver | ✓ | | | | | | | |
| SX | 80 | photo | | | ✓ | | | | | |
| SX | 81 | photo | | | ✓ | | | | | |
| S | 2 | photo | ✓ | | | | | | | |
| SX | 83 | photo | ✓ | | | | | | | |
| SX | 84 | statement | | | | | | | | |
| SX | 85 | photo | ✓ | | | | | | | |
| | | Motion to Suppress | | | | | | | | |
| SX | 84 | statement | | | ✓ | | | | | |
| | | Defendant's Exhibits | | | | | | | | |
| DX | 1 | photo | | | ✓ | | | | | |

NOTE: ARAP RULE 11(c)...Reporter shall file all exhibits with trial Court Clerk within 14 days (2 weeks) of date of the Notice Appeal in Criminal and Civil Actions, assembled in a flat file (not stuck) and if incapable then assembled in a suitable iner...with index.

1) ABOVE INDEX RECEIVED & FILED ___Nov 15 2000___
2) EXHIBITS IN FILE &/OR CONTAINER VERIFIED (except as noted)

/S/ ___Judy Byrd___
CLERK · REGISTER · or · AUTHORIZED ASS'T.
CLERK'S OFC. [ ] — REGISTER'S OFC. [ ]

DATED THIS 15 DAY OF ___November___ 19 2000

/S/ ___Carla H. Woodall___
4 of 4 pages    20TH    COURT REPORTER JUDICIAL CIRCUIT

STATE'S EXHIBIT NUMBER 11



STATE'S EXHIBIT NUBMER 12



STATE'S EXHIBIT NUMBER 13



STATE'S EXHIBIT NUMBER 14



STATE'S EXHIBIT NUMBER 15



STATE'S EXHIBIT NUMBER 16



STATE'S EXHIBIT NUMBER 17



142

STATE'S EXHIBIT NUMBER 18

CERTIFICATION OF EVIDENCE

I, Judy Byrd, Clerk of the Circuit Court of Houston County, Alabama, that State's Exhibit Number 18 is of such size and bulk (Screwdriver) that it is incapable of being included in the transcript, but will be forwarded to Court of Criminal Appeals if requested by the Court.

*Judy Byrd*

Judy Byrd, Clerk

143

STATE'S EXHIBIT NUMBER 19

CERTIFICATION OF EVIDENCE

I, Judy Byrd, Clerk of the Circuit Court of Houston County, Alabama, do hereby certify that State's Exhibit Number 19 is of such size and bulk ( Paper Towel ) that it is incapable of being included in the transcsript, but will be forwarded to Court of Criminal Appeals if requested by the Court.

_Judy Byrd_
Judy Byrd, Clerk

144

STATE'S EXHIBIT NUMBER 20

CERTIFICATION OF EVIDENCE

　　I, Judy Byrd, Clerk of the Circuit Court of Houston County, Alabama, do hereby certify that State's Exhibit Number 20 is of such size and bulk ( Map ) that it is incapable of being included in the transcript, but will be forwarded to Court of Criminal Appeals if requested by the Court.

Judy Byrd, Clerk

STATE'S EXHIBIT NUMBER 21

CERTIFICATION OF EVIDENCE


    I, Judy Byrd, Clerk of the Circuit Court of Houston County, Alabama, do hereby certify that State's Exhibit Number 21 is of such size and bulk ( Tag ) that it is incapable of being included in the transcript, but will be forwarded to Court of Criminal Appeals if requested by the Court.

Judy Byrd, Clerk

146

STATE'S EXHIBIT NUMBER 22

CERTIFICATION OF EVIDENCE

I, Judy Byrd, Clerk of the Circuit Court of Houston County, Alabama, do hereby certify that State's Number 22 is of such size and bulk (Duct Tape and Plastic) that it is incapable of being included in the transcript, but will be forwarded to Court of Criminal Appeals if requested by the Court.

*Judy Byrd*
Judy Byrd, Clerk

147

STATE'S EXHIBIT NUMBER 27



STATE'S EXHIBIT NUMBER 30



148

STATE'S EXHIBIT NUBMER 33



STATE'S EXHIBIT NUMBER 34



149

STATE'S EXHIBIT NUMBER 36

CERTIFICATION OF EVIDENCE


I, JUdy Byrd, Clerk of the Circuit Court of Houston County, Alabama,
do hereby certify that State's Exhibit Number 36 is of such size and bulk
( Winn Dixie Bag ) that it is incapable of being included in the transcript
but will be forwarded to Court of Criminal Appeals if requested by the Court.

Judy Byrd, Clerk

150

STATE'S EXHIBIT NUMBER 37



STATE'S EXHIBIT NUMBER 46

CERTIFICATION OF EVIDENCE


    I, Judy Byrd, Clerk of the Circuit Court of Houston County, Alabama, do hereby certify that State's Exhibit Number 46 is of such size and ~~bulk~~ ( Finger Prints ) that it is incapable of being included in the transcript but will be forwarded to Court of Criminal Appeals if requested by the Court.

<br>

Judy Byrd, Clerk

STATE'S EXHIBIT NUMBER 78

CERTIFICATION OF EVIDENCE

I, Judy Byrd, Clerk of the Circuit Court of Houston County, Alabama, do hereby certify that State's Exhibit Number 78 is of such size and bulk ( Tape ) that it is incapable of being included in the transcript, but will be forwarded to Court of Criminal Appeals if requested by the Court.

Judy Byrd, Clerk

153

STATE'S EXHIBIT NUMBER 79



*125*    *154*

## DOTHAN POLICE DEPARTMENT

AME _Willie McCray_                    PLACE _Havana Police Dept Fl_

ASE NUMBER _93-05-03593_              DATE/TIME _2330   08-13-93_

:fore we ask you any questions, you must understand your rights.

ou have the right to remain silent.

nything you say can be used against you in Court.

ou have the right to talk to a lawyer for advice before we ask you any questions and to have him with you ıring questioning.

you cannot afford a lawyer, one will be appointed for you before any question, if you wish.

you decide to answer questions now, without a lawyer present, you will still have the right to stop answering any time. You also have the right to stop answering at any time until you talk with a lawyer.

### WAIVER OF RIGHTS

have read this statement of my rights and I understand what my rights are. I am willing to make a statement d answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises threats have been made to me and no pressure of any kind has been used against me to get me to make a statement.

SIGNED _Willie McCray_

/ITNESS _Sgt S Odel_            EDUCATION _12th grade_

ITNESS_____

ME_____ _2332_ _____

have explained the right to remain silent and the right to counsel to _____ well as all other rights to which he is entitled prior to questioning or interrogation by law enforcement of-:ers. After having these rights explained, he refused to sign this statement.

SIGNED _____

VITNESS_____

AT _____

.o. 28

STATE'S EXHIBIT NUMBER 82



STATE'S EXHIBIT NUMBER 83



STATE'S EXHIBIT NUMBER 85



State of Alabama
Unified Judicial System
Form ARAP- 1C        8/91

**REPORTER'S TRANSCRIPT ORDER -- CRIMINAL**
See Rules 10(c) and 11(b) of the
Alabama Rules of Appellate Procedure (A.R. App.P.)

Criminal Appeal Number
CR - 00-241

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

☒ CIRCUIT COURT   ☐ DISTRICT COURT   ☐ JUVENILE COURT OF _____ Houston _____ COUNTY

_____ Willie C. McCray _____, Appellant

v.   ☒ STATE OF ALABAMA   ☐ MUNICIPALITY OF _____

| Case Number CC 94-791 | Date of Judgment/Sentence/Order 10/24/00 |
|---|---|
| Date of Notice of Appeal Oral: 10/24/00    Written: 10/25/00 | Indigent Status Granted: ☒ Yes  ☐ No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, CODE OF ALABAMA 1975).

| Signature | Date | Print or Type Name |
|---|---|---|

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

MARK PROCEEDINGS REQUESTED:

**COURT REPORTER(S)**
Carla H. Woodhall
c/o Hon. Larry Anderson
Dothan, AL 36302

A. ☒ TRIAL PROCEEDINGS - Although this designation will include the judgment and sentence proceedings, a transcript of the organization of the jury and arguments of counsel must be designated separately.

B. ☒ ORGANIZATION OF THE JURY - This designation will include voir dire examination and challenges for cause. Note that in noncapital cases the voir dire of the jury will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

C. ☒ ARGUMENTS OF COUNSEL - Note that in noncapital cases the arguments of counsel will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

| ADDITIONAL PROCEEDINGS REQUESTED | DATE | CODE FOR |
|---|---|---|
| D. | | **FILED** |
| E. | | NOV 8 2000 |
| F. | | Judy Byrd, CLERK |
| G. | | JUDY BYRD, CLERK HOUSTON CO., AL |

IMPORTANT NOTICE: The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

| Signature | Date 11/08/00 | Print or Type Name Joseph W. Lewis |
|---|---|---|

DISTRIBUTION: Original filed with Clerk of Trial Court and copies mailed to: (1) Clerk of the Court of Criminal Appeals. (2) the District Attorney (3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and (4) to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript.

1          IN THE CIRCUIT COURT OF HOUSTON COUNTY

2                     STATE OF ALABAMA

3    STATE OF ALABAMA,              *
                                    *
4    v.                            *    Case No. CC-94-791-792
                                    *
5    WILLIE MCCRAY,                 *
                                    *
6         Defendant.                *

7


8          REPORTER'S OFFICIAL TRANSCRIPT ON APPEAL

9


10

11   Before:

12          The Honorable Jerry M. White and jury

13                October 23, 2000


14   APPEARANCES

15          For the State

16                Douglas Albert Valeska, Esquire
                  District Attorney

17
                  Denise Bates, Esquire
18                Assistant District Attorney

19                Gary Maxwell, Esquire
                  Chief Assistant District Attorney

20

21          For the Defendant

22                Christopher Capps, Esquire
                  Dothan, Alabama

23


24   Carla H. Woodall
25   Court Reporter

3

I N D E X

State of Alabama   v.   Willie McCray
Case Nos. CC-94-791-792

|                                        | PAGE |
|----------------------------------------|------|
| REPORTER'S TRANSCRIPT ORDER            | 1    |
| TITLE PAGE                             | 2    |
| INDEX                                  | 3    |
| INDEX OF STATE'S TRIAL EXHIBITS        | 10   |
| INDEX OF DEFENDANT'S TRIAL EXHIBITS    | 14   |
| INDEX OF MOTION EXHIBITS               | 15   |
| ROLL OF JURY VENIRE CALLED             | 16   |
| COLLOQUY                               | 16   |
| JURY VENIRE SWORN                      | 17   |
| JURY GENERALLY QUALIFIED               | 17   |
| INDIVIDUAL EXCUSES                     | 20   |
| JURORS EXCUSED                         | 23   |
| JURY VENIRE SWORN                      | 25   |
| VOIR DIRE BY THE COURT                 | 25   |
| VOIR DIRE BY MR. VALESKA               | 27   |
| VOIR DIRE BY THE COURT                 | 50   |
| VOIR DIRE BY MR. CAPPS                 | 52   |
| VOIR DIRE BY THE COURT                 | 94   |
| INDIVIDUAL VOIR DIRE                   | 96   |
| CHALLENGES FOR CAUSE                   | 97   |
| JURY STRUCK                            | 98   |

I N D E X   (Continued)

1

2

3    JURY IMPANELED                                      99

4    ROLL OF JURY CALLED                                 99

5    JURY SWORN                                          99

6    COLLOQUY BY THE COURT                               99

7    MOTION TO QUASH BY MR. VALESKA                     100

8    BATSON MOTION BY MR. CAPPS                         118

9    RULING BY THE COURT                                124

10   COLLOQUY                                           124

11   OPENING STATEMENTS BY MR. VALESKA                  127

12   OPENING STATEMENTS BY MR. CAPPS                    148

13
                    STATE'S TESTAMENTARY EVIDENCE
14
     WITNESSES:
15
         JODY PONCELL
16
             Direct Examination by Mr. Valeska         151
17           Cross Examination by Mr. Capps            157

18
         DWAYNE PEARSON
19
             Direct Examination by Mr. Valeska         160
20           Cross Examination by Mr. Capps            170
             Redirect Examination by Mr. Valeska       173
21

22       FRANK EDWARDS

23           Direct Examination by Mr. Valeska         174
             Cross Examination by Mr. Capps            183
24

25   MOTION FOR ATTORNEY RECUSAL BY DEFENDANT           184

1                       I N D E X   (Continued)

2

3    RULING BY THE COURT                                    186

4              STATE'S TESTAMENTARY EVIDENCE CONTINUED

5    WITNESSES:

6         MIKE ETRESS

7              Direct Examination by Mr. Valeska          188
               Cross Examination by Mr. Capps            195
8

9         JAMES WHITEHURST

10             Direct Examination by Mr. Valeska          197
               Cross Examination by Mr. Capps            208
11

12        DEBORAH SHELTON

13             Direct Examination by Mr. Valeska          211
               Cross Examination by Mr. Capps            228
14             Redirect Examination by Mr. Valeska        232

15

16        JEFF CLARK

17             Direct Examination by Mr. Valeska          236
               Cross Examination by Mr. Capps            249
               Redirect Examination by Mr. Valeska        257
18             Recross Examination by Mr. Capps           268
               Further Redirect Examination
19               by Mr. Valeska                           269

20             Further Recross Examination
                 by Mr. Capps                             271
21

22        ALFREDO PAREDES

23             Direct Examination by Mr. Valeska          272

24   COLLOQUY                                             277

25   PROCEEDINGS FOR OCTOBER 23, 2000, ENDED 5:00 P.M.    279

6

I N D E X   (Continued)

TITLE PAGE                                                280

PROCEEDINGS FOR OCTOBER 24, 2000, BEGAN 9:00 A.M.        281


STATE'S TESTAMENTARY EVIDENCE CONTINUED

WITNESSES:

     STANLEY DEVANE

          Direct Examination by Mr. Valeska             281


MOTION TO SUPPRESS HEARING

ARGUMENT BY MR. CAPPS                                    307


STATE'S TESTAMENTARY EVIDENCE

WITNESSES:

     STANTLEY DEVANE

          Direct Examination by Mr. Valeska             309
          Cross Examination by Mr. Capps                311
          Redirect Examination by Mr. Valeska           312
          Recross Examination by Mr. Capps              312

RULING BY THE COURT                                     315


TRIAL CONTINUED

STATE'S TESTAMENTARY EVIDENCE CONTINUED

WITNESSES:

     STANLEY DEVANE (Continued)

          Cross Examination by Mr. Capps                316
          Redirect Examination by Mr. Valeska           327
          Recross Examination by Mr. Capps              329

     MELANIE MCDOUGLE

I N D E X  (Continued)


Direct Examination by Mr. Valeska         331
Cross Examination by Mr. Capps            335
Redirect Examination by Mr. Valeska       336


MARIETTA PREVOS

Direct Examination by Mr. Valeska         338
Cross Examination by Mr. Capps            354
Redirect Examination by Mr. Valeska       360


KEITHLAND RAYMOND REEVES

Direct Examination by Mr. Valeska         362
Cross Examination by Mr. Capps            371
Redirect Examination by Mr. Valeska       376


STATE RESTS                                        377

COLLOQUY                                           377

MOTION FOR JUDGEMENT OF ACQUITTAL BY MR. CAPPS     378

ARGUMENT BY MR. CAPPS                              378

ARGUMENT BY MR. VALESKA                            378

RULING BY THE COURT                                378

COLLOQUY                                           379

MOTION TO WITHDRAW BY MR. CAPPS                    384

RULING BY THE COURT                                384

COLLOQUY BY THE COURT                              385

DEFENDANT'S TESTAMENTARY EVIDENCE

WITNESSES:

WILLIE C. MCCRAY

I N D E X  (Continued)


Testimony by Mr. McCray                    391
Cross Examination by Mr. Valeska           398

DEFENSE RESTS                                         439

CHARGE CONFERENCE                                     440

RULING BY THE COURT                                   440

CLOSING ARGUMENTS BY MR. VALESKA                      441

CLOSING ARGUMENTS BY MR. CAPPS                        459

REBUTTAL ARGUMENTS BY MR. VALESKA                     463

JURY CHARGE                                           472

ALTERNATE JURORS RELEASED                             495

JURY DELIBERATION                                     495

JURY QUESTION                                         496

JURY DELIBERATION                                     497

JURY QUESTION                                         497

JURY DELIBERATION                                     498

VERDICTS                                              499

JURY POLLED                                           500

JURY DISMISSED                                        500

JUDGEMENT ENTERED                                     500

SENTENCING                                            505

ORAL NOTICE OF APPEAL                                 506

PROCEEDINGS FOR OCTOBER 24, 2000, ENDED               506


MOTION FOR NEW TRIAL

9

1                    I N D E X   (Continued)

2

3    TITLE PAGE                                          507

4    MOTION FOR NEW TRIAL                                508

5    ARGUMENT BY MR. LEWIS                               508

6    RULING BY THE COURT                                 509

7    PROCEEDINGS FOR DECEMBER 14, 2000, ENDED            509

8    REPORTER'S CERTIFICATE                              510

9    CERTIFICATE OF COMPLETION                           512

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF STATE'S TRIAL EXHIBITS

| EXHIBIT NO. | PAGE MARKED | PAGE OFFERED | PAGE ADMITTED |
|---|---|---|---|
| State's 1 | 151 | | |
| State's 2 | 151 | | |
| State's 3 | 151 | | |
| State's 4 | 151 | | |
| State's 5 | 151 | | |
| State's 6 | 151 | | |
| State's 7 | 151 | | |
| State's 8 | 151 | | |
| State's 9 | 151 | | |
| State's 10 | 151 | | |
| State's 11 | 151 | 183 | |
| State's 12 | 151 | 183 | |
| State's 13 | 151 | 183 | |
| State's 14 | 151 | 183 | |
| State's 15 | 151 | 183 | |
| State's 16 | 151 | 183 | |
| State's 17 | 151 | 183 | |
| State's 18 | 151 | 353 | |
| State's 19 | 151 | 347 | |
| State's 20 | 151 | 351 | |
| State's 21 | 151 | 353 | |
| State's 22 | 151 | 348 | |

| | INDEX OF STATE'S TRIAL EXHIBITS CONTINUED | |
|---|---|---|
| State's 23 | 151 | |
| State's 24 | 151 | |
| State's 25 | 151 | |
| State's 26 | 151 | |
| State's 27 | 151 | 264 |
| State's 28 | 151 | |
| State's 29 | 151 | |
| State's 30 | 151 | 266 |
| State's 31 | 151 | |
| State's 32 | 151 | |
| State's 33 | 151 | 266 |
| State's 34 | 151 | 267 |
| State's 35 | 151 | |
| State's 36 | 151 | 350 |
| State's 37 | 151 | 208 |
| State's 38 | 151 | |
| State's 39 | 151 | |
| State's 40 | 151 | |
| State's 41 | 151 | |
| State's 42 | 151 | |
| State's 43 | 151 | |
| State's 44 | 151 | |
| State's 45 | 151 | |

| | INDEX OF STATE'S TRIAL EXHIBITS CONTINUED | | |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | State's 46 | 151 | 348 |
| 4 | State's 47 | 151 | |
| 5 | State's 48 | 151 | |
| 6 | State's 49 | 151 | |
| 7 | State's 50 | 151 | |
| 8 | State's 51 | 151 | |
| 9 | State's 52 | 151 | |
| 10 | State's 53 | 151 | |
| 11 | State's 54 | 151 | |
| 12 | State's 55 | 151 | |
| 13 | State's 56 | 151 | |
| 14 | State's 57 | 151 | |
| 15 | State's 58 | 151 | |
| 16 | State's 59 | 151 | |
| 17 | State's 60 | 151 | |
| 18 | State's 61 | 151 | |
| 19 | State's 62 | 151 | |
| 20 | State's 63 | 151 | |
| 21 | State's 64 | 151 | |
| 22 | State's 65 | 151 | |
| 23 | State's 66 | 151 | |
| 24 | State's 67 | 151 | |
| 25 | State's 68 | 151 | |

| | INDEX OF STATE'S TRIAL EXHIBITS CONTINUED | | |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | State's 69 | 151 | |
| 4 | State's 70 | 151 | |
| 5 | State's 71 | 151 | |
| 6 | State's 72 | 151 | |
| 7 | State's 73 | 151 | |
| 8 | State's 74 | 151 | |
| 9 | State's 75 | 151 | |
| 10 | State's 76 | 151 | |
| 11 | State's 77 | 151 | |
| 12 | State's 78 | 151 | 315 |
| 13 | State's 79 | 151 | 306 |
| 14 | State's 80 | 151 | |
| 15 | State's 81 | 151 | |
| 16 | State's 82 | 151 | 195 |
| 17 | State's 83 | 151 | 195 |
| 18 | State's 85 | 376 | 377 |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

14

| | | | |
|---|---|---|---|

1                    INDEX OF DEFENDANT'S TRIAL EXHIBITS

2

| EXHIBIT NO. | PAGE MARKED | PAGE OFFERED | PAGE ADMITTED |
|---|---|---|---|
| Defendant's 1 | 230 | | |

15

<u>INDEX OF MOTION EXHIBITS</u>

| EXHIBIT NO. | PAGE<br>MARKED | PAGE<br>OFFERED | PAGE<br>ADMITTED |
|---|---|---|---|
| State's 84 | 311 | | |

PROCEEDINGS

1

2          (Jury venire present.)

3      THE CLERK:  Ladies and gentlemen, as I call

4  your name, please announce your presence.

5              (At which time the roll of the jury

6              venire was called by the clerk.)

7      THE COURT:  While she's checking her list,

8  let me ask you to do this for me.  All the jurors;

9  that is, whose names who have just been called, if

10 you will, move up to about the first six rows on

11 both sides.  I don't want you to be uncomfortable,

12 but we have a number of questions that we have to

13 ask you, and these attorneys will be able to see

14 you and understand you better if you're sitting up

15 closer to the front.

16          (Jury venire complied.)

17     THE COURT:  Now, ladies and gentlemen of the

18 jury, we have only one case that will be tried

19 this week, and you will be only qualified as to

20 this one case.  Let me say this to you.  My name

21 is Jerry White, and I am a retired circuit judge

22 on active duty, and I'll be trying the case this

23 week.  This is Mr. Doug Valeska over here

24 representing the State of Alabama; and Mr. Gary

25 Maxwell, his assistant, representing the State;

1     and Ms. Denise Bates, representing the State.

2     This is Mr. Capps -- Mr. Christopher Capps here

3     representing the Defendant.  And the defendant in

4     these cases that will be tried this week is Mr.

5     McCray here, Mr. Willie C. McCray.

6           Now, the first thing that I need to do,

7     ladies and gentlemen, is to qualify you generally

8     to see whether or not you are subject to jury duty

9     in this county.  But I'll first ask the clerk to

10     place you under oath.  If you will, each of you

11     stand and raise your right hand, please.

12           (Jury venire complied.)

13           (At which time the jury venire was sworn

14           by the clerk.)

15     THE COURT:  Now, from this point on let me

16     ask you, sometimes people will walk out of the

17     courtroom without our knowing it, go to the rest

18     room or something.  Please let me ask you this.

19     Please do not leave the courtroom without my

20     knowing it from this point until we select the

21     jury of twelve that will try the case.  Because if

22     you did leave, then something important could

23     occur while you're gone.

24           Now, these are general questions that I

25     need to ask each of you.  And if the answers to

1   these questions do not apply to you, please let me

2   know.  Now, are each of you a citizen of the

3   United States of America?  Is there anyone here

4   who is not a citizen of the United States of

5   America?

6            (No response.)

7       THE COURT:  Is each of you a resident,

8   householder, or free holder of Houston County,

9   Alabama, and have you been such for the past six

10  months -- excuse me, twelve months?  That simply

11  means, has each of you lived in Houston County,

12  Alabama, for the past twelve months?  Is there

13  anyone here who has not lived in Houston County

14  for the past twelve months?

15           (No response.)

16      THE COURT:  Is each of you over the age of

17  nineteen years?  Anyone here under the age of

18  nineteen years?

19           (No response.)

20      THE COURT:  Has either of you ever been

21  convicted of a felony?  A felony being a crime

22  which is punishable by imprisonment in the

23  penitentiary.  Anybody here ever been convicted of

24  a felony?  A felony being defined as a crime which

25  is punishable by imprisonment in the

1  penitentiary.

2          (No response.)

3      THE COURT:  Has either of you been indicted

4  -- that means charged by a grand jury -- with a

5  felony offense within the past twelve months?

6          (No response.)

7      THE COURT:  Is each of you of sound mind so

8  far as you know?

9          (No response.)

10     THE COURT:  Is each of you able to read, to

11 speak, and to understand the English language and

12 to follow instructions which might be given to you

13 in the English language?

14         (No response.)

15     THE COURT:  Does anybody here have a legal

16 excuse as to why they should not do jury duty here

17 this week?  And legal excuses are things such as

18 that you're sick or things of that nature.  Does

19 anybody have a legal excuse?

20         (Hands raised.)

21     THE COURT:  Raise your hands those that you

22 think you've got a legal excuse.

23         (Hands raised.)

24     THE COURT:  The three of you, if you will,

25 approach the bench.

1         (At which time the following proceedings

2         were held at the bench outside of the

3         hearing of the jury venire:)

4      A JUROR:  I have scoliosis and have a great

5 deal of lower back pain and my internist and so I

6 can't sit still.

7      THE COURT:  I know.  I have that, too.

8      A JUROR:  Audrey Swicegood.

9      THE COURT:  If you'll just have a seat right

10 over there.

11      That's Ms. Swicegood.

12      Now, I had three who raised their hands

13 and I've got six up here.

14      A JUROR:  My name is Jas E. Springfield.  I

15 have a sleeping disorder.  And years ago I come

16 down here and represented the bank and told the

17 judge I had a sleeping disorder.  I had a doctor's

18 excuse, but he didn't accept it.  He said he will

19 write down that I won't be able to participate on

20 jury duty at no time.  And so I thought --

21      THE COURT:  A sleep disorder?

22      A JUROR:  Yes, sir.  Sleeping disorder.  I

23 fall asleep all the time.

24      THE COURT:  You fall asleep.

25      A JUROR:  I tried to call, but I couldn't get

1  through.

2  　　THE COURT:  There are so many people that

3  have things like that, there's no way to keep a

4  record of it.

5  　　A JUROR:  Well, I could have got a doctor's

6  excuse, but I thought maybe it was still on file.

7  　　THE COURT:  Just have a seat over there.

8  It's Springfield?

9  　　A JUROR:  Yes, sir.

10  　　THE COURT:  Just have a seat.

11  　　　Yes, ma'am?

12  　　A JUROR:  I have ill bowel syndrome, and I

13  have to go to the rest room a lot.  As long as I

14  can go to the rest room, I don't mind serving.

15  But, you know, like every thirty-five or forty

16  five minutes if I don't go then, I have real bad

17  stomach cramps.

18  　　THE COURT:  What is your name?

19  　　A JUROR:  Charlotte McCoy -- M-c-C-o-y.

20  　　THE COURT:  Just have a seat.

21  　　　Yes, ma'am?

22  　　A JUROR:  Samantha Wall.  I'm an owner and

23  operator of a beauty salon, and I have nobody else

24  in there.

25  　　THE COURT:  Ms. Wall?

1        A JUROR:  Yes.

2        THE COURT:  Would that mean you wouldn't be

3    able to be paid?

4        A JUROR:  I don't get paid if I'm not there.

5    I get paid by the cuts I do.

6        THE COURT:  Yes, ma'am.

7        A JUROR:  Mary Turner.  I do housework; and

8    if I don't work and pay my bills, I don't get

9    paid.

10        THE COURT:  What's your name?

11        A JUROR:  Mary Turner.

12        THE COURT:  Just have a seat over there, Ms.

13    Turner.

14            (At which time the following proceedings

15            were held in open court:)

16        THE COURT:  Roy Thomas, could I speak to you

17    just a second?

18        A JUROR:  Yes, sir.

19            (At which time the following proceedings

20            were held at the bench outside of the

21            hearing of the jury venire:)

22        THE COURT:  Do you have a son named Roy

23    Thomas?

24        A JUROR:  Yes.

25        THE COURT:  Was he subpoenaed for jury duty

1    last week?

2          A JUROR:  I don't know, sir.

3          THE COURT:  You don't know.  You're senior?

4          A JUROR:  Yes.

5          THE COURT:  You're birthday the 28th of

6    February?

7          A JUROR:  Yes, sir.

8          THE COURT:  We're just making sure we have

9    the right -- the mixup is because your son was

10   subpoenaed last week for jury duty.  Thank you

11   very much.

12              (At which time the following proceedings

13              were held in open court:)

14         THE COURT:  Ms. Swicegood, Mr. Springfield,

15   Ms. McCoy, Ms. Wall, and Ms. Turner, I'm going to

16   excuse all five of you.  You may go.  Thank you

17   very much.  If you will, just let the clerk here

18   have your jury buttons.

19              (Jurors excused by the Court.)

20         THE COURT:  Gentlemen, you want to check your

21   list with the clerk to see.

22         MR. VALESKA:  I wrote down the numbers.

23         THE COURT:  You did.  You got them.

24              Mr. Capps, you got them?

25         MR. CAPPS:  I think I do, Judge.

1    (At which time the following proceedings

2    were held at the bench outside of the

3    hearing of the jury venire:)

4    A JUROR:  I work at night.  And I worked last

5    night, and I'm tired and sleepy, and can I go home

6    where I can get some sleep?

7    MR. VALESKA:  I heard him.  I heard what he

8    said.

9    THE COURT:  We're real low on jurors.  That

10    puts us down to thirty-nine.  What kind of work do

11    you do?

12    A JUROR:  Sir?

13    THE COURT:  Do you work every night?

14    A JUROR:  No, not every night.

15    THE COURT:  Where did you work last night?

16    A JUROR:  I started Thursday night and go all

17    the way through the weekend.

18    THE COURT:  I hate to have him up here if

19    he's not alert.

20    MR. CAPPS:  He didn't hear his name called

21    the first time, Judge.

22    THE COURT:  What is your name?  I don't

23    remember your name.

24    A JUROR:  J. R. Rhodes.

25    THE COURT:  We'll excuse you and let you go.

1    A JUROR:  Sir?

2    THE COURT:  I said -- give this lady your

3    button and you can go.

4              (Juror excused by the Court.)

5              (At which time the following proceedings

6              were held in open court:)

7    THE COURT:  Now, ladies and gentlemen of the

8    jury venire, at this time I need to qualify you as

9    to the case -- or cases that will be tried this

10   week.  If you will, I need you to stand and raise

11   your right hand, and the clerk will place you

12   under oath again.

13             (Jury venire complied.)

14             (At which time the jury venire was sworn

15             by the clerk.)

16   THE COURT:  Thank you very much.

17             Now, we're actually going to be trying

18   here this week, or whatever length of time it

19   takes, two cases which have been consolidated for

20   one trial.  In other words, you'll be hearing two

21   charges against this Defendant in one trial.  And

22   I have specific questions that I need to ask you

23   in qualifying you for these cases, and then the

24   attorneys for each side will want to ask you

25   additional questions.

26

1      Is either of you, ladies and gentlemen

2   of the jury, related by blood or by marriage to

3   the Defendant in these cases, Willie D. McCray?

4   And this is Mr. McCray over here as I explained to

5   you.  Is either of you related to Mr. Willie D.

6   McCray by either blood or by marriage?

7          (No response.)

8      THE COURT:  Is either of you a witness in

9   this case -- or these cases either for the State

10  of Alabama or for this Defendant here, Willie D.

11  McCray?

12         (No response.)

13     THE COURT:  Is either of you on the

14  appearance bond or either of the appearance bonds

15  of Mr. Willie D. McCray?

16         (No response.)

17     THE COURT:  Was either of you on the grand

18  jury of Houston County, Alabama, which returned

19  the indictments against this Defendant, that being

20  the September 1994 grand jury where Mr. Glenn

21  Bowers was the foreman?  Was either of you ladies

22  and gentlemen of the jury on that grand jury?

23  That's back in September of 1994.  I believe Mr.

24  Glenn Bowers -- is that correct, Mr. Valeska?

25     MR. VALESKA:  Yes, sir.

1            Judge, it's Willie C. It's Willie C.

2   McCray. I apologize. His middle initial is C.

3       THE COURT: Oh, Willie C.

4       MR. VALESKA: That's correct. It was Mr.

5   Bowers. You're correct. Yes, sir.

6       THE COURT: And this defendant's name is

7   Willie C. I may have said Willie D. But it's

8   Willie C. McCray.

9        (No response.)

10      THE COURT: Was either of you on a petty jury

11  back in September of 1995 where this Defendant

12  appeared where Mr. Jerry Tadlock was the foreman

13  of that petty jury?

14        (No response.)

15      THE COURT: I believe those are all the

16  qualifying questions.

17       Now, Mr. Valeska, does the State have

18  any questions of this jury?

19      MR. VALESKA: I do. Thank you very much,

20  Judge White.

21       Good morning, ladies and gentlemen. I'm

22  Doug Valeska, the district attorney, along with

23  Mr. Gary Maxwell, the chief assistant to my right,

24  and along with Denise Bates, one of the attorneys

25  with the District Attorney's office, that will be

1    handling this case.

2    This is the part of the trial we get to

3    ask you some questions. I appreciate you being

4    honest. I know you will speak up. The court

5    reporter has to take down your responses. I ask

6    you some questions, plus we have to get your name

7    for the Record, okay. I apologize. I don't want

8    to point at you, but that's the only way I can

9    explain it to you there's a bunch of people, can

10   you tell me your name, please, ma'am, can you tell

11   me your name, please, sir.

12   Now, a couple of questions I want to ask

13   you. Judge White asked if any of you knew Chris

14   Capps, the attorney who represents him. What I

15   want to find out, do you know members of his

16   family, ever went to school with him, has he ever

17   done any legal work for you or members of your

18   family? Once again, you know him socially in any

19   way? Does that apply to anybody on the panel?

20   (No response.)

21   MR. VALESKA: Next question. Willie C.

22   McCray, the defendant, as Judge White indicated to

23   you has two charges in this case, two charges we

24   must prove to you from the witness stand. One is

25   murder and one is theft of property in the first

1    degree.  Now, what I want to ask you, ladies and

2    gentlemen, everybody agree that your memory today,

3    today right now as you sit here, wouldn't be as

4    good, a hundred percent as it was back in 1993?

5    Would that be fair?  Everybody agree with that.

6    The reverse I'd like to ask you.  Does anybody

7    believe that if you saw, watched, heard something,

8    you couldn't remember some things that occurred if

9    they stood out for whatever reason, whatever

10    reason they may be, that you couldn't remember

11    some things?  Everybody agree you couldn't

12    remember some things if there was a major event?

13    Would that be fair to say?  For example, you lost

14    a loved one, somebody got married in the family,

15    a child was born, you became a grandmother the

16    first time.  Everybody agree that would be fair,

17    correct?

18            (No response.)

19         MR. VALESKA:  Now, everybody agree human

20    beings cannot remember things one hundred percent

21    seven days a week -- one, two, three, four, five,

22    six, seven, eight, nine, ten years ago one hundred

23    percent always like a computer?  Is that fair to

24    say?  Everybody agree with that?

25            (No response.)

1       MR. VALESKA:  Now, anybody who believes the

2   laws pertaining to murder or theft of property in

3   the murder should not be enforced in Houston

4   County?  Does anybody believe that way?

5       (No response.)

6       MR. VALESKA:  Nobody believes that laws

7   should not be enforced, correct?

8       (No response.)

9       MR. VALESKA:  It's a tough question.  As the

10   district attorney my job is to try cases.  I want

11   to ask you -- and I don't want to ask you to

12   necessarily raise your hand.  At the appropriate

13   time Judge White will allow you to come up and

14   tell him personally, individually, of course, when

15   the lawyers are present.  But I need to find out

16   when a grand jury indicts someone they tell their

17   district attorney to take that individual to

18   trial.  Everybody understands that.  Is that

19   fair?  What I want to make sure is the D.A.'s

20   office that I work in as the district attorney and

21   we have two counties -- Houston and Henry -- in

22   this circuit as well as my staff who works for you

23   in this circuit as well in Henry County, don't

24   raise your hand, but what I want to know, have we

25   ever prosecuted a family member or a friend, a

1    neighbor, someone you went to school with; and I

2    want to know in this way only, ladies and

3    gentlemen, if you're sitting there right now and

4    say, well, Valeska prosecuted someone in my family

5    for whatever offense it is I believe they were

6    innocent, they were convicted, they went to the

7    penitentiary and now Valeska is trying cases with

8    me on the jury, that I can't be fair, I won't be

9    fair in any manner or fashion -- I don't really

10   like the term bias or prejudice, but that's the

11   best way to put it -- if I actually sit on the

12   jury in the case?  So if that would apply to you,

13   I need to know it.  Come up and tell us, okay.

14   Tell us confidently.

15          Does everybody agree the district

16   attorney, myself, any members of the district

17   attorney's office, the attorneys that prosecute

18   cases, everybody knows everybody agrees that when

19   jurors hear cases, actually twelve jurors are the

20   ones who decide whether the State has met their

21   burden and someone is guilty or the State has not

22   proved they are guilty and they are not guilty; is

23   that fair to say?  Everybody agree with that?

24   Does everybody understand and make sure no doubt

25   about it Doug Valeska as the district attorney

32

1     when the jury goes back there and shuts the door

2     and gets ready to vote, Doug Valeska doesn't get a

3     vote?  Everybody agree?

4             (No response.)

5         MR. VALESKA:  That goes back to my question.

6     If we prosecuted a family member or a friend, you

7     understand whether someone goes to the

8     penitentiary, I want to look you straight in the

9     face, that Doug Valeska doesn't make that

10    decision?  Everybody know that?

11            (No response.)

12        MR. VALESKA:  Anybody have a problem with

13    that?  You just think, oh, yeah, Valeska, if you

14    convict someone, you send them to the

15    penitentiary?  The district attorney does not do

16    that.  The district attorney tries cases and the

17    law in this state determines with a circuit judge

18    what determines after that.  Does everybody agree

19    that's fair to say?

20            (No response.)

21        MR. VALEKSA:  Let me ask you this, if I

22    could.  Fingerprints, ladies and gentlemen.

23    Everybody at sometime during your lifetime in your

24    experiences in life either you, yourself, your

25    children, grandchildren, brother, or sisters ever

33

1    looked at your hand, ever looked at the bottom of

2    the foot, you've heard something about

3    fingerprints, correct?  Anybody in this room who

4    has not?

5     -cq

6                    (No response.)

7         MR. VALESKA:  Anybody in this room from your

8    own personal knowledge, your own personal opinion

9    in any way believe that two human beings can have

10   the same fingerprints, palm prints, thumb prints,

11   fingertips, or footprint as another human being of

12   the entire world?  Does anybody believe that?

13                  (No response.)

14        MR. VALEKSA:  Anybody?  If you do, I please

15   need to know.  Or if you're sitting there

16   thinking, well, Valeska, I'm not sure, there could

17   be someone who has the exact same fingerprints,

18   palm prints, footprints that I have.  Does anybody

19   believe that in any way?  The slightest doubt in

20   your mind in any way?  If you do, raise your

21   hand.  There's nothing wrong with that.  If you

22   feel that way, that could be possible.  Anybody

23   believe that?

24                  (No response.)

25        MR. VALESKA:  Once again, by your silence

1    that is no one, correct?

2    (No response.)

3    MR. VALESKA:  Now, the burden of proof the

4    State must meet in these cases against Willie C.

5    McCray on the alleged murder and the alleged theft

6    of property in the first agree has to be proved

7    from the evidence from the witness stand behind me

8    to your satisfaction under the laws of this state

9    the burden is beyond a reasonable doubt, okay.

10   Now, what I want to ask you, beyond a reasonable

11   doubt do you understand does not mean one hundred

12   percent?  Not a mathematical certainty that goes

13   with it.  Not a need that you have to be convinced

14   beyond all doubt.  That's not the burden.  It's

15   beyond a reasonable doubt.  Anybody feel it should

16   be higher, it should be a hundred percent?

17   Valeska, if I sit on this jury and you're handling

18   this case and it comes time to vote, if I'm a

19   juror, I must be convinced -- I'm asking you if

20   you feel this way -- I must be convinced one

21   hundred percent beyond all doubt to a mathematical

22   certainty no doubt about it?  That's not the

23   burden.  But if you feel that way, I have no

24   problem, and I need to know, okay.  I need to know

25   if you feel it should be a hundred percent, it

1    should be beyond all doubt.  Anybody feel that?

2         (No response.)

3         THE COURT:  If you do, that's okay.  It's

4    your opinion.  But that's not the law.  Once

5    again, by your silence no one would require myself

6    or my prosecutors to prove one hundred percent in

7    a case against Willie C. McCray on the alleged

8    murder or the alleged theft of property; is that

9    correct, ladies and gentlemen?

10        (No response.)

11        MR. VALESKA:  Once again, I'll ask a few more

12   questions.  I'll sit down.  But remember that

13   question.  Because if you're one of the twelve

14   that sits and has to decide in this jury box later

15   on this week, I want to make sure that you agree

16   and promise that's not the burden, it's beyond a

17   reasonable doubt, okay.

18        Now, I want to ask you some other

19   questions, if I could.  The evidence that's

20   allowed in the state of Alabama that's called

21   direct evidence and circumstantial evidence.  Two

22   types of evidence admissible in the state.  Direct

23   evidence, the best way I can put it, I see you,

24   you see me.  Direct evidence.  I see me.  I see

25   you.  That's one form of evidence the State can

rely on.  It's called direct evidence.

Another form of evidence is what's called circumstantial evidence.  Direct evidence and circumstantial.  I guess the best example I can give you of circumstantial evidence is we need right now in this community we need one thing to come down from heaven is what?  Rain.  If you went to bed tonight and you fell asleep and you slept hard and you didn't hear anything, see anything, when you got up tomorrow morning and the grass is all green, the flowers are all perked up, peanuts are washed off, puddles everywhere, not just in your yard, but where you drive and you come, you know it did what last night?  You didn't see it, didn't hear it; but you know it rained.  That's a form of circumstantial evidence by the events, circumstances, happenings you observed -- you didn't observe it, but you heard, saw, and watched something not directly but indirectly.  You saw what occurred.  That's a form of circumstantial evidence, okay.

What I want to ask you.  If I can prove from the witness stand allegedly that Willie C. McCray allegedly took an automobile in the theft of property that belonged to a man by the name of

Frank Edwards, but I don't have a direct
witness -- I see you, you see me, okay -- that
actually watched the theft occur, but I can prove
to you beyond a reasonable doubt he allegedly took
the automobile, there's evidence to prove he took
it and didn't have permission, it was in Houston
County, and the owner didn't give it to him or
allow him to use, anybody could return a verdict
of guilty on circumstantial evidence?  Okay.
Anybody that could not?

             (No response.)

      MR. VALESKA:  I've got to have direct
evidence, Valeska.  I've got to have you put
someone who saw them do that.  I don't have to do
that.  That's not what the law says.  I can use
circumstantial evidence.  Anybody have a problem
with that in any way?  You're sitting there
thinking, yeah, I got to have someone that saw him
do it.  In other words, eye-witness testimony.
I'll tell you right now, you won't have
eye-witness testimony on the alleged theft of
property in the first degree.  We will rely on
circumstantial evidence.  Okay.  But you must be
convinced the burden is the same beyond a
reasonable doubt, okay.  Anybody have a problem

1    with that in any way?

2              (No response.)

3         MR. VALESKA:  Nobody, correct?

4              (No response.)

5         MR. VALESKA:  Let me ask you this, if I

6    could.  Difficult being the district attorney.  As

7    the chief law enforcement officer my job is to try

8    cases, to make decisions.  There's different law

9    enforcement agencies within this state.  What I

10   want to know in this county or in this circuit --

11   don't raise your hand -- but tell me because of

12   the nature of some type of case that's going on in

13   the community and some kind of case that was tried

14   in the courthouse last week -- anybody that didn't

15   read The Dothan Eagle Saturday, or did everybody

16   read The Dothan Eagle Saturday?  Somebody did.

17   Did you read the editorials or comments that were

18   written sending the district attorney a message

19   about some alleged case?  If you did or didn't,

20   what I want to ask you is, what I want to know,

21   because of something that's occurred in the

22   community, law enforcement has made an arrest

23   against someone in your family, you don't like the

24   way they handled some case, would that effect you

25   if you sat on the jury in this case?  If it would,

1  come up and tell us confidentially.  Judge White

2  will allow you to come up at the appropriate time.

3  I need to know.

4     Now, if I could, I want to ask you, if I

5  could, once again, in your answer I respect

6  certain individuals in addition to a full-time

7  job, it may be your full-time job, both men and

8  women, because of your religion or your faith or

9  your belief that people say, well, Valeska, I

10  can't sit on a jury.  What occurs sometimes people

11  get selected to sit on a jury and after they have

12  heard all the testimony and the arguments they go

13  back there after they are charged and they knock

14  on the door and they say, because of my beliefs or

15  convictions pertaining to my religious beliefs I

16  can't sit in judgment of my fellow human being

17  because I can't render a decision.  What I want to

18  ask you right now, anybody on this panel that you

19  feel that if you sit on a jury in this case right

20  here this week, if you're sitting in judgment of

21  your fellow human being?  Anybody believe that?

22     (No response.)

23  MR. VALESKA:  No one believes that, do they?

24     (Hand raised.)

25  MR. VALESKA:  You do.  Could I have your

1    name?

2        A JUROR:  James Stroud.

3        MR. VALESKA:  Thank you, Mr. Stroud.

4          Le me ask you, if I could, Mr. Stroud.

5    What I want to ask you, could you sit on the jury

6    and keep an open mind but because when I use the

7    term you're sitting in judgment of your fellow

8    human being, would that effect you in any manner

9    or fashion?

10        A JUROR:  Yeah.

11        MR. VALESKA:  Once again, I'm not asking if

12    you can't do it, I'm just saying in any manner or

13    fashion because your religious beliefs or opinions

14    that some teachers say you don't sit on a jury.

15    You understand you're not sitting in judgment,

16    you're sitting as juror to see if the State of

17    Alabama who I represent can prove to you the

18    alleged crimes of murder and theft of property had

19    occurred; and if they do beyond a reasonable

20    doubt, the law says you should convict Willie

21    McCray if you're satisfied individually and

22    collectively as a jury?  The reverse is if you're

23    not satisfied the State has proved beyond a

24    reasonable doubt on one or both charges, the law

25    says you should find Willie C. McCray not guilty.

1   That's the reverse side.  There's two sides,

2   okay.  What I want to ask you, Mr. Stroud, could

3   you sit on the jury or because you're sitting in

4   judgment and you feel you are that you couldn't do

5   it in this case?

6        A JUROR:  That's a tough question.  I feel

7   that I'm judging him automatically.

8        MR. VALESKA:  Okay.  And that would cause you

9   some concerns?

10       A JUROR:  Uh-huh.

11       MR. VALESKA:  I appreciate your honesty.

12  And, once again, Mr. Capps will have some

13  questions.  I'm not mad or upset with you.  I just

14  want to ask you some questions.

15       Now, if I could, I want you to

16  understand that anybody feel that witnesses, human

17  beings, when they deal with identification

18  testimony, once again, you're talking about two

19  types of direct evidence, the form of

20  identification testimony you dealt with it in your

21  life and seen with people and talked with people

22  and remember what they looked like, do you believe

23  in any manner or fashion that if someone gets on

24  the stand and allegedly identifies someone as the

25  person who allegedly took the life of Michael

42

1    Scott by Willie C. McCray by shooting him with a

2    deadly weapon, semi-automatic the alleged type

3    weapon, in Houston County could be identified,

4    that person has to be a hundred percent sure

5    beyond all doubt?  No one feels that way, do

6    they?  Hundred percent, now.

7            (No response.)

8        MR. VALESKA:  Now, let many ask you this.  I

9    want to ask you about a few witnesses.  These

10   people may or may not testify on behalf of the

11   Defense.  If they do, please let me know how you

12   know them.  I'll try to go over them real

13   quickly.

14           Kenneth Brooks.  Anybody know a Kenneth

15   Brooks down to Columbia, Post Office Box A,

16   Columbia?

17           (Hand raised.)

18       MR. VALESKA:  Yes, sir, could I have your

19   name?

20       A JUROR:  Ed Sims.

21       MR. VALESKA:  How do you know him?

22       A JUROR:  I'm not sure it's the same guy.

23       MR. VALESKA:  I understand.  I have a list

24   here.  These people may or may not testify.  I

25   want you to understand they don't have to

43

1    testify.  The burden is on the State.  Lawyers

2    decide which witnesses they want to call.

3        A JUROR:  He used to live in Seminole

4    County.  I don't know if that's the same Brooks.

5        MR. VALESKA:  That's all I can give you is

6    the name.  That's fine.

7            Anybody else?

8            (Hand raised.)

9        MR. VALESKA:  Yes, ma'am.

10       A JUROR:  I went to school with a Kenneth

11   Brooks in Ashford.

12       MR. VALESKA:  Can I have your name?

13       A JUROR:  Lisa White.

14       MR. VALESKA:  That fact alone cause you to

15   believe his testimony versus the other witnesses?

16   Can keep an open mind?

17       A JUROR:  (Nodded.)

18       MR. VALESKA:  Same with you, would that apply

19   in any way, Mr. Sims?

20       A JUROR:  Do what, now?

21       MR. VALESKA:  Because of his testimony, would

22   you believe his over everybody else's that you

23   couldn't listen to the rest of the testimony and

24   compare it and see what weight you want to give

25   it?  No matter what he said, you believe above

COURT OF CRIMINAL APPEALS NO._____

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

## CIRCUIT COURT OF   HOUSTON   COUNTY, ALABAMA

CIRCUIT COURT NO.    CC-94-791    Volume II

CIRCUIT JUDGE    Jerry White

Type of Conviction / Order Appealed From:   MURDER

Sentence Imposed:   99 years, $20,000.00 Fine, $50.00 Victim Compensation and Restitution

Defendant Indigent:   [X] YES   [ ] NO

Willie C. McCray
_____
                                         **NAME OF APPELLANT**

Honorable Joe Lewis      794-0759
(Appellant's Attorney)        (Telephone No.)
P. O. Box 536
(Address)
Dothan,      Alabama      36302
(City)        (State)        (Zip Code)

### V.

## STATE OF ALABAMA

                                         **NAME OF APPELLEE**

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)





1      anybody else?

2            A JUROR:  I don't think I understand your

3      question.

4            MR. VALESKA:  If that person testified --

5      I'm sorry, I went kind of fast.  If that person

6      testified, just because you possibly know him --

7            A JUROR:  I don't know that I would.

8            MR. VALESKA:  But if you knew him, this

9      person you know, would you automatically believe

10     his testimony no matter what compared to anybody

11     else's or would you keep an open mind and compare

12     it and see what weight you wanted to give it?  Is

13     that fair?

14           A JUROR:  Yes.

15           MR. VALESKA:  Thank you very much.

16               Jeff Mims?  He used to work with the

17     sheriff's office.  Show an address, 214 Goliath

18     Drive, Dothan.  Anybody know Jeff Mims?

19           A JUROR:  I do.

20           MR. VALESKA:  Could I have your name?

21           A JUROR:  Sandy Goodson.

22           MR. VALESKA:  Ms. Goodson, how do you know

23     him?

24           A JUROR:  He's married to one of my friends.

25           MR. VALESKA:  Thank you.

```
 1                    Anybody else?

 2          A JUROR:  I work with him at Farley Nuclear

 3     Plant.

 4          MR. VALESKA:  Could I have your name?

 5          A JUROR:  Sam Hubbard.

 6          MR. VALESKA:  Thank you, Mr. Hubbard.

 7               Jackie Mendheim, he used to work with

 8     the district attorney's office as an investigator,

 9     was a Dothan police officer twenty something

10     years, one of the assistant district attorneys

11     he's related to -- Brad Mendheim -- works for me

12     and running for one of the district judgeships,

13     has Mendheim Bonding Company his brothers do.

14     Anybody know Jackie Mendheim?

15               (Hands raised.)

16          MR. VALESKA:  Yes, sir.  Could I have your

17     name?

18          A JUROR:  Ronnie Kendrick.

19          MR. VALESKA:  How do you know him?

20          A JUROR:  My wife is kin to him.

21          MR. VALESKA:  Once again, any response I ask

22     you may have drawn from that, if you would rather

23     take that up personally, that's fine.

24               Yes, ma'am.  Could I have your name?

25          A JUROR:  Nora Rodriguez -- or Miller.
```

| | |
|---|---|
| 1 | MR. VALESKA:  How do you know him? |
| 2 | A JUROR:  Through a cousin. |
| 3 | MR. VALESKA:  Anybody else on this side? |
| 4 | A JUROR:  Customers with the bonding company. |
| 5 | MR. VALESKA:  Pardon me? |
| 6 | A JUROR:  They eat at our restaurant. |
| 7 | MR. VALESKA:  I need your name for the Record |
| 8 | again. |
| 9 | A JUROR:  Lisa White. |
| 10 | MR. VALESKA:  Thank you. |
| 11 | Anybody on this side? |
| 12 | (Hand raised.) |
| 13 | MR. VALEKSA:  Mr. McCarroll. |
| 14 | A JUROR:  Jackie is a friend of mine. |
| 15 | MR. VALESKA:  Mr. Smith? |
| 16 | A JUROR:  Friend. |
| 17 | MR. VALESKA:  Anybody else? |
| 18 | (No response.) |
| 19 | MR. VALESKA:  Sara Nell Dodson, 207 South |
| 20 | Edwards, Dothan, Alabama.  Anybody know Ms. |
| 21 | Dodson? |
| 22 | (No response.) |
| 23 | MR. VALESKA:  Cora Sapp, 3756 Cypress Circle, |
| 24 | Tallahassee, Florida, does anybody know Mr. Cora |
| 25 | Sapp?  Is she in the courtroom? |

```
 1            MS. SAPP:  (Hand raised.)

 2            MR. VALEKSA:  She's seated right here on the

 3       second row.  Anybody know Ms. Sapp?

 4                 (No response.)

 5            MR. VALESKA:  Thank you, Ms. Sapp.

 6                 Michelle Westbury.  Ms. Westbury?  She's

 7       not here.  Sharon Westbury I show an address of

 8       4004 Cornish Drive, Tallahassee, Florida.  Anybody

 9       know Ms. Westbury?

10                 (No response.)

11            MR. VALESKA:  Raymond Dicks?  He's an

12       attorney down in Florida.  Anybody know Raymond

13       Dicks?  Does that ring a bell?  Down in Quincey,

14       Florida.

15                 (No response.)

16            MR. VALESKA:  One second, please, Judge.

17                 One final question.  Please, if I can

18       have your attention.  I appreciate your attention.

19       I know the Defense does coming down and helping

20       us.  Judge White appreciates it as he indicated.

21       I know the Defense feels the same way.

22                 Any reason you can think of, you don't

23       have to raise your hand, that you would prefer not

24       to sit on the jury in this case in any manner or

25       fashion?  Once again, I know everybody wants to go
```

1    home to their occupation.  I understand that.  But

2    for any real reason, Judge White went over the

3    ones that are legal.

4            (No response.)

5        MR. VALESKA:  That's all I have.

6          (Hand raised.)

7        MR. VALESKA:  Yes, sir?

8        A JUROR:  I ain't -- I don't want to sit on a

9    capital case.

10       MR. VALESKA:  The alleged charge here is

11    murder.  It's not a capital case.  Let me make

12    sure you understand.  The alleged charge is

13    murder.  It's not a capital murder.  Capital

14    murder carries two types of punishment -- death

15    by electrocution and life without parole.  This is

16    this not a capital murder case.  Make sure you

17    understand.  It's an alleged murder case and

18    alleged theft of property.  I appreciate you

19    raising your hand.  But knowing that, does that

20    cause you a concern?  What I mean is not a

21    concern, but can you sit because it's an alleged

22    murder case and we're not talking about capital?

23    I want to make sure everybody understands.  That's

24    not the case.

25       A JUROR:  I can, but I prefer not to.

1          A JUROR:  What's the difference?

2          MR. VALESKA:  That's fine.

3               Could I have your name?

4          A JUROR:  Courtland Kuykendall.

5               (Hand raised.)

6          MR. VALESKA:  Could I have your name for the

7     Record?

8          A JUROR:  Pam Harrelson.

9          MR. VALESKA:  Ms. Harrelson.

10              The question she has, Judge, she asked

11    me what the difference was.  I don't think I'll

12    get into that.  He's charged with murder, not

13    capital murder.

14         THE COURT:  The difference, you know, is -- I

15    mean, between capital murder and regular murder?

16    The death penalty is not -- cannot be imposed in

17    just ordinary felony murder.

18         A JUROR:  Thank you.

19         THE COURT:  The thing that would concern

20    you.

21         MR. VALESKA:  Thank you, Judge.  I just want

22    to make sure -- I appreciate him raising his hand.

23    I don't know what you've seen or heard or possibly

24    know anything allegedly.  But, once again, this is

25    an alleged murder case as Judge White indicated

1    and it's theft of property and the cases we're

2    prosecuting.

3         Thank you very much, ladies and

4    gentlemen.

5         Thank you, Judge White.

6         THE COURT:  Yes, sir.

7         Before I give it to Mr. Capps, I want to

8    ask a couple of other questions.  The Court wants

9    to ask a couple of other questions because of some

10   concerns.  I think I've already asked this, but I

11   want to ask it again.  Is each of you -- is either

12   of you a witness in this case either for the State

13   of Alabama or for Willie C. McCray on either of

14   the murder case or the theft of property in the

15   first degree case?

16        (No response.)

17        THE COURT:  Is either of you -- are any of

18   you related by blood or by marriage to Willie C.

19   McCray?

20        (No response.)

21        THE COURT:  Or were you related by blood or

22   by marriage to Michael Scott, who is the

23   deceased?  Either of you related by blood or by

24   marriage to Michael Scott who is now deceased?

25        (No response.)

```
 1          THE COURT:  Or is either of you related by
 2   blood or by marriage to Frank Edwards?
 3          (No response.)
 4          THE COURT:  Is either of you -- let me ask
 5   this question first.
 6              Do either of you know anything about the
 7   facts of this case?  Have you read, heard, or seen
 8   anything about the facts in this case that would
 9   bias your mind and prejudice your verdict and
10   prevent you from giving a fair and impartial trial
11   both to the State of Alabama or this Defendant
12   here, Willie C. McCray, if you were selected as a
13   juror to try this case?
14          (No response.)
15          THE COURT:  Any of you witnessed any of the
16   events of the trial -- of the case or have you
17   heard from somebody else about the facts in the
18   case?  Have you read in the newspaper, heard on
19   television, radio, anything about the facts in
20   this case that would tend to bias your mind and
21   prejudice your verdict and put you in a position
22   to where you couldn't render a fair and impartial
23   verdict for either the State or for this
24   Defendant?
25          (No response.)
```

 1          THE COURT:  Has either of you made any

 2     promise or given any assurance that you would

 3     either convict or acquit this Defendant if you

 4     were selected as a juror to try this case?

 5          (No response.)

 6          THE COURT:  Does either of you have a fixed

 7     opinion before the trial even starts as to the

 8     guilt or the innocence of this Defendant that

 9     would bias your mind and prejudice your verdict

10     and prevent you from giving a fair and impartial

11     trial to both the State and to the Defendant?

12          (No response.)

13          THE COURT:  Mr. Capps, you may take the

14     venire on voir dire.

15          MR. CAPPS:  Thank you, Judge White.

16              Ladies and gentlemen, as Mr. Valeska

17     said, this is a very important case not only for

18     the State of Alabama but also the Defendant in

19     this matter, Mr. Willie C. McCray.  My purpose

20     here today is to seek and enlighten you.  It's not

21     to embarrass anyone or demean anyone, but some of

22     the questions I may ask may be of a sensitive

23     nature; that is, a nature you would rather not

24     answer here in public.  And I certainly

25     understand, and I'd like to give you an

```
 1        opportunity if you would if there's a question
 2        such as that that comes out that you're not
 3        comfortable answering here in public, to please
 4        just remember that and come up before Judge White
 5        so he will give you a chance momentarily in
 6        private to do that.  And that's what I suggest
 7        anyone do with the questions they don't feel
 8        comfortable answering here today.
 9             Sir, are you having trouble hearing?
10        A JUROR:  Yes.
11        MR. CAPPS:  Would you please move up closer?
12        If anyone can't hear, if you'll raise your hand
13        and I will try to increase my voice as much as
14        possible.  I know this is going to be a long
15        trial, and I don't want to give up my voice in the
16        first thirty minutes.
17             However, I would ask you, do you know
18        Mr. Valeska?  Anyone that's a friend with Doug,
19        plays golf with him, tennis, anything of that
20        nature?
21             (Hands raised.)
22        MR. CAPPS:  Yes, sir.  Your name, sir?
23        A JUROR:  Steve McCarroll.
24        MR. CAPPS:  The fact that you know Mr.
25        Valeska, would that tend to sway your opinion in
```

1     this matter in any cause?

2         A JUROR:  No, sir.

3         MR. CAPPS:  Yes, sir?  Your name, please?

4         A JUROR:  Joe Smith.

5         MR. CAPPS:  Mr. Smith, same question.  The

6     fact that you know Mr. Valeska, would that in any

7     way tend to give the evidence he presents more

8     credibility in your mind the simple fact that you

9     know him or a friend of his?

10        A JUROR:  I wouldn't think so.

11        MR. CAPPS:  Anyone else on this first row?

12         (No response.)

13        MR. CAPPS:  If I could go back on this side.

14    Anyone that knows Mr. Valeska, friends,

15    acquaintances, knows his wife, Donna?

16        A JUROR:  I used to work with his wife at

17    SouthTrust Bank.  We were in different

18    departments.

19        MR. CAPPS:  Your name, ma'am?

20        A JUROR:  Roxie Simmons.

21        MR. CAPPS:  Ms. Simmons, once again, the same

22    question.  The fact that you know Ms. Valeska,

23    would that have any impact on your decision here

24    today?

25        A JUROR:  No.

1    MR. CAPPS:  On this side, anyone know Mr.

2    Valeska?

3        (No response.)

4    MR. CAPPS:  Moving along, he has several

5    assistants in his office.  Seated here next to him

6    is Mr. Gary Maxwell.  I understand Mr. Maxwell is

7    also an avid golfer.  Anyone know Mr. Maxwell,

8    play golf with him?

9    A JUROR:  Nora Miller.

10    MR. CAPPS:  How do you know Mr. Maxwell?

11    A JUROR:  My husband is a golf pro where he

12    plays.

13    MR. CAPPS:  Would that in any way impact

14    your decision here in this courtroom today?

15    A JUROR:  No.

16    MR. CAPPS:  Anyone know Ms. Bates -- Ms.

17    Denise Bates?  She's also a member of the

18    prosecution.

19        (Hands raised.)

20    MR. CAPPS:  Yes, ma'am, Ms. Miller.  Once

21    again, how do you know Ms. Bates?

22    A JUROR:  From Dothan High.  She taught at

23    Dothan High when I was in high school.

24    MR. CAPPS:  Was she a teacher of yours in any

25    class?

1        A JUROR:  No.

2        MR. CAPPS:  Anyone else know Ms. Bates?

3           (No response.)

4        MR. CAPPS:  Moving along, several others I'll

5    mention the name.  If anyone knows any of these

6    individuals in the district attorney's office, if

7    you would, just raise your hand and I'll come back

8    to you.  Mr. Butch Binford -- Henry Binford, Brad

9    Mendheim, Eric Davis, William White, Martin Adams,

10   and Durrell Whiddon up in Henry County?  Any of

11   those names you're familiar with these people?

12        (Hands raised.)

13      MR. CAPPS:  Yes, sir?

14      A JUROR:  Brad Mendheim.

15      MR. CAPPS:  How do you know Mr. Mendheim?

16      A JUROR:  Wife's family.

17      MR. CAPPS:  Your name, sir?

18      A JUROR:  Kendrick.

19      MR. CAPPS:  Yes, sir, I believe you had your

20   hand up?

21      A JUROR:  Robert Peterman.

22      MR. CAPPS:  Yes, sir, Mr. Peterman.

23      A JUROR:  A friend of Eric Davis.

24      MR. CAPPS:  And both of you, Mr. Kendrick and

25   Mr. Peterman, the fact that you know these

1       individuals, would that in any way impact the

2       decision you would have here today?

3               A JUROR:  No.

4               A JUROR:  No.

5               MR. CAPPS:  Negative for both of you.

6                   Anyone else know -- yes, sir, your

7       name?

8               A JUROR:  Bobby Norton.

9               MR. CAPPS:  And which one or which of those

10      do you know?

11              A JUROR:  Durrell Whiddon.

12              MR. CAPPS:  Mr. Durrell.  That wouldn't

13      impact your decision here today the fact that you

14      know him?

15              A JUROR:  No.

16              MR. CAPPS:  I don't anticipate him being

17      involved here today at all.

18                  Anyone else?

19              A JUROR:  I know Brad Mendheim through the

20      church.  Joe Smith.

21                  (Hand raised.)

22              MR. CAPPS:  And you're?

23              A JUROR:  Steve McCarroll.  Brad Mendheim.

24              MR. CAPPS:  Same question, would that in any

25      way influence your opinion today the fact that you

1    know someone associated with the prosecutor's

2    office?

3         A JUROR:  No, sir.

4         MR. CAPPS:  Same for you?

5         A JUROR:  Yes, sir.

6         MR. CAPPS:  Anyone here today that's related

7    to anyone in the law enforcement field, that being

8    a state trooper, FBI agent, county deputy sheriff,

9    City of Dothan police officer, or maybe a police

10   officer in any other jurisdiction or locality?

11             (Hand raised.)

12        MR. CAPPS:  Yes, ma'am, your name?

13        A JUROR:  Barbara Hughes.

14        MR. CAPPS:  Ms. Hughes, and who do you know?

15        A JUROR:  Andy Hughes is my nephew.

16        MR. CAPPS:  Andy.  And I believe he's with

17   the Dothan Police Department?

18        A JUROR:  And Frank Meredith in

19   investigations.  He's my son-in-law.  And then my

20   daughter is a juvenile probation officer.

21        MR. CAPPS:  Anyone else familiar with law

22   enforcement?

23        A JUROR:  Any police officer or someone just

24   familiar with this case?

25        MR. CAPPS:  No.  Any police officer.  Even

1    yourself if you were involved in law enforcement.

2    A JUROR:  I know Donnie Smith, Dothan Police

3    Department.

4    MR. CAPPS:  And your name?

5    A JUROR:  Mickey Holland.

6    MR. CAPPS:  How do you know Mr. Smith?

7    A JUROR:  I went to church with him and

8    neighbor.

9    MR. CAPPS:  A neighbor and go to church?

10    A JUROR:  Uh-huh.

11    MR. CAPPS:  Anyone else here have law

12    enforcement acquaintances in the family or

13    involved in law enforcement or past law

14    enforcement?  I'm sort of blooming out the

15    question.

16    A JUROR:  I used to ride with the sheriff's

17    reserve.

18    MR. CAPPS:  You used to ride sheriff's

19    reserve.  And your name?

20    A JUROR:  Steve Hopkins.

21    (Hand raised.)

22    MR. CAPPS:  Yes, sir?

23    A JUROR:  I know Alton Miller.

24    MR. CAPPS:  And your name, sir?

25    A JUROR:  Roy Thomas.

60

```
1          MR. CAPPS:  Anyone else on this side
2     involved --
3               (Hand raised.)
4          MR. CAPPS:  Yes, sir?
5          A JUROR:  Billy Gilmer -- Johnny Gilmer.
6          MR. CAPPS:  And your relationship?
7          A JUROR:  Kin to my mother.
8          MR. CAPPS:  Anyone else on this left side?
9               (No response.)
10         MR. CAPPS:  Moving over here to the right
11    side on this side of the room that's involved in
12    law enforcement either yourself or family members
13    or retired law enforcement?
14              (Hands raised.)
15         MR. CAPPS:  Yes, sir?
16         A JUROR:  My stepson is a police officer in
17    San Antonio, Texas.
18         MR. CAPPS:  Your name?
19         A JUROR:  Carl Hawkey.
20         MR. CAPPS:  Moving on back?
21              (Hand raised.)
22         MR. CAPPS:  Yes, sir?
23         A JUROR:  Mike Etress.
24         MR. CAPPS:  And how do you know --
25         A JUROR:  He's my brother-in-law.
```

```
 1          MR. CAPPS:  And your name, please?

 2          A JUROR:  Tim Martin.

 3          MR. CAPPS:  Is there someone else?

 4               (Hand raised.)

 5          MR. CAPPS:  Yes, sir?

 6          A JUROR:  I have a cousin that is a law

 7     enforcement in Douglasville, Georgia.

 8          MR. CAPPS:  And your name?

 9          A JUROR:  John Toth -- T-o-t-h.

10          MR. CAPPS:  Yes, ma'am?

11          A JUROR:  I have a sister-in-law, Carol Penn,

12     who is a police dispatcher.  And she's my

13     sister-in-law.  And then her son -- stepson, Jason

14     Penn, is on the police department.

15          MR. CAPPS:  Is that here in town?

16          A JUROR:  Yes.  Here in Dothan.  And then I

17     have Mr. Westbury is also a police officer, and

18     he's a good friend with my daughter.  My name is

19     Kathy Stewart.

20          MR. CAPPS:  Thank you, Ms. Stewart.

21               Anyone else?

22               (Hand raised.)

23          MR. CAPPS:  Yes, sir?

24          A JUROR:  My father is retired from the

25     Houston County Sheriff's Department.
```

```
1              MR. CAPPS:  And what's your name, sir?

2              A JUROR:  Sam Hubbard.

3                  (Hand raised.)

4              MR. CAPPS:  Yes, ma'am?

5              A JUROR:  Do you just want to know if we're

6         kin to different law enforcement?

7              MR. CAPPS:  No, ma'am.  It was more broad

8         than that, and I sort of intended to broaden my

9         question as we went along.  But if you know anyone

10        in law enforcement, friends with them; and going

11        back from there, that would be family members,

12        even closer.

13             A JUROR:  I'm Lisa White, and I go to church

14        with Ray Weihe, and Mr. Roney is a police

15        officer.  Joe Phillips.

16             MR. CAPPS:  Thank you, ma'am.

17                  Anyone else on this side over here?

18                  (Hand raised.)

19             MR. CAPPS:  Yes, sir, you had your hand up?

20             A JUROR:  Joe Phillips is a neighbor.  John

21        Grantham is my name.

22             MR. CAPPS:  John Grantham?

23             A JUROR:  Yes, sir.

24                  (Hand raised.)

25             MR. CAPPS:  Yes, ma'am?
```

1        A JUROR:  Stacie Pruitt.  I teach at Girard

2    Middle School, and we have an Officer Garrett in

3    our school with us.  And I also know Richard St.

4    John.

5        MR. CAPPS:  Anyone else?

6          (Hand raised.)

7        MR. CAPPS:  Yes, sir?

8        A JUROR:  Sheriff's department.  Tony Turner,

9    Spivey.

10        MR. CAPPS:  What's your name?

11        A JUROR:  Ronnie Kendrick.

12        MR. CAPPS:  Anyone else have law enforcement

13    ties, know these people in law enforcement?

14        (No response.)

15        MR. CAPPS:  I'll just ask a broad question to

16    everyone that asked the general question regarding

17    law enforcement.  The fact that you know someone

18    involved in law enforcement, would that make you

19    more apt to believe a police officer or deputy's

20    or investigator's testimony than an average

21    person's testimony?

22        (No response.)

23     MR. CAPPS:  Anyone that would be more apt to

24    believe someone in law enforcement?

25        (No response.)

1        MR. CAPPS:  Anyone here that has read The

2    Dothan Eagle this morning?

3            (Hands raised.)

4        MR. CAPPS:  I know I saw a couple of papers

5    in the courtroom.  Start right here.  Your name,

6    sir?

7        A JUROR:  Steve McCarroll.

8        MR. CAPPS:  And did you read the front page

9    this morning?

10       A JUROR:  I glanced at the front page, and I

11   read the sports page.

12       MR. CAPPS:  Did you read anything about the

13   case you heard Judge White mention?

14       A JUROR:  No, sir.

15       MR. CAPPS:  Yes, sir, I believe you mentioned

16   you had read it?

17       A JUROR:  Right.  Same way.

18       THE COURT:  Your name, please?

19       A JUROR:  Jennings Smith.

20       MR. CAPPS:  And your name?

21       A JUROR:  Joe Smith.

22       MR. CAPPS:  Anyone else on the front row read

23   The Eagle this morning?

24           (No response.)

25       MR. CAPPS:  Second row, anybody read The

```
 1        Eagle?

 2                    (No response.)

 3            MR. CAPPS:  Third row, you read The Eagle?

 4                    (No response.)

 5            MR. CAPPS:  Fourth row?

 6                    (Hand raised.)

 7            MR. CAPPS:  Yes, ma'am?

 8            A JUROR:  Elizabeth Shealy.

 9            MR. CAPPS:  And did you read the story

10       relating to this case here this morning?

11            A JUROR:  Lightly.  But I was not aware of

12       it.

13            MR. CAPPS:  Anybody else on the row with Ms.

14       Shealy?

15                    (No response.)

16            MR. CAPPS:  Going on back, anyone else on

17       that row that read The Dothan Eagle this morning?

18            A JUROR:  I saw the headlines.

19            MR. CAPPS:  Your name, sir?

20            A JUROR:  Mickey Holland.

21            MR. CAPPS:  Anyone else on this side that

22       read The Dothan Eagle today?

23                    (No response.)

24            MR. CAPPS:  Anybody on this side of the room,

25       sir?
```

1      A JUROR:  Carl Hawkey.

2      MR. CAPPS:  Did you read the story related to

3  this case?

4      A JUROR:  Yes, I did.

5      MR. CAPPS:  Of course, when you were reading

6  the paper this morning, you didn't know what case

7  you were on?

8      A JUROR:  No.

9      MR. CAPPS:  Nobody knew that.  I'm not trying

10  to point fingers at anybody.  You knew that.

11  Judge White told you a few minutes ago.  No way

12  you could have known that.  I'm not trying to say

13  it's a problem or anything.

14          Anybody else on the third row there

15  you-all read The Eagle?

16        (No response.)

17      MR. CAPPS:  Fourth row?  I believe you had

18  your hand up?

19      A JUROR:  Kendrick.

20      MR. CAPPS:  Mr. Kendrick.  Did you read the

21  story same as Mr. Hawkey?

22      A JUROR:  Yes.

23      MR. CAPPS:  Anyone else on this side over

24  here -- right side read The Dothan Eagle today?

25        (No response.)

1    MR. CAPPS:  Anybody now that has read The

2  Dothan Eagle at any time that is related to this

3  case, State of Alabama versus Willie C. McCray,

4  heard any stories or news accounts of this

5  particular case now that you know what it's

6  about?

7          (No response.)

8    MR. CAPPS:  No one that can recall at least.

9          Anybody here know Michael Scott?

10         (Hand raised.)

11   MR. CAPPS:  Yes, ma'am?

12   A JUROR:  I know -- how old is he?  I went to

13  school with a Michael Scott.  I don't know if it

14  would be the same one.

15   MR. CAPPS:  If I'm not mistaken, I believe he

16  would be in his early -- late thirties, early

17  forties.

18   A JUROR:  I may have.  I went to school with

19  a Michael Scott.  I've lost contact.

20   MR. CAPPS:  You've had no contact for some

21  time?

22   A JUROR:  No.

23   MR. CAPPS:  Your name again, please?

24   A JUROR:  Lisa White.

25   MR. CAPPS:  Anyone else know Michael Scott?

1              (No response.)

2         MR. CAPPS:  There are a few other witnesses

3    that I'd like to briefly go over with you.  Judge

4    White has covered some of them, and Mr. Valeska

5    has covered some of them; and, however, I want to

6    go over the witnesses that I anticipate will

7    testify and ask you if you're related to any of

8    these people or whether or not you know any of

9    these specific individuals I'm fixing to mention.

10   If you do, just raise your hand and I'll stop

11   right there.

12             Melanie McDougle?  She's a news

13   reporter with KMX radio.

14             (No response.)

15        MR. CAPPS:  Marietta Prevos?  She's a

16   fingerprints expert for the State of Alabama.

17             (No response.)

18        MR. CAPPS:  Stan Devane, a police officer

19   with the City of Dothan?

20             (Hands raised.)

21        A JUROR:  I know Stan.

22        MR. CAPPS:  You know Stan Devane.  Mr.

23   Norton, how do you know Stan?

24        A JUROR:  He married a girl in our church

25   several years ago and also bought some carpet when

1    he was part-time, I believe.

2        MR. CAPPS:  The fact that you know Mr.

3    Devane, would you tend to give his testimony more

4    credibility than someone else's?

5        A JUROR:  No.

6        MR. CAPPS:  Anyone else?

7            (Hand raised.)

8        MR. CAPPS:  Yes, sir?

9        A JUROR:  I had some contact with Mr. Devane

10   about fifteen years ago.

11       MR. CAPPS:  And your name?

12       A JUROR:  John Grantham.

13       MR. CAPPS:  Same question that I asked Mr.

14   Norton.  The fact that you know Mr. Devane, would

15   that tend you to give him more credibility than

16   someone else?

17       A JUROR:  No.

18       MR. CAPPS:  Anyone else?

19           (Hand raised.)

20       MR. CAPPS:  Yes, sir?

21       A JUROR:  Been friends with him for a while.

22       MR. CAPPS:  Mr. Smith?

23       A JUROR:  Uh-huh.  Joe Smith.

24       MR. CAPPS:  Same question to you, Mr. Smith.

25   The fact that you know him, would that tend to

1             lead you to believe his testimony any more than

2             someone else's?

3                 A JUROR:  No.

4                 MR. CAPPS:  Anyone else know Officer Devane?

5                     (Hand raised.)

6                 MR. CAPPS:  Yes, sir?

7                 A JUROR:  I worked with him at the Farm

8             Center.

9                 THE COURT:  Your name, please?

10                 A JUROR:  Tim Martin.

11                 MR. CAPPS:  Did you work with him on a

12             continuing basis?

13                 A JUROR:  A couple of months.  I didn't work

14             with him -- maybe three months.  It was a year

15             ago.

16                 MR. CAPPS:  And the fact that you worked with

17             him and know him, would that tend to make you more

18             believable -- his testimony believable to you?

19                 A JUROR:  No.

20                 MR. CAPPS:  Anyone else?

21                   (Hand raised.)

22                 MR. CAPPS:  Yes, ma'am?

23                 A JUROR:  Stan Devane and his wife have been

24             customers for many years.  I'm Lisa white.

25                 MR. CAPPS:  Ms. White, the same question, the

1      fact that you know them and they have been

2      customers of yours, would that in any way make you

3      more apt to believe his testimony than someone

4      else's?

5           A JUROR:  I would certainly think that his

6      testimony would be honorable.  I mean, I know him.

7           MR. CAPPS:  Anyone else on this side?

8               (No response.)

9           MR. CAPPS:  Anyone know Frank Edwards?

10              (No response.)

11          MR. CAPPS:  That address is 815 Appletree

12     Street here in Dothan.

13              (Hand raised.)

14          MR. CAPPS:  Mr. Joe Smith?

15          A JUROR:  Is he in the automobile business?

16     Was he in here earlier?

17          MR. CAPPS:  I really don't know if he was or

18     not.

19          A JUROR:  The Frank Edwards that was in here

20     earlier I know real well.  He's an elderly man,

21     too.  He was in here earlier.

22          MR. CAPPS:  I believe that's the gentleman.

23     The fact that you know him, would that make you

24     more apt to believe his testimony than the average

25     other person that would testify?

```
 1              A JUROR:  I wouldn't think so.

 2              MR. CAPPS:  Anyone else that knows Mr.

 3      Edwards?

 4                  (No response.)

 5              MR. CAPPS:  We've got Jeff Clark who I

 6      anticipate will testify.  A Jeff Clark?

 7                  (No response.)

 8              MR. CAPPS:  Also a Debbie Shelton?

 9                  (No response.)

10              MR. CAPPS:  Linda Hughes?

11                  (No response.)

12              MR. CAPPS:  Jenny McBride?

13                  (No response.)

14              MR. CAPPS:  Karen Scott?

15                  (No response.)

16              MR. CAPPS:  Jody Poncell?

17                  (No response.)

18              MR. CAPPS:  Dwayne Pearson?

19                  (No response.)

20              MR. CAPPS:  Don Pines from Cottonwood Auto

21      Wholesale?

22                  (Hands raised.)

23              MR. CAPPS:  Joe Smith.  Same question I asked

24      you about three times now, Mr. Smith.  Would that

25      influence your opinion as to him or his
```

1    testimony?

2        A JUROR:  No.

3            (Hand raised.)

4        MR. CAPPS:  Yes, sir?

5        A JUROR:  I went to school with him.

6        MR. CAPPS:  And your name?

7        A JUROR:  Mickey Holland.

8        MR. CAPPS:  Mr. Holland, the fact that you

9    went to school with him, would you be more apt to

10   believe his testimony than any other person?

11       A JUROR:  No.

12       MR. CAPPS:  Anyone else know Mr. Pines?

13           (No response.)

14       MR. CAPPS:  Walter Sheffield, have I

15   mentioned the name Walter Sheffield?

16           (No response.)

17       MR. CAPPS:  Walter Powell, he's a fire

18   fighter here with the City of Dothan -- paramedic.

19           (No response.)

20       MR. CAPPS:  Mark Reynolds?

21           (Hand raised.)

22       A JUROR:  I went to school with Mark.

23       MR. CAPPS:  Your name, please?

24       A JUROR:  Sam Hubbard.

25       MR. CAPPS:  The fact that you attended school

1   with Mr. Reynolds, would that make you more apt to

2   believe his testimony than anyone else's?

3        A JUROR:  No, it wouldn't.

4        MR. CAPPS:  Anyone else know Mr. Reynolds?

5        A JUROR:  I know acquaintances and friends.

6        MR. CAPPS:  Your name, please, sir?

7        A JUROR:  Steve Hopkins.

8        MR. CAPPS:  Same question I've asked the

9   other people, Mr. Hopkins.  Would the fact that

10  you know Mr. Reynolds, would that lead you to

11  believe his testimony over someone else's?

12       A JUROR:  No.

13       MR. CAPPS:  A witness by the name of Shelby

14  Kelly.  Anyone know Ms. Shelby Kelly?

15            (No response.)

16       MR. CAPPS:  Shane Lee?

17            (No response.)

18       MR. CAPPS:  Don Parrish of Pilcher's

19  Ambulance Service?

20            (Hand raised.)

21       MR. CAPPS:  Ms. White?

22       A JUROR:  Customer a long time.

23            (Hand raised.)

24       MR. CAPPS:  And your name, sir?

25       A JUROR:  Kendrick.

1    MR. CAPPS:  And you know Mr. --

2    A JUROR:  Good friends.

3    MR. CAPPS:  The fact that both of you know

4    Mr. Parrish, would that impact your believability

5    of his testimony and more apt to believe him

6    because you know him?

7    A JUROR:  No, it wouldn't.

8    MR. CAPPS:  Same for you, Ms. White?

9    A JUROR:  I feel about him the same way as I

10   did with Officer Devane.

11   MR. CAPPS:  Thank you.

12       Anyone else know Mr. Parrish?

13       (No response.)

14   MR. CAPPS:  The last one, I believe, is Dr.

15   Paredes, who is a forensic pathologist here in

16   Houston County?

17       (Hand raised.)

18   A JUROR:  Robert Peterman.  I used to work

19   with Dr. Paredes in the hospital about twenty

20   years ago.

21   MR. CAPPS:  And the fact that you've worked

22   with him in the past, would that influence your

23   opinion of his testimony and be more believable?

24   A JUROR:  No, it would not.

25   MR. CAPPS:  Anyone else?

1              (Hand raised.)

2         MR. CAPPS:  Yes, sir.

3         A JUROR:  I know his wife from where I work.

4         MR. CAPPS:  You don't know him personally,

5    you just know his wife?

6         A JUROR:  Yes.

7         MR. CAPPS:  Your name, sir?

8         A JUROR:  John Grantham.

9         MR. CAPPS:  Anyone else know Dr. Paredes?

10             (No response.)

11        MR. CAPPS:  There are a few others here.  I

12   apologize I need to run over quickly.

13             Dr. Jimmy Jones of the Medical Center?

14        A JUROR:  What was that name?

15        MR. CAPPS:  Dr. Jimmy Jones.

16        A JUROR:  Yes.

17        MR. CAPPS:  And how do you know him?

18        A JUROR:  I work at the Medical Center.

19        MR. CAPPS:  So you're familiar with the

20   personnel at the Medical Center?

21        A JUROR:  Yes, sir.

22        MR. CAPPS:  Your name again?

23        A JUROR:  Peterman.

24        MR. CAPPS:  Thank you, Mr. Peterman -- Robert

25   Peterman.

```
 1                    (Hand raised.)

 2            MR. CAPPS:  Yes, sir?

 3            A JUROR:  Robert Vandelune.  He's a

 4       customer.

 5            MR. CAPPS:  Anyone else know Dr. Jones?

 6            A JUROR:  He is an ER doctor?

 7            MR. CAPPS:  Yes.

 8            A JUROR:  Yes.  A customer of ours.  Lisa

 9       White.

10            MR. CAPPS:  Anyone else over here know Dr.

11       Jones?  Anyone on this side now that I haven't

12       mentioned?

13                    (No response.)

14            MR. CAPPS:  Moving along we have Dr. Jonus

15       Salna, he's also an ER physician?

16                    (Hands raised.)

17            MR. CAPPS:  You as well, Mr. Vandelune, know

18       Dr. Salna?

19            A JUROR:  Yes, sir.

20            MR. CAPPS:  You know him?

21            A JUROR:  Yes, sir.  Peterman.

22            MR. CAPPS:  Based on your employment at the

23       Medical Center?

24            A JUROR:  Yes, sir.

25            MR. CAPPS:  Also have Lieutenant Nick Monday
```

1      of the Dothan Police Department.  Anyone know

2      Lieutenant Monday?

3               (No response.)

4          MR. CAPPS:  Rickey Owens with the Dothan

5      Police Department?

6          A JUROR:  Who was that again?

7          MR. CAPPS:  Rickey Owens.

8          A JUROR:  Yes, sir.

9          MR. CAPPS:  Yes, Ms. White.

10              And we have Joe Saloom, anyone know

11     him?

12              (No response.)

13         MR. CAPPS:  Willie Williamson.  She's an

14     investigator with the Dothan Police Department.

15     Willie Williamson?

16              (No response.)

17         MR. CAPPS:  Eric Davis, I believe I've

18     mentioned his name before.  He's an assistant

19     prosecutor here.

20              (Hand raised.)

21         MR. CAPPS:  You know him?

22         A JUROR:  Yes.

23         MR. CAPPS:  If I can ask how you know Mr.

24     Davis?

25         A JUROR:  Our wives are friends.  We go out

1     to dinner.

2          MR. CAPPS:  Thank you very much, Mr.

3     Peterman.

4               (Hand raised.)

5          MR. CAPPS:  Yes, sir?

6          A JUROR:  Just passing in church.  Hello,

7     good-bye.  Eric Davis.

8          MR. CAPPS:  Mr. Vandelune?

9          A JUROR:  Yes.

10         MR. CAPPS:  Anyone know Mr. Mark Day, he's an

11    investigator with the forensic science?

12              (Hand raised.)

13         MR. CAPPS:  Ms. White.

14              Then there's Sam Bond.  Anyone know Mr.

15    Bond?  He works security at the Medical Center.

16                   (Hands raised.)

17         MR. CAPPS:  Yes, ma'am?

18         A JUROR:  I work with his wife.

19         MR. CAPPS:  Your name?

20         A JUROR:  Diana Lawson.

21         MR. CAPPS:  Mr. Peterman?

22         A JUROR:  I know of Mr. Bond.  Not

23    personally.

24         MR. CAPPS:  You know him through employment?

25         A JUROR:  Yes, sir.

1          MR. CAPPS:  I believe this is the last

2     individual.  Dr. David Williams at the Medical

3     Center?

4               (Hand raised.)

5          MR. CAPPS:  Mr. Vandelune.

6               Anyone else?

7               (Hand raised.)

8          MR. CAPPS:  Of course, Mr. Peterman.  You

9     know him?

10          A JUROR:  Yes, sir.

11          MR. CAPPS:  Anyone else know Mr. Williams --

12     David Williams?

13               (No response.)

14          MR. CAPPS:  Is there anyone here -- and let

15     me ask this question in a general sense since I've

16     already asked -- most everyone here has known

17     somebody -- either a police officer or a potential

18     witness in this case.  Anyone here that has raised

19     their hand that has knowledge they know someone,

20     anyone here that would be more apt to believe that

21     person than the average witness because they know

22     him or because of their background with them?

23     Would they give them that slight edge before they

24     even take the witness stand because they know

25     them?  Is there anyone that would say yes to that

1      question?

2            (Hand raised.)

3      MR. CAPPS:  Ms. White?

4      A JUROR:  Yes.  If you know someone's

5      character and know that they have been honorable

6      people, then it certainly does give more weight.

7      MR. CAPPS:  The question would be you would

8      be more apt to believe their testimony?

9      A JUROR:  Yes.

10     MR. CAPPS:  Anyone else that feels as Ms.

11     White?

12           (No response.)

13     MR. CAPPS:  Anybody here that's ever been

14     accused of doing something that they didn't do?

15     Maybe you were a child, maybe you were scolded by

16     momma for taking the last cookie out of the cookie

17     jar.  Anybody that that's ever happened to that

18     you've been falsely accused of something?

19     A JUROR:  I'm sure it's happened to

20     everyone.

21     THE COURT:  Let me ask and invert.  Anyone

22     that hasn't happened to?  You've never been

23     accused of nothing you know deep down in your mind

24     you did not do that?

25           (Hands raised.)

```
 1          MR. VALESKA:  We have to get responses.  I

 2   need to get some names if I could.

 3          Mr. Hawkey, you responded, correct?

 4      A JUROR:  Beg your pardon?

 5      MR. VALESKA:  You had two jurors that said

 6   something.  I'd like to know who they were.

 7      MR. CAPPS:  No.  I said on the invert.

 8      MR. VALESKA:  What was your name?

 9      A JUROR:  Roxie Simmons.

10      MR. VALESKA:  Thank you, Ms. Simmons.  Just

11   for the Record.

12          And someone else was talking.  Did you

13   respond when he said something?

14      A JUROR:  I was the someone that said I'm

15   sure that's happened to everyone at some point in

16   their life.

17      MR. VALESKA:  And someone else said

18   something.

19      A JUROR:  Oh, yeah.  I agree with what they

20   said.

21      MR. VALESKA:  Just for the Record she's got

22   to take it down.  Thank you.

23      MR. CAPPS:  Anyone here that believes a

24   police officer is perfect?  Anyone believes that?

25   They are not capable of making mistakes?
```

```
 1              (No response.)

 2         MR. CAPPS:  Does everyone agree that police

 3    officers -- that people, that us, human beings,

 4    that we're all imperfect and all capable of making

 5    mistakes?  Does everyone agree with that

 6    statement?

 7              (No response.)

 8         MR. CAPPS:  Is there anyone here today that

 9    has been a -- personally has been a victim of a

10    crime -- criminal act?  Anyone present here

11    today?

12              (No response.)

13         A JUROR:  Been robbed.

14         MR. CAPPS:  Ms. White.

15              Anyone else?

16              (Hand raised.)

17         MR. CAPPS:  Yes, ma'am?

18         A JUROR:  We've been robbed, too.

19         MR. CAPPS:  Your name, too?

20         A JUROR:  Shelia Spears.

21         MR. CAPPS:  Anyone else over here that's been

22    a victim of a crime?  That can be anything from

23    being robbed all the way down to having something

24    stolen from your business or something of that

25    nature?
```

```
 1                    (Hand raised.)

 2          MR. CAPPS:  Yes, sir?

 3          A JUROR:  Kendrick.

 4          MR. CAPPS:  Do you mind telling me --

 5          A JUROR:  Robbed years ago.

 6          MR. CAPPS:  Anyone else?

 7                    (Hand raised.)

 8          MR. CAPPS:  Ma'am?

 9          A JUROR:  Nora Miller.  I've been robbed.

10          MR. CAPPS:  Anyone -- yes, sir?

11          A JUROR:  I had someone go through my car and

12     steal a couple of items out of my car.

13          MR. CAPPS:  Theft?

14          A JUROR:  Yes, sir.

15          MR. CAPPS:  Your name?

16          A JUROR:  John Toth -- T-o-t-h.

17          MR. CAPPS:  Anyone else over on this right

18     side that's been a victim of a crime?

19                    (No response.)

20          MR. CAPPS:  Moving over here to this side.

21     Anyone on this side of the room?

22                    (Hands raised.)

23          MR. CAPPS:  Joe Smith?

24          A JUROR:  Yes.  I've had automobiles stolen

25     from my business and vandalized.
```

1        MR. CAPPS:  Anyone on the second row?

2          (Hand raised.)

3        MR. CAPPS:  Yes, ma'am?

4        A JUROR:  Yes.  My vehicle was broken into

5 and some items were stolen.

6        MR. CAPPS:  Your name, please?

7        A JUROR:  Sandy Goodson.

8          (Hand raised.)

9        MR. CAPPS:  Yes, ma'am?

10        A JUROR:  Rachel Haveard.  I've been robbed.

11        MR. CAPPS:  Yes, ma'am?

12        A JUROR:  Willie Harrelson.  Stolen riding

13 lawn mower.

14        MR. CAPPS:  Anyone else on this left side?

15          (Hands raised.)

16        MR. CAPPS:  Yes, ma'am?

17        A JUROR:  Elizabeth Shealy.  Theft of

18 property.

19        MR. CAPPS:  Moving on down that row.  Yes,

20 sir?

21        A JUROR:  I had -- I've had my house robbed.

22 And forgery on my checking account.  My name is

23 Hopkins.

24        MR. CAPPS:  Anyone else on that row?

25          (Hand raised.)

1          MR. CAPPS:  Yes, sir?

2          A JUROR:  Lawn mower stolen.

3          MR. CAPPS:  Your name, please?

4          A JUROR:  Sims.

5          MR. CAPPS:  Moving down there, sir.  Yes,

6     sir?

7          A JUROR:  Laddie Mayes.  Theft of property.

8          MR. CAPPS:  Anyone else on this --

9              (Hand raised.)

10         MR. CAPPS:  Yes, sir?

11         A JUROR:  Robbery.

12         MR. CAPPS:  Mr. Norton.

13             Anyone --

14             (Hand raised.)

15         MR. CAPPS:  Yes, sir, behind Mr. Norton?

16         A JUROR:  Theft, burglarized.

17         MR. CAPPS:  Mr. Thomas?

18         A JUROR:  Yes.

19         MR. CAPPS:  Anyone else been a victim of a

20    crime here on this side?

21             (No response.)

22         MR. CAPPS:  Anyone that has had a family

23    member involved in a -- involved as a victim of a

24    crime?  And let me qualify that by saying a

25    serious-type crime.  I know all crimes are

1    serious, but let's talk about the robbery-type

2    crimes, the things that are very serious such as

3    rapes, murders, things of that nature.  Anyone

4    that's had a family member or a close friend

5    that's ever been a victim of what we would call a

6    serious-type crime?

7         (Hand raised.)

8         MR. CAPPS:  Yes, sir?  I believe you're Mr.

9    Thomas?

10        A JUROR:  Yes.  Nephew, raped; a nephew,

11   burglary.

12        MR. CAPPS:  That was a nephew of yours,

13   then?

14        A JUROR:  (Nodded.)

15        (Hand raised.)

16        MR. CAPPS:  Yes, ma'am?

17        A JUROR:  Roxie Simmons.  Several years ago

18   my son was stabbed.

19        MR. CAPPS:  Anyone else on the left side

20   related to friends, family members, close

21   acquaintances enough that you were involved in

22   what occurred in their life?

23        (No response.)

24        MR. CAPPS:  Anyone here on the right side?

25        (Hand raised.)

1        MR. CAPPS:  Ms. White?

2        A JUROR:  Had a nephew murdered.

3           (Hand raised.)

4        MR. CAPPS:  Yes, sir?

5        A JUROR:  My name is Randy Hughes.  My

6  sister's in-laws were murdered.

7           (Hand raised.)

8        MR. CAPPS:  Yes, ma'am?

9        A JUROR:  A close friend, they were guardian

10  of a girl that was murdered.

11        MR. CAPPS:  And your name, please?

12        A JUROR:  Shelia Spears.

13        MR. CAPPS:  Anyone else that hasn't

14  answered?

15           (No response.)

16        MR. CAPPS:  Is there anyone here who has

17  served on a jury before that's been up here and

18  actually been selected and sat on a jury before?

19           (Hands raised.)

20        MR. CAPPS:  I'll start here at the front.

21  Your name again, please?

22        A JUROR:  Steve McCarroll.

23        MR. CAPPS:  Do you remember what type jury it

24  was?  Criminal, civil?

25        A JUROR:  It seems like it was civil.

```
1          MR. CAPPS:  Do you remember if the verdict
2     was for the defendant or the plaintiff?
3          A JUROR:  I do.  It was for the complaintant.
4          MR. CAPPS:  For the plaintiff.
5          A JUROR:  Jennings Smith.
6          MR. CAPPS:  First name again?
7          A JUROR:  Jennings.
8          MR. CAPPS:  Do you know if it was civil,
9     criminal jury service?
10         A JUROR:  Civil.
11         MR. CAPPS:  Do you know what the verdict was
12    for the complaining party or the defending party?
13         A JUROR:  Well, he did not get what he
14    wanted, but he got a little.  He got a little, but
15    he wanted to rob Alabama Power Company.
16         MR. CAPPS:  Mr. Joe Smith?
17         A JUROR:  Yes.  It was a DUI offense.
18         MR. CAPPS:  That would have been criminal.
19    Do you remember if it was for the State or the
20    defendant?
21         A JUROR:  He was guilty.  Or he was found
22    guilty.
23         MR. CAPPS:  Anyone else on the first row?
24         A JUROR:  It was a rape.
25         MR. CAPPS:  Your name, please?
```

```
1              A JUROR:  Roxie Simmons.

2              A JUROR:  Do you remember the verdict?

3              A JUROR:  It was not guilty.

4         MR. CAPPS:  Anyone else?

5              (Hand raised.)

6         MR. CAPPS:  Yes, ma'am?

7         A JUROR:  I served on federal.

8         MR. CAPPS:  That's included.  What was your

9    name, please?

10        A JUROR:  Barbara Hughes.

11        MR. CAPPS:  Do you remember what type case it

12   was?

13        A JUROR:  No, I don't.  It's been a long time

14   ago.  I'm sorry.

15        MR. CAPPS:  I'll just write down federal.  Do

16   you know if it was here in Dothan?

17        A JUROR:  Yes, it was in Dothan.

18        MR. CAPPS:  Anyone else on the second row?

19             (No response.)

20        MR. CAPPS:  Third row, anybody?

21             (No response.)

22        MR. CAPPS:  Fourth row?

23        A JUROR:  Margie Wade.  It was a traffic

24   ticket is all I remember, and he was convicted.

25        MR. CAPPS:  Anyone else?
```

1              (Hand raised.)

2          MR. CAPPS:  Yes, sir?

3          A JUROR:  I served on grand jury years ago.

4      Probably ten years ago.

5          MR. CAPPS:  I'm going to have to ask you your

6      name again.

7          A JUROR:  Hopkins.

8              (Hand raised.)

9          MR. CAPPS:  Yes, sir?

10         A JUROR:  James Jordan.  It was armed

11     robbery.  And he was convicted.

12         MR. CAPPS:  Mr. Jordan.

13             Anyone else on this next row?

14             (Hands raised.)

15         A JUROR:  Laddie Mayes.  It was dealing in

16     narcotics.  He was convicted.

17         MR. CAPPS:  Next to Mr. Mayes, yes, sir?

18         A JUROR:  Sims.  Broke in a car.  He was

19     convicted.

20         MR. CAPPS:  Anyone on the back row been on

21     jury service before?

22             (No response.)

23         MR. CAPPS:  Anyone over here that's been on

24     jury service?

25         A JUROR:  Miller.  On a murder trial, and he

1    was convicted.

2         MR. CAPPS:  And you don't remember the style

3    of the case -- the name of the case -- the

4    Defendant's name?

5         A JUROR:  It was -- no, I can't remember his

6    name.

7         MR. CAPPS:  Was it here in Houston County?

8         A JUROR:  It was.

9         MR. CAPPS:  Has it been in the last ten

10   years?

11        A JUROR:  It was in '98.

12        MR. CAPPS:  Anyone else?

13            (Hand raised.)

14        A JUROR:  Ruth Ivey.  And in the sixties.  It

15   was a drug case.  But that's about all I

16   remember.

17        MR. CAPPS:  Do you remember if you-all found

18   him guilty or not guilty?

19        A JUROR:  Not guilty I think.

20        MR. CAPPS:  Anyone else on this right side?

21   Ms. White, you served?

22        A JUROR:  Yes.  It was an insurance case, and

23   the verdict was for the defendant.

24        MR. CAPPS:  Anyone else?

25            (Hand raised.)

1    MR. CAPPS:  Yes, ma'am?

2    A JUROR:  I served on two federal cases and a

3    DUI and a theft.  I think one -- one verdict was

4    for the defendant and three were for the

5    plaintiff.

6    MR. CAPPS:  And your name, please?

7    A JUROR:  Shelia Spears.

8    MR. CAPPS:  Anyone else?

9    (Hand raised.)

10   MR. CAPPS:  Yes, sir?

11   A JUROR:  Randy Hughes.  I've served on a

12   civil and a criminal.

13   MR. CAPPS:  Do you remember the verdict for

14   the defendant or the plaintiff?

15   A JUROR:  Civil it was for the plaintiff, and

16   criminal was for the State.

17   MR. CAPPS:  Anyone else to the right side?

18   (No response.)

19   MR. CAPPS:  Anybody here today that believes

20   the Defendant should take the stand to testify in

21   this matter?

22   (No response.)

23   MR. CAPPS:  Anybody that believes that the

24   Defendant -- does anybody not believe the

25   Defendant has a right not to take the stand?

1    Anybody believe in that?

2         (No response.)

3    MR. CAPPS:  Is there anybody here that would

4    not be able to follow the instructions that Judge

5    White gives you as the jury in this case and the

6    law of the case, that you could not follow the

7    instructions; that is, the laws of the state of

8    Alabama, regarding the law in this particular

9    case?  Anyone that feels like they could not

10   follow the law?

11        (No response.)

12   MR. CAPPS:  I thank you for your

13   attentiveness.  Thank you.

14   THE COURT:  Okay, gentlemen, if you will

15   approach the bench, please.

16        (At which time the following proceedings

17        were held at the bench outside of the

18        hearing of the jury venire:)

19   THE COURT:  I don't think anybody is

20   disqualified from any of the voir dire questions.

21   MR. VALESKA:  No.  I didn't have any.

22   MR. CAPPS:  The only question I have is about

23   Ms. White.  She in response would be more

24   believable to some of the witnesses that the State

25   has on the list because she knows them.  That's

```
 1      the only one I saw that might be a potential
 2      problem.  I don't know if Mr. Valeska has a
 3      response.
 4              THE COURT:  I mean, you can strike her, but
 5      I'm not sure that would disqualify her.
 6              MR. VALESKA:  The only thing I have I think
 7      the corporation.  In case they own stock or own
 8      any interest in that business at the time it was
 9      involved.  The IGA.  The legal corporation.  I
10      don't know if anyone owns any stock.  I don't
11      know.
12                      (At which time the following proceedings
13                       were held in open court:)
14              THE COURT:  Is either of you an officer or
15      employee or director of the Higdon Grocery
16      Company, Incorporated, which does business as
17      Country Market?  Any of you connected with Higdon
18      Grocery Company, Incorporated, doing business as
19      Country Market in any way?
20                      (No response.)
21              THE COURT:  Now, gentlemen, let me see
22      you-all another minute.
23                      (At which time the following proceedings
24                       were held at the bench outside of the
25                       hearing of the jury venire:)
```

1    THE COURT:  I think I ought to just let them

2    go for lunch because it's going to take you an

3    hour probably to get it done.

4         MR. VALESKA:  That's fine.

5         MR. CAPPS:  That's all right.

6              (At which time the following proceedings

7              were held in open court:)

8         THE COURT:  Now, ladies and gentlemen, it's

9    going to take a little time for these attorneys to

10   strike the jury, and I don't see any purpose in

11   your sitting here or staying here while that's

12   done.  So I'm going to excuse you ladies and

13   gentlemen until one-fifteen this afternoon.  If

14   you will, you may go at this time and just come

15   back to this courtroom at one-fifteen.  I'll need

16   everybody back at one-fifteen.  Thank you very

17   much.

18              (Jury venire not present.)

19              (At which time the following proceedings

20              were held at the bench:)

21        A JUROR:  Judge they asked one question if

22   any family members ever been convicted of

23   anything.  My wife has.  But I don't think it will

24   effect my verdict.

25        THE COURT:  Mr. Valeska and Mr. Capps, if

1    you will, approach the bench here.

2         MR. CAPPS:  (Complied.)

3         MR. VALESKA:  (Complied.)

4         THE COURT:  If you will, you don't have to

5    broadcast to the courtroom, if you will, just tell

6    them what you told me.

7         A JUROR:  My wife was convicted one time for

8    shop lifting.

9         MR. VALESKA:  No questions.

10        A JUROR:  My name is Sims.

11        MR. CAPPS:  I forgot to ask them to come up.

12   The answers to my questions, I was pretty verbal

13   with them.

14        THE COURT:  He didn't make any point in it.

15   So, let's see, tell me specifically what the

16   answer that Ms. White that you were -- you said

17   there might be some problem.  What was the

18   answer?  What was the question and the answer?

19        MR. CAPPS:  It was -- she knew the officers.

20   And I had asked her would she be more apt to

21   believe their testimony than any other witness'

22   testimony, and she said that she would.  And then

23   she qualified that by saying because I've known

24   them and know their character and have known their

25   character so they would automatically come in with

1    an edge over someone I didn't know.  And I asked

2    her could she put that aside, and she said she

3    would be more likely to believe their testimony.

4    And I circled that, more likely to believe.

5         THE COURT:  That does -- with those

6    qualifications, that does almost get down to the

7    point where it's -- puts a heavy burden on the

8    Defendant.  I think I'll just disqualify her.

9    What's her number?

10        MR. CAPPS:  One ten.

11        THE COURT:  Strike one ten off.

12        MR. VALESKA:  Yes, sir.

13             (At which time the jury was struck by

14             the attorneys and the clerk off the

15             Record.)

16             (Off the Record.)

17             (Jury venire present.)

18        THE COURT:  If you'll call the roll.

19        THE CLERK:  John Grantham.  Carl Hawkey.

20    Mickey Holland.  Samuel Hubbard.  Barbara Hughes.

21    Nora Miller.  Robert Peterman.  Stacie Pruitt.

22    Elizabeth Shealy.  Jennings Smith.  Gary

23    Strickland.  Roy Thomas.  Margie Wade.  Sara

24    Williams.

25        THE COURT:  We're missing one.

1    THE CLERK:  Let me call the roll and see who

2    it is.

3         (At which time the roll of the jury was

4         called by the clerk.)

5    THE CLERK:  They're all here now, Judge.

6         (At which time the jury was sworn by the

7         clerk.)

8    THE COURT:  Now, ladies and gentlemen, you're

9    the trial jury in these cases against Willie C.

10   McCray, who is charged with felony murder and with

11   theft of property in the first degree.  And until

12   all of the evidence is in and this case has been

13   submitted to you for your verdict, you should not

14   discuss the case among yourselves nor shall you

15   discuss it with anyone else nor should you allow

16   anyone to discuss it with you.  And if anyone

17   approaches you and attempts to discuss this case

18   with you, you should let the Court know

19   immediately.  Now, I'm going at this time to ask

20   you to go to the jury room here at the end of the

21   hall, and we'll call for you shortly to start

22   taking evidence.  If you will, just go with the

23   bailiff to the jury room.

24        (Jury not present.)

25   THE COURT:  Now, all of you other ladies and

```
 1        gentlemen who were not selected on this case, you

 2        are discharged, and you may go by the clerk's

 3        office -- yeah, if you will, go by the clerk's

 4        office on the first floor and they will give you

 5        your pay for your attendance here today.  That's

 6        Room 105.  Thank you very much for your help.

 7                  (Jury venire excused by the Court.)

 8             THE COURT:  How much time do you gentlemen

 9        need to talk to your witnesses before we start

10        taking evidence?

11             MR. CAPPS:  I'll defer to Mr. Valeska?

12             MR. VALESKA:  I'm ready, Your Honor.

13             MR. CAPPS:  Your Honor, I anticipate my

14        witnesses will be called after his.

15             THE COURT:  So it's no problem for you?

16             MR. CAPPS:  No.  Not to delay things.

17             Judge, I don't know if now is a good

18        time -- and I guess wait for the Defendant -- but

19        I do have a couple of motions.

20             THE COURT:  I know you do.  But I want him to

21        be present.

22             Okay.  Let's see.  Does the State -- let

23        me go with the State first.  Does the State have

24        any motions?

25             MR. VALESKA:  Yes, sir.
```

1          If I could, first of all, the Defense

2     served a subpoena on me to testify during the

3     trial.  I'm the lead prosecutor in the case.  I

4     move to quash that subpoena that was served upon

5     me.  So I would ask the Court to do that.

6          THE COURT:  What sort of testimony were you

7     expecting?

8          MR. CAPPS:  Your Honor, it's my belief that

9     the State will attempt to introduce and will

10    introduce testimony that my client made a

11    statement during the course of the last trial here

12    in Houston County.  That the tables were somewhat

13    close together than I believe they are here

14    today.  And Mr. Maxwell was seated in the

15    approximate position where he is now, and my

16    client was seated a little bit closer over this

17    way from my review of the transcript.  And my

18    client allegedly made a statement that

19    incriminates him during the course of the trial.

20    Mr. Maxwell was called on behalf of the State

21    during the last trial and did testify as to what

22    he thought he heard my client say.  Mr. Valeska

23    was present in the courtroom, so was Mr. -- Deputy

24    Mims, who was a court liaison officer at the time,

25    along with Mr. Lamere and Ms. Atwell.  There was a

102

1    lengthy, shall we say conference, regarding it in

2    that first trial.  It was ultimately determined

3    that Mr. Maxwell could testify and as a matter of

4    fact did testify.  And I would submit to the Court

5    that his testimony would be something along the

6    lines quoting allegedly what he heard my client

7    say, that I wasn't wearing no shorts, relating to

8    whether or not the alleged perpetrator had on

9    shorts or didn't have on shorts.  Therefore, Mr.

10   Valeska is a material witness.  He was present

11   when the words were said -- or were not said.  And

12   his evidence, his testimony would have great

13   weight as to whether or not the jury is to believe

14   if this comment was made.  I think this comment

15   whether or not it was made will be very, very

16   shall we say prejudicial to my client.  Mr.

17   Valeska has been introduced here today already as

18   a chief assistant district attorney.  He sat at

19   counsel table here --

20        THE COURT:  Wait a minute.  I thought the

21   subpoena was for Doug.

22        MR. CAPPS:  It is.  However, I anticipate

23   they will call Mr. Maxwell as a witness in this

24   matter.

25        MR. VALESKA:  If I could respond?

1          THE COURT:  Okay.

2          MR. VALESKA:  Judge, if I could point out

3     because this Court did not try the case there are

4     other witnesses if I can give you quick scenarios.

5     There's a KMX reporter who sat back here on the

6     second row when it was brought to Judge Little's

7     attention.  The chief assistant had overheard the

8     Defendant say, quote, unquote, I wasn't wearing no

9     shorts at the time.  The KMX radio reporter heard

10     it.  She did testify.  She is available at trial.

11     Myself being subpoenaed, I was doing direct

12     examination of the witness, Mr. Clark, who was one

13     of the managers of the store.  I was standing up.

14     At the last time this was brought up the Defense

15     did not attempt to subpoena me.  But I was doing

16     direct asking questions at that time in the trial

17     in front of Judge Little and the Defendant present

18     when it was brought to the Court's attention.  I

19     was asking questions.

20          To subpoena me, there are other

21     witnesses they can subpoena -- the Defense can if

22     they wish.  They mentioned one.  Deputy Mims, who

23     they did call to the stand, the Defense did.  He's

24     been subpoenaed by the Defense again.  He would

25     testify as he did last time that he was, as I

1    recall, once again, they will put on what they

2    like, but he wasn't paying attention,  he didn't

3    hear it, his head was turned.  They put him on.

4    He's available.  He's been subpoenaed by the

5    Defense this time.

6          Second, the attorneys, Mr. Lamere and

7    Ms. Atwell, were -- I'm well aware of

8    attorney-client privilege, was the argument to

9    Judge Little, this was a statement made in open

10   court where there's no protection by the Defendant

11   McCray.  Mr. Lamere as I recall the transcript

12   indicated that he would not say it wasn't said.

13   He didn't hear it.  As I recall, that's in the

14   transcript.  Ms. Atwell declined to answer because

15   of the attorney-client privilege.  She never told

16   Judge Little at any time the words were not said,

17   but she declined to give any testimony because of

18   the attorney-client privilege.  Judge Little got

19   off the bench at some point in time and contacted

20   the State Bar because they raised that if they

21   were going to testify or called to the stand they

22   could lose their law license.  The State Bar told

23   them that if Judge Little didn't bring a

24   complaint, the State Bar would not.  And if he

25   did, if they were called to testify, because of

1    what occurred during the trial, there would be no

2    complaint pursued against them because of what was

3    occurring in the courtroom.

4         Second, there's another witness who sat

5    at this table, Jackie Mendheim, who the Defense

6    did call, who was my investigator who no longer

7    works in the office.  I'll give you a proffer of

8    what he said on the Record.  He didn't hear it.

9    He's got poor hearing because he was in Vietnam

10   and he can't hear anything basically.  Mr. Maxwell

11   did hear the comment.  But as far as myself, at no

12   time did I bring to the Court's attention in any

13   way I heard.  I couldn't say it was said because I

14   was doing direct.  So I submit a subpoena on me --

15   there are other witnesses they can bring to the

16   Court if they choose to in this case, and they

17   don't have to naturally, that can testify whether

18   they heard something or something wasn't said.

19   And I'm not even talking about the Defendant.  I'm

20   saying other witnesses.  Jeff Mims, a bailiff, who

21   was a deputy them.  The KMX reporter.

22        Whether I call Mr. Maxwell or not is my

23   decision.  But I would make an argument to the

24   Court he should be allowed to stay in the trial

25   because there's no new evidence he would testify

 1    to in this case if I he chose to call him as a

 2    witness.  It's what he heard during the trial

 3    itself.  There will be no new surprises we would

 4    elicit from Mr. Maxwell.  He did help me try the

 5    first case.  He spent a lot of time and effort in

 6    it.  I submit to the Court if I call him to

 7    testify, once again, the Record itself is what he

 8    testified last time is what he would testify to

 9    again.  But I have no testimony.  I would think

10    they would want to call me as a district attorney

11    to say I didn't hear it as indicated.  But there's

12    a reason because I was doing direct examination.

13         THE COURT:  You didn't hear any --

14         MR. VALESKA:  No, sir.  I didn't hear

15    anything.  And that was put on the Record I

16    believe.  And, once again, Chris can correct me --

17    Mr. Capps -- if I'm wrong.  But I told Judge

18    Little I didn't hear it because I was doing direct

19    of Jeff Clark, a witness.  As I recall, once

20    again, it's been a while, but, I was even standing

21    up.  I wasn't at the table.  But, once again, it's

22    been a couple of years.  Even if I was at the

23    table, I was doing direct.  And that's when the

24    State alleges the Defendant McCray said what I've

25    said.

1          Plus, the KMX reporter, Judge, when we

2     brought forth Mr. Maxwell -- you know, I won't get

3     into the allegations the Defense brought up

4     against the State -- but she stood up and told

5     Judge Little she sat on the second row she heard

6     the Defendant McCray say it.  She's not connected

7     to the D.A.'s office in any way.  She wasn't

8     working for us.  Of course, they are alleging we

9     were eavesdropping on them.  We argued to Judge

10    Little if they don't say it quiet enough, this is

11    a public courtroom, once again, they lose that

12    privilege when they say it loud enough.  She

13    testified in the previous trial.  She made notes.

14    She's available to testify this time as to what

15    she said.  She wrote it down.  And, of course,

16    this is a quote, McCray said, I wasn't wearing no

17    shorts.  So I'm saying there are other witnesses

18    besides the district attorneys.

19         THE COURT:  Yeah.  And I don't understand why

20    you would want to call him in the first place if

21    he didn't hear anything.

22         MR. CAPPS:  That's the whole fact of the

23    matter, Judge.  He didn't hear it.  We're --

24         THE COURT:  He's not saying that it didn't

25    happen, he's just saying he didn't hearing

1     anything.

2         MR. VALESKA:  Correct.

3         THE COURT:  That's what I understand.  Is

4     that what you're saying?

5         MR. VALESKA:  Yes, sir.  And I never once --

6     just for Mr. Capp's benefit because I know he

7     didn't try the other case, but I never once argued

8     to the jury in McCray's last trial that I as the

9     district attorney heard it in any manner or

10    fashion.  I did not.  And that would be the same

11    position I would have now.  I was doing direct.  I

12    was doing Jeff Clark, the witness.  That's where

13    my attention was.  Now, we put on other witnesses

14    who the State allege what McCray said.  Of course,

15    we say we proved it through the KMX reporter and

16    the chief assistant.  Mr. Mendheim is been

17    subpoenaed.  He is available for the Defense to

18    call.  I would submit they would call him if they

19    choose to.  And he's going to say he didn't hear

20    it because of his poor hearing.  I'll tell you

21    that.  That's what's in the trial record from the

22    previous trial.

23        THE COURT:  Did Gary Maxwell testify in the

24    last trial?

25        MR. VALESKA:  Yes, sir.

1              MR. MAXWELL:  As a rebuttal witness.

2              THE COURT:  As a rebuttal witness.

3                    I guess the question I've got that goes

4       to all of this is how can a person act as the

5       lawyer and a witness in a case?

6              MR. VALESKA:  Judge, I think you're

7       absolutely correct.  That was a concern of the

8       last trial when the Defense was arguing that, you

9       know, they could be forced to testify or the

10      attorney-client privilege and they are now put in

11      they had to testify and they wanted to withdraw

12      during the middle of the trial.  Judge Little

13      said, no, we've come this far, there are other

14      witnesses you can use.  They did use.  I didn't

15      call Ms. Atwell to the stand.  And she didn't

16      testify.  Mr. Lamere didn't put her up there.  Mr.

17      Lamere did not take the witness stand.  Once

18      again, I know what the Constitution says.  I can't

19      call Willie McCray to the stand to ask him if he

20      said it, and I know he doesn't have to deny it

21      under the Constitution.  I can't use that.  I'm

22      well aware of that.  But I'm saying I think this

23      is a little bit different because Mr. Maxwell --

24             THE COURT:  It was strictly as a rebuttal

25      because in that trial he took the witness stand

1    and denied --

2        MR. VALESKA:  No, sir.  They put on Jeff Mims

3    and Jackie Mendheim.  Jeff Mims was a bailiff to

4    say he didn't hear it.  So we were trying to show

5    the jury that besides the KMX reporter someone

6    else heard it.

7        THE COURT:  How did the issue ever arise in

8    the first place as direct evidence?

9        MR. VALESKA:  I was doing direct cross

10    examination of Jeff Clark.  An eye witness --

11        THE COURT:  Yeah.  I understand how that --

12        MR. VALESKA:  And what occurred was we were

13    at the table here.  I was standing up.  But what

14    we the State allege and what we offer to the jury

15    is saying there's a KMX reporter that when he was

16    saying he saw the Defendant in clothing he was

17    wearing shorts.  And McCray says -- leans over to

18    Jennifer and/or to Matt -- of course, I believe

19    Matt might have even been standing up.  I'm not

20    sure.  But the statement is made, I wasn't wearing

21    no shorts.  And what occurred is that went on for

22    a few minutes and then there was a recess and Mr.

23    Maxwell tells Jennifer, you better tell your

24    client to talk softer, not so loud, I heard what

25    he said.  And then we got into, for the Court's

1   benefit, yeah-yeahing between the Defense and the

2   State.  We were eavesdropping.  We made it up.  We

3   were trying to violate his rights.  And the KMX

4   reporter sitting on the second row said, excuse

5   me, Judge Little, I heard McCray say it, too.  So

6   we put her on on our case.  They put on Jeff on

7   direct.

8           THE COURT:  On direct?

9           MR. VALESKA:  Yes, sir.  After we got through

10  with Mr. Clark later on in the trial still on

11  direct we put her testimony on.  They put on Jeff

12  Mims as I recall saying he didn't hear anything.

13  This is, once again, my recollection, Judge.  He

14  wasn't looking at McCray.  He wouldn't say it

15  wasn't said, he just didn't hear it.  And then

16  they call Jackie Mendheim, who was the district

17  attorney's investigator who has since left the

18  office.  He said, look -- once again, the Record

19  will state what I'm telling the Court, Mr. Capps

20  has read it -- I was in Vietnam, I road in

21  helicopters, I've got poor hearing, and I wouldn't

22  have heard it anyway my hearing is so bad.  Then

23  we put Mr. Maxwell on rebuttal only to testify for

24  the jury that McCray did make the statement.  In

25  other words, their defense is I didn't do this, I

112

1    wasn't there, I've got an alibi that he said I

2    wasn't wearing no shorts.  In other words, Mr.

3    Clark was wrong.  So I would only offer Mr.

4    Maxwell if I choose to bring him, Judge, only on

5    rebuttal, once again.  If they put on other

6    witnesses.

7        THE COURT:  If the only two witnesses that

8    testified to that were -- you put the WKMX

9    reporter on --

10        MR. VALESKA:  Melanie McDougle.

11        THE COURT:  -- that testified that he or she

12    heard him say that.  Then on the Defendant's case

13    they produced a deputy named Jeff Mims who

14    testified that he didn't see or hear one way or

15    another -- he didn't know.  Why would rebuttal

16    come into play?

17        MR. VALESKA:  Because the Defense -- I

18    understand exactly what you're asking me, Your

19    Honor.  Because they also put on Jackie Mendheim.

20        THE COURT:  Oh, Jackie Mendheim.  And Jackie

21    Mendheim said that it didn't happen.

22        MR. VALESKA:  Jackie, he couldn't hear

23    anything because of his hearing.  And what we did

24    is they also alluded -- Judge, I understand what

25    you're saying is there's nothing to rebut, but the

1    point was Judge Little allowed it because they

2    were implying that we made it up and that somehow

3    the newspaper reporter because she's writing the

4    story for sensationalism, she is naturally going

5    to say because it makes a better story for her and

6    so we put on Maxwell, once again, for rebuttal to

7    say that it did in fact occur.  Mr. Mendheim was

8    sitting here and this is close proximity.  Mr.

9    Maxwell was here.  And I was over here standing

10   up.

11        THE COURT:  So really it might not ever come

12   to that.

13        MR. VALESKA:  Correct.  And I may never call

14   Mr. Maxwell, Your Honor.

15        THE COURT:  It may never even come to pass.

16        MR. VALESKA:  I sure don't know what they are

17   going to put on.  You're correct.

18        THE COURT:  You tell the Court that if you

19   were -- for some reason you were on the witness

20   stand, that your testimony would be that you are

21   not -- you don't know whether it happened or not.

22   You can't say it did or didn't.

23        MR. VALESKA:  That's correct.  That's what I

24   told Judge Little.  I was doing direct.  No manner

25   or fashion.  I tell the Court I've tried a lot of

1    cases during this trial, too.  They look at each

2    other.  Making motion.  Whatever.  I understand

3    they are talking.  But I wasn't listening.  I

4    wasn't listening.  I was doing him and so I wasn't

5    paying any attention.  My direct was to him, his

6    response, and my voice to him.  And I can't tell

7    the Court exactly when I was asking a question, I

8    was asking and he was responding and then they

9    said something because I was not listening or

10    heard anything over there myself.  Because I was

11    doing direct.  And, yes, sir, that wouldn't change

12    at any time.  And that was told to Judge Little.

13    So I would move to quash the subpoena on me.  That

14    would be the reason.

15        THE COURT:  I don't see the value of his

16    testimony to you.

17        MR. CAPPS:  Well, you know, like I said, I do

18    have a feeling they are going to call Mr.

19    Maxwell.  I anticipate they will call him as a

20    witness in this matter.  And the fact that he sat

21    at counsel table during the course of trial and

22    will now be testifying certainly forms a much

23    greater believability in him than an ordinary lay

24    witness.  After all, he's got all the notes, the

25    trial documents there on the table.  He's had

1      information that may be privy to him that no one

2      else has had and now he's coming up here and

3      testifying a vial piece of information that

4      allegedly links this Defendant to a crime scene.

5      And I find it astronomical that we're even having

6      this argument essentially.

7           THE COURT:  Well, I sort of do, too.  But

8      maybe not the same reasons that you do.  It's been

9      represented to me by the D.A. that Mr. Maxwell

10     would not be put on the witness stand personally

11     unless it was necessary for rebuttal.

12          MR. VALESKA:  That would be the only time.

13          THE COURT:  That would be the only time.

14          MR. VALESKA:  And it would be limited -- I'll

15     make an offer to the Court that would only be if

16     they put on witnesses in reference to that.  I'm

17     not going to call him because I've got other

18     witnesses I could use, Your Honor.  And I'm well

19     aware of what the law -- I mean, what the Bar

20     says about a lawyer testifying during a case.  I

21     understand.  You're correct.

22          THE COURT:  It's not supposed to be done.

23          MR. VALESKA:  I agree.  And I don't plan to

24     call him.  I just want to quash the subpoena on me

25     and then try to tell the Court somewhat why they

1    wanted me to testify.

2        THE COURT:  Mr. Capps, anything further?

3        MR. CAPPS:  I have nothing further than I ask

4    the Court to deny that as it was in the

5    courtroom.  He just told us he was at the end of

6    the counsel table and he wasn't paying attention.

7    He was paying attention to his case.

8        MR. VALESKA:  I'm just not going to call

9    him.  If that will resolve it.  I will not call

10   the chief assistant.

11       THE COURT:  Okay.  Very frankly, you know, I

12   feel confident that he couldn't be called anyway.

13   But he says he's not going to call Gary Maxwell so

14   that solves it.  But just for your own

15   information, I was fixing to rule for you-all.

16       MR. VALESKA:  I understand.

17       THE COURT:  Because I don't think that you

18   can -- any more than you can call Mr. Capps to

19   testify that he can call you to testify.

20       MR. VALESKA:  And I agree with you.

21       THE COURT:  Now, anything else, Mr. Valeska?

22       MR. VALESKA:  Judge, yes.  They filed a

23   motion for independent fingerprint analysis.  And

24   once again under the Rules I would be entitled to

25   get copies if they are going to use that

1    information or put on the expert.  Once again,

2    they don't have to tell me their trial strategy.

3    I understand.  But if they are going to use an

4    expert, I'd like to know who it is and what his

5    published records would be.  I have furnished that

6    in mine.  With that limited request I make of the

7    Court.  I understand they don't have to tell me

8    their strategy.  I know that.  I bring that up.

9        MR. CAPPS:  Your Honor, I understand what Mr.

10    Valeska is saying.  At this point in time I do not

11    intend to calling an independent fingerprint

12    expert.

13        THE COURT:  Do not?

14        MR. CAPPS:  I do not anticipate.  However, if

15    that should become an issue, I will immediately

16    make him aware of that and provide him with the

17    documents he's requested.

18        MR. VALESKA:  The only other thing I would

19    ask the Court I have some witnesses as we get into

20    the trial itself if I could call out of order

21    because they work in other jurisdictions.  I would

22    tell the Court I'm well aware of everything I

23    offer they can't connect it up what would happen

24    to the case.  I've tried the case before.  Based

25    on other past rulings I would not in any way try

1       to get into anything else.  Like I said, I just

2       have a couple of GBI officers I need to get on out

3       of order possibly after I get into some testimony,

4       and I would ask for indulgence with that if

5       possible.

6            THE COURT:  I don't have any objection to

7       out-of-order witnesses as long as, you know, the

8       jury realizes what's going on that, you know, it's

9       all going to be connected up.

10           MR. VALESKA:  That's all I have, Judge

11      White.

12           THE COURT:  Mr. Capps?

13           MR. CAPPS:  Thank you, Judge.  On behalf of

14      the Defense we would make a motion pursuant to

15      Batson versus Kentucky and the cases that follow.

16      I would ask the Court to take judicial notice that

17      the Defendant, Willie C. McCray, is an

18      African-American.  I would also ask the Court to

19      take judicial notice that the victim in this case

20      was a white man.

21           THE COURT:  Now, I'm not aware of that.  I

22      don't know.

23           MR. CAPPS:  Well, I would expect the evidence

24      to show that Mr. Michael Scott is a white man.

25      That's what I --

1    MR. VALESKA:  We concur.  That's true.

2    THE COURT:  Okay.  He concurs.

3    MR. CAPPS:  I also ask the Court to note that

4    there were three African-Americans on the venire

5    from which we struck from and that the State

6    struck two of the three, specifically jurors

7    number ninety-eight, James W. Stroud, a black

8    male.

9    THE COURT:  Number ninety-eight?

10    MR. CAPPS:  Yes, Your Honor.

11    Juror number sixty-five, Diana L.

12    Lawson, a black female.

13    THE COURT:  Ninety-eight and sixty-five.

14    MR. CAPPS:  Yes, Your Honor.

15    And that according to my notes there is

16    one African-American on the jury at this time.

17    THE COURT:  I didn't even notice the racial

18    makeup of the jury, but I believe there is just

19    one.

20    MR. VALESKA:  Roy Thomas, who is a black

21    male.  If I'm wrong, Mr. Capps can correct me.

22    MR. CAPPS:  That's correct.

23    THE COURT:  Number one hundred.

24    MR. VALESKA:  And he's not an alternate.

25    He's on the jury.

1      THE COURT:  Okay.  Continue.

2      MR. CAPPS:  According to my notes, I did not

3  hear any responses that I took note of.  I'm not

4  saying there weren't any.  We had a court reporter

5  here to take it down.  And Mr. Valeska's notes may

6  be better than mine.  He has Ms. Bates and Mr.

7  Maxwell to assist him in taking notes.  So I'm

8  just saying my notes don't reflect anything

9  specific that stood out in my mind as for grounds

10  to strike Mr. Stroud or Ms. Lawson that I reviewed

11  and that I wrote in my notes.  So I would ask the

12  Court to declare there's a prima facie case that's

13  been made and require the Prosecutor to go forward

14  and give his reason for the strikes in this

15  matter.

16      THE COURT:  Mr. Maxwell, if you could just

17  state for the Record for me.

18      MR. MAXWELL:  Yes, sir.  In regards to -- let

19  me get the name.  Number ninety-eight, James W.

20  Stroud, he in Mr. Valeska's voir dire answered up

21  that he had religious beliefs that would prevent

22  him from sitting in judgment of his fellow man.

23  So that was the reason we struck him.  And I think

24  probably we could have asked for a strike for

25  cause, but we didn't.  We struck him --

1        THE COURT:  I remember him saying that now.

2    I didn't -- I remember a juror saying that.  I

3    don't specifically remember who it was, but it was

4    Mr. Stroud?

5        MR. MAXWELL:  Yes, sir.

6        And then with Ms. Lawson, our records

7    indicate that, first of all, she has four counts

8    of speeding that she had been convicted of.  I

9    had a number of white people on the jury who, for

10    instance, Samuel A. Hubbard also on four counts of

11    speeding.  I struck him.  Timothy Martin, a white

12    person, has a speeding case.  I struck him.

13    Robert A. Meyer, a white person, a speeding case,

14    I struck them.  Also, early in the voir dire

15    process the Court requested the jurors to move

16    up.  And there was two ladies who did not move

17    up.  One of them was Ms. Lawson and another one

18    was a black female, and I believe that black

19    female was -- I can't remember her name -- but,

20    anyway, she was excused by the Court.  She did

21    move up when the Court told her to.  Mr. Valeska

22    goes through all of his voir dire questions.  Mr.

23    Capps gets ready to do his, and at that point she

24    said she can't hear and would like to move up and

25    she does in fact move up at that time.  So based

1  on the fact that she would not follow the Court's

2  direction to move up when you told her to and also

3  the fact of the speeding cases, I struck her.

4      THE COURT:  Mr. Capps, anything further as

5  far as your Batson motion?

6      MR. CAPPS:  In response to that, Your Honor,

7  I would state that there are a number of jurors

8  out in the venire that evidently could not hear

9  what I was saying.  We had a couple to -- I had to

10  speak up a little louder, and they were sort of

11  cupping their ears and I had to a make adjustments

12  for those.  And what I would like to know and what

13  I would ask the Court to inquire of if in the

14  scrutiny placed upon Ms. Lawson, was that the same

15  amount of scrutiny placed upon the other jurors to

16  research of their background, to see if they had

17  any traffic tickets of every juror, and was the

18  strikes of every other juror consistent with the

19  reason that they struck Ms. Lawson; did they pary

20  particular attention to the other jurors to see if

21  they responded immediately when requested or if

22  they maybe looked the other way or nodded.  What

23  I'm asking the Court, have they required Ms.

24  Lawson, a black female, to have a higher standard

25  because she's black.

1      MR. MAXWELL:  Judge, we struck number

2  forty-four, Sandy L. Goodson, who was a white

3  female, because she had a NWNI.  I struck -- going

4  through the list, as I said, Samuel A. Hubbard

5  because he had four speeding cases; Timothy S.

6  Martin because he had one speeding case; Robert A.

7  Meyer because he had a speeding case.  There was

8  another person on the jury that I had on the list

9  to strike was Bobby R. Norton.  He's had a expired

10  tag.  I didn't have to strike him because Mr.

11  Capps did for me.  Every person who on our list

12  showed any type of arrest whatsoever has either

13  been struck by myself or by Mr. Capps.

14      MR. VALESKA:  Judge, there was a white male

15  -- an elderly gentleman that came to the bench

16  that was excused that said he couldn't hear.  And

17  his name was --

18      MR. MAXWELL:  Mr. Rhodes.

19      THE COURT:  Well, she heard me because I

20  spoke right into the microphone, and I have a loud

21  voice.  There's no doubt in my mind.  Now, Mr.

22  Capps, he has a softer voice, and I know they

23  heard me because I was speaking directly into the

24  microphone.  Where was she sitting?

25      MR. MAXWELL:  She was on the very back.  I

1    think it was in the row in front of the two

2    deputies there (indicating), and you asked her to

3    move, and she did not.

4        THE COURT:  I specifically requested that

5    they all move to the front five or six rows on

6    each side.

7        MR. MAXWELL:  Yes, sir.  The lady that was

8    sitting with her I believe was Ms. Samantha M.

9    Wall.

10        THE COURT:  She was -- she asked to be

11    excused because she is a sole proprietor of a

12    beauty shop.  And I honored her request.

13        MR. VALESKA:  She was one oh seven her juror

14    number.

15        MR. MAXWELL:  And I have a note on my pad

16    here about the business problem and also she did

17    not move up when you told her to.

18        THE COURT:  She was the sole proprietor of a

19    beauty shop.

20            I deny the Batson motion because I

21    don't think that -- it doesn't appear to me that

22    the strikes were made for racial reasons.

23            Now, Mr. Capps, I think you said you had

24    some other matters, or did you?

25        MR. CAPPS:  No, sir.  There have been various

1  rulings prior to, motions in limine, that were

2  denied.  Things of that nature.  And I saw no real

3  reason to relitigate all those issues that have

4  already been litigated.

5      THE COURT:  If you'll just call anything to

6  my attention as we move along.

7      MR. CAPPS:  I believe you are familiar with

8  those, aren't you, Doug?  You-all had various

9  hearings.

10     MR. VALESKA:  It's been a long time, Judge.

11 I've read the transcript.  I really don't recall

12 anything that Judge Little indicated that I could

13 or could not do except for like nolo contendre.  I

14 understand that kind of thing.  I believe I do.

15     THE COURT:  All right.  Are you gentlemen

16 ready for me to call the jury?

17     MR. CAPPS:  Yes, sir.

18     MR. VALESKA:  I'm ready.

19     THE COURT:  If you will, please bring the

20 jury, please, sir.

21         (Jury present.)

22     THE COURT:  Ladies and gentlemen, let me make

23 just a couple of opening comments to you.  As I've

24 told you before, you are -- you, ladies and

25 gentlemen, are the trial jury in this case -- or

1    the cases that are combined of the State of

2    Alabama versus Willie C. McCray.  And during the

3    course of this trial and until all of the evidence

4    is in and the case has been submitted to you for

5    your verdict, you should not discuss the case

6    among yourselves.  You should not discuss the case

7    with anyone else.  And you should not allow anyone

8    to discuss the case with you.  And if anyone

9    approaches you at any point at any time during the

10   course of this trial and attempts to discuss this

11   case with you, then you should let the Court know

12   immediately.  Just completely avoid anybody who

13   attempts to discuss this case with you and let me

14   know immediately.

15          Now, I do not anticipate that this case

16   is going to be a real short case.  It could last a

17   couple -- or three days.  And I'm not going to

18   keep you together during that time.  And when we

19   recess, you'll be able to go to your own homes, of

20   course, to take your meals and go to your own

21   homes at night.  But just remember the

22   instructions that I've given you about not

23   discussing the case with anybody.  No family

24   members or anybody else.  And in addition to that,

25   you cannot read, listen to, or view any news

1    accounts of the events of this trial.  In other

2    words, everything that you know about the trial of

3    this case has to come from this witness stand in

4    this courtroom.

5              Now, with that, I'm going to ask the

6    State, Mr. Valeska, are you ready to state your

7    case to the jury?

8         MR. VALESKA:  I'm ready, Judge White.  Thank

9    you very much.

10             Go back to August 7th of 1993.

11    Saturday.  I want to go even further back to a

12    Friday night where a Mr. and Ms. Frank Edwards

13    owned a 1984 blue Monte Carlo in their business,

14    their car business.  They had washed it up.

15    Getting ready to take it to the sale that Friday

16    night.  They took it to the sale.  It didn't sell.

17    They left the sale with their son, Frank, Jr., who

18    drove the car and they came home where they kept

19    the car in their business.  They had cleaned the

20    car up and when they had cleaned the car up to

21    take it to the sale, there was no road map inside

22    of it.  The steering column wasn't busted in any

23    manner or fashion.  There was no screwdriver

24    inside.  There was no paper white towel that I

25    refer to like a Bounty towel, something you use in

1    the kitchen, inside that car.  And particularly

2    Mr. Edwards will testify and tell you that Willie

3    C. McCray, the man seated over at the table, he

4    didn't give him permission to have, to use, to

5    touch, or to drive that 1984 blue Monte Carlo, a

6    GM Motors dark-colored-looking vehicle.  Also a

7    man by the name of Decory Doster did not have

8    permission to drive, to use, or to have that car

9    in any manner or fashion.

10         Now, what you're going to hear is the

11    car came home that Friday night and was parked.

12    Did not have a tag on it.  No Alabama tag.  In

13    other words, these were people who sold cars and

14    they could use a dealer tag.  When they parked it

15    out front, Frank, Jr., locked it up and gave his

16    father the keys.  It was parked out there on a

17    dirt-type asphalt road area.  Mr. Edwards or his

18    son or his wife didn't wear Hi-Tech boots.  They

19    went in and locked up.  The car was locked.  They

20    went into the house that night.  He was going to

21    get up the next morning and go fishing with his

22    grandson around six-thirty on Saturday morning.

23    What you're going to hear is he gets up with his

24    wife and goes outside and finds the Monte Carlo is

25    gone.  Stolen.  Not there.  They called the

1    police.  Mike Etress comes down from the Dothan

2    Police Department and makes a report, sees the

3    tracks.  Two different sets of tracks by the Monte

4    Carlo.  It had rained that might.  There's some

5    red-looking clay -- sand.  Saw two sets of tracks

6    where the car had been.  The Monte Carlo was

7    gone.

8        Also saw in the sand itself -- I'm

9    talking about the sand on top of asphalt, super

10   thin -- an imprint of a boot.  A print mark in the

11   sand that Etress saw and observed.  He called for

12   another police officer to come and take pictures

13   of the boot because he didn't have a camera in his

14   unit.  Officer comes down there -- Dothan police

15   officer in fact came down there wearing boots.

16   This officer was actually wearing boots.  Etress

17   will testify and tell you that the boot print was

18   there before he got there, and he made sure the

19   officer didn't put any other boot print by that

20   boot print so they could look to collect a picture

21   of the evidence.  They put a little template down

22   for size -- little plastic sides.  You know, like

23   you did in geometry.  Stuck that down to get the

24   size in the picture and took the picture.  Took

25   the call in.  Made a report.  The investigator is

1    looking for it.  No car.

2         What is occurring is I want to go

3    backwards, if I could, to on or about April 4,

4    1993.  Jody Poncell, GBI agent in the state of

5    Georgia.  Alabama has ABI officers, Alabama Bureau

6    of Investigation.  Georgia's are GBI.  And then an

7    officer with the Cairo Police Department, Dwayne

8    Pearson, had the occasion -- Dwayne Pearson

9    observed Willie McCray, the man seated at the

10   table, with another individual named Sutton in a

11   Cadillac in Cairo.  Pearson was not in his patrol

12   unit.  He was a police officer.  He went home and

13   got his badge and his gun and his police unit; in

14   other words, his car, went back looking for Willie

15   McCray.  That Cadillac.  And he sees the Cadillac.

16   It's got a busted-out taillight.  He stopped the

17   vehicle.  The testimony from Dwayne Pearson that

18   they took the known prints, fingerprints of Willie

19   McCray -- called major case prints, and all that

20   is just a slang-type term.  In other words, they

21   take your palm prints, the fingertips, the sides

22   versus what they normally call prints.  They take

23   prints and put them on a white card, the

24   fingerprint card with your thumbs, your fingers,

25   and your tips like I'm holding mine.  But not the

1    palms and sides.  They got Willie C. McCray's

2    prints on April 4, 1993.  They took them into

3    their custody.  Dwayne Pearson kept them.  Cairo

4    Police Department also with Jody Poncell, the

5    Georgia Bureau Investigation officer.

6              Now, I know I'm kind of moving around,

7    but I want to go back.  Mr. and Ms. Edwards, their

8    Monte Carlo was gone.  Disappeared.  That was

9    between Friday night late and Saturday morning at

10   six-thirty on August 7th.  The 6th was Friday

11   night, the 7th Saturday.  What you'll hear in

12   Houston County -- and you'll recall Judge White

13   asked you the property of Higdon Grocery Company,

14   Incorporated, a corporation doing business as the

15   Country Market.  Right down here (indicating), one

16   of the busiest grocery stores here in Dothan,

17   Houston County.  It was open that day doing

18   business.  Saturday night.  Big business.  They

19   had some of the companies around here their

20   employees that come cash their checks.  Extremely

21   large amount of business that Saturday night.

22   Jeff Clark, one of the managers, was there

23   working.  Deborah Shelton, one of the head

24   cashiers.  Walter Sheffield, other employees

25   working inside the Country Market here in Houston

1    County around ten-forty.  Ten-forty.

2           What you will hear is around ten-forty

3    Jeff Clark is left inside the Country Market.  He

4    was inside.  He's the manager.  Goes outside.

5    Goes outside as I recall and he will testify and

6    tell you to smoke a cigarette and take a little

7    break.  He walks out of the store and inside the

8    store.  And as for the cash register lines money

9    is coming in, checks.  They have a safe in the

10   area as you come in the door to the left in a

11   little secure-type area, an office.  And Jeff goes

12   outside.  He's outside smoking cigarettes.

13   Whatever he's doing.  He's the manager looking for

14   some baskets.  And he has the opportunity to

15   observe a Monte Carlo drive up out in front of the

16   store, two individuals get out of the Monte Carlo

17   dressed in black-type clothing, one of them

18   carrying a bag -- a brown grocery-type bag.  Jeff

19   will testify and tell you one of them is Willie

20   McCray, that man sitting right over there behind

21   Mr. Capps (indicating).  He was outside he will

22   tell you.  The manager worked there for a while.

23   It was not unusual for people to do a couple of

24   things -- to come in and bring a bag and go

25   shoplift and take things, or, well, whether they

1  had to make an exchange for some type of item --

2  meat or something, whatever.  But it got his

3  attention.  He goes back in the store.  As he

4  walks in the front of the Country Market just like

5  I'm walking, he walks in the front door here and

6  goes to the right.  Over here to the left, the

7  extreme left is where the office is.  There's cash

8  register aisles all down here.  That's where the

9  safe is.  That's where Deborah was working --

10 Deborah Shelton.  Walter Sheffield is working one

11 of the cash register aisles.  She was inside.  She

12 was supposed to have already left.  It had been a

13 busy night.  She was in there counting money and

14 putting her keys -- and to get inside the inner

15 office you have to buzz a button.  They had VCR's

16 in the store -- there again, we're talking about

17 movies -- in the inner part of the office there

18 was a door for secure reasons.  You had to buzz to

19 get in.  You could see out it.

20        Jeff goes to the right, heads back

21 toward the meat-type counter area in that part of

22 the store.  He comes down the aisles, and so he

23 can't really see through the front.  Doesn't see

24 anything at that time.  Goes down, comes around

25 and starts back up to the front.  As he comes back

1   up the front down one of the aisles, he looks over

2   to the office and he sees an individual at that

3   time dressed in all black, boots, dark shirt.  The

4   black male he will identify and tell you is Willie

5   McCray with the bag.  The bag is going to be,

6   ladies and gentlemen -- this was an IGA Country

7   Market.  The bag is a Winn Dixie bag.  IGA doesn't

8   use Winn Dixie.  Country Market doesn't use Winn

9   Dixie bags.  They use their own namebrand.

10          He sees him there with Walter.  What's

11   occurred is McCray has come in the front door.  He

12   went to the left.  Keithland Reeves was there with

13   his father, a customer.  He's standing there when

14   McCray comes in.  They bump into each other.  He

15   sees McCray dressed in all black, mustache,

16   goatee, good size.  He sees the boots -- Hi-Tech

17   boots.  He sees the bag.  And McCray bumps into

18   him.  He says to McCray, words to the effect, hey,

19   what's going on, hey.  And McCray shows him the

20   bag at that time, he will testify and tell you,

21   with a semi-automatic or a short-type handgun,

22   which is -- has like a bicycle it's got those

23   little cut out little holes like a muffler on a

24   car or a motor bike, a vent that goes across a

25   gun, which he will testify and tell you it was

1    some kind of semi-automatic, not a pistol.  And

2    when he sees that, he knows right then, Keithland

3    Reeves knows there's fixing to be a robbery.

4    Something is fixing to go down.  I want to get out

5    of here with my father.  And as he looks back to

6    the door -- the entrance door there's another man

7    standing there wearing dark clothing with a gun.

8    I submit to you the evidence is going to be it's

9    Doster guarding the entrance and exit.  Same type

10    of clothing.  A hat on with an X on it.  Black.

11    Standing there with a pistol.  Making sure no one

12    could get out or get in.

13        McCray has now come over to where Walter

14    was at one of the cash registers and gets Walter's

15    attention.  He's got the weapon.  Puts it on

16    Walter and starts taking him into the office.

17    Once again, to the left.  As they get to the

18    office, Deborah Shelton is inside.  She sees

19    Walter coming first just like I'm walking at you

20    now.  She really can't see who is behind him at

21    that time.  So she reaches down and buzzes the

22    door to let Walter in.  She figures he's coming in

23    to close his door and get ready to leave and

24    changing shifts.  Nothing about it.  When the door

25    opens, all of a sudden with Walter is Willie

1    McCray with the bag and the weapon.  Yells the

2    words to the effect he wants the money, open the

3    safe, we don't have any key.  She looks at Walter

4    and says, is this a joke.  What you will hear is,

5    these are the words that will come from the

6    testimony, and excuse my expression I'm going to

7    say, but McCray says, this ain't no fucking joke,

8    and shows her the gun.  She's now afraid.

9    Extremely.  She sees McCray.  She sees him.  She

10    sees the gun.  She sees Walter.  He's telling him

11    to open the safe.  They are saying, we can't open

12    the safe, we don't have any keys, only the

13    manager, you got to get a manager.  She's going

14    like this to her blouse (indicating), I don't have

15    any keys.  She's already locked them in the drawer

16    and shut the drawer.  She's closed out inside the

17    office.

18         McCray is then inside the office.  Tells

19    them to get down inside the office.  She looks at

20    Walter, are we supposed to get down.  Seeing the

21    gun, she starts getting down.  McCray is in the

22    office with them.  In her office.  The safe is in

23    there.  What you're going to hear then is McCray

24    leaves inner office, goes to the outer office,

25    goes through the little door, steps out where the

1    first cash register is.  Walter and Deborah are

2    down on the floor.  They can't see in any manner

3    or fashion.  They are afraid.  They don't know

4    what is fixing to occur.  And then Deborah will

5    testify and tell you she hears some screaming or

6    yelling or commotion.  It sounds like glass

7    breaking.  And then she hears, oh, my God, oh, my

8    God, Mike has been shot, someone help me, someone

9    help him.  What's occurred is McCray has stepped

10   out by the first aisle where the cash register is.

11   He's looking for a manager.  Jeff Clark is one of

12   the managers.  He's come back up front and sees

13   there's a robbery and tells the other manager,

14   there's a robbery, call the police.

15              Michael Scott was forty-one years old.

16   He went in the store with his wife.  Went inside

17   to buy some beer there at the Country Market.

18   Michael is coming around the corner up from the

19   aisle.  The evidence will be that he sees McCray.

20   McCray is looking at an angle like this holding

21   the bag and the gun.  Michael walks up to him,

22   strikes him as hard as he can right in the face.

23   Hits McCray in the side of the face with his fist.

24   McCray spuns around a little bit.  McCray has

25   still got the gun with the IGA bag (sic).

1    Keithland Reeves will testify and tell you he was

2    watching.  And when he hit him, he spun around and

3    there was at least one, two, three seconds before

4    McCray takes the automatic weapon, points it at

5    Michael McCray (sic) who I will submit to you at

6    that point in time when he came in the store was a

7    walking dead man, fires the automatic weapon and

8    strikes Michael right here in the chin

9    (indicating).  Makes a big hole.  Goes back

10   through his neck.  Hits the spinal column.

11   Michael is wearing a red hat.  Michael falls over

12   in this manner or fashion straight down on his

13   face.  Goes right down.  There's blood

14   everywhere.  Deborah and them hear the screaming

15   and yelling.  Glass.  Glass from the lights inside

16   the store had busted at the same time the shots

17   went off.  Neon-type lights.  In your experience

18   I'm sure you've heard one explode and how they

19   sound -- loud commotion when they hit or something

20   goes into them.

21         When the weapon is fired, the customers

22   in the store start screaming and yelling and

23   running heading towards the back door so they can

24   get out of the store.  Doster is still at the

25   front door with his weapon.  Keithland Reeves

```
 1    after he sees Michael gets shot, he dives down so

 2    he's not going to get shot.  And then he hears

 3    approximately two more shots that occur.  The

 4    evidence you will hear Jeff heard two more shots

 5    going throughout the store.  Michael goes to the

 6    ground.

 7              Willie McCray I submit to you the

 8    evidence will be he left the Winn Dixie bag right

 9    there where Michael Scott's body was with a hole

10    blown in his chin -- huge hole, with his red hat

11    belonging to Michael.  He runs out of the store

12    with Doster while shots were fired in the store.

13    They run to the Monte Carlo, jump in the Monte

14    Carlo.

15              James Whitehurst, who came with Michael

16    and his wife and had been drinking -- he will

17    testify and tell you he's been drinking.  And

18    believe he will testify and tell you, I was

19    intoxicated.  I was sitting in the car.  They came

20    in.  And I saw this Monte Carlo.  He will not call

21    it a Monte Carlo.  He will say a GM Motors car.

22    Blue -- dark blue or gray.  But he hears what he

23    thought was a backfire.  It got his attention.

24    He's looking to the front of the store.  And all

25    of a sudden two men come running out wearing dark
```

1    clothing.  One has a pistol.  They jump in the

2    Monte Carlo.  Race out to the front of Main

3    Street.  Take a left.  And head up Main.  And he's

4    in the vehicle.  He then gets out.  People are

5    running out of the store.  There's commotion.  He

6    comes to learn his friends Michael has been shot.

7    Four days later Michael is dead.  He died as a

8     result of the gunshot wound.  The Monte Carlo

9    sped off to the left.  This is the store right

10   here.  Main Street left.  He looses sight of it.

11   The two black males.  He can't identify anybody as

12   far as the actual face.  He will tell you.  But he

13   can tell you it was dark.  They had on dark

14   clothing.  Saw a weapon with one of them.  They

15   jumped in that Monte Carlo and they got out of

16   there quickly.

17            What you will hear is police officers

18   start coming, paramedics to the scene.  Try to

19   secure the area and collect evidence.  And there

20   were three spent casings fired as I recall

21   Winchester Remington casings from the weapons that

22   were fired.  They actually fired some of the

23   bullets themselves and fragments that went through

24   the ceiling that were found at the scene.  The

25   bullet that went through Michael Scott and killed

1    him went completely through him.  They never found

2    anything inside of him.  He was taken to the

3    hospital and died three or four days later as a

4    result of the gunshot wound.

5         The police come and they are looking for

6    evidence.  They take pictures.  They collect the

7    hat.  They get the Winn Dixie bag.  They take it

8    into evidence.  Stan Devane gives it to the

9    detective, now a lieutenant working with the

10   detective bureau.  He takes it and he's looking

11   for fingerprints.  He gets it.

12        They are still working at the scene, and

13   as I recall, it was around ten-forty --

14   ten-forty-one on a Saturday night.  And around

15   three o'clock later that morning, into Sunday

16   morning, Jeff is still at the store cleaning up.

17   Police officers are still there.  He calls

18   Devane.  Some of his friends come back, people in

19   the neighborhood, and he says, look, we found a

20   car a couple of blocks here, it's still running,

21   it's a Monte Carlo, it's blue.  I believe if I'm

22   not mistaken -- and he will tell you, I could be

23   wrong, it's been a long time -- but the blinker

24   was on.  So he calls Devane.  Jeff and Devane go a

25   couple of blocks away and find the Monte Carlo.

1    Jeff will testify it's the same one that came to

2    the front of the store with the two black males

3    that went into the store with the dark clothing.

4         When Devane gets there, they find a

5    Monte Carlo that one of the windows in the back

6    that's been broken and there's some duct tape on

7    it.  That the steering column has been broken.

8    There's a screwdriver that's used to start the

9    car.  There is no key, in other words.  When it

10   was taken, it was locked.  They didn't leave their

11   key in there.  Also find a paper towel on one of

12   the doors by the door handle draped over the door

13   handle.  Little white paper towel.  They also find

14   in the Monte Carlo a road map.  A road map.  Once

15   again, the evidence will be Mr. Edwards will

16   testify and tell you what his business was over

17   there by Don Clements' business where the car was

18   kept, there are roads, you can take back roads.

19   It might even be Road 53 that can take you down

20   into Florida, okay, instead of main way.  Some of

21   the back roads.

22        Devane saw the road map.  Took custody

23   of the road map, collection for evidence just

24   like the fingerprint bag.  And also took the tag.

25   As I recall the tag was 38BSF 61.  The tag didn't

1    go on that Monte Carlo.  That tag was taken from

2    another car dealership here in Houston County by

3    Mr. Don Pines was the owner of that tag.  He had a

4    truck that was an '82 truck on that Friday night.

5    And it turned up missing when they started to run

6    the tag.  And Devane contacts him.  And, once

7    again, runs the tag and they go looking for Mr.

8    Don Pines.  That tag was down there at his place

9    of business.  So it's on the stolen Monte Carlo

10   that tag that doesn't go on it, but it's an

11   Alabama tag.

12        What you will hear is then Jody Poncell

13   with ABI over there in Georgia reads about the

14   killing and the robbery at the Country Market here

15   in Dothan.  He calls Lieutenant Stan Devane and at

16   that time asks Sergeant Devane to come to Georgia.

17   We need to see you.  They go to Georgia and have a

18   meeting between Poncell, Devane, and Pearson.  At

19   that time the known fingerprints -- fingerprints

20   of Willie McCray -- are given to Devane.  Now,

21   Devane has personally taken the Winn Dixie bag as

22   well as the Alabama road map to Montgomery to the

23   fingerprint bureau and turned over to a

24   fingerprint expert who is now retired and worked

25   for more than thirty years.  She's one of the few

1    prints experts that on twelve or thirteen in the

2    whole world.  She's certified.  She took the bag

3    and tried to lift fingerprints off it -- latent,

4    hidden fingerprints.  They call them latent

5    fingerprints.  When you touch a glass and you can

6    see you get a fingerprint on the glass.  But a

7    latent print can be something like touch this wood

8    or if you touch paper.  She applies chemicals to

9    it -- the map and the Winn Dixie bag.  She

10   develops fingerprints off the Winn Dixie bag.  She

11   finds three latents -- the left ring finger of

12   Willie McCray, the left index finger of Willie

13   McCray, and the right ring finger of Willie

14   McCray -- on the Winn Dixie bag.  It's the same

15   bag Mr. Clark, Ms. Shelton, and Keithland Reeves

16   will testify and identify as the man who had the

17   weapon that killed Michael Scott.  Jeff actually

18   saw it.  Deborah will testify she was in the store

19   and saw the Winn Dixie bag with the weapon.

20   Keithland Reeves was over to the side, and he

21   observed the shooting when he got down.

22            And then they take the Alabama road map

23   and they attempt to get prints off that.  They

24   find Marietta Prevos will testify and tell you she

25   makes comparisons of the known ink prints of

1    Willie to those on the Alabama map.  And they find

2    the left thumb print of Willie, the left palm

3    fingerprint, and the right palm print.  One

4    outside as I recall and two inside the bag and

5    some on the map.  So that's six different

6    fingerprints on the bag and the map of Willie C.

7    McCray.

8            Now, I expect the evidence is going to

9    be at that time based on talking with Georgia,

10   they start looking for Willie C. McCray.  Based on

11   information, they go to Havana, Florida.  They go

12   down to Havana -- Devane -- and they find Willie

13   McCray at a location.  They pick him up, bring him

14   down, and give him his Miranda Rights, and he

15   agrees to talk to Stan Devane.

16           What you will hear is Devane in a

17   statement asks him, do you know of any reason

18   there would be any items found in Dothan, Alabama,

19   at the Country Market Grocery Store that would

20   have your identification in any manner or fashion.

21   Willie McCray's response, no, it shouldn't be.

22   They tell him there was a killing and a robbery in

23   Houston County as well as a Monte Carlo being

24   taken.  And they ask, have you been to Dothan.  I

25   haven't been to Dothan since I was three years

1    old.  You let anybody borrow your car in any

2    manner or fashion.  No.  No one's borrowed my

3    car.  Is there any reason we should find any

4    fingerprints on a road map or Winn Dixie bag that

5    have your fingerprints on them in any manner or

6    fashion in any way in Dothan, Alabama, Houston

7    County in any  way, can you tell us that.  There

8    should be absolutely no none, none whatsoever is

9    what he told the police in any manner or fashion,

10   you shouldn't find anything of mine.  But they

11   do.  They do.  I've told you what evidence was

12   found on the fingerprint.

13              They ask him where he had been.  I

14   submit you'll hear testimony he was at home that

15   Saturday night.  He had done some yardwork.  They

16   asked him where he lived.  Can you give us your

17   address.  He couldn't give them the address of

18   where he was living at that time.  He was living

19   with his girlfriend and couldn't give him the

20   street or the address of the place he was living

21   with his girlfriend.  Couldn't give them that.

22   They asked what he did.  She had gone to work.  He

23   was there home by himself and then she came back

24   from work.  There should be no evidence in any

25   manner or fashion connecting him.  You shouldn't

1    find anything is what he said.

2              Well, they did.  They placed him under

3    arrest and charged him.  He was brought back to

4    Alabama.  He's been indicted, and he stands here

5    before you on trial charged with murder and theft

6    of property.  That's what I expect the evidence to

7    be.

8              I expect there to be some further

9    evidence.  I expect there will be prior sworn

10   testimony that you will hear that Willie C. McCray

11   in this courtroom made a statement to his two

12   lawyers, Matt Lamere and Jennifer Atwell.  Made a

13   statement and he said, I wasn't wearing no

14   shorts.  What you will hear is that I as the

15   district attorney will call a KMX retired former

16   radio reporter who was seated in the courtroom and

17   heard the statement, when I was asking questions

18   of Jeff Clark, the manager, remember, as to what

19   the Defendant McCray was wearing at the time he

20   saw him in the Country Market, his clothing, how

21   he was dressed.  And that she will be called on

22   behalf of the State and testify and tell you when

23   McCray was seated at the table over here and she

24   heard him say and will testify when Jeff Clark

25   said he was wearing shorts, quote, unquote, he

1    responded in a loud voice, she was on the second

2    row over here behind him and could hear him say, I

3    wasn't wearing no shorts.

4         Based on that and other testimony, I'll

5    stand up here at the end of the trial based on

6    what the State puts to you in evidence and I'll

7    ask you to find the man that sits right over

8    there, Willie C. McCray, wearing a vest today,

9    guilty of the murder of Michael Scott and the

10   theft of property of the Monte Carlo belonging to

11   Frank Edwards.

12        Thank you.

13     MR. CAPPS:  Ladies and gentlemen, evidence is

14   not anything that I should say to you today.

15   Evidence is nothing that Mr. Valeska will say to

16   you today.  Evidence is what you hear from the

17   stand.  And the evidence is the exhibits

18   introduced.

19        Now, I understand Mr. Valeska paints a

20   pretty grim picture for Mr. McCray.  But there's

21   fuzzy edges to this portrait.  Fuzzy edges.

22   McCray.  McCray.  You'll hear the evidence that

23   the people did not know Willie C. McCray in the

24   store.  They did not know the name.  They didn't

25   know who he was.  This officer from the State of

149

Georgia has took Mr. McCray's photograph, his likeness, in the limelight in this case.

You'll also hear from what the evidence will be presented that the people that were in the store that were involved -- that were close by did not identify this man as the one who killed Mr. Scott. You'll also hear evidence that there was a map that was found, and I suspect there will be no testimony that she believes, the expert the State will put on paid by the State of Alabama, believes that those prints are all Mr. McCray's prints. But you'll also hear some testimony that there are some prints on there that they don't know who they belong to. In other words, they are unfound. They are unknown. You'll also hear testimony that there were some prints of a Mr. Doster. Now, where is Mr. Doster? I intend to ask that question and try to enlighten you and find out as well. Also, you'll hear testimony that there was a print on this bag, this Winn Dixie bag that their expert says was Mr. McCray's. Now, there's also some other prints on this bag. Some of those were unidentifiable. But what I want you to do, ladies and gentlemen, is to not take what I say as evidence and take what Mr. Valeska says as

1    evidence.  But take the evidence as you hear it

2    from the witness stand and take that as the

3    evidence.

4         I also want to ask you to look at the

5    things that were not done that should have been

6    done.  I anticipate there will be questions that I

7    will present that I will ask that will put

8    reasonable doubt in your mind as to what did or

9    didn't happen and why we're at this point we're

10   here at today.

11        I believe the evidence will be that

12   there are critical gaps in this case and that the

13   case is not as tight as Mr. Valeska will have you

14   believe.  But there again, that is your decision

15   after you hear the evidence.  I would ask you to

16   listen very closely to the evidence, each and

17   every witness -- to the direct examination by Mr.

18   Valeska as well as the cross examination by

19   myself.  That I'll ask the witnesses specific

20   items that I think are important that I will try

21   to point out to you through the testimony.  I'll

22   ask you to listen to all the testimony and to

23   conclude upon your hearing the testimony that the

24   State has not proved beyond a reasonable doubt

25   that Mr. McCray committed a murder or a theft of

1      property.  Thank you very much.

2                    THE COURT:  Who will the State have first?

3                    MR. VALESKA:  GBI Agent Jody Poncell.

4                    (State's Exhibits Nos. 1 through 83 were

5                    premarked for identification by the

6                    District Attorney's office.)

7                              JODY PONCELL

8      having first been duly sworn, was examined and

9      testified as follows:

10                         DIRECT EXAMINATION

11     BY MR. VALESKA:

12     Q    Tell us your name, please, sir.

13     A    Jody Poncell.

14     Q    Where are you employed today?

15     A    I am a special agent with the Georgia Bureau of

16          Investigation.

17     Q    Go back to on or about April 4, 1993, and ask were

18          you employed at that time?

19     A    Yes, I was.

20     Q    And who were you working for?

21     A    GBI.

22     Q    And the GBI, that the detective bureau for the

23          state troopers of Georgia?

24     A    Yes, sir.  We're the state police.

25     Q    How long had you been a GBI at that time?

| | | |
|---|---|---|
| 1 | A | I came on GBI in 1987.  Prior to that I was with |
| 2 | | the Georgia State Patrol. |
| 3 | Q | How many years just roughly? |
| 4 | A | I started with the patrol in 1985. |
| 5 | Q | Now, if I could, do you know Dwayne Pearson? |
| 6 | A | Yes, I do. |
| 7 | Q | Did you know him back in April of 1993? |
| 8 | A | Yes, I do. |
| 9 | Q | Tell the jury how you knew him. |
| 10 | A | He was a police officer with the Cairo Police |
| 11 | | Department. |
| 12 | Q | After August 7th of 1993, after that day, did you |
| 13 | | ever have an occasion yourself to talk to a Dothan |
| 14 | | detective or meet with a Sergeant Stan Devane with |
| 15 | | the Dothan Police Department? |
| 16 | A | Yes, I did. |
| 17 | Q | Where did the meeting take place? |
| 18 | A | I initially contacted him by the telephone and |
| 19 | | then we met in-person at my office, which at that |
| 20 | | time was located in Thomasville, Georgia. |
| 21 | Q | Who was present? |
| 22 | A | At the initial meeting? |
| 23 | Q | In Georgia. |
| 24 | A | Myself and Sergeant Devane at that time.  I |
| 25 | | believe he's a lieutenant now with the Dothan |

| | | |
|---|---|---|
| 1 | | Police Department. |
| 2 | Q | Did you ever have a meeting with yourself and |
| 3 | | Devane and Pearson? |
| 4 | A | Yes.  We left my office and then went to the Cairo |
| 5 | | Police Department. |
| 6 | Q | Now, when you got to the Cairo Police Department, |
| 7 | | did Dwayne Pearson turn anything in your presence |
| 8 | | or did you turn anything in Dwayne Pearson's |
| 9 | | presence to Sergeant Stan Devane with the Dothan |
| 10 | | Police Department? |
| 11 | A | Yes, sir. |
| 12 | Q | What was that? |
| 13 | A | What we call in Georgia major case prints. |
| 14 | Q | The major case prints of which individual? |
| 15 | A | That subject right there (indicating). |
| 16 | | MR. VALESKA:  Let the Record reflect he |
| 17 | | pointed out Willie C. McCray. |
| 18 | Q | Now, would you tell the ladies and gentlemen, did |
| 19 | | you personally know a man from the Cairo Police |
| 20 | | Department, a jailer or officer, by the name of |
| 21 | | James Lamb? |
| 22 | A | Yes, sir, I knew him. |
| 23 | Q | How did you know James Lamb? |
| 24 | A | He was a patrol officer with the Cairo Police |
| 25 | | Department. |

1    Q    I want to show you what's been marked for exhibit

2         State's Exhibit 46.  What I want show you -- I'll

3         let Mr. Capps look at it.  I want to show you some

4         items that you refer to as major case prints of

5         Willie C. McCray and ask if you recognize those.

6         That's what I want to ask you about, okay.  I'm

7         going to pull out, if I could, a packet that just

8         for the Record has a -- what's the top piece of

9         paper?  What color is it?

10   A    White.

11   Q    And is it a fingerprint card, yes or no?

12   A    Yes, sir.

13   Q    Whose is it?

14   A    It is the fingerprint card of Willie C. McCray.

15   Q    Now, second piece of paper, third piece of paper,

16        and fourth piece of paper that are attached to it

17        by stapler, do you recognize what I will refer to

18        as State's Exhibit 46, pages two, three, and four

19        of that not counting the white card?  Do you

20        recognize those?

21   A    Yes, sir, I do.

22   Q    What are those, if you know?

23   A    These are major case prints of the palm, fingers,

24        thumb, and side of the hand of Willie C. McCray.

25   Q    Would you tell the ladies and gentlemen of the

| | | |
|---|---|---|
| 1 | | jury who took those major case prints or were they |
| 2 | | taken in your presence? |
| 3 | A | Yes, sir.  They were taken by Detective Dwayne |
| 4 | | Pearson of the Cairo Police Department on 4-4 of |
| 5 | | '93. |
| 6 | Q | And the first page, I'll refer it as the white |
| 7 | | print card, who put those prints on that card in |
| 8 | | your presence if anyone? |
| 9 | A | That was Officer James Lamb. |
| 10 | Q | Was there any identification besides Willie C. |
| 11 | | McCray as to any height or weight that was placed |
| 12 | | on the card? |
| 13 | A | Yes, sir.  This is a -- |
| 14 | Q | Okay.  What was the height or weight?  Just answer |
| 15 | | my questions, okay. |
| 16 | A | Six feet, one hundred and ninety pounds. |
| 17 | Q | Does it appear to be marked, altered, or changed |
| 18 | | in any way except for any biographical |
| 19 | | information that was placed on it in your presence |
| 20 | | by Lamb on any of the exhibit on State's 46 in any |
| 21 | | way? |
| 22 | A | No, sir. |
| 23 | Q | What about the back?  Are the backs different with |
| 24 | | any additional writings or markings that were not |
| 25 | | on them at the time? |

| | | |
|---|---|---|
| 1 | A | Yes, sir.  I believe there's some initials. |
| 2 | Q | Did you place that additional writing or markings |
| 3 | | on the back yourself? |
| 4 | A | No. |
| 5 | Q | Do you know where the writing on back came from? |
| 6 | A | No, sir, I don't. |
| 7 | Q | Now, did Willie C. McCray, did he sign the major |
| 8 | | case prints in your presence? |
| 9 | A | Yes, sir. |
| 10 | Q | Are each page on two, three, four, and five of 46 |
| 11 | | signed or identified as a Willie C. McCray? |
| 12 | A | That's correct. |
| 13 | Q | And the time they were taken? |
| 14 | A | That is correct. |
| 15 | Q | What time were they taken, what day? |
| 16 | A | That is military time 1315, which would have been |
| 17 | | one-fifteen p.m. |
| 18 | Q | They appear to be marked, altered, or changed in |
| 19 | | any way as you're looking them now under oath as |
| 20 | | the time they were done in Cairo with you being |
| 21 | | present with Pearson and Lamb, the officer, and |
| 22 | | McCray? |
| 23 | A | No, sir. |
| 24 | Q | Did you take custody of them? |
| 25 | A | I had custody of them while I was in the presence |

1          of Detective Pearson and Detective Devane.

2     Q    Who were they turned over to?

3     A    They went from Pearson to me to Devane.

4     Q    Did you ever get custody of them again, the

5          originals, yourself?

6     A    No.

7     Q    For you to keep in your business?  What I mean --

8          for you to keep is what I mean?

9     A    No, sir.

10              MR. VALESKA:  No more questions.  Pass the

11         witness.

12              THE COURT:  Mr. Capps?

13              MR. CAPPS:  Thank you, Your Honor.

14                      CROSS EXAMINATION

15    BY MR. CAPPS:

16    Q    Mr. Poncell, did you take the prints in question?

17    A    No, sir, I did not physically take those prints.

18    Q    When were those prints taken?

19    A    4-4 of '93.

20    Q    And I believe you said they were taken by an

21         officer --

22    A    There's two separate sets there.

23    Q    An Officer James Lamb?

24    A    Correct.

25    Q    Do you remember what time of day it was that these

```
1          were taken?

2    A     I know that the major case prints, which are on

3          the second sheet that you're looking at, those

4          were taken about one-fifteen in the afternoon.

5    Q     And it's your testimony that you were present when

6          the prints were taken?

7    A     Yes, sir.

8    Q     And you observed the prints being taken?

9    A     I observed the major case prints being taken by

10         Detective Pearson.

11   Q     And what did Detective Pearson do with the prints?

12   A     If I'm not mistaken, I made a copy of them for my

13         case file, and Detective Pearson kept the original

14         prints with him until they were relinquished to

15         Detective Devane.

16   Q     So from the time that they were originally taken

17         back in April 4th of '93, they were in the custody

18         of who?

19   A     My understanding they were in the custody of

20         Detective Pearson.

21   Q     So you can't testify as to whether or not these

22         are marked, altered, or changed in any way from

23         the time they left your custody until they went

24         into the custody of Mr. Pearson?

25   A     I can only testify to when I was present.  I did
```

```
1        not see them altered in any way, and they appear

2        the same way I saw them the last time I saw them.

3    Q   When did you see them again?

4    A   It would have been several days after the incident

5        in Dothan.

6    Q   So sometime after August 7th?

7    A   Yes, sir.  I believe it was on the 11th.  I may be

8        off by a day or two.  But it was right there

9        shortly after that date.

10   Q   So from April 4, 1993, until August 7th -- 8th,

11       you cannot account for the whereabouts of these

12       prints, can you?

13   A   No, sir.  Detective Pearson would have to answer

14       that.

15           MR. CAPPS:  Thank you.

16           THE COURT:  Anything further?

17           MR. VALESKA:  No more questions.  Ask if he

18       can be excused.

19           THE COURT:  Do you have any objection to this

20       witness being excused?

21           MR. CAPPS:  No, sir.

22           THE COURT:  You're excused, and thank you

23       very much.

24           MR. VALESKA:  Dwayne Pearson.

25           THE COURT:  Dwayne Pearson.
```

1                    DWAYNE PEARSON

2        having first been duly sworn, was examined and

3        testified as follows:

4                    DIRECT EXAMINATION

5    BY MR. VALESKA:

6    Q    Tell the jury your name, please, sir.

7    A    Dwayne Pearson.

8    Q    Where are you employed at this time?

9    A    Cairo Police Department.

10   Q    What position do you hold with them?

11   A    Patrol lieutenant.

12   Q    How long have you been a lieutenant with the

13       Cairo Police Department?

14   A    Seven years.

15   Q    Now, if I could, let's go back to on or about

16       April 4th of 1993.  Ask if you were working with

17       the Cairo Police Department on that day?

18   A    Yes, I was.

19   Q    Do you recall what shift you worked that day?  By

20       any chance do you remember what hours?

21   A    No.  I was working criminal investigations at that

22       time.  Day shift primarily.

23   Q    I want to ask you, if you could, there was a time

24       that you were either -- before you went on shift

25       or you were off shift is what I'm asking you about

1      on that day on April 4, 1993.  And ask if could

2      you tell the ladies and gentlemen of the jury

3      today in this very courtroom do you see anybody

4      that you saw in Cairo on that day on April 4th of

5      1993?

6  A   Yes, I do.

7  Q   Point that man or woman out for the jury.

8  A   Willie McCray (indicating).

9          MR. VALESKA:  Let the Record reflect he

10     pointed out Willie C. McCray.

11 Q   Where did you first see Willie McCray on April 4,

12     1993?

13 A   Second Avenue southeast near Arby Supermarket.

14 Q   What was he doing at that location that you saw

15     him -- that you saw him yourself?  What was he

16     doing?

17 A   He was driving in a gray Cadillac.

18 Q   Anybody with him that you could tell?

19 A   Yes, there was.

20 Q   Male or female?

21 A   Male.

22 Q   White male or black male?

23 A   Black male.

24 Q   Who was driving?

25 A   Willie C. McCray.

| | | |
|---|---|---|
| 1 | Q | Would you tell the ladies and gentlemen of the |
| 2 | | jury at that time were you in a marked unit or |
| 3 | | have your weapon or gun or badge at any time? |
| 4 | A | No.  I was in my personal vehicle at that time. |
| 5 | Q | After you saw McCray in the Cadillac and the other |
| 6 | | individual, did you observe the condition of the |
| 7 | | Cadillac? |
| 8 | A | Yes, I did. |
| 9 | Q | What did you see? |
| 10 | A | The vehicle was traveling extremely slow in an |
| 11 | | area that we had had problems. |
| 12 | Q | Let me just ask you this, if I could.  The vehicle |
| 13 | | itself, did you observe anything on the vehicle as |
| 14 | | a police officer that you saw on the outside of |
| 15 | | the Cadillac? |
| 16 | A | The vehicle had an out-of-state tag license plate |
| 17 | | that I had not recognized before. |
| 18 | Q | Where was the tag from? |
| 19 | A | It was a Florida tag. |
| 20 | Q | Now, at that point in time, what did you do |
| 21 | | yourself? |
| 22 | A | I observed the vehicle from my personal vehicle. |
| 23 | Q | And where did you go next yourself? |
| 24 | A | I drove to my house and got -- |
| 25 | Q | When you got to your house, what did you get? |

1    A    I got in my patrol unit and also my firearm duty

2         weapon and returned to the area that I had

3         previously seen them.

4    Q    And did you see McCray and the other man at that

5         time or shortly afterwards?

6    A    Yes, I did.

7    Q    Did you stop the vehicle?

8    A    Yes, I did.

9    Q    What was the occasion of stopping the vehicle?

10   A    The right taillight was blinking as well as them

11        being in an area --

12   Q    Was the taillight functioning correctly is what I

13        want to ask you or incorrectly?

14   A    Incorrectly.

15   Q    You stopped the -- you stopped the Cadillac.  Who

16        did you get out of the vehicle?

17   A    Willie McCray and Darren Sutton.

18   Q    I want to go forward and ask did you have the

19        occasion to take them anywhere after that?  Where

20        did you take them?

21   A    To the Cairo Police Department.

22   Q    When you got to the Cairo Police Department, did

23        you obtain or get any fingerprints from Willie C.

24        McCray or Sutton?

25   A    Yes, I did.

| | | |
|---|---|---|
| 1 | Q | Who did you get them from? |
| 2 | A | From both. |
| 3 | Q | Now, I want to show you what's been marked as |
| 4 | | State's Exhibit 46 for identification purposes. |
| 5 | | This envelope right here, okay.  And we took out |
| 6 | | some items.  Mr. Capps looked at them. |
| 7 | | MR. VALESKA:  And, Mr. Capps, these are the |
| 8 | | same ones. |
| 9 | Q | Showing you a white card.  Do you recognize the |
| 10 | | white card?  The first thing on the exhibit, what |
| 11 | | is it? |
| 12 | A | The white card is fingerprints from Willie McCray. |
| 13 | Q | Does it give a height and a weight? |
| 14 | A | Yes, it does. |
| 15 | Q | Did you put those fingerprints yourself on that |
| 16 | | card? |
| 17 | A | No, I did not. |
| 18 | Q | Did you observe anybody else take McCray's |
| 19 | | fingerprints on the white index card and place |
| 20 | | them on there? |
| 21 | A | Yes, I did. |
| 22 | Q | Who was that? |
| 23 | A | James Lamb. |
| 24 | Q | Was that done in your presence? |
| 25 | A | Yes, it was. |

1  Q   Had you ever seen Lamb do fingerprints before
2      working with the Cairo Police Department?
3  A   Yes, I did.
4  Q   How many times?  A few?  Many?  A lot?
5  A   Several.  Many.
6  Q   Had you yourself had any training in relationship
7      to taking fingerprints from a human being, how to
8      roll them or how to put them on a card?
9  A   Yes, I had.
10 Q   Before April 4, 1993, had you done that yourself
11     many times?
12 A   Yes, I did.
13 Q   When you watched Lamb take Willie C. McCray's
14     fingerprints, what you observed, did he do it in
15     the correct and proper manner?
16 A   Yes, he did.
17 Q   How did he do it?  Tell the jury.  How would you
18     put them on the card?
19 A   We start by rolling the ink on the finger -- well,
20     roll the ink on the display board and then roll
21     the finger on the ink and then roll the finger on
22     the actual card myself.
23 Q   Take my finger and just use this right here -- if
24     this was the card.  Take my finger --
25         MR. VALESKA:  With the Court's permission,

1        can he stand right here, Judge?

2           THE COURT:  Yes, sir.

3    Q    And show the jury how -- just use my finger -- how

4        you would have done it or you watched Lamb do it.

5    A    Would start out by inking the finger and then

6        moving over to the card (indicating) and roll the

7        print.  And therefore getting the edges of the

8        print as well as the center of the fingerprint.

9    Q    You can have a seat again.

10   A    (Complied.)

11   Q    Was that done on every finger and thumb as well as

12       on the left four fingers, the left and right

13       thumb, and the right four fingers simultaneous in

14       your presence by Officer Lamb?

15   A    Yes, sir.

16   Q    Was that placed on that card?

17   A    Yes, it was.

18   Q    Did you take custody of that card?

19   A    Yes, I did.

20   Q    Does it appear to be marked, altered, or changed

21       in any way from the time he placed McCray's on

22       there and you got it into your custody, the white

23       card itself, is it different in any way now?

24   A    No, it's not.

25   Q    What did you do with it?

| | | |
|---|---|---|
| 1 | A | I maintained it in my case file. |
| 2 | Q | Anybody else have access, in other words, the |
| 3 | | general public, that it could have gotten mixed up |
| 4 | | or the name changed or somebody else's |
| 5 | | fingerprints put on there? |
| 6 | A | No.  This card was signed immediately upon it |
| 7 | | being complete. |
| 8 | Q | Who signed it? |
| 9 | A | Willie C. McCray. |
| 10 | Q | And you pointed to that man at the table, correct? |
| 11 | A | Yes, sir. |
| 12 | Q | Let's go to the second on 46, second of four |
| 13 | | pieces of paper, and you refer to as major case |
| 14 | | prints.  Who placed the major case prints of |
| 15 | | Willie C. McCray on the piece of paper -- two, |
| 16 | | three, four, and five of 46, the long, white |
| 17 | | pieces of paper?  Who did that? |
| 18 | A | I collected the major case prints. |
| 19 | Q | If you'll tell the jury, explain to them how you |
| 20 | | took the major case prints of Willie McCray on |
| 21 | | those white pieces of paper.  Just show us with |
| 22 | | your hands up there with the Court's permission. |
| 23 | A | I placed a can on the actual table itself.  I |
| 24 | | rolled the ink onto the hand and then actually |
| 25 | | rolled the curvature of the hand (indicating). |

| | | |
|---|---|---|
| 1 | Q | Did you do the palms? |
| 2 | A | Yes, I did. |
| 3 | Q | The fingers also? |
| 4 | A | Yes. |
| 5 | Q | And after you did that, was it signed at that time |
| 6 | | in your presence by Willie C. McCray? |
| 7 | A | Yes, they were. |
| 8 | Q | Did you take custody of what I refer to as 46, |
| 9 | | two, three, four, and five, the white pieces of |
| 10 | | paper, the major case prints, did you take |
| 11 | | physical custody of them? |
| 12 | A | Yes, I did. |
| 13 | Q | Did they get marked, altered, or changed in any |
| 14 | | way from the time you took them from McCray |
| 15 | | yourself? |
| 16 | A | No, they didn't. |
| 17 | Q | What did you do with them?  Tell the jury. |
| 18 | A | I placed them in the case file. |
| 19 | Q | Also with the first card, correct, that James Lamb |
| 20 | | took in your presence? |
| 21 | A | Yes. |
| 22 | Q | And did you keep them under your care, custody, |
| 23 | | and control and sealed up until you turned them |
| 24 | | over to someone else or make copies of them? |
| 25 | | Which was it? |

|    |   |                                                         |
|----|---|---------------------------------------------------------|
| 1  | A | I kept them under my control.                           |
| 2  | Q | Did they ever go missing?                               |
| 3  | A | No, sir.                                                |
| 4  | Q | Did you mix them up with anybody else's file?           |
| 5  | A | No, sir.                                                |
| 6  | Q | Let me just ask you.  Can you tell the jury if          |
| 7  |   | two, three, four, and five of 46, could they have       |
| 8  |   | been mixed up with somebody else's?                     |
| 9  | A | No.  They were also signed immediately upon them        |
| 10 |   | being collected.                                        |
| 11 | Q | And did they ever go missing?                           |
| 12 | A | No, sir.                                                |
| 13 | Q | Now, after you got 46, the entire exhibit, was          |
| 14 |   | taken into your custody, did you ever turn it over      |
| 15 |   | to anybody?                                             |
| 16 | A | Yes, I did.                                             |
| 17 | Q | Who did you turn over State's Exhibit 46 to that        |
| 18 |   | remain in a sealed condition?  Who did you give it      |
| 19 |   | to, if anyone?                                          |
| 20 | A | Stan Devane with the Dothan Police Department.          |
| 21 | Q | After you gave the originals, 46, to Stan Devane,       |
| 22 |   | did they ever come back into your custody?              |
| 23 | A | No, they did not.                                       |
| 24 | Q | Let me show you, if I could, along with State's         |
| 25 |   | Exhibit 46, I showed you the front of what I refer      |

1    to as two, three, four, and five of 46, looking at

2    the backs, there additional writings or markings

3    on the backs that were not on them at the time

4    when you placed the major ink print, palms and

5    fingers of Willie McCray to sign?  Anything

6    different on the back?

7  A    All the writing on the back was not there.

8  Q    And that's on every piece of paper, all four of

9    them, correct?

10  A    Correct.

11  Q    Now, looking at them, do they in any way

12    interfere, influence, or cover up any of the

13    actual prints themselves on the front in any way?

14    Can you tell us, Lieutenant Pearson?

15  A    No, they do not.

16  Q    Now, after you turned them over to Devane, once

17    again, until you looked at them right now under

18    oath, did they ever come back into your physical

19    custody for you to keep or control?

20  A    No, sir.

21        MR. VALESKA:  That's all.  Pass the witness.

22    Thank you, Judge White.

23        THE COURT:  Mr. Capps?

24        MR. CAPPS:  Thank you, Judge.

25                    CROSS EXAMINATION

BY MR. CAPPS:

1
2  Q    Officer Pearson, who was present during the
3       fingerprinting?
4  A    James Lamb, myself, and Willie C. McCray.
5  Q    You're sure of that?
6  A    There was possibly another police officer also.
7       Possibly a GBI agent in during part of the
8       printing process.
9  Q    Were you in there for the entire process?
10 A    Yes, I was.
11 Q    Now, who took the information that is obtained on
12      on the biographical information on there?
13 A    Officer Lamb.
14 Q    Did you yourself witness any identification, that
15      being a driver's license, any other information
16      that was put on that document?
17 A    No, sir.
18 Q    And Officer Lamb did all of the filling out -- all
19      of the biographical information?
20 A    Yes, sir.
21 Q    Including the name of Willie C. McCray?
22 A    Yes.
23 Q    Date of birth, height, weight, and all that stuff?
24 A    Yes, sir.
25 Q    And where were you when all of that was done?

| | | |
|---|---|---|
| 1 | A | I was inside the booking area with Officer Lamb |
| 2 | | and Willie C. McCray. |
| 3 | Q | Are you within sight distance? |
| 4 | A | Yes, sir. |
| 5 | Q | Did you see every item as it was written in? |
| 6 | A | Yes, sir. |
| 7 | Q | Now, you said you had the prints in your |
| 8 | | possession from the time they were taken until |
| 9 | | they were turned over to Sergeant Devane; is that |
| 10 | | right? |
| 11 | A | Yes, sir. |
| 12 | Q | And where were those kept? |
| 13 | A | They were maintained in my case file inside my |
| 14 | | office. |
| 15 | Q | And is your office there in the Ciro Police |
| 16 | | Department? |
| 17 | A | Cairo. |
| 18 | Q | Cairo.  Excuse me.  Who had access to that file? |
| 19 | A | I did. |
| 20 | Q | Was it a locked file? |
| 21 | A | The cabinet that was maintained was locked. |
| 22 | Q | Were you the only one that had a key to that file? |
| 23 | A | Yes, sir. |
| 24 | Q | Your chief didn't have a key? |
| 25 | A | No, sir. |

1  Q    You were the only one with a key?

2  A    Yes, sir.

3  Q    And after you took them out of the file, you

4       immediately gave them over to Sergeant Devane; is

5       that right?

6  A    Yes, sir.

7  Q    When was that?

8  A    The early part of August.  I'm not sure of exact

9       date.

10           MR. CAPPS:  Thank you.

11           MR. VALESKA:  One last question.

12                  REDIRECT EXAMINATION

13 BY MR. VALESKA:

14 Q    If I ask you on or about August 7th of '93, is

15      that when State's Exhibit 46, the known print card

16      as well as the major case file prints, were turned

17      over to Stan Devane?

18 A    Yes, sir.

19           MR. VALESKA:  That's all.

20           THE COURT:  Do you want to excuse him?

21           MR. VALESKA:  Could he be excused?  Yes, sir,

22      he needs to go back and work.

23           THE COURT:  Mr. Capps, any objection to him

24      being excused?

25           MR. CAPPS:  I don't have any objection.

174

1        THE COURT:  You may be excused.  Thank you

2    very much.

3        MR. VALESKA:  Frank Edwards.

4        THE COURT:  Frank Edwards.

5                    FRANK EDWARDS

6    having first been duly sworn, was examined and

7    testified as follows:

8                  DIRECT EXAMINATION

9    BY MR. VALESKA:

10   Q    Tell us your name, please, sir.

11   A    Frank Edwards.

12   Q    Mr. Edwards, let's go back to on or about Friday

13        night -- Friday night on or about August 6, 1993,

14        a Saturday morning, August 7, 1993, what was your

15        business then -- your occupation?  What did you do

16        for a living?

17   A    We was in the used car business.

18   Q    Who is we?

19   A    Me and my wife.

20   Q    Now, tell the ladies and gentlemen of the jury did

21        you have a son then?  What was your son's name?

22   A    Frank, Junior.

23   Q    Did he ever help you and your wife?

24   A    Sir?

25   Q    Did he ever help you-all with your business --

```
 1          your son?

 2     A    Yes, he did.

 3     Q    Did you-all ever have a 1984 blue Monte Carlo on

 4          or about August 6th, a Friday night, of 1993 that

 5          you owned?

 6     A    Yes, sir.

 7     Q    Did you do anything to get -- with that vehicle

 8          before you took it to the sale?

 9     A    Yes, sir.  We cleaned it up.

10     Q    How did you clean it up?  Tell the jury.

11     A    We taken from it, the seats some of them out of it

12          -- the back seats.  All that and really cleaned it

13          up and carried it to the auction.

14     Q    Could you tell the ladies and gentlemen of the

15          jury did you ever drive that Monte Carlo yourself?

16     A    Yes, sir.

17     Q    When you drove it to the sale, came home that

18          night from the sale, was the steering column where

19          you put a key in, was it busted?

20     A    No, sir.

21     Q    Were there any broken windows or duct tape on

22          there after you brought it back from the sale?

23     A    No, sir.

24     Q    Now, did you keep an Alabama road map in there

25          when you took it to the sale?
```

1    A    No, sir.

2    Q    Did you keep any paper towels in there?

3    A    No, sir.

4    Q    Did you put any screwdriver in there?

5    A    No, sir.

6    Q    Now, did it sell at the sale when you took it?

7    A    No.  I brought it back to the -- I carried it to

8         the sale and it didn't sell, and we brought it

9         back to the shop and left it.

10   Q    When you brought it back to the shop that night,

11        tell the jury who drove it back from the sale?

12   A    We drove it back from the sale.

13   Q    Who drove it?

14   A    My son.

15   Q    Were you there when he got back to the shop with

16        the car?  Were you present?

17   A    Yes, sir.  We locked it up.

18   Q    Who got the keys?

19   A    I got the keys.

20   Q    Was there an Alabama road map in it when you

21        locked it up at your business?

22   A    No.  There wasn't no road map in it.

23   Q    Any paper towel in it?

24   A    No, sir.

25   Q    Column busted?

```
 1    A    No, sir.

 2    Q    Would you tell the ladies and gentlemen of the

 3         jury, was there a license tag on that vehicle?

 4    A    No, sir.

 5    Q    Why not?

 6    A    Because it was -- we run a dealer tag on it.

 7    Q    Did you go to bed that night with the car locked

 8         up?

 9    A    Sir?

10    Q    When you went to bed, was your car locked up?

11    A    Yes, sir.

12    Q    Would you tell the ladies and gentlemen of the

13         jury, what time did you get up Saturday morning,

14         if you know?

15    A    Well, around seven or eight o'clock.  Somewhere

16         along in there.

17    Q    Were you going to do something that morning?

18    A    We was going to Lake Seminole.  I got a trailer

19         there.  We was going fishing.

20    Q    Who was going fishing with you?

21    A    Me and my wife and grandson.

22    Q    You woke up and went outside.  Did you see your

23         Monte Carlo that Saturday morning?

24    A    No.  It wasn't there.

25    Q    Did you give a man by the name of Decory Doster
```

| | | |
|---|---|---|
| 1 | | permission to have it? |
| 2 | A | No, sir.  I don't see the man. |
| 3 | Q | Did you give a man by the name of Willie C. McCray |
| 4 | | permission to have it? |
| 5 | A | No, sir. |
| 6 | Q | This man with the vest on (indicating)? |
| 7 | A | I never seen that man. |
| 8 | Q | Would you tell the ladies and gentlemen of the |
| 9 | | jury, did you call the police? |
| 10 | A | We called the police, yes, sir. |
| 11 | Q | Now, where the car was when you went to bed that |
| 12 | | night, were there any tracks that night when you |
| 13 | | went to bed? |
| 14 | A | No, sir. |
| 15 | Q | Did you yourself or wife or grandson wear any type |
| 16 | | of Hi-Tech boots that night when you went out |
| 17 | | there to look for your car? |
| 18 | A | I didn't understand you, sir. |
| 19 | Q | When you, your wife, your son, or your grandson |
| 20 | | went out to look for your Monte Carlo -- |
| 21 | A | No. |
| 22 | Q | -- did you see any tracks where the Monte Carlo |
| 23 | | had been? |
| 24 | A | I don't remember that. |
| 25 | Q | The police officer came? |

1    A    Yes, sir.

2    Q    Did you tell him what occurred?  Were you present

3         when he took any pictures?

4    A    No.

5    Q    Now, let me ask you if I could, I want to show you

6         some pictures, okay.  Let me show you, if I could,

7         State's Exhibit No. 11, State's Exhibit No. 12,

8         No. 17, 13, 14, 15, and 16.  Using those, looking

9         at that, do you recognize whose car that is?

10   A    Yeah.

11   Q    Whose car was that?

12   A    It was mine.

13   Q    Now, I want to point to State's Exhibit 14.  Do

14        you know what that is -- that white piece of

15        paper?

16   A    No, sir.

17   Q    Look at 13, that white piece of paper hanging off

18        the door handle, do you know what that is?

19   A    No.

20   Q    Look at State's 11, the column, what condition is

21        it in?

22   A    It was in perfect condition when it left.  But

23        when it come back, that's the way it was.  That's

24        the way I picked it up at the police department

25        down here.

1    Q    Looking at State's Exhibit No. 12, did you or your

2         wife or your son leave any maps or white pieces of

3         paper inside the vehicle that night when you

4         locked it up?

5    A    No, sir.

6    Q    Now, looking at 13 -- excuse me, 15 and 16, look

7         at those and let me show you this metal thing with

8         it.  Did you have this tag on your vehicle that

9         Friday night when you went to bed?

10   A    No, sir.  No, sir.

11   Q    Now, you said -- you told the jury from the police

12        and the metal thing was State's Exhibit 21, the

13        tag, Your Honor.  And what I want to ask you, Mr.

14        Edwards, you said you got the car back from who?

15   A    The City.

16   Q    And was it -- anything else missing out of it?

17   A    Out of the car?

18   Q    Yes, sir.

19   A    The radio was gone, and the dash was torn up, and

20        the seats was torn in it when I got it back.

21   Q    Now, tell the jury why you cleaned up the vehicle

22        to take to the sale.  Why would you clean it up if

23        you wanted to sell it?

24   A    We were in the wholesale business.  We carried all

25        our cars to the auction to sale it.  And we had to

```
 1        get them cleaned for anyone to buy them.  So we
 2        went and cleaned them up the very best we know how
 3        to carry them to an auction.
 4   Q    Your house where you lived and where you kept the
 5        car, the business, okay --
 6   A    Where I kept the car was at the shop.
 7   Q    Was that close to your house?
 8   A    No, sir.
 9   Q    You know where Don Clements' business was back
10        then -- our city commissioner?
11   A    Sir?
12   Q    Do you know where Don Clements, his business
13        was --
14   A    Don Clements was the man I had the shop rented
15        from.
16   Q    Did you need an Alabama road map to get to the
17        sale or to your business or the sale from your
18        house?
19   A    No, sir.
20   Q    You come out where your shop was and the Monte
21        Carlo was parked that Friday night when you left,
22        okay, is there a road that will take you down into
23        Florida anyway in there?
24   A    No, sir.  There wasn't no road map in the car.
25   Q    No.  I'm asking --
```

1        MR. VALESKA:  I'm sorry, Your Honor.  I'll

2    speak up a little bit.

3        THE COURT:  Yeah.  I don't think he

4    understood.

5  Q   Where you parked your car that night and locked it

6    up, the Monte Carlo at your shop, and you went

7    home and went to bed, what I want to ask you is,

8    if you were there with your Monte Carlo was and

9    locked up, could you have gotten that Monte Carlo

10   and driven to Florida in any way?

11  A   No, sir.

12  Q   You got in and cranked it up and drove it

13    yourself, could you drive it to Florida from that

14    location, from your shop, could you get down to

15    Florida?  Let me ask you this.  What road would

16    you take to get to Florida from your shop?

17  A   What road would I take?  231 to go to Florida.

18  Q   Is there another way you go?

19  A   Went down to Cottonwood and that way.

20  Q   All right.  Now, let me ask you, if I could.  Did

21    you sell the Monte Carlo eventually?

22  A   Yeah.  Later I did.

23  Q   Was the shop, where you kept your Monte Carlo and

24    you locked it up that night and went to bed at

25    your shop in your house, was it in Houston County

1      when it was locked up and you went home?

2    A    Yeah.  It was in Houston County.  It was out there

3         at Don Clements' place at Ardilla.  Across from

4         City Used Parts there.

5              MR. VALESKA:  That's all.  I offer those

6         pictures into evidence.

7              MR. CAPPS:  I don't have any objection.

8              THE COURT:  No objection.  Let those be

9         admitted.  That's 11 through 17.

10                  (State's Exhibits No. 11 through 17 were

11                  admitted into evidence.)

12             MR. VALESKA:  Pass the witness, Your Honor.

13                        CROSS EXAMINATION

14   BY MR. CAPPS:

15   Q    Sir, you didn't see anyone take your car, did you?

16   A    Sir, you'll have to --

17   Q    Sir, did you see anyone take your car?

18   A    No, sir.

19   Q    You don't know who took the car?

20   A    No, I don't know who took it.

21             MR. CAPPS:  That's all.  Thank you.

22             MR. VALESKA:  No more questions.  Ask that he

23        can be excused, Your Honor.

24             THE COURT:  Do you have any objection to

25        that, Mr. Capps?

1      MR. CAPPS:  No, sir.

2      THE COURT:  You're excused.  You can go

3   home.

4      MR. VALESKA:  Short witness.

5      MR. CAPPS:  Your Honor, could I call for a

6   recess and have a matter taken with the Court?

7      THE COURT:  Okay.  All right.

8          Ladies and gentlemen, let me ask you to

9   go to the jury room and recall the instructions

10  that I've given you about not discussing the case

11  among yourselves or with anyone else.  And some of

12  them might want to get some coffee or help them

13  out.  Whatever.

14          (Jury not present.)

15     THE COURT:  Let the Record show this is out

16  of the presence and hearing of the trial jury.

17     MR. CAPPS:  Your Honor, if I could approach

18  at this time and speak regarding representation of

19  Mr. McCray.  Mr. McCray has indicated to me at

20  counsel table various times throughout the course

21  of this trial or very earlier in the trial that

22  he's not at all satisfied with his representing --

23     THE DEFENDANT:  Excuse me, may I approach?

24     THE COURT:  Let the gentleman finish.

25     MR. CAPPS:  He's not at all satisfied with my

1  representation in this matter, and he had rather

2  represent himself.  We've been down this road and

3  let me step back.

4      THE DEFENDANT:  Your Honor, what I requested

5  is that Mr. Capps is basically going over the same

6  thing that the D.A.'s going over.  He's basically

7  just walking through what happened in the last

8  trial.  He's not even putting up a fight.  Mr.

9  Dwayne Pearson stated that he viewed the

10 Cadillac.  He's behind the Cadillac.  He take off

11 from the Cadillac to go home to get his squad car

12 and come back.  That's very impossible.  Another

13 thing Mr. Pearson said also that's not even in the

14 transcript, he also stated that a taillight was

15 busted.  That wasn't in the transcript.  That's

16 not even in the police report.

17     THE COURT:  That's not what he testified to

18 either.

19     THE DEFENDANT:  Yes, he said a taillight was

20 busted or light was blinking.

21     THE COURT:  He said the taillight was not

22 working.  He didn't say it was busted.

23     THE DEFENDANT:  Well, Your Honor, that --

24     THE COURT:  The Record will speak for

25 itself.

1      THE DEFENDANT:  I understand.  I understand.
2  But that wasn't even mentioned the reason of him
3  stopping --
4      THE COURT:  What do you want to ask me
5  about?
6      THE DEFENDANT:  I'm saying Mr. Capps is
7  basically walking through.  He's not putting up a
8  fight.
9      THE COURT:  Mr. Capps is an attorney who is
10  well qualified.
11      THE DEFENDANT:  Maybe he is qualified, Your
12  Honor.
13      THE COURT:  He's tried cases.  And he knows
14  the rules of evidence.
15      THE DEFENDANT:  He's not putting up a fight.
16      THE COURT:  He can try a criminal case and
17  you do not.  Now, we've been back and forth on
18  this.
19      THE DEFENDANT:  There any way --
20      THE COURT:  I appointed Mr. Capps to
21  represent you.  And you at one point said that you
22  wanted to take over the defense of the case by
23  yourself.  And I grant -- hold it.  And I granted
24  your motion.  And then you came back and made
25  another motion for me to then put Mr. Capps back

on the case in charge of it. And now you're
coming back after we've started the trial of the
case and are complaining against Mr. Capps. And I
not going to relieve Mr. Capps. I'm not going to
continue this line of going back and forth taking
him off and putting him back on. And that's my
ruling.

THE DEFENDANT: Your Honor, may I speak?

THE COURT: What do you want to say?

THE DEFENDANT: What I want to say is Mr.
Capps is not putting up a battle for me. And the
only reason that I ask that Mr. Capps be replaced
back on the trial because I couldn't get no
cooperation from the Court, which I think that Mr.
Capps could have. But he didn't.

THE COURT: Okay. Just have a seat. This
motion to have Chris Capps relieved, I'm not going
to relieve Chris Capps. He's doing the very best
he can with what he has to work with. Have a
seat.

THE DEFENDANT: Your Honor --

THE COURT: We're going to take a fifteen
minute recess.

(Off the Record.)

THE COURT: If you'll bring the jury in.

1      (Jury present.)

2      THE COURT:  Who will your next witness be?

3      MR. VALESKA:  Sergeant Mike Etress.

4                    MIKE ETRESS

5      having first been duly sworn, was examined and

6      testified as follows:

7                  DIRECT EXAMINATION

8  BY MR. VALESKA:

9  Q    Tell us your name, please.

10  A    Mike Etress.

11  Q    Where are you employed?

12  A    City of Dothan Police Department.

13  Q    If I could, how long have you been a police

14      officer with the City of Dothan?

15  A    Almost nine years.

16  Q    Now, are you currently still employed in that

17      position today?

18  A    That's correct.

19  Q    If I could, Sergeant Etress, let's go back to

20      about August 6, 1993, on a Friday going into a

21      Saturday -- the 6th through the 7th, okay.  That's

22      the time period I want to ask you.  Did you have

23      an occasion on Saturday morning on August 7th of

24      1993 to see or talk to a man that identified

25      himself by the name of Frank Edwards?

| | | |
|---|---|---|
| 1 | A | That's correct. |
| 2 | Q | Do you remember do you recall where you saw him or |
| 3 | | met with him? |
| 4 | A | At his son's business. |
| 5 | Q | Was that in Houston County? |
| 6 | A | Yes, it was. |
| 7 | Q | Did you have the occasion to talk with him about |
| 8 | | whether an automobile was missing? |
| 9 | A | Yes, sir. |
| 10 | Q | What type automobile? |
| 11 | A | It was a Monte Carlo. |
| 12 | Q | Do you recall the color? |
| 13 | A | Blue. |
| 14 | Q | And the year, if you do? |
| 15 | A | I don't recall the year. |
| 16 | Q | That's all right. |
| 17 | | If you could, did you do a report as a police |
| 18 | | officer responding to the case? |
| 19 | A | Yes. |
| 20 | Q | At that time did you have a camera in your car? |
| 21 | A | No, I did not. |
| 22 | Q | Did you after talking with the victim and Frank |
| 23 | | Junior and the wife determine the location where |
| 24 | | the Monte Carlo had been prior to it being taken? |
| 25 | A | That's correct. |

1    Q    After dark into Friday when the sun came up with

2         the weather condition, anything occurred that

3         night if you know?

4    A    I believe it had rained on that Friday of Friday

5         evening.

6    Q    Did you go to the location where identified, Mr.

7         Edwards, where the Monte Carlo had been taken

8         from?

9    A    Yes.

10   Q    I know it's a silly question, was the car there?

11   A    No, sir.

12   Q    Did you observe where the car had been, in a

13        locked condition, where it had been?

14   A    Yes, sir.  There were some muddy tire tracks in

15        the parking lot area where the vehicle had been

16        sitting.

17   Q    Could you tell me how many different type tire

18        tracks in relationship that you could see that

19        location, if any?

20   A    I saws two sets of tire tracks.

21   Q    Same sets or different sets?

22   A    Two different sets.

23   Q    Now, did you also look in the area where the tire

24        tracks were -- two different sets where the

25        vehicle had been to see if there were any

|     |   |                                                                    |
|-----|---|--------------------------------------------------------------------|
| 1   |   | impressions in the dirt or on the sand in any                      |
| 2   |   | manner or fashion?                                                 |
| 3   | A | Yes, sir.                                                          |
| 4   | Q | What did you find, if anything, Sergeant Etress?                   |
| 5   |   | Tell the jury.                                                     |
| 6   | A | A boot print.                                                      |
| 7   | Q | What kind of boot print, in other words?  Cowboy                   |
| 8   |   | boots?                                                             |
| 9   | A | No, sir.  It appeared to be a boot print -- a                      |
| 10  |   | Hi-Tech boot.                                                      |
| 11  | Q | Help me for my benefit.  What's a Hi-Tech?  I                      |
| 12  |   | apologize for my ignorance.  What does that mean?                  |
| 13  | A | It's a type of combat boot, but at the time and                    |
| 14  |   | still do some of the police officers wear that                     |
| 15  |   | type of boot now.                                                  |
| 16  | Q | Now, didn't have a camera.  Did you call for                       |
| 17  |   | anybody that had a camera?                                         |
| 18  | A | Yes, sir.                                                          |
| 19  | Q | Who came, if anyone?  Do you remember?                             |
| 20  | A | John Brackin.  Officer John Brackin.                               |
| 21  | Q | And how did he come dressed?                                       |
| 22  | A | In uniform.                                                        |
| 23  | Q | What kind of shoes was he wearing, if you recall?                  |
| 24  | A | Hi-Tech boots.                                                     |
| 25  | Q | You had seen a Hi-Tech boot at the scene where the                 |

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | car was with two different sets of tracks, could             |
| 2  |   | that have been Brackin's shoe print -- boot print?           |
| 3  | A | No, sir.  He had not gotten there yet.                        |
| 4  | Q | When he got there, did he walk over the area and             |
| 5  |   | could he have placed another print or walked over            |
| 6  |   | the original print you had seen there?                        |
| 7  | A | Not that particular one, no, sir.                            |
| 8  | Q | Why not?                                                      |
| 9  | A | Because I stood there.                                        |
| 10 | Q | Did you do anything to attempt to obtain the                 |
| 11 |   | evidence from the boot print?  What did you do?              |
| 12 | A | I instructed Officer Brackin to photograph the               |
| 13 |   | boot print and the tire tracks.                              |
| 14 | Q | Was that done?                                               |
| 15 | A | Yes, it was.                                                 |
| 16 | Q | Did you place anything yourself or Brackin in your           |
| 17 |   | presence by the boot print anything down to show            |
| 18 |   | the size -- approximate size of the boot print?             |
| 19 | A | Officer Brackin placed an accident report template          |
| 20 |   | used in diagraming traffic accidents.  He placed            |
| 21 |   | it beside the boot print for measurement.                    |
| 22 | Q | Tell the jury, did you attempt to take -- gee, I            |
| 23 |   | don't know -- plaster of Paris or some kind of              |
| 24 |   | substance and lift the boot print and did you do            |
| 25 |   | that?                                                         |

| | | |
|---|---|---|
| 1 | A | No, sir. |
| 2 | Q | Why not? |
| 3 | A | For one thing, the foot impression was made of |
| 4 | | sand.  The parking lot area was asphalt.  The sand |
| 5 | | was very thin.  The asphalt had been covered in |
| 6 | | sand, and the foot print when someone stepped on |
| 7 | | the sand had just simply pushed the sand away. |
| 8 | | Any plaster that you would have poured on it would |
| 9 | | have simply just disrupted it and it would have |
| 10 | | went away. |
| 11 | Q | Let me show you some pictures if I could for |
| 12 | | identification purposes.  State's Exhibit 82 for |
| 13 | | identification purposes and State's Exhibit 83, |
| 14 | | do you recognize 82 or 83? |
| 15 | A | Yes, sir. |
| 16 | Q | What is 82? |
| 17 | A | That is a photograph of the tire tracks that were |
| 18 | | on the parking lot. |
| 19 | Q | Now, you indicated there were two different sets |
| 20 | | of tire tracks.  Does that picture 82 indicate |
| 21 | | there are two different sets from two different |
| 22 | | vehicles? |
| 23 | A | That's correct. |
| 24 | Q | Do they appear to be marked, altered, or changed |
| 25 | | in any way from the time you saw it until the time |

1       the picture was taken?

2   A   No, sir.

3   Q   Now, once again, the picture was developed at a

4       later point in time.  Does that look like the area

5       to you?

6   A   Yes, sir.

7   Q   Does that look like the color of the prints in

8       relationship to the actual prints themselves from

9       the tire tracks, the colors of them, the

10      indentions in the dirt, is that how they looked?

11   A   Yes, sir.

12   Q   They all the same color?

13   A   Yes, sir.

14   Q   If I'm pointing to one, just one in the middle

15      (indicating), what color does that appear to be,

16      if any?

17   A   Red mud.

18   Q   Is there another track with a different color, if

19      any?

20   A   There's also -- they appear to be black, but

21      actually that's where the sand has been moved

22      around on the black asphalt.

23   Q   You said sand if I'm not incorrect with

24      impressions as well as red clay impressions; is

25      that fair, from the picture what you saw?

1    A    That's correct.

2    Q    Does that picture appear in the same substantial

3         condition?

4    A    Yes, sir.

5              MR. VALESKA:  Offer 82 into evidence.

6              MR. CAPPS:  No objection.

7              THE COURT:  Let those be admitted.

8                   (State's Exhibit No. 82 was admitted

9                   into evidence.)

10   Q    And 83, is that the boot print with the template?

11   A    That's correct.

12   Q    With the asphalt and the sand that you've already

13        testified?

14   A    Yes, sir.

15   Q    Appear to be marked, altered, or changed in any

16        way?

17   A    No, sir.

18             MR. VALESKA:  Offer 83.

19             MR. CAPPS:  No objection.

20             THE COURT:  Let it be admitted.

21                  (State's Exhibit No. 83 was admitted

22                  into evidence.)

23             MR. VALESKA:  That's all.  Pass the witness.

24             THE COURT:  Mr. Capps?

25                        <u>CROSS EXAMINATION</u>

196

BY MR. CAPPS:

1

2    Q    You didn't make an impression of this boot print?

3    A    No, sir.

4    Q    And what did you do with this after you took this

5         photograph?

6    A    That's all.  It was simply photographed.

7    Q    Did you send it to the crime lab?

8    A    No, sir.

9    Q    It just simply stayed in your file?

10   A    No, sir.

11   Q    Where did the picture go after it was --

12   A    I had Officer Brackin respond to the scene to take

13        photographs of the impression, and I never had any

14        other dealings with the case at all.  I would

15        assume that Officer Brackin gave the investigator

16        that photograph.

17   Q    So you weren't the investigator in charge of these

18        exhibits; is that correct?

19   A    No, sir.  I just made the police report.

20            MR. CAPPS:  That's all.  Thank you.

21            MR. VALESKA:  No more questions.

22            THE COURT:  You may step down.

23            MR. VALESKA:  We call James Whitehurst,

24        please.

25            THE COURT:  James Whitehurst.

```
 1                      JAMES WHITEHURST
 2        having first been duly sworn, was examined and
 3        testified as follows:
 4                    DIRECT EXAMINATION
 5   BY MR. VALESKA:
 6   Q    Please tell the jury your name.
 7   A    James Whitehurst.
 8   Q    Would you tell the ladies and gentlemen of the
 9        jury during his lifetime did you know Michael
10        Scott?
11   A    Yes, sir.
12   Q    How did you know him?
13   A    I was a friend of him and his wife.
14   Q    What was his wife's name?
15   A    Karen.
16   Q    Now, let's go to a Saturday night on or about
17        August 7, 1993, sometime around ten-thirty --
18        ten-forty-five p.m. that Saturday night.  Would
19        you tell the ladies and gentlemen of the jury just
20        before that, had you been anywhere with Mike or
21        Karen Scott?
22   A    Had I been anywhere?
23   Q    Had you been with them?
24   A    Yes, sir.
25   Q    Where had you-all been?  What had you been doing?
```

198

| 1 | A | We left my house to come to the store. |
|---|---|---|
| 2 | Q | Your house was in what town? |
| 3 | A | Webb. |
| 4 | Q | What store did you go to? |
| 5 | A | Country Market on East Main. |
| 6 | Q | Is that Dothan, Alabama, Houston County? |
| 7 | A | Yes, sir. |
| 8 | Q | Would you tell the ladies and gentlemen of the |
| 9 | | jury who was driving? |
| 10 | A | Karen Scott. |
| 11 | Q | When you got to the Country Market, who got out of |
| 12 | | the car? |
| 13 | A | Karen and Mike. |
| 14 | Q | Now, tell the jury, had you been drinking, Mr. |
| 15 | | Whitehurst? |
| 16 | A | Yes, sir. |
| 17 | Q | What had you been drinking? |
| 18 | A | Beer. |
| 19 | Q | Had Mike Scott been drinking? |
| 20 | A | Yes, sir. |
| 21 | Q | Had Karen been drinking? |
| 22 | A | No, sir. |
| 23 | Q | Would you tell the ladies and gentlemen of the |
| 24 | | jury if I asked you were you intoxicated, do you |
| 25 | | know what that means? |

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | Were you intoxicated? |
| 3 | A | Yes, sir. |
| 4 | Q | Were you so intoxicated that you didn't know |
| 5 | | enough that you weren't driving the car, or were |
| 6 | | you driving the car? |
| 7 | A | No, sir. |
| 8 | Q | Why didn't you drive the car? |
| 9 | A | It wasn't my car. |
| 10 | Q | Would you tell the ladies and gentlemen of the |
| 11 | | jury, when you got to the Country Market, who left |
| 12 | | the vehicle? |
| 13 | A | Karen and Mike. |
| 14 | Q | And who stayed in the vehicle? |
| 15 | A | I did. |
| 16 | Q | Now, where was the vehicle parked in relationship |
| 17 | | to the front door of the Country Market? |
| 18 | A | To the left of the Country Market -- left side. |
| 19 | Q | Were you parked in a particular location where |
| 20 | | other people could park or some special parking |
| 21 | | place? |
| 22 | A | We were parked to the left.  There was a |
| 23 | | handicapped spot, and we were parked beside the |
| 24 | | handicapped. |
| 25 | Q | Now, did you have the occasion to be in the |

| | | |
|---|---|---|
| 1 | | vehicle to see any type of vehicle drive up to the |
| 2 | | front door or close to that handicap spot besides |
| 3 | | you-all? |
| 4 | A | No, sir. |
| 5 | Q | When Mike and Karen Scott went inside the Country |
| 6 | | Market, did you lose sight of them? |
| 7 | A | Yes, sir. |
| 8 | Q | Had you talked to Mike? |
| 9 | A | Yes, sir. |
| 10 | Q | Was he alive? |
| 11 | A | Yes, sir. |
| 12 | Q | Did you ever see him alive again to talk with him |
| 13 | | yourself after he went inside that store? |
| 14 | A | No, sir. |
| 15 | Q | Would you tell the ladies and gentlemen of the |
| 16 | | jury, while you're in the car, did you hear or see |
| 17 | | anybody drive up? |
| 18 | A | No, sir. |
| 19 | Q | Did you hear any noises? |
| 20 | A | Yes, sir. |
| 21 | Q | What kind of noise did you hear? |
| 22 | A | It sounded like a backfire of an automobile. |
| 23 | Q | When you heard the backfire, did it get your |
| 24 | | attention? |
| 25 | A | Yes, sir. |

| | | |
|---|---|---|
| 1 | Q | What direction did you look, tell the jury? |
| 2 | A | I looked to the left on the four-lane -- the |
| 3 | | overpass.  And I looked up there to start with, |
| 4 | | and then I looked back to the right.  There's |
| 5 | | roads on both sides of the Country Market.  And I |
| 6 | | looked to the left, and I looked to the right. |
| 7 | Q | Now, do you know where the front door of the |
| 8 | | Country Market was at that time? |
| 9 | A | Yes, sir. |
| 10 | Q | Did you look in that direction shortly after that? |
| 11 | A | Yes, sir. |
| 12 | Q | Did you see any vehicles parked close to that? |
| 13 | A | Yes, sir. |
| 14 | Q | What kind of vehicle? |
| 15 | A | It was a blue or gray looking General Motors |
| 16 | | vehicle. |
| 17 | Q | And would you tell the ladies and gentlemen of the |
| 18 | | jury how close it was to the front door, if any? |
| 19 | A | How close it was? |
| 20 | Q | Yes, sir.  Use something in this courtroom where |
| 21 | | you're seated.  Use the front door from where you |
| 22 | | are and go backwards. |
| 23 | A | From here to the column in the back |
| 24 | | there(indicating). |
| 25 | Q | Okay.  Now, after you heard the backfire, did you |

| | | |
|---|---|---|
| 1 | | look at the front door of the Country Market? |
| 2 | A | Yes, sir. |
| 3 | Q | Did anybody come out of the building? |
| 4 | A | Yes, sir. |
| 5 | Q | Who came out? |
| 6 | A | Two guys. |
| 7 | Q | White males or black males? |
| 8 | A | Black males. |
| 9 | Q | Could you see how they were dressed? |
| 10 | A | Yes, sir. |
| 11 | Q | What type clothing did you observe on them, if |
| 12 | | any? |
| 13 | A | They were dressed in dark clothing. |
| 14 | Q | Would you tell the ladies and gentlemen of the |
| 15 | | jury, did you see anything in either one of them's |
| 16 | | hands, if anything? |
| 17 | A | Yes, sir. |
| 18 | Q | What did you see? |
| 19 | A | A gun. |
| 20 | Q | Would you tell the ladies and gentlemen of the |
| 21 | | jury, could you see what type of shoes they were |
| 22 | | wearing? |
| 23 | A | I didn't pay any attention to the shoes. |
| 24 | Q | Now, would you tell the ladies and gentlemen of |
| 25 | | the jury, when they came to the front door of the |

| | | |
|---|---|---|
| 1 | | Country Market going to the General Motors car, |
| 2 | | dark blue or gray? |
| 3 | A | Yes, sir.  Dark colors. |
| 4 | Q | Would you tell the ladies and gentlemen of the |
| 5 | | jury, how did they approach that car? |
| 6 | A | Running. |
| 7 | Q | Fast or slow? |
| 8 | A | Very fast. |
| 9 | Q | When they got to the car, what did they do? |
| 10 | A | The one holding the gun went into the driver's |
| 11 | | side and the other ran around and got in the other |
| 12 | | side of the car. |
| 13 | Q | And then what happened to the General Motors car? |
| 14 | A | It left from there. |
| 15 | Q | What manner or fashion did it leave? |
| 16 | A | Very fast. |
| 17 | Q | What direction did it go when it left?  When it |
| 18 | | got to the end of the parking lot at the Country |
| 19 | | Market, which way did it go? |
| 20 | A | To the left, east. |
| 21 | Q | Okay.  That would be towards downtown or away from |
| 22 | | downtown? |
| 23 | A | Away from downtown. |
| 24 | Q | Appletree Street, do you know where that is? |
| 25 | A | Yes, sir. |

```
 1    Q    Is that a couple of blocks away?

 2    A    Yes, sir.

 3    Q    Now, after you saw the vehicle leave, the General

 4         Motors vehicle, the two black males, did you

 5         yourself go anywhere?

 6    A    Yes, sir.

 7    Q    Where did you go?

 8    A    I went in the store.

 9    Q    After you went in the store and went to the front

10         door, did you see Michael Scott?

11    A    Yes, sir.

12    Q    Was he different from the time he went in from

13         when you went in and saw him at that time?

14    A    Yes, sir.

15    Q    What was different?

16    A    He was in the floor.

17    Q    Did you see any marks on his face?

18    A    There was a bullet hole in his chin.

19    Q    Did you see any red substances -- any blood?

20    A    No, sir.

21    Q    Do you know if he had a hat when he went in?

22    A    Excuse me.  I did.  On the floor.

23    Q    Yes, sir.  How much?  Small amount?  Large amount?

24    A    A large amount.

25    Q    Do you know when he went inside, Michael Scott, if
```

| 1 | | he was wearing anything on his head?  If you |
| 2 | | remember. |
| 3 | A | Was Mike wearing anything?  I believe he was |
| 4 | | wearing a hat.  A cap. |
| 5 | Q | Do you recall the color, if you can, if you can't? |
| 6 | A | No, sir. |
| 7 | Q | Would you tell the ladies and gentlemen of the |
| 8 | | jury, were you present when the police officers |
| 9 | | and paramedics started coming? |
| 10 | A | Yes, sir. |
| 11 | Q | Now, Michael Scott, a friend of yours, correct? |
| 12 | A | Yes, sir. |
| 13 | Q | What happened to him? |
| 14 | A | He had been shot. |
| 15 | Q | What happened to him? |
| 16 | A | He died. |
| 17 | Q | Now, would you tell the ladies and gentlemen of |
| 18 | | the jury, did you ever talk to him again in |
| 19 | | person? |
| 20 | A | No, sir. |
| 21 | Q | Did you talk to the police that night? |
| 22 | A | Yes, sir. |
| 23 | Q | Did you tell them what you recall? |
| 24 | A | Sir? |
| 25 | Q | Did you tell them what you saw and what you |

|    |   |                                                      |
|----|---|------------------------------------------------------|
| 1  |   | recall?                                              |
| 2  | A | Yes, sir.                                            |
| 3  | Q | Let me show you if I could -- if I use the term      |
| 4  |   | Monte Carlo, a car, do you know who makes that?      |
| 5  |   | What company?                                        |
| 6  | A | Chevrolet dealer.                                    |
| 7  | Q | Do you know what corporation Chevrolet belongs to,   |
| 8  |   | if you know?                                         |
| 9  | A | (Witness nodded.)                                    |
| 10 | Q | Is it a Ford?                                         |
| 11 | A | No.  It's not a Ford.                                |
| 12 | Q | You mentioned that it was a General Motors car?      |
| 13 | A | Yes, sir.                                            |
| 14 | Q | Do you know if Monte Carlo is made by General        |
| 15 |   | Motors, G.M.?  If you know.                          |
| 16 | A | No.                                                  |
| 17 | Q | Let me show you, if I could, State's Exhibit 17,     |
| 18 |   | State's Exhibits 13, 16, 15, okay.  Looking at       |
| 19 |   | those items, okay, does that appear to be the type   |
| 20 |   | or color or the size of the vehicle that you         |
| 21 |   | observed that you referred to as a General Motors    |
| 22 |   | in either a gray or dark blue car?                   |
| 23 | A | Yes, sir.                                            |
| 24 | Q | Do you know if the car, the General Motors car       |
| 25 |   | that left, whether it had a tag on the back or       |

1      not?  Could you tell?

2   A   It did not that I recall.

3   Q   And the conditions, the conditions, could you tell

4       the jury, completely lit up?  Dark?  Describe the

5       conditions when you could see the vehicle where

6       from where you were sitting -- lighting condition,

7       artificial lighting, if any?

8   A   It was a little light.  It wasn't lit up like it

9       is in here.

10  Q   Was it fair to say it was darker than it is light?

11  A   Yes, sir.

12  Q   Let me show you State's Exhibit 37, okay.  Take

13      your time.  I want to see if you recognize who's

14      in 37.  Do you know who that is?

15  A   Yes, sir.

16  Q   Who is that?

17  A   Michael Scott.

18  Q   Would you tell the ladies and gentlemen of the

19      jury, looking at that picture, can you tell what

20      you saw yourself where he had been shot?

21  A   Yes, sir.

22  Q   Point out on 37 the picture where he was shot,

23      what part of his body.

24  A   His face (indicating).

25  Q   Showing the chin?

1   A   The chin.

2   Q   Is that depicted on here?

3   A   Yes, sir.

4           MR. VALESKA:  Offer 37, a picture of Michael

5   Scott, into evidence.

6           MR. CAPPS:  Let me look at it first.

7               No objection.

8           THE COURT:  Let it be admitted.

9               (State's Exhibit No. 37 was admitted

10              into evidence.)

11  Q   If I could ask you --

12          MR. VALESKA:  Excuse me.  The Judge wants to

13  see the picture.

14  Q   Final question I would ask.  Could you tell the

15  ladies and gentlemen of the jury when the two

16  black males got into the General Motors car, were

17  the lights on or off?

18  A   Off.

19          MR. VALESKA:  That's all.  Pass the witness.

20          THE COURT:  Mr. Capps?

21          MR. CAPPS:  Thank you.

22                  CROSS EXAMINATION

23  BY MR. CAPPS:

24  Q   Mr. Whitehurst, you're not saying on the night in

25  question you realize this was a Monte Carlo car,

| 1 | | are you? |
|---|---|---|
| 2 | A | Repeat that, sir. |
| 3 | Q | On the night in question, this G.M. car -- |
| 4 | A | Yes, sir. |
| 5 | Q | -- you didn't know it was a Monte Carlo that |
| 6 | | night, did you? |
| 7 | A | I knew it was a G.M.  I don't know for sure it was |
| 8 | | a Monte Carlo.  I know it was a General Motors.  I |
| 9 | | knew it wasn't a Ford. |
| 10 | Q | You knew it was a General Motors car, but there |
| 11 | | are a lot of General Motors cars, are there not? |
| 12 | A | Yes, sir. |
| 13 | Q | You have a Cutlass? |
| 14 | A | Sir? |
| 15 | Q | You have a Cutlass, a General Motors car, a |
| 16 | | two-door car? |
| 17 | A | Yes, sir. |
| 18 | Q | You also have various others; is that right? |
| 19 | A | Yes, sir. |
| 20 | Q | You're not telling us you knew it was a Monte |
| 21 | | Carlo, you're saying you knew it was a General |
| 22 | | Motors car? |
| 23 | A | Yes, sir. |
| 24 | Q | Now, you said it was dark, but you did not know |
| 25 | | the color; is that right? |

| 1 | A | Correct. |
| 2 | Q | Did the police interview you at any time during |
| 3 | | their investigation? |
| 4 | A | At the Country Market. |
| 5 | Q | Did they call you in and ask you to -- any |
| 6 | | questions about the incident as it occurred? |
| 7 | A | Just at the Country Market. |
| 8 | Q | And do you recall what questions that you were |
| 9 | | asked? |
| 10 | A | No, sir.  It's been so long, I forgot. |
| 11 | Q | Do you remember the police coming back out to talk |
| 12 | | with you at a later date to show you any |
| 13 | | photographs of any individuals? |
| 14 | A | No, sir. |
| 15 | Q | Now, you've already testified that you saw two |
| 16 | | individuals running from the store; is that right? |
| 17 | A | Yes, sir. |
| 18 | Q | And the police didn't inquire as to whether or not |
| 19 | | you knew these individuals? |
| 20 | A | No, sir. |
| 21 | Q | Now, you said you had been drinking that night and |
| 22 | | maybe were intoxicated.  How much had you had to |
| 23 | | drink, Mr. Whitehurst? |
| 24 | A | About eight or ten beers in an all day period -- |
| 25 | | or all afternoon and part of the night period of |

211

| | | |
|---|---|---|
| 1 | | time. |
| 2 | Q | So you weren't drunk, then? |
| 3 | A | No, sir. |
| 4 | Q | You were just intoxicated, but you wouldn't |
| 5 | | consider yourself drunk? |
| 6 | A | No, sir.  I wasn't staggering drunk or anything |
| 7 | | like that. |
| 8 | Q | You were about your faculties, you knew what was |
| 9 | | going on, and things of that nature? |
| 10 | A | Yes, sir. |
| 11 | Q | Sitting here today, do you recognize anyone that |
| 12 | | you saw leaving the store that night? |
| 13 | A | No, sir. |
| 14 | | MR. CAPPS:  Thank you. |
| 15 | | MR. VALESKA:  No more questions. |
| 16 | | THE COURT:  You may step down. |
| 17 | | MR. VALESKA:  Ask that he be excused. |
| 18 | | THE COURT:  Any objection to his being |
| 19 | | excused? |
| 20 | | MR. CAPPS:  No, sir. |
| 21 | | THE COURT:  You're excused.  You may go. |
| 22 | | Thank you very much. |
| 23 | | MR. VALESKA:  Deborah Shelton. |
| 24 | | THE COURT:  Deborah Shelton. |
| 25 | | DEBORAH SHELTON |

1          having first been duly sworn, was examined and

2          testified as follows:

3                         DIRECT EXAMINATION

4    BY MR. VALESKA:

5    Q    Tell us your name, please, ma'am.

6    A    Deborah Shelton.

7    Q    If we could, let's go back to on or about August

8          7, 1993.  Could you tell the ladies and gentlemen

9          of the jury, were you employed at that time?

10   A    Yes, I was.

11   Q    Where were you employed?

12   A    It was called Country Market then.

13   Q    Country Market, was it on the property of Higdon

14         Grocery Company, Incorporated, a corporation doing

15         business as Country Market in Houston County on

16         August 7, 1993?

17   A    That's correct.

18   Q    What was your position in the store at that time?

19   A    Head cashier.

20   Q    Who was the manager that night, if anyone?

21   A    Jack (sic) Clark.

22   Q    How long had you worked at the store previous to

23         this Saturday night?

24   A    About a year.

25   Q    Now, Saturday night, would there be a small amount

1        or large amount of money in the ordinary course of

2        business, the habit of that store, in other words,

3        currency in that store on a Saturday night?

4  A   Yes.  A fairly large amount.

5  Q   Approximately, do you have opinion as to how much

6        money or currency, not checks, but currency would

7        have been in that store sometime around ten-forty

8        -- ten-thirty p.m. on August 7, 1993?

9  A   Approximately twenty thousand dollars.

10  Q   Now, tell the ladies and gentlemen of the jury,

11       did you know Walter Sheffield?

12  A   Yes.

13  Q   How did you know him?

14  A   He was an employee at the store.

15  Q   What shift did you work that night?

16  A   Second shift.

17  Q   Now, at ten-forty -- ten-thirty-nine -- ten

18       forty-one p.m. on Saturday night August 7, 1993,

19       did that include your shift?

20  A   No.  I should have left at ten o'clock.

21  Q   Why didn't you leave?

22  A   My last cashier had had a problem with her food

23       stamps, and she needed to be reinstructed on the

24       proper way to do it, and so it took a while.

25  Q   How did the money get from the cash registers out

214

| | | |
|---|---|---|
| 1 | | the front on the aisle when their shift was over |
| 2 | | or if they have got large amounts of money, how |
| 3 | | would it get to the office? |
| 4 | A | They would bring it to me. |
| 5 | Q | Describe the office.  If you come in the front |
| 6 | | door and take a left as you walk towards the |
| 7 | | office, tell me the first store or first counter |
| 8 | | as you get into the office.  Describe and go |
| 9 | | inwards to the inner office.  What's it made of? |
| 10 | A | Paneling. |
| 11 | Q | How many doors? |
| 12 | A | Two. |
| 13 | Q | Now, what was the first part of the paneling -- |
| 14 | | the counter as you approach on this Saturday |
| 15 | | night?  Anything for sale there at that time? |
| 16 | A | Cigarettes were behind that counter.  Movies.  We |
| 17 | | rented movies on occasion. |
| 18 | Q | How would you gain access to the inner office |
| 19 | | from the outside if you were inside the office -- |
| 20 | | the inner office? |
| 21 | A | Through a door. |
| 22 | Q | And was that door locked or kept unlocked? |
| 23 | A | Locked all the time. |
| 24 | Q | And is there any way you could unlock it without |
| 25 | | standing right next to it and doing it with your |

215

| | | |
|---|---|---|
| 1 | | hand?  Anything you could push that would unlock |
| 2 | | the door? |
| 3 | A | It was an automatic lock. |
| 4 | Q | Now, if you could, tell the ladies and gentlemen |
| 5 | | of the jury, was there a safe inside the inner |
| 6 | | office that Saturday night? |
| 7 | A | The outer office where the movies were is where |
| 8 | | the safe was. |
| 9 | Q | And if you stood at the counter, the wooden |
| 10 | | counter or looking where the movies and cigarettes |
| 11 | | were, could you observe the safe with your own |
| 12 | | eyes if you were standing on the opposite side |
| 13 | | looking back in the direction?  Could you see? |
| 14 | A | Yes. |
| 15 | Q | It wasn't hidden in any manner or fashion? |
| 16 | A | No. |
| 17 | Q | Now, tell the ladies and gentlemen of the jury, do |
| 18 | | you know who was on the first aisle closest to the |
| 19 | | office -- which cashier again? |
| 20 | A | Sarah Dodson. |
| 21 | Q | Do you know who was on the second one? |
| 22 | A | Walter Sheffield. |
| 23 | Q | Did they continue to go down more aisles of the |
| 24 | | store? |
| 25 | A | Yes.  We had seven registers. |

```
 1    Q    Sometime around ten-forty -- ten-thirty-eight p.m.
 2         that night, where were you?
 3    A    I was in the office -- the inner office.
 4    Q    And what were you doing at that exact time?
 5    A    I had just gotten finished with Cindy.  That was
 6         my last cashier.  And she was leaving, and then I
 7         was going to clock out and leave.
 8    Q    Did you have any keys that were entrusted to you
 9         by the company?
10    A    Yes.  But I didn't want to have them on me.
11    Q    I understand.  What had you done with your keys
12         just prior to you getting ready to leave?
13    A    I had already locked them in the register that was
14         inside there.
15    Q    Once you locked them and closed the register,
16         could you get back into it?
17    A    No.
18    Q    At that point in time after you put the keys and
19         locked the register and getting ready to leave,
20         did you look through either the door or the window
21         and see someone coming?
22    A    I had a plate glass window that was in front of
23         me, and I saw Walter approaching the office.
24    Q    Is that the only person you could see at that time
25         was Walter?
```

217

```
1    A    Yes.

2    Q    And what did you do?

3    A    I went to the door to open for him to come in.

4    Q    When you opened the door, did he come in?

5    A    Uh-huh.

6    Q    Was there someone else with him?

7    A    Yes, there was.

8    Q    Man or woman?

9    A    A man.

10   Q    White male or black male?

11   A    Black male.

12   Q    How was he dressed?

13   A    Tight black T-shirt.  Black hat.  Black pants.

14        Black boots.

15   Q    Did have anything in his hands?

16   A    Paper bag.

17   Q    Let me ask you something.  You worked at the

18        Country Market.  This is an IGA.  What kind of

19        bags did you-all use to bag the groceries on this

20        occasion Saturday night?  What would they have

21        been placed in?

22   A    Well, we had two.  We had the plastic bags and the

23        paper bags.

24   Q    I'll ask you, if I could, would you have been

25        using Winn Dixie bags in your store on that
```

1      occasion?

2   A   No, sir.

3   Q   Why not?

4   A   We had no reason to have Winn Dixie bags.

5   Q   Did your bags identify any type of writing or

6      marking?

7   A   They said IGA.

8   Q   Now, would you tell the ladies and gentlemen of

9      the jury, when you opened the door when Walter

10      came in, do you see anybody in the courtroom at

11      that time that came in with Walter that you had

12      described with the clothing you just told us?

13   A   Yes.

14   Q   Point that person out.

15   A   Willie McCray came in with him (indicating).

16           MR. VALESKA:  Let the Record reflect she

17      pointed at Willie McCray.

18   Q   Now, tell the jury, at that very moment on

19      Saturday night, around ten-forty or ten-forty-one

20      on Saturday, August 7, 1993, did you know his name

21      is Willie McCray right then?

22   A   No.  I hadn't seen him before.

23   Q   Now, tell the ladies and gentlemen of the jury,

24      the bag, what was inside the bag that he showed

25      you if you saw anything?

1    A    A gun.

2    Q    Describe the gun.

3    A    It was a black gun. It was larger than a pistol.

4         He couldn't have hid it in his pocket. But the

5         bag totally concealed it. It was a larger gun,

6         but it wasn't a rifle.

7    Q    Did you ever see anything on the gun itself or

8         next to the gun, in other words, any type --

9    A    Towards the end of the gun, the barrel, it had a

10        black circular thing that went all around it and

11        had holes in it.

12    Q    Would you tell the ladies and gentlemen of the

13        jury, at the time he came in and had the bag, did

14        he say anything to you or in Walter's presence at

15        that time?

16    A    Yes.

17    Q    What did he say?

18    A    He was reaching in with the gun and pulling it out

19        of the bag and saying, give me the money, give me

20        the money, give me the money.

21    Q    And was that in Houston County at that time?

22    A    Yes.

23    Q    What did you say to Walter or to him?

24    A    I told him I couldn't get him any money. I told

25        him I didn't have any keys. I showed him I had no

```
 1           pockets so I wasn't concealing keys.  I couldn't
 2           get him any money.
 3      Q    Why did you do that?
 4      A    Because he was ordering me to give him money.
 5      Q    Did you say anything to him about whether this was
 6           a robbery or not?
 7      A    No.
 8      Q    Did you ever say anything to Walter about whether
 9           it was a robbery or not?
10      A    No.
11      Q    Did you ever refer to a joke in any manner or
12           fashion?
13      A    After the fact when I was talking to a police
14           officer I said I just couldn't believe it was
15           happening.  I said that.
16      Q    Tell the ladies and gentlemen of the jury, when
17           you showed him you didn't have any keys, what did
18           he say to you or to Walter?
19      A    He got very angry.
20      Q    And what did he say?
21      A    He -- my language is going to be pretty rough.
22      Q    Just tell the ladies and gentlemen of the jury,
23           they weren't there, what exactly he said.
24      A    He looked at me and he said, what do you think
25           this is, a fucking joke, this ain't no fucking
```

1      joke.

2   Q    Tell the ladies and gentlemen of the jury, at that

3      very moment when he said that, did he have the

4      weapon?

5   A    Yes.

6   Q    Were you afraid at that time?

7   A    Yes.

8   Q    Why were you afraid?  Tell the jury.

9   A    Because he had gotten angry.  He was -- he started

10      out being very controlled, almost methodical.  And

11      then when he saw he couldn't get any money, he got

12      very angry.  And I didn't know what was going to

13      happen next.

14   Q    Could you tell the ladies and gentlemen of the

15      jury, when you opened the door and let Walter in

16      as well as McCray came in, could you still see the

17      cash registers of the other customers doing

18      business?

19   A    I didn't look at anybody but him.

20   Q    Could you hear business being conducted in the

21      store and the cash registers being rung up or any

22      of the items?

23   A    I'm not aware of anything that was happening

24      except what he was saying to me.

25   Q    Why?  Why were you looking at him?

222

```
 1    A    I was just totally focused on what was happening

 2         right there in front of me.

 3    Q    What did he have you or Walter do at this point in

 4         time when you showed him you couldn't get to the

 5         safe and open it and no money?

 6    A    He started making comments about -- well, Walter

 7         explained to him that only a manager could access

 8         the money.  Then he wanted a manager.  But he

 9         didn't let us go get a manager.  And then he

10         started telling us to get down.

11    Q    Did you get down?

12    A    Yes.

13    Q    Why did you get down?

14    A    Because he was standing in front of me with a gun

15         and he told me to get down.

16    Q    Did you get down?

17    A    Yes.

18    Q    Did Walter get down?

19    A    Yes.

20    Q    What did you-all get down on?

21    A    The tile.  The floor.

22    Q    Could you see outside the inner office then?

23    A    When I got down, I was directly in front of his

24         shoes -- his boots.  I couldn't see anything.

25    Q    Do you know what type boots they were, if you
```

223

| | | |
|---|---|---|
| 1 | | know? |
| 2 | A | They were laced-up boots.  Had a lot of laces. |
| 3 | | Black.  His pants were tucked down inside the |
| 4 | | boots. |
| 5 | Q | Now, would you tell the ladies and gentlemen of |
| 6 | | the jury, after you and Walter were down on the |
| 7 | | tile inside the inner office, did McCray leave the |
| 8 | | inner office? |
| 9 | A | I never saw him leave. |
| 10 | Q | The door, did you ever hear any movement from the |
| 11 | | door? |
| 12 | A | I heard what sounded like stomping or running. |
| 13 | | Then I heard -- |
| 14 | Q | Then what did you hear next? |
| 15 | A | Glass breaking like an explosion noise and |
| 16 | | screaming. |
| 17 | Q | Describe the screaming. |
| 18 | A | A lady was screaming, help me, Mike's been shot. |
| 19 | | And just screaming with no words. |
| 20 | Q | Tell the ladies and gentlemen of the jury, that |
| 21 | | exact moment when you heard that and the commotion |
| 22 | | and exploding, how did you feel? |
| 23 | A | I was terrified.  I was scared.  From the time I |
| 24 | | laid down on my stomach, I was waiting to be shot. |
| 25 | Q | Did Walter Sheffield get up and leave the inner |

224

| | | |
|---|---|---|
| 1 | | office at any point in time? |
| 2 | A | He was trying to crawl behind the petition -- |
| 3 | | partition, and then he looked like he thought he |
| 4 | | had got caught and was trying to get back to the |
| 5 | | position he was in. |
| 6 | Q | Now, would you tell the ladies and gentlemen of |
| 7 | | the jury, do you recall, if any, how many shots |
| 8 | | you heard? |
| 9 | A | I don't remember that. |
| 10 | Q | Describe as you were on the floor, did your body |
| 11 | | react in any manner or fashion -- physical body? |
| 12 | A | When I was laying on the floor? |
| 13 | Q | Yes. |
| 14 | A | When I was laying on the floor, I was praying as |
| 15 | | hard as I could to myself.  I didn't hear anything |
| 16 | | for a couple of minutes.  I know I didn't pass |
| 17 | | out.  But I just couldn't hear until I heard that |
| 18 | | loud like glass breaking. |
| 19 | Q | And after you heard the voice about Mike being |
| 20 | | shot, help, did you hear any more noise after that? |
| 21 | A | The whole store was in an uproar.  There were |
| 22 | | customers trying to break out.  There were lots of |
| 23 | | screaming in the front.  We were basically just |
| 24 | | trying to count heads and check on people, see if |
| 25 | | anybody else was hurt, and get assistance. |

1   Q   When you left the inner office and went outside

2       yourself, you did do that, didn't you?

3   A   Yes.

4   Q   Did you come to see a white male that was

5       identified to you shortly afterwards as Michael

6       Scott?

7   A   Yes.

8   Q   Did you see his wife?

9   A   Yes.

10  Q   Describe his wife's demeanor or appearance.

11  A   She was hysterical.

12  Q   What did you do to help her, if anything?

13  A   I got her to sit down at the end of one of the

14      registers and tried to position myself in such a

15      ways that she couldn't see her husband.

16  Q   Did you observe any injuries on him -- Michael

17      Scott?

18  A   Yes.

19  Q   What did you see?

20  A   He had a hole in his chin.

21  Q   Did you observe anything on -- close to his body?

22  A   There was a paper bag and a red hat.

23  Q   Did you ever touch the paper bag?

24  A   I didn't touch anything.

25  Q   Did you see any red substances on the floor close

226

| | | |
|---|---|---|
| 1 | | to him -- any blood? |
| 2 | A | A lot of blood. |
| 3 | Q | Did the paramedics come and the police come and |
| 4 | | the ambulance and take Michael Scott to the |
| 5 | | hospital? |
| 6 | A | Yes. |
| 7 | Q | Did the police interview you shortly after that or |
| 8 | | that night as to what you had seen or heard? |
| 9 | A | Yes. |
| 10 | Q | Now, would you tell the ladies and gentlemen of |
| 11 | | the jury, do you know what happened to the paper |
| 12 | | bag that was by Mr. Scott? |
| 13 | A | The police took it. |
| 14 | Q | What about his hat, if you know? |
| 15 | A | The police took -- I don't remember about the hat, |
| 16 | | now. |
| 17 | Q | Did you ever look at the paper bag, any writing on |
| 18 | | it yourself? |
| 19 | A | I didn't see anything. |
| 20 | Q | If I could, let me show you what's been marked |
| 21 | | for identification purpose State's Exhibit 36. |
| 22 | | Looking at that, that back itself, now, is that |
| 23 | | the kind of bag you had in the Country Market? |
| 24 | A | No. |
| 25 | Q | You sure? |

227

| 1  | A | That's not one of our bags. |
| 2  | Q | The bag you saw on the floor by Michael Scott, you |
| 3  |   | never read the writing? |
| 4  | A | No, I didn't. |
| 5  | Q | And when of the police left, once again, the bag |
| 6  |   | was taken also, correct? |
| 7  | A | Yes. |
| 8  | Q | You didn't see it left there? |
| 9  | A | No. |
| 10 | Q | Can you tell the ladies and gentlemen of the jury |
| 11 |   | as you stood next to Willie McCray, do you have an |
| 12 |   | opinion as to how tall he was? |
| 13 | A | He was taller than me.  I'm not good with |
| 14 |   | heights. |
| 15 | Q | How tall are you? |
| 16 | A | Five two. |
| 17 | Q | His weight, in other words in pounds, can you tell |
| 18 |   | us how much he weighed? |
| 19 | A | At about medium weight.  One seventy. |
| 20 | Q | Did he have any facial hair? |
| 21 | A | I don't remember that. |
| 22 | Q | What were you looking at during this time? |
| 23 | A | His eyes. |
| 24 | Q | How long can you tell the jury from the time he |
| 25 |   | came in with Walter until you lost sight of him |

228

1    was he with you and Walter in your best judgment?

2    A    Two to three minutes.

3    Q    During that time tell the panel, two or three

4    minutes, who were you looking at during that time?

5    A    I was looking at Willie McCray and his eyes.

6    Q    Any doubt in your mind the man at the table

7    sitting over there with Mr. Capps is the man that

8    came over with the bag and the gun and wanted the

9    money?

10    A    Absolutely that's him.

11    MR. VALESKA:  Pass the witness.

12    CROSS EXAMINATION

13    BY MR. CAPPS:

14    Q    Ms. Whitehurst -- excuse me, Ms. Shelton, you paid

15    particular attention to that; is that correct?

16    A    Yes, I did.

17    Q    Was there any video surveillance in the store?

18    A    We had video cameras, but they weren't operative.

19    Q    You gave a description of the man, did you not?

20    A    Yes, I did.

21    Q    You said the individual was muscular?

22    A    Yes.

23    Q    Would you elaborate on that, please?

24    A    His T-shirt fit him snuggly.  All his clothing

25    looked new.  It didn't look stretched out or

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | anything.  He had a tight black T-shirt on.  And             |
| 2  |   | the way he was pulling that weapon in and out of             |
| 3  |   | the bag, his muscles were flexing in his arm.                |
| 4  | Q | So would you say that he was an individual that              |
| 5  |   | appeared to have worked out?                                 |
| 6  | A | He didn't look like a weight lifter, but he had             |
| 7  |   | definition in his arm.  He wasn't skinny as a                |
| 8  |   | rail.                                                        |
| 9  | Q | Now, were you showed any photographic lineups?              |
| 10 | A | Yes, sir.                                                    |
| 11 | Q | And how many photographic lineups were you shown            |
| 12 |   | by the police department?                                    |
| 13 | A | Two, I believe.                                              |
| 14 | Q | Two photographic lineups?                                    |
| 15 | A | I believe so, yes.                                           |
| 16 | Q | And when did you first learn the name Willie                |
| 17 |   | McCray?                                                       |
| 18 | A | I don't recall that.                                         |
| 19 | Q | You didn't know a Willie McCray when you were                |
| 20 |   | working at the store that night, did you?                    |
| 21 | A | No.  No.  He wasn't one of my regular customers,             |
| 22 |   | and I didn't know anybody by the name of Willie              |
| 23 |   | McCray.                                                       |
| 24 | Q | So when you were shown the photographs, did you             |
| 25 |   | know the name Willie McCray?                                 |

230

| | | |
|---|---|---|
| 1 | A | No, sir. |
| 2 | Q | It was after you had viewed the photographs that |
| 3 | | you were told the name Willie McCray? |
| 4 | A | I don't believe I knew his name until he was |
| 5 | | actually arrested. |
| 6 | Q | Were you shown any other photographs by the police |
| 7 | | department? |
| 8 | A | The two lineups, there were six pictures to a |
| 9 | | set.  I saw two. |
| 10 | Q | I'm going to show you a picture and see if you can |
| 11 | | identify this individual, and I'll mark it for |
| 12 | | Defendant's Exhibit 1. |
| 13 | | (Defendant's Exhibit No. 1 was marked |
| 14 | | for identification.) |
| 15 | Q | Were you shown this photograph of this individual? |
| 16 | A | By whom? |
| 17 | Q | By the police officer during the investigation. |
| 18 | A | I don't remember seeing that, no. |
| 19 | Q | You didn't pick this individual out as one of the |
| 20 | | ones involved? |
| 21 | A | No.  I picked out one person, and that was him |
| 22 | | (indicating). |
| 23 | Q | You never picked out this individual? |
| 24 | A | No. |
| 25 | Q | And you were never shown this picture, then? |

231

1   A   I don't remember seeing that picture.

2   Q   If I can, Ms. Shelton, did you give any

3       identification as to the character of the

4       defendants -- excuse me, the individual you allege

5       did this -- teeth or any kind of mouth, shall we

6       say design, or anything that was unusual?

7   A   Anything about his character or his appearance?

8   Q   His appearance as far as his teeth or mouth or

9       anything of that nature.

10  A   His most prominent feature was his eyes.  That's

11      what I kept stressing.  His eyes.

12  Q   Did you tell the officer at the time that you were

13      -- that you think that the teeth were not out of

14      order?

15  A   I believe I told the officer that I didn't notice

16      his teeth one way or the other.

17  Q   Do you remember giving that information to the

18      police department?  If you'll just take a minute

19      to look over it.

20  A   Yes.

21  Q   And I've underlined a portion there.  Is that the

22      information you gave to the police department?

23  A   This is not a direct quote from me, and it's not

24      my handwriting, and I don't use that phrase --

25      out-of-order signs.  That's not a phrase I would

1     use.

2  Q   Well, do you recall what you would have told the

3     officer?

4  A   That I didn't notice his teeth one way or the

5     other.

6          MR. CAPPS:  That's all I have.

7          THE COURT:  Anything else?

8          MR. VALESKA:  Yes, if I could.

9                    REDIRECT EXAMINATION

10  BY MR. VALESKA:

11  Q   I want to ask you -- Mr. Capps asked you about

12     looking at many lineups.  The first time the

13     police officers came to you and brought you some

14     pictures, do you recall it being six pictures?

15  A   Yes.

16  Q   Would you tell the ladies and gentlemen of the

17     jury, when you looked at six pictures, did you

18     identify anybody and say, the man that came in

19     there and did the robbery, did the shooting, he's

20     in that group?  Did you identify him?

21  A   No, he wasn't in that group.

22  Q   And you're sure?

23  A   Yes.  I told him he wasn't there.

24  Q   If I could, let me ask you, can you tell the

25     ladies and gentlemen, did they come back at a

1    later point in time and show you a file-type

2    folder, something like this, this color

3    (indicating), with cut-out pictures and ask you to

4    look at a lineup again?

5  A    Yes.

6  Q    And do you recall that being six pictures, once

7    again?

8  A    Right.

9  Q    And at that time, would you tell this jury, did

10    you pick anybody out?

11  A    Yes, I did.

12  Q    Were you positive?

13  A    Yes.

14  Q    And would you tell the ladies and gentlemen of the

15    jury, did you have the opportunity to go to

16    Florida at a later point in time somewhere around

17    August 13, 1993, after that, go down into Florida

18    and actually see a live lineup with six black

19    males actually in the flesh alive standing there?

20  A    Yes.

21  Q    Would you tell the ladies and gentlemen of the

22    jury, did you identify anybody in that lineup?

23  A    Yes, I did.

24  Q    Who was that?

25  A    Willie McCray.

234

| | | |
|---|---|---|
| 1 | Q | The second lineup, going backwards, okay, who did |
| 2 | | you identify in the second lineup? |
| 3 | A | Willie McCray. |
| 4 | Q | In the first line, did you identify anybody? |
| 5 | A | No one. |
| 6 | Q | Now, if I could, the detective, Sergeant Devane, |
| 7 | | when you looked at the photographic lineup, the |
| 8 | | one I refer to the manila folder, asked you to put |
| 9 | | it into percentage to give numbers of percentage |
| 10 | | if you could identify the person if anyone, did he |
| 11 | | ask you to do that? |
| 12 | A | Yes, he did. |
| 13 | Q | What percentage did you give him? |
| 14 | A | I really don't recall.  It wasn't a hundred |
| 15 | | percent. |
| 16 | Q | If I gave you a percentage of what you told him, |
| 17 | | would that refresh your recollection? |
| 18 | A | Yes. |
| 19 | Q | Did you tell him it was ninety-eight?  If you |
| 20 | | remember.  If you don't, just tell us you don't. |
| 21 | | That's fine.  Either way.  Just tell me if you |
| 22 | | remember. |
| 23 | A | That sounds right.  But I'm not sure. |
| 24 | Q | Now, tell the ladies and gentlemen of the jury, |
| 25 | | if I could, Mr. Capps showed you a picture and |

```
 1        asked you to look at it.  The picture he showed
 2        you was a Xerox copy; is that correct?
 3   A    Uh-huh.
 4   Q    Was that the man that came in and did --
 5   A    No, it wasn't.
 6   Q    Did you ever look at that picture, tell the jury,
 7        at any time during his testimony under oath and
 8        say, you looked at it and you weren't sure?
 9   A    I was shown that picture when I was under oath
10        previously and stated that I didn't know who that
11        was, it could be anybody basically.
12   Q    And let me ask you, if I could, I want to ask you
13        now to tell the jury -- you've identified Willie
14        McCray at the table -- any doubt in your mind in
15        any way that you're not sure that's the man who
16        did the robbery --
17   A    That's the man that held a gun on me.
18             MR. VALESKA:  Pass the witness.  That's all.
19        Thank you.
20             THE COURT:  Mr. Capps, anything else?
21             MR. CAPPS:  I don't have any further
22        questions.
23             THE COURT:  You may step down.
24             MR. VALESKA:  May she be excused subject to
25        being recalled if needed so she can go back to
```

236

1        work?

2                    THE COURT:  All right.  You're excused.

3            MR. VALESKA:  Jeff Clark.

4            THE COURT:  Jeff Clark.

5                        JEFF CLARK

6        having first been duly sworn, was examined and

7        testified as follows:

8                    DIRECT EXAMINATION

9    BY MR. VALESKA:

10   Q    Tell us your name, please, sir.

11   A    Jeff Clark.

12   Q    Let's go back to August 7, 1993, on Saturday night

13        and ask if you can tell the jury were you working

14        on that occasion in Houston County?

15   A    Yes, sir.

16   Q    Where did you work on August 7th of 1993?

17   A    Country Market.

18   Q    And what position did you hold with them?

19   A    Night manager.

20   Q    Can you tell the ladies and gentlemen of the

21        jury, was the Country Market, was the corporation

22        the property of Higdon Grocery Company,

23        Incorporated, a corporation doing business as the

24        Country Market?

25   A    That's correct.

237

1    Q    Now, did you go Deborah Sheffield?

2    A    Yes, sir.

3         Shelton.

4    Q    Deborah Shelton and Walter Sheffield, did you know

5         them?

6    A    Yes.

7    Q    Tell the jury how you know them.

8    A    Deborah was my night cashier -- head cashier, and

9         Walter was my -- ran cash registers for me at

10        nighttime.

11   Q    Now, would you tell the ladies and gentlemen of

12        the jury, sometime around ten-thirty -- ten-forty

13        p.m., August 7, 1993, a Saturday night, did you

14        have an occasion to leave the store and go outside

15        before anything big happened in the store?

16   A    Yes, sir.

17   Q    Why did you go outside?  Tell the jury.

18   A    To gather buggies from the parking lot.

19   Q    What else?

20   A    To smoke a cigarette.

21   Q    Now, tell the ladies and gentlemen of the jury, if

22        you could, while you were outside doing that, did

23        see any type vehicles pull up in close proximity

24        of the front door of the Country Market?

25   A    Yes.

238

```
1    Q    What kind of vehicle?

2    A    Looked to be like a blue Buick Regal -- Monte

3         Carlo -- Grand Prix -- two-door coupe.

4    Q    Did anybody get out of that vehicle?

5    A    Yes, sir.

6    Q    Males or females?

7    A    Males.

8    Q    White males or black males?

9    A    Black males.

10   Q    Did you see anything in their hands?

11   A    In one of the men's hands I saw a brown grocery

12        bag.

13   Q    Now, would you tell the ladies and gentlemen of

14        the jury, you saw that, two black males one have a

15        grocery sack, paper bag --

16   A    Paper sack.

17   Q    -- where did they go with the brown sack?  Where

18        did they go?

19   A    The male with the paper sack was going into the

20        store, and as I was finishing my cigarette I said,

21        this is either a refund, I need to go to the

22        office and do the exchange or -- and in that

23        particular store I had a lot of problems with

24        people coming with empty paper bags and putting

25        merchandise in like beer and meats and then
```

1          leaving the store with it.

2     Q    Would it be fair to say shoplifting?

3     A    Yes, sir.  On a regular basis.

4     Q    After you went back inside, you went to the store,

5          which door did you go into to gain access?

6     A    The entrance -- the automatic double doors.

7     Q    When you went in, did you go right or left or

8          straight?

9     A    I went in and went to the right.

10    Q    Why did you go to the right?

11    A    Because my first thing was if it's an exchange,

12         the man would be at the front waiting on me

13         because I'm the only one.  If it's a shoplifter,

14         it's either going to be beer or meat, and I went

15         to check those sections first.

16    Q    Now, do you know where Deborah was at that time

17         when you came in the front door yourself?  Do you

18         know where she was?

19    A    In her little cubbyhole office -- office.

20    Q    The amount of currency, cash or checks, that the

21         Country Market would have done that night, where

22         would it have been stored or kept before it could

23         be taken to the bank or money dropped?  Where

24         would it have been kept that night?

25    A    We have a safe that's actually in the back part of

240

1       the office.

2    Q  Who had access to the safe?

3    A  Just me and Deborah.

4    Q  Would you tell the ladies and gentlemen of the

5       jury, was it a combination or key lock?

6    A  Key.

7    Q  Now, would you tell the ladies and gentlemen of

8       the jury, when you went in and went to the right,

9       at that precise moment did you see the two black

10      males you had seen come in the store right then

11      when you first went in?

12   A  The second male followed him behind me, and I went

13      to the right.  He was at the other door coming

14      in.  But he never came in.  And I went all the way

15      around the store.

16   Q  As you went in and went back to the meats or the

17      beer, did you eventually wind back and come back

18      to the front part of the store?

19   A  Yes, sir.  I didn't see the first gentleman so I

20      said to myself, thank goodness, it's an exchange,

21      I better get to the front.

22   Q  As you came to the front through the aisles, could

23      you see the front office?

24   A  As I came up the aisle, I stopped --

25   Q  What did you see then?

241

| 1 | A | I saw the first gentleman with a paper bag in the |
| 2 | | office and had Deborah and Walter in the office |
| 3 | | with him. |
| 4 | Q | Do you see that man in the courtroom today? |
| 5 | A | Yes, sir. |
| 6 | Q | Point him out for the Record? |
| 7 | A | Right here (indicating).  I saw him as I came in. |
| 8 | Q | Which one at the table, the white male or the |
| 9 | | black male? |
| 10 | A | The black male. |
| 11 | | MR. VALESKA:  Let the Record reflect he |
| 12 | | pointed out Willie C. McCray. |
| 13 | Q | At that time did you know his name was Willie C. |
| 14 | | McCray? |
| 15 | A | No, sir. |
| 16 | Q | Now, would you tell the ladies and gentlemen of |
| 17 | | the jury, as you saw Willie C. McCray with the |
| 18 | | paper bag and Deborah and Walter, what, if |
| 19 | | anything, could you see was happening? |
| 20 | A | Ask me again. |
| 21 | Q | What did you see happening in the office? |
| 22 | A | As I came up to the end of the aisle, there was a |
| 23 | | display, and I knew something was wrong because he |
| 24 | | was in the doorway of the office and no one is |
| 25 | | allowed back there under any -- |

|    |   |                                                           |
|----|---|-----------------------------------------------------------|
| 1  | Q | You conduct normal business there with customers?         |
| 2  | A | Right.  But there's a counter.  No one is allowed          |
| 3  |   | inside the office where he was.                           |
| 4  | Q | What is kept, though, in that office, though --            |
| 5  |   | the main thing?                                           |
| 6  | A | Money.                                                    |
| 7  | Q | Could you see the bag?                                    |
| 8  | A | Yes, sir.                                                |
| 9  | Q | Could you tell the ladies and gentlemen of the           |
| 10 |   | jury, did you form an opinion as to what was             |
| 11 |   | happening right then?                                    |
| 12 | A | Oh, there I did.                                         |
| 13 | Q | What was it?                                             |
| 14 | A | I knew something was going on.  I thought we were        |
| 15 |   | being robbed.                                            |
| 16 | Q | Could you tell the ladies and gentlemen of the          |
| 17 |   | jury, at that point in time, did you talk or tell       |
| 18 |   | anybody else to call the police?                        |
| 19 | A | I ran back to see the other manager named Shelby.       |
| 20 |   | He was in the meat department wrapping some meat        |
| 21 |   | to carry home.  I told him I thought we were being      |
| 22 |   | robbed.  I said, let's go to the front and take         |
| 23 |   | care of it.  He stayed back to call 911.                |
| 24 | Q | When you got up to the front, did you come to see       |
| 25 |   | Willie C. McCray, the man you identified, as to         |

243

```
1          where he was at that time?
2    A     Right.  They were coming out of the office at that
3          time.
4    Q     See any other customers shortly after that in
5          close proximity to Willie McCray?
6    A     There were some in line at the office.  There's a
7          line of cash registers.  In the first line there
8          was three or four customers.
9    Q     Let's start from the office.  The first cash
10         register, first aisle, the second one, how many
11         aisles did we have?  Do you recall the cash
12         registers?
13   A     Seven or eight.
14   Q     Would it be fair to say the one closest to the
15         office is aisle number one?
16   A     Number one.
17   Q     Cashier one?
18   A     Correct.
19   Q     Do you know where Walter was working, which aisle?
20   A     Either one or two.
21   Q     Would you tell the ladies and gentlemen of the
22         jury, as you stood there watching, did you see a
23         customer do anything in close proximity to Willie
24         McCray?
25   A     Yes, sir.
```

1   Q   What did you see a customer do?

2   A   Hit Willie.

3   Q   Was it a man or woman?

4   A   It was a man.

5   Q   White male or black male?

6   A   White.

7   Q   Do you recall what was on his head -- that the

8       white male had on his head, if anything?

9   A   A cap.  A softball cap, baseball cap.

10   Q   Do you remember the color?

11   A   I don't remember.

12   Q   How did he strike Willie McCray?

13   A   Just reared back and caught him right there on

14       the jaw (indicating).

15   Q   When he hit Willie McCray at that point in time,

16       how did Willie McCray react?

17   A   Well, that paper sack came off, and he turned

18       around and shot him.  I thought he shot him in the

19       throat.  I found out it was the upper face.

20   Q   Would you tell the ladies and gentlemen of the

21       jury, did the victim, the white male that struck

22       him, did you see him have a gun or weapon or

23       anything?

24   A   No, sir.  He was just a customer of mine.

25   Q   What happened to the bag?  What did you see happen

COURT OF CRIMINAL APPEALS NO._____

## PPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

CIRCUIT COURT OF _____HOUSTON_____ COUNTY, ALABAMA

CIRCUIT COURT NO. _____CC-94-791_____ Volume ___III___

CIRCUIT JUDGE _____Jerry White_____

Type of Conviction / Order Appealed From: ___MURDER___

Sentence Imposed: ___99 years, $20,000.00 Fine, $50.00 Victim Compensation and___
___Restitution___

Defendant Indigent: [X] YES [ ] NO

___Willie C. McCray___                                          **NAME OF APPELLANT**

___Honorable Joe Lewis___        ___794-0759___
(Appellant's Attorney)              (Telephone No.)
___P. O. Box 536___
(Address)
___Dothan,___        ___Alabama___        ___36302___
(City)            (State)            (Zip Code)

### V.

### STATE OF ALABAMA                                    **NAME OF APPELLEE**

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)



Volume III

```
 1              to the bag, if anything, after the shot went off?

 2        A     Just flew off.  Three or four feet.

 3        Q     Now, when you saw that and heard the shot, what

 4              did you see the white male do that got shot?  What

 5              did he do?

 6        A     He hit the ground.

 7        Q     What did you do?

 8        A     Took off running.

 9        Q     Which way did you go?

10        A     Back down the aisle.

11        Q     Would you tell the ladies and gentlemen of the

12              jury, did you come to hear any other sounds?

13        A     Yes, sir.  Everybody -- it wasn't just me.

14              Everybody scattered.  And as the man fell down and

15              the Defendant was running out the store shooting

16              up the store with an automatic type weapon.

17        Q     Would you tell the ladies and gentlemen of the

18              jury, shortly after that did the police or

19              paramedics arrive?

20        A     Yes, sir.

21        Q     Did you get back up front where Michael Scott had

22              been shot?

23        A     Yes, sir.

24        Q     Did you see him?

25        A     Yes, sir.
```

| | | |
|---|---|---|
| 1 | Q | Large amount of blood? |
| 2 | A | Yes, sir. |
| 3 | Q | Did you see his hat? |
| 4 | A | Yes, sir. |
| 5 | Q | Now, the store itself, you work at the Country |
| 6 | | Market, did you-all use or keep Winn Dixie paper |
| 7 | | bags? |
| 8 | A | No, sir. |
| 9 | Q | What bags did you-all use? |
| 10 | A | Country Market. |
| 11 | Q | Why wouldn't you use Winn Dixie? |
| 12 | A | Competition. |
| 13 | Q | Would you tell the ladies and gentlemen of the |
| 14 | | jury, when the police came, was the Winn Dixie bag |
| 15 | | still in close proximity of the shooting on |
| 16 | | Michael Scott where he was laying? |
| 17 | A | Yes, sir.  Right there at it. |
| 18 | Q | Did they take custody of the paper bag? |
| 19 | A | The police did. |
| 20 | Q | Did you ever touch it? |
| 21 | A | No, sir. |
| 22 | Q | Would you tell the ladies and gentlemen of the |
| 23 | | jury, later on that night -- excuse me, shortly |
| 24 | | afterwards, did you have occasion to go back |
| 25 | | outside the front part of the Country Market and |

| | | |
|---|---|---|
| 1 | | see if that blue vehicle was still out front? |
| 2 | A | Well, we had closed the store down, and me and |
| 3 | | Walter stayed back. |
| 4 | Q | Was it out there before you closed the store down, |
| 5 | | though? |
| 6 | A | I don't understand. |
| 7 | Q | After Michael Scott got shot, did you ever go back |
| 8 | | outside before you closed the store again? |
| 9 | A | Yes, sir. |
| 10 | Q | Was that vehicle you described, the blue vehicle, |
| 11 | | was it still out there? |
| 12 | A | Oh, no, sir. |
| 13 | Q | After you got ready to close the store down and |
| 14 | | closed it down and the police left, did some |
| 15 | | friends or acquaintance contact you or come up to |
| 16 | | the store? |
| 17 | A | Yes, sir. |
| 18 | Q | Did they tell you something? |
| 19 | A | Yes, sir. |
| 20 | Q | And after they told you something, did you contact |
| 21 | | Sergeant Devane again? |
| 22 | A | Correct. |
| 23 | Q | Did you and Devane leave the Country Market to go |
| 24 | | looking for an item? |
| 25 | A | Yes, sir. |

| | | |
|---|---|---|
| 1 | Q | What did you go looking for? |
| 2 | A | The car. |
| 3 | Q | Did you find the car? |
| 4 | A | Yes, sir. |
| 5 | Q | Describe when you got to the car how it looked. |
| 6 | | Tell the jury. |
| 7 | A | Well, my friends that I played ball with in school |
| 8 | | came and told me that that car that they took off |
| 9 | | in is two blocks down the road. |
| 10 | Q | Did you go and find it? |
| 11 | A | We went and found it. |
| 12 | Q | You and Devane? |
| 13 | A | Yes, sir. |
| 14 | Q | What was the condition of the car? |
| 15 | A | The doors was open, the blinker was on, and it was |
| 16 | | still running. |
| 17 | Q | Did you touch anything on the car yourself? |
| 18 | A | No, sir. |
| 19 | Q | Did Devane take custody? |
| 20 | A | Him and a bunch of guys. |
| 21 | Q | Did you ever look inside the car? |
| 22 | A | I peaked in there just kind of glimpsed as anybody |
| 23 | | would seeing something like that. |
| 24 | Q | Now, would you tell the ladies and gentlemen of |
| 25 | | the jury, was any money taken from the Country |

1        Market?

2    A    No, sir.

3    Q    Any doubt in your mind when you told the jury you

4         identified Willie C. McCray as the one you saw in

5         the store?

6    A    No, sir.

7              MR. VALESKA:  Pass the witness.

8                    CROSS EXAMINATION

9    BY MR. CAPPS:

10   Q    Mr. Clark, did you receive any inducements or

11        promises to get you to come testify here today?

12   A    No, sir.

13   Q    Have you ever had any cases that were pending

14        against you dismissed?

15   A    I didn't understand the question.

16   Q    Has there been an occasion -- has there been an

17        occasion for you to have criminal charges pending

18        against you and those charges were subsequently

19        dismissed?

20   A    I had a case where a lady was suing me, and she

21        didn't show up for court, and the Court dismissed

22        it because she didn't show up.

23   Q    Let me ask you this.  Have you ever been arrested

24        and charged with a criminal offense here in

25        Houston County, Alabama?

250

1    MR. VALESKA:  I object to the form of that

2    question unless it has to do with the promise or

3    inducement he may have obtained whether he's been

4    arrested.

5        THE COURT:  Approach the bench, Gentlemen.

6            (At which time the following proceedings

7            were held at the bench outside of the

8            hearing of the jury:)

9        THE COURT:  A conviction?

10    MR. CAPPS:  No.  He said he had never been

11    arrested or he had never -- when I asked if he

12    has -- a civil matter.  Civil is different than

13    criminal.

14        THE COURT:  What was the case?

15    MR. VALESKA:  I don't object if it goes to

16    any inducements or promises to testify.

17        THE COURT:  Tell me -- it was a civil case?

18    MR. CAPPS:  No.  It was a criminal matter

19    with the City of Dothan.  And if he says he's been

20    arrested and charged, that's fine.  But at this

21    point I'm trying to impeach him because he's

22    basically lying.

23    MR. VALESKA:  I'm saying I don't object if he

24    phrases the question was he ever promised or any

25    inducement to testify in this case to get a case

1    dropped.  I don't object to that.

2          THE COURT:  Is that it?

3          MR. CAPPS:  Right.

4          MR. VALESKA:  I won't object to that.

5          THE COURT:  Okay.

6                (At which time the following proceedings

7                were held in open court:)

8    Q    Once again, Mr. Clark, maybe I didn't phrase the

9         question quite properly.  But were you promised to

10        have any cases dismissed or dropped to get you to

11        come down here and testify?

12   A    No, sir.

13   Q    When you became a witness in this case, you were

14        interviewed by the Dothan Police Department; is

15        that correct?

16   A    Yes, sir.

17   Q    Where did they locate you to talk with you about

18        the case?

19   A    Originally?

20   Q    No.  After the case was going on.  Of course,

21        originally it was at the Country Market.  I'm

22        talking after that.

23   A    I was living in Tallahassee when the first trial

24        was to be -- you know, do the first trial.

25   Q    You were living in Tallahassee?

1 A That's correct.

2 Q And when you were living in Tallahassee, did

3   anyone assist you in coming to Dothan, Alabama?

4 A Yes, sir.

5 Q Who was that?

6 A Police officer named Willie -- female named

7   Willie.

8    MR. VALESKA:  We stipulate Willie Williamson.

9    MR. CAPPS:  Thank you.

10 Q Now, you said there were two black males that

11   entered the store; is that correct?

12 A Actually, the second one never did enter.  He came

13   to the doorway and stayed there.

14 Q Did you ever identify that individual?

15 A Just small framed, light skin.

16 Q Were you shown any photographs of a lineup,

17   photographs regarding that individual?

18 A No, sir, I couldn't pick him out.

19 Q You did not see him?

20 A Just corner of my eye.  Knew he was light skinned

21   and small framed.  That's all I could say about

22   that person.

23 Q You're sure he never came into the store?

24 A Yes, sir.

25 Q Did he have a weapon?

253

1    A    Yes, sir.

2    Q    Do you know if he discharged his weapon?

3    A    I'm not sure.

4    Q    How many shots did you hear, Mr. Clark?

5    A    Five or six.  It was so fast.  It was ta-ta-ta-ta.

6         Could have been eight or nine.  I don't know.  It

7         was pretty fast.

8    Q    Did you have an occasion to see where the shots

9         went -- the projectiles ended up?

10   A    Afterwards.

11   Q    Where would that have been?

12   A    I knew -- the ones I seen shot lights as in the

13        front.  From what I understand, some had and went

14        into some of the products in the store and hit

15        some other signs in the store.

16   Q    So we're talking five to seven shots; is that

17        correct?

18   A    Yes, sir.

19   Q    How many hit up in the ceiling?

20   A    I don't know.

21   Q    Do you know how many hit in the floor?

22   A    I don't know.

23   Q    You stated some ricocheted.  Do you know what said

24        projectile ricocheted from?  When you said that,

25        what were you thinking?

```
1    A    Well, I think one ended up in a pack of noodles.

2         So I just -- me assuming when he hit the lights it

3         ricocheted off and went into a pack of noodles.

4    Q    So it was a quick ta-ta-ta I think that was your

5         testimony; is that correct?

6    A    Yeah.  This is after.  Yes, sir.  As he was

7         running out of the store.

8    Q    Now, when did you see the bag come off the gun?

9    A    After the customer in line hit the Defendant.  It

10        came off and he shot him.

11   Q    And in what hand was the bag in?

12   A    The bag was being held the whole time kind of

13        cradled with his right arm inside the bag and then

14        the left arm would be kind of cradled like this

15        (indicating).

16   Q    Is it possible that the shot was fired while the

17        bag was still on the gun?

18   A    I don't know.  I just know what I saw.

19   Q    Now, at what point did you see the bag hit the

20        floor?

21   A    I never seen it hit the floor.  I just seen it fly

22        off, and then my eyes were on the gun, of course.

23        My eyes weren't on the bag.  I just knew it had to

24        land. I followed the gun.

25   Q    You didn't see the bag where it ended up, then?
```

1    Q    And it's your testimony that you heard six to

2         seven shots in rapid succession; is that correct?

3    A    After the one shot, yes, sir.

4    Q    And then the individual ran from the store?

5    A    Right.  As he was leaving, he was shooting.

6    Q    Do you know if any shots were fired while the gun

7         was in the bag?

8    A    No, sir.

9    Q    You don't know?

10   A    Not that night they weren't.  I didn't see them.

11   Q    You didn't see them, or you don't know?  I'm

12        asking you.

13   A    Well, I'll tell you what I saw.  I saw the bag

14        come off and the shot fired.  Prior to that, there

15        were no shots in the store.  The only shots that

16        were made when the bag was not on the gun.

17             MR. CAPPS:  That's all.  Thank you.

18             THE COURT:  Anything else?

19             MR. VALESKA:  Just a couple of quick

20        questions if I can.

21                    REDIRECT EXAMINATION

22   BY MR. VALESKA:

23   Q    Let me make sure I understand for the benefit of

24        the jury.  The first time you looked at a

25        photographic lineup, you looked at a photographic

```
1         lineup with six pictures on some manilla folder

2         like this (indicating) that were cut out with six

3         individuals; is that correct?  Is that fair?

4    A    That was the second.

5    Q    Tell me about the first one, then.

6    A    The first one was like some home pictures that the

7         police department had and showed me.

8    Q    You didn't identify anybody?

9    A    (Witness nodded.)

10   Q    The second lineup, the one I asked about the

11        manila-colored folder, once again, you looked at

12        six photographs and you picked out a man

13        identified as Willie McCray, correct?

14   A    Correct.

15   Q    And that was Sergeant Stan Devane, and Devane

16        asked you to put it in percentages, can you give

17        me a percentage up to a hundred percent how sure

18        you are, correct?

19   A    Correct.

20   Q    Do you remember the percentage?

21   A    I think that night I said eighty-five percent.

22   Q    Then tell the ladies and gentlemen of the jury

23        after you said eighty-five percent, a later point

24        in time, did you have the occasion they come and

25        you go down into Florida and you go to a live
```

1      lineup where there are six black males all dressed

2      alike with hats and same type clothing and all

3      dressed alike, correct?

4    A    Yes, sir.

5    Q    They didn't tell you Willie C. McCray was in

6      there, did they?

7    A    No, sir.

8    Q    They didn't suggest, indicate, or say, we've

9      caught him, he's in there, all you've got to do is

10      pick him out?  They never said anything, did they?

11    A    No, sir.

12    Q    They asked you to look at the lineup, correct?

13    A    Yes, sir.

14    Q    You looked at the six black males all dressed

15      alike, all with facial hair in whatever manner or

16      fashion, the pictures will depict, and you picked

17      out who?  Who did you pick out?

18    A    Mr. McCray.

19    Q    Any doubt in your mind?

20    A    One hundred percent.

21    Q    Now, and you have identified him in the courtroom

22      today, correct?

23    A    Yes, sir.

24    Q    Any doubt in your mind, tell this jury, that

25      that's not the man, in other words, you know it's

1    him, the one that came in and had the gun and shot

2    Michael Scott?

3  A    Yes, sir.

4  Q    The one you saw also get out of the blue-colored

5    car -- did you say Monte Carlo?  I don't want to

6    put any words in your mouth.

7  A    I said three different type cars.  Monte Carlo was

8    one of them.

9  Q    I want to ask you, if I could, at a later point in

10    time, a month later, maybe two months later,

11    Corporal David Jay, not Stan Devane, but Corporal

12    David Jay came back with six more photographs and

13    said, look at these and see if you can pick

14    anybody out, right?

15  A    Yes, sir.

16  Q    You didn't pick anybody out, did you?

17  A    No, sir.

18  Q    Why didn't you pick anybody out?

19  A    It wasn't one of the guys.

20  Q    Now, let's talk about Mr. Capps asked you about

21    the second man, the man at the door, the shorter,

22    that you described with the lighter skin, was he

23    as tall as McCray?

24  A    No, sir.  He was shorter.

25  Q    Tell the jury why you couldn't pick him out if you

1    saw both these men.  What prevented you from

2    getting a good look at the man at the door with

3    the lighter skin, the black male, if anything?

4  A    I just never had eye contact with his face.

5  Q    What did he have that prevented you from seeing

6    his entire face?  What was he wearing?

7  A    Had a cap pulled down.

8  Q    What was on the cap?  Do you remember what initial?

9  A    I want to say an X.

10  Q    Could you see his entire face like you saw

11    McCray's?

12  A    No, sir.  I just seen his arms and his frame and

13    the gun.

14  Q    I want to show you, if I could -- almost finished,

15    I promise -- if I could, State's Exhibits 27, 30,

16    33, and 34.  Let Mr. Capps see them.  And while

17    he's looking at those, I'll ask you about this

18    one.  State's Exhibit 36, looking at 36, is that

19    the kind of paper bag that you-all sold your

20    products in?

21  A    Oh, no, sir.

22  Q    Did you see this bag, 36, in the store?

23  A    Yes, sir.

24  Q    You saw the writing, didn't you?

25  A    Right.

```
 1    Q    And is that the close proximity of the aisle or
 2         counter where Michael shot had been shot?
 3    A    Yes, sir.
 4    Q    Would you tell the ladies and gentlemen of the
 5         jury, did you ever touch it?
 6    A    No, sir.
 7    Q    It appears -- is this the condition it was in when
 8         you saw it in the store just like this?
 9    A    No, sir.  It was together like you could put
10         groceries in it.
11    Q    Now, you told the ladies and gentlemen of the jury
12         when you saw McCray holding the bag, you described
13         it what matter or fashion from the time you first
14         saw him until you came in until the shooting, how
15         was he holding the bag?
16    A    Cradled it like a baby.
17    Q    Cradled.  Could you see the entire bag to see if
18         there were any holes in it at the time he was
19         cradling it?
20    A    No, sir.
21    Q    When the gun went off, fired the weapon that shot
22         Mr. Scott in Houston County, and you said the bag
23         was up, what were you watching at that exact
24         moment?  Were you watching the bag or the gun or
25         McCray?  What were you watching?
```

263

| | | |
|---|---|---|
| 1 | A | The gun.  The whole time. |
| 2 | Q | When you heard the gun, what kind of sound did it |
| 3 | | make? |
| 4 | A | Like a firecracker.  Like a clap. |
| 5 | Q | And would you tell the ladies and gentlemen of the |
| 6 | | jury, were you focused on the bag then or Michael |
| 7 | | Scott?  Who were you looking at? |
| 8 | A | Michael Scott, the gun. |
| 9 | Q | And tell these twelve people at that time when |
| 10 | | Michael Scott got shot and heard the gun, were you |
| 11 | | yourself afraid? |
| 12 | A | Oh, yes, sir. |
| 13 | Q | Why?  Why were you afraid?  Tell them. |
| 14 | A | See it everyday.  I don't know.  Thought about |
| 15 | | it.  I was going to get killed. |
| 16 | Q | By who? |
| 17 | A | By the guy with the gun. |
| 18 | Q | Which was who? |
| 19 | A | Mr. McCray.  Everybody was scared. |
| 20 | Q | At that point in time did you stand there and |
| 21 | | continue to watch? |
| 22 | A | Well, no, sir. |
| 23 | Q | What did you do? |
| 24 | A | Ran. |
| 25 | Q | Now, the pictures I want to show you.  This is |

264

1        it.  I want to show you these pictures.  Start off

2        with State's Exhibit 27.  Do you recognize 27?

3    A   Yes, sir.

4    Q   What is 27?

5    A   That's the register on one, and that's where Mr.

6        Scott was kill.

7    Q   Up in the right-hand corner where I'm pointing

8        (indicating), do you see any object in there in

9        reference to 36 in the right-hand corner?

10   A   Yes, sir.

11   Q   What is that?

12   A   Brown paper bag.

13   Q   Is that 36?

14   A   Yes, sir.

15   Q   Does 27 appear to be marked, altered, or changed

16       except Michael Scott, the victim, has been

17       removed, correct?

18   A   Yes, sir.

19   Q   Besides that, is that the way it looked after he

20       was left, correct?

21   A   Correct.

22            MR. VALESKA:  Offer 27.

23            MR. CAPPS:  No objection.

24       THE COURT:  Let it be admitted.

25               (State's Exhibit No. 27 was admitted

```
 1                    into evidence.)

 2      Q    Let me go to State's 30.  Do you see 30 at the

 3           bottom?

 4      A    Yes, sir.

 5      Q    What does that show?  What part of the store?

 6      A    That shows the front of the office and the cash

 7           register.

 8      Q    Does it show the hat Michael Scott had on?

 9      A    That is right.

10      Q    Show the blood stain?

11      A    Yes, sir.

12      Q    Do you see any employees in there?

13      A    Yes, sir.

14      Q    Who are the employees?

15      A    That's Debbie, Walter.  I can't -- that may be

16           Cindy.

17      Q    Does that truly and accurately depict as you come

18           in the front door the counter that goes down the

19           wall between the back of the cash register aisles

20           where the bags are and the width of the wall down

21           to the office?

22      A    Yes, sir.

23      Q    Is that the way it looked except Mr. Scott had

24           been removed where there's blood stains and

25           there's a red basket turned over?
```

| | | |
|---|---|---|
| 1 | A | Right. That wasn't there. |
| 2 | Q | Everything else except his hat, that the way it |
| 3 | | looked? |
| 4 | A | Right. |
| 5 | | MR. VALESKA: Offer 30. |
| 6 | | MR. CAPPS: No objection. |
| 7 | | THE COURT: Let it be admitted. |
| 8 | | (State's Exhibit No. 30 was admitted |
| 9 | | into evidence.) |
| 10 | Q | And State's 33, what is that? |
| 11 | A | That's outside the parking lot. |
| 12 | Q | Is that the way it looked that night when you went |
| 13 | | back inside while the General Motors vehicle, |
| 14 | | whatever described, if it was Oldsmobile or Monte |
| 15 | | Carlo, where it was? |
| 16 | A | Yes. |
| 17 | Q | Does that show the actual lighting? |
| 18 | A | Yes, sir. |
| 19 | Q | Same substantial condition except for the police |
| 20 | | cars, right? |
| 21 | A | Correct. |
| 22 | | MR. VALESKA: Offer 33. |
| 23 | | MR. CAPPS: No objection. |
| 24 | | THE COURT: Let that be admitted. |
| 25 | | (State's Exhibit No. 33 was admitted |

1            into evidence.)

2    Q    34 for identification purposes, that's what?

3    A    That's the Winn Dixie paper bag.

4    Q    What's the item that's touching or close to you at

5         that time?

6    A    Brachs Candy.

7    Q    Once again, does it appear to be marked, altered,

8         or changed in any way?

9    A    No, sir.

10            MR. VALESKA:  Offer 34.

11            MR. CAPPS:  No objection.

12            THE COURT:  Let that be admitted.

13              (State's Exhibit No. 34 was admitted

14              into evidence.)

15    Q    Final two questions I have.  While you were there

16         with the police, not that you touched them, did

17         you saw spent fired cartridges on the floor in the

18         general proximity where Michael Scott, did you see

19         them lying there?

20    A    I saw them, right.

21    Q    Did you also find or see -- you didn't touch them,

22         but actual the bullets, the casings that had been

23         fired, the metal or copper jackets, three

24         different parts, one in the fettucini, one on the

25         floor, and one they took out of the ceiling, did

1    you actually see them when the police took custody

2    of them?

3  A    Yes.  Because it was amazing to me that they ended

4    up where they ended up.

5        MR. VALESKA:  That's all.  Pass the witness,

6    Judge.

7        THE COURT:  Anything?

8        MR. CAPPS:  Yes, sir.

9                  RECROSS EXAMINATION

10 BY MR. CAPPS:

11 Q    State's Exhibit 34, do you know what that

12    substance is there on the floor?  Is that

13    something that was in your store?

14 A    I don't have no idea.

15 Q    You've never seen that before?

16 A    (Witness nodded.)

17 Q    So is it fair to say that that substance, whatever

18    that markings are on the floor in front of the

19    Brachs Candy counter, were not there prior to this

20    incident?

21 A    I don't know.

22 Q    So those markings could have been there, then,

23    prior to this incident, you just don't know?

24 A    I don't know.

25        MR. CAPPS:  Thank you.

1        MR. VALESKA:  If I could, Judge, let me show

2    him and show Chris State's Exhibit 25.

3          <u>FURTHER REDIRECT EXAMINATION</u>

4   <u>BY MR. VALESKA:</u>

5   Q   25 for identification purposes, Mr. Capps is

6    asking you about the substance on the floor, which

7    is in -- if I could, 34.  Let me show 25 for

8    identification purposes.  You referred to the item

9    that the bag was touching was what?  What kind of

10   stand?

11  A   Brachs display.

12  Q   Locking at 25, the corner of the paneling, the

13    aisle, are you able to tell what position the

14    Brachs Candy aisle was actually in and/or whether

15    it was moved or the scrape he asked you about that

16    that's what caused it?

17  A   (Witness nodded.)

18  Q   Let me ask you.  The candy aisle itself, do you

19    know how long that -- not the machine, but the

20    stand had been there?  Had it been there for a

21    while?

22  A   Forever.

23  Q   You worked at that store for how long?

24  A   A couple of years.

25  Q   Were you ever there in the store when anything

1    was removed or cleaned up or waxed the floor in

2    any manner or fashion?  Did that ever occur while

3    you worked there?

4  A    Every night.

5  Q    If something is moved and hadn't been cleaned

6    under there, what color is going to be up under

7    there that been sitting there for a long time?

8  A    It's going to be disgusting, dirty.

9  Q    And if it's dragged or moved, is it going to make

10    any indentions or your tile?

11  A    Sure.

12  Q    Looking at -- Mr. Capps asked you about the stain

13    on 34, in other words, what that is, looking at

14    the aisle on 34, the mark, then look at 25, does

15    it appear that, once again, the Brachs Candy aisle

16    thing had been moved in any manner or fashion, or

17    is that the position it was in when the shooting

18    occurred?

19  A    No.  That's --

20  Q    Had it been moved?

21  A    It's level with the registers.

22  Q    But the floor marks?

23  A    Right.

24  Q    Looking at 25 -- and let Chris see them -- can you

25    tell whether or not that's the exact position or

271

```
 1        whether it had been moved or pushed out of the way
 2        in any manner or fashion?
 3    A   I can't tell.
 4            MR. VALESKA:  That's all.
 5                  FURTHER RECROSS EXAMINATION
 6   BY MR. CAPPS:
 7    Q   Also looking at this marking, could that also be
 8        consistent with bullet marks on the floor?
 9    A   Say that again?
10    Q   Could these markings also be consistent with
11        bullet marks?
12    A   Are you asking me do I think those are bullet
13        marks?
14    Q   I'm asking you could they be consistent with
15        that.  Mr. Valeska asked you could it be
16        consistent with the candy bar being moved around.
17    A   Ain't no bullet marks.
18    Q   How do you know that?
19    A   I just -- how can it be bullet marks?  It looks
20        like filth and something.  Gum or something.  I
21        don't know what it is.
22    Q   Don't know what it is.  But you don't think it's
23        bullet marks?
24    A   I don't know.
25    Q   Is it there today, or was it there when you left,
```

1       or have you cleaned it up?

2    A    I don't know.  I'm sure they waxed it up.

3          MR. CAPPS:  That's all.

4          MR. VALESKA:  No more questions.  Ask if he

5     can be excused.

6          THE COURT:  Do you have any objection to his

7     being excused?

8          MR. CAPPS:  No need for him.

9          THE COURT:  You're excused, and you may go.

10    Thank you very much.

11          MR. VALESKA:  Dr. Paredes is very short.

12          THE COURT:  All right.  Dr. Paredes.

13                  ALFREDO PAREDES

14     having first been duly sworn, was examined and

15     testified as follows:

16                 DIRECT EXAMINATION

17    BY MR. VALESKA:

18    Q    Tell us your name.

19    A    My name is Alfredo Paredes.

20    Q    And what is your occupation or profession,

21         please, sir?

22    A    I'm a state medical examiner.  I make pathologies

23         and a forensic -- general pathologies and a

24         forensic pathologist.  I work for the Alabama

25         Department of Forensic Sciences, which is a state

1    agency.

2  Q  Now, Dr. Paredes, how long have you been a

3     forensic pathologist to do autopsies on human

4     beings?

5  A  Approximately fifteen years.

6  Q  Are you licensed in the state of Alabama as a

7     general pathologist as well as you've had training

8     in becoming a forensic pathologist?

9  A  Yes, sir.

10  Q  How many autopsies have you been before August 7,

11     1993, tell the jury, on human beings to determine

12     the cause of death?

13  A  I do an excess of three thousand cases from '93 to

14     this time.  I do about -- in excess of two hundred

15     a year.

16  Q  Now, Dr. Paredes, could you tell the ladies and

17     gentlemen of the jury, before August 7, 1993, were

18     you licensed as a medical doctor in the state of

19     Alabama?

20  A  Oh, yes, sir.

21  Q  Have you testified before August 7, 1993, in trial

22     courts like today in front of a jury with the

23     circuit judge based on your training and education

24     as a physician and doing pathology and forensic

25     pathology -- excuse me, autopsies on human beings,

1      were you allowed to give your opinion in trial

2      courts of the state?

3  A   The answer to the question is yes.

4  Q   How many times?

5  A   Numerous times.

6  Q   Have you done autopsies on human beings in

7      relationship to gunshots, automatic weapons,

8      semi-automatic weapons before August 7, 1993?

9  A   Oh, yes, sir.

10  Q   Have you done the internal examination to see the

11      track of the bullet or what organs it penetrated

12      to determine the cause of death?  Have you done

13      that?

14  A   Yes.

15  Q   Many times?

16  A   Many times.

17  Q   Have you also published reports as to your autopsy

18      findings when you do an autopsy as a forensic

19      pathologist for the State of Alabama?  Do you do

20      that?

21  A   Yes.

22      MR. CAPPS:  Your Honor, I'll stipulate to his

23      qualifications as an expert.  He's been declared

24      an expert numerous times in his field.

25      MR. VALESKA:  Thank you.

1          THE COURT:  You admit his qualification.

2          MR. CAPPS:  Yes.

3    Q   Based on that --

4          MR. VALESKA:  Thank you, Judge.

5    Q   -- would you tell the ladies and gentlemen of the

6        jury, did you have the opportunity, Dr. Paredes,

7        to do a post-mortem exam on the body of Michael

8        Lester Scott, a forty-one year old white male on

9        or about August 6, 1993?

10   A   Yes.  I did it on August 11, 1993.

11   Q   And would you tell the ladies and gentlemen of the

12       jury, when you examined Mr. Scott in the lab at

13       the morgue, did you determine whether or not he

14       had any gunshot wounds to the face?

15   A   Yes.

16   Q   Where were any entry wounds, if any?

17   A   He was shot over the chin area on the left side.

18       The bullet went through the upper and lower part

19       of the neck.

20   Q   What did it do inside?

21   A   Through the -- well, it tore the larynx, which is

22       the voice box, and then it went backwards into the

23       spinal column and tore the lower cervical spinal

24       column.  The bullet exited the back of the chest

25       at the base -- the upper chest area.

1 Q Did you find any bullet fragments inside his body

2   in any manner or fashion?

3 A No, sir.

4 Q The sides of the hole.  Tell me about the entrance

5   wound, how big it was.  Did you measure it?

6 A I measure it as being pear shape.  Three-sixteenth

7   of an inch in diameter, gunshot wound defect.

8 Q Is that a small or big hole?

9 A It's a relatively small.

10 Q What about the exit wound?  It's size?

11 A The size of the exit wound, I call it stellate;

12   that is, with a lot of projection like a star.

13   Irregularly shaped, three-sixteenth of an inch.

14   The same way.

15 Q Now, could you tell the ladies and gentlemen of

16   the jury, when the projectile went inside the chin

17   and went through as indicated the injury it

18   caused, when it went through the spinal column in

19   the back, it severed that?

20 A Yes.

21 Q Any type of physical motor movement, hands or legs

22   or feet, once that bullet went in and severed that

23   spinal column, would Mr. Scott have any use of his

24   hands or legs in any manner or fashion?

25 A This level at the base of the neck he should have

1    fall and he lose the control of his upper and

2    lower extremities immediately.

3    Q   Did you publish a report and determine the cause

4        of death to Michael Scott?

5    A   Yes.

6    Q   What took his life?

7    A   A gunshot wound to the face.

8    Q   Now, let me show you State's Exhibit No. 37 for

9        identification purposes.  I'm not sure it's been

10       admitted.  It's been admitted.  State's 37, is

11       that the Michael Lester Scott you did the autopsy

12       on with the gunshot wound to the chin using your

13       pictures or information you have?

14   A   Yes, that is him.

15   Q   How tall was he, and how much did he weigh?

16   A   Sixty-nine inches, five feet nine inches; and

17       weighed a hundred and eighty-three pounds.

18   Q   What was his height?  Give me that again.

19   A   Five feet nine inches, hundred and eighty-three

20       pounds.

21           MR. VALESKA:  That's all I have.  Pass the

22       witness.  Thank you, Judge.

23           THE COURT:  Mr. Capps?

24           MR. CAPPS:  I don't have any questions.

25           MR. VALESKA:  Can he be excused?  He's got

1    other cases.

2        THE COURT:  Yes, sir.

3            You're excused.  You may go.

4        MR. VALESKA:  I can call another witness if

5    you like, Sergeant Devane, or I can stop here.

6        THE COURT:  Let's stop here.  If we get into

7    Devane, that will take a while.

8        MR. VALESKA:  If I could just offer to the

9    Court, I'm getting close to the end of my

10   witnesses.  I will finish tomorrow easily.  I'll

11   represent to the Court in my opinion maybe even

12   before lunch.  Just making you aware.

13       THE COURT:  Now, ladies and gentlemen of the

14   jury, it will not be necessary for you to stay

15   together overnight.  You may go to your own homes

16   overnight.  While you're away out of the jury box

17   and away from the courthouse, do not discuss the

18   case among yourself.  Do not discuss it with

19   anyone else.  Do not allow anyone to discuss it

20   with you.  If anyone attempts to discuss the case

21   with you, you should let me know immediately.

22           Now, there may be some television or

23   radio broadcasts concerning the events of this

24   trial.  There might be some newspaper accounts of

25   the events of this trial.  If there are, you

279

1    should not watch, read, or listen to any of those

2    news accounts of the events of this trial.  As I

3    told you at the outset, all the information that

4    you have concerning this trial must come from the

5    witness stand.

6              Now, with that, you are discharged until

7    nine o'clock in the morning.  If you will, just

8    come back to this courtroom at nine o'clock in the

9    morning.  And you may go at this time.  Thank you

10    very much.

11              (Jury not present.)

12         THE COURT:  Gentlemen, we'll be at recess

13    until nine o'clock in the morning.

14              (The proceedings for October 23, 2000,

15              were concluded at 5:00 p.m. CT.)

16              (Off the Record.)

17

18

19

20

21

22

23

24

25

1              IN THE CIRCUIT COURT OF HOUSTON COUNTY

2                        STATE OF ALABAMA

3    STATE OF ALABAMA,              *
                                    *
4    v.                             *    Case No. CC-94-791-192
                                    *
5    WILLIE MCCRAY,                 *
                                    *
6         Defendant.                *

7

8              REPORTER'S OFFICIAL TRANSCRIPT ON APPEAL

9

10

11    Before:

            The Honorable Jerry M. White and jury

12                    October 24, 2000

13

14    APPEARANCES

15         For the State

16              Douglas Albert Valeska, Esquire
                District Attorney
17
                Denise Bates, Esquire
18              Assistant District Attorney

19              Gary Maxwell, Esquire
                Chief Assistant District Attorney
20

21         For the Defendant

22              Christopher Capps, Esquire
                Dothan, Alabama
23

24    Carla H. Woodall
25    Court Reporter

```
1                          PROCEEDINGS
2                    (The proceedings for October 24, 2000,
3                    began at 9:00 a.m. CT.)
4            THE COURT:  Okay, gentlemen, are we ready to
5      proceed?
6            MR. VALESKA:  The State is ready, Your
7      Honor.
8            MR. CAPPS:  Yes, sir, Your Honor.
9            THE COURT:  Bring the jury.
10                   (Jury present.)
11           THE COURT:  I believe everybody is present
12     and accounted for.  So if you ladies and gentlemen
13     are ready, we will get started.
14                 Mr. Valeska?
15           MR. VALESKA:  We call the witness Stanley
16     Devane.
17                      STANLEY DEVANE
18     having first been duly sworn, was examined and
19     testified as follows:
20                   DIRECT EXAMINATION
21     BY MR. VALESKA:
22     Q    Please tell the jury your name.
23     A    Stanley Devane.
24     Q    Where are you employed, sir?
25     A    Dothan Police Department.
```

1    Q    What position do you hold today?

2    A    Lieutenant.

3    Q    How long have you been a police officer with the

4         City of Dothan?

5    A    Twenty-three years.

6    Q    Still employed in that position; is that correct?

7    A    Yes, sir.

8    Q    Let's go back to August 6th and the 7th, a Friday

9         going into a Saturday, okay.  Friday night,

10        Saturday morning, Saturday night, Sunday, the 6th,

11        7th, and 8th of 1993, would you tell the ladies

12        and gentlemen of the jury were you working in

13        criminal investigation, major felonies, with the

14        Dothan Police Department at that time?

15   A    Yes, I was.

16   Q    Were you assigned to work the case of the shooting

17        and robbery of Michael Scott at the Country Market

18        in Houston County that occurred on or about August

19        7th of 1993 around ten-forty p.m. in Houston

20        County?

21   A    Yes.

22   Q    Now, Lieutenant Devane, when you first got to the

23        scene, were there any G.M. motor cars,

24        particularly a blue Monte Carlo, specifically,

25        parked in front of the store when you got there?

```
 1    A    No, sir.

 2    Q    Now, did you go inside the store and look at the

 3         area where the robbery and homicide occurred?

 4    A    Yes.

 5    Q    Was Michael Scott, the victim, still there when

 6         you got there?

 7    A    No.

 8    Q    Could you see any red substances in the proximity

 9         of the office and the first cash register aisle as

10         you go to the door take a left and go all the way

11         down to the end where the safe was?

12    A    Yes.

13    Q    Small amount or large amount?

14    A    Large.

15    Q    Did you have an occasion to see a red hat?

16    A    Yes.

17    Q    Did you find any spent casing, in other words,

18         projectiles that had been fired or the casings

19         that they went in, in the Country Market?

20    A    Yes.

21    Q    Can you tell the ladies and gentlemen of the jury

22         how many spent casings did you find?

23    A    Three.

24    Q    Do you know their location -- where they were

25         found?  In close proximity use the front door and
```

1       where the office was or where there was red blood

2       in that general area, tell us where you found the

3       casings.

4   A   Two was found immediately around the area of the

5       blood on the floor in the cash register area.  One

6       one found close to the front door.

7   Q   Now, as the detective in charge did you after the

8       scene was secured start looking for the actual

9       bullets themselves that had been fired that you

10      attempt to recover?

11  A   Yes.

12  Q   Did you find any?

13  A   Yes.

14  Q   What did you find and how did you find them?  What

15      did you do?

16  A   We searched the inside of the building.  We found

17      one on the top shelf in a display case in a roll

18      of paper towels that had ricocheted through the

19      building and had come to rest in the top of the

20      roll of paper towels.  Captain White found one in

21      a box of fettucini which was on a shelf on aisle

22      six.

23  Q   So recovered is it fair to say in your best

24      judgement --

25  A   Yes.

```
1    Q    -- two fired projectiles?

2    A    Yes.

3    Q    Now, tell the ladies and gentlemen of the jury if

4         you could, was any money taken during the robbery?

5    A    Yes.

6    Q    How much money was taken?

7    A    Oh, no.  During the robbery, no, sir.

8    Q    Now, tell the ladies and gentlemen of the jury,

9         did you talk with Jeff Clark?

10   A    Yes, sir.

11   Q    Now, how long did you stay -- well, let me do

12        this.  Let me go forward sometime around three

13        o'clock Sunday morning.  Did you and Jeff Clark

14        leave the Country Market and go to any location

15        here in Houston County?

16   A    Yes, sir.

17   Q    Where did you go?  What address?

18   A    Went to the two hundred block of Second Avenue,

19        which is behind General Cigar.

20   Q    Did you find anything in the street there?

21   A    Found a Chevrolet Monte Carlo.

22   Q    And when you first observed it, describe how it

23        looked.

24   A    It was seen in the middle of the southbound lane

25        of Second Avenue.  The blinker was still on.  The
```

```
 1              driver's door was open.  The vehicle was running.
 2              The headlights was off.  And it was emitting a
 3              large amount of engine smoke.
 4        Q     Would you tell the ladies and gentlemen of the
 5              jury, did you determine if there were any items
 6              inside the blue Monte Carlo?
 7        A     Yes, I did.
 8        Q     What did you find?
 9        A     I found a road map laying in the driver's seat.
10        Q     Did you take custody of that?
11        A     I did.
12        Q     What was the condition of the window of the Monte
13              Carlo -- any of the windows?
14        A     The right rear vent window on the Monte Carlo had
15              been busted out and a piece of plastic and duct
16              tape had been taped over it.
17        Q     What was the condition of the steering column?
18        A     The left side of the steering column had been
19              pried open, or the plastic had been busted off,
20              which exposed the ignition slide on a G.M. product
21              on that left side, which is a common way to crank
22              it without using a key.
23        Q     Anything that was used to crank the car that you
24              found inside?
25        A     Found a screwdriver inside the vehicle which was
```

| | | |
|---|---|---|
| 1 | | used to crank the car. |
| 2 | Q | The opposite side from the driver's side, the |
| 3 | | passenger's side, did you find anything next to |
| 4 | | that door handle hanging down? |
| 5 | A | There was a piece of white industrial style paper |
| 6 | | towel hanging under the door latch on the outside. |
| 7 | Q | When you found the blue Monte Carlo, was there an |
| 8 | | Alabama tag on it? |
| 9 | A | Yes, there was. |
| 10 | Q | Let me show you State's Exhibit 21 for |
| 11 | | identification purposes and ask you do you |
| 12 | | recognize that tag? |
| 13 | A | Yes.  This was the tag that was displayed on the |
| 14 | | back of the Monte Carlo. |
| 15 | Q | Now, did you collect the towel, the tape, the |
| 16 | | screwdriver, the license tag, the road map and |
| 17 | | take those into your custody? |
| 18 | A | Yes, I did. |
| 19 | Q | Did you put them all together and mix them up in |
| 20 | | any manner or fashion? |
| 21 | A | No. |
| 22 | Q | Did you mark them and keep them separate? |
| 23 | A | Yes, sir. |
| 24 | | MR. VALESKA:  Judge, we need to make sure we |
| 25 | | have the Rule in effect.  I don't know if there's |

```
 1              any witnesses --
 2                   THE COURT:  It's supposed to be.  I assume
 3              they are not testifying.
 4                        Are they your witnesses?
 5                   MR. CAPPS:  No, sir.
 6                   THE DEFENDANT:  No.  No.  Just family
 7              members.
 8                   THE COURT:  Pardon me?
 9                   THE DEFENDANT:  Just family members.
10                   THE COURT:  All right.
11                   MR. VALESKA:  Thank you.
12    Q    If I could, did you mix them up or keep them
13         separate?
14    A    I placed them in individual bags.
15    Q    What was the purpose of individual bags to keep
16         them separate?  Tell the jury, Lieutenant Devane.
17    A    To keep the integrity of the evidence.  Keep it
18         separate.
19    Q    What were we looking for, if anything, on these
20         pieces of evidence you as the detective in charge?
21    A    Latent prints.  Trace evidence.  Anything that
22         might have been left by a suspect on the items
23         that were recovered from the vehicle.
24    Q    Did you attempt to fingerprint the inside of the
25         vehicle -- the Monte Carlo -- the steering wheel,
```

```
 1              the columns, the doors, anywhere looking for any
 2              latent hidden fingerprints?
 3      A       Yes, we did.
 4      Q       Were you able to find any?
 5      A       No, sir.
 6      Q       Why not?
 7      A       The vehicle had been wiped clean.  That's why the
 8              white paper towel had been left under the
 9              doorhandle on the right side.  There was
10              absolutely no latent prints of any kind even
11              smeared or smudged on the vehicle.
12      Q       State's 21 for identification purposes is a
13              license tag you took into custody, did you run the
14              tag to determine who it belonged to?
15      A       Yes, sir.
16      Q       Who did it belong to?
17      A       It belonged on an S-10 Chevrolet pick-up truck.
18              Mr. Pines.
19      Q       Did you determine whether it had been taken or
20              when it was missing from Mr. Pines?
21      A       Yeah.  But I don't recall.
22      Q       Was it recent or old?  I mean, was it --
23      A       It was recently.
24      Q       Several years before or --
25      A       It was recently.
```

1   Q   That's fine.

2         Would you tell the ladies and gentlemen of

3        the jury, the items that you took off the car that

4        I asked you about, the license tag, the paper

5        towel, the road map -- I'm sorry, let me show it

6        to you.

7         State's Exhibit 20 for identification

8        purposes, the plastic bag as well as the item in

9        my hand, tell me, you recognize that?

10   A   This is the map I found in the driver's seat of

11       the vehicle which was in the two hundred block of

12       Second Avenue.

13   Q   Now, did you place it in the bag?  Once again,

14       that bag?

15   A   Yes, I did.

16   Q   Now, I want you to look at State's Exhibit -- take

17       this one first of all.  I want you to read me the

18       numbers while I look -- what are the two -- start

19       with that one.  Read me the numbers on that first

20       exhibit in front of you.

21   A   This is State's Exhibit No. 11 and 12.

22   Q   What is that?

23   A   The Exhibit No. 11 depicts the left side of the

24       steering column on the Monte Carlo where it had

25       been broken open so you could crank the vehicle.

1    Q    Now, is that the way it looked when you found it?

2    A    Yes, sir.

3    Q    Marked, altered, or changed in any way?

4    A    No, sir.

5    Q    Go to the next exhibit.

6    A    State's Exhibit No. 12 is a photograph of the map

7         here, which was laying in the driver's seat of the

8         vehicle.

9    Q    Now, is that the position you found it in when you

10        got there?

11   A    Yes, sir.

12   Q    The picture was taken and then you took custody,

13        right?

14   A    Correct.

15   Q    Been marked, altered, or changed in any way?

16   A    No, sir.

17   Q    Go to the next exhibit.

18   A    State's Exhibit No. 13 is a photograph of the

19        right side of the car.  It shows the paper towel

20        hanging from the door handle, and it also shows a

21        view of the right rear -- it's not a vent window,

22        but it's a window on the Monte Carlo that had been

23        busted out.

24   Q    Let me show you, if I could first of all, to go

25        with that State's Exhibit No. 19 for

```
 1        identification purpose in reference to picture 13

 2        that's in evidence that you testified to, do you

 3        recognize anything in 19, the plastic bag?

 4   A    This is the paper towel that was hanging from

 5        under the right door handle on the vehicle.

 6   Q    Did you place it in 19?

 7   A    Yes, I did.

 8   Q    And then sealed it up, correct, kept in your

 9        care, custody, and control?

10   A    Yes, sir.

11   Q    Let me show you State's Exhibit No. 22, once

12        again, paper bag, and I know it's open at this

13        time.  Do you recognize I've showed you any

14        contents inside it?  Do you recognize that?

15   A    Yes, sir.  That's --

16   Q    Have you seen these earlier under oath before?

17   A    Yes, sir.

18   Q    Now, besides when you saw them earlier under oath

19        when you testified, would you tell the ladies and

20        gentlemen of the jury, was it sealed or unsealed

21        last time you saw it?  Do you recall?

22   A    It was sealed.

23   Q    Now, what is State's Exhibit 23?

24   A    It's --

25   Q    22, excuse me.  I apologize.  22.
```

293

| | | |
|---|---|---|
| 1 | A | It's the plastic and the duct tape which covered |
| 2 | | the right rear window of the Monte Carlo. |
| 3 | Q | Is that referred to in State's 13 that you |
| 4 | | testified to already? |
| 5 | A | Correct. |
| 6 | Q | Now, if I could, let me show you -- go to the next |
| 7 | | picture. |
| 8 | A | This is State's Exhibit No. 15. |
| 9 | Q | Does it show you the license tag in reference to |
| 10 | | 21 you've already testified to 38BSF 61, that |
| 11 | | picture? |
| 12 | A | Yes, it does. |
| 13 | Q | Is that the way the car looked in the dark when |
| 14 | | you lit it up to take a picture? |
| 15 | A | Right. |
| 16 | Q | 16? |
| 17 | A | Same picture, just a different angle. |
| 18 | Q | What's the last one, then?  17? |
| 19 | A | 17 is on shot -- an overall shot of the vehicle |
| 20 | | after I shut the door to give a side view of the |
| 21 | | vehicle. |
| 22 | Q | Do you know what car it is? |
| 23 | A | Chevrolet Monte Carlo. |
| 24 | Q | Do you know who makes it? |
| 25 | A | Chevrolet. |

| 1 | Q | Do you know what corporation they belong to? |
| 2 | A | G.M. |
| 3 | Q | Now, if I could, let me show you State's Exhibit |
| 4 | | No. 18 for identification purposes.  What's 18? |
| 5 | A | It's a screwdriver that was found in the car. |
| 6 | Q | Did you take custody and seal that up, once again? |
| 7 | A | Yes, sir. |
| 8 | Q | Now, I want to show you these exhibits, if I |
| 9 | | could.  I'm just going to read them to you. |
| 10 | | State's Exhibit 47, State's Exhibit 48, State's |
| 11 | | Exhibit 49, State's Exhibit 50, State's Exhibit |
| 12 | | 51, State's Exhibit 52, and 53, what are those? |
| 13 | A | These are jacket bullets that were recovered from |
| 14 | | the scene -- the shell casings. |
| 15 | Q | The ones you've already testified to; in other |
| 16 | | words, the ones that were actually fired, correct? |
| 17 | A | Yes, sir. |
| 18 | Q | What are the other ones? |
| 19 | A | Exhibit -- you want me to go by numbers on |
| 20 | | exhibits? |
| 21 | Q | Yeah.  Go ahead.  That's fine. |
| 22 | A | 47 is a shell casing.  It was found on the floor |
| 23 | | by Sergeant Sorrells.  48 is a jacketed bullet |
| 24 | | removed from Exhibit No. 4, which was found by |
| 25 | | Sergeant Merritt.  49 is a jacketed bullet that |

1    was removed from the insulation in the ceiling at

2    the back of the store above the butcher -- or meat

3    department.  No. 50 is a jacketed bullet that was

4    found in the roll of paper towels in a roll -- or

5    aisles five and six.  And No. 51 is a shell casing

6    that was found beside the front door.  52 is a

7    shell casing that was found between cash registers

8    four and five.  And No. 53 was a black metal piece

9    that was found in front of register number five.

10   Q   Now, let me show you, if I could, going back when

11       you were in the Country Market, did you collect

12       any other evidence in reference to where the blood

13       was where Michael Scott had been shot?

14   A   Yes, sir, I did.

15   Q   Let me show you State's 36 for identification

16       purposes.  What's 36?

17   A   It's a Winn Dixie bag that was collected from the

18       floor of the store.

19   Q   Now, did you take it in your custody?

20   A   Yes, I did.

21   Q   And what did you do with it?

22   A   I folded it up and placed it inside another

23       grocery bag that we use to seal evidence in.

24   Q   Is this the condition it was in, all split open

25       like it is now?

| | | |
|---|---|---|
| 1 | A | No, sir. |
| 2 | Q | What condition was it in? |
| 3 | A | It was in the normal condition. |
| 4 | Q | This manner or fashion (indicating)? |
| 5 | A | Sealed together. |
| 6 | Q | But back together, in other words? |
| 7 | A | Yes. |
| 8 | Q | And what did you do with it after you sealed it up? |
| 9 | A | It was kept in my custody until it was sent to |
| 10 | | ABI. |
| 11 | Q | Now, let's go back.  The road map, screwdriver, |
| 12 | | white paper towel, the road map, the paper bag |
| 13 | | that's in front of you right now, the license tag, |
| 14 | | all those exhibits I just asked you about, you |
| 15 | | took custody of them that night on August 6th -- I |
| 16 | | mean, the 7th, Saturday going into Sunday morning, |
| 17 | | in your care, custody, and control, correct? |
| 18 | A | Yes, sir. |
| 19 | Q | Now, you got them and sealed them up and kept them |
| 20 | | in your care, custody, and control.  Did anybody |
| 21 | | else get custody of them? |
| 22 | A | No, sir. |
| 23 | Q | Did you mix them up with any other evidence? |
| 24 | A | No, sir. |
| 25 | Q | Did you put your fingerprints on them? |

| | | |
|---|---|---|
| 1 | A | No, sir. |
| 2 | Q | Now, what did you next do with those exhibits? |
| 3 | | Tell the jury. |
| 4 | A | They were taken to the Alabama Department of |
| 5 | | Forensic Science in Montgomery. |
| 6 | Q | Did you take them? |
| 7 | A | Yes. |
| 8 | Q | How do you know you took them personally?  Tell me |
| 9 | | how you know that. |
| 10 | A | I personally went. |
| 11 | Q | Who did you turn them over to? |
| 12 | A | Marietta Prevos. |
| 13 | Q | Do you know what day that was? |
| 14 | A | I can tell you.  It was on August 9th. |
| 15 | Q | What year? |
| 16 | A | '93. |
| 17 | Q | And you turned them over to her personally and |
| 18 | | signed the evidence receipt, correct? |
| 19 | A | Correct. |
| 20 | Q | Now, if I could, let me go to -- let me ask you, |
| 21 | | Lieutenant Devane, any arrest made that night at |
| 22 | | the Country Market? |
| 23 | A | No. |
| 24 | Q | Now, Jody Poncell and Dwayne Pearson, did you come |
| 25 | | to know those men, Lieutenant Devane? |

```
 1    A    Yes, I did.

 2    Q    Did you leave the state of Alabama and go into

 3         northern Georgia to meet those officers?

 4    A    Yes, I did.

 5    Q    When you met with those officers, did any known

 6         fingerprints, major case prints, come into your

 7         custody of a particular individual?

 8    A    Yes, sir.

 9    Q    Who was it?

10    A    Willie C. McCray.

11    Q    And did you take custody of the prints that were

12         given to you by those officers personally?

13    A    Yes, sir.

14    Q    Let me show you 46.  Once again, an exhibit.  Let

15         me hand them to you, if I could.  Refer to, once

16         again I've referred to him as a white card, 46,

17         with four other piece of paper, five total

18         exhibits within 46.  Looking at them, do you

19         recognize them?

20    A    These are the latent prints that was turned over

21         to me.

22    Q    The white fingerprint card, the first one as well

23         as the next four pages with palms, major case

24         prints, fingertips, sides, right sides,

25         fingertips, and right palm?
```

```
1    A    Dwayne Pearson give me those.

2    Q    When you took them into your custody, did you

3         mark, alter, or change them in any way?

4    A    No, sir.

5    Q    What did you do with these prints of Willie C.

6         McCray, State's 46?

7    A    I brought them back to the police department.

8         Contacted Marietta Prevos.  I faxed her a copy of

9         those prints to her office where she compared them

10        with the prints that they developed off the

11        evidence that I had sent to her.  She called me

12        back.  Wanted me to bring the original ink prints

13        to her.

14   Q    Would this be 46, the originals?

15   A    Uh-huh.

16   Q    Did you bring her the originals to her also?

17   A    Yes, I did.

18   Q    Turn them over to her?

19   A    I did.

20   Q    Did these, 46, ever come back into your custody,

21        the originals, again?

22   A    No.  They were mailed back or either one of the

23        officers picked them up -- the other case

24        officers.

25   Q    Do they appear to be marked, altered, or changed
```

| | | |
|---|---|---|
| 1 | | in any way except the writings on the back in blue |
| 2 | | or black ink in any way on the four white pieces |
| 3 | | of paper as well as the white card? |
| 4 | A | No, sir. |
| 5 | Q | Everything else appear to be the same? |
| 6 | A | Yes, sir. |
| 7 | Q | Now, after she got the original prints, did you |
| 8 | | talk with her again? |
| 9 | A | Yes, I did. |
| 10 | Q | Now, first time you talked with her when she got |
| 11 | | the Xerox copies, did you go interview any of the |
| 12 | | witnesses that were at the scene where Michael |
| 13 | | Scott was shot and the robbery occurred? |
| 14 | A | Yes. |
| 15 | Q | Did you do any photographic lineups for any of the |
| 16 | | victims? |
| 17 | A | Yes. |
| 18 | Q | Excuse me.  The witnesses.  I said the victims. |
| 19 | | Now, based on that, did you get an arrest |
| 20 | | warrant for Willie C. McCray? |
| 21 | A | Yes, sir. |
| 22 | Q | Now, and if I could, that was for a homicide and a |
| 23 | | theft of property in the first degree, correct? |
| 24 | A | Yes, sir. |
| 25 | Q | Now, if I could, Lieutenant Devane, did you have |

| | | |
|---|---|---|
| 1 | | the occasion to go into Havana, Florida, with GBI |
| 2 | | officers and other Dothan police officers looking |
| 3 | | for Willie C. McCray? |
| 4 | A | Yes, sir. |
| 5 | Q | What day did you go to Havana, Florida, or what |
| 6 | | night?  When was it? |
| 7 | | If I give you the date, would that help you? |
| 8 | A | Yes. |
| 9 | Q | Did you take a statement from Willie C. McCray? |
| 10 | A | Yes, I did. |
| 11 | Q | Did you do a Miranda form? |
| 12 | A | Yes, I did. |
| 13 | Q | Would you have put the date on that? |
| 14 | A | Yes, I would have. |
| 15 | Q | If I show you the original waiver form, would that |
| 16 | | refresh your memory as to the exact date? |
| 17 | A | Yes, sir. |
| 18 | Q | Let me show you State's 79 for identification |
| 19 | | purposes. |
| 20 | A | It's on the 14th. |
| 21 | Q | Looking at the date on the waiver and the name, |
| 22 | | does that refresh your memory as to when you went |
| 23 | | to Havana to arrest Willie C. McCray? |
| 24 | A | It was August 13, 1993. |
| 25 | Q | Now, did you find McCray? |

```
1     A    Yes, we did.

2     Q    And did you take him into custody?

3     A    Yes, we did.

4     Q    Did you take him down to the police station in

5          Havana?

6     A    Right.

7     Q    At that point in time did you take the waiver

8          which I just showed you?  What number is on it?

9     A    79.

10    Q    Did you give Willie McCray his Constitutional

11         Miranda rights?

12    A    Yes.

13    Q    Tell us how you did that.

14    A    I have a copy.  I give him a copy.  And then I

15         read the copy out loud to him.

16    Q    Tell us what rights you gave him specifically.

17    A    I told him that before we ask him any questions

18         that you must understand your rights.  You have

19         the right to remain silent.  Anything you say can

20         be used against you in court.  You have a right to

21         talk to a lawyer for advice before I ask you any

22         questions and have him with you during

23         questioning.  If you cannot afford a lawyer, one

24         will be appointed for you before any questions are

25         asked if you wish.  You also have the -- if you
```

1    decide to answer a question now without a lawyer

2    present, you still have the right to stop

3    answering questions at any time.  And you also

4    have the right to stop answering questions at any

5    time to talk to a lawyer.  The waiver of the

6    rights I've read this statement of my rights and I

7    understand what my rights are and I am willing to

8    make a statement and answer questions.  I do not

9    want a lawyer at this time.  I understand and know

10   what I'm doing.  No promises or threats have been

11   made to me.  And no pressure of any kind has been

12   used against me to get me to make this statement.

13   Q   Now, did Willie C. McCray sign that?

14   A   Yes, sir.

15   Q   What was the date and time?

16   A   He signed it at eleven-thirty on 8-13 of '93.

17   Q   Did you sign it?

18   A   Yes, I did.

19   Q   Who else was present in the room when the waiver

20       was done?

21   A   No one.

22   Q   Now, did he agree to talk with you?

23   A   Yes, he did.

24   Q   Now, Lieutenant Devane, can you tell the ladies

25       and gentlemen of the jury, did he appear to be

1      under the influence of any drugs or narcotics in

2      any manner or fashion when you went over the

3      rights with him?

4  A   No, sir.

5  Q   You arrested at what location?

6  A   We arrested him at a bar.

7  Q   You were close to him when you were talking to

8      him, correct?

9  A   Right.

10 Q   Did he have any strong odor of alcohol in any

11     manner or fashion that led you to believe he's

12     intoxicated or couldn't understand what you were

13     saying?

14 A   No.

15 Q   Did you or any other police officers in the

16     hearing and presence of Willie C. McCray tell him

17     it would be better or worse for him if he would or

18     would not make a statement?

19 A   No.

20 Q   Did you, Lieutenant Devane, or any other police

21     officer in the hearing or presence of Willie C.

22     McCray offer him any enumeration, probation, or

23     reward in order to get him to make a statement?

24 A   No.

25 Q   Now, did you take a statement from him?

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Did he answer questions? |
| 3 | A | Yes. |
| 4 | Q | Did you record that? |
| 5 | A | Yes. |
| 6 | Q | Now, how did you record it?  Tell the jury. |
| 7 | A | With a small microrecorder that the department |
| 8 | | issues each investigator. |
| 9 | Q | Let me show you, if I could, what's been marked |
| 10 | | for identification purposes State's Exhibit 78 |
| 11 | | with the cassette tape.  Is that it? |
| 12 | A | The tape, yes, sir. |
| 13 | Q | Is that the envelope you placed it in? |
| 14 | A | Yes, sir. |
| 15 | Q | Did you determine if your equipment, the recorder, |
| 16 | | was working before you recorded the interview |
| 17 | | properly? |
| 18 | A | Yes. |
| 19 | Q | Had the battery and working correctly? |
| 20 | A | Yes. |
| 21 | Q | You did the interview.  Who was on tape? |
| 22 | A | Willie McCray and me. |
| 23 | Q | Anybody else? |
| 24 | A | No. |
| 25 | Q | After you did the interview did you have an |

1    occasion later to listen to the tape to see if it

2    truly and accurately depicted what you asked him

3    or what he said to you, anything that took place

4    during the interview?

5    A    Yes.

6    Q    Your voice and his voice?

7    A    Right.

8    Q    And it was working correctly?

9    A    Yes.

10   Q    Did you have it typed up and transcribed?

11   A    Yes.

12   Q    Have a chance to look at the typed-up copy and

13        compare it to the tape?

14   A    Yes.

15   Q    To the best of your knowledge was it correct?

16   A    Yes.

17   Q    Now, the waiver itself, 79, has it been marked or

18        changed in any way except it's got a discovery

19        number one twenty-five on top?

20   A    Other than that the department issued number one.

21           MR. VALESKA:  Offer 79 into evidence, Judge

22        White, the waiver.

23           MR. CAPPS:  No objection to 79.

24           THE COURT:  Let that be admitted.

25                (State's Exhibit No. 79 was admitted

1          into evidence.)

2          MR. VALESKA:  At this time I offer State's

3    Exhibit 78, the tape, into evidence itself.  The

4    statement and the interview of Willie C. McCray by

5    Lieutenant Devane.

6          MR. CAPPS:  I make an objection as the

7    objections that were previously raised in this

8    matter and ask the Court to consider those.

9          THE COURT:  Do you want to take that up at

10   this time?

11         MR. CAPPS:  Yes.

12         THE COURT:  Ladies and gentlemen of the jury,

13   let me ask you if you will go to the jury room.

14   And while you're out of the courtroom, do not

15   discuss the case among yourselves, do not discuss

16   it with anyone else, do not allow anyone to

17   discuss it with you.  We'll call for you shortly.

18         (Jury not present.)

19         THE COURT:  Let the Record show this is out

20   of the presence and hearing of the trial jury.

21         And, Mr. Capps, I'll hear you now as to

22   why you feel that this should not be admitted into

23   evidence.  This is the statement of the

24   Defendant.

25         MR. CAPPS:  Your Honor, we would object and

1    state for the Record that the Defendant at no time

2    was fully informed of the rights he had -- he had

3    the right for an attorney to be present with him

4    at this time.  Although that says that on the

5    statement, the waiver form, Lieutenant Devane was

6    in the state of Florida and had no means of

7    providing the Defendant with an attorney.  He's

8    already testified that he was the only one in the

9    room with the Defendant and there was no other

10    person there.  He was outside the state of

11    Alabama, outside the jurisdiction of this district

12    attorney's office and the state of Alabama and had

13    no authority with which to provide this Defendant

14    an attorney.  There's already been testimony I

15    believe that there was an attorney present at a

16    lineup that did represent Mr. McCray through the

17    public defender's office down there in the state

18    of Florida.  It's obvious to me that that office

19    from the testimony we heard had a policy of

20    providing defendants attorneys in that state when

21    they were made aware that a defendant would be

22    possibly questioned and/or put in a lineup.  This

23    was not the case.  He was not given the right to

24    an attorney.  He was in the state of Florida, not

25    in the state of Alabama, and as such we'd ask the

```
1              Court to exclude that statement.

2                    THE COURT:  Mr. Valeska?

3                           STANLEY DEVANE

4              having previously been sworn, was examined and

5              testified as follows:

6                         DIRECT EXAMINATION

7   BY MR. VALESKA:

8   Q     If I could, Lieutenant Devane, when you went over

9         his rights, did you offer him a chance for

10        attorney?

11  A     Yes.

12  Q     The physical lineup had already been done or had

13        it not been done?

14  A     It had not been done at this time.

15  Q     Tell Judge White, if he wanted a lawyer before he

16        would have talked to you, would you have obtained

17        a lawyer there for him?

18  A     Yes, sir.

19  Q     At any time did he tell you he didn't want to talk

20        with you?

21  A     No, sir.

22  Q     At any time did he tell you he wanted to stop?

23  A     No, sir.

24  Q     So he signed the consent and agreed to talk with

25        you without having counsel; is that correct?
```

1    A    Correct.

2              MR. VALESKA:  That's all.

3              THE COURT:  Let me see that form.

4                   You say that no promises or threats of

5         any kind whatsoever were made to get him to make a

6         statement?

7              THE WITNESS:  Correct.

8              MR. VALESKA:  Judge, if I could ask him

9         another question.

10   Q    In the statement itself, once again, tell Judge

11        White, did you go over the Miranda once again on

12        the statement and tell him he had the right to

13        have a lawyer, any threats, promises, he didn't

14        make any threats or promise and he could stop

15        answering questions, he could have a lawyer,

16        that's on the tape itself, correct?

17   A    Yes, sir.

18             MR. VALESKA:  Can I show the Court a copy of

19        the statement -- the Defense has a copy -- where

20        he went over there because you have not had the

21        tape to view.

22             THE COURT:  Yes, sir.

23             MR. VALESKA:  And I'd have this marked, too,

24        for the purpose of this hearing -- the statement

25        itself or on the tape itself Lieutenant Devane.

311

| | |
|---|---|
| 1 | THE COURT:  This is a transcription? |
| 2 | MR. VALESKA:  Yes, sir.  A transcription of |
| 3 | the tape.  Mr. Capps has a copy and the Defense. |
| 4 | THE COURT:  Okay. |
| 5 | MR. VALESKA:  We'd offer that. |
| 6 | (State's Exhibit No. 84 was marked for |
| 7 | identification for the purposes of the |
| 8 | suppression hearing.) |
| 9 | THE COURT:  This isn't offered for the |
| 10 | benefit of the jury, this is just for my benefit? |
| 11 | MR. VALESKA:  Correct.  It's 84, Judge, for |
| 12 | the purposes of this hearing. |
| 13 | THE COURT:  Anything else, gentlemen? |
| 14 | MR. CAPPS:  Judge, I would ask. |
| 15 | CROSS EXAMINATION |
| 16 | BY MR. CAPPS: |
| 17 | Q    At the time you interviewed McCray, Lieutenant, |
| 18 | was he under arrest? |
| 19 | A    Yes, sir. |
| 20 | Q    What was he under arrest for? |
| 21 | A    Capital murder. |
| 22 | Q    You had executed a warrant on him at the time? |
| 23 | A    Yes, sir. |
| 24 | Q    And this was before the lineup; is that correct? |
| 25 | A    Yes, sir. |

```
 1            MR. VALESKA:  Could I ask him, Judge White?

 2                    REDIRECT EXAMINATION

 3   BY MR. VALESKA:

 4   Q    After you took a statement, tell Judge White, did

 5        you indicate, tell him there was going to be a

 6        lineup?

 7   A    No, sir.

 8   Q    Was he made aware there was going to be a lineup?

 9   A    Huh-uh.   Later.

10   Q    Would you tell Judge White was a lawyer provided

11        at that time for a lineup?

12   A    Correct.

13   Q    Would he cooperate and go in the lineup?

14   A    No, sir.

15   Q    He was made to go in the lineup at some point in

16        time after counsel was brought in for the lineup

17        under Florida lawyers, correct?

18   A    Yes, sir.

19   Q    State's attorney office equivolent to the D.A.'s

20        office was contacted through the law enforcement

21        as well as a Raymond Dicks?

22   A    That's right.  It was Dicks.

23            MR. VALESKA:  That's all.

24                    RECROSS EXAMINATION

25   BY MR. CAPPS:
```

| | | |
|---|---|---|
| 1 | Q | If I could ask you, when you did interview Mr. |
| 2 | | McCray at this time, did you advise him he was |
| 3 | | under arrest for capital murder? |
| 4 | A | Yes, sir.  They told him he was under arrest at |
| 5 | | the time we brought him down to the -- |
| 6 | Q | No.  I'm asking did you tell him. |
| 7 | A | Yes, sir.  I told him he was under arrest when I |
| 8 | | went back into the room where he was at. |
| 9 | Q | Is it on the tape there about you telling Mr. |
| 10 | | McCray here are your rights, you're being charged |
| 11 | | with capital murder? |
| 12 | A | No, sir. |
| 13 | Q | So you never informed him on the statement of the |
| 14 | | consequences of what he was getting himself into |
| 15 | | of making a statement? |
| 16 | A | He knew he was under arrest, and I asked him to |
| 17 | | give a statement. |
| 18 | Q | But you never advised him he was under arrest for |
| 19 | | capital murder, you said they did? |
| 20 | A | I told him, yeah -- he was arrested by FDLE.  We |
| 21 | | provided them a certified copy of our capital |
| 22 | | murder warrant.  FDLE swat team arrested him.  He |
| 23 | | was brought in, and I told him -- I explained to |
| 24 | | him that he was under arrest for the robbery at |
| 25 | | the Country Market and that I wanted to talk to |

314

1          him about it and get a statement from him.

2          Initially I did not tell him he was under arrest.

3          FDLE did.  They executed our warrant.

4    Q    My question is, prior to your interview with Mr.

5          McCray down there in Florida, did you, you and him

6          sitting in the room, did you tell him, Mr. McCray,

7          you are being charged, you are under arrest for,

8          you are being questioned relating to a capital

9          murder charge?

10   A    Yes.  And I told him what the location was.

11   Q    Now, you just said earlier that a robbery and an

12        event at the Country Market?

13   A    Right.

14   Q    Now, you're telling me that you told him the

15        words, capital murder?

16   A    Yes.  It's on the warrant.

17   Q    No.  I'm asking you did you --

18   A    That's what I told him.  That's what he was

19        arrested for.

20   Q    You told him that?

21   A    Yes.

22   Q    He was under arrest for capital murder?

23   A    Uh-huh.

24              MR. CAPPS:  Thank you.

25              MR. VALESKA:  That's all I have.

1     THE COURT:  I overrule the objection.  You

2 can bring the jury back.

3     THE COURT:  Bring the jury.

4     THE COURT REPORTER:  Judge, is State's 84

5 admitted for the purposes of the suppression?

6     MR. VALESKA:  I didn't offer it.

7     THE COURT:  It doesn't go to the jury.  It

8 was just offered as evidence on this motion.

9      (Jury present.)

10     MR. VALESKA:  I offer 78, the statement, at

11 this time into evidence.

12     MR. CAPPS:  I believe the Court has already

13 ruled on that.

14     MR. VALESKA:  I understand that.  I need to

15 do it in front of the jury.

16     THE COURT:  Is that tape in the same

17 condition now that it was in at the time you took

18 it?

19     THE WITNESS:  Yes, sir.

20     THE COURT:  Hasn't been altered in any way?

21     THE WITNESS:  No, sir.

22     THE COURT:  Let it be admitted.

23      (State's Exhibit No. 78 was admitted

24      into evidence.)

25     MR. VALESKA:  With the Court's permission,

1     I'd like to play it.

2          (At which time State's Exhibit No. 78

3          was played for the jury.)

4       MR. VALESKA:  That's all.  Pass the witness.

5     Thank you, Judge.

6              CROSS EXAMINATION

7  BY MR. CAPPS:

8  Q    Lieutenant Devane, how many shots were fired at

9      the Country Market?

10  A    Three.

11  Q    Are you sure of that?

12  A    Best of my knowledge.  Let me check the report.

13      Yes, sir.

14  Q    Did you locate the final resting place of each of

15      those projectiles?

16  A    No, sir.  I could not recover one.

17  Q    You told us that you recovered one of the

18      projectiles from the ceiling; is that correct --

19      ceiling tile?

20  A    Celotext, yes, sir.

21  Q    Now, where was that projectile recovered in

22      relation to the victim?

23  A    The victim was at the front of the store close to

24      the office -- or where the shooting occurred.  The

25      bullet traveled upward, ricocheted off the ceiling

```
 1              -- the concrete roof which went through a

 2              subceiling -- a Celotext similar to this.  I found

 3              a mark on the back wall where it apparently

 4              ricocheted and then traveled back towards the

 5              front of the store and fell into the insulation,

 6              or the Celotext in the floor.  And it was

 7              basically at a slight angle going back to the rear

 8              of the store and coming back.

 9    Q    And do you know the distance from where the victim

10         was to the bullet hit the ceiling in the back of

11         the store?

12    A    I didn't measure the actual feet, no, sir.

13    Q    Could you use this courtroom or this building and

14         give us some idea of the distance?

15    A    It's further than from here to the back of the

16         building -- back of the courtroom here.  That's a

17         large store.

18    Q    And then is it your testimony that the bullet then

19         ricocheted off of the ceiling and back down?  Is

20         that what I'm understanding?

21    A    There was a spot on the -- above the Celotext

22         ceiling on the -- there's a Celotext ceiling, and

23         then there's a concrete roof, or some type of

24         concrete up there.  You can see where the bullet

25         hit the concrete and appeared to have traveled
```

```
 1          toward the rear of the store.  I got up and
 2          crawled in the Celotext in the back and found
 3          where it hit the wall.  And I could not find it,
 4          and I had to start search from the back of the
 5          store back, and I found it back towards the front
 6          of the store six or seven feet.  I don't recall
 7          the exact distance, but it was some distance back
 8          towards the front of the store.
 9     Q    The next projectile, where was it ultimately
10          located?
11     A    It was found in a box of fettucini, which was on
12          the top -- there was -- it was stacked like
13          normally stacked in the grocery store.  It was the
14          top box.  Captain White was walking down the aisle
15          and saw the box had been damaged, and we found
16          the bullet lodged inside the box.
17     Q    How did the bullet come to rest inside that box of
18          fettucini?
19     A    The only thing I can tell you is it ricocheted
20          around.  I could not -- I found some holes in some
21          signs -- some display signs and all, but I could
22          not find the actual pattern that it traveled.  It
23          hit some light fixtures.  There were some exposed
24          eight foot fluorescent light fixtures.  And we had
25          some of the light fixture casings had been
```

```
 1            damaged.  You could tell where the bullet had

 2            struck it.  But there was just no way for me to

 3            tell which way that bullet bounced around after it

 4            went through the signs and struck that light

 5            fixture.

 6    Q       So the bullet from your best investigation went

 7            through the sign first?

 8    A       Yes, sir.  One of them did.

 9    Q       Would that be the same -- the first one we talked

10            about, it hit the ceiling?

11    A       Yes, sir.

12    Q       Would it add up that that bullet -- the second one

13            we're talking about -- would have been the one

14            that went through the sign and hit the ceiling, or

15            was it different locations?

16    A       It's different locations.

17    Q       So the first one that we talked about that ended

18            up in the ceiling --

19    A       It took a more direct route to the rear of the

20            building.  It's not like I'm pointing to the back

21            of the building.  It was more of a slight angle.

22    Q       It was upward?

23    A       Yes, sir.  The next bullet was further over

24            towards the middle of the store.

25    Q       Also in an upward angle?
```

1    A    Yes, sir.  It struck the light fixtures in the

2         middle of the aisles.  The eight foot fluorescent

3         lights you see in shops and stuff that's got the

4         real thin metal casing, it struck the cover of it,

5         busted the light bulbs, and then went back down

6         and landed in the box of fettucini.

7    Q    Is it your belief that it went through this sign

8         before it hit the light fixture?

9    A    Yes, sir.  The signs were suspended from the

10        ceiling.

11   Q    That's the aisle sign?

12   A    Yes, sir.

13   Q    Aisle six, seven?

14   A    Right.

15   Q    It's the aisle number?

16   A    Yes, sir.

17   Q    And that sign, would you have any idea how much

18        off the floor it was suspended -- how high off the

19        floor?

20   A    Probably eight foot.  I'm six foot tall, and I

21        could walk under it, and I couldn't reach up and

22        touch it with my hands.  Eight foot.  Strictly a

23        guess.

24   Q    Right.

25             Now, was the bullet in the bottom part of

| | | |
|---|---|---|
| 1 | | that sign or the top portion of the sign? |
| 2 | A | You mean the bullet hole? |
| 3 | Q | Yes, sir.  The bullet hole.  Excuse me. |
| 4 | A | It was the best I can recall -- I believe it was |
| 5 | | about half way through the sign and more -- if |
| 6 | | you're looking down the aisle, more toward the |
| 7 | | left side of the sign than it would be the center. |
| 8 | Q | How far was that sign from the victim when the |
| 9 | | victim was found? |
| 10 | A | About half way down the aisle.  It was suspended |
| 11 | | from the center -- in the center of the aisle |
| 12 | | where you would normally see a sign that describes |
| 13 | | the items on that particular aisle for sale. |
| 14 | Q | Now, the third projectile you've not located? |
| 15 | A | No, sir. |
| 16 | Q | You said you recovered three shell casings; is |
| 17 | | that correct? |
| 18 | A | Yes, sir. |
| 19 | Q | Spent shell casings. |
| 20 | | And what did you do with those shell casings? |
| 21 | A | I placed them in a small envelope. |
| 22 | Q | You handled them with care; is that correct? |
| 23 | A | Yes, sir.  Actually, I initially I did not |
| 24 | | actually find the shell casings.  There was other |
| 25 | | investigators on the scene when I got there.  They |

```
 1          located them, secured them.  And then when I got

 2          there, I was a major case investigator -- robbery

 3          homicide investigator.  They showed them to me,

 4          and then they were collected.  And then they were

 5          turned over to me.  I actually went to the

 6          location where they were at, saw them, but I would

 7          have to look at these bags to tell you if I

 8          actually picked them up and put them in an

 9          evidence bag.  Because it was a large crime scene

10          and there was two or three other investigators

11          there assisting and trying to locate stuff.

12     Q    Certainly.

13              Now, where were those shells -- you as the

14          major case officer, you took the evidence, where

15          were those shell casings taken?

16     A    They were brought back -- you talking about for --

17     Q    After you took --

18     A    After I took them?

19     Q    -- possession of them, what did you do with them?

20     A    I locked them in the trunk of my car.

21     Q    And then what did you do with them?

22     A    I took them to the Alabama Department of Forensic

23          Science in Montgomery.

24     Q    For testing?

25     A    Yes, sir.
```

| | | |
|---|---|---|
| 1 | Q | Were there any fingerprints recovered from the |
| 2 | | shell casings? |
| 3 | A | No, sir. |
| 4 | Q | Now, you also testified that you obtained a |
| 5 | | screwdriver; is that correct? |
| 6 | A | Yes, sir. |
| 7 | Q | Was that likewise sent to the Alabama Department |
| 8 | | of Forensic Sciences for testing? |
| 9 | A | No, sir.  I tested that at our lab in Dothan. |
| 10 | Q | Did you test that item for fingerprints? |
| 11 | A | Yes, sir. |
| 12 | Q | Did you recover any fingerprints? |
| 13 | A | No, sir. |
| 14 | Q | Now, you say you recovered no fingerprints.  Does |
| 15 | | that mean there were none, or you did not recover |
| 16 | | any? |
| 17 | A | There were none on the screwdriver. |
| 18 | Q | Now, you did not send that instrument -- that |
| 19 | | screwdriver to Marietta Prevos, then?  Is that |
| 20 | | your testimony? |
| 21 | A | Yes, sir. |
| 22 | Q | You sent the Winn Dixie bag and the map? |
| 23 | A | Yes, sir. |
| 24 | Q | Did you recover the Winn Dixie bag that is laying |
| 25 | | right here (indicating)? |

1   A   Yes, sir.

2   Q   You did.

3       And did you send it for testing as well?

4   A   Yes, sir.

5   Q   Is it your opinion that that's a bullet hole in

6       that bag?

7   A   Yes, sir.

8   Q   So that would have been one of the three shots

9       that was fired would have went through this bag

10      before it went in any other location; is that

11      correct?

12  A   Yes, sir.

13  Q   Now, you as a major case officer, you interviewed

14      the witnesses or oversaw their interview; is that

15      correct?

16  A   No, sir.  I interviewed some of the witnesses.

17      Other investigators interviewed them and then

18      their interview was taped or typed and then give

19      to me and I put it in my file.  So I did not --

20      when you say oversee, I wasn't there with them as

21      they interviewed them and didn't go out with them

22      to all the locations where the witnesses was.

23  Q   Right.  But they will do the investigation and

24      report back to you as the major case officer?

25  A   Right.  Return it to me.  Yes, sir.

1   Q   You will have a chance to overview it and review

2        what they had uncovered and act on it or whatever;

3        is that correct?

4   A   Yes, sir.

5   Q   Now, you had a photographic lineup; is that

6        correct?

7   A   Yes, sir.

8   Q   Were there any individuals that did not identify

9        Mr. McCray after reviewing the photographic

10       lineup?

11           MR. VALESKA:  I object.  That's hearsay.

12           THE COURT:  Excuse me, what was the

13       question?

14           MR. CAPPS:  I said, are there any individuals

15       that did not identify Mr. McCray as part of his

16       investigation as the individual that was in the

17       store.

18           THE COURT:  That was in the store?

19           MR. CAPPS:  I'm not asking what they said.

20       I'm asking did they identify him or not.

21           THE COURT:  Any individuals who were in the

22       store that did not -- you mean identified somebody

23       else?

24           MR. CAPPS:  Quite possibly.  I don't know the

25       answer to that question yet.

1       THE COURT:  Well, I'll let him answer if he

2     knows.

3    A   Repeat the question.

4    Q   Were there any individuals that were in the store,

5     witnesses, that did not identify Mr. McCray?

6    A   Yes, sir.

7    Q   And who were those people?

8    A   I would have to go through the report and read.

9     Cindy Thompson was unable to pick out anyone in a

10    photo lineup.

11   Q   Anyone else?

12   A   No, sir, not in the photo lineup.

13   Q   Now, what about the physical lineup?  Same

14    question regarding the physical lineup.

15   A   Sara Dodson.

16   Q   Anyone else?

17   A   No, sir, not that I see.

18   Q   Was Mr. Scott accompanied by anybody in the store?

19   A   Yes, sir.

20   Q   And who would that have been?

21   A   His wife.

22   Q   Did she pick somebody out in the lineup?

23   A   Yes, sir.  She picked out someone other than Mr.

24    McCray.  She said it looked like number one, which

25    was not Mr. McCray.

1             MR. CAPPS:  That's all.  Thank you.

2                REDIRECT EXAMINATION

3  BY MR. VALESKA:

4  Q   Let me ask you.  Did Walter Sheffield identify

5      anybody as who committed the robbery and the

6      shooting of Michael Scott?

7  A   In the lineup -- physical lineup, photo lineup, or

8      both?

9  Q   Anytime.

10  A   He picked out Willie C. McCray in both.

11  Q   How many times?

12  A   Twice.

13  Q   Now, let me ask you.  Mr. Capps asked you about

14      the bag itself, Lieutenant Devane.  The bag

15      appeared the weapon was fired through the bag.  Is

16      that the question he asked you?

17  A   Yes, sir.

18  Q   And your response was?

19  A   Yes, it was.

20  Q   Now, do you know if the weapon was inside the bag

21      when it was fired?

22  A   It had to be to produce a hole.

23  Q   Okay.  Well --

24  A   Or at least not -- totally but partially --

25  Q   Any burn marks on the inside of the bag that you

| | | |
|---|---|---|
| 1 | | see? |
| 2 | A | No, sir. |
| 3 | Q | So let me ask you this.  The weapon if it was in |
| 4 | | the bag and pushed through the bag just before it |
| 5 | | was fired, could that have occurred? |
| 6 | A | Yes, sir. |
| 7 | Q | If the weapon was pulled out of the bag and the |
| 8 | | bag was in close proximity when the weapon was |
| 9 | | fired, could it not have blown a hole through the |
| 10 | | bag? |
| 11 | A | Yes, sir.  That's a possibility. |
| 12 | Q | And let me ask you something.  Are you familiar |
| 13 | | with semi-automatic weapons, automatic weapons, |
| 14 | | Tec-9's? |
| 15 | A | Yes, sir. |
| 16 | Q | Do they have any kind of guards on them or |
| 17 | | anything to keep you from burning your hands if |
| 18 | | you touch the barrels when they are fired?  What |
| 19 | | do they have, if you know? |
| 20 | A | Some come equipped with a round black cylinder |
| 21 | | that's on the outside of the barrel that has small |
| 22 | | holes drilled in it.  It looks similar to a flash |
| 23 | | suppressor. |
| 24 | Q | Let me ask you, if I could.  Do you have an |
| 25 | | opinion if a Tec-9 was fired, automatic weapon, |

1       Mr. Capps asked you about that bag, whether there

2       would be any burning or scorching if it was fired

3       in close proximity of the bag or the hole when it

4       was fired?

5   A   There should be.

6          MR. VALESKA:  That's all.  Pass the witness.

7       Thank you, Judge.

8                RECROSS EXAMINATION

9   BY MR. CAPPS:

10  Q   You as the major case officer on this case made a

11      determination that the bullet had been fired

12      through the bag; is that correct?

13  A   Yes, sir.

14  Q   So after you made your determination, you didn't

15      submit that bag for any further testing, did you?

16  A   No, sir.

17         MR. CAPPS:  That's all.  Thank you.

18         MR. VALESKA:  That's all.  No more questions.

19         THE COURT:  You may step down.

20         MR. VALESKA:  Melanie McDougle.

21         THE COURT:  Any objection to him leaving?

22         MR. CAPPS:  Oh, not to his being released.

23         THE COURT:  You're excused.

24         MR. VALESKA:  Judge, could I ask the Court,

25      Ms. McDougle has an oxygen tank.  Can she just sit

1    here in a chair if she speaks loud enough?  Would

2    that be permissible?  As long as they can hear,

3    would that be all right?

4         MR. CAPPS:  That's fining with us.

5         THE COURT:  Yes.

6              (At which time the following proceedings

7              were held at the bench outside of the

8              hearing of the jury:)

9         MR. CAPPS:  I have an objection.  The

10   objection would be improper testimony at this

11   point.  I would object calling her as a witness in

12   a matter that occurred in the last trial, the

13   testimony was overheard during the course of the

14   first trial in this matter.  And it was at counsel

15   table with counsel she overheard alleged statement

16   of the Defendant where he made a statement

17   indicating, I wasn't wearing no shorts.  That was

18   during the course of a trial.  It was a privileged

19   communication between attorney and client -- Mr.

20   Lamere and Ms. Atwell at that time.  The testimony

21   today of what occurred during the trial proceeding

22   some years ago at this point is highly prejudicial

23   to the Defendant, and the probative value is

24   certainly to be questioned.  The prejudicial

25   effect is outweighed substantially in this

matter. And the probative value is little, if
any. It has nothing to do with the crimes, the
events that occurred on or about August 7, 1993.
And it only relates to an alleged in-court
statement that she overheard while the Defendant
had an expectation of privacy while communicating
with his attorney.

MR. VALESKA: I would respond that we've
taken this issue up. The Defendant is at counsel
table in an open courtroom. There is no
expectation of privacy. If he makes a statement
loud enough that can be heard by a reporter two
rows behind him. Once again, there was no
eavesdropping or recording. She will testify she
heard him say it in open public courtroom. So I
say there's no attorney-client privilege. It is
relevant because the State alleges he's the
shooter and one of the two that committed the
robbery. She has no connection to the D.A.'s
office or the State in any way. She's in a public
courtroom and because the Defendant chose to speak
loud enough to someone could overhear it, he's
the one that gave that up.

THE COURT: I overrule the objection.

(At which time the following proceedings

332

```
 1                    were held in open court:)

 2                      MELANIE MCDOUGLE

 3        having first been duly sworn, was examined and

 4        testified as follows:

 5                      DIRECT EXAMINATION

 6   BY MR. VALESKA:

 7   Q    Just for the Record, you've been put under oath,

 8        correct, ma'am?

 9   A    Yes, sir.

10   Q    Tell me your name, please, ma'am.

11   A    Melanie McDougle.

12   Q    Ms. McDougle, if I could, previously, before

13        coming in court today, years ago, did you have an

14        opportunity to be employed?

15   A    Yes, I was.

16   Q    Were you employed in the media in any manner or

17        fashion?

18   A    Yes, I was.

19   Q    Who did you work for?

20   A    WKMX.

21   Q    Now, did you have the occasion to be present while

22        prior testimony was given under oath in this very

23        courtroom while the State of Alabama, I

24        represented, Willie C. McCray was present with his

25        attorneys Jennifer Atwell and a Matt Lamere?
```

```
 1    A    Yes, sir.

 2    Q    Were you covering the testimony under oath

 3         yourself as a KMX reporter seated on the second

 4         row as the lady in green now behind her on the

 5         second row in this public courtroom?

 6    A    Yes, sir.

 7    Q    Do you recall me asking some questions of a

 8         witness, if I could for the Record, a man by the

 9         name of Jeff Clark, one of the managers of the

10         store?

11    A    Yes, sir.

12    Q    Do you recall when I was asking questions whether

13         Willie McCray made any statement to his lawyers

14         that you could overhear in a public courtroom on

15         the second row where he's still seated today at

16         the table just like he was back then?

17    A    Yes, sir.

18    Q    Would you tell the jury what you overheard Willie

19         McCray say when I was questioning Jeff Clark?

20    A    Mr. Clark had given the description of the

21         clothing --

22              MR. CAPPS:  I object, Your Honor.  It's

23         nonresponsive.

24              MR. VALESKA:  Let me go back and ask this

25         way.
```

```
 1    Q    In the presence of Willie McCray and his two

 2         lawyers, ma'am, do you recall what question I was

 3         asking Jeff Clark or what he said in Willie

 4         McCray's hearing or presence testimony under oath

 5         in this courtroom?

 6    A    Yes, sir.  You had asked what the Defendant was

 7         wearing.

 8    Q    And was there a response by Willie C. McCray at

 9         the counsel table with his two lawyers that you

10         overheard in a public courtroom as to what he said

11         in response to that, if anything?

12    A    Yes, sir.  He said, I wasn't wearing no shorts.

13    Q    And would you tell the ladies and gentlemen of the

14         jury as being a reporter for KMX, were you also

15         writing down what was being said in the courtroom?

16    A    Yes, sir, I was.

17    Q    Did you write down his response?

18    A    Yes, sir, I did.

19    Q    Was that brought to Mr. Lamere's and Ms. Atwell's

20         and Willie C. McCray's attention as to what you

21         had overheard him say publicly?

22    A    Yes, sir.

23    Q    Do you see Willie C. McCray at the table?

24    A    Yes, sir.

25    Q    Is that the man who said what you've indicated
```

1    that he wasn't wearing no shorts?

2  A    Yes, sir.

3         MR. VALESKA:  That's all I have.  I pass the

4    witness, Your Honor.

5                    CROSS EXAMINATION

6  BY MR. CAPPS:

7  Q    Ms. McDougle, you did not hear anything other than

8    that one statement; is that correct?

9  A    No, sir.

10        THE COURT:  You mean that the Defendant said?

11        MR. CAPPS:  Yes.  I'm sorry.  That's what we

12    were talking about.

13  Q    Is that correct?

14  A    I'm sorry.  I don't understand the question.

15  Q    Before that statement was made, did you hear the

16    Defendant say anything?

17  A    Yes, sir.

18  Q    After the statement was made, did you hear him say

19    anything?

20  A    No, sir.

21  Q    Did you testify in a previous trial?

22  A    Yes, sir.

23  Q    And once again, immediately before -- let me

24    qualify.  Immediately before the statement was

25    made that you allege here today, did you hear the

| | | |
|---|---|---|
| 1 | | Defendant say anything? |
| 2 | A | I wouldn't say immediately before, no. |
| 3 | Q | Relating to that statement? |
| 4 | A | No, sir. |
| 5 | Q | Do you know who Mr. McCray was talking to? |
| 6 | A | Yes, sir.  He was speaking to his attorney. |
| 7 | Q | And you were sitting here in the courtroom behind |
| 8 | | the defense table; is that correct? |
| 9 | A | Yes, sir. |
| 10 | Q | Would you classify the statement as a loud |
| 11 | | whisper? |
| 12 | A | Yes, sir. |
| 13 | Q | In other words, the voice was in a whisper tone |
| 14 | | rather than in a robust tone? |
| 15 | A | Yes, sir. |
| 16 | Q | Now, isn't it possible that Mr. McCray could have |
| 17 | | said, he said I wasn't wearing no shorts? |
| 18 | A | It's possible. |
| 19 | | MR. CAPPS:  Thank you.  That's all. |
| 20 | | REDIRECT EXAMINATION |
| 21 | | BY MR. VALESKA: |
| 22 | Q | The only question I have, Mr. Capps said is it |
| 23 | | possible that Mr. McCray said, he said I wasn't |
| 24 | | wearing no shorts.  Did you hear him say that? |
| 25 | A | No, sir. |

```
 1    Q    What did he say?

 2    A    I heard him say, I wasn't wearing no shorts.

 3              MR. VALESKA:  That's all.  Thank you.

 4              MR. CAPPS:  No further questions.

 5              THE COURT:  Is it all right to excuse this

 6         witness?

 7              MR. CAPPS:  Yes.  Please.

 8              THE COURT:  You're excused.  And you may go.

 9                   Let's take a short recess.

10                   Ladies and gentlemen, we're going to

11         take a short recess here at this point.  And I'm

12         going to ask you to go with the bailiff to the

13         jury room.  And while you're out of the courtroom,

14         do not discuss the case among yourselves or

15         discuss it with anyone else or allow anyone to

16         discuss it with you.  And if anybody attempts to

17         discuss it with you, let the Court know

18         immediately.  We'll be at recess about fifteen

19         minutes.  If any of you need anything, be sure and

20         let the bailiffs know.

21                   (Jury not present.)

22              THE COURT:  We'll recess for about fifteen

23         minutes.

24                   (Off the Record.)

25                   (Jury present.)
```

| | |
|---|---|
| 1 | MR. VALESKA:  We call Marietta Prevos to the |
| 2 | stand. |
| 3 | MARIETTA PREVOS |
| 4 | having first been duly sworn, was examined and |
| 5 | testified as follows: |
| 6 | DIRECT EXAMINATION |
| 7 | BY MR. VALESKA: |
| 8 | Q    Please tell the jury your name. |
| 9 | A    Marietta Prevos. |
| 10 | Q    What's your profession or occupation, please, |
| 11 | ma'am? |
| 12 | A    I'm a latent print examiner retired from the |
| 13 | Alabama Bureau of Investigation, Montgomery, |
| 14 | Alabama. |
| 15 | Q    What's a latent fingerprint examiner? |
| 16 | A    As a latent print examiner, I examined items from |
| 17 | evidence from scenes of crime for the purpose of |
| 18 | developing, preserving, and identifying unknown |
| 19 | fingerprints and palm prints that are left on |
| 20 | objects. |
| 21 | Q    Can you tell the ladies and gentlemen of the jury |
| 22 | what type of training or education you have in |
| 23 | relationship to obtaining the position with the |
| 24 | Alabama Bureau of Investigation and fingerprint |
| 25 | identification bureau? |

339

1          MR. CAPPS:  Judge, I'll be glad to stipulate

2     as to her qualifications.  She's been qualified in

3     this court many times as an expert in that field.

4          MR. VALESKA:  Thank you.

5   Q   If I could, then, if you would, please tell us

6     just use the term latent print, what does that

7     mean?

8   A   Actually the word latent itself means hidden or

9     invisible.  And in reference to a fingerprint or

10     palm print, it's an invisible print left on an

11     object by a person touching that object with the

12     undersides of the hands or the soles of the feet.

13     Latent prints require some type of processing

14     either with powders or chemicals to make them

15     visible for preservation and/or identification.

16     They are made up of ninety-eight percent

17     moisture.  They are quite fragile by nature and

18     can be easily destroyed.

19   Q   Is it possible to touch certain substances and not

20     leave your latent fingerprints or your palm or

21     your tips or your hands or even your feet?

22   A   Yes, sir.

23   Q   Is that completely unusual in your profession and

24     occupation?

25   A   No, sir, it's not.

1    Q    Can you tell the ladies and gentlemen of the jury,

2          there are certain number points of identification

3          you have to have as an expert when you take a

4          latent print that you've lifted to compare it to

5          known ink prints or major case prints to see if

6          you can make a match, certain characteristic

7          numbers you have to have?

8    A    In the state of Alabama we're not bound by a

9          certain law that requires a specific number.

10         However, in the Alabama Bureau of Investigation

11         where I worked, we had a general standard of nine

12         points.  However, depending on the quality of the

13         print, we would go with less than nine.

14    Q    The Federal Bureau of Investigation, did you have

15         any training by them?

16    A    Yes, sir, I did.

17    Q    Do they have a set number of points of

18         identification they have to have before they will

19         make a match?

20    A    Actually, we adapted our standard from the FBI.

21         And they have a general standard of nine as well.

22         But they will go with less than that, here again,

23         depending on the quality of the print.

24    Q    Now, is there a difference between -- I'll use an

25         example, someone that's three years old, a

|   |   |   |
|---|---|---|
| 1 |   | three-year-old child who has -- take fingerprints |
| 2 |   | from a three-year-old child in relationship to |
| 3 |   | their size or their palm prints, their fingertips, |
| 4 |   | or their tips versus someone who is more than |
| 5 |   | twenty or twenty-five years old, their palm print, |
| 6 |   | fingertips, could you tell a difference in those |
| 7 |   | prints?  In other words, if you could see them, |
| 8 |   | the known ink prints, comparing size, would they |
| 9 |   | be different? |
| 10 | A | Yes, sir.  The three-year-old's prints would be |
| 11 |   | much smaller than the adult's. |
| 12 | Q | Now, can you tell the ladies and gentlemen of the |
| 13 |   | jury in your training and education and experience |
| 14 |   | and you have testified many times in the circuit |
| 15 |   | court based on that, correct? |
| 16 | A | Yes, sir. |
| 17 | Q | And you're allowed to give your opinion, correct? |
| 18 | A | Yes, sir. |
| 19 | Q | Now, have you ever known in your training -- how |
| 20 |   | many years have you been doing this? |
| 21 | A | Approximately twenty-eight years. |
| 22 | Q | Still doing it today, correct? |
| 23 | A | Yes, sir. |
| 24 | Q | Have you ever known in your training and |
| 25 |   | experience, yourself, going to -- dealing with |

342

| | | |
|---|---|---|
| 1 | | other fingerprint experts world-wide that you have |
| 2 | | done, that anybody's fingerprints, any human |
| 3 | | being, have the same prints as another human |
| 4 | | being?  Palm prints, fingerprints, in any manner |
| 5 | | or fashion exactly the same? |
| 6 | A | No, sir. |
| 7 | Q | No doubt about it? |
| 8 | A | No doubt about it. |
| 9 | Q | Would you tell the ladies and gentlemen of the |
| 10 | | jury, do you know Lieutenant -- or back then |
| 11 | | Sergeant Stan Devane with the Dothan Police |
| 12 | | Department? |
| 13 | A | Yes, sir, I do. |
| 14 | Q | Did you have the opportunity to have him or see |
| 15 | | him personally in the office in Montgomery at the |
| 16 | | Department of Public Safety on August 9, 1993, |
| 17 | | around two-twelve p.m. in your office he came? |
| 18 | A | Yes, sir, he did. |
| 19 | Q | Did he turn anything over to you? |
| 20 | A | Yes, sir, he did. |
| 21 | Q | What did he turn over to you? |
| 22 | A | He turned over a brown paper Winn Dixie bag, a |
| 23 | | flathead screwdriver, a white paper towel, an |
| 24 | | Alabama road map, Alabama license plate, and a |
| 25 | | clear piece of plastic with duct tape. |

1   Q   Now, once he turned those over to you, did you

2       take them into your care, custody, and control in

3       a sealed condition yourself?

4   A   Yes, sir, I did.

5   Q   Did you unseal them and attempt to look for any

6       latent prints or attempt to get any prints of

7       those items?

8   A   Yes, sir, I did.

9   Q   Did you use a certain process by applying either

10       the black powder and chemicals trying to see if

11       you could raise any latent prints?  Did you do

12       that?

13   A   Yes, sir.  I used both powders and chemicals on

14       these items.

15   Q   Can you tell the ladies and gentlemen of the jury,

16       let me show you these items if I could.  Really

17       quick, first of all, State's Exhibit 36, is this

18       the Winn Dixie bag that you referred to that

19       Devane turned over to you?

20   A   Yes, sir, it is.

21   Q   Is that the condition it was in -- in other words,

22       it's all split open now if I can characterize it

23       like that.  Is that the way it was in, or was it

24       completely intact as a normal paper bag you get at

25       the grocery store?

344

| | | |
|---|---|---|
| 1 | A | It was completely intact. But it did have some |
| 2 | | tearing in this area here (indicating). I cut |
| 3 | | along the seams and flattened it out for the |
| 4 | | purpose of processing and examining the paper bag. |
| 5 | Q | And then did you find any latent prints on State's |
| 6 | | 36? |
| 7 | A | Yes, sir, I did. There were three prints of value |
| 8 | | that I found for identification purposes. |
| 9 | Q | Did you find one inside and -- excuse me, two |
| 10 | | inside and one outside? |
| 11 | A | Actually -- |
| 12 | Q | Or two outside and one inside? |
| 13 | A | There are two on the bottom portion of the bag and |
| 14 | | one on the inside portion of the bag. |
| 15 | Q | Did you identify or place any markings on the bags |
| 16 | | themselves, Ms. Prevos? |
| 17 | A | Yes, sir, I did. I marked the prints L1, L2, and |
| 18 | | L3, indicating latent one, latent two, and latent |
| 19 | | three. |
| 20 | Q | Now, if I could, let me take that Exhibit No. 36 |
| 21 | | and go to State's 46, which is in front of you |
| 22 | | with a white ink print card as well as four other |
| 23 | | white pieces of paper identified as the ink card |
| 24 | | of Willie C. McCray and then the major case prints |
| 25 | | taken of the left palm, left side fingertips, |

| | | |
|---|---|---|
| 1 | | right side fingertips, right palm.  Do you |
| 2 | | recognize those? |
| 3 | A | Yes, sir.  These are the known standards that I |
| 4 | | used bearing the name of Willie C. McCray for |
| 5 | | comparison of the latent prints in this case. |
| 6 | Q | Did 46 come into your custody? |
| 7 | A | This is 46? |
| 8 | Q | 46 is the manila envelope.  Yes, ma'am, that's |
| 9 | | correct. |
| 10 | A | Yes, it did. |
| 11 | Q | How did they come into your custody? |
| 12 | A | I received those from Stan Devane. |
| 13 | Q | And then did you have the opportunity to take 46, |
| 14 | | keep it in your care, custody, and control, and |
| 15 | | make any comparison to the paper bag which was 36 |
| 16 | | for the three prints you found of value on that |
| 17 | | bag? |
| 18 | A | Yes, sir, I did. |
| 19 | Q | Now, did you also take and try to print the |
| 20 | | screwdriver? |
| 21 | A | Yes, sir, I did. |
| 22 | Q | Anything found on the screwdriver? |
| 23 | A | There were no prints of value for identification |
| 24 | | purposes. |
| 25 | Q | Let me show you State's 21, if I could.  21, hold |

346

```
 1         it in front of you.  Do you recognize 21?

 2    A    Yes, sir.  That's the license plate that I

 3         examined in this case.

 4    Q    Did you print it for latent prints?

 5    A    Yes, sir, I did.

 6    Q    Now, if I could, let me go to State's No. 20, once

 7         again.  It's been ripped open.  Items in your

 8         hand, you can open up the map if you need to.  See

 9         if you recognize the map.

10    A    Yes, sir.  This is the map that I received from

11         Stan Devane.

12    Q    And did you look for latent prints on the map?

13    A    Yes, sir, I did.

14    Q    Now, did you also receive from Sergeant Devane a

15         white paper towel -- let me show you, here it is

16         right here -- State's Exhibit No. 19 from Sergeant

17         Devane when you received the other items?

18    A    Yes, sir, I did.

19    Q    Did you try to get any prints off that?

20    A    Yes, sir.

21    Q    19, did you get anything off 19?

22    A    No, sir, I did not.

23    Q    Did you seal it back up?

24    A    Yes, sir.

25    Q    Still sealed like the last time you gave testimony
```

347

```
1         under oath before?

2    A    Yes, sir.

3              MR. VALESKA:  Offer 19, the white paper

4         towel.

5              MR. CAPPS:  No objection.

6              THE COURT:  Let it be admitted.

7                   (State's Exhibit No. 19 was admitted

8                   into evidence.)

9    Q    Show you State's 22 for identification purpose,

10        Ms. Prevos.  Do you recognize that?  I'll take it

11        out of the bag.

12   A    Yes, sir.  This is the piece of clear plastic with

13        the duct tape.

14   Q    And does it show you found some prints?  I'm

15        holding it up with the latent.  Your indicating

16        number four on there, correct?

17   A    There were two on there.  Latent four and latent

18        five.

19   Q    You circled them or put parenthesis around them

20        and identified?

21   A    Yes, sir.

22   Q    You turned it back over to Devane in a sealed

23        condition?

24   A    Yes, sir, I did.

25             MR. VALESKA:  Offer 22.
```

348

1    MR. CAPPS:  No objection.

2    THE COURT:  Let it be admitted.

3        (State's Exhibit No. 22 was admitted

4        into evidence.)

5    MR. VALESKA:  Offer 46, which are the case

6    prints and fingerprint card of Willie McCray into

7    evidence.

8    MR. CAPPS:  No objection.

9    THE COURT:  Let those be admitted.

10        (State's Exhibit No. 46 was admitted

11        into evidence.)

12  Q  Now, if I could, tell the ladies and gentlemen of

13     the jury, did you receive other ink prints or

14     major case prints of other individuals to make

15     comparisons on the exhibit you had looking for

16     latent prints?

17  A  Yes, sir, I did.

18  Q  Roger Alan Melton, or Roger Melton, did you

19     receive his?

20  A  Roger Alton Miller.

21  Q  Miller.  Excuse me.  Did you receive his?

22  A  Yes, sir, I did.

23  Q  Did you make a comparison to see if you found his

24     prints on any of the items?

25  A  Yes, sir, I did.

1  Q   Did you find any of Miller's?

2  A   No, sir, I did not.

3  Q   What other individuals' did you receive?

4  A   Would you like for me to name?

5  Q   If you would.

6  A   There was a Curtis Brown, Morris Carroll, Danny

7      Lee Stewart, Terry and Carey Hammonds, Amos

8      Parrish, William Samuel Johnson, Eric Brown,

9      Francis Foster, Danny Ray Owens, Larry Edwards,

10     Tommy Lee Curry, Michael Barfield, Roy Holley,

11     Leo Frank, and Robert Lee Hall, and Decory Michael

12     Doster.

13 Q   Before Doster, going backwards, any of the names

14     you just read out before Doster, did you find any

15     latent prints that matched up on the map, the tag,

16     the bag, any item that was submitted to you taken

17     from the Monte Carlo or from the crime scene that

18     Devane gave you?

19 A   No, sir, I did not.

20 Q   Let's go back to Decory Doster, the last name you

21     mentioned.  Did you find any exhibits that were

22     submitted to you by Devane you've already

23     testified to that matched any of his print?

24 A   Yes, sir, I did.

25 Q   What was it?

1    A    The Alabama road map and the Alabama license

2         plate.

3    Q    Now, if I could, let me go back to Exhibit 36, the

4         paper bag, and ask you to take it and you compared

5         it to 36.  Has it been marked, altered, or changed

6         in any way except for the Court's identification

7         and markings you placed on it yourself or any

8         prints you found?  Is it in the same condition?

9    A    Yes, sir, it is.

10          MR. VALESKA:  Offer 36 into evidence, the

11        paper bag.

12          MR. CAPPS:  No objection.

13          THE COURT:  Let that be admitted.

14           (State's Exhibit No. 36 was admitted

15           into evidence.)

16    Q    State's 36, did you compare it to the known ink

17         prints or the major case prints of Willie McCray?

18    A    Yes, sir, I did.

19    Q    On the paper bag did you find any type of latent

20         prints that matched up?

21    A    Yes, sir.  Latent number one was positively

22         identified as the left ring finger of Willie

23         McCray.  That's right here (indicating).  Latent

24         number two was identified positively as the left

25         index finger of Willie McCray.  And latent number

351

1    three was positively identified as the right ring

2    finger of Willie McCray.

3  Q    And the last one was inside the bag, correct?

4  A    Yes, sir.

5  Q    The other two on the bottom outside the bag?

6  A    Yes, sir.

7  Q    Now, State's 20, the Alabama road map, does it

8    appear to be marked, altered, or changed in any

9    way after you did your testing except for the

10    Court's identification number and any writings you

11    placed on it yourself?

12  A    No, sir.  It appears to be in the same condition.

13        MR. VALESKA:  Offer State's 20 into evidence,

14    the road map, Your Honor.

15        MR. CAPPS:  No objection.

16        THE COURT:  Let it be admitted.

17            (State's Exhibit No. 20 was admitted

18            into evidence.)

19  Q    Taking State's 20, the Alabama road map, once

20    again, did you find any latent prints that matched

21    up to 46 of Willie C. McCray on the Alabama road

22    map?

23  A    Yes, sir.  There were -- there was a left thumb

24    print that I identified as Willie McCray, which

25    was marked latent number nine.  There was a left

352

1      palm print that I marked latent number twelve that

2      I positively identified as Willie McCray.  And

3      latent number seventeen, a right palm print, that

4      I positively identified as Willie McCray on the

5      Alabama road map.

6    Q    Now, did you find any other unidentified prints --

7      latent prints on the road map that you couldn't

8      match?

9    A    There were three prints that are labeled fourteen,

10      fifteen, and sixteen that are -- remain

11      unidentifiable today.

12    Q    Did you find any other unidentified prints on the

13      license tag?

14    A    No, sir.

15    Q    Did you find any other identified prints that you

16      were unable to match with on the paper bag?

17    A    The paper towel?

18    Q    The paper bag first.

19    A    Oh, the paper bag, there are -- only the three

20      that were positively identified.

21    Q    The paper towel that you asked -- that you

22      referred to, anything on the paper towel at all?

23    A    There were no prints of value.

24    Q    And then the duct tape, which was submitted to you

25      that you had found two latents, any identification

1      of those?

2    A    No, sir.

3         MR. VALESKA:  I offer the tag into evidence,

4    too, Judge.  The Alabama license tag.  I thought I

5    did that.  If I did, I apologize.  The number is

6    21 into evidence.

7         MR. CAPPS:  No objection.

8         THE COURT:  Let it be admitted.

9              (State's Exhibit No. 21 was admitted

10             into evidence.)

11   Q    State's 18, after you tried to get any prints off

12   the screwdriver, what did you do with it?

13   A    Returned it to Stan Devane.

14   Q    In a sealed condition?

15   A    Yes, sir.

16   Q    Appeared to be marked, altered, or changed in any

17   way?

18   A    No, sir.

19        MR. VALESKA:  Offer 18, the screwdriver.

20        MR. CAPPS:  No objection.

21        THE COURT:  Let it be admitted.

22             (State's Exhibit No. 18 was admitted

23             into evidence.)

24        MR. VALESKA:  Pass the witness.  Thank you,

25   Judge White.

CROSS EXAMINATION

BY MR. CAPPS:

Q    Ms. Prevos, you've testified that you use nine
     points to identify a print; is that correct?

A    Yes, sir.

Q    And how many points did you use in this particular
     case?

A    There were at least nine points of identification
     on all those that were listed as positively
     identified and possibly more.

Q    Do you have any notes that reflect your workings
     when you identified these prints?

A    To reflect the number of points?

Q    Yes.

A    No, sir.

Q    Did you make any notes relating to that?

A    No, sir.

Q    Now, in fingerprint identification there's certain
     ridges that are prevalent in a fingerprint; is
     that correct?

A    The friction skin that's on the undersides of the
     hands and the soles of the feet contain a small
     line of openings called sweat pores.  Sweat is
     naturally secreted through these pores.  And
     whenever a surface is touched or an object is

1        touched, the outline of the ridges is what makes

2        the print impression.

3  Q   Do you have anything in your notes that indicate

4        the comparisons of these ridges between the known

5        prints and the prints that you found that you

6        testified to here today?

7  A   No, sir, I do not.

8  Q   Now, you've also found some prints that were

9        unidentifiable; is that correct?

10  A   There were prints that I listed of value, mean

11        that they contain sufficient ridge characteristics

12        to positively identify those, that remain

13        unidentified.

14  Q   Were these prints placed into the state-wide

15        computer, I believe it's AFIS; is that correct?

16  A   That's correct.

17  Q   Were these prints placed in that computer?

18  A   The fingerprints were.

19  Q   The ones that are known you're saying?

20  A   The latent fingerprints.  The state-wide computer

21        has a database of print impressions from standard

22        fingerprint cards which show the end joints of the

23        finger.  The database does not reflect any palm or

24        known palm impressions; therefore, the only thing

25        that's searched through the database as far as

356

1    latent impressions are the end joints of the

2    fingers.

3  Q  So you couldn't take a portion of a fingerprint

4    and insert it into the database?

5  A  You could take a portion of the end joints of the

6    finger and search the database, but not like the

7    lower finger joints or the palm print.

8  Q  I guess getting back to my original question was,

9    was that done in this case?

10  A  The latent fingerprints that were unidentified?

11  Q  Right.

12  A  Were searched, yes, sir.

13  Q  You still had no response, no known prints to

14    those?

15  A  The ones that I listed that are identified remain

16    unidentified today.

17  Q  Thank you.

18        Now, how many of the prints that you

19    identified did you attribute to Mr. Michael Decory

20    -- or Decory Michael Doster?

21  A  There was latent number seven.

22  Q  If you could, just tell us where you found that

23    print.

24  A  The Alabama road map.  Latent number ten from the

25    Alabama road map.  Latent number eight also on the

357

| | | |
|---|---|---|
| 1 | | road map. Latent number eleven on the map. And |
| 2 | | latent number thirteen on the map. And also |
| 3 | | latent number six on the Alabama license plate. |
| 4 | Q | So tracking back, that's one, two, three, four, |
| 5 | | five prints of Mr. Doster that were found on the |
| 6 | | map; is that correct? |
| 7 | A | That were five on the map and one on the license |
| 8 | | plate. |
| 9 | Q | And then you say there were three prints of Mr. |
| 10 | | McCray on the map; is that correct? |
| 11 | A | That's correct, yes, sir. |
| 12 | Q | Now, on the license plate -- and I believe you |
| 13 | | just told us that, but on the license plate you |
| 14 | | developed one print; is that correct? |
| 15 | A | That's correct. |
| 16 | Q | And you attributed that to Mr. Doster? |
| 17 | A | Yes, sir. |
| 18 | Q | No prints on the map -- excuse me, no prints on |
| 19 | | the license plate, the tag, that were related to |
| 20 | | Mr. McCray; is that correct? |
| 21 | A | That's correct. |
| 22 | Q | Now, after you -- if I could, just your |
| 23 | | department, you're involved with fingerprint print |
| 24 | | analysis, correct? |
| 25 | A | Yes, sir. |

358

| | | |
|---|---|---|
| 1 | Q | You're not involved in a ballistics testing, |
| 2 | | powder analysis, or anything of that nature, are |
| 3 | | you? |
| 4 | A | No. |
| 5 | Q | What did you do with the Winn Dixie bag that was |
| 6 | | submitted to you -- I believe it's State's No. |
| 7 | | 36 -- when you were finished with it? |
| 8 | A | After I did my examinations, then I sealed it and |
| 9 | | returned it to Stan Devane with the Dothan Police |
| 10 | | Department. |
| 11 | Q | So it went from the latent print division of your |
| 12 | | department where you were employed at the time? |
| 13 | A | Yes, sir. |
| 14 | Q | Back to the Dothan Police Department; is that |
| 15 | | correct? |
| 16 | A | Yes, sir. |
| 17 | Q | Was there any other testing that was done on the |
| 18 | | bag to your knowledge? |
| 19 | A | No, sir. |
| 20 | Q | Now, I believe you've told us that you found no |
| 21 | | prints on the screwdriver; is that correct? |
| 22 | A | That's correct. |
| 23 | Q | Were any shell casings submitted for your review? |
| 24 | A | No, sir. |
| 25 | Q | You know what shell casings are? |

1    A    Yes, sir.

2    Q    In your line of work do you sometimes -- are you

3         sometimes called on to look at shell casings for

4         fingerprints?

5    A    Yes, sir.

6    Q    Is that a pretty common occurrence?  Were there

7         shell casings found for you to review them?

8    A    No, sir.

9    Q    That's not common?

10    A    Oh, excuse me.  Yes, sir, it is common.

11    Q    It's common for when shell casings are found they

12         send them to you, the expert in the field of

13         fingerprint analysis, to try to determine if there

14         are any prints; is that right?

15    A    Only if the agency doesn't have someone that can

16         do the processing.

17    Q    Okay.  But you are -- at the time that you were

18         employed, of course, you're retired now, but you

19         were the expert in that field for the State of

20         Alabama; is that right?

21    A    Yes, sir.

22    Q    And you've testified all over this state regarding

23         fingerprint identification and analysis; is that

24         right?

25    A    Yes, sir.

1    Q    So the items that you have testified to here

2         today, the Winn Dixie bag, the screwdriver, the

3         road map, the paper towel, and car tag, that was

4         the only items that were submitted to you for

5         fingerprint analysis?

6    A    And the piece of clear plastic with the duct tape.

7    Q    Clear plastic with the duct tape.  Right.

8         There was no door knobs sent up to you from

9         the car that were removed?  None of those items?

10   A    These items that I listed is what --

11   Q    That's it?

12   A    Yes, sir.

13        MR. CAPPS:  That's all.  Thank you.

14        THE COURT:  Anything further?

15        MR. VALESKA:  Just one question.

16                    REDIRECT EXAMINATION

17   BY MR. VALESKA:

18   Q    Hypothetically, could I ask you based on your

19        training, education, and experience, Mr. Capps

20        asked about a door knob, I'll ask about a door

21        handle on a car.  If someone had touched a door

22        handle and left a perfect latent print under

23        perfect conditions with no heat, humidity, no

24        moisture in the air, but they took a paper towel

25        after they had touched it and wiped it off, is it

1    possibly hypothetically that there would be no

2    print to obtain there, it would be wiped away?

3  A    Yes, sir.

4  Q    And of the cases that you go to crime scenes and

5    work throughout the state in your training,

6    education, and experience, like the King killing

7    in Dale County you worked, correct?

8  A    Yes, sir.

9  Q    Capital murder case there where a trooper and his

10    wife were killed.  Is it not true that normally

11    you don't find a lot of fingerprints at crime

12    scenes, do you?

13  A    As a general rule you find less than you find

14    more.

15        MR. VALESKA:  Thank you.  That's all.

16        MR. CAPPS:  No further questions.

17        MR. VALESKA:  Can she be excused, then?

18        MR. CAPPS:  Yes.

19        THE COURT:  Any objection to her being

20    excused?

21        MR. CAPPS:  I don't have any objection.

22        THE COURT:  You're excused.  Thank you very

23    much.

24        MR. VALESKA:  Call our last witness, Your

25    Honor.  Keithland Reeves.

1             KEITHLAND REEVES

2       having first been duly sworn, was examined and

3       testified as follows:

4             DIRECT EXAMINATION

5  BY MR. VALESKA:

6  Q    Please tell the ladies and gentlemen of the jury

7       your name.

8  A    Keithland Raymond Reeves.

9  Q    Mr. Reeves, if I could go back to about on or

10      about a Saturday August 7, 1993, at the Country

11      Market, here in Dothan, Alabama, Houston County,

12      on or about ten-thirty -- ten-forty, did you have

13      an occasion to be at the store on that night?

14  A    Yes, sir.

15  Q    Who was with you?

16  A    Me and my father.

17  Q    What was the occasion of you and your father going

18      into the store, if any?

19  A    Well, I had to go buy some Pampers for my little

20      girl.

21  Q    How did you get inside the sore yourself, you and

22      your father?  How did you get inside the store?

23  A    We went through the entrance and we just walked

24      around a little bit.

25  Q    As you got to the entrance, did you come to see

363

| | | |
|---|---|---|
| 1 | | anybody in the courtroom today that you had an |
| 2 | | occasion to see out there on that occasion when |
| 3 | | you were at the door walking in the front door? |
| 4 | A | As I was coming in the door? |
| 5 | Q | Yes, sir. |
| 6 | A | No, sir. |
| 7 | Q | Do you see anybody in the courtroom today that you |
| 8 | | saw out there then? |
| 9 | A | Yes, sir. |
| 10 | Q | Point that person out. |
| 11 | A | (Indicating.) |
| 12 | Q | Which man? |
| 13 | A | Mr. Willie. |
| 14 | Q | You indicated you pointed out the Defendant, |
| 15 | | Willie McCray.  Tell the ladies and gentlemen of |
| 16 | | the jury, at that time did you know his name? |
| 17 | A | No, sir. |
| 18 | Q | You have come to know his name, correct? |
| 19 | A | Yes, sir. |
| 20 | Q | Tell the ladies and gentlemen of the jury how he |
| 21 | | was dressed. |
| 22 | A | He had on black pants and a black shirt and some |
| 23 | | Hi-Tech boots. |
| 24 | Q | And would you tell the ladies and gentlemen of the |
| 25 | | jury, did he have anything in his hand? |

```
 1    A    Yes, sir.  He had a brown bag.
 2    Q    And did he say anything to you or did you say
 3         anything to him as you were inside the front of
 4         the store?
 5    A    We kind of like bumped into each other.
 6    Q    What did he say to you or --
 7    A    I think I said, what's up.
 8    Q    Did he respond to you?
 9    A    Yes, sir.
10    Q    And when you said what's up, what did he say to
11         you, then, please, Mr. Reeves?  Tell the jury.
12    A    He said, this what's up, and he had a brown bag in
13         his hand.
14    Q    And did he show you what was in the brown paper
15         bag when he said, this is what's up?
16    A    Yes, sir.
17    Q    What was it?
18    A    It was a gun.
19    Q    Could you tell what kind of gun it was?
20    A    It looked like a Tec-9.
21    Q    Was it a pistol or a revolver with a chamber on
22         it?
23    A    No.
24    Q    When you saw him with the paper bag the Tec-9, the
25         weapon, were you afraid at that point in time?
```

1    A    Yes, sir.

2    Q    Now, where did you go next, or where did he go?

3    A    He backed up against the counter.  We had backed

4         up against the counter.

5    Q    Were you completely inside the store?

6    A    Yes, sir.

7    Q    With your father standing there, did you look to

8         leave the store right then and there?

9    A    Yeah.  I wanted to leave the store then.

10   Q    When you looked to leave the store, did you see

11        anybody else at the door?

12   A    Yeah.  There was another guy at the door.

13   Q    White male or black male?

14   A    Black male.

15   Q    How was he dressed?

16   A    He had on black, too.

17   Q    Did you see anything in his hand?

18   A    He had a gun in his hand.

19   Q    Now, did you go out the door right then and leave?

20   A    No, sir.

21   Q    Why not?

22   A    You couldn't leave.

23   Q    Now, which way did you see McCray, the man you've

24        identified, go -- dressed in the black clothing

25        and the boots and the bag, which way did he go?

```
 1    A    He went towards the office.

 2    Q    And did you move inside the store some more, or

 3         did you go outside?

 4    A    We stayed inside the store.

 5    Q    When McCray got to the office, did you see him go

 6         inside the office?

 7    A    Yes, sir.

 8    Q    Did you ever see him come out of the office?

 9    A    No, sir.

10    Q    Did you ever see the first aisle the first cash

11         register is by the office?

12    A    (Witness nodded.)

13    Q    Did you see a white male that approached or came

14         close to Willie McCray?

15    A    Yes, sir.

16    Q    Do you recall whether that man was wearing a hat

17         or not?

18    A    I can't remember.

19    Q    You need to speak a little closer to that

20         microphone.  You're leaning back.  That thing will

21         pull down some.

22    A    Okay.

23    Q    Could you tell the ladies and gentlemen of the

24         jury, did you see the white male do anything to

25         Willie McCray?
```

```
1   A    Yes, sir.

2   Q    What did he do to him?

3   A    He hit him.

4   Q    In what manner or fashion did he hit Willie

5        McCray?

6   A    He punched him.

7   Q    And when he punched him, was McCray still holding

8        the bag?

9   A    Yes, sir.

10  Q    When he punched him, how did it effect McCray's

11       body?  Show me.  In other words, if I'm standing

12       up straight when he punched him, did he move in

13       any manner or fashion?

14  A    He, like, stumbled a little bit.  Because there

15       was a counter, like, right there.  And when he

16       punched him, he, like, stumbled a little bit.

17  Q    And did McCray still have the bag in his hand?

18  A    Yes, sir.

19  Q    And would you tell the ladies and gentlemen of the

20       jury, what happened next with McCray and the man

21       that hit him in the face?

22  A    At the time when McCray punched him he, like,

23       stumbled, and then he just looked at him and then

24       he shot him.

25  Q    How much time elapsed, can you tell the jury, from
```

```
 1        the time the man punched him and McCray was

 2        looking at him before he shot him?  How much time

 3        went by, if any?

 4   A    He had about three to five seconds.

 5   Q    Three to five seconds, you sure?

 6   A    Yes, sir.

 7   Q    Did the man that punched him have a gun or weapon

 8        in any manner or fashion?

 9   A    No, sir.

10   Q    Who shot the white male?

11   A    Mr. Willie McCray.

12   Q    Would you tell the ladies and gentlemen of the

13        jury, when McCray shot him, anything prevented

14        McCray from what you could see where he was

15        standing from walking away and going back out the

16        door and leaving before he shot the man?

17   A    No, sir.

18   Q    Anybody else have weapons besides McCray and the

19        other black male at the door that you saw?

20   A    No, sir.

21   Q    When McCray shot him, do you know what part of the

22        body Michael Scott got shot, the white male?

23   A    Up here somewhere (indicating).

24   Q    And how did his body react when McCray pointed

25        the weapon and shot him?
```

| | | |
|---|---|---|
| 1 | A | He fell forward after he shot him. |
| 2 | Q | What did you do when that weapon went off? |
| 3 | A | I went in the cash register. |
| 4 | Q | What did you see your father do? |
| 5 | A | He went under the cash register, too. |
| 6 | Q | Describe what you were hearing then in the store. |
| 7 | | What were you hearing next? |
| 8 | A | After that incident happened? |
| 9 | Q | Yeah. |
| 10 | A | Just heard gunshots. |
| 11 | Q | Could you hear the people reacting and what they |
| 12 | | are doing -- the human beings? |
| 13 | A | They were just running and screaming and stuff. |
| 14 | Q | How loud was the screaming? |
| 15 | A | There was some screaming. |
| 16 | Q | Would you tell the ladies and gentlemen of the |
| 17 | | jury, when you saw the white male, Michael Scott, |
| 18 | | get shot, were afraid for your life? |
| 19 | A | Yeah. |
| 20 | Q | Why? |
| 21 | A | Because he done shot a man.  So I just went under |
| 22 | | the cash register. |
| 23 | Q | When you heard the other shots go off, were you |
| 24 | | afraid? |
| 25 | A | Yes, sir. |

```
 1    Q    Were you concerned for yourself?

 2    A    Yes, sir.

 3    Q    For your father?

 4    A    Oh, yes, sir.

 5    Q    Now, did you ever get back up off the floor again?

 6    A    After they left.

 7    Q    How do you know they left?

 8    A    Because I heard them went out the door.

 9    Q    How did they go out the door?  Walking?

10    A    No.

11    Q    How?

12    A    They were running.

13    Q    After they ran out, did you stand back up shortly

14         after that?

15    A    Yes, sir.

16    Q    Could you see what the white male was doing that

17         got shot?

18    A    He was laying down.

19    Q    Did you ever see him get up again?

20    A    No, sir.

21    Q    Once again, point out to the ladies and gentlemen

22         of the jury if you see this person who shot the

23         white male, Michael Scott, in this courtroom.

24    A    Mr. Willie (indicating).

25              MR. VALESKA:  Let the Record reflect he
```

1           pointed out the Defendant.

2                    Pass the witness.

3                 CROSS EXAMINATION

4    BY MR. CAPPS:

5    Q    Mr. Reeves, are you free to leave the courthouse

6         here today?

7    A    Sir?

8    Q    Are you free to leave the courthouse --

9    A    Yes, sir.

10   Q    -- after you testify?

11   A    Yes, sir.

12   Q    You're not under arrest?

13   A    No, sir.

14   Q    Have you talked with this deputy right here,

15        Deputy Brown, before you took the witness stand?

16   A    I talked to him.

17   Q    You did?

18   A    Yes, sir.

19   Q    He didn't indicate to you that there was a warrant

20        out for your arrest?

21   A    He indicated to me.

22   Q    Did he tell you you could leave the building?

23   A    Yes, sir.  I'm going to leave.

24   Q    He didn't tell you to stay around?

25   A    He didn't tell me nothing.

372

| | | |
|---|---|---|
| 1 | Q | Now, do you know Zach Harris? |
| 2 | A | The name sound familiar. |
| 3 | Q | Have you ever been shown a photograph of Mr. |
| 4 | | McCray? |
| 5 | A | Yes, sir. |
| 6 | Q | When you saw the photograph, isn't it true that |
| 7 | | you said that's not the man at the store? |
| 8 | A | At the time I didn't see the photograph.  You |
| 9 | | talking about the -- what photograph you talking |
| 10 | | about? |
| 11 | Q | You tell me.  You're the one that said you saw a |
| 12 | | photograph. |
| 13 | A | Yes, sir, I saw one. |
| 14 | Q | And isn't it true that you said that's not the man |
| 15 | | that was at the store? |
| 16 | A | At the time I did. |
| 17 | Q | Now, how many shots were fired? |
| 18 | A | Going in the store or out of the store? |
| 19 | Q | Total. |
| 20 | A | I guess about five. |
| 21 | Q | Five shots were fired.  You sure of that? |
| 22 | A | To my knowledge. |
| 23 | Q | You were paying close attention? |
| 24 | A | I was watching Mr. McCray. |
| 25 | Q | Did you see a hole in the bag? |

```
 1    A    No, sir.

 2    Q    Let me show you this item of evidence that the

 3         State has marked as Exhibit 36.  This is a bag

 4         that's been represented to be recovered at the

 5         scene.  Do you see a hole in this bag?

 6    A    Yes, sir.  Right there (indicating).

 7    Q    On the night in question, did you see that hole in

 8         this bag?

 9    A    (Witness nodded.)

10    Q    Yes or no?

11    A    No, sir.

12    Q    Isn't it true that the shots were fired in rapid

13         succession, bam, bam?

14    A    Yes, sir.

15    Q    And you say there were five shots?

16    A    (Witness nodded.)

17    Q    You need to speak up so the court reporter can

18         take it down.

19    A    Yes, sir.

20    Q    Now, during all of this, what was the black male

21         at the door doing?

22    A    He was just standing at the door.

23    Q    Did he have a gun?

24    A    Yes, sir.

25    Q    Did you see him point the gun?
```

| | | |
|---|---|---|
| 1 | A | I heard him shoot the gun. |
| 2 | Q | So the black male at the door shot the gun? |
| 3 | A | Right.  When they were leaving the store. |
| 4 | Q | How many shots did he fire? |
| 5 | A | About four. |
| 6 | Q | So total number of shots fired were how many? |
| 7 | A | Five. |
| 8 | Q | And the man at the door shot four of them? |
| 9 | A | Yes, sir. |
| 10 | Q | And Mr. McCray shot one? |
| 11 | A | One. |
| 12 | Q | Now, isn't it true that at the time Mr. McCray |
| 13 | | allegedly struck this man that you're saying -- |
| 14 | | your testimony, not mine -- that a -- fell back; |
| 15 | | is that right? |
| 16 | A | Right. |
| 17 | Q | Gun discharged, everybody is running from the |
| 18 | | store, and the man at the door is shooting the gun |
| 19 | | as well; is that right? |
| 20 | A | Right. |
| 21 | Q | Did you see any of the individuals aim a weapon? |
| 22 | A | No.  Nobody but Mr. McCray. |
| 23 | Q | When you say Mr. McCray, describe what you saw |
| 24 | | relating to Mr. McCray. |
| 25 | A | After the incident happened when the guy hit him? |

1    Q    Yeah.

2    A    When the guy hit him, he, like, leaned against the

3         counter.  Like I said, he was up there three to

4         five seconds and then the gun went off.  And after

5         that, I went under the cash register.

6    Q    Now, the gentleman that was at the door, do you

7         know how many -- do you know which direction,

8         shall I say, the gun he was firing was shot in?

9    A    I don't have no idea which direction.

10   Q    Do you know if it was shot inside the store?

11   A    It was shot inside the store.

12   Q    Inside the store?

13   A    Yes, sir.

14   Q    So he was on the inside of the door?

15   A    When you come in the door, he was standing right

16        there in front of the entrance so nobody else

17        could come in.

18   Q    So he was inside the building?

19   A    Right.

20   Q    He wasn't outside the building?

21   A    No, sir.

22   Q    And he discharged his firearm at least four times?

23   A    Yes, sir.

24             MR. CAPPS:  That's all.  Thank you.

25             MR. VALESKA:  Just two questions if I could.

REDIRECT EXAMINATION

BY MR. VALESKA:

Q    Mr. Reeves, had you ever seen anybody get shot and killed before that night?

A    No, sir.

Q    I want to show and get this marked if I could, please.

(State's Exhibit No. 85 was marked for identification.)

Q    I want to show you what's been marked State's 85 for identification purposes and ask you, do you recognize that picture?

A    Yes, sir.

Q    That the picture Ray Owens showed you on September 2, 1993, and ask if you could identify anybody?

A    Yes, sir.

Q    Can you identify anybody in there?

A    Yes, sir.

Q    Take this red marker and circle the person that you said did the shooting that you watched and when you identified.

A    (Witness complied.)

Q    Mr. Capps can see it.

Who is that?

A    Mr. McCray.

1     MR. VALESKA:  Offer State's 85 into evidence.

2     MR. CAPPS:  No objection.

3     THE COURT:  Let it be admitted.

4          (State's Exhibit No. 85 was admitted

5          into evidence.)

6     MR. VALESKA:  That's all.

7     THE COURT:  Anything further?

8     MR. CAPPS:  No further questions.

9     THE COURT:  You may step down.

10    MR. VALESKA:  Can he be excused, Your Honor?

11    THE COURT:  Any opposition to his being

12 excused?

13    MR. CAPPS:  No.

14    THE COURT:  You may go.  You're excused.

15 Thank you very much.

16    MR. VALESKA:  The State rests.

17    THE COURT:  Ladies and gentlemen, at this

18 time I'm going to ask you to go to the jury room.

19 And while you're out of the courtroom, recall the

20 instructions I've given you about not discussing

21 the case among yourselves or with anyone else.

22 We'll call for you shortly to continue the case.

23 Thank you very much.

24          (Jury not present.)

25    THE COURT:  Let the Record show that this is

1   out of the presence and hearing of the trial

2   jury.  And I just wanted to give Mr. Capps any --

3   an opportunity to make any motions that you may

4   want to make.

5       MR. CAPPS:  Yes, Your Honor.  Thank you very

6   much.  At this time on behalf of the Defendant,

7   Willie C. McCray, I move the Court to grant a

8   motion for judgment of acquittal and specifically

9   case number CC-94-791 and case number CC-94-792

10   wherein number one, theft of property, I allege

11   the State has failed to make a prima facie case of

12   theft of property in the first degree as it

13   relates to this Defendant, Willie C. McCray.

14   Also, the second charge being murder, felony

15   murder, I also allege the State has failed to make

16   a prima facie case of murder in that case as

17   well.

18       THE COURT:  Mr. Valeska, do you want to

19   respond?

20       MR. VALESKA:  No.  I just respond on the

21   evidence, Judge.  I say that we've met those

22   burdens and ask you to deny those motions.

23       THE COURT:  Those motions are denied.

24       MR. CAPPS:  Judge, this might be a good

25   time.  I also ask the Court to inquire of the jury

1    if they read any accounts or saw any media

2    accounts of this or if anyone discussed the case

3    with them.  I don't know if you did this earlier.

4    I may have missed it.

5         THE COURT:  I instructed them last night to

6    do it before we left, but I'll do it again.

7         MR. CAPPS:  If you'll just inquire if any of

8    these heard any accounts.

9         THE COURT:  I'll be glad to do that.

10              Do we have any other matters to take up

11   before we go into the Defendant's case?

12        MR. CAPPS:  Judge, I would ask the Court to

13   grant us a recess.  This might be a good time if

14   we could to break for lunch so I'll have time to

15   get all my witnesses together.  There's been some

16   served.  I don't know if they are all here.  And

17   if I could have, say, thirty or forty minutes, I

18   would appreciate it.

19        THE COURT:  That will be fine.  How many

20   witnesses do you have?

21        MR. CAPPS:  Quite possibly three.

22        THE COURT:  Before we do that -- and I will

23   bring them back and inquire as you've asked me

24   to.  I wanted to hear from both sides -- I haven't

25   heard the Defendant's case yet.  So I don't know

1    if there's something -- it appears to me it's just

2    a plea of not guilty.  I mean, he wasn't there and

3    he didn't do it.  Is that what I understand?

4        MR. CAPPS:  That's the plea that's been put

5    forth, Your Honor.

6        THE COURT:  Sir?

7        MR. CAPPS:  That's the plea that's been put

8    forth is a not guilty plea.

9        THE COURT:  And is that what you anticipate

10   that your evidence will show?

11       MR. CAPPS:  Well, I would like to keep that

12   door open.  I'd ask the Court to consider a charge

13   of manslaughter.

14       THE COURT:  And that's what I'm aiming at.

15   Is because we've got -- as I understand it, the

16   charge here is felony murder.  So murder is not a

17   lesser included offense.  I mean, murder is on the

18   same level with felony murder.  And I don't see

19   how the evidence would go to show any

20   manslaughter.  Would you enlighten me on that as

21   to why you feel that they should be charged as to

22   manslaughter?

23       MR. CAPPS:  Yes, Your Honor.  There's been

24   conflicting testimony about whether the gun was

25   discharged while in the bag, out of the bag, the

1    relationship between the time the Defendant was

2    struck by the alleged victim as the testimony has

3    been presented.  And, once again, I'm just arguing

4    what testimony has come out at this point in the

5    case.  And the proximity of the Defendant, the

6    time frame of the shots that were quick succession

7    shots.  We've had the police officer testify that

8    there were three shots fired.  And then we've had

9    various other witnesses testify anywhere from five

10   to seven shots were fired at the time.  And the

11   evidence in my argument would be the intentional

12   act was somewhat in question at this point is my

13   argument because of all the testimony we've heard

14   at this point regarding the Defendant's actions.

15        THE COURT:  Actually, the crime doesn't call

16   for any intent.  Felony murder doesn't require an

17   intent.  That's the thing that's troubling to me.

18   Well, it doesn't -- it doesn't require an intent.

19   Manslaughter is defined as being -- okay,

20   manslaughter can be the wreckless causing of the

21   death of another or the causing of a death of

22   another under circumstances setforth in 13A-6-2 1

23   or 2, which is not felony murder.  So that one

24   wouldn't be -- the offense is felony murder.  So

25   it would have to be -- in order for manslaughter

1    to come into play here, it would have to be

2    wrecklessly causing the death of another.

3        MR. CAPPS:  Your Honor, I would submit to the

4    Court there's been testimony regarding ricocheting

5    bullet.  Bullets have ricocheted here and there.

6    They were shot upwards in an upward motion.  And

7    to me I think the evidence points to wreckless

8    conduct.

9        THE COURT:  Well, of course, and then, you

10    know, and please don't think I'm arguing with

11    you.  I'm just throwing out the evidence as I

12    recall it.  The evidence that there was a robbery

13    or attempted robbery being brought about there is

14    uncontradicted.  So if you take that, if you've

15    got the attempt of a robbery, it's uncontradicted,

16    then causing the death of another person, it don't

17    matter how it was done.  Whether it was wreckless

18    or anything else added to the attempt to commit a

19    felony or attempt to commit a robbery or the

20    actual commission of a robbery makes it felony

21    murder.  Now, you know, if you don't agree with

22    that, then I need to be convinced otherwise

23    because that's the way I'm going right now.

24        MR. CAPPS:  I would just submit to the Court

25    that it would be for the jury to decide, and I

1    think that my -- my position would be the jury

2    should be charged and let them decide whether or

3    not they think the evidence as presented fits

4    whichever category and for them to make the

5    determination rather than us -- or me or you.

6         THE COURT:  All right.  Anything that the

7    State?

8         MR. VALESKA:  No.  We think you've correctly

9    phrased what occurred what you've said legally.

10        THE COURT:  I just -- I feel like I've got to

11   charge them according to the evidence.  And if the

12   evidence, you know, changes things, then I'll go

13   accordingly.  But I'm not bad about charging on

14   things that aren't in evidence.

15             You say you need about thirty or forty

16   minutes, Chris, to get your witnesses together?

17        MR. CAPPS:  Yes, sir.  If we could take up a

18   matter beforehand.

19             (At which time a bench conference was

20             held off the Record.)

21             (Off the Record.)

22        THE COURT:  The Defendant has indicated that

23   he wants to take the witness stand?

24        MR. CAPPS:  That's correct.

25        THE COURT:  And he wants to do that against

1    your advice?

2         MR. CAPPS:  That's exactly correct.

3         THE COURT:  Mr. Valeska, you understand what

4    he's saying?

5         MR. VALESKA:  Yes, sir.  I heard, Your Honor.

6         THE COURT:  Mr. McCray, is that what I

7    understand?

8         THE DEFENDANT:  Yes, sir.

9         THE COURT:  You want to --

10         THE DEFENDANT:  Yes, sir.

11         THE COURT:  -- take the witness stand?

12         THE DEFENDANT:  Right.

13         THE COURT:  And you know that your attorney

14    has advised you not to, that he thinks it is in

15    your best interest that you not take the witness

16    stand?

17         THE DEFENDANT:  Right.

18         THE COURT:  But you want to do it anyway?

19         THE DEFENDANT:  Yes, sir.

20         MR. CAPPS:  Also, at this point under ethical

21    consideration I think I would have to move the

22    Court to withdraw his attorney.

23         THE COURT:  I don't think so.

24         MR. CAPPS:  Would that be denied, then?

25         THE COURT:  His motion to take the witness

1     stand?

2        MR. CAPPS: My motion to withdraw and

3     question him on the witness stand.

4        THE COURT: Your motion to withdraw.

5        MR. CAPPS: And question him on the witness

6     stand under ethical concerns I have about me

7     questioning him on the witness stand.

8        THE COURT: Well, I think he's got a right to

9     take the witness stand if he wants to. If he

10     wants to violate his attorney's advice, you know,

11     that's his decision.

12        MR. CAPPS: My question to this Court is, do

13     I have to assist him in that, or can he be allowed

14     to tell his side of what he wants to say without

15     my being involved and eliciting --

16        THE COURT: Without? I'm sorry. Are you

17     saying can you leave the courtroom?

18        MR. CAPPS: No. No. No. What I'm saying

19     is, do I have to elicit testimony from him in this

20     matter?

21        MR. VALESKA: Judge, maybe this would be

22     better done ex parte with us out of the room, the

23     State, and take these matters up. We would have

24     no objection. I'm trying to surmise what the

25     defense attorney is saying to the Court, and I

1  think this matter would be better taken up outside

2  our presence.  I think what he's trying to tell

3  the Court -- once again, I'm just guessing.  I

4  don't know about what the concerns he has.  And

5  you have the authority --

6      THE COURT:  I know what he's saying.

7      MR. CAPPS:  Your Honor, once again, I have no

8  idea what Mr. McCray will say.

9      THE COURT:  Well, you know, he has a

10  Constitutional right to take the witness stand if

11  he wants to.

12      MR. CAPPS:  I understand.  I'm just looking

13  for some guidance, Your Honor.

14      THE COURT:  And for me to refuse to allow him

15  to testify in his own behalf would be for me to

16  deny him a Constitutional right that he has.  Now,

17  I understand that in your judgment you don't think

18  it's a good idea for him to take it.

19      MR. CAPPS:  No, Your Honor.  And it's my

20  opinion they are going to bring up some prior

21  convictions that he's had regarding --

22      THE COURT:  But you've advised him of that --

23  as to that?

24      MR. CAPPS:  Could you inquire as to whether

25  or not he's aware of all of that to make sure?

1      THE COURT:  Are you aware that -- I don't

2  know whether you have any prior convictions of

3  felony offenses involving moral turpitude or not.

4  But if you do and you take the witness stand, then

5  the State can ask you about it.

6      THE DEFENDANT:  Right.

7      THE COURT:  You understand that?

8      THE DEFENDANT:  Yes, I do.

9      THE COURT:  With that, I'm going to bring the

10  jury back, then.  You know, I know that you're in

11  a -- that you don't think it's a good idea.  But,

12  you know, I think his Constitutional right

13  overshadows and overcomes in this instance.

14      MR. CAPPS:  Thank you.

15      THE COURT:  I'm going to bring the jury back

16  and ask them what you asked me to, and then I'm

17  going to let them go to lunch, and then we'll come

18  back and start the trial.  Will one-fifteen give

19  you enough time?

20      MR. CAPPS:  Yes, sir, it should be.

21      THE COURT:  Or do you want me to do it

22  one-thirty?

23      MR. CAPPS:  One-thirty might be a little

24  better.

25      THE COURT:  Okay.  If you will, bring the

388

1    jury back.

2                    (Jury present.)

3        THE COURT:  Now, I just need to ask the jury

4    a question and then we'll -- I'm going to allow

5    you to go to lunch because there's some additional

6    preparation that needs to be made by some -- by

7    the attorneys before the case continues.

8            I'm not even -- I don't know personally

9    whether there were any newspaper, television, or

10   radio accounts of the events of this trial because

11   I didn't read or listen to any of the media.  But

12   did any of you read any newspaper accounts of the

13   events of the trial?  If anybody did, I'd

14   appreciate you raising your hand.  Or did you

15   watch any television broadcasts of the events of

16   the trial or listen to any radio broadcasts?

17                    (No response.)

18       THE COURT:  Everybody says that they didn't

19   do any of those things, which, of course, they

20   honored the Court's instructions last night before

21   they were dismissed.

22           I know that when we take long recesses

23   it looks like to you that we're wasting time and

24   whatever, and I promise you that we're not because

25   there's a lot that goes on, you know, during the

1  trial of the case that the lawyers have to take

2  care of and that I as the judge have to take care

3  also.  So I promise you that between now and

4  one-thirty when I'm asking you-all to be back that

5  we won't be fooling around and wasting you-all's

6  time.  I'm just saying that as an explanation so

7  you won't think we're wasting time and, you know

8  -- because I know you want to go ahead and get the

9  case tried and to a conclusion.  But we are going

10 to recess at this time.  And you won't have to be

11 back until one-thirty.  But while you're out of

12 the jury box and in your own homes or wherever you

13 go during that two-hour break, do not discuss the

14 case among yourselves.  Do not discuss it with

15 anyone else.  Do not allow anyone to discuss it

16 with you.  And if anyone approaches you and

17 attempts to discuss the case with you, you should

18 let the Court know immediately.  And, of course,

19 the caution about news reports of the events of

20 the trial also applies.  Don't watch, listen to,

21 or view any news accounts of the events of this

22 trial.  And thank you very much.  And we'll see

23 you-all back here at one-thirty.

24          (Jury not present.)

25      THE COURT:  Gentlemen, we're going to be at

1    recess until one-thirty, and I'll just see you

2    back here at that time.

3                    (Off the Record.)

4                    (Jury present.)

5         THE COURT:  The State has rested.

6              Mr. Capps, is the Defendant prepared to

7    go forward?

8         MR. CAPPS:  Yes, Your Honor.  The Defendant

9    calls Willie C. McCray.

10        THE COURT:  I want to make sure you

11   understand you have the right to testify or not to

12   testify.

13        THE DEFENDANT:  Yes, sir.

14        THE COURT:  You understand that.  You don't

15   have to if you don't want to, but you have chosen

16   to testify; is that correct?

17        THE DEFENDANT:  Yes, sir.

18        THE COURT:  Just the tell jury -- I assume --

19   just tell the jury --

20        THE DEFENDANT:  Okay.

21        THE COURT:  -- what you want to tell them

22   about this case --

23        THE DEFENDANT:  All right.

24        THE COURT:  -- in your opinion.

25                    WILLIE MCCRAY

1   having first been duly sworn, testified as

2   follows:

3                          TESTIMONY

4       THE DEFENDANT:  To the jury and the

5   prosecutor and this Court, I am not guilty --

6       MR. VALESKA:  I object.

7       THE DEFENDANT:  -- of felony murder --

8       MR. VALESKA:  I object.  This is not --

9       THE DEFENDANT:  -- not murder.

10      MR. VALESKA:  I object.

11      THE COURT:  Hold on just a second.  What's

12  the problem?

13      MR. VALESKA:  Is he just going to --

14      THE COURT:  Approach the bench, if you will.

15          (At which time the following proceeding

16          were held at the bench outside of the

17          hearing of the jury:)

18      THE COURT:  He's not going to question him.

19      MR. VALESKA:  Okay.  I understand that.

20          (At which time the following proceedings

21          were held in open court:)

22      THE DEFENDANT:  As I was saying, I'm not

23  guilty of felony murder, not murder, not auto

24  theft, but I am guilty of manslaughter.

25      MR. VALESKA:  Objection.

1          THE DEFENDANT:  On or about --

2          MR. VALESKA:  I object to the manslaughter.

3    There's no evidence of manslaughter at this time.

4          THE DEFENDANT:  On or about August 7th I was

5    contacted by an individual named Mr. Rufus Weston.

6    That individual contacted me and told me that he

7    knew --

8          MR. VALESKA:  I object to what some other

9    party I can't cross examine that's not here.

10         THE COURT:  Sustain to that as to what

11    somebody else told you.

12         THE DEFENDANT:  May I approach the bench?

13         THE COURT:  Well, it's going to be the same.

14    Hearsay evidence is not admissible.

15         THE DEFENDANT:  Okay.  Well, an individual by

16    the name of Rufus Wesley and I committed this

17    incident.  Mr. Wesley contacted me and told me --

18         MR. VALESKA:  I object what Wesley told him.

19         THE COURT:  Sustain the objection as to what

20    he told you.

21         THE DEFENDANT:  Okay.  Well, Rufus Wesley and

22    I came to Dothan, Alabama, approximately on August

23    7th of 1993.  Mr. Wesley and I pulled up at the

24    business known as the Country Market here in

25    Dothan, Alabama, on East Main Street.  Mr. Wesley

1     got out, made a phone call.  He told me it was an

2     inside job.  He made the phone call at the Country

3     Market.  It's a pay phone that's located on the

4     end of the building.  As Mr. Wesley made this

5     call, an individual came out and stood in front of

6     the establishment.  That individual was Mr. Jeff

7     Clark.  Mr. Wesley and I backed up.  And this

8     Monte Carlo, this Monte Carlo was already in the

9     picture before I came into it.  Mr. Wesley and Mr.

10    Dawson was supposed to have committed the robbery,

11    but Mr. Dawson backed out and couldn't be found at

12    the time.  Mr. Wesley contact me and asked me will

13    I go with him.  As we proceeded, Mr. Clark

14    greeted Mr. Wesley at the entrance with a nod as

15    it was okay.  Mr. Wesley and I entered the

16    structure.  Mr. Weston stayed to the door.  I went

17    to the office.  I braced the individual that said

18    I braced him when I went through the door --

19    Keithland Reeve.

20         THE COURT:  Did what?  I'm sorry, I didn't

21    understand.

22         THE DEFENDANT:  Braced him with my arm

23    (indicating).

24              Mr. Keithland Reeve.  And told Mr.

25    Reeve to stay there.  Mr. Reeve turned around and

1    replied to me, what. And I said, just stay

2    there. As I proceed towards the office, I came in

3    contact with an individual by the name of Walter

4    Sheffield, which was running a register. I

5    escorted Mr. Sheffield to the office. Went to the

6    office. There was an individual in the office by

7    the name of Debbie Sheffield that was supposed to

8    have been counting the money. Ms. Sheffield told

9    me that she had no access to gain entrance to the

10    money. She had already dropped it. I played hard

11    for a minute. My intention was not to hurt

12    anyone. As I proceed to leave the office -- and I

13    would like to demonstrate with the permission of

14    this Court what happened. May I step down?

15        THE COURT: Uh-huh.

16        THE DEFENDANT: (Left the witness stand.)

17            I want to use Exhibit 36.

18            Mr. Capps, may I use you for a minute,

19    please?

20        MR. CAPPS: No, not at all. Use the deputy.

21        THE DEFENDANT: May I use the deputy?

22        THE DEPUTY: Excuse me?

23        THE DEFENDANT: May I use you for a second?

24        THE COURT: Use what?

25        THE DEFENDANT: I want to use the deputy to

1    instruct what happened.

2        THE COURT:  Okay.

3        THE DEFENDANT:  With the Court, then, please,

4    sir, stand right here.

5        THE COURT:  Now --

6        THE DEFENDANT:  We can use anybody.  It

7    doesn't make a difference.

8        THE COURT:  I don't mind him using the

9    deputy.  But, if you will, remove the weapon.

10       THE BAILIFF:  You can use me.

11       THE DEFENDANT:  I can use him.

12       THE COURT:  No.  I'd rather you use -- okay.

13   Come on up.

14       MR. PITTS:  He can use another individual,

15   Judge.  He's not allowed to be disarmed at any

16   time while he's in the courtroom.

17       MR. CAPPS:  The bailiff, Judge.

18       THE DEFENDANT:  I can use this individual,

19   the bailiff.

20       THE COURT:  Okay.  Will you come around,

21   Tommy?

22       THE BAILIFF:  Yes, sir.

23       THE COURT:  Thank you.

24       THE DEFENDANT:  Okay.  Mr. Tommy, would you

25   just please stand right there.

1    (Demonstrating.)  As I left the office,

2  this is the manner I left the office in.  The

3  register one was located about right here where

4  the podium is.  I left the office.  Mr. Scott was

5  talking with his wife.  Mr. Scott's wife was

6  telling him the store was being robbed, which I

7  viewed with my back turned slightly and saw her

8  telling him that the store was being robbed.  Mr.

9  Scott purchased his items, which was some beer.

10  Mr. Scott put his receipt in his pocket.  As I

11  proceed to leave the store, I was walking by Mr.

12  Scott as such.  Mr. Scott stepped in my path.

13  When he stepped in my path, I side stepped him

14  like this, and Mr. Scott hit me in the face.  I

15  fumbled around like this.  And before I could

16  regain my balance, Mr. Scott grabbed the bag and

17  pulled it thinking as if it was money, but it was

18  a gun in there, and that's when the gun went off.

19  As I proceed Mr. Scott had the bag in his arm like

20  this when he fell.  Now, I'm running out of the

21  store.  No other shot fired by me.  Two additional

22  shots was fired by Mr. Weston to keep the crowd

23  back.

24    THE COURT:  Okay.  You through with your

25  demonstration?  If you are, you can take the

1    stand.

2    THE DEFENDANT:  Thank you, Mr. Tommy.

3    (Returned to witness stand.)

4    Ladies and gentlemen of the jury, that's

5    how the hole got in the bag, and that's exactly

6    what happened.  I'm guilty of manslaughter.

7    MR. VALESKA:  Objection.

8    THE COURT:  I sustain the objection.

9    MR. VALESKA:  Move to exclude and instruct

10   the jury to disregard, there's no manslaughter in

11   this case.

12   THE DEFENDANT:  There's evidence, strong

13   evidence that that is exactly --

14   MR. VALESKA:  Objection.

15   THE DEFENDANT:  -- what happened --

16   MR. VALESKA:  Now he's being argumentative.

17   THE COURT:  I sustain the objection.  It will

18   be up to the Court to instruct the jury as to the

19   law.

20   THE DEFENDANT:  That's exactly what

21   happened.

22   THE COURT:  Do you have anything else you

23   want to say?

24   THE DEFENDANT:  No.  Do anyone have any

25   questions?

```
 1              THE COURT:  Okay.  Mr. Valeska.

 2                    CROSS EXAMINATION

 3    BY MR. VALESKA:

 4    Q    Do you know what it means to tell the truth, Mr.

 5         McCray?

 6    A    Yes, I do.

 7    Q    And you're telling the jury you just told them the

 8         truth?

 9    A    Yes, sir.

10    Q    Now, let me ask you a few questions, if I could.

11         I want you to spell the name of the man you said

12         that helped you do the robbery.  Spell his name

13         for me.

14    A    R-u-f-f-s.

15    Q    Rufus.

16    A    Rufus.

17    Q    Last name?  Or is that his last name?

18    A    That's his first name.

19    Q    Spell his last name for me.

20    A    His last name could be Wesley or West.

21    Q    Could be Wesley or could be West, correct?

22    A    Right.

23    Q    Now, at the time you did the robbery and Michael

24         Scott was killed in the Country Market, you didn't

25         live in Dothan, did you?
```

```
1    A    No, I did not.

2    Q    You lived in Havana, correct?

3    A    Right.  Tallahassee.

4    Q    You got from Tallahassee to Dothan sometime that

5         afternoon or that night, which was it?

6    A    Sometime that night.  I was contacted by Mr.

7         Wesley or West approximately about ten o'clock

8         Florida time which would have been --

9    Q    Was that in Tallahasse?

10   A    Yes.

11   Q    Now, you didn't know this man's last name,

12        right?  For sure?

13   A    I went to school with him.

14   Q    You went to school with him how many years?

15   A    Twelve.

16   Q    Twelve years.  But you can't tell the jury going

17        to school with an individual for twelve years what

18        his name is, correct?

19   A    His name is Wesley or West.  I don't want to

20        mispronounce it.  That's why I'm staying neutral

21        with the Wesley or the West.

22   Q    It wouldn't be because you wouldn't want him to

23        get arrested and charged with the robbery or the

24        homicide of Mr. Scott?  Would that be the reason

25        you wouldn't want to give us the right name?
```

| | | |
|---|---|---|
| 1 | A | That's not the reason. |
| 2 | Q | You said you also talked to Doster, right? |
| 3 | A | I didn't talk with Doster. |
| 4 | Q | Decory Michael Doster, you knew him, didn't you? |
| 5 | A | I knew him. |
| 6 | Q | You-all had been friends, hadn't you? |
| 7 | A | Sure. |
| 8 | Q | Roger Miller? |
| 9 | A | Yes. |
| 10 | Q | You know Roger Miller? |
| 11 | A | Yes, I do. |
| 12 | Q | In fact, you're related to him, correct? |
| 13 | A | Yes. |
| 14 | Q | Now, let me ask you, if I could.  Is this the |
| 15 | | first time since August 7th of 1993 anybody has |
| 16 | | ever heard the story you just told the jury?  Is |
| 17 | | it? |
| 18 | A | No. |
| 19 | Q | Who was the first person you told how it really |
| 20 | | happened? |
| 21 | A | I told Mr. Weston how it happened. |
| 22 | Q | You told Mr. Weston how it happened? |
| 23 | A | Right. |
| 24 | Q | Who is the next person you told? |
| 25 | A | That's it. |

```
1    Q    You never told your lawyers?

2    A    No.

3    Q    Never one time?

4    A    No.

5    Q    Now, when did you tell Mr. Wesley what happened?

6    A    He asked me what -- he wasn't looking when the

7         incident went down.  He heard the shot.  He was

8         focused on something else.  And he heard the shot,

9         and he asked me what happened.

10   Q    Tell the jury how you got from Tallahassee,

11        Florida, to the Country Market that night.

12   A    In my girlfriend's car, and I followed Mr. Wesley

13        in what's supposed to have been the stolen

14        automobile.

15   Q    Your girlfriend's car, is that the red car?

16   A    Yes, it is.

17   Q    Your girlfriend's name was Sharon Wesley --

18        Westbury?

19   A    Westbury.

20   Q    You got arrested down in Havana, correct?

21   A    Yes.

22   Q    She came to visit you in the jail many times,

23        correct?

24   A    Yes.

25   Q    And did you-all talk about the case?
```

| | | |
|---|---|---|
| 1 | A | No, we didn't. |
| 2 | Q | You never talked about it one time? |
| 3 | A | No. |
| 4 | Q | Can you explain, then, how she gave to the Dothan |
| 5 | | police a signed statement giving you alibi -- |
| 6 | |     MR. CAPPS:  Object, Your Honor, if it's a |
| 7 | | hearsay statement. |
| 8 | |     MR. VALESKA:  It goes to his story as to |
| 9 | | whether he told the truth or not. |
| 10 | |     MR. CAPPS:  It's still hearsay. |
| 11 | |     THE COURT:  Yeah, it's hearsay. |
| 12 | Q | When Sharon Westbury came to the jail, you never |
| 13 | | talked about what occurred that night one time? |
| 14 | A | Never. |
| 15 | Q | Now, you followed it's your testimony in her red |
| 16 | | car the blue Monte Carlo, correct? |
| 17 | A | The blue Monte Carlo, right. |
| 18 | Q | So the blue Monte Carlo that you've come to learn |
| 19 | | from hearing testimony that was taken here in |
| 20 | | Dothan, you followed it from Tallahassee up here? |
| 21 | A | I wasn't present when the car was taken.  I was |
| 22 | | told it was taken from Alabama. |
| 23 | Q | Where did you see the Monte Carlo?  Tell the first |
| 24 | | time -- |
| 25 | A | The first time I saw the Monte Carlo was in the |

1       parking lot of the Winn Dixie store in

2       Tallahassee, Florida, located on Highway 27.

3   Q   So it was in Florida, right?

4   A   Yes, it was.

5   Q   And it had an Alabama tag on it?

6   A   Yes, it did.

7   Q   You want this jury to believe you, right?

8   A   It's the truth.

9   Q   It's the truth.  Now, do you always tell the truth

10      when you're asked by police officers what

11      occurred?

12  A   I'm telling the truth today.

13  Q   The question is, do you always tell the truth if

14      you're asked by police officers what occurred?  Is

15      that a yes or no?

16  A   It's got to be a no due to the fact that I didn't

17      admit to the murder when it happened.

18  Q   You didn't admit to the murder while it happened.

19      Is there a reason why you waited until today to

20      tell anybody to admit in front of a jury that you

21      did the murder?

22  A   Because I want to tell the truth in front of the

23      jury.

24  Q   You had the opportunity to tell the truth in front

25      of another jury, did you not?

| | | |
|---|---|---|
| 1 | A | I was denied the chance to testify. |
| 2 | Q | Now, let me ask you about that. You're saying you |
| 3 | | were prevented from testifying? |
| 4 | A | Well, I was informed not to testify. |
| 5 | Q | But let me ask you today. No one prevented you |
| 6 | | from getting on the witness stand, did they? |
| 7 | A | Today? |
| 8 | Q | Anytime? No one prevented you, did they, Mr. |
| 9 | | McCray? |
| 10 | A | Re -- re -- |
| 11 | Q | The question is, at any time has anybody ever |
| 12 | | denied you the opportunity to get up there and |
| 13 | | testify, prevented you, yes or no? |
| 14 | A | I was informed, yes. I was informed not to take |
| 15 | | the stand. |
| 16 | Q | Who made the choice not to take the stand? You |
| 17 | | did, didn't you? |
| 18 | A | When? This trial? Last trial? |
| 19 | Q | Last trial. |
| 20 | A | Last trial? |
| 21 | Q | Yes, sir. |
| 22 | A | My attorney informed me not to take the stand, and |
| 23 | | I followed his informant. |
| 24 | Q | And today did you make the decision to get on the |
| 25 | | stand yourself? |

405

```
1    A    I made a decision to get on the stand myself.

2         Yes, I did.

3    Q    Now, when you were interviewed in Havana by Devane

4         on August 13, 1993, he gave you your

5         Constitutional Miranda rights, correct?

6    A    Yes, he did.

7    Q    He asked you if you had been in Dothan, correct?

8    A    Yes.

9    Q    The night of the robbery.  What did you tell him?

10   A    That's past present.

11   Q    Did you tell him you had been in Dothan when he

12        asked if you did the robbery?  Yes or no, did you

13        tell him, Mr. McCray?

14   A    I told him.  But that's past present.  The truth

15        has already been revealed.

16   Q    No, sir.  The truth hasn't been revealed.  That's

17        why I'm getting to ask you some questions, Mr.

18        McCray.  Did you tell him you had been in Dothan?

19        You lied to him, didn't you?  Yes or no?

20   A    Yes, I did.

21   Q    Now, when he asked you the last time you had been

22        in Dothan when you said I was three years old, you

23        told him that, that was a lie also, correct?

24   A    Yes.  I've been in Dothan after that.

25   Q    He asked you if you had been in Dothan that
```

1       Saturday night; and your response was, no, I was

2       not, correct?

3  A    Yes.

4  Q    That was a lie, wasn't it?

5  A    Yes, that was.

6  Q    In fact, you were lying because you knew you had

7       been charged and arrested with what?  What did

8       they arrest you for?  Tell the jury.

9  A    Capital murder.

10  Q    Now, let's talk about that now.  Today you're

11       charged with what?  Felony murder and theft of

12       property, correct?

13  A    Correct.

14  Q    Now, let's go back when he asked you some

15       questions.  He asked you if you had had a Winn

16       Dixie bag or seen a Winn Dixie bag, and what was

17       your response to Sergeant Devane?  Do you remember?

18  A    Yes.

19  Q    Did you tell him the truth?

20  A    I told him no.

21  Q    That was a lie, wasn't it?

22  A    Yes, it was.

23  Q    Is it fair to say that everything you told him in

24       this statement was a lie?

25  A    No.

1    Q    Okay. Well, let me ask you this. He asked if you

2         had -- any evidence would be at the scene where

3         the robbery and the homicide occurred, any

4         evidence anything belonging to you --

5    A    I'll admit --

6    Q    -- and you said there wouldn't be, correct?

7    A    I'll admit that was a lie. And I'll admit that a

8         lot of things in there that I said was a lie to

9         cover up. But now today I'm revealing the truth.

10   Q    You're revealing the truth today because a jury

11        found you guilty of felony murder and not capital

12        murder, and that's the reason you're changing your

13        story --

14             MR. CAPPS:  I'd like to object to that --

15             THE COURT:  Sustained.

16   A    It's not changing the story. It's the truth.

17             THE COURT:  I sustain the objection.

18             MR. CAPPS:  And I move to strike that if the

19        jury would disregard that.

20             THE COURT:  Ladies and gentlemen of the jury,

21        that is struck and you're not to consider that

22        when you come to weigh and consider the evidence

23        and to make up your verdict in this case.

24   Q    Let me ask you. In the statement you gave to

25        Sergeant Devane, you said that you did yardwork

1      that Saturday, correct?

2  A   Yes, I did.

3  Q   Was that the truth?

4  A   Yes, that was the truth.

5  Q   Well, you said you did yardwork all day, correct?

6  A   I did yardwork all day, not all day.

7  Q   You also said that your girlfriend came home from

8      work, correct?

9  A   Yes.  She did.

10  Q   That wasn't the truth, was it?

11  A   That was the truth.

12  Q   When did you leave Tallahassee to come to Dothan?

13  A   I left Tallahassee approximately about --

14     approximately about ten-thirty.

15  Q   In the morning?

16  A   No.  Afternoon.  P.M.

17  Q   Ten-thirty Tallahassee time would make it --

18  A   Nine-thirty.

19  Q   -- nine-thirty Alabama time, right?

20  A   Yes.

21  Q   So you got to Tallahassee to the Country Market

22     right at an hour and eleven minutes --

23  A   Approximately about forty-five minutes it took.

24  Q   Forty-five minutes is all it took you to come from

25     Tallahassee?

| | | |
|---|---|---|
| 1 | A | Approximately.  It's an hour drive -- |
| 2 | Q | Now, the weapon you had.  What kind of weapon was |
| 3 | | it? |
| 4 | A | It was a Tec-9. |
| 5 | Q | It's black, correct? |
| 6 | A | Yes. |
| 7 | Q | You were dressed in black, true? |
| 8 | A | Dark color. |
| 9 | Q | You had boots on, didn't you? |
| 10 | A | No. |
| 11 | Q | You had no boots? |
| 12 | A | No. |
| 13 | Q | Did the other guy -- |
| 14 | A | Tennis shoes. |
| 15 | Q | Did the other guy have on boots? |
| 16 | A | Yes, he did. |
| 17 | Q | So it's your testimony if there were boot prints |
| 18 | | found where the car was taken, that had to be his |
| 19 | | and not yours, correct? |
| 20 | A | I don't own any Hi-Tech boots.  As a matter of |
| 21 | | fact, I don't -- I don't own no boots except those |
| 22 | | shoes that you got in that bucket there. |
| 23 | Q | Well, those shoes in the bucket, are those boots? |
| 24 | A | They are boots.  They are not Hi-Techs. |
| 25 | Q | But the question is, it's your explanation that |

410

| | | |
|---|---|---|
| 1 | | the prints that were found where the car was |
| 2 | | taken, the Hi-Tech boot and prints, were your |
| 3 | | co-robber's and murderer's, right?  Is that true |
| 4 | | or not? |
| 5 | A | It had to be.  I wasn't present when the car was |
| 6 | | taken. |
| 7 | Q | Now, let me ask you something if I could.  When |
| 8 | | you left Tallahassee, were you at your |
| 9 | | girlfriend's house? |
| 10 | A | Yes. |
| 11 | Q | Where did the weapon come from?  Where you get -- |
| 12 | A | He had the weapon. |
| 13 | Q | He gave you the weapon? |
| 14 | A | He gave me the weapon.  I went inside the Winn |
| 15 | | Dixie establishment and purchased some items, and |
| 16 | | that's how I came across the bag. |
| 17 | Q | Winn Dixie in Florida? |
| 18 | A | Yes, sir. |
| 19 | Q | So you brought that bag to help hide the weapon, |
| 20 | | right? |
| 21 | A | To conceal it. |
| 22 | Q | Let me ask you, if I could.  He had a pistol? |
| 23 | A | Yes. |
| 24 | Q | What kind of pistol did he have? |
| 25 | A | It was a three eighty. |

1    Q    And he was dressed in dark clothing, correct?

2    A    Yes, he was.

3    Q    In fact, he had on a hat that had an X on it,

4         right?

5    A    No, he didn't.

6    Q    There was no hat with an X?

7    A    No.

8    Q    By either one of you?

9    A    No.

10   Q    Were you wearing a hat?

11   A    Yes, I was.

12   Q    Did you have a mustache then?

13   A    Mustache?

14   Q    Yes.

15   A    Yes.

16   Q    Now, let me ask you something, if I could.  You

17        get to the IGA -- the Country Market here I'm

18        talking about.

19   A    Right.

20   Q    You come inside.  You've got the weapon, right?

21   A    Yes.

22   Q    The weapon was loaded, wasn't it?

23   A    Yes, it was.

24   Q    In fact, you took a loaded weapon, an automatic

25        weapon into a store where you knew there were no

1  police officers, right?

2 A I didn't know that.

3 Q You didn't know there was any security, did you?

4 A I didn't know that.

5 Q Did you believe customers had guns?

6 A I didn't know.

7 Q But you took a loaded weapon inside?

8 A Yes, I did.

9 Q Why did you take the weapon inside that was

10 loaded?

11 A It was a robbery.

12 Q And during a robbery -- what can happen during a

13 robbery?  Can somebody get killed or shot?  They

14 can, can't they?

15 A Yes.  But it wasn't my intention --

16 Q Somebody got killed, didn't they?

17 A Somebody -- somebody deprived me of control.

18 Q Okay.  Let's talk about that.  Deprived you of

19 your control.  You were six foot a hundred and

20 ninety pounds then, weren't you?

21 A Yes.

22 Q Pretty strong, right?

23 A Yes.

24 Q Now, you're saying Michael Scott deprived you of

25 your control, correct?

| | | |
|---|---|---|
| 1 | A | He caught me offguard by hitting me in the face. |
| 2 | Q | Made you mad, didn't it? |
| 3 | A | No, not really. |
| 4 | Q | Then why did you pull the trigger? |
| 5 | A | I didn't pull the trigger.  Mr. Scott pulled the |
| 6 | | bag and the gun went off. |
| 7 | Q | Where's the weapon now? |
| 8 | A | I don't know. |
| 9 | Q | What did you do with the weapon? |
| 10 | A | I gave it back to him. |
| 11 | Q | And my question is, you're telling the jury this |
| 12 | | automatic weapon that if you touch the barrel it |
| 13 | | goes off automatically, right? |
| 14 | A | If you pull it with someone's finger on the |
| 15 | | trigger. |
| 16 | Q | Tell this jury whose finger was on the trigger |
| 17 | | when Michael Scott got shot.  It was yours, wasn't |
| 18 | | it? |
| 19 | A | My finger was on the trigger, and it was on the |
| 20 | | trigger unintentionally.  I was trying to gain my |
| 21 | | control. |
| 22 | Q | Hold your hand up for me, please. |
| 23 | A | (Complied.) |
| 24 | Q | Now squeeze your fingers, okay. |
| 25 | A | (Complied.) |

1    Q    Do your trigger finger like this (indicating).

2    A    (Complied.)

3    Q    Now, tell me what part of your body told you to

4         move that finger and squeeze it.  What part of

5         your body?

6    A    No part.

7    Q    Your brain told you, didn't it?

8    A    I didn't squeeze the trigger.  The gun was pulled.

9    Q    How did the gun go off?

10   A    The gun was pulled.

11   Q    It's not your testimony, is it, that Michael Scott

12        pulled the trigger and made it go of?  That's not

13        what --

14   A    Michael Scott pulled the gun and it went off.

15   Q    Was the gun in the bag?

16   A    Yes, it was.  That's how the hole got in the bag.

17   Q    Did he grab the trigger is the question?

18   A    He grabbed the bag.  He grabbed the barrel of the

19        gun.

20   Q    Tell me about the bag.  It was bigger than the

21        trigger, right?  That's fair to say, isn't it?

22        The bag is bigger than where the trigger housing

23        is, correct?  The bag is bigger, isn't it?

24   A    What do you --

25   Q    I'm asking you is that paper bag bigger than the

```
1        gun?

2    A   Yes.

3    Q   Okay.  Is it bigger than where the trigger was

4        where you had the finger, yes or no?

5    A   Yes, it was.

6    Q   So you're telling the ladies and gentlemen of the

7        jury this bag that Michael Scott pulled the

8        trigger?  You're not saying that, are you?

9    A   I'm saying Mr. Scott grabbed the bag and pulled

10       it.

11   Q   Okay.

12   A   And that's how the gun went off.

13   Q   Okay.  Well, let me ask you something.  When you

14       went in the store when you first went in, did you

15       have your finger on the trigger?

16   A   No, I didn't.

17   Q   When did you put your finger on the trigger?  What

18       point in time?

19   A   When I tried to pull the gun back from Mr. Scott.

20   Q   It was after he struck you, right?

21   A   Right.

22   Q   You were looking for the manager, weren't you?

23   A   No, I wasn't --

24   Q   To get the money?

25   A   -- looking for the manager.
```

```
1    Q    You didn't go to get money?

2    A    Yes.

3    Q    Had you-all looked at the place before, cased it,

4         to see what kind of people were going in or out?

5    A    In wasn't no you-all.  I wasn't in the picture

6         from the beginning.

7    Q    You're saying you weren't in the picture.  Tell

8         these twelve people who went in the store with the

9         automatic weapon to help do a robbery.  Who were

10        the people?  Tell me.  Give me the names.

11   A    I didn't case the store out.  That's what I'm

12        telling you.

13   Q    Tell me the names of the people who went in the

14        door to commit the robbery.  Tell these twelve

15        people.  One of them is you, isn't it, Mr. McCray?

16   A    Yes, it is.

17   Q    And the other one is who?

18   A    Ruffal Weston.

19   Q    And Michael Scott wasn't involved in the robbery,

20        was he?

21   A    He wasn't involved in the robbery, but he involved

22        himself when he came over and initiated the

23        blow --

24   Q    And let me ask you this --

25   A    -- to the face.
```

1   Q   -- you're telling these twelve people this man

2       that's down there with his wife, someone who lives

3       in Houston County saw you committing a robbery and

4       he tried to stop you and it's his fault?  Is that

5       what you're telling these jurors?

6   A   I'm saying it's no one's fault.  It was an

7       accident.

8   Q   It was an accident.  Who loaded the gun?  You did,

9       didn't you?

10  A   No, I didn't load it.

11  Q   Did you check to see --

12  A   I was already loaded.

13  Q   -- if it was loaded?

14  A   No, I didn't.

15  Q   Did you check to see?

16  A   No, I didn't.

17  Q   So you're telling the jury you went in to do a

18      robbery with a gun you didn't even think was

19      loaded?  You're not saying that, are you?

20  A   I didn't check to see was it loaded.

21  Q   So you went in to commit a robbery with an unarmed

22      weapon you didn't know had bullets in it, right?

23      That's what you're saying?

24  A   Well, I saw the club handle so I assumed it was

25      loaded.

1    Q    Let me ask you something.  After you came out of

2         the office where the safe was and you couldn't get

3         any money from Ms. Shelton or Walter Sheffield,

4         they told you the only one that could get into the

5         safe was the manager, right?

6    A    Right.

7    Q    Now, you tell the ladies and gentlemen of the

8         jury, the minute you walked through the door of

9         the office, is there not -- is there not a rail

10        that went down the side and the cash registers

11        over here (indicating)?  In other words, an aisle

12        you could walk right down?  There was, wasn't it?

13        True?

14   A    Yes.

15   Q    Tell this jury, then, when you came out of the

16        office if you didn't want any money, you had the

17        weapon, right?

18   A    After I couldn't get any money, I was fixing to

19        leave.

20   Q    Well, I want to ask you about that.  Tell the

21        jury, Mr. McCray, when you went through the door

22        and you didn't have any money, Mr. Scott didn't

23        jump on you, you could have walked on by and left,

24        couldn't you?

25   A    Mr. Scott after he checked out from the register,

| | | |
|---|---|---|
| 1 | | Mr. Scott got directly in my path.  I went to |
| 2 | | brace Mr. Scott to push him aside to walk by him. |
| 3 | Q | You demonstrated, right? |
| 4 | A | Right. |
| 5 | Q | And the gun was down here (indicating) like you |
| 6 | | said? |
| 7 | A | The gun was in the my right hand. |
| 8 | Q | And it was down? |
| 9 | A | It was in my right hand. |
| 10 | Q | He was above you, correct? |
| 11 | A | Right.  When he hit me -- the way I demonstrated |
| 12 | | just then. |
| 13 | Q | Just like this, correct? |
| 14 | A | Right.  I spent around. |
| 15 | Q | And you went down -- |
| 16 | A | And he grabbed it. |
| 17 | Q | And -- |
| 18 | A | Right. |
| 19 | Q | Okay. |
| 20 | A | And he attacked me again.  And he grabbed the gun. |
| 21 | Q | He attacked you? |
| 22 | A | Again. |
| 23 | Q | Now, tell the jury from the time when he hit you, |
| 24 | | did the gun go off right away? |
| 25 | A | No.  The gun went off when he snatched it. |

| | | |
|---|---|---|
| 1 | Q | When he attacked you? |
| 2 | A | When he snatched the gun. |
| 3 | Q | Now, my question to you is -- and you're sure this |
| 4 | | is the position, you demonstrated you were down, |
| 5 | | was like this, the bag, and he was above you right |
| 6 | | here (indicating), right?  Is that fair? |
| 7 | A | He wasn't standing straight up. |
| 8 | Q | How was he standing? |
| 9 | A | May I demonstrate? |
| 10 | Q | Yes, sir. |
| 11 | | MR. VALESKA:  With the Court's permission. |
| 12 | | THE DEFENDANT:  With the Court's permission, |
| 13 | | may I step down? |
| 14 | Q | Just stand right there will be fine.  Just stand |
| 15 | | up if you can.  Slide the chair, but I think it |
| 16 | | will go back.  Okay. |
| 17 | A | (Complied.) |
| 18 | Q | You're Michael Scott? |
| 19 | A | Right. |
| 20 | | (Demonstrating.)  When I went to -- he was in |
| 21 | | the aisle.  He stood in the aisle waiting just |
| 22 | | like this with the package in his hand. |
| 23 | Q | Okay. |
| 24 | A | When I approached Mr. Scott, Mr. Scott like hit me |
| 25 | | with his left hand -- |

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | A | -- in the face.  When he hit me, I stumbled back |
| 3 | | as such. |
| 4 | Q | Went down like that? |
| 5 | A | Went back like this. |
| 6 | Q | Okay. |
| 7 | A | Before I can gain may proposion (phonetic) again, |
| 8 | | Mr. Scott was on me again. |
| 9 | Q | Okay.  Hold your hand just like you had the gun, |
| 10 | | if you would. |
| 11 | A | (Complied.) |
| 12 | Q | And I'm Mr. Scott and you've got the bag.  Show me |
| 13 | | how he grabbed it. |
| 14 | A | Let me use that -- |
| 15 | | THE COURT:  Yeah.  That will be all right. |
| 16 | | MR. VALESKA:  Can he step down? |
| 17 | | THE COURT:  Uh-huh. |
| 18 | Q | Step down right over here in front of the jury. |
| 19 | A | (Complied.) |
| 20 | Q | Just use this, Mr. McCray. |
| 21 | A | Let's just use this for -- |
| 22 | Q | Okay.  I'm Michael Scott, and I'm standing there. |
| 23 | | It's your testimony he's got something in his hand |
| 24 | | and you're approaching him.  Can you see the gun? |
| 25 | A | Could you see the gun? |

| | | |
|---|---|---|
| 1 | Q | Could he see the gun? |
| 2 | A | The handle.  I had the handle in the bag just like |
| 3 | | this. |
| 4 | Q | All right.  Come to me.  Show me what he does. |
| 5 | A | I walks by him.  Come over. |
| 6 | Q | So I step over here? |
| 7 | A | Right there. |
| 8 | Q | Okay. |
| 9 | A | I walks by him like this. |
| 10 | Q | All right. |
| 11 | A | He wait until I got up on him. |
| 12 | Q | Okay. |
| 13 | A | And he hit me in the face -- bam. |
| 14 | Q | He hit you? |
| 15 | A | Yes.  And I fell back like this. |
| 16 | Q | Okay. |
| 17 | A | Okay.  But -- |
| 18 | Q | And he attacks the bag? |
| 19 | A | He drops it down. |
| 20 | Q | Drop it? |
| 21 | A | Drop the item. |
| 22 | Q | Okay. |
| 23 | A | And before I can gain my proposion, before I can |
| 24 | | gain my proposion again -- |
| 25 | Q | Tell me what to do. |

| 1 | A | Like this right here -- just grab the bag. |
|---|---|---|
| 2 | Q | Grab the bag? |
| 3 | A | Yeah.  And he pulled it.  And when he pulled it, I |
| 4 |   | pulled the gun out.  Bam. |
| 5 | Q | Okay.  Get back on the stand for me. |
| 6 | A | (Complied.) |
| 7 | Q | Shot right here (indicating); is that right? |
| 8 | A | Yes. |
| 9 | Q | And you're down? |
| 10 | A | I'm down at an angle. |
| 11 | Q | Gun was lower? |
| 12 | A | Yeah. |
| 13 | Q | You heard Dr. Paredes testify, didn't you? |
| 14 | A | Yes, I did. |
| 15 | Q | That the bullet went through the chin, went |
| 16 |   | straight through, went through the back, got the |
| 17 |   | spinal column and came through the upper back, |
| 18 |   | correct? |
| 19 | A | Right. |
| 20 | Q | Well, let me ask you.  Explain to the jury then if |
| 21 |   | he's in this position shooting down why the |
| 22 |   | bullet, the projectile, didn't blow out the top of |
| 23 |   | his skull in that angle like you just |
| 24 |   | demonstrated.  Why -- |
| 25 | A | Because -- |

1    Q    Why didn't --

2    A    When you heard -- when the doctor testified it

3         said it hit a bone, a hard bone, and it took

4         another path.

5    Q    And he said it was a straight back, correct?

6    A    Right.  It went back.

7    Q    But your angle -- once again I ask you, your

8         demonstration should have showed it went through

9         the chin and went up through the roof of the mouth

10        and back part --

11   A    No.  He said once it hit the chin it took a

12        different path.

13   Q    That's what you say.  I'm just asking.  From your

14        demonstration, is it not true I asked you and you

15        said, no, it hit a bone and went straight, right?

16        That's what you said?

17   A    You're losing me there.  It's not making any sense

18        what you're saying.

19   Q    I'm asking you on your demonstration, I ask is it

20        not true had he been shot in the chain like you

21        said it would have blown out the top of his head

22        and not back here --

23   A    I don't know.  I'm not an expert.

24   Q    I understand.  But from what you just

25        demonstrated.

1         Now, let me ask you this, if I could.  Is it

2     your testimony the other man, what was his name

3     again?

4   A   Rufus.

5   Q   Rufus?

6   A   Weston or Wesley.

7   Q   Weston or Wesley?

8   A   Right.

9   Q   That he fired a couple of times, right?

10   A   Yes, he did.

11   Q   You knew his gun was loaded, right?

12   A   Not really.

13   Q   Well, let me ask you something.  When you went in

14     to do the robbery, what if someone said we're not

15     going to give you any money and they pulled a gun

16     to shoot you, were you going to shoot back?

17   A   That's something you have to deal with when it

18     happened.  I can't say.

19   Q   You decided to go in and help do the robbery,

20     right?

21   A   Right.

22   Q   You took a loaded weapon, right?

23   A   Was believed to at the time.

24   Q   You looked at the clip?  If I'm wrong, tell me.

25   A   Right.

1   Q   Saw the bullets, so you knew the weapon could

2        fire, correct?  You knew there were people in

3        there, right?

4   A   Yes.

5   Q   Women?

6   A   I don't know.

7   Q   Well, did you see women, Mr. McCray?

8   A   The only woman I saw -- really saw in view was Ms.

9        Scott and Ms. Debra Shelton.

10   Q   So there were women, right?

11   A   Yes.

12   Q   Men in there, right?

13   A   Yes.

14   Q   Children in there also?

15   A   I didn't see any kids.

16   Q   Well, let me ask you something.  When you fired

17        and got Mr. Scott --

18   A   I didn't fire.  Mr. Scott pulled the gun.

19   Q   Who pulled the trigger?

20   A   I had my hand on the trigger.

21   Q   Well, let me ask you something.  If you didn't

22        want to shoot Mr. Scott, didn't intend to shoot

23        him or hurt him in any way, why did you have your

24        hand on the trigger, then?

25   A   Because I was trying to pull the gun back.

1    Q    Well, let's talk about the gun.  The gun has a

2         long type handle, doesn't it?  It does, doesn't

3         it?

4    A    What do you mean?

5    Q    It has a long type handle on the back to hold it,

6         correct?  The Tec-9.

7    A    I don't know what position my hand was in on the

8         gun at the time.

9    Q    So is the question, you can answer, it does have a

10        long handle on the back?  It does, does it not?

11        Yes or no?

12   A    I don't know.

13   Q    Let me ask you something.  How did you hold the

14        weapon, then?  Did you just hold the trigger part

15        and nothing else on the weapon?  Is that what you

16        did?

17   A    I had my hand on the whole gun.

18   Q    You had your hand on the gun to help control the

19        gun, didn't you?

20   A    Yes.

21   Q    Now, let me ask you this, if I could.  It's your

22        testimony you didn't have your finger on the

23        trigger in the bag until he reached out and

24        grabbed it; is that right?

25   A    After I got hit and Mr. Scott tried to pull the

1        gun away from me.  I just pulled the gun back.

2   Q   Well, we don't have the weapon to test, do we?  We

3        can't see if it could have gone off like that

4        according to being grabbed from the barrel because

5        you-all --

6   A   Any gun is grabbed from the barrel --

7   Q   -- did away with it, didn't you?

8   A   -- when pulled.

9   Q   Any gun will go off when if you pull the barrel?

10       That's what you're telling these twelve people?

11       Is that what you just said?  Yes or no?

12   A   If you grab the barrel and pull a gun and

13       someone's finger is on trigger and the gun is

14       cocked, quite naturally it will go off.

15   Q   The question was, did you tell the jury if you

16       pull any barrel a gun will go off?  Yes or no?

17       Did you say that?

18   A   You're not making any sense.

19   Q   Can you answer the question?  Did you not --

20   A   What are you saying?

21   Q   If you pull a barrel of any gun it will go off,

22       yes or no?

23   A   If you pull a barrel on that in particular gun

24       and the individual's finger is on the trigger, it

25       will go off.

1   Q   And who did that in this courtroom, Mr. McCray?

2       It was you, correct?

3   A   Me and Mr. Scott.

4   Q   Tell the ladies and gentlemen of the jury how you

5       cock or load a Tec-9 to put a live round in the

6       chamber so you can start firing.  How do you do

7       that?

8   A   I don't know.  I guess you just push the magazine

9       up.

10   Q   When you push the magazine and then the live

11       bullets -- the cartridges with the bullets in them

12       go into the chamber where you can start the

13       firing, right?

14   A   Yes.

15   Q   True?  What makes that weapon fire?  What one

16       thing?  Tell the jury what makes that weapon

17       fire.  What do you do to it?  One thing.

18   A   You have to pull it.

19   Q   Pull what part?

20   A   Or drop it.  The automatic weapon --

21   Q   Pull what part of the weapon to make it fire?

22   A   The trigger.  Or drop the weapon.  An automatic

23       weapon will go off if it's dropped.

24   Q   We don't have this Tec-9 to test it to see if

25       that's true, though, do we, Mr. McCray?  Correct?

| | | |
|---|---|---|
| 1 | A | Common sense will tell you that. |
| 2 | Q | Common sense you and your partner got rid of the |
| 3 | | weapons, right?   True? |
| 4 | A | I didn't get rid of no weapon.   I gave it back to |
| 5 | | him. |
| 6 | Q | Why didn't you keep it? |
| 7 | A | Because it wasn't mine. |
| 8 | Q | You didn't want them to come and search your |
| 9 | | residence and find it, correct? |
| 10 | A | It wasn't my weapon. |
| 11 | Q | What did you do with your clothes that you wore |
| 12 | | that night? |
| 13 | A | I don't know.   I guess at home. |
| 14 | Q | Did you get rid of them? |
| 15 | A | No. |
| 16 | Q | You kept all of them? |
| 17 | A | Yes. |
| 18 | Q | At your girlfriend's house? |
| 19 | A | Yes. |
| 20 | Q | They came and searched Sharon Westbury's where you |
| 21 | | were living, didn't they?   You know that. |
| 22 | A | Yes, they did. |
| 23 | Q | And they didn't find any of the clothes, did they? |
| 24 | A | No. |
| 25 | Q | Now, let me ask you if I could.   What did you do |

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | with the car after you left the Country Market --            |
| 2  |   | the Monte Carlo?                                             |
| 3  | A | As we were leaving the Country Market, we made a             |
| 4  |   | left out of the parking lot, went up to I think it          |
| 5  |   | was some tracks or something there on Lafayette --          |
| 6  |   | or somewhere around in there.  And the car was              |
| 7  |   | left in that area.                                           |
| 8  | Q | You followed the Monte Carlo is what you said --            |
| 9  | A | Yes, I did.                                                   |
| 10 | Q | And in your girlfriend's red car?                           |
| 11 | A | Yes.                                                         |
| 12 | Q | Did that car have a Florida tag on it?                      |
| 13 | A | Which car?                                                   |
| 14 | Q | Your girlfriend.                                            |
| 15 | A | Yes.                                                         |
| 16 | Q | And let me ask you.  Where did you park to leave            |
| 17 |   | the red car when you rode the Monte Carlo when you          |
| 18 |   | said -- you drove up to the Country Market in the           |
| 19 |   | Monte Carlo, right?                                          |
| 20 | A | Yes.                                                         |
| 21 | Q | Where did you leave the red car?                            |
| 22 | A | The red car was left in the same place that the             |
| 23 |   | Monte Carlo was left.                                        |
| 24 | Q | You saw the picture, did you not, where the Monte           |
| 25 |   | Carlo was taken and it was two sets of tracks from          |

```
 1        where it was taken?  You saw that picture, didn't

 2        you?

 3   A    No, I didn't.

 4   Q    Now, let me ask you, if I could.  You left there

 5        and went back to where when you left the Country

 6        Market?  Drove back in your girlfriend's red car?

 7        You and --

 8   A    Yes.  The both of us.

 9   Q    So you helped them get away, right?  You drove the

10        car --

11   A    Helped them get away -- we drove back to Florida.

12   Q    And you got back to Florida and you went to

13        where?  You went to Sharon's house?

14   A    Yes.

15   Q    Why did he go?

16   A    I dropped him off at home -- well, to a friend's

17        house or wherever.

18   Q    So it's true, Mr. McCray, Debra Shelton, Jeff

19        Clark, Keithland Reeves, and Walter Sheffield,

20        every one of those witnesses that was at the IGA

21        when the robbery and the homicide occurred -- the

22        murder --

23   A    You say what?

24   Q    -- it's true they all identified you correctly,

25        right?
```

```
 1    A    Yes.

 2    Q    No doubt about it, a hundred percent, right?

 3    A    Yes.

 4    Q    And it's true the fingerprints that were found on

 5         the Winn Dixie bag, they are your fingerprints

 6         because you brought the bag, true?

 7    A    Yes.

 8    Q    And it's true that your fingerprints were on the

 9         map -- Alabama map, right?

10    A    Right.

11    Q    Did you not know how to get to Dothan?

12    A    Yes, I do.  He was showing me.  Those unidentified

13         prints belong to Mr. Rufus Wesley.

14    Q    Now, if I'm mistaken, you said he was showing you

15         the map, right?  That's what you said, isn't it?

16    A    Let me --

17    Q    No.  Is that what you said?  Yes or no?

18    A    Let me tell you.  I don't remember.  But let me

19         tell you this right here.

20    Q    Mr. McCray, would you --

21    A    Mr. Rufus --

22              MR. VALESKA:  Judge, would you ask him to

23         answer my question?

24              THE COURT:  Let him ask his question.

25              THE DEFENDANT:  Okay.
```

```
 1   Q   My question is, you just told the jury that he was
 2       showing you the map.  That's what you said?
 3   A   We both viewed the map.
 4   Q   Well, let me ask you something.  How did you both
 5       view the map if you were in two different cars
 6       coming up here at one time?
 7   A   We viewed the map -- we viewed the map in the
 8       parking lot of the Winn Dixie.
 9   Q   Is that how to get to Dothan?
10   A   He was showing me where the spot was.  I already
11       knew how to get to Dothan.
12   Q   Now, you say the spot.  You mean where Dothan was?
13   A   Yes.  No.
14   Q   That's right.  Because -- which was it?
15   A   You double questioning me.
16   Q   Let me rephrase it.  He was showing you the map
17       looking for what?
18   A   For Dothan.
19   Q   And this is the map, correct?  Let me take it up
20       here and let you take a look at it.  That side and
21       see the front side?
22   A   Yeah.  Yes, this is the map.
23   Q   And correct me if I'm wrong, this map shows
24       Alabama, shows just a tad bit of Mississippi in
25       here, and a portion in Florida, but it doesn't
```

```
 1          show Tallahassee, does it?

 2     A    No.

 3     Q    In fact, it doesn't show any roads, does it, from

 4          Tallahassee to Dothan?  It doesn't, does it?

 5     A    It doesn't show Tallahassee in there, but I

 6          already know the way to Dothan.

 7     Q    Why did you have to look at the map if you already

 8          knew the way?

 9     A    He was showing me where it was.

10     Q    When you were looking at the map with him, Doster,

11          to help find some ways to come back home --

12     A    I wasn't looking at the map with Doster.  It

13          wasn't Doster.

14     Q    Well, there was an Alabama tag on there, right?

15     A    Right.

16               Like I told you.  When --

17     Q    And when you --

18     A    The car was already in the picture before I came

19          in there.

20     Q    You didn't ask where the car came from?

21     A    No, I didn't.  I saw the Alabama tag on it.

22     Q    And you didn't ask where the car came from is what

23          you said?  No, right?  And you saw the Alabama

24          tag, correct?

25     A    Yes.
```

```
 1    Q    And your friend didn't live in Alabama, did he?

 2    A    No, he didn't.

 3    Q    He lived in Florida with you, right?

 4    A    Right.

 5    Q    And Doster lived in Florida, right?

 6    A    Right.

 7    Q    Now, let's go back if we -- where you heard --

 8         Dwayne Pearson said that you were in Cairo,

 9         Georgia, right?

10    A    Right.

11    Q    You weren't with your friend then, the one that

12         you did -- you say you did the robbery with, were

13         you?

14    A    No.

15    Q    And you weren't with Doster then, were you?

16    A    No.

17    Q    Who were you with?

18    A    I was with a guy by the name of Darryl Sutton.

19    Q    And you were driving a Cadillac then, right?

20    A    Yes, I was.

21    Q    Was it yours?

22    A    No, it wasn't.

23    Q    Who's was --

24    A    It was Mr. Sutton.

25    Q    Mr. Sutton, but you were driving it?
```

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Okay. |
| 3 | A | We was coming through on the main street. |
| 4 | Q | But you didn't live in Cairo either, did you? |
| 5 | A | No. |
| 6 | Q | You had no friends in Cairo, did you? |
| 7 | A | Yes, I did. |
| 8 | Q | Who did you have as a friend in Cairo? |
| 9 | A | A girl. |
| 10 | Q | The projectiles, the casings that came out of the |
| 11 | | weapon you fired, okay, did you touch that when it |
| 12 | | was loaded?  You didn't, did you? |
| 13 | A | I told you I didn't. |
| 14 | Q | So there couldn't be any of your fingerprints on |
| 15 | | that, right? |
| 16 | A | No. |
| 17 | Q | Now, your partner, Weston that shot twice, did he |
| 18 | | have a revolver? |
| 19 | A | Yes. |
| 20 | Q | And he fired how many times? |
| 21 | A | Twice. |
| 22 | Q | He fired two times so you could help get out of |
| 23 | | the store, right? |
| 24 | A | No.  He fired because it was panic in the store. |
| 25 | Q | Was there panic after you shot Michael Scott? |

| | | |
|---|---|---|
| 1 | A | Yes.  After Mr. Scott pulled the weapon. |
| 2 | Q | And no one else attacked you, did they, Mr. McCray? |
| 3 | A | No. |
| 4 | Q | No one else tried to stop you in any manner or |
| 5 | | fashion, did they? |
| 6 | A | Neither did I attack anyone. |
| 7 | Q | Now, Keithland Reeves said that you bumped into |
| 8 | | him, that's true, correct? |
| 9 | A | That's true. |
| 10 | Q | You showed him the weapon, right? |
| 11 | A | No, I didn't show him the weapon. |
| 12 | Q | You didn't show him the weapon in the bag? |
| 13 | A | No.  He saw the individual at the door with the |
| 14 | | weapon. |
| 15 | Q | But you rode in the Monte Carlo from where you |
| 16 | | left the red car to the Country Market, right? |
| 17 | A | Yes. |
| 18 | Q | And you knew it wasn't his car, right? |
| 19 | A | Yes. |
| 20 | Q | Did you drive it off or did he drive it from the |
| 21 | | Country -- |
| 22 | A | He drove it. |
| 23 | Q | And you jumped in it, right? |
| 24 | A | Right. |
| 25 | Q | Knew it had an Alabama tag, right? |

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Then you drove to over there by Jackson Gas or the |
| 3 | | street where you left it and jumped in your car |
| 4 | | and drove off, right? |
| 5 | A | I don't know where Jackson Gas is. |
| 6 | Q | The address or the street you said you went to, |
| 7 | | what was it?  You gave me a street.  You said |
| 8 | | Lafayette? |
| 9 | A | Down -- yeah.  I remember Lafayette. |
| 10 | Q | You-all wiped the car clean to make sure there |
| 11 | | were no prints in it, too, didn't you? |
| 12 | A | I never touched the car physically. |
| 13 | Q | Did your buddy wipe it in your presence? |
| 14 | A | No. |
| 15 | Q | There was a paper towel on the passenger's side. |
| 16 | | In other words, you didn't drive so is that the |
| 17 | | side you got out on, Mr. McCray? |
| 18 | A | Yes, it was. |
| 19 | | MR. VALESKA:  That's all.  Thank you. |
| 20 | | THE COURT:  Mr. Capps, who do you have? |
| 21 | | MR. CAPPS:  Just one moment, please. |
| 22 | | MR. CAPPS:  Your Honor, we rest at this |
| 23 | | time. |
| 24 | | MR. VALESKA:  We rest also, Your Honor. |
| 25 | | THE COURT:  No rebuttal? |

1    MR. VALESKA:  No, sir.

2    THE COURT:  I'm going to let the jury go to

3 the jury room.  And, ladies and gentlemen of the

4 jury, while you're out of the jury box and back in

5 the jury room, recall the instructions I've given

6 you about not discussing the case among

7 yourselves or with anyone else.  We'll call for

8 you shortly.  Thank you very much.

9     (Jury not present.)

10   THE COURT:  Let the Record show this is out

11 of the presence and hearing of the trial jury.

12    And I don't know if you have -- if we

13 need to take up anything else before we argue the

14 case to the jury.

15   MR. CAPPS:  Once again, I would ask the Court

16 to charge with the charge of manslaughter.

17   THE COURT:  Pardon me?

18   MR. CAPPS:  Once again, I would ask the Court

19 to charge the jury with the charge of manslaughter

20 in this matter.

21   THE COURT:  Well, I just don't think it's

22 applicable.  I don't think it's a lesser included

23 offense of felony murder, and I'm going to deny

24 that motion.

25    You gentlemen ready to argue your case?

1    I know it's sort of sudden.

2         MR. VALESKA:  I'm ready.  If I can just have

3    five minutes to go to the restroom.  I don't know

4    what they need.

5         THE COURT:  Is that going to be sufficient

6    for you?

7         MR. CAPPS:  That will be fine, Judge.

8         THE COURT:  All right.

9              (Off the Record.)

10         THE COURT:  Gentlemen, are you ready to argue

11    your cases to the jury?

12         MR. VALESKA:  I'm ready, Your Honor.

13         MR. CAPPS:  Yes, sir.

14         THE COURT:  Bring the jury.

15              (Jury present.)

16         THE COURT:  Who is going to close for the

17    State?

18         MR. VALESKA:  I am, Your Honor.

19         THE COURT:  You may argue your case to the

20    jury.

21         MR. VALESKA:  Frank Edwards told you the blue

22    Monte Carlo they had cleaned it, they had soaked

23    it, cleaned it out.  There was no road map in

24    there.  It was his property belonging to him.  The

25    Monte Carlo.  He didn't give Willie C. McCray or

1    Decory Doster this Rufus Weston or Wesley that I

2    want you to remember that he gets on the stand,

3    seven years later, and now wants to tell a jury

4    somebody that I went to school with for twelve

5    years, twelve years, but he can't even get the

6    name right.  Whose got an interest in this case?

7    Whose got a reason to intentionally to lie for

8    what motive?  Willie C. McCray does.  Edwards said

9    the vehicle was stolen.  The radio was taken out

10   of it.  There was duct tape on it.  The inside

11   column was broken with a screwdriver.  It's used

12   to commit a felony murder of a robbery at the

13   Country Market where Michael Scott lost his life.

14        What occurs is they steal the car.  For

15   what purpose?  You can draw inferences.  Because I

16   submit to you -- remember the tracks that Etress

17   told you that he saw.  He told you it rained

18   Friday night.  It was his recollection.  There

19   were two sets of tracks.  You've got the pictures,

20   and you will see.  Red-looking tracks and brownish

21   another color tracks.  They are all set in the

22   picture.  They stick out like a sore thumb.  Plus

23   you see a boot print.  A boot print.  That's

24   important because if you're going to commit a

25   robbery and you want a get-away car, you don't

want to be caught, you don't want to drive a
vehicle that they can trace or find or check or to
see a tag and trace back to you, you use a stolen
car.  That's what they did.

And you know from the evidence, ladies
and gentlemen, the evidence is that you heard from
this witness stand that the prints that were found
on the map, the prints that were found on the bag
belong to Willie C. McCray.  Now, Doster's prints
are also on the map.  What did McCray say about
Doster, his friend?  He was supposed to be there,
but he didn't show up.  Well, use your common
sense.

It takes two vehicles to get from
Tallahassee to Dothan, Alabama.  But the vehicle
was taken sometime after nine-thirty on Friday
night and six-thirty Saturday morning it was
taken.  Where it was in the meantime, I cannot
tell you.  McCray gets on the stand and says he
drove it back to Tallahassee and he picked me up
and that I left there and I come out and see this
Monte Carlo -- no part of the Monte Carlo.  Do you
know why?  Because it goes with the felony murder
a theft of property, another charge against Willie
C. McCray.  So he wants to disassociate himself

with the car theft and get up there and say, oh, I killed him, I didn't mean to kill him, he grabbed the bag.  And the evidence on the car is Doster and McCray.

Now could there have been a third person?  Could have been.  Could have been.  Don't know.  But you know from the testimony the Monte Carlo pulled up in front.  You know the State's witnesses saw it.  James Whitehurst said, I saw a General Motors car, it was dark, saw two black males get out of it, too far away, too dark, I couldn't identify them.  They went inside.  They came running back in.  I heard the backfire.  They got in the car and tore off and they went up in that direction.

You know, Jeff Clark said he was outside.  That he sees them come in with the bag, a Winn Dixie bag.  Once again, well, I got the Winn Dixie bag and I purchased some items in Tallahassee.

Why did Willie C. McCray come to Houston County?  To do what?  To commit a robbery.  Think about that.  A robbery.  He wants you to believe from testimony he gave that he brought a semi-automatic, a Tec-9 automatic weapon that he

1  didn't know for sure was loaded or armed so he
2  could protect himself. And then when I said, wait
3  a minute, you want these people to believe you
4  were coming to Houston County to do a robbery with
5  a gun you didn't even know if it was loaded.
6  Well, I did see a clip, that's why I knew. You
7  better believe he knew that. You better believe.
8         He was big, bad, and tough when he went
9  into that store dressed all in black with his
10 boots on with we submit to you Doster. Not this
11 other party. Doster. They go with their weapons
12 in a grocery store where mothers and fathers,
13 children, people are going buying groceries,
14 unarmed, no police, no security guards. They walk
15 in.

16        And Keithland Reeves walked in with his
17 father and he bumps into him and, he said, well,
18 yeah, he did brace me. I braced him. Keithland
19 said he told you he showed him the weapon.
20 Keithland said, hey, man, when he bumped into me
21 he showed him the weapon with the bag. He's got
22 the instrument of death right then and there with
23 him. He's got it.

24        Michael Scott was a walking dead man I
25 told you from the minute he got out of his car

COURT OF CRIMINAL APPEALS NO. _____

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

## FROM

CIRCUIT COURT OF ____HOUSTON____ COUNTY, ALABAMA

CIRCUIT COURT NO. ____CC-94-791____ Volume IV

CIRCUIT JUDGE ____Jerry White____

Type of Conviction / Order Appealed From: ____MURDER____

Sentence Imposed: ____99 years, $20,000.00 Fine, $50.00 Victim Compensation and Restitution____

Defendant Indigent: [X] YES  [ ] NO

Willie C. McCray                                              NAME OF APPELLANT

Honorable Joe Lewis                    794-0759
(Appellant's Attorney)                 (Telephone No.)
P. O. Box 536
(Address)
Dothan,              Alabama            36302
(City)               (State)            (Zip Code)

## V.

STATE OF ALABAMA                                            NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)



1 with his wife to go into a grocery store -- I

2 never tried to hide it -- to buy some beer.  He

3 came in.  Whitehurst was in the vehicle.

4 Unbeknownst to him what faith had planned for him

5 and what Willie C. McCray was going too to do to

6 him.

7    Jeff goes in the store.  He goes right.

8 He lost sight of McCray because he went back to

9 meat, whatever, in case there was an exchange.  He

10 goes back and comes around and comes to the front

11 and looks over at the officer and what does he

12 see?  The robbery is in process.

13    Remember, McCray comes in and he gets

14 Walter Sheffield.  Sheffield identified him.

15 Bang.  You know he did.  No doubt about it.  No

16 doubt in your mind.  Takes him over there to the

17 office where Debra is.  And what did he say?  He

18 wants you to believe this was an inside job, that

19 Jeff Clark, Dodson, Sheffield, these people were

20 involved in helping them commit this robbery.

21 Now, do you believe that in any manner or

22 fashion?  No way.  No way.

23    Jeff says he's back, he's watching the

24 front.  And Walter goes to the office.  There's --

25 Debra lets him in.  She doesn't see him.  He goes

1       in and Willie has got the gun.  And what does he

2       say?  I want to put on their heir or attitude and

3       whatever I was tough -- whatever.  You know, put

4       on a show.  You believe a lady would come back and

5       testify seven years later if she had been involved

6       in this robbery in any manner or fashion?  What

7       did she tell you?  She was praying.  She was

8       praying for her life.  That's all she could think

9       about.  Because there stands McCray with an

10      automatic weapon in the bag concealing it.  The

11      type of individual he is trying to hide it.  But

12      wanting the money.  I have no money.  I have no

13      keys.  I can't get in.  You got to get a manager.

14      Nothing.  Nothing in the world prevented McCray

15      from just walking out of that inner office, taking

16      his Tec-9 and leaving with his cohort, Doster, at

17      the door and getting away.  But he didn't want to

18      do that.  He was looking for what?  You know what

19      he was looking for.  Willie C. McCray was looking

20      for the money.  They wanted the money.  That's why

21      they came here.  That store was defenseless.  And

22      he's looking for a manager.  And Jeff is over

23      there watching.

24              And Michael Scott.  He's a hero.  He

25      didn't make the right choice.  Think about that.

1     What do you hear in today's times?  No one wants

2     to get involved.  Everybody wants to look the

3     other way.  I didn't see, hear, or know nothing.

4     I don't want to be involved.  Something could

5     happen to me.  Well, Michael paid the extreme

6     price.  His life.  It was the wrong choice.  But,

7     once again, he was a hero.  He tried to stop it.

8     He tried to do something.  It was a poor choice.

9     It cost him his life.

10         But I want you to remember this.  What

11     did McCray tell you?  How did he tell you it

12     occurred?  He demonstrated.  And I got a chance to

13     cross examine him.  Dr. Paredes testified and told

14     you.  Dr. Paredes never said it hit a bone in any

15     direction.  He said it went in here (indicating),

16     went through the back, got the larynx and went out

17     the upper back.  If it's like McCray demonstrated,

18     just like I asked him, it would have blown out the

19     back of the skull or the head or the neck of

20     Michael.  Michael struck him.  Hit him hard.

21     McCray had the weapon.  So what does he say?  It

22     was in the bag.  It was in the bag.

23         Well, you use your common sense.  You

24     know as well as I do what parts of your body tell

25     you other parts to do something.  You know what it

 1          is.  Your brain tells you.  And that brain is so

 2          fast.  I said, demonstrate how you take a finger,

 3          squeeze your finger and move your fingers.  What

 4          makes that move?  You know what it is.  Your brain

 5          tells you.  There's no other way around that.

 6          Well, he's got the bag with the weapon.  You use

 7          your common sense.  Did he have his finger on the

 8          trigger?  Did he have his finger on the Tec-9

 9          after Michael struck him?  What did he say?  Do

10          you remember what Keithland Reeves said?  How much

11          time elapsed from the time that Willie C. McCray

12          got struck until Michael got shot?  What did he

13          say?  You wrote it down.  I watched you.  Three to

14          five seconds.  Remember?  Count them off.  One

15          thousand one.  One thousand two.  One thousand

16          three.  One thousand four.  One thousand five.

17          What happened?  He struck McCray, and McCray got

18          mad that someone would have the audacity to

19          challenge his authority when he's doing a robbery

20          with a Tec-9, and it made him mad.  He didn't like

21          it.

22               Michael is standing there unarmed.  He

23          said, well, he grabbed the bag.  He grabbed the

24          bag.  He also said if you grab the barrel of a gun

25          it goes off.  He said that.  You heard him.  Guns

1       don't go off that way.  They don't go off that

2       way.  You have to do what to make a gun fire?

3       You've got to pull that trigger.  No doubt about

4       it.

5                   Where's the gun now?  Where's the

6       pistol?  Disposed of by who?  By them.  Once

7       again, he says the clothes, ah, my clothes, I

8       guess they were there when they came to search.

9       They weren't there.  We looked for them, couldn't

10      find them.

11                  McCray has got his finger on the

12      trigger.  Michael wasn't shot right away.  That's

13      not what occurred.  Keithland told you he hit him,

14      he spun around, he looked at him, five seconds

15      elapsed, and then he shot him.  And then he shot

16      him.  You never heard one shred of testimony

17      except from who, McCray, that one witness said

18      that Michael was grabbing, pulling on the bag, did

19      you?  Huh-uh.  Didn't happen like that.  Not one

20      witness told you that.  That Michael Scott ever

21      grabbed that bag in any manner or fashion.  They

22      didn't testify because that's not how it

23      happened.  That's not how it happened.

24                  And you saw the real Willie C. McCray

25      when you heard, what, good people?  You watched

1    him testify.  You observed his demeanor.  Somebody

2    deprived me of my control.  Think about those

3    words what Willie C. McCray said.  Someone

4    deprived me of my control.  In other words,

5    someone struck him, hit him, and he didn't like

6    it, and he loses control.  No.  Cool, calm, and

7    collected he gunned down an unarmed man that tried

8    to prevent a robbery.  Shot him in cold blood that

9    had no weapon, no way to defend himself.  Shot him

10   through his chin right there in front of his wife,

11   blew him into smithereens, because the man struck

12   him because he's doing a robbery in your

13   community.  A man that lived here, had every right

14   to be there.  And he comes up from Tallahassee.

15   Willie C. McCray was a dangerous person.  A

16   dangerous individual.  And you know that by the

17   plan that he and his cohorts planned.  They don't

18   do it down there where they live, do they?  Why

19   not?  You draw some inferences and use your common

20   sense.  How come?  How come Willie C. McCray

21   stopped in Cairo, Georgia?  I believe they call it

22   Cairo.  I said Cairo.  Think about that.

23            And what do they do?  They get his

24   prints.  Think about that.  Where do you live, Mr.

25   McCray.  I live in Tallahassee.  I do have some

452

1    friends in Cairo.  I do.  Use your own common

2    sense.  And what occurs?  You got GBI agents in

3    Georgia contacting who?  The Dothan Police

4    Department.  Why?  Why?  What do they do?  Robbery

5    occurs here, a killer, Michael is killed.  Use

6    your own common sense to draw inferences.  What

7    happens when something like that occurs?

8

9        McDougle, Melanie from KMX got on the

10   stand and testified and told you she heard Willie

11   C. McCray say, I wasn't wearing no shorts.  You

12   know the media covers things, correct?  Sure they

13   do.

14       And then the GBI agent is contacted and

15   the Dothan police and say, come to Georgia.  And

16   they come to Georgia.  And they get whose prints?

17   Willie C. McCray.  Why?  Why?  Out of the entire

18   United States of America and the southeast, Stan

19   Devane is getting the prints of who?  Willie C.

20   McCray from a GBI officer in Georgia because

21   there's no identification to the killing of

22   Michael and the robbery here at the Country Market

23   on that Saturday or Sunday, is there?  There's

24   not.  Evidence was left at the scene.  Good

25   evidence.  I told you about identification.  The

1    case and evidence, it's not perfect.  There's no

2    doubt.  Use your common sense, everyday life.  You

3    know that.  But you know in this case no doubt

4    about it.

5         The witnesses identified McCray.  And

6    you know from the testimony the witnesses did not

7    identify Doster.  They could not.  Why?  Because

8    he was at the door.  Everybody else was over here

9    with McCray where the shooting and the robbery is

10   occurring because Doster was at the door just like

11   Keithland said keeping people coming and out.  He

12   had a hat on.  I really couldn't see his face.

13   But he saw the gun.  They gets the prints off the

14   bag -- the Winn Dixie bag.  And they made a

15   mistake.  They panicked.  They panicked.  They

16   didn't get the money, and they now what?  They now

17   graduated up to what, good people?  You've got the

18   picture -- look at it -- of Michael with a hole in

19   him about that big (indicating) and his chin now

20   during the commission of a robbery a felony murder

21   occurs at this time.

22        They send the bag off.  They send the

23   screwdriver.  They get the bag.  They send the

24   map.  The car is wiped down completely.  Why is

25   that?  So they can't find any fingerprints.

1    But after this time there was a killing

2    in this case which you heard and there's a panic.

3    Now killed somebody that you see will occur.  He

4    did in this case.  We've got to get the heck out

5    of town, out of Dodge.  They got the get-away cars

6    parked a couple of blocks away to get out of that

7    car and get into another car that's not so

8    noticeable.  The police officers don't just stop

9    everybody up and down a highway.  What can you use

10   as an inference for the map?  Why did they need

11   the map?  They wanted to come the back roads.

12   They didn't want to go down the main area.  He

13   said, oh, we were looking at the map because where

14   we come.  Well, Mr. McCray, you lived in Dothan

15   before, you knew where Dothan was, why did you

16   have to have a map?  Oh, Decory Doster did.

17           What happened to Doster?  What happened

18   to Doster, good people?  According to Willie

19   McCray he didn't show up at the robbery.  He was

20   there.  That's his buddy.  He was there.  Because

21   the Monte Carlo comes and the red car he follows

22   in.

23           And you've got the evidence of the case.

24   The projectiles, the casings found on the floor.

25   Bullets.  They send the evidence off.  They take

1    the prints from Willie C. McCray and send them to
2    Marietta and she looks at them and bingo got a
3    hit.  Got a preliminary.
4         And then who do they start sticking in
5    photographic lineup?  Willie C. McCray.  You know
6    the importance.  Willie C. McCray wasn't in that
7    lineup.  She didn't pick him out.  She wasn't
8    wrong.  And you've got Jeff saying that he was --
9    Debra Shelton said she was ninety-eight percent
10   sure.  You've got Jeff saying he was eighty-five
11   percent sure.  And Walter Sheffield who didn't
12   testify but you heard because I asked he also
13   identified you heard that --  identified him, plus
14   identified him in a live lineup.
15        And we've got McCray saying somebody
16   deprived me of my control.  I want you to remember
17   if he wasn't concerned whether the weapon was
18   loaded or not, then why would he have had his
19   finger on the trigger, okay.  And if you believe
20   your wildest imagination you can pull on a barrel
21   and make it go off without Willie C. McCray
22   holding the trigger, find him not guilty.  Find
23   him not guilty.  Because that's not the evidence.
24
25        And then the bullets are fired, panic.

1    Can you imagine what it was like in the grocery

2    store, mothers and fathers and children and

3    people, when Michael Scott hits him three to five

4    seconds later that weapon fires, explodes, how

5    loud it was and panic?  People bust out the doors

6    to get out of there.

7            Keithland Reeves told you like it was.

8    You saw Keithland.  Good-size young man.  He says,

9    but I saw the Tec-9 with the man who had the boots

10   on, McCray, I knew what was fixing to occur.  And

11   what's the first reaction?  I wanted get the heck

12   out of here.  But he couldn't get out of the store

13   because why?  Doster was there with the pistol.

14   And he's stuck there.  And I said, had you ever

15   seen someone get shot and killed.  No, sir.  Did

16   you see that night.  I did.  What did you do when

17   he shot him and he went over forwards like this

18   (indicating) because that is what happened Paredes

19   told you the minute the bullet strikes the voice

20   box.  Remember he said that.  Got the cord and

21   went out.  He couldn't use his arms or legs.

22   Severed it completely down.  Tremendous amount of

23   blood.  And can you imagine what the people in the

24   community were in that store seeing that what they

25   were experiencing and what they were going

1    through?

2         But Willie C. McCray and Doster got

3    away.  Nobody stopped them after that.  Because of

4    good police work and citizens and people just like

5    Michael that are willing to step up and get

6    involved, Willie C. McCray stands before you

7    charged with felony murder and theft of property

8    in the car.

9         Told you -- I told you on opening I

10   would have no eye witness that could prove to you

11   who took the car by direct evidence.  But I told

12   you I could prove to you by circumstantial

13   evidence who took the car.  And what's amazing --

14   and he can testify and McCray testifying correct,

15   I didn't mean to shoot him  because he grabbed the

16   bag and deprived me of my control.  This is a man

17   whose controlling everything that's occurring by

18   telling women to get down and the man.  Remember

19   the expression, excuse me, this ain't no fucking

20   joke.  Willie controlled everything and his

21   partner.

22        And the car, the car, do you know why

23   the car played an important part in the robbery?

24   Because we've already been over it.  The

25   fingerprints are found on the map just like Doster

1    as well as the tag.  They had to get the tag from

2    another location.  Why is that?  Why didn't they

3    steal a tag right there from the car lot where

4    they got the Monte Carlo?  I can tell you why.

5    Use your common sense.  The longer that your

6    location in the dead of the night when the sun

7    goes down and you can't see as well and there's

8    not a deputy or police officers controlling as

9    much, they can be everywhere, you go to a place

10   and steal a car.  Had to go in through the window.

11   They had jimmied the column and forced that and

12   hot wired that to make it go.  They do not want to

13   stand around there in the same location and start

14   unscrewing tags on other vehicles because noise

15   breaking and glass people starting looking and

16   dogs do bark.  They don't know who is going to

17   drive by.  So they get their tag from another

18   location, don't they?  Yeah.  Mr. Pines.  A

19   different location.  An Alabama tag.  Because it

20   didn't go on that Monte Carlo.  It's a plan,

21   scheme, devise and they tried to put it together

22   and it fell apart.

23          And I'll say it again.  Michael played a

24   tremendous price.  But you know, like I said, I

25   refer to him as a walking dead man.  He stepped in

1  and tried to do something.  You know it and I know

2  it and, Lord, he knows it.  But at least he was

3  willing to do something or try to do something to

4  prevent the likes of Willie C. McCray doing what

5  he was doing in this community.  I've got the

6  burden of proof.  I go first.  I get one more

7  chance.  I stand up here.  I appreciate your

8  attention.

9          Thank you, Judge White.

10         THE COURT:  Mr. Capps.

11         MR. CAPPS:  Ladies and gentlemen, I'll have

12 to admit to you this has been a somewhat unusual

13 case.  But there's one thing that's true that I

14 told you from the outset and still true here

15 today.  You will hear evidence from the witness

16 stand.  And you heard the evidence from the

17 witness stand.  By gosh, you heard a lot of it.

18 What Mr. Valeska says is not evidence.  What I say

19 is not evidence.  All we're here to do is to sum

20 up things and try to sway you to our position.

21         I can't top the testimony of my client,

22 Willie C. McCray.  I heard it.  He told you under

23 oath sitting in this courtroom that the only

24 person that he had talked to about this was Mr.

25 Wesley -- Rufus Wesley.  Mr. Valeska asked him,

1    have you shared that with your attorney.  No, I

2    have not.  Mr. McCray went to great lengths to

3    explain things to Mr. Valeska.  Mr. Valeska asked

4    him to go over things how it would occur.  He even

5    used the bailiff here as a person to help show

6    what occurred.  And the best terms that he could

7    show you what occurred in that store.

8           We've heard no other witness account --

9    give the accounts that Mr. McCray gave you to give

10    you the details of what occurred in that store.

11    We've heard witnesses from the State testify that

12    there were six or seven shots fired.  We've heard

13    one witness say that there were three shots

14    fired.  But I think we know exactly how many shots

15    were fired because we heard Mr. McCray and the

16    lead investigator on the case say there were three

17    shots fired.  Some of the testimony was if you

18    recall the testimony I believe Ms. Shelton who

19    testified that the gun was bam, bam, that the

20    shots were from Mr. McCray's gun.  Well, we've

21    heard other testimony, conflicting testimony, that

22    some of the gun's shots were from Mr. Valeska says

23    Mr. Doster.  Mr. Doster.  Today in open court you

24    heard that the individual was not Mr. Doster at

25    all, it was a Mr. Wesley.  And I hope the State of

1   Alabama will prosecute Mr. Wesley as well as they

2   have Mr. McCray.

3          The fingerprints that were found on the

4   tag match up to what Mr. McCray told you.  He told

5   you he was not involved with the theft of the car,

6   had no idea there a theft of a car.  His

7   prints were not on the tag.  The prints of a

8   Doster were on the tag, and there were another

9   unknown prints that were found by Mr. Prevos.  She

10  testified to unknown prints.  They did not belong

11  to this Mr. Doster.  Did not belong to Mr.

12  McCray.  Mr. Wesley, where is he?  Where is his

13  prints?  There's been no evidence that his prints

14  were compared.

15         The story that Mr. McCray has told you

16  completely adds up.  His testimony can be no more

17  than truthful.  Mr. Valeska wants you to believe

18  part of it and not believe the other part of it.

19  Take bits and pieces of it.  Well, that's entirely

20  up to you.  You can do that.  That's the jury's

21  discretion.  You can do that.  However, I submit

22  to you that the complete testimony of Mr. McCray

23  taken as a whole is the only testimony in this

24  case that makes sense as to what happened.  When

25  you look at it as a whole, the testimony of Mr.

1     McCray provides the missing link, if you will, as

2     to what happened.  Because a lot of the evidence

3     up to that point was seven shots, six shots,

4     somebody here.  It was really back and forth.

5          Now, Mr. Valeska pointed out that your

6     mind pulls the trigger of a gun.  Your mind.

7     Well, that's true in some cases.  That is very

8     true.  But that is not what happened in this

9     case.  You heard evidence that the gun was

10    pulled.  And certainly if someone's hand is on or

11    near the trigger and it is pulled in a tussle, a

12    gun can discharge.  We all know that.  We've read

13    about it in the paper of guns discharging and

14    things of that nature.  That is clearly what

15    happened here today.  The other shots that were

16    found were in the ceiling up high.  Now, you and I

17    know that if you're going to go down and mow

18    somebody down you're not going to aim up at the

19    ceiling.  That goes to exactly to what Mr. McCray

20    has told you occurred here.

21         Another thing was this bag.  This hole

22    in this bag is from the shot that was fired when

23    the bag was pulled from Mr. McCray's hand and the

24    firearm discharged.  It's obvious that that is

25    where the hole came from.  It's unfortunate very

1    much so that a life has been lost.  Mr. Scott will

2    never be back.  But nothing I can say or do will

3    bring him back.  And nothing Mr. Valeska can say

4    or do will bring him back either.  I submit to you

5    that the State has not proved this man had

6    anything to do with the theft of a car, nor the

7    intentional murder of Michael Scott.

8              Thank you.

9         MR. VALESKA:  Let's talk about truth now.

10    Let's go back to when McCray was interviewed in

11    Havana.  He was arrested by Sergeant Devane.  You

12    got the tape.  Listen to it.  I want to go over it

13    real briefly.  I want you to remember they ask

14    you, have you been to Dothan.  Not since I was

15    three years old.  Did you go to Dothan Saturday

16    night.  No, I wasn't there.  At the Country Market

17    grocery store would you have any identification or

18    anything that should be found at a crime scene.

19    No, it should not, should not.  Have you had a

20    Winn Dixie bag.  I haven't had a Winn Dixie bag.

21    Should we find your prints on anything, any map we

22    obtained in relationship to the crime scene.  No,

23    you should not.  Do you have any friends who live

24    in Dothan.  No, I do not.  Any relative.  No, I do

25    not.  We shouldn't find anything.  That's correct.

1  You shouldn't find anything.  Where had you been

2  since work.  I've been at home.  Who was at home

3  with you.  My wife.  Sharon Westbury, his

4  girlfriend, comes home.  She's with him after work

5  until ten o'clock.  You can't be in Tallahassee

6  and with her and then be in Dothan and committing

7  a robbery, okay.  So he's telling the detective in

8  1993 he's denying all of this.  So what's he

9  doing?  He's lying.  Okay.  No doubt about it.

10        Now, I want you to remember, use your

11  common sense, when he comes up with his buddy --

12  Weston, Westbury, Weston, Wesley, whatever the

13  name is -- Rufus he says, someone he went to

14  school with twelve years ago but can't get the

15  name straight, when was the first time that story

16  was ever told?  Didn't tell the detective, did

17  he?  No.

18        Now, I want you to look and think about

19  the case.  Seven years old.  Crime occurred.  They

20  got his fingerprints.  The Defendant has a right

21  to see the things the State has.  And Mr. Capps

22  says, what are we going to do with Weston, Wesson,

23  Rufus?  What are we going to do with him?  When is

24  the first time we ever heard about him?  Today.

25  Today.  In 2000.  The first time we ever heard

1    about him.  We've known about Doster.  We've known

2    about Willie C. McCray.

3            Let's talk about him.  I want you to

4    remember.  I asked the Defendant McCray, got the

5    Tec-9, the automatic weapon, how do you hold it?

6    Isn't it true you hold the back of it and got a

7    long type handle, something to hold your hand on.

8    Remember how he acted.  Sat there and thought.  I

9    don't know.  Why is that?  Because it's a way to

10   hold that weapon.  The way it was designed.  It's

11   a small type weapon.  I mean small.  It will go in

12   that bag.  Take up the whole bag.  But it's a

13   powerful weapon.

14           Remember what he said.  He said on his

15   demonstration, this is what he said.  And you

16   wrote it down.  You remember it.  And it's how you

17   hear it, not what I tell you.  And I submit to you

18   and tell you right now, I'm not trying to get you

19   in any way to sway towards the State.  My job is

20   to present the testimony.  That's what I've done.

21   And I sure won't apologize for that.  You make the

22   decision, not me.  You made notes, and you heard

23   it in your mind and heart and soul, and this is

24   what he said.  He said, somebody deprived me of my

25   control.  It was Michael.  And he said, my finger

1    was on the trigger.  Michael Scott pulled the

2    barrel of the gun and the gun went off.  Why was

3    his finger on the trigger?  Why would he have his

4    finger on the trigger?  What else did he say?  Two

5    or three questions later he said, I put my finger

6    on the trigger to try to pull the gun back from

7    Mr. Scott.  Those two things don't go together,

8    people.  If I've got my finger on the trigger,

9    Willie C. McCray, like he wants you to believe and

10   Michael reaches out and grabs the bag and pulls on

11   it, what's going to happen?  What way is it going

12   to be, Mr. McCray?  You can't have it both way.

13   If it's that way and according to him he's got his

14   finger on the trigger and he pulled on the barrel,

15   it should go off, right?  That's what he said.

16           What did the other witnesses tell you?

17   Once again, I told you on opening, summation too,

18   no other witness that watched and saw this that

19   said in any manner or fashion did Michael reach

20   out and grab or tug on that bag in any way, did

21   he?  They did not.  They did not.  That's not what

22   Keithland said.  That's not what Jeff said in any

23   manner or fashion the way it occurred.

24           And then he says, I put my finger on the

25   trigger to try to pull the gun back from Mr.

1    Scott.  Come on, people, use your common sense.

2    You're a robber committing a heinous-type crime,

3    an armed robbery, where people all around you,

4    show them the weapon, and you are going to put

5    your finger on the trigger and you're going to let

6    someone that hits you, strikes you, spins you

7    around, and they are going to reach out there and

8    grab the weapon, Tec-9, the automatic weapon,

9    you're holding the back of the trigger, and you're

10    going to allow them to take it away from you and

11    your hand is going to slip and you're going to

12    reach out and want to grab the trigger again?

13    Huh-uh.  Didn't happen like that.  Not in any

14    manner or fashion.  Any manner or fashion.

15          It happened like Scott (Sic) told you

16    and just like Keithland said.  They struck him.

17    Spun him around.  He looked at him.  He waited

18    three to five seconds.  Deprived him of his

19    control.  He got mad.  And then he shot Michael.

20          He says, the bag.  The bag.  The

21    burning on the bag.  There's no burning on the

22    inside of the bag.  Take a look at it.  You'll

23    have it.  You'll have it.  That's not how it

24    occurred in any manner or fashion.  Doesn't like

25    it now.  Look at it.  Anything I want to say he's

1    got a response I'll submit to you.  But the point

2    is in this case you've got to look at that Michael

3    had no weapon.

4        Willie C. McCray is a dangerous person

5    who knowingly came to Houston County to commit a

6    robbery.  Engaged in a dangerous-type crime

7    knowing what the possibilities could be when you

8    commit a robbery.  And I asked him, when you

9    commit a robbery and you got a gun and it's

10   loaded, what can happen.  What can happen?

11   Someone can get shot or killed, right?  Sure it

12   is.  Robbery is a crime committed against a

13   person, an individual.  It's not a robbery of a

14   home.  That's a burglary.  That's not a robbery

15   under our law.  A robbery is when you take a

16   deadly weapon, like an automatic weapon, or a

17   pistol, and you point it against people, you

18   threaten to shoot them or do something with them.

19   You don't have to get anything.  You don't have to

20   get a thing to commit a robbery or attempted

21   robbery in this state.  He did that.  He came into

22   the store which was a highly susceptible to

23   causing death.  If an instrument of death never

24   came into that store, Michael would have never

25   been shot in the head.  Michael wouldn't have

struck him if he didn't have a weapon.  Who had

the weapon?  McCray did.  McCray is the one who

shot him.  And in fact, did cause the death.  Did

he cause the death of Michael?  Or do you believe

in your wildest imagination like McCray wants you

to believe?  Oh, it went off because he tugged on

it and I didn't mean to shoot.  Do you believe

that?  Then why did he take a high-powered Tec

automatic weapon in there if it wasn't to

intimidate if it went bad so he could do what?

Protect himself.

     And the testimony about six or seven

shots Capps talks about, who cares if there were

six or seven shots?  You know what occurred out

there.  There's no doubt about it in this case.

There is no confusion.  No confusion.  You know

McCray is the one that shot Michael.  Shot him

right in the chin.  Gunned him down after some

time went by because he got mad.  He didn't like

it.  Michael is willing to step up and ticked him

off.  He wanted to show him who was big and bad

and tough.  With that weapon he shot him and he

killed him right there in front of his wife.  And

the gun exploded.

     And I ask you to consider this.  Think

1    about Mr. Capps says, Mr. McCray told you the

2    truth.  Mr. Valeska wants you to believe some of

3    it, part of it, but not all of it.  That's not

4    true.  I don't have an opinion.  That's not my

5    job.

6         But I want you to draw an inference and

7    think what it was like for Michael Scott.  Michael

8    Scott stood right there in front of Willie just

9    like this for one, two, three, four, five seconds

10   and looked at him.  And when he looked at that

11   weapon, and there was an explosion when Willie is

12   the one that squeezed the trigger that made it

13   fire.  Mr. Capps says, well, the brain made it

14   fire.  You believe that.  If you don't, then you

15   better go back to basic biology school because you

16   know the brain does tell you that.  You know how

17   fast it can be.  The brain says, put it in your

18   hand and then move it.  And that brain tells you.

19   You can't even watch it it is so fast because it

20   runs there through the impulses.  It tells you

21   like that (snapping).  That's why you've got a

22   brain.

23        And Michael is standing there looking at

24   him and he sees that weapon.  It explodes and goes

25   out.  You can draw an inference.  Sometimes you

see things on TV. You see a gun test fired, and
you see it in slow motion and you see that
projectile exploding coming out with that
burning. And that was headed right for his face.
Right through the chin and severed his spine and
took his life as you know four days later and he
died. He gets up there and says, this is how it
occurred. I want you to believe me. Willie C.
McCray.

I'm going to tell you one more time and
I'll sit down. Willie C. McCray was indicted and
charged with the offense, and Willie C. McCray
plead what? Not guilty? Not guilty. But Willie
C. McCray wants to change and explain it to a jury
only after he sits there and he says the State of
Alabama has proved that he committed a felony
murder and he stole the car with theft of property
and things don't look too good for Willie in the
courtroom and the State of Alabama can prove he
did those two felonies and he did them and we have
proved it and then he wants to get up there and
say, uh, I didn't mean to shoot him. He tugged on
the bag. It went off. And I'm what? I didn't
mean to do it. He did it. He meant to do it. He
carried it through.

1    Justice speaks loudly and speaks

2    truthfully.  And go back in there and listen to

3    the instructions of the law and come back here and

4    send a message to Willie C. McCray and Doster --

5    and I assure you as your district attorney we'll

6    be glad to go look for the known prints of his

7    other buddy if he exists and if we can match up

8    his prints, I'll prosecute him, too, I promise

9    you.  Find him guilty of felony murder and theft

10   of property and let Willie know truth and justice

11   occurs in this community and Michael's life was

12   worth something.  He was a hero.  He paid the

13   price, and Willie can't walk away.

14        Thank you.

15        THE COURT:  Ladies and gentlemen of the jury,

16   you are the trial jury in these cases of the State

17   of Alabama versus Willie C. McCray.  And the

18   Defendant in this case, Willie -- or these

19   cases --  there are actually two cases that you're

20   trying.  The Defendant in these cases, Willie C.

21   McCray, is charged by indictments -- two separate

22   indictments with felony murder and theft of

23   property in the first degree.  Now, the first

24   indictment being that one which charges this

25   Defendant with felony murder charges that in

1    Houston County, Alabama, that this Defendant,

2    Willie C. McCray, whose name is otherwise to the

3    grand jury unknown, did cause the death of Michael

4    Scott by shooting him in the face and causing his

5    death at the time he was in the course of

6    committing a robbery, the property of Higdon

7    Grocery Company Inc., a corporation, doing

8    business as Country Market, in violation of

9    Section 13A-6-Subsection A-3 of the Code of

10    Alabama against the peace and dignity of the State

11    of Alabama.

12        Now, the other indictment charges and

13    says here that the grand jury of said county

14    charge that before the finding of this indictment,

15    that the Defendant, Willie C. McCray, whose name

16    is to the grand jury otherwise unknown, did

17    knowingly obtain or exert unauthorized control

18    over a motor vehicle; to wit, a 1984 Chevrolet

19    Monte Carlo, the property of Frank Edwards, with

20    the intent to deprive the owner of said property

21    in violation of Section 13A-8-3 of the Code of

22    Alabama against the peace and dignity of the State

23    of Alabama.

24        Now, these indictments that were

25    returned by the grand jury of Houston County,

1  Alabama, back in 1994 are not evidence in this

2  case showing or intending to show that this

3  Defendant is guilty of the offenses charged.  The

4  indictments are merely the formal charges that

5  were made by the grand jury so that this accused,

6  so that this Defendant here, could be placed upon

7  trial before you, the petty jury, for a

8  determination as to guilt or innocence.  And the

9  fact that this Defendant was indicted by the grand

10  jury of Houston County and was charged by

11  indictment with these offenses is not in any sense

12  a fact or circumstance from which you may judge

13  that the Defendant is guilty.

14          Now, the first indictment as I have

15  said charges this Defendant with felony murder.

16  And I need to define for you what the law says

17  that felony murder is.  The law says that a person

18  who commits the crime of murder -- excuse me, a

19  person commits the crime of murder if he commits

20  or attempts to commit a robbery in any degree and

21  in the course of the crime or in the furtherance

22  of the crime or in immediate flight from the

23  crime he is committing or attempting to -- which

24  he is committing or attempting to commit he causes

25  the death of any person.  Let me go over that with

1    you again.  The law says that a person commits the

2    crime of murder if he commits or attempts to

3    commit robbery in the first degree as charged in

4    this particular indictment.  He must commit or

5    attempt to commit robbery in the first degree.

6    And I'll later define for you what I mean by

7    robbery in the first degree.  And while he is

8    committing or attempting to commit robbery in the

9    first degree he causes the death of any other

10   person.  Now, the law doesn't say that he has to

11   intend to commit the death of the other person,

12   but it simply says that while he is committing or

13   attempting to commit robbery in the first degree

14   he then causes the death of another person.  And,

15   of course, the State has charged in the indictment

16   here that this Defendant was committing the

17   offense of robbery in the first degree or

18   attempting to commit robbery in the first degree,

19   and that while he was doing that while in the

20   course of the crime or in the furtherance of the

21   crime or while trying to flee from the crime he

22   caused the death of another person.  That person

23   being Michael Scott.

24        Now, to convict, the State must prove

25   beyond a reasonable doubt each of the following

1  elements of the offense of felony murder.  First

2  of all, they must prove that Michael Scott is

3  dead.  Second of all, that this Defendant here,

4  Willie C. McCray, caused the death of Michael

5  Scott by shooting him with a gun.  And that in

6  committing the act which caused the death of

7  Michael Scott this Defendant here, Willie C.

8  McCray, was acting in the course of and in the

9  furtherance of or in the immediate flight from the

10  crime of robbery in the first degree.  And that

11  doing -- in doing the act which constituted the

12  commission of the felony of robbery in the first

13  degree during the course of which or in the

14  furtherance of which or in the immediate flight

15  from which the death of Michael Scott was caused.

16          Now, I also told you that I would define

17  for you what robbery in the first degree is.

18  Robbery in the first degree, the law says that a

19  person commits the crime of robbery in the first

20  degree if in the course of committing a theft;

21  that is, in the course of committing of stealing

22  something, he uses or threatens to use the

23  imminent use of force against the person of the

24  owner of the property or any person present with

25  the intent to overcome that person's physical

1   resistance or physical power of resistance and in

2   so doing he is armed with a deadly weapon or a

3   dangerous instrument.  In other words, the State

4   of Alabama must prove beyond a reasonable doubt

5   that this Defendant, in order to prove robbery in

6   the first degree, that this Defendant here, Willie

7   C. McCray, committed or attempted to commit a

8   theft; that he stole or attempted to steal

9   money -- let's see, I believe they allege that he

10  was attempting to steal property belonging to

11  Higdon Grocery Company, Incorporated; and that in

12  the course of committing or attempting to commit

13  that theft while he was trying to steal that

14  property or in the immediate flight after the

15  attempt or commission that this Defendant here

16  either used force against a person -- I believe in

17  this case the State has attempted to prove that he

18  used or attempted to use force against the persons

19  of Walter Sheffield or Debra Shelton, who were

20  employees of Higdon Grocery Company -- that he

21  used force against them with the intent to

22  overcome their physical resistance or physical

23  power to resist or threatened imminent use of

24  force against the person of Walter Sheffield or

25  Debra Shelton with the intent to compel their

1   acquiescence to the taking of that property or --

2   excuse me; and that he, Willie C. McCray, was

3   armed with a deadly weapon or a dangerous

4   instrument.

5          A person commits the crime of theft of

6   property if he knowingly obtains or exerts

7   unauthorized control over the property of another

8   with the intent to deprive the owner of the

9   property.

10         Now, a deadly weapon is defined as being

11  a firearm or anything manifestedly designed, made,

12  or adapted for the purpose of inflicting death or

13  serious physical injury.

14         Of course, if after you have weighed and

15  considered all of the evidence in this case, that

16  for the State and that for the Defendant, you're

17  convinced beyond a reasonable doubt that this

18  Defendant committed felony murder, then, of

19  course, you should find him guilty of felony

20  murder.  But if you have so weighed and considered

21  all the evidence in the case, that for the State

22  and that for the Defendant, if you are not

23  convinced beyond a reasonable doubt that he is

24  guilty of felony murder as to that indictment, you

25  should find him not guilty.

1      Now, I've told you that he is also

2  charged with theft of property in the first

3  degree.  And that's under the indictment which

4  charges that he knowingly obtained or exerted

5  unauthorized control over a motor vehicle; to wit,

6  a 1984 Chevrolet Monte Carlo, the property of

7  Frank Edwards, with the intent to deprive Frank

8  Edwards of that motor vehicle in violation of the

9  Code of Alabama.  Now, the law simply says that a

10  person commits the crime of theft of property if

11  he knowingly obtains or exerts unauthorized

12  control over the property of another with the

13  intent to deprive the owner of his property.  Now,

14  the value of the property in this instance does

15  not matter because the law of Alabama says that

16  the stealing of any motor vehicle is theft of

17  property in the first degree.  So the value would

18  be -- would not matter here.

19      So in order for the State of Alabama to

20  convict in order for to you find a verdict of

21  guilty against this Defendant on the second

22  indictment, the State must prove beyond a

23  reasonable doubt each of the following elements of

24  theft of property in the first degree.  First of

25  all, that the Defendant here, Willie C. McCray,

1   knowingly obtained or exerted unauthorized control

2   over the properties, that 1884 Chevrolet Monte

3   Carlo, that belonged to Frank Edwards; and that

4   when he obtained that property he knowingly or

5   exerted unauthorized control over it; that he

6   intended to deprive Frank Edwards of his

7   property.

8         Therefore, ladies and gentlemen, if

9   after you've weighed and considered all the

10  evidence in the case, that for the State of

11  Alabama and that for the Defendant, if you're

12  convinced beyond a reasonable doubt that he's

13  guilty -- this Defendant is guilty of theft of

14  property in the first degree as charged in the

15  second indictment, then you should find him guilty

16  of theft of property in the first degree under

17  that second indictment.  But if after so weighing

18  and considering all of the evidence you are not

19  convinced beyond a reasonable doubt that he's

20  guilty of theft of property in the first degree,

21  then you should find him not guilty on that second

22  indictment.

23        Now, the Defendant in this case, Willie

24  C. McCray, went into the trial of this case with a

25  presumption of innocence in his favor.  And that

1   presumption of innocence stays with him and abides

2   with him and attends him throughout the trial of

3   this case and until his guilt is established to

4   your satisfaction beyond a reasonable doubt and to

5   a moral certainty.  This presumption of innocence,

6   ladies and gentlemen, is evidentiary in nature

7   under all the rules of law and it attends the

8   accused throughout the trial and until the

9   presumption is overcome by the evidence in the

10  case and until it is shown beyond a reasonable

11  doubt and to a moral certainty that the

12  presumption must fall and that the Defendant is

13  guilty.  And if after you've weighed and

14  considered all the evidence in the case, that for

15  the State and that for the Defendant, there

16  remains a reasonable doubt as to the guilt of the

17  Defendant on trial as to either of these offenses

18  charged, then he would be entitled to the benefit

19  of that doubt and an acquittal at your hands.

20          The burden of proof -- or the burden of

21  proving that this Defendant is guilty as charged

22  in these indictments rests upon the State of

23  Alabama as I have told you before.  And before a

24  conviction can be had in this case the State of

25  Alabama must satisfy the jury of the Defendant's

guilt beyond a reasonable doubt. Unless the State so satisfies you of the Defendant's guilt beyond a reasonable doubt, then the Defendant is entitled to an acquittal at your hands. For a verdict of guilty to be returned in this case, the entire jury must believe from the evidence beyond a reasonable doubt and to a moral certainty that the Defendant is guilty as charged in the indictments to the exclusion of every probability of his innocence and every reasonable doubt of his guilt. And if the Prosecution -- if the Prosecution has failed to furnish such a measure of proof and to so impress the minds of the jury of the Defendant's guilt on either of these indictments, then the jury should find the Defendant not guilty on the indictment where you're not convinced of his guilt beyond a reasonable doubt.

Now, ladies and gentlemen of the jury, the phrase reasonable doubt is self explanatory and efforts to define it do not always clarify the term. But it may help you some to say that a doubt which would justify an acquittal must be an actual and substantial doubt, not a mere possible doubt. A reasonable doubt is not a mere guess or

1    a surmise.  And it is not -- and it is not a

2    forced or a capricious doubt.  If after

3    considering all of the evidence in the case you

4    have an abiding conviction of the truth of either

5    or both of the charges that are made against this

6    Defendant, then you're convinced beyond a

7    reasonable doubt and it would be your duty to

8    convict this Defendant.  The reasonable doubt

9    which entitles an accused to an acquittal is not a

10   mere fanciful, vague, conjectural, or speculative

11   doubt; but it must be a real substantial doubt

12   arising from the evidence or a lack of the

13   evidence, and it must remain after a careful

14   consideration of the testimony such as reasonable,

15   fair-minded, and conscientious men and women would

16   entertain under all the circumstances.

17          Now, let me caution you, ladies and

18   gentlemen, that the State of Alabama is not

19   required to convince you of this Defendant's doubt

20   -- excuse me, let me go back.  The State of

21   Alabama is not required to convince you of this

22   Defendant's guilt beyond all doubt and to the

23   point that you cannot possibly be mistaken, but

24   they are to convince you of his guilt beyond a

25   reasonable doubt and to a moral certainty.  Moral

1  certainty is that degree of assurance which

2  induces a man of sound mind to act without doubt

3  upon conclusions to which it leads.  A certainty

4  that convinces and directs the understanding and

5  satisfies the reason and judgment of those who are

6  bound to act conscientiously upon it.

7          Of course, as has been brought to your

8  attention several times, the State of Alabama has

9  relied in this case somewhat -- to some extent on

10  circumstantial evidence to prove or to attempt to

11  prove the Defendant's guilt in connection with

12  this robbery and killing of Michael Scott and the

13  theft of the automobile that belonged to Mr. Frank

14  Edwards.  The laws with regard to circumstantial

15  evidence is that where the State relies on

16  circumstantial evidence to prove the Defendant's

17  guilt or his guilty connection or the commission

18  of a criminal offense, the degree of proof is as

19  great on the part of the State as though the State

20  had relied upon eyewitnesses to the commission of

21  the crime.  However, that does not mean -- and I

22  caution you -- it does not mean that although the

23  State may rely in whole or in part on

24  circumstantial evidence to prove the Defendant's

25  guilt of the crime with which he is charged, that

1  he should be acquitted because after you have

2  weighed and considered all the evidence in the

3  case, that for the State and that for the

4  Defendant, if you're convinced beyond a reasonable

5  doubt that the Defendant is guilty of either or

6  both charges, then, of course, your verdict or

7  verdicts should be guilty and that notwithstanding

8  the fact that the State relied in whole or in part

9  on circumstantial evidence to prove the

10  Defendant's guilty connection or to prove that the

11  Defendant committed a robbery and killed Michael

12  Scott and stole the 1984 Chevrolet Monte Carlo

13  belonging to Frank Edwards.

14          Now, you, ladies and gentlemen of the

15  jury, well know that the Defendant, Willie C.

16  McCray, has testified during the course of this

17  trial in his own behalf.  And the law gives him

18  that right and it gives him that privilege.  And

19  when a defendant does testify during a trial of

20  his own case, the law says that the jury would not

21  be justified in rejecting his testimony and

22  setting it aside and saying that you will not

23  believe it simply because he is the defendant in

24  the case and is interested in the result of your

25  verdict.  However, the law goes further and says

1    that when you do weigh and consider the testimony

2    of the Defendant, that it is within your right,

3    within your providence to take into consideration

4    the fact that he is the defendant in the case and

5    he is interested in the result of your verdict,

6    and then give to his testimony whatever weight and

7    whatever credit that you, ladies and gentlemen,

8    deem it to be entitled.

9          Now, where any witness testifies --

10    where any witness testifies against another and is

11    interested in securing or bringing about a

12    conviction or an acquittal, when you come to weigh

13    and to consider that witness' testimony, you,

14    ladies and gentlemen, may weigh and consider the

15    witness' testimony in the light of his or her

16    interest in the outcome of the case and then give

17    his testimony whatever weight and whatever credit

18    that you deem it entitled.  In other words,

19    whether the witness testifies for the State

20    attempting to secure a conviction or testifies for

21    the Defendant attempting to secure an acquittal,

22    then it is your right to consider the interest

23    that that witness has in the case and then give to

24    his testimony whatever weight and whatever credit

25    that you deem it entitled in the light of his

1    interest in that case.

2            Now, if you believe that any witness

3    who has testified in this case from the first

4    witness who took the witness stand to the last

5    witness who took the witness stand, if you believe

6    that any of the witnesses have testified willfully

7    falsely; that is, have testified falsely

8    willingly, as to any material matter in this case,

9    then it's within your providence, it's within your

10   right to take into consideration that fact that

11   you believe that he testified falsely.  And when

12   you come to weigh and to consider that witness'

13   testimony, then you have the right to discard

14   everything that that witness has testified about

15   and not give any consideration to his or her

16   testimony; or on the other hand, it would be

17   within your providence to cast aside that part of

18   the witness' testimony that you believe that he or

19   she has testified falsely about and then take that

20   part of the witness' testimony that you believe

21   that he or she has testified truthfully about and

22   give to the truthful part of the testimony

23   whatever weight and whatever credit you deem it to

24   be entitled.

25           Now, you, ladies and gentlemen, of

1  course, have heard all of the testimony in this

2  case.  And it now is up to you and it's for you

3  and for you alone to determine what weight and

4  what credit that you will give to the testimony of

5  the various witnesses who have testified before

6  you and as to what weight and credit you will give

7  to the various exhibits.  There are a number of

8  exhibits that have been offered that will go with

9  you into the jury room.  And you must take the

10 testimony of the witnesses who have testified from

11 the first witness who went upon the witness stand

12 to the last witness who went upon the witness

13 stand and you must try to use your common sense,

14 your common experience in human affairs, your

15 everyday experiences in human conduct, and you

16 must try to correlate the testimony, correlate all

17 of the testimony, all of the evidence that you

18 have heard, and then give to the testimony of each

19 and every witness whatever weight and whatever

20 credit that you deem it entitled under the

21 circumstances.  And then after you have weighed

22 and considered all of the testimony in the case,

23 that for the State and that for the Defendant, if

24 you're convinced beyond a reasonable doubt that

25 this Defendant, Willie C. McCray, is guilty of

felony murder as charged in the first indictment,

then you should find him guilty of felony murder

as charged in that indictment.  And in that event

the form of your verdict on that case would be,

we, the jury, find the Defendant, Willie C.

McCray, guilty of felony murder as charged in the

indictment.  Of course, on the other hand, if

after you've so weighed and considered all the

evidence in the case, if you're not convinced

beyond a reasonable doubt that he is guilty of

felony murder as charged in the indictment, you

should find him not guilty on that indictment.

And the form of your verdict as to that case would

simply be, we, the jury, find the Defendant,

Willie C. McCray, not guilty of felony murder.

On the other case, the one concerning

the theft of the automobile, if after you've

weighed and considered all the evidence in the

case, if you're convinced beyond a reasonable

doubt that he is guilty of theft of property in

the first degree; that is, the stealing of the

1984 Chevrolet Monte Carlo, if you're convinced

beyond a reasonable doubt that he is guilty of

that, then you should find him guilty.  And in

that event the form of your verdict in that case

1   would be, we, the jury, find the Defendant, Willie

2   C. McCray, guilty of theft of property in the

3   first degree as charged in the indictment. Of

4   course, on the other hand if after you've weighed

5   and considered all of the evidence you're not

6   convinced beyond a reasonable doubt that he is

7   guilty of the theft in the first degree of that

8   automobile as to that case, you should find him

9   not guilty, and your verdict would simply be, we,

10  the jury, find the Defendant, Willie C. McCray,

11  not guilty of theft of property in the first

12  degree as charged in the indictment. And I have

13  prepared forms of verdicts for you. These are

14  prepared just to aid and assist you in arriving at

15  the form of your verdict. But let me remind you

16  as I've said, you must return two verdicts in this

17  case. One as to the felony murder and one as to

18  the theft of property in first degree.

19          Of course, whichever verdicts you

20  render, one of your number should sign these

21  verdicts as foreman. And whichever verdicts you

22  render, they must be unanimous. Each and every

23  one of you must agree upon the verdicts. I would

24  suggest to you that the first thing that you'll

25  want to do once the case is submitted to you for

1    your verdict and you've gone back into the jury

2    room would be to select a foreman to preside over

3    the jury's deliberations.  And then once unanimous

4    verdicts are reached, then you need to have your

5    foreman sign these verdicts as foreman of the

6    jury.

7            Now, the Defendant has requested certain

8    written charges which state correct propositions

9    of law and are to be taken by you along with the

10   Court's oral charge on the law in arriving at your

11   verdict in this case.  And I'll read these

12   verdicts requested by the Defendant to you.

13           The Court charges the jury that

14   circumstances no matter how strong which merely

15   arouse the suspicion of guilt cannot serve as a

16   basis for convicting Willie C. McCray.

17           The Court charges the jury that

18   circumstances merely consistent with guilt or

19   causing suspicion thereof are insufficient to

20   justify conviction of Willie C. McCray.

21           The Court charge the jury that for

22   circumstantial evidence to be sufficient to

23   justify a conviction, circumstances proved must

24   not only be consistent with the hypothesis that

25   the Defendant is guilty but inconsistent with the

1     hypothesis that Willie C. McCray is innocent and

2     inconsistent with every other rational hypothesis,

3     except that of guilt.

4            The Court charges you, the jury, that

5     you cannot convict Willie C. McCray on mere

6     possibilities, surmise, suspicion, or speculation

7     however strong they may be.  A verdict of guilty

8     based upon mere possibilities, surmise, suspicion,

9     or speculation would violate the oath that you,

10     the members of the jury, have taken.  If after

11     carefully and fairly reviewing the facts you are

12     not satisfied of Willie C. McCray's guilt, then

13     you have a reasonable doubt and Willie C. McCray

14     should not -- should be found not guilty.

15            The Court charges the jury that the

16     burden is always on the Prosecution and never

17     shifts to the Defendant.

18            The Court charges the jury that the

19     Defendant is presumed innocent at all stages of

20     the trial until guilt is proven beyond a

21     reasonable doubt.

22            I charge you, members of the jury, that

23     the Defendant is presumed to be innocent until the

24     evidence convinces you, the jury, beyond a

25     reasonable doubt that he is guilty; and if upon

1    consideration of all the evidence you, the jury,

2    have a reasonable doubt growing out of all the

3    evidence, you must find the Defendant not guilty.

4         The Court charges the jury that the

5    burden is never on the Defendant to establish his

6    innocence or to disprove a fact necessary to

7    establish a crime of which he is charged.  But in

8    this case if any or all of the evidence after

9    considering all of the same raises in your minds

10    reasonable doubt as to the guilt of the Defendant,

11    you should find the Defendant not guilty.

12         I charge you, members of the jury, that

13    you are instructed that the burden is on the State

14    to convince you of the Defendant's guilt to the

15    exclusion of every reasonable doubt and by

16    evidence which overcomes the presumption of fact

17    that the law surrounds the Defendant with that he

18    is innocent of a crime.

19         I charge you, members of the jury, that

20    there's a legal presumption of innocence which is

21    to be regarded as a matter of evidence by you, the

22    jury, to the benefit of which the accused is

23    entitled.

24         I charge you, members of the jury, that

25    if you have a reasonable doubt as to the

1    Defendant's guilt growing out of the evidence or

2    any part of it, then you must find the Defendant

3    not guilty of felony murder.

4         I charge you, members of the jury, if

5    any member of your number has a reasonable doubt

6    as to the guilt of the Defendant growing out of

7    any part of the testimony upon consideration of

8    all the testimony, then you must find the

9    Defendant not guilty.

10         I charge you, members of the jury, that

11    circumstances which merely arouse suspicion of

12    guilt will not serve as a basis for conviction.

13         I charge you, members of the jury, the

14    presumption of innocence with which the Defendant

15    enters into the trial is a fact in the case which

16    must be considered with all the evidence and it is

17    not to be disregarded by you.

18         I charge you, members of the jury, that

19    if there's a reasonable probability that the

20    Defendant in this case is innocent arising from

21    the evidence, there's a reasonable doubt as to his

22    guilt.

23         Now, as to the Court's oral charge, is

24    the State satisfied with the Court's oral charge?

25         MR. VALESKA:  The State is satisfied, Judge

1    White.

2         THE COURT:  The Defense --

3         MR. CAPPS:  Yes, Your Honor.  The Defense is

4    satisfied with exception the others that we have

5    previously mentioned that the Court refused.

6    Thank you.

7         THE COURT:  Now, ladies and gentlemen, with

8    that I'm going to ask you to go to the jury room.

9    And let me ask you not to start your deliberation

10   until I get all of the exhibits in there to you.

11   It won't take us but just a minute to get the

12   exhibits that were admitted into evidence gathered

13   up and in there to you.  And when the bailiff

14   brings the admitted exhibits to you, then at that

15   point you need to go ahead and select your foreman

16   and begin your deliberations.  Thank you very

17   much.

18         (Jury not present.)

19       THE COURT:  I'm releasing the two alternates

20   and submitting the case to the jury.

21         (At 3:55 p.m. CT, the jury began their

22         deliberations.)

23         (Off the Record.)

24         (At 4:15 p.m. CT, the following

25         proceedings were held:)

```
1              THE COURT:  Bring the jury.
2                   (Jury present.)
3              THE COURT:  Yes, ma'am.
4              A JUROR:  The question was brought up
5         about --
6              THE COURT:  You're the foreperson?
7              THE FOREPERSON:  Yes.
8                        Were the shell casing all the same?
9              THE COURT:  Don't tell me anything about the
10        deliberations.
11             THE FOREPERSON:  No.  No.
12             THE COURT:  But there's some question that
13        you had?
14             THE FOREPERSON:  Yeah.  Were all the shell
15        casings all the same, from the same gun?
16             THE COURT:  Well, I don't know whether that
17        evidence came out or not.
18             THE FOREPERSON:  We didn't hear it.
19             THE COURT:  But evidence is closed so we
20        can't take new further evidence.  You'll have to
21        depend on what you heard.  That's all I know to
22        say to you about it.  Thank you very much.
23             THE FOREPERSON:  Thank you.
24             THE COURT:  I'll allow you to go out and
25        continue your deliberation.
```

```
 1                    (Jury not present.)

 2                    (At 4:17 p.m. CT, the jury continued

 3                    their deliberations.)

 4                    (Off the Record.)

 5                    (At 4:35 p.m. CT, the following

 6                    proceedings were held:)

 7          THE COURT:  Bring the jury.

 8                    (Jury present.)

 9          THE COURT:  Madam Foreperson, I understand

10     you have another question?

11          THE FOREPERSON:  Yes.  We would like the

12     definition of theft of property again, please.

13          THE COURT:  Theft of property in the first

14     degree?

15          THE FOREPERSON:  Yes.

16          THE COURT:  Gentlemen, do you-all -- either

17     one of you have any objection to my defining theft

18     of property in the first degree again?

19          MR. VALESKA:  No, I have no objection.

20          MR. CAPPS:  No, sir, Judge White.

21          THE COURT:  Ladies and gentlemen, the law

22     says a person commits the crime of theft of

23     property if he knowingly obtains or exerts

24     unauthorized control over the properties of

25     another with the intent to deprive the owner of
```

1    that property.

2            In order to convict, the State of

3    Alabama must have proven beyond a reasonable doubt

4    each of the following elements of the offense of

5    theft of property in the first degree.  First of

6    all, that this Defendant here knowingly obtained

7    or aided and abetted some other person in

8    obtaining or exerted unauthorized control.  That

9    he obtained or exerted unauthorized control over

10   property that belonged to some other person.  In

11   this particular case we're talking about a 1984

12   Chevrolet Monte Carlo automobile.  And that at the

13   time that he obtained that property or exerted

14   unauthorized control over that property, the

15   Chevrolet automobile, that -- or aided and abetted

16   some other person in doing that, that he intended

17   to deprive the owner of that property.  In other

18   words, he intended not to restore it to its

19   truthful owner.

20           THE FOREPERSON:  Okay.  Thank you.

21               (Jury not present.)

22               (At 4:38 p.m. CT, the jury continued

23               their deliberations.)

24               (Off the Record.)

25               (At 4:58 p.m. CT, the Court was notified

1           the jury had reached a verdict.)

2           THE COURT:  Bring the jury.

3               (Jury present.)

4           THE COURT:  Ms. Wade, I understand you are

5      the foreperson of the jury; is that correct?

6           THE FOREPERSON:  Yes.

7           THE COURT:  The bailiff has advised the Court

8      the jury has reached verdicts in these cases; is

9      that also correct?

10          THE FOREPERSON:  Yes, it is.

11          THE COURT:  If you would, hand those to the

12     clerk, please.

13          THE FOREPERSON:  (Complied.)

14          THE COURT:  Read the verdicts, Ms. Stanley.

15          THE CLERK:  In the case of the State of

16     Alabama versus Willie McCray; CC-94-791, we, the

17     jury, find the Defendant, Willie C. McCray, guilty

18     of felony murder as charged in the indictment.

19

20          Case number CC-94-792, State of Alabama

21     versus Willie C. McCray, we, the jury, find the

22     Defendant, Willie C. McCray, guilty of theft of

23     property in the first degree as charged in the

24     indictment.

25          THE COURT:  Now, Ms. Wade, are those your

1    verdicts?

2         THE FOREPERSON:  Yes.

3              (At which time the Court polled the jury

4              and each nodded in the affirmative it

5              was their verdict.)

6         THE COURT:  Let the Record show that the

7    Court has polled the jury and that each and every

8    member of the jury replied the verdicts were his

9    or hers.

10             Thank you very much for your services

11   here this week.  I know it hasn't been fun for any

12   of you and that it's taken you away from your

13   homes and your jobs and your families and things

14   that are important to you, but I think all of you

15   know that we couldn't have a system of justice

16   without people like you who are willing to serve

17   on jury.

18             Now, Ms. Stanley here has your pay.

19   She'll pay you at this time and you're excused.

20   And, once again, thank you very much.

21             (Jury excused.)

22        THE COURT:  Willie C. McCray, approach the

23   bench, please.

24        THE DEFENDANT:  (Complied.)

25        THE COURT:  Willie C. McCray, the jury having

1  found you guilty of felony murder as charged in

2  the indictment in case number CC-94-791, on that

3  jury verdict I hereby adjudge you guilty of felony

4  murder as charged in the indictment.  Do you have

5  anything to say as to why sentence of law should

6  not be pronounced upon you at this time in that

7  case?

8       THE DEFENDANT:  No, sir.

9       MR. CAPPS:  No, sir.

10      THE COURT:  I'm going to delay sentencing.

11           In case number CC-94-792, the jury

12  having found you guilty of theft of property in

13  the first degree as charged in the indictment,

14  based on that jury verdict, I hereby adjudge you

15  guilty of theft of property in the first degree as

16  charged in the indictment.  Do you have anything

17  to say --

18      THE DEFENDANT:  No, sir.

19      THE COURT:  -- as to why sentence of law

20  should not be pronounced upon you in that case?

21      THE DEFENDANT:  No, sir.

22      MR. CAPPS:  No, sir.

23      THE COURT:  Do you want me to sentence him

24  now or does he want a sentencing hearing?

25      MR. CAPPS:  We ask a sentencing now.  There

1       was a sentencing report completed in the other

2       trial.  I don't think anything has changed in

3       that.

4           THE COURT:  You-all don't happen to have a

5       copy?

6           MR. VALESKA:  Judge, I don't.  There's not

7       one in my file.

8           THE COURT:  I was looking.  I don't find a

9       copy of the presentence.  Let me look and make

10      sure if I can tell from the case action summary.

11          MR. CAPPS:  I have the motion for restitution

12      submitted by the State.

13          THE COURT:  I've got that.  I found that.

14          MR. CAPPS:  What's the Court --

15          THE COURT:  Let's see.  Yeah.  There was one

16      ordered.  There was a presentence investigation

17      ordered.  And sentencing.  That was on September

18      6, 1995.  And sentencing was set for September 22,

19      1995.  I'll do whatever the Defendant wants.  If

20      he wants the presentence thing, we can continue it

21      until a time where I can get it from the probation

22      office or we can sentence him on the spot.

23      Whichever.  I'll leave that to his discretion.

24          MR. CAPPS:  Your Honor, he's agreed to waive

25      a presentence report.  I've read it.  I've seen

1   it.  It's some years ago.  He's been incarcerated

2   in the Houston County Jail since '93.  And he

3   would ask to be sentenced where he can go on and

4   be transported to the State Department of

5   Corrections.

6        THE COURT:  Let me hear if the State has

7   anything to say.

8        MR. VALESKA:  Yes, sir.  The murder is a

9   Class A felony.  Ten to ninety-nine, or life.  I

10  recommend ninety-nine years for taking Michael

11  Scott's life.  The theft of property in the first

12  degree is a Class B.  Two to twenty years.  I

13  recommend two years consecutive just like he was

14  sentenced the last time on those cases with what's

15  occurred in these cases.  But there are no priors

16  for enhancements.  There are nolos out of Florida

17  for robbery, possession of drugs as I recall, and

18  a car theft.  They were in the file.  They were

19  introduced last time.  The Appellate Court

20  reversed the sentencing saying you cannot use to

21  enhance under the Habitual Offender law.  Once

22  again, certified copies are in the legal file of

23  those nolo convictions in Florida.  He did serve

24  time in Florida on the nolo.  Went to prison on

25  those.  Once again, Judge, Michael Scott lost his

1    life.  It's forever.  He's now to the State for

2    some point in time he will be eligible for parole.

3    He's gone from being indicted on capital murder to

4    convicted of felony murder.  It's not excessive

5    based on what occurred in this case.

6        MR. CAPPS:  Your Honor, Mr. Valeska is

7    correct except in the sentence handed down by

8    Judge Little that was reversed.  Judge Little

9    sentenced him to life without parole.  And that

10    was because --

11        THE COURT:  Because they used some --

12        MR. CAPPS:  Nolos.

13        THE COURT:  To enhance punishment.

14        MR. VALESKA:  Judge Little did.  That's

15    correct.  He counted those three for the Habitual

16    Offender.  The law is clear at this time.  It's

17    clear now.  You can't use those to -- I cannot --

18    the State cannot increase his punishment.  By

19    saying instead of ten to life it's fifteen to

20    twenty automatically life under the Habitual

21    Offender Act we can't use those for the purpose of

22    Habitual Offender.

23        MR. CAPPS:  The only thing I would say I ask

24    the Court to consider whatever concurrent sentence

25    as this Court has tried the cases together, one

1     entire event from the Court's testimony they

2     heard.  And I ask the Court to consider a

3     concurrent sentence with whatever the Court hands

4     down.

5          THE COURT:  In case number CC-94-791 I hereby

6     sentence you to imprisonment in the penitentiary

7     in the State of Alabama for a period of

8     ninety-nine years.  And as further and additional

9     punishment I hereby fine you twenty thousand

10    dollars and the cost of court and order you to pay

11    restitution -- is that a copy of the restitution?

12         MR. CAPPS:  Yes, sir.

13         THE COURT:  There's an order in there.  I

14    order you to pay restitution as follows:  Ten

15    thousand dollars to the Alabama Crime Victim's

16    Compensation; nineteen thousand six hundred and

17    fifty-nine dollars and sixty-five cents to the St.

18    Joe Container Company; one thousand two hundred

19    and ninety-five dollars to Karen Scott; one

20    hundred sixty-five dollars and eighty cents to

21    Southeast Alabama Medical Center; two hundred and

22    thirty-eight dollars to Dr. J. W. McCloud; and

23    thirty-four dollars and fifty cents to

24    Radiological Associates for a total restitution of

25    thirty-one thousand three hundred and ninety-two

1      dollars and ninety-five cents.

2              In case number CC-94-792 -- it's a Class

3      B?

4          MR. VALESKA:  Two to twenty.

5          THE COURT:  I hereby sentence you to

6      imprisonment in the State of Alabama for a period

7      of twenty years.  And as further and additional

8      punishment I hereby fine you ten thousand dollars

9      and cost of court.

10             You're in the custody of the sheriff.

11         MR. CAPPS:  Thank you.  We give oral notice

12     of appeal, Your Honor, and I will follow it up

13     with written notice.

14             (The proceedings for October 24, 2000,

15             were concluded.)

16             (Off the Record.)

17

18

19

20

21

22

23

24

25

1            IN THE CIRCUIT COURT OF HOUSTON COUNTY

2                 STATE OF ALABAMA

3   STATE OF ALABAMA,        *

                          *

4   v.                *   Case No. CC-94-791-192

                          *

5   WILLIE MCCRAY,         *

                          *

6      Defendant.       *

7

8

9        REPORTER'S OFFICIAL TRANSCRIPT ON APPEAL

10

11  Before:

12          The Honorable Jerry M. White

13            December 14, 2000

14

15

16  APPEARANCES

17         For the State

18            Butch Binford, Esquire
              Assistant District Attorney

19         For the Defendant

20            Joe Lewis, Esquire
              Dothan, Alabama

21

22

23

24

25  Carla H. Woodall
    Court Reporter

<u>PROCEEDINGS</u>

THE COURT:  The first thing I've got on the docket is the State versus Willie McCray.

MR. LEWIS:  Judge, again, I've not obtained a transcript of the trial proceedings yet so I'm kind of groping around to some extent.  But I have spoken with Mr. McCray and Mr. Capps, who was his trial counsel, and I believe there's some evidence that was presented at trial to the effect that the victim in this case punched Mr. McCray prior to the time the gun went off.

THE COURT:  That's true.

MR. LEWIS:  Based on that, I would ask the Court to reconsider whether there should have been an instruction on manslaughter in the case.  I realize that there was also evidence presented that this occurred during the course of a robbery. And under that section of the murder statute that's strictly murder.  But I would also point out to the Court that the manslaughter statute says that it's manslaughter -- it would have been murder under the murder statute that cites the entire murder statute unless there was legal provocation.  So on those grounds I would ask the Court to reconsider whether there should have been

1   a manslaughter instruction.

2       THE COURT:  Does he have anything he wants to

3   say?

4       THE DEFENDANT:  No, sir.

5       THE COURT:  Have a seat.

6       THE DEFENDANT:  (Complied.)

7       THE COURT:  That motion for a new trial is

8   denied.

9           (The proceedings for December 14, 2000,

10          were concluded.)

11          (Off the Record.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

510

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

\* \* \* \* \* \* \* \* \* \* \*

REPORTER'S CERTIFICATE

\* \* \* \* \* \* \* \* \* \* \*

STATE OF ALABAMA

COUNTY OF HOUSTON


I, Carla H. Woodall, Court Reporter and Notary Public in and for the State of Alabama at Large, do hereby certify that the above-styled and numbered cause was reported stenographically by me and is a true and correct transcript of the testimony, objections, motions, rulings of the Court, and was transcribed by or under my direction and control.

I further certify that I have filed all exhibits offered in the trial of this cause, if any, with the Circuit Clerk of Houston County, Dothan, Alabama, for incorporation into the Record on Appeal.

I further certify that I have on this day, filed with the Clerk of the Court of Criminal Appeals, the Attorney General, and the parties here involved, a copy of the Reporter's Index to the Testimony and a Certificate of Completion of Reporter's Transcript of the said cause.

I further certify that I have filed the original and three copies of this transcript in the

511

1    office of the Circuit Clerk of the Circuit Court of

2    Houston County, Dothan, Alabama.

3

4      Done this the 20th day of August, 2001.

5

6

7

8     Carla H. Woodall

     Court Reporter and Notary Public

9     State of Alabama at Large

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Alabama Certificate of Completion and Transmittal of Record on Appeal by Trial Clerk

## CERTIFICATE OF COMPLETION AND TRANSMITTAL
## OF RECORD ON APPEAL BY TRIAL CLERK

TOTAL PAGES
670

Willie C. McCray

_____
Appellant

V.

State of Alabama
Appellee

TO: The Clerk of the Court of
 Criminal Appeals of Alabama

Case No. _____ CC-94-791

Date of Notice of Appeal _____ 10-24-00 _____

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling _____ 157 _____ pages of the Clerk's record, and _____ 512 _____ pages of the Court Reporter's transcript, and that one copy of each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

DATED this _____ 22nd _____ day of _____ August _____ XXXX 2001 .

_____
 Circuit Clerk

HOUSTON
_____
 County

| State of Alabama<br>Unified Judicial System<br><br>Form ARAP 13 | CERTIFICATE OF COMPLETION<br>REPORTER'S TRANSCRIPT | Page Number<br><br>512 |

**TO:**   The Clerk of the Court of Criminal Appeals        **Fax: (334) 242-4689**
P. O. Box 301555
Montgomery, Alabama 36130-1555

**Criminal Appeals Case Number**        CR _____ - _____

Willie C. McCray _____  **v.**  State of Alabama
**Appellant's Name**                              **Appellee**

On appeal from the:   [ X ] Circuit Court of
[   ] District Court of     Houston     County
[   ] Juvenile Court of

**Trial Court Case Number** _CC-94-791-792_____

**Notice of Appeal Date** __October 24, 2000___

I, ____Carla H. Woodall_____, certify that I have this date completed and filed with the clerk of the trial court an original and three copies of a true and correct transcript of all proceedings in the above referenced case that were reported by me and were specifically designated by the appellant for inclusion on the Reporter's Transcript Order. The transcript, which is numbered serially in the upper right-hand corner of each page, begins with a copy of the Reporter's Transcript Order and an index of both the exhibits and the testimony of the witnesses. The original transcript concludes with the original of this notice and the copies of the transcript conclude with copies of this notice. The page number appearing in the upper right-hand corner of this certificate is the last page of my portion of the transcript in this case.

Done this the __20th___ day of __August_____, _2001___.

_Carla H. Woodall_____
Court Reporter

**FILING AND SERVICE OF THIS FORM:**   Pursuant to Rule 11(b), A.R.App.P., the court reporter should file a copy of this certificate with the Clerk of the Court of Criminal Appeals and should serve copies of the certificate on counsel for the appellant or the appellant if he or she is not represented by appellate counsel, the attorney general and the district attorney, unless the appeal is from a municipal appeal, in which event a copy of the form should be served on the municipal prosecutor rather than the attorney general and district attorney.

NO. 00-0241

# IN THE COURT OF CRIMINAL APPEALS

## STATE OF ALABAMA

WILLIE C. MCCRAY,             )
                              )
    APPELLANT,            )
                              )
VS.                           ) ON APPEAL FORM THE
                              ) HOUSTON COUNTY
STATE OF ALABAMA,             ) CIRCUIT COURT
                              ) CC 94 - 791
    APPELLEE.             )

---

## BRIEF OF APPELLANT

---

## ORAL ARGUMENT REQUESTED

**Joseph W. Lewis**
**BYRD & BYRD**
**P.O. Box 536**
**Dothan, Alabama 36302**
**334-794-0759**
**334-792-0163 (fax)**

**Counsel for:**
**Willie C. McCray**



# TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS.......................................... i

TABLE OF AUTHORITIES...................................... ii

STATEMENT OF THE CASE................................. 1

ISSUE PRESENTED FOR REVIEW........................ 2

STATEMENT OF FACTS..................................... 3

ARGUMENT...................................................... 5

CONCLUSION.................................................... 10

CERTIFICATE OF SERVICE................................. 11

## **TABLE OF AUTHORITIES**

PAGES

**_Anderson v. State,_**
507 So.2d 580 (Ala.Crim.App. 1987)...................... 5,8,9,10

**_Bryan v. State,_**
453 So.2d 765 (Ala.Crim.App. 1984)......................     7

**_Buffalow v. State,_**
219 Ala. 407, 123 So.2d 633 (1929).....................     7

**_Ex Parte Cobb,_**
703 So.2d 871 (Ala. 1996)................................     6

**_ExParte Pfizer Inc.,_**
746 So.2d 960 (Ala. 1999)................................     6

# <u>TABLE OF STATUTES</u>

PAGES

Code of Alabama, (1975),
    Title 13A, Section 13A-6-2.......................... 2,5-9
             Section 13A-6-3.......................... 5-8, 10

## STATEMENT OF THE CASE

This appeal arises from a criminal case in the Houston County Circuit Court, in which the appellant, Willie C. McCray, was convicted of Felony Murder.

The appellant was originally indicted by the August 1994 term of the Houston County Grand Jury, for the crime of Capital Murder. (C. 25). The appellant was tried in the Houston County Circuit Court for Capital Murder, and on September 6, 1995, was convicted of the lesser included crime of Felony Murder. (C. 4). This Court reversed that judgment on August 28, 1998. (C. 29).

The appellant was retried in the Houston County Circuit Court in October, 2000, based upon an amended indictment charging Felony Murder. (C. 25). The appellant was convicted of Felony Murder on October 24, 2000. (C. 114). The appellant was sentenced to 99 years in the penitentiary of the State of Alabama, ordered to pay a fine of $20,000.00, ordered to pay restitution to various parties in the amount of $31,558.75, and ordered to pay a victim's compensation fund assessment of $50.00. (C. 114-115). A Motion for New Trial was denied on December 14, 2000, and this appeal followed. (C. 130).

1

## <u>ISSUE</u>

Whether the trial erred in refusing to instruct the jury on heat-of-passion manslaughter, where the appellant was convicted of murder pursuant to Section 13A-6-2 of the Code of Alabama, and where there was evidence produced at trial from which the jury could have determined that the appellant caused the death of another person due to a sudden heat-of-passion caused by provocation recognized by law, before a reasonable time for the passion to cool and for reason to reassert itself.

## STATEMENT OF THE FACTS

The evidence presented at trial tended to show that on or about August 7, 1993, around 10:30 or 10:45 p.m., the appellant, Willie C. McCray entered the Country Market grocery store in Dothan, Alabama, carrying a brown paper grocery sack, which contained a semi-automatic handgun. (R. 237-238; 363-365). Another individual, also armed with a handgun, positioned himself at the entrance/exit of the store, once the appellant was inside. (R. 365).

The appellant entered the store's inner office, where the safe was located, with one of the store's employees; another employee was already in the office. (R. 215-223; 237-242). The appellant told the two employees he wanted money, and was told the safe could not be opened without a manager. (R. 219-222). The appellant then walked back out into the store. (R. 223; 241-243).

The witnesses to the shooting in this case testified that, at that point, the victim, Michael Scott, walked up to the appellant and punched him in the face. (R. 244; 367). Within seconds, the appellant shot Mr. Scott, who died of the wound.

3

(R. 244; 367-368; 277).

The appellant's trial counsel moved the court, in writing and orally at trial, for a jury instruction on heat-of-passion manslaughter. (C. 112-113; R. 440). The trial court refused to give such an instruction on the grounds that manslaughter is not a lesser included offense of the crime with which the appellant was charged. (R. 440). The trial court later denied a Motion for New Trial, based on the court's refusal to give a jury charge on manslaughter. (R. 509).

## **ARGUMENT**

The trial court erred in refusing to give a jury instruction on manslaughter, because there was sufficient evidence presented at trial to support a manslaughter conviction, pursuant to the precise statutory language set forth in Section 13A-6-3 of the Code of Alabama.

The Code of Alabama defines manslaughter, inter alia, as "...[the causation] of the death of another person under circumstances that would constitute murder under Section 13A-6-2; except, that he causes the death due to a sudden heat of passion caused by provocation recognized by law, and before a reasonable time for the passion to cool and for reason to reassert itself." ALA.CODE § 13A-6-3(a)(2) (1975).

This Court has held that it is prejudicial error for a trial court to fail to instruct the jury on the lesser included charge of manslaughter, where there is evidence presented at trial to support a reasonable theory that the defendant's conduct in bringing about another person's death was due to a sudden heat of passion caused by provocation recognized by law. Anderson v. State, 507 So.2d 580, 583 (Ala.Crim.App. 1987).

5

The trial court's rationale for refusing to give an instruction on heat-of-passion manslaughter in this case was that manslaughter is not a lesser included offense of felony murder. (R. 440).

This is not reconcilable with the exact wording of Alabama's manslaughter statute. The statute says that a person commits the crime of manslaughter if, in a heat-of-passion caused by legally recognized provocation, he "...causes the death of another person under circumstances that would constitute murder under Section 13A-6-2...." ALA.CODE § 13A-6-3(a)(2) (1975).

When the language of a statute is plain and unambiguous, courts must enforce the statute as written by giving the words of the statute their ordinary plain meaning; they must interpret that language to mean exactly what it says and thus give effect to the apparent intent of the legislature. Ex Parte Pfizer, Inc., 746 So.2d 960, 964 (Ala.1999); Ex Parte Cobb, 703 So.2d 871, 875 (Ala. 1996).

The appellant was indicted and convicted under Section 13A-6-2(a)(3) of the Code of Alabama. (C. 25; 114). The

6

jury therefore concluded that he "....cause [d] the death of another person under circumstances that would constitute murder under Section 13A-6-2...". In addition, it is clear from the record that there was evidence presented at trial in this case which would have allowed jurors to conclude that the appellant's conduct in causing the death of Mr. Scott, the victim, was due to a sudden heat-of-passion caused by legal provocation. A number of witnesses testified that Mr. Scott walked up to the appellant and struck him in the face, seconds before the appellant shot Mr. Scott. (R. 244; 367). This is arguably legal provocation, with regard to heat-of-passion manslaughter, under Alabama law. Bryan v. State, 453 So.2d 765 (Ala.Crim.App. 1984), quoting Buffalow v. State, 219 Ala. 407, 122 So.2d 633, 635 (1929).

This is squarely within the Alabama manslaughter statute. Had the legislature intended to except felony murder from treatment with regard to heat-of-passion killings under Section 13A-6-3, they could have done so. They did not. ALA.CODE § 13A-6-3(a)(2) (1975). A construction of this statute to mean exactly what it says necessarily means that

7

the statute contemplates felony murder to the same extent as any other type of murder under Section 13A-6-2, as warranting consideration by the jury as to whether there is sufficient evidence of heat-of-passion to convict a defendant of manslaughter rather than murder.

The trial court therefore erred in refusing to give a jury instruction on manslaughter. Anderson, at 583. The trial court's rationale that manslaughter is not a lesser included offense of felony murder is inconsistent with a construction of Section 13A-6-3 of the Code of Alabama to mean exactly what it says. The statute unequivocally treats all murder under Section 13A-6-2 as subject to jury deliberation with regard to manslaughter, where a defendant causes the death of another due to a sudden heat-of-passion caused by legal provocation, where the death is caused before a reasonable time for the passion to cool and reason to reassert itself. ALA.CODE § 13A-6-3(a)(2)(1975). There was ample evidence presented at trial to bring the appellant's conduct within this statutory definition of manslaughter. Both of the State's eyewitnesses testified that Mr. Scott struck the appellant in the face right

8

before the shot occurred. (R. 244; 367). One of these witnesses testified the shot came "three to five seconds" after Mr. Scott struck the appellant. (R. 368).

The jury believed the appellant's conduct constituted murder under Section 13A-6-2(a)(3). (C. 25; R. 499). They therefore concluded he committed a crime "...under circumstances that would constitute murder under Section 13A-6-2...". That fact, taken together with the evidence presented that the appellant was struck in the face by the victim seconds before the fatal shot, bring the appellant's conduct within the ambit of the manslaughter statute, and the jury should have been so instructed. Anderson, at 583.

## **CONCLUSION**

The trial court erred in refusing to give a jury instruction on manslaughter. The trial court's rationale that manslaughter is not a lesser included offense of felony murder is inconsistent with a construction of Section 13A-6-3 of the Code of Alabama to mean exactly what it says. Because there was evidence presented at trial which would have allowed the jurors to determine that the appellant's actions in causing the death of Mr. Scott were due to a sudden heat-of-passion caused by legal provocation, the trial court's refusal to give the manslaughter instruction was prejudicial error, and the judgment of the trial court is due to be reversed. Anderson, at 583.

NO.  00-0241

## IN THE COURT OF CRIMINAL APPEALS OF THE

## STATE OF ALABAMA

| | |
|---|---|
| WILLIE C. McCRAY, | ) |
| | ) |
| APPELLANT, | ) |
| | ) |
| VS. | ) ON APPEAL FROM THE |
| | ) HOUSTON COUNTY |
| STATE OF ALABAMA, | ) CIRCUIT COURT |
| | ) CC 94-791 |
| APPELLEE. | ) |

### CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing upon the below named individual by placing a copy of the same in the U.S. Mail, postage pre-paid and correctly addressed:  The Attorney General of the State of Alabama, Honorable William Pryor, Alabama State House, Room 303, 11 South Union Street, Montgomery, Alabama 36130.

Dated this the _25th_ day of _September_, 2001.

JOSEPH W. LEWIS
Attorney for Appellant
P.O. Box 536
Dothan, Alabama 36302
(334) 794-0759
(334) 792-0163 fax

11

NO. CR-00-0241

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

WILLIE C. McCRAY,

APPELLANT,

V.

STATE OF ALABAMA,

APPELLEE.

ON APPEAL FROM THE CIRCUIT COURT OF
HOUSTON COUNTY, ALABAMA
(NO. CC-94-791 & 792)

BRIEF AND ARGUMENT

OF

BILL PRYOR
ATTORNEY GENERAL

AND

JOSEPH G. L. MARSTON, III
ASSISTANT ATTORNEY GENERAL

ATTORNEYS FOR APPELLEE

ADDRESS OF COUNSEL:

Office of the Attorney General
Criminal Appeals Division
Alabama State House
11 South Union Street
Montgomery, Alabama 36130
(334) 242-7300



## TABLE OF CONTENTS

PAGE

TABLE OF CASES..........................................................................ii

TABLE OF STATUTES..................................................................iii

TABLE OF RULES OF COURT.....................................................iii

STATEMENT OF THE CASE ........................................................1

STATEMENT OF ISSUES PRESENTED.........................................4

STATEMENT OF THE FACTS........................................................5

ARGUMENT.................................................................................8

    I. IN RE: SUBSTANCE......................................................8

        A. AS A MATTER OF LAW.........................................9

        B. AS A MATTER OF FACT......................................11

    II. IN RE: THIS CLAIM IS NOT PRESERVED
              FOR REVIEW................................................12

CONCLUSION...........................................................................14

APPENDIX.................................................................................15

CERTIFICATE OF SERVICE.......................................................20

TABLE OF CASES

PAGE(S)

Bang v. State,
     620 So.2d. 106, (Ala.Crim.App, 1993) ................................ 8

Cook v. State,
     431 So. 2d 1322, (Ala, 1983). ............................................ 9

Davis v. Alabama,
     498 U.S. 1127, (1991) ...................................................... 8

Davis v. State,
     554 So.2d. 1094, (Ala.Crim.App, 1986) ............................. 8

Ex parte Davis,
     554 So.2d. 1111, (Ala, 1986) ............................................ 8

Ex parte Tomlin,
     443 So.2d. 59, (Ala, 1983) ............................................ 8-9

Ex parte Wright,
     494 So.2d. 745, (Ala, 1986) .............................................. 8

Greenhill v. State,
     746 So.2d. 1064, (Ala.Crim.App, 1999)............................ 13

McCart v. State,
     765 So.2d. 21, (Ala.Crim.App, 2000)............................... 13

McCray V. State,
     738 So.2d. 911, (Ala. Crim. App, 1998)............................. 2

Miranda V. Arizona,
     384 U.S. 436, (1966)....................................................... 7

Perry v. State,
     453 So.2d. 762, (Ala.Crim.App, 1984).............................. 11

Tomlin v. Alabama,
    466 U.S. 954, (1984) ........................................................ 9

Wright v. Alabama,
    479 U.S. 1101, (1987) ...................................................... 8

Wright v. State,
    494 So.2d. 726, (Ala.Crim.App, 1985)................................ 8

## TABLE OF STATUTES

PAGE(S)

Code of Alabama, (1975),

    Title 13A, Section 13A-1-9............................................. 8, 16

        Section 13A-5-6........................................ 3, 16-17

        Section 13A-6-2..................... 2, 3, 4, 9, 10, 17-18

        Section 13A-6-3................................. 4, 9-10, 18

        Section 13A-8-2.......................................... 3, 18

        Section 13A-8-3.......................................... 1, 19

        Section 13A-5-40............................................. 1

        Section 13A-8-41............................................ 19

        Section 13A-8-44............................................ 19

## TABLE OF RULES OF COURT

PAGE(S)

Alabama Rules Of Criminal Procedure,

    Rule 21.3.......................................................................... 12

iii

NO. CR-00-0241

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

WILLIE C. McCRAY,

APPELLANT,

V.

STATE OF ALABAMA,

APPELLEE.

ON APPEAL FROM THE CIRCUIT COURT OF
HOUSTON COUNTY, ALABAMA
(NO. CC-94-791 & 792)

BRIEF AND ARGUMENT OF APPELLEE,
THE STATE OF ALABAMA

STATEMENT OF THE CASE

The Grand Jury of Houston County, at its August, 1994

Term, indicted the respondent-appellant, Willie C. McCray, for

capital murder[1] and theft of property in the first degree[2]. (C. Vol. I,

pp. 25-28)

McCray was arraigned and pleaded not guilty on October 12,

1994. (C. Vol. I, pp. 1 and 14)

---

[1] Code of Alabama, 1975, Section 13A-5-40(a)(2).

[2] Ibid, Section 13A-8-3, appendix

On September 6, 1995, McCray was found guilty of felony-murder[3], and theft of property in the first degree, as charged in the indictments.  McCray was adjudged guilty in accordance with the verdicts.  (C. Vol. I, pp. 4-5 and 17-18)

On September 22, 1995, McCray was sentenced.  (C. Vol. I, pp. 5 and 18)

Appeal followed.  (C. Vol I, p. 12 and 18)

On August 28, 1998, this Honorable Court reversed McCray's convictions.  (McCray v. State, 738 So.2d. 911, [Ala.Crim.App, 1998]; cert. den.)

Prior to the retrial, new counsel was appointed for McCray and he was re-arraigned on the indictment. McCray moved to proceed *pro se*, which was granted, but his appointed attorney was directed to assist him. McCray filed a number of patently irrelevant motions, and ultimately decided that he did not want to proceed *pro se*. His appointed attorney took over the defense. However, during trial, McCray again sought to replace his attorney, claiming that his attorney was, "... not putting up a fight... ." (Vol. II, R-185) The trial judge refused to remove the attorney in the middle of trial. (C. Vol. I, pp. 21-22 and 65-84, and Vol. II. R-184-188)

---

[3] Ibid, Section 13A-6-2(a)(3), appendix.

2

On October 23, 2000, the cause came on for retrial before the Honorable Jerry M. White, a circuit judge, and a jury. McCray was attended by his attorney, Mr. Christopher Capps, Esq. The State was represented by its district attorney, Mr. Douglas Albert Valeska, Esq, his chief assistant, Mr. Gary Maxwell, Esq, and assistant, Ms. Denise Bates, Esq. (C. Vol. I, pp. 11 and 22 and R-2)

On October 24, 2000, the jury, having heard the evidence, argument of counsel, and charge of the court, again found McCray guilty of felony-murder and theft of property in the first degree. McCray was adjudged guilty in accordance with the verdicts. (C. Vol. I, pp. 11 and 23 and Vol. IV, R-499-501.)

At the request of the defense, McCray was sentenced the same day to ninety-nine years imprisonment for murder[4] and twenty years imprisonment for theft[5], in addition to fines and various assessments.  (C. Vol. I, pp. 12 and 23 and Vol. IV, R-501-506)

The next day, October 25, 2000, McCray filed a motion for a new trial, which was denied on December 14, 2000. (C. Vol. I, pp. 12, 24, and 119-120 and Vol. IV, R-508-509.)

---

[4] Ibid, Sections 13A-5-6(a)(1) & (4) and 13A-6-2(c), appendix.

[5] Ibid, Sections 13A-5-6(a)2) and 13A-8-3(c), appendix.

3

This appeal follows. (C. Vol. I, pp. 12, 24, and 121, and Vol. IV, R-506)

## STATEMENT OF ISSUES PRESENTED

1. Does a criminal defendant have the right to charges to the jury on a lesser offense, which is neither included in the charged offense nor supported by the evidence?

2. Does a victim's resistance to a robber constitute a, "... provocation recognized by law... .", under Code of Alabama, (1975), Sections 13A-6-2(b) and 13A-6-3(a)(2), so as to reduce felony-murder to manslaughter?

3. Where a criminal defendant gives no grounds for an objection to the trial judge's oral charge to the jury, what, if anything, is preserved for review?

4

## STATEMENT OF THE FACTS

It was undisputed that sometime after ten o'clock, p.m, on August 6, 1993, a blue 1984 Chevrolet Monte Carlo automobile was stolen from Mr. Frank Edwards in Dothan, Houston County, Alabama. That same night, a license tag, No. 38BSF61, was stolen from a truck owned by Mr. Don Pynes. Mr. Edwards' stolen automobile, affixed with Mr. Pynes' stolen license tag was used by the perpetrators of the robbery of the County Market in Dothan, Houston County, Alabama, at about ten o'clock p.m. on August 7, 1993. (Vol. II, R-174-183, 188-195, and 219)

At the time of the robbery, Assistant Manager Jeff Clark was outside at the front of the store collecting carts and smoking a cigarette. He saw two black men arrive in the blue Monte Carlo. One of the men was carrying something in a Winn Dixie bag. Assuming that the men were returning an earlier purchase, Mr. Clark discarded his cigarette and followed the men into store. One of the men, stayed by the door; the other, who was identified as McCray, moved into the store demanding money. Both McCray and his accomplice were armed with pistols. At one point, Mr. Michael Scott struck McCray, whereupon McCray shot Mr. Scott in

5

the face. The robbers then fled the store, shooting at random, and escaped in Mr. Edwards' Blue Monte Carlo. (R. Vol. II, R-197-208, 211-228, 236- Vol. III, 249, 281-285, and 362-371)

Mr. Scott died of a gunshot wound to his head. (Vol. III, R-272-278)

The McCray was connected to the robbery-murder by three eye-witness identifications, including: Head Cashier Deborah Shelton, (Vol. II, R-218 and 228), Assistant Manager Jeff Clark, (Vol. II, R-218 and 228), and Mr. Keithland Reeves. Mr. Reeves, knew McCray before the robbery. Mr. Reeves was leaving the store as McCray and his accomplice were coming in. Mr. Reeves greeted McCray, saying, "...What's up?" (Vol. III, R-364) McCray responded, "... this is what's up...", (Ibid.), and he showed Mr. Reeves a paper bag containing a gun. Mr. Reeves saw the entire robbery-murder unfold. (Vol. III, R-362-371)

The McCray was also connected to the theft of Mr. Edward's automobile and the robbery-murder by his fingerprints, which were found on various items recovered from Mr. Edward's Blue Monte Carlo. (Vol. II, R-151-157, 160-170, Vol. III, 285-300, and 338-353.)

6

Under the procedure mandated by <u>Miranda V. Arizona</u>, 384 U.S. 436, (1966), a tape-recorded statement was provided by McCray, but its contents are not transcribed.

Finally, an extremely incriminating statement by McCray was overheard by Ms. Melanie McDougal during his first trial. (Vol. III, R-332-335)

The defense presented McCray, who testified in his own behalf. McCray was back to proceeding *pro se* and simply recited his tale to the jury. Incredibly, McCray admitted the robbery and even most of the details testified to by the State's witnesses. He claimed that he shot and killed Mr. Michael Scott "accidentally", after Mr. Scott, "...involved himself... .", (Vol. III, R-416), in the robbery by resisting. (Vol. III, R-390-439)

McCray admitted on cross-examination that he had told this story to no one, except the person he claims was his accomplice. Specifically, he never told any of this to his attorneys. (Vol. III, R-400-402)

ARGUMENT

The only point raised by McCray in this appeal is a claim that the trial judge should have charged the jury on heat of passion manslaughter under Code of Alabama, (1975), Sections 13A-6-2(b) and 13A-6-3(a)(2), appendix. This submission would be due to be rejected on the basis of the law and the facts, but it does not appear that the claim is preserved for review.

I.

IN RE: SUBSTANCE

It is well established that, where there is no basis for a verdict of guilty of a certain lesser-included offense, an accused person has no right to charges on such offense. Section 13A-1-9(b), Code of Alabama, 1975, appendix; Bang v. State, 620 So.2d. 106, at 110, (Ala.Crim.App, 1993); cert. den; Davis. v. State, 554 So.2d. 1094, at 1103, (Ala.Crim.App, 1986); aff'd sub nom Ex parte Davis, 554 So.2d. 1111, (Ala, 1986); U.S. cert. den. sub nom Davis v. Alabama, 498 U.S. 1127, (1991); Wright v. State, 494 So.2d. 726, at 729ff, (Ala.Crim.App, 1985); aff'd. sub nom Ex parte Wright, 494 So.2d. 745, at 747ff, (cases collected) (Ala, 1986); U.S. cert. den. sub nom Wright v. Alabama, 479 U.S. 1101, (1987); Ex parte

8

Tomlin, 443 So.2d. 59, at 61ff, (Ala, 1983); U.S. cert. den. *sub nom* Tomlin v. Alabama, 466 U.S. 954, (1984), and Cook v. State, 431 So.2d. 1322, (Ala, 1983).

In this case, heat of passion manslaughter was not a lesser included offense in felony-murder, both as a matter of law and as a matter of fact.

### A.

### AS A MATTER OF LAW

Code of Alabama, (1975), section 13A-6-2(b), appendix, provides as follows:

> ...(b) A person does not commit murder under subdivisions (a)(1) or (a)(2) of this section if he was moved to act by a sudden heat of passion caused by *provocation recognized by law*, and before there had been a reasonable time for the passion to cool and for reason to reassert itself. The burden of injecting the issue of killing under legal provocation is on the defendant, but this does not shift the burden of proof. This subsection does not apply to a prosecution for, or preclude a conviction of, manslaughter or other crime..... (Emphasis supplied.)

Code of Alabama, (1975), section 13A-6-3(a)(2), appendix, provides as follows:

> ...(2) He causes the death of another person under circumstances that would constitute murder under section 13A-602; except, that he causes the death due to a sudden heat of passion caused by *provocation recognized by law*, and before a reasonable time for the

9

passion to cool and for reason to reassert itself... .
(Emphasis supplied.)

Thus, both statutes require that the provocation be, "... recognized by law,... ."

McCray was charged with felony-murder, which is defined as follows:

(a) A person commits the crime of murder if:...

(3) He commits...robbery in any degree...and, in the course of or in furtherance of the crime that he is committing or attempting to commit, or in immediate flight therefrom, he, or another participant if there be any, causes the death of any person.... . (Code of Alabama, [1975], Section 13A-6-2[a][3], appendix.)

Mr. Scott, the homicide victim in this case, was a victim of McCray's robbery. It was undisputed, indeed sworn to by McCray himself, that he, McCray, was engaged in a robbery, when Mr. Scott struck McCray and McCray shot him in the face.

McCray's submission sets the concept of provocation "on its head". McCray's robbery provoked Mr. Scott's action. Obviously, it was never the Legislature's intention that an armed robber's killing of a robbery victim should be reduced to a misdemeanor, if the robber was provoked by the victim's resistance to being robbed.

10

As we will discuss below, Mr. Scott's action did not provoke McCray, but, even if it had, a victim's resistance to a robbery is not a, "...provocation recognized by law...."

Therefore, no charge on heat of passion manslaughter was authorized by the law. *E.g.* Perry v. State, 453 So.2d. 762, 765, (Ala.Crim.App, 1984).

### B.

### AS A MATTER OF FACT

The evidence in this case did not provide a factual basis for a conviction for heat of passion manslaughter, because the evidence, in particular McCray's own testimony, shows that he did not experience "heat of passion". McCray did not claim that Mr. Scott's action made him angry; McCray claimed that Scott's action cause McCray to lose his grip on the gun. According to McCray, Mr. Scott's death was an "accident".

Without some evidence that the defendant experienced "heat of passion", there is no basis for charges on heat of passion.

The evidence in this case was open to only two possibilities, either McCray was guilty of felony murder or he was not guilty. In

11

this state of the evidence, there was no basis for a charge on heat

of passion manslaughter..

## II.

### IN RE: THIS CLAIM IS NOT PRESERVED FOR REVIEW

Rule 21.3, A.R.Cr.P. provides as follows:

> No party may assign as error the court's giving or
> failing to give a written instruction, or the giving of an
> erroneous, misleading, incomplete, or otherwise
> improper oral charge, unless the party objects thereto
> before the jury retires to consider its verdict, *stating
> the matter to which he or she objects and the grounds of
> the objection... .* (Emphasis supplied.)

Before closing arguments, McCray's attorney stated to the

court:

> ...MR. CAPPS: Once again, I would ask the Court to
> charge the jury with the charge of manslaughter in
> this matter... . (Vol. III. R-440)

At the close of the oral charge to the jury, the defense

objected as follows:

> ...MR. CAPPS: ...The Defense is satisfied with the
> exception [of] the others that we have previously
> mention that the Court refused... . (Vol. IV, R-495)

The objection did not state, "...the grounds of the objection... .".

While, given the frivolity of McCray's claim, this is understandable,

the objection was not sufficient to preserve for review the trial

12

court's refusal to charge on heat of passion manslaughter. <u>McCart</u>

<u>v. State</u>, 765 So.2d. 21, at 29-30, (Ala.Crim.App, 2000); <u>Greenhill</u>

<u>v. State</u>, 746 So.2d. 1064, 1069, (Ala.Crim.App, 1999);

   This claim is, therefore, not properly before this Honorable

Court.

## CONCLUSION

In conclusion, the appellee, the State of Alabama, respectfully submits that there is no error in the record, and the appellee prays that the judgments and sentences of the Honorable Circuit Court of Houston County in this case be affirmed.

Respectfully submitted,

BILL PRYOR
PRY002
ATTORNEY GENERAL
By:

JOSEPH G. L. MARSTON, III
Mar032
ASSISTANT ATTORNEY GENERAL

ATTORNEYS FOR THE STATE
OF ALABAMA, APPELLEE

ADDRESS OF COUNSEL:

Office of the Attorney General
Criminal Appeals Division
Alabama State House
11 South Union Street
Montgomery, Alabama 36130
(334) 242-7300

14

APPENDIX

<u>CODE OF ALABAMA</u>, (1975)

TITLE 13A,

**SECTION 13A-1-9. LESSER INCLUDED OFFENSES.**

(a) A defendant may be convicted of an offense included in an offense charged.  An offense is an included one if:

(1) It is established by proof of the same or fewer than all the facts required to establish the commission of the offenses charged; or

(2) It consists of an attempt of an attempt or solicitation to commit the offense charged of to commit a lesser included offense; or

(3) It is specifically designated by statute as a lesser degree of the offense charged or;

(4) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property or public interest, or a lesser kind of culpability suffices to establish its commission.

(b) The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense.

**SECTION 13A-5-6. SENTENCES OF IMPRISONMENT FOR FELONIES.**

(a) Sentences for felonies shall be for a definite term of imprisonment, which imprisonment includes hard labor, within the following limitations:

(1) For a Class A felony, for life or not more than 99 years or less than 10 years.

(2) For a Class B felony, not more than 20 years or less than 2 years.

16

(3) For a Class C felony, not more than 10 years or less than 1 year and 1 day.

(4) For a Class A felony in which a firearm or deadly weapon was used or attempted to be used in the commission of the felony, not less than 20 years.

(5) For a Class B or C felony in which a firearm or deadly weapon was used or attempted to be used in the commission of the felony, not less than 10 years.

(b) The actual time of release within the limitations established by subsection (a) of this section shall be determined under procedures established elsewhere by law.

## SECTION 13A-6-2. MURDER.

(a) A person commits the crime of murder if:

(1) With intent to cause the death of another person, he causes the death of that person or of another person; or

(2) Under circumstances manifesting extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to a person other than himself, and thereby causes the death of another person; or

(3) He commits or attempts to commit arson in the first degree, burglary in the first or second degree, escape in the first degree or second degree, escape in the first degree, kidnapping in the first degree, rape in the first degree, robbery in any degree, sodomy in the first degree or any other felony clearly dangerous to human life and, in the course of or in furtherance of the crime that he is committing or attempting to commit, or in immediate flight therefrom, he, or another participant if there be any, causes the death of any person.

(b) A person does not commit murder under subdivisions (a)(1) or (a)(2) of this section if he was moved to act by a sudden heat of passion caused by provocation recognized by law, and before there had been a reasonable time for the passion to cool and for reason to

17

reassert itself. The burden of injecting the issue of killing under legal provocation is on the defendant, but this does not shift the burden of proof. This subsection does not apply to a prosecution for, or preclude a conviction of, manslaughter or other crime.

(c) Murder is a Class A felony; provided, that the punishment for murder or any offense committed under aggravated circumstances, as provided by article 2 of chapter 5 of this title, is death or life imprisonment without parole, which punishment shall be determined and fixed as provided by article 2 of chapter 5 of this title or any amendments thereto.

## SECTION 13A-6-3. MANSLAUGHTER.

(a) A person commits the crime of manslaughter if:

(1) He recklessly causes the death of another person, or

(2) He causes the death of another person under circumstances that would constitute murder under section 13A-602; except, that he causes the death due to a sudden heat of passion caused by provocation recognized by law, and before a reasonable time for the passion to cool and for reason to reassert itself.

(b) Manslaughter is a Class B felony.

## SECTION 13A-8-2. THEFT OF PROPERTY - DEFINITION.

A person commits the crime of theft of property if he:

(1) Knowingly obtains or exerts unauthorized control over the property of another, with intent to deprive the owner of his property; or

(2) Knowingly obtains by deception control over the property of another, with intent to deprive the owner of his property.

18

**SECTION 13A-8-3. THEFT OF PROPERTY IN THE FIRST DEGREE.**

(a) The theft of property which exceeds $1,000.00 in value, or property of any value taken from the person of another, constitutes theft of property in the first degree.

(b) The theft of a motor vehicle, regardless of its value, constitutes theft of property in the first degree.

(c) Theft of property in the first degree is a Class B felony.

**SECTION 13A-8-41. ROBBERY IN THE FIRST DEGREE.**

(a) A person commits the crime of robbery in the first degree if he violates section 13A-8-43 and he:

(1) Is armed with a deadly weapon or dangerous instrument; or

(2) Causes serious physical injury to another.

(b) Possession then and there of an article used or fashioned in a manner to lead any person who is present reasonably to believe it to be a deadly weapon or dangerous instrument, or any verbal or other representation by the defendant that he is then and there so armed, is prima facie evidence under subsection (a) of this section that he was so armed.

(c) Robbery in the first degree is a Class A felony.

**SECTION 13A-8-44. CLAIM OF RIGHT NOT DEFENSE IN ROBBERY PROSECUTION.**

No person may submit in defense against a prosecution for robbery in any of its degrees that there was no theft because the taking was under a claim of right. Claim of right is not a defense under this article.

19

CERTIFICATE OF SERVICE

I, Joseph G. L. Marston, III, Assistant Attorney General of Alabama and one of the attorneys for the State of Alabama, appellee, do hereby certify that on this the 10th day of October, 2001, I did serve copies of the foregoing on the attorney* for the appellant and his former attorney**, by mailing the same to them, first class postage prepaid and addressed as follows:

    Mr. Joseph W. Lewis, Esq.**
    Byrd & Byrd
    Attorneys At Law
    Suite One
    211 West Main Street
    Post Office Box 536
    Dothan, Alabama, 36302

    Mr. J. Christopher Capps, Esq.**
    Jackson, Rhodes, Moulton, & Capps
    Attorneys At Law
    Post Office Box 7122
    Dothan, Alabama, 36301

    JOSEPH G. L. MARSTON, III
    Mar032
    ASSISTANT ATTORNEY GENERAL

ADDRESS OF COUNSEL:

Office of the Attorney General
Criminal Appeals Division
Alabama State House
11 South Union Street
Montgomery, Alabama 36130
(334) 242-7300

NUMBER 53585

*Marston*
*21505*

# Court of Criminal Appeals

State of Alabama

Judicial Building, 300 Dexter Avenue

**P. O. Box 301555**

**Montgomery, AL 36130-1555**

H. W. "BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges


RELEASED
NOV 21 2001
CLERK
ALA COURT CRIMINAL APPEALS

Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

### MEMORANDUM

CR-00-0241    Houston Circuit Court CC-94-791 and CC-94-792

## Willie C. McCray v. State

WISE, Judge.

The appellant, Willie C. McCray, appeals from his conviction of felony murder, a violation of § 13A-6-2(a)(3), Ala. Code 1975 and theft of property in the first degree, a violation of § 13A-8-3, Ala. Code 1975. The trial court sentenced the appellant to 99 years' imprisonment for the felony murder conviction. The trial court also ordered the appellant to pay a $50 assessment to the Crime Victims Compensation Fund. In addition, the trial court ordered the appellant to pay $31,558.75 in restitution and a $20,000 fine. Further, the trial court sentenced the appellant to 20 years' imprisonment for the theft conviction. The trial court also ordered the appellant to pay a $50 assessment to the Crime Victims Compensation Fund and a $10,000 fine. This appeal followed.[1]

The State's evidence tended to establish that on August 6, 1993, the appellant and an accomplice stole an automobile belonging to Frank Edwards and drove to the Country Market

---

[1]This is the second appeal taken by the appellant. On August 28, 1998, this Court reversed the appellant's convictions in McCray v. State, 738 So.2d 911 (Ala.Crim.App. 1998)(trial court reversible error in denying McCray's Batson motion).

EXHIBIT
D

PENGAD 800-631-6989

grocery store in Dothan.  The appellant, armed with a pistol, entered the store while his accomplice stood by the exit.  The appellant demanded two store employees to retrieve the money from the store safe.  During the robbery, Michael Scott, a customer who had been waiting in the check-out line, struck the appellant in the face, whereupon the appellant shot Scott in the face.  The appellant and his accomplice fled the scene while firing their guns as they left.  Scott died four days later as a result of the gunshot to his face.

The appellant contends that the trial court erred in refusing to instruct the jury on heat-of-passion manslaughter. Specifically, the appellant argues that there was sufficient evidence presented at trial from which the jury could determine that the appellant caused the death of another person due to sudden heat-of-passion caused by provocation recognized by law. Rule 21.3, Ala.R.Crim.P., provides:

> "No party may assign as error the court's giving or failing to give a written instruction, or the giving of an erroneous, misleading, or incomplete, or otherwise improper oral charge, unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds for the objection."

The record reflects that the appellant submitted 23 requested jury charges to the trial court.  Of these 23 requested charges, 7 were denied.  Of the 7 requested jury charges that were denied, 4 were related to the offense of manslaughter.  Before delivering closing arguments, the appellant simply asked the trial court to charge the jury with manslaughter, without any explanation why such a charge was warranted. However, when the trial court stated that it would not give the requested jury instruction, the appellant did not object.  After the trial court's oral charge to the jury, the appellant objected stating, "[t]he Defense is satisfied with exception [of] the others that we have previously mentioned that the Court refused." (R. 495.)

"The defendant is required to state with particularity the grounds of his objection to the court's refusal to give a requested charge." Miller v. State, 673 So.2d 819, 820 (Ala.Crim.App. 1995) (citing Morrison v. State, 601 So.2d 165, 178 (Ala.Crim.App. 1992)).  In Miller, this Court found that the appellant had failed to preserve for review the trial court's refusal to give a jury instruction where the appellant's objection at trial was, "'[w]e are satisfied except for the failure to give the requested charge.'" Miller v. State, 673 So.2d at 820.

2

In the instant case, the appellant failed to preserve the issue he raised as to whether the trial court erred in refusing to give his jury instruction. Although the appellant excepted to the trial court's refusal to give the requested charges, he did not state with particularity the specific grounds of his objection. See <u>Miller v. State</u>, 673 So.2d 819 (Ala.Crim.App. 1995). Merely excepting to the other charges previously mentioned without stating any grounds for the objection is not sufficient to preserve this issue for appellate review. See <u>Greenhill v. State</u>, 673 So.2d 819 (Ala.Crim.App. 1999).

Based on the foregoing, the judgment of the trial court is affirmed.

**AFFIRMED.**

McMillan, P.J., and Cobb, Baschab, and Shaw, JJ., concur.

3

*Marston*

## NO. 00-0241

## IN THE COURT OF CRIMINAL APPEALS

## STATE OF ALABAMA

WILLIE C. MCCRAY,          )
                           )
　　APPELLANT,             )
                           )
VS.                        ) ON APPEAL FORM THE
                           ) HOUSTON COUNTY
STATE OF ALABAMA,          ) CIRCUIT COURT
                           ) CC 94 - 791
　　　APPELLEE.            )

---

## APPLICATION FOR REHEARING

---

**JOSEPH W. LEWIS
BYRD & BYRD
P.O. Box 536
Dothan, Alabama 36302
334-794-0759
334-792-0163 (fax)**

**Counsel for:
Willie C. McCray**



## **TABLE OF CONTENTS**

                                                          PAGE

TABLE OF CONTENTS........................................    i

TABLE OF AUTHORITIES....................................    ii

APPLICATION FOR REHEARING..........................    iv

STATEMENT OF THE CASE...............................    1

ISSUE PRESENTED FOR REVIEW........................    2

STATEMENT OF FACTS......................................    3

ARGUMENT.......................................................    5

CONCLUSION....................................................    10

CERTIFICATE OF SERVICE...............................    11

i

# TABLE OF AUTHORITIES

PAGES

*Anderson v. State,*
507 So.2d 580 (Ala.Crim.App. 1987)...................... 5,8,9,10

*Bryan v. State,*
453 So.2d 765 (Ala.Crim.App. 1984)..................... 7

*Buffalow v. State,*
219 Ala. 407, 123 So.2d 633 (1929)..................... 7

*Ex Parte Cobb,*
703 So.2d 871 (Ala. 1996)................................. 6

*Miller v. State,*
673 So.2d 819 (Ala.Crim.App. 1995)................... 10,11

*Morrison v. State,*
601 So.2d 165 (Ala.Crim.App. 1992)................... 10

*ExParte Pfizer Inc.,*
746 So.2d 960 (Ala. 1999)................................. 6

## TABLE OF STATUTES

                                          PAGES
Code of Alabama, (1975),
     Title 13A, Section 13A-6-2.........................  2,5-9
          Section 13A-6-3..........................  5-8, 10

iii

NO.  00-0241

## IN THE COURT OF CRIMINAL APPEALS

## STATE OF ALABAMA

| | |
|---|---|
| **WILLIE C. MCCRAY,** | ) |
| | ) |
| **APPELLANT,** | ) |
| | ) |
| **VS.** | ) **ON APPEAL FORM THE** |
| | ) **HOUSTON COUNTY** |
| **STATE OF ALABAMA,** | ) **CIRCUIT COURT** |
| | ) **CC 94 - 791** |
| **APPELLEE.** | ) |

## <u>APPLICATION FOR REHEARING</u>

Comes now the appellant, Willie C. McCray, in the above-styled cause, and moves this Court to grant a rehearing in this cause, and to reconsider, revise, reverse, and withdraw its judgment of November 21, 2001, affirming the appellant's conviction in the Circuit Court of Houston County, Alabama, and to enter an order reversing said judgment.  Submitted herewith are a brief and argument in support of said application.

Respectfully submitted this the _5ᵗʰ_ day of _December_, 2001.

_____
JOSEPH W. LEWIS (LEW 048)
Attorney for Appellant

iv

## STATEMENT OF THE CASE

This appeal arises from a criminal case in the Houston County Circuit Court, in which the appellant, Willie C. McCray, was convicted of Felony Murder.

The appellant was originally indicted by the August 1994 term of the Houston County Grand Jury, for the crime of Capital Murder. (C. 25). The appellant was tried in the Houston County Circuit Court for Capital Murder, and on September 6, 1995, was convicted of the lesser included crime of Felony Murder. (C. 4). This Court reversed that judgment on August 28, 1998. (C. 29).

The appellant was retried in the Houston County Circuit Court in October, 2000, based upon an amended indictment charging Felony Murder. (C. 25). The appellant was convicted of Felony Murder on October 24, 2000. (C. 114). The appellant was sentenced to 99 years in the penitentiary of the State of Alabama, ordered to pay a fine of $20,000.00, ordered to pay restitution to various parties in the amount of $31,558.75, and ordered to pay a victim's compensation fund assessment of $50.00. (C. 114-115). A Motion for New Trial was denied on December 14, 2000, and this appeal followed. (C. 130).

1

On November 21, 2001, this Court affirmed the appellant's conviction in a memorandum opinion. The Court held that because the appellant's trial counsel failed to object with particularity to the trial court's refusal to give a jury instruction on heat-of-passion manslaughter, the issue was not preserved for review. (Memorandum Opinion, at p. 3).

## ISSUE

Whether the trial erred in refusing to instruct the jury on heat-of-passion manslaughter, where the appellant was convicted of murder pursuant to Section 13A-6-2 of the Code of Alabama, and where there was evidence produced at trial from which the jury could have determined that the appellant caused the death of another person due to a sudden heat-of-passion caused by provocation recognized by law, before a reasonable time for the passion to cool and for reason to reassert itself.

## **STATEMENT OF THE FACTS**

The evidence presented at trial tended to show that on or about August 7, 1993, around 10:30 or 10:45 p.m., the appellant, Willie C. McCray entered the Country Market grocery store in Dothan, Alabama, carrying a brown paper grocery sack, which contained a semi-automatic handgun. (R. 237-238; 363-365). Another individual, also armed with a handgun, positioned himself at the entrance/exit of the store, once the appellant was inside. (R. 365).

The appellant entered the store's inner office, where the safe was located, with one of the store's employees; another employee was already in the office. (R. 215-223; 237-242). The appellant told the two employees he wanted money, and was told the safe could not be opened without a manager. (R. 219-222). The appellant then walked back out into the store. (R. 223; 241-243).

The witnesses to the shooting in this case testified that, at that point, the victim, Michael Scott, walked up to the appellant and punched him in the face. (R. 244; 367). Within seconds, the appellant shot Mr. Scott, who died of the wound.

4

(R. 244; 367-368; 277).

The appellant's trial counsel moved the court, in writing and orally at trial, for a jury instruction on heat-of-passion manslaughter. (C. 112-113; R. 440). The trial court refused to give such an instruction on the grounds that manslaughter is not a lesser included offense of the crime with which the appellant was charged. (R. 440).

5

## **ARGUMENT**

The trial court erred in refusing to give a jury instruction on manslaughter, because there was sufficient evidence presented at trial to support a manslaughter conviction, pursuant to the precise statutory language set forth in Section 13A-6-3 of the Code of Alabama.

The Code of Alabama defines manslaughter, inter alia, as "...[the causation] of the death of another person under circumstances that would constitute murder under Section 13A-6-2; except, that he causes the death due to a sudden heat of passion caused by provocation recognized by law, and before a reasonable time for the passion to cool and for reason to reassert itself." ALA.CODE § 13A-6-3(a)(2) (1975).

This Court has held that it is prejudicial error for a trial court to fail to instruct the jury on the lesser included charge of manslaughter, where there is evidence presented at trial to support a reasonable theory that the defendant's conduct in bringing about another person's death was due to a sudden heat of passion caused by provocation recognized by law. Anderson v. State, 507 So.2d 580, 583 (Ala.Crim.App. 1987).

6

The trial court's rationale for refusing to give an instruction on heat-of-passion manslaughter in this case was that manslaughter is not a lesser included offense of felony murder. (R. 440).

This is not reconcilable with the exact wording of Alabama's manslaughter statute. The statute says that a person commits the crime of manslaughter if, in a heat-of-passion caused by legally recognized provocation, he "...causes the death of another person under circumstances that would constitute murder under Section 13A-6-2...." ALA.CODE § 13A-6-3(a)(2) (1975).

When the language of a statute is plain and unambiguous, courts must enforce the statute as written by giving the words of the statute their ordinary plain meaning; they must interpret that language to mean exactly what it says and thus give effect to the apparent intent of the legislature. <u>Ex Parte Pfizer, Inc.</u>, 746 So.2d 960, 964 (Ala.1999); <u>Ex Parte Cobb</u>, 703 So.2d 871, 875 (Ala. 1996).

The appellant was indicted and convicted under Section 13A-6-2(a)(3) of the Code of Alabama. (C. 25; 114). The

7

jury therefore concluded that he "....cause [d] the death of another person under circumstances that would constitute murder under Section 13A-6-2...". In addition, it is clear from the record that there was evidence presented at trial in this case which would have allowed jurors to conclude that the appellant's conduct in causing the death of Mr. Scott, the victim, was due to a sudden heat-of-passion caused by legal provocation. A number of witnesses testified that Mr. Scott walked up to the appellant and struck him in the face, seconds before the appellant shot Mr. Scott. (R. 244; 367). This is arguably legal provocation, with regard to heat-of-passion manslaughter, under Alabama law. Bryan v. State, 453 So.2d 765 (Ala.Crim.App. 1984), *quoting* Buffalow v. State, 219 Ala. 407, 122 So.2d 633, 635 (1929).

This is squarely within the Alabama manslaughter statute. Had the legislature intended to except felony murder from treatment with regard to heat-of-passion killings under Section 13A-6-3, they could have done so. They did not. ALA.CODE § 13A-6-3(a)(2) (1975). A construction of this statute to mean exactly what it says necessarily means that

8

the statute contemplates felony murder to the same extent as any other type of murder under Section 13A-6-2, as warranting consideration by the jury as to whether there is sufficient evidence of heat-of-passion to convict a defendant of manslaughter rather than murder.

The trial court therefore erred in refusing to give a jury instruction on manslaughter. <u>Anderson</u>, at 583. The trial court's rationale that manslaughter is not a lesser included offense of felony murder is inconsistent with a construction of Section 13A-6-3 of the Code of Alabama to mean exactly what it says. The statute unequivocally treats <u>all</u> murder under Section 13A-6-2 as subject to jury deliberation with regard to manslaughter, where a defendant causes the death of another due to a sudden heat-of-passion caused by legal provocation, where the death is caused before a reasonable time for the passion to cool and reason to reassert itself. ALA.CODE § 13A-6-3(a)(2)(1975). There was ample evidence presented at trial to bring the appellant's conduct within this statutory definition of manslaughter. Both of the State's eyewitnesses testified that Mr. Scott struck the appellant in the face right

9

before the shot occurred. (R. 244; 367). One of these witnesses testified the shot came "three to five seconds" after Mr. Scott struck the appellant. (R. 368).

The jury believed the appellant's conduct constituted murder under Section 13A-6-2(a)(3). (C. 25; R. 499). They therefore concluded he committed a crime "...under circumstances that would constitute murder under Section 13A-6-2...". That fact, taken together with the evidence presented that the appellant was struck in the face by the victim seconds before the fatal shot, bring the appellant's conduct within the ambit of the manslaughter statute, and the jury should have been so instructed. Anderson, at 583.

In affirming the appellant's conviction, this Court cited Miller v. State, 673 So.2d 819 (Ala.Crim.App 1995), wherein the Court held that "[t]he defendant is required to state with particularity the grounds of his objection to the court's refusal to give a requested charge." Miller, at 820 (citing Morrison v. State, 601 So.2d 165, 178 (Ala.Crim.App. 1992). The Court in Miller had found that the appellant had failed to preserve for review the trial court's refusal to give a jury instruction where

10

the appellant's objection at trial was, "[w]e are satisfied except for the failure to give the requested charge." <u>Miller</u>, at 820.

This case is distinguishable from <u>Miller</u>. Although Mr. McCray's trial counsel, as in <u>Miller</u>, excepted to the trial court's failure to give a manslaughter charge in one instance without particularly stating the reason for the exception, Mr. McCray's trial counsel had already stated, on the record, and based on evidence already in the record, why he thought a manslaughter charge was warranted. (R 380-81). The Court effectively refused to give the charge at that time. (R 382-83). When Mr. McCray's trial counsel told the Court, "[t]he Defense is satisfied with the exception [of] the others that we have previously mentioned that the Court refused", he thereby incorporated the particular reasons for asking for a manslaughter charge which had been placed on the record earlier in the trial proceedings.

Accordingly, the appellant prays this Court would reconsider its decision of November 21, 2001, affirming the appellant's conviction.

11

## **CONCLUSION**

The trial court erred in refusing to give a jury instruction on manslaughter. The trial court's rationale that manslaughter is not a lesser included offense of felony murder is inconsistent with a construction of Section 13A-6-3 of the Code of Alabama to mean exactly what it says. Because there was evidence presented at trial which would have allowed the jurors to determine that the appellant's actions in causing the death of Mr. Scott were due to a sudden heat-of-passion caused by legal provocation, the trial court's refusal to give the manslaughter instruction was prejudicial error, and the judgment of the trial court is due to be reversed. <u>Anderson</u>, at 583.

12

NO. 00-0241

# IN THE COURT OF CRIMINAL APPEALS OF THE

## STATE OF ALABAMA

| | |
|---|---|
| **WILLIE C. McCRAY,** | ) |
| | ) |
| **APPELLANT,** | ) |
| | ) |
| **VS.** | ) **ON APPEAL FROM THE** |
| | ) **HOUSTON COUNTY** |
| **STATE OF ALABAMA,** | ) **CIRCUIT COURT** |
| | ) **CC 94-791** |
| **APPELLEE.** | ) |

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing upon the below named individual by placing a copy of the same in the U.S. Mail, postage pre-paid and correctly addressed: The Attorney General of the State of Alabama, Honorable William Pryor, Alabama State House, Room 303, 11 South Union Street, Montgomery, Alabama 36130.

Dated this the _5th_ day of ___December___, 2001.

_____
JOSEPH W. LEWIS (LEW 048)
Attorney for Appellant
P.O. Box 536
Dothan, Alabama 36302
(334) 794-0759
(334) 792-0163 fax

13

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA
### JUDICIAL BUILDING, 300 DEXTER AVENUE
### P.O. BOX 301555
### MONTGOMERY, AL 36130-1555

H. W. "Bucky" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges

Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334) 242-4590
FAX (334) 242-4689

Hon. Judy Byrd, Circuit Clerk
Hon. Joseph G. L. Marston, III, Asst. Atty.
Gen.
Hon. Joseph W. Lewis, Attorney

RE:  CR-00-0241
Willie C. McCray v. State of Alabama (Appeal from
Houston Circuit Court: CC94-791; 792).

Dear Sir or Madam:

You are hereby notified that on December 21st, 2001 the following action was taken in the above referenced
cause by the Court of Criminal Appeals:

Application for rehearing overruled.

Lane W. Mann
Clerk
Court of Criminal Appeals

LWM/ lk



# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA
### JUDICIAL BUILDING, 300 DEXTER AVENUE
### P.O. BOX 301555
### MONTGOMERY, AL 36130-1555

H. W. "Bucky" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges

Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334) 242-4590
FAX (334) 242-4689

Hon. Judy Byrd, Circuit Clerk
Hon. Joseph G. L. Marston, III, Asst. Atty. Gen.
Hon. Joseph W. Lewis, Attorney

RE:   CR-00-0241
      Willie C. McCray v. State of Alabama (Appeal from
      Houston Circuit Court: CC94-791; 792).

Dear Sir or Madam:

You are hereby notified that on December 21st, 2001 the following action was taken in the above referenced cause by the Court of Criminal Appeals:

Application for rehearing overruled.

Lane W. Mann
Clerk
Court of Criminal Appeals

LWM/ lk



...RT OF CRIMINAL APPEALS NO. CR-05-1474

# ...PEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

CIRCUIT COURT OF _____ HOUSTON _____ COUNTY, ALABAMA

CIRCUIT COURT NO _____ CC1994-791.60 _____

CIRCUIT JUDGE _____ JERRY M. WHITE _____

...iction/ Order Appealed From: _____ RULE 32 PETITION _____

...posed: _____ PETITION DENIED _____

...nt Iadigent: ☑ YES ☐ NO

## WILLIE MCCRAY

**NAME OF APPELLANT**

BRENT GOURLEY        334-677-7734
(Appellant's Attorney)              (Telephone No )

...28 S OATES ST

...THAN        AL        36301
              (State)        (Zip Code)

### V.

## STATE OF ALABAMA

**NAME OF APPELLEE**

...epresented by Attorney General)

...OTE: If municipal appeal, indicate above, and enter

...name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)



CLERK'S INDEX

CASE ACTION SUMMARY                                            1-2

PETITION FOR RELIEF FROM CONVICITON OR SENTENCE.              3-16

IN FORMA PAUPERIS DECLARATION                                 17-19

02-28-06 ORDER: DEFT ALLOWED TO FILE RULE 32 PETITION         20
IN FORMA PAUPERIS.  BRENT GOURLEY APPOINTED TO
REPRESENT DEFENDANT.  HEARING ON PETITION SET FOR
APRIL 19, 2006 9:00 A.M.  CLERK TO FURNISH MR. GOURLEY WITH
COPY OF PETITION.

TRANSPORT ORDER                                               21

MOTION FOR SUMMARY DISPOSITION                                22-23

MOTION TO PRODUCE THE TRANSCRIPT FOR THE COURT'S              24
REFERENCE.

RESPONSE TO RESPONDENT MOTION TO DISMISS                      25-26

04-19-06 ORDER:  ON HEARING EVIDENCE. THE DEFENDANT'S         27
RULE 32 PETITION IS DENIED.

NOTICE OF APPEAL TO THE COURT OF CRIMINAL APPEALS OF          28
ALABAMA.

COURT OF CRIMINAL APPEALS DOCKETING STATEMENT                29-30

COURT REPORTER'S TRANSCRIPT ORDER – CRIMINAL                  31

05-08-06 ORDER: BRENT GOURLEY APPOINTED TO REPRESENT         32
DEFENDANT ON APPEAL.  DEFENDANT ALLOWED FREE
TRANSCRIPT.

CLERK'S NOTICE OF APPEAL                                       33

NOTICE OF APPEAL, CCA DOCKETING STATEMENT AND COURT          34-37
REPORTER'S TRANSCRIPT ORDER FILED BY DEFT.

COURT REPORTER'S TRANSCRIPT OF RULE 32 PROCEEDINGS.          1-19

CERTIFICATE OF COMPLETION                                     57

```
RO372                ALABAMA JUDICIAL INFORMATION SYSTEM      CASE: CC 1994 000791.60
 R: RHM                      CASE ACTION SUMMARY
 AGE:  1                    CIRCUIT    CRIMINAL                RUN DATE: 02/27/2006
================================================================================
IN THE CIRCUIT COURT OF  HOUSTON                                       JUDGE: JMW
STATE  OF  ALABAMA                   VS     MCCRAY WILLIE C
                                            C/O ELMORE CC
CASE: CC 1994 000791.60                     P O BOX 8
                                            ELMORE, AL  36025 0000

DOB: 03/11/1959        SEX: M  RACE: B  HT: 6 00  WT: 145   HR: BLK EYES: BRO
SSN: 265455968   ALIAS NAMES:
--------------------------------------------------------------------------------
CHARGE01: RULE 32-FELONY      CODE01: RULE  LIT: RULE 32-FELONY TYP: F #: 001
OFFENSE DATE: 08/07/1993              AGENCY/OFFICER: 0380100 DEVANE

DATE WAR/CAP ISS:                     DATE ARRESTED: 10/04/1993
DATE    INDICTED: 09/02/1994          DATE    FILED: 09/15/1994
DATE    RELEASED:                     DATE  HEARING:
BOND    AMOUNT:          $.00         SURETIES:

DATE 1: 04/10/2000  DESC: JTRL               TIME: 0830 A
DATE 2:             DESC:                     TIME: 0000

TRACKING NOS: Gowdey Brent       /                  /
    DEF/ATY: LEWIS JOSEPH W            TYPE: A                   TYPE:
             P O BOX 536

             DOTHAN        AL 36302                        00000

PROSECUTOR:

================================================================================
OTH CSE:  000000000000 CHK/TICKET NO: 93 3030        GRAND JURY: 000169
COURT REPORTER:                  SID NO:  000000000
   STATUS: JAIL                  DEMAND:                    OPER: RHM
NOTE:                                                       9300226400
================================================================================
DATE  |      ACTIONS,  JUDGEMENTS,  AND  NOTES
================================================================================
```

| DATE | ACTIONS, JUDGEMENTS, AND NOTES |
|---|---|
| 02-03-06 | Petition for Relief form Conviction or sentence. In Forma Pauperis filed. |
| | February 28, 2006. Defendant allowed to file his 32 Petition in forma pauperis Brent Gowdey appointed to represent defendant. Hearing on petition set for April 19, 2006 9 AM Clerk to furnish Bren Gowdey with copy of petition. |
| | *(signature)* Judge |
| | 3-2-06 N. DA, BG, Deft |
| 3-1-06 | Transport order in file. |
| | N. DA, BG, CC (½), DOC. |
| 3-17-06 | Motion for Summary Disposition |

STATE OF ALABAMA  VS  WILLIE C. McCRAY   CC 1994-791.60

04-11-06   Motion to produce the transcript for the court's reference.

_April 19, 2006. On hearing evidence, the defendant's Rule 32 petition is denied._ _[Signature] Judge_

4-19-06  N'. DA, BG & Deft

04-13-06   Response to respondent motion to dismiss.

05-04-06   Notice of appeal to the CCA, CCA docketing statement and CR transcrsipt order
filed.                                                                   5-4-06 N'CW

_May 8, 2006. Ifred Bowles appointed to represent defendant on appeal. Defendant allowed free transcript_  _[Signature] Judge_

5-9-06 N'. DA, BG & CW

5-09-06   Clerk's notice of appeal, CCA docketing statement and CR transcript order to
CCA, AG, BG and CW

05-23-06   Notice of appeal filed by deft w/cca docketing statement and CR transcript order.

5-26-06  COPY CAS TO Deft

2

# PETITION FOR RELIEF FROM CONVICTION OR SENTENCE

(Pursuant to Rule 32,
Alabama Rules of Criminal Procedure)

FILED

FEB 03 2006

*Judy Byrd*
JUDY BYRD, CLERK
HOUSTON CO., AL

FILED

JAN 2 6 2006

*Judy Byrd*
JUDY BYRD, CLERK
HOUSTON CO., AL

**Case Number**

| Cc | 94 | 791 |
|----|----|-----|
| ID | YR | NUMBER |

IN THE ___CIRCUIT___ COURT OF ___HOUSTON___, ALABAMA

___Willie C. McCray___ vs. ___Alabama___
Petitioner (Full Name)                          Respondent

[Indicate either the "State" or, if filed in municipal court, the name of the "Municipality"]

Prison Number ___183709___ Place of Confinement ___Elmore Correction___

County of conviction ___Houston County___

**NOTICE:  BEFORE COMPLETING THIS FORM, READ CAREFULLY THE ACCOMPANYING INSTRUCTIONS.**

1. Name and location (city and county) of court which entered the judgment of conviction or sentence under attack ___Houston County Circuit Court___

2. Date of judgment of conviction _____

3. Length of sentence _____

4. Nature of offense involved (all counts) ___1) Felony Murder & (2) Theft Of Property first degree___

5. What was your plea?  (Check one)

   (a)  Guilty _____

   (b)  Not guilty _X_

   (c)  Not guilty by reason of mental disease or defect _____

   (d)  Not guilty and not guilty by reason of mental disease or defect _____

3

6.  Kind of trial: (Check one)

   (a)  Jury __X__               (b)  Judge only _____

7.  Did you testify at the trial?

   Yes __X__                    No _____

8.  Did you appeal from the judgment of conviction?

   Yes __X__                    No _____

9.  If you did appeal, answer the following:

   (a)  As to the state court to which you first appealed, give the following information:

      (1)  Name of court _Alabama Court of Criminal Appeals_
            _Direct Appeal_

      (2)  Result _Affirmed_

      (3)  Date of result __November 21, 2001_

   (b)  If you appealed to any other court, then as to the second court to which you appealed, give the following information:

      (1)  Name of court _Alabama Court of Criminal Appeals_
            _Application for Rehearing_

      (2)  Result __OVERRULED_

      (3)  Date of result __December 21, 2001_

   (c)  If you appealed to any other court, then as to the third court to which you appealed, give the following information:

      (1)  Name of court _____

      (2)  Result _____

      (3)  Date of result _____

any petitions, applications, or motions with respect to this judgment and sentence, have you previously filed in any court, state or federal?

Yes _____                    No __X__

11. If your answer to Question 10 was "yes", then give the following information in regard to the first such petition, application, or motion you filed:

(a) (1) Name of court _____ *NA* _____

(2) Nature of proceeding _____

(3) Grounds raised _____

_____

_____

_____

_____

(attach additional sheets if necessary)

(4) Did you receive an evidentiary hearing on your petition, application, or motion?

Yes _____                    No _____

(5) Result _____

(6) Date of result _____

(b) As to any second petition, application, or motion, give the same information:

(1) Name of court _____ *NA* _____

(2) Nature of proceeding _____

(3) Grounds raised _____

_____

_____

_____

_____

(attach additional sheets if necessary)

(4) Did you receive an evidentiary hearing on your petition, application, or motion?

Yes _____                    No _____

(5) Result _____ *NA* _____

(6) Date of result _____

(c) As to any third petition, application, or motion, give the same information (attach additional sheets giving the same information for any subsequent petitions, applications, or motions):

(1) Name of court _____

3

(2)   Nature of proceed _____

(3)   Grounds raised _____

_____

_____

_____

_____

(attach additional sheets if necessary)

(4)   Did you receive an evidentiary hearing on your petition, application, or motion?

Yes _____                    No _____

(5)   Result _____

(6)   Date of result _____

(d)   Did you appeal to any appellate court the result of the action taken on any petition, application, or motion?

(1)   First petition, etc.          Yes _____               No _____

(2)   Second petition, etc.         Yes _____               No _____

(2)   Third petition, etc.          Yes _____               No _____

**ATTACH ADDITIONAL SHEETS GIVING THE SAME INFORMATION FOR ANY SUBSEQUENT PETITIONS, APPLICATIONS, OR MOTIONS.**

(e)   If you did not appeal when you lost on any petition, application, or motion, explain briefly why you did not:

_____

_____

_____

12.   Specify every ground on which you claim that you are being held unlawfully, by placing a check mark on the appropriate line(s) below and providing the required information. Include all facts. If necessary, you may attach pages stating additional grounds and the facts supporting them.

# GROUNDS OF PETITION

Listed below are the possible grounds for relief under Rule 32. Check the ground(s) that apply in your case, and follow the instruction under the ground(s):

__X__   A.   The Constitution of the United States or of the State of Alabama requires a new trial, a new sentence proceeding, or other relief.

For your information, the following is a list of the most frequently raised claims of constitutional violation:.

(1)  Conviction obtai   ] by plea of guilty which was unlawfully    uced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(2)  Conviction obtained by use of coerced confession.

(3)  Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(4)  Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(5)  Conviction obtained by a violation of the privilege against self-incrimination.

(6)  Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(7)  Conviction obtained by a violation of the protection against double jeopardy.

(8)  Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(9)  Denial of effective assistance of counsel.

**This list is not a complete listing of all possible constitutional violations.**

If you checked this ground of relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each constitutional violation that you claim, whether or not it is one of the nine listed above, and include under it each and every fact you feel supports this claim. Be specific and give details.

___X___  B.  <u>The court was without jurisdiction to render the judgment or to impose the sentence.</u>

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

_____  C.  <u>The sentence imposed exceeds the maximum authorized by law, or is otherwise not authorized by law.</u>

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

_____  D.  <u>Petitioner is being held in custody after his sentence has expired.</u>

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

_____  E.  <u>Newly discovered material facts exist which require that the conviction or sentence be vacated by the court, because:</u>

<u>The facts relied upon were not known by petitioner or petitioner's counsel at the time of trial or sentencing or in time to file a post-trial motion pursuant to rule 24, or in time to be included in any previous collateral proceeding, and could not have been discovered by any of those times through the exercise of reasonable diligence; and</u>

<u>The facts are not merely cumulative to other facts that were known; and</u>

The facts do not merely amount to impeachment evidence; and

If the facts had been known at the time of trial or sentencing, the result would probably have been different; and

The facts establish that petitioner is innocent of the crime for which he was convicted or should not have received the sentence that he did.

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

F. The petitioner failed to appeal within the prescribed time and that failure was without fault on petitioner's part.

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

13. IMPORTANT NOTICE REGARDING ADDITIONAL PETITIONS RULE 32.2(b) LIMITS YOU TO ONLY ONE PETITION IN MOST CIRCUMSTANCES. IT PROVIDES:

"Successive Petitions. The court shall not grant relief on a second or successive petition on the same or similar grounds on behalf of the same petitioner. A second or successive petition on different grounds shall be denied unless the petitioner shows both that good cause exist why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and that failure to entertain the petition will result in a miscarriage of justice."

A. Other than an appeal to the Alabama Court of Criminal Appeals or the Alabama Supreme Court, have you filed in state court any petition attacking this conviction or sentence?

Yes __X__                    No _____

B. If you checked "Yes," give the following information as to earlier petition attacking this conviction or sentence:

(a) Name of court __Alabama Court Of Criminal Appeals__

(b) Result __Reversed on Batson Issue__

(c) Date of result __AUGUST, 1998__
(attach additional sheets if necessary)

C. If you checked the "Yes" line in 13A, above, and this petition contains a different ground or grounds of relief from an earlier petition or petitions you filed, attach a separate sheet or sheets labeled: "EXPLANATION FOR NEW GROUND(S) OF RELIEF."

On the separate sheet(s) explain why "good cause exists why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and [why the] failure to entertain [this] petition will result in a miscarriage of justice."

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?

Yes _____                    No __X__

6

8

15. Give the name and address known, of each attorney who represer I you at the following stages of the case that resulted in the judgment under attack:

(a) At preliminary hearing _____

_____

(b) At arraignment and plea _____

_____

(c) At trial _____

_____

(d) At sentencing _____

_____

(e) On appeal _____

_____

(f) In any post-conviction proceeding _____

_____

_____

(g) On appeal from adverse ruling in a post-conviction proceeding _____

_____

_____

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?

Yes _X____                    No _____

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?

Yes _____                    No __X___

(a) If so, give name and location of court which imposed sentence to be served in the future: _____

_____

(b) And give date and length of sentence to be served in the future: _____

_____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?

Yes _____                    No _X___

18. What date is this petition being mailed?

_January 23, 2006_____

Wherefore, petitioner prays that the court grant petitioner relief to which he may be entitled in this proceeding.

7
9

# PETITIONER'S VERIFICATION UNDER OATH SUBJECT TO PENALTY FOR PERJURY

I swear (or affirm) under penalty of perjury that the foregoing is true and correct.

Executed on _____1/19/06_____ .
                    (Date)

_____Willie C. McCray_____
Signature of Petitioner

SWORN TO AND SUBSCRIBED before me this the __19th__ day of __January__ 2006

_____
Notary Public

## OR *

## ATTORNEY'S VERIFICATION UNDER OATH SUBJECT TO PENALTY FOR PERJURY

I Swear (or affirm) under penalty of perjury that, upon information and belief, the foregoing is true and correct. Executed on _____ .
                                          (Date)

_____
Signature of Petitioner's Attorney

SWORN TO AND SUBSCRIBED before me this the _____ day of _____, _____

_____
Notary Public

Name and address of attorney representing petitioner
in this proceeding (if any)

_____

_____

_____

_____

_____

* If petitioner is represented by counsel, Rule 32.6(a) permits either petitioner or counsel to verify the

<u>Argument</u>

The petitioner Willie McCray , herein known as the petitioner contends that the trial court did not have jurisdiction to render a judgment and impose a sentence in his case because the indictment against him was improperly amended. The petitioner was indicted for the offense of Capitol murder of murder during the course of a robbery in the first degree, see § 13A-5-40(a)(2), Ala. Code 1975 , and for theft of property in the first degree, a violation of § 13A-8-3, Ala. Code 1975. Petitioner contends that the Court was without subject-matter jurisdiction to impose the sentence to an indictment that was amended without his consent pursuant to §15-8-90 Code of Ala. 1975; Rule 13.5(a), A.R.Crim.P the 5th, 6th, & 14th Amendments to the United States Constitution; Art. 1 § 6 of the Alabama Constitution of 1901. Petitioner further avers that he was sentenced upon review an indictment that was amended in violation of his constitutional rights to due process and equal protection of the law. see McCray v. State, 738 so. 2d 911 (Ala. Crim. App. 1998)

In the instant case of this petitioner, his indictment alleged as follows:
"[Willie McCray] did intentionally cause the death of [Michael Scott] by shooting him in the face and causing his death at the time he was in the course of committing a robbery, the property of Higdon Grocery Company, Inc., a corporation, doing business as Country Market, in violation of §13A-5-40 (a) 2 of the Code of Alabama, against the peace and dignity of the State of Alabama."
An indictment may be amended by order of the court with the consent of the defendant in all cases, except to change the offense or to charge new offenses not contemplated by the original indictment. Ross v. State, 529 So. 2d 1074 (Ala. Crim. App. 1988) ; Ala. R. Cr. P. 13.5.

In this cause, the State made no attempt to dismiss the indictment charging the felony murder pursuant to §13A-6-2(a)(3) and to reindict petitioner under a new indictment properly charging him with the felony murder of [Michael Scott].The State's failure to do so resulted in a fatal variance between indictment and the proof presented at trial, and conviction under the original indictment is therefore void.
Under § 13A-6-2(a)(3), Ala. Code 1975 , "[a] person commits the crime of [felony] murder if ... he commits ... robbery in any degree, ... and, in the course of and in furtherance of the crime ... or in immediate flight therefrom, he, or another participant if there be any, causes the death of any person."

This indictment was amended to delet the intentionally and change the charge to felony murder as defined in 13A-6-2 (a) (3) without the petitioner consent or to reindict the petitioner in this case in violation of petitioner Constitutional Rights to be informed of the charge (s) against him. Petitioner contends that the Court was without subject-matter jurisdiction to impose the sentence to an indictment that was amended without his consent pursuant to §15-8-90 Code of Ala. 1975, & Rule 13.5(a), A.R.Crim.P. Petitioner contends that the indictment was illegally amended to charge petitioner with violation of § 13A-6-2(a)(3) where in fact he[petitioner] was originall charged with violating § 13A-5-40(a)(2).
A defendant is constitutionally entitled to be informed of the nature and the cause of the accusation against him. U.S. Const. amend. VI; Ala. Const. art. I, § 6. The function of the indictment is to inform the accused of the crime with which he is charged, so that he may prepare a defense if one is available, Ex Parte Hightower, 443 So.2d 1272 (Ala. 1983); City of Montgomery v. Collins, 355 So. 2d 1111 (Ala. 1978). The person accused of a crime is required at trial to answer only the specific charge contained in the indictment. Geeter v. State, 35 Ala. App. 207, 45 So. 2d 167 (1950).

Rule 13.5(a), A.R.Crim.P., changes the prior procedure set out in this section, except as to amendments to charge a new offense not contemplated in the original indictment. While this section states that an indictment may be amended when the name of the defendant is incorrectly stated, it is only when the defendant consents to the amendment. However, Rule 13.5(a), A.R.Crim.P., states that as long as no additional or different offense is charged and if the substantial rights of the defendant are not prejudiced, an indictment may be amended by the court before the verdict or finding without the defendant's consent. Capers v. State, 606 So. 2d 207, 1992 Ala. Crim. App. (Ala. Crim. App. 1992).

"A valid indictment or complaint, giving the accused notice of the criminal charge against him, is the source of the subject-matter jurisdiction to try a contested criminal case. Ash v. State, 843 So. 2d 213 (Ala. 2002); see also Ex parte Looney, 797 So. 2d [427] at 429 [(Ala. 2001)] ; Batey v. State, 755 So. 2d 593, 595 (Ala. Crim. App. 1999). Absent a valid indictment or complaint, a trial court would lack subject-matter jurisdiction to try, to convict, or to sentence a defendant in a contested criminal case. See Ash v. State, supra; see also Batey v. State, supra. Rule 13.5(a), Ala.R.Crim.P., prohibits any amendment to an indictment that changes the offense or charges a new offense not contemplated in the original indictment. See also Rule 13.2(c), Ala.R.Crim.P. (specifying an offense in the indictment provides notice to the accused that he has been charged with all lesser offenses necessarily included in the charged offense). Rule 13.5(a), in conjunction with Rule 13.2(c), allows an indictment to be amended to charge a lesser offense included within the offense charged in the indictment because the accused is placed on sufficient notice of the charge against which he must defend, and the accused is not being tried for an offense different from the charge intended by the grand jury. See Ash v. State, supra ; Ex parte Washington, 571 So. 2d 1062, 1063 (Ala. 1990) ; Woods v. State, 675 So. 2d 47, 50 (Ala. Crim. App. 1995) ; Gayden v. State, 38 Ala. App. 39, 42, 80 So. 2d 495, 498 (1954).

It is beyond cavil that felony murder is an offense contemplated in the 1995 capital-murder indictment. That indictment charged Peterson with intentional murder during the course of committing a robbery. Felony murder, as defined by Ala. Code 1975, § 13A-6-2(a)(3) , is a lesser-included offense of the capital offense of intentional murder committed during the course of a robbery. Ala. Code 1975, § 13A-5-41; Ex parte Dorsey, 881 So. 2d 533, 536, 2003 Ala. (Ala. 2003) ; Ex parte Rice, 766 So. 2d 143, 144-45 (Ala. 1999) ; Harris v. State, 854 So. 2d 145 (Ala. Crim. App. 2002) . Thus, there is no merit in the State's argument that Peterson's 1995 capital-murder indictment was "illegally amended" to accommodate a plea to felony murder.

felony-murder involves causing a death during the commission or attempt to commit certain specific felonies including kidnapping in the first degree. Alabama Code 1975, § 13A-6-2(a)(3) .
"Alabama law requires that, before an accused can be convicted of capital murder, he must have a specific intent to kill. Smith v. State, 745 So. 2d 922 (Ala. Crim. App. 1999) . We have also held that this specific intent to kill cannot be supplied by the felony-murder doctrine. Travis v. State, 776 So. 2d 819 (Ala. Crim. App. 1998) , aff'd, 776 So. 2d 874 (Ala. 2000) , cert. denied, 531 U.S. 1081, 121 S. Ct. 785, 148 L. Ed. 2d 681 (2001) . Felony murder requires no intent to kill, but only the intent to commit the underlying felony. Mitchell v. State, 706 So. 2d 787 (Ala. Crim. App. 1997) . Alabama's capital murder statute, § 13A-5-40 , requires a specific intent to kill that is not necessary to convict for felony murder. One murder cannot be both unintended and intended.

**O. C. Bester v. State, 362 so. 2d 1282** (Ala. Cr. App. 1978), The appellant was indicted under one Code section and sentenced under another. This was a substantial change from the indictment as returned by the grand jury and does not fall within the permissible limits of § 15-8-90, supra. see: Crews v. State,

40 Ala.App. 306, 112 So.2d 805 (1959).

Section 15-8-90, Ala. Code 1975, provides: "An indictment may be amended, with the consent of the defendant entered of record, when the name of the defendant is incorrectly stated or when any person, property or matter therein stated is incorrectly described." Section 15-8-91 continues: "If the defendant will not consent to such amendment of an indictment, the prosecution may be dismissed at any time before the jury retires as to the count in the indictment to which the variance applies, and the court may order another indictment to be preferred at a subsequent time ...." These statutes suggest that where there is a material variance, such as incorrectly describing a person (such as the victim) in the indictment, an amendment of the indictment is appropriate for a valid prosecution.

Section 15-8-90 is but a codification of the common law which forbade amendments to an indictment, even as to an immaterial {393 So. 2d 1032} variance between indictment and proof, without the consent of defendant. Shiff v. State, 84 Ala. 454, 4 So. 419 (1887); and Lay v. State, 42 Ala. App. 534, 170 So. 2d 815 (1965). Section 15-8-91 directs the procedure for a "variance" dismissal and for reindictment in the event of Defendant's non-consent That the statutory amendment procedure is restricted in its application is well illustrated in Wright v. State, 40 Ala. App. 683, 122 So.2d 555 (1960), which disallowed a double jeopardy plea, reasoning that the charge in the first indictment was not sustainable by the proof adduced thereunder. See, also, Oliver v. State, 234 Ala. 460, 175 So. 305 (1937).

In a prosecution for capital murder-robbery under Ala. Code 1975, § 13A-5-40(a)(2), the State must prove that the murder occurred during the commission of a first degree robbery or an attempt thereof. Beverly v. State, 439 So.2d 758, 761-62 (Ala.Cr.App. 1983).

The term variance, for purposes of an objection in a trial, means a variance between pleadings and proof, not a variance between pleadings and instructions. See, e.g., House v. State, 380 So. 2d 940, 941 (Ala. 1979). See also Turner v. State, 610 So. 2d 1198, 1199 (Ala. Crim. App. 1992); Daniels v. State, 523 So. 2d 517, 518 (Ala. Crim. App. 1987); and Tyson v. State, 361 So. 2d 1182, 1188 (Ala. Crim. App. 1978).
"This means that (1) a charge may only be amended with the defendant's consent and (2) a charge may not be amended where the amendment changes the offense or charges a new offense not included in the original charge." Dunn v. City of Montgomery, 515 So. 2d 135, 136 (Ala. Cr. App. 1987).

"Jeopardy attaches on a guilty plea when the plea is accepted and entered by a court with jurisdiction. " Ex parte Wright, 477 So. 2d 492, 493 (Ala. 1985) . A trial court lacks jurisdiction to accept a plea to an offense not encompassed within the original indictment . Ex parte Cole, 842 So. 2d 605, 607 (Ala. 2002) ("Rule 13.5(a), Ala. R. Crim. P., prohibits any amendment to an indictment that changes the offense or charges a new offense not contemplated in the original indictment."). Lesser-included offenses are, by Ala. R. Crim. P. 13.2(c), necessarily charged in an indictment. Therefore, "'the concept of a lesser included offense does not involve ... an amendment of the indictment.'" Wesson v. State, 644 So. 2d 1302, 1306 (Ala. Crim. App. 1994) (quoting Black v. State, 586 So. 2d 968, 970 (Ala. Crim. App. 1991)) .

## § 15-8-90. Incorrect description of defendant or property.
An indictment may be amended, with the consent of the defendant entered of record, when the name of the defendant is incorrectly stated or when any person, property or matter therein stated is incorrectly described. Both Ala. Code § 15-8-90 and Ala. Code § 15-8-91 suggest that where there is a material variance, such as

incorrectly describing a person (e.g., the victim in the indictment), an amendment of the indictment is appropriate for a valid prosecution; thus, where the State made no attempt to amend or dismiss the flawed indictment, a conviction entered under the same was reversed. Ex parte Verzone 868 So. 2d 399, 2003 Ala.(Ala. 2003). Ex parte Hamm, 564 So. 2d 469, 471 (Ala. 1990) , the following holding:

"A variance in the form of the offense charged in the indictment and the proof presented at trial is fatal if the proof offered by the State is of a different crime, or of the same crime, but under a set of facts different from those set out in the indictment. Ex parte Hightower, 443 So. 2d 1272, 1274 (Ala. 1983) ."

## CONCLUSION

Wherefore, premises considered, petitioner prays and requests this court issue an order granting said petition and any other relief this Court deems just and necessary.

Grand Jury No. _____169_____                    *Exhibit A*                    Case No. *CC-94-791*

---

## INDICTMENT

| The State of Alabama<br>HOUSTON COUNTY | } | CIRCUIT COURT<br>TWENTIETH JUDICIAL CIRCUIT<br>August     Term, 19 94 |

The grand jury of said county charge that, before the finding of the indictment,

Willie C. McCray

whose name is otherwise unknown to the Grand Jury,

did ~~intentionally~~ cause the death of Michael Scott by shooting
him in the face and causing his death at the time he was in the
course of committing a robbery, the property of Higdon Grocery
Company, Inc., a corporation, doing business as Country Market,
in violation of 13A-~~5-40~~ (a) 2 of the Code of Alabama, against
       6 (a) 3
the peace and dignity of the State of Alabama.

Douglas Albert Valeska
District Attorney

---

THE STATE OF ALABAMA
Houston County

THE CIRCUIT COURT

Twentieth Judicial Circuit

THE STATE

vs.

Willie C. McCray

S.I.D. No.

.O.A.

CAPITAL MURDER

Witnesses:

Stan Devane
PD
Dothan, Al   93 08 3593

Jeff Clark
1809 S Oates # 1706
Dothan, Al

Debbie Shelton
1702 Alexander Dr
Dothan, Al

Linda Hughes
419 E Main
Dothan, Al

Billy McBride
419 E Main
Dothan, Al

(Over)

#169

A TRUE BILL

_____
Foreman of the Grand Jury

Presented to the presiding Judge, in open court
a foreman of the Grand Jury, in the presence of
14 Grand Jurors and filed in open
court by order of the court on this the 2nd
day of September, 19 94.

_____
Clerk

## INDICTMENT

NO PROSECUTOR

Upon the arrest of Defendant let him be
admitted to bail on giving bond in the sum of

No Bond

_____ Dollars
with security to be approved by the Sheriff.

This 2nd day of Sept 19 94.

_____
Judge Presiding

Continued Witnesses

Marietta Prevost
ABI
Motgomery, Al    09 1156, 1293

16

Case Number

| ID | YR | NUMBER |
|----|----|--------|

(To be completed
by Court Clerk)

# IN FORMA PAUPERIS DECLARATION

IN THE CIRCUIT COURT OF HOUSTON COUNTY

[Insert appropriate court]

Willie C. McCray

(Petitioner)

vs.

State Of Alabama

(Respondent(s)

## DECLARATION IN SUPPORT OF REQUEST TO PROCEED
## IN FORMA PAUPERIS

I, Willie C. McCray , declare that I am the petitioner in the above entitled case; that in support of my motion to proceed without being required to prepay fees, costs, or give security therefor, I state that because of my poverty I am unable to pay the costs of said proceeding or to give security therefor; that I believe I am entitled to relief.

1. Are you presently employed?    Yes _____    No __X__

    a. If the answer is "yes", state the amount of your salary or wages per month, and give the name and address of your employer.

       _____

       _____

    b. If the answer is "no", state the date of last employment and the amount of the salary and wages per month which you received.

       _____

       _____

2. Have you received within the past twelve months any money from any of the following sources?

    a. Business, profession, or other form of self-employment?

       Yes _____        No __X__

    b. Rent payments, interest, or dividends?

       Yes _____        No __X__

    c. Pensions, annuities, or life insurance payments?

       Yes _____        No __X__

    d. Gifts or inheritances?            see attached PMOD Account

       Yes _____        No __X__

    e. Any other sources?

       Yes _____        No __X__

17

If the answer to any of the above is "yes", describe each source of money and state the amount received from each during the past twelve months.

_____

_____

_____

_____

3. Do you own cash, or do you have money in a checking or savings account?

Yes _____                No __X__

(Include any funds in prison accounts.) Incarcerated see attached PMOD account

If the answer is "yes", state the total value of the items owned.

_____

_____

_____

4. Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property (excluding ordinary household furnishings and clothing)?

Yes _____                No __X__

If the answer is "yes", describe the property and state its approximate value.

_____

_____

5. List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support.

_____

_____

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on _____

(Date)

_____
Signature of Petitioner

## CERTIFICATE

I hereby certify that the petitioner herein has the sum of $ _____ on account to his credit at the institution where he is confined. I further certify that petitioner likewise has the foregoing securities to his credit according to the records of said _Elmore CC_____ institution:

_See attached Printout for Willie McCray_
_# 183709  as of  L-19-06_

_L-19-06_
DATE

_Bebea Crtlm_
AUTHORIZED OFFICER OF INSTITUTION

18

```
                    STATE OF ALABAMA
                DEPARTMENT OF CORRECTIONS
             ELMORE CORRECTIONAL FACILITY


 AIS #: 183709      NAME: MCCRAY,WILLIE              AS OF: 01/19/2006

                        # OF        AVG DAILY        MONTHLY
              MONTH     DAYS         BALANCE         DEPOSITS
-----------------------------------------------------------------------

              JAN        12          $0.00           $0.00
              FEB        28          $0.00           $0.00
              MAR        31          $0.00           $0.00
              APR        30          $0.00           $0.00
              MAY        31          $0.00           $0.00
              JUN        30          $0.00           $0.00
              JUL        31          $0.00           $0.00
              AUG        31          $0.00           $0.00
              SEP        30          $0.02           $0.05
              OCT        31          $0.05           $0.00
              NOV        30          $0.05           $0.00
              DEC        31          $0.05           $0.00
              JAN        19          $0.05           $0.00
```



Petition for Relief form conviction.

February 28, 2006. Defendant allowed to file this petition in forma pauperis. Brent Fomby appointed to represent defendant. Hearing on petition set for April 19, 2006 9 AM. Clerk to furnish Tom Fomby with copy of petition.

Myron White
Judge

# STATE OF ALABAMA
## IN THE CIRCUIT COURT OF HOUSTON COUNTY

## CRIMINAL DIVISION

| | | |
|---|---|---|
| **STATE OF ALABAMA** | ) | |
| **VS** | ) | **CC-94-791** |
| **WILLIE C MCCRAY,** | ) | |
| **DEFENDANT** | ) | |

## TRANSPORT ORDER

**TO:**     **Lamar Glover, Sheriff of Houston County and the State of Alabama Board of Corrections:**

You are hereby requested to pick up and transport the above named Defendant confined by the Alabama Board of Corrections under safe and secure conduct before the Circuit Court of Houston County, Alabama, at Dothan, on or before April 19, 2006, for the following purpose: For the Defendant to attend a hearing before Judge White.

Immediately afterwards, you are requested to arrange for the transport of the above named person back into the custody of the Board of Corrections, State of Alabama.

DONE and ORDERED this the 28th day of February, 2006.

**FILED**

MAR 0 1 2006

*Judy Byrd*
JUDY BYRD, CLERK
HOUSTON CO., AL

_____
CIRCUIT JUDGE
20th Judicial Circuit of Alabama

| | | |
|---|---|---|
| EX PARTE, | ) | IN THE CIRCUIT COURT OF |
| WILLIE C. McCRAY | ) | HOUSTON COUNTY, ALABAMA |
| VS. | ) | |
| STATE OF ALABAMA | ) | CASE NO. CC 1994-791 |

**FILED**

MAR 1 0 2006

*Judy Byrd*

JUDY BYRD, CLERK
HOUSTON CO., AL

## MOTION FOR SUMMARY DISPOSITION

Comes now the State of Alabama and moves the Court for an order summarily dismissing the petition filed herein and for reason alleges the following:

1. The petition fails to state a claim for which relief may be granted.

2. The grounds alleged in the petition either were raised at trial or could have been but were not raised at trial.

3. The grounds alleged in the petition either were raised on appeal or could have been but were not raised on appeal.

4. The grounds alleged and facts stated do not amount to newly discovered evidence.

5. The basis of the petitioner's jurisdictional claim is he alleges the indictment charging him with Capital Murder was amended without his consent so as to charge him with felony murder. This constitutes a blatant attempt to mislead the Court. The indictment was never amended. The petitioner was put to trial on the Capital Murder charge and the jury found him guilty of the lesser included charge of felony murder which his counsel requested the jury be instructed on. As there was no amendment, a jurisdictional defect does not exist, and the petition should be barred by the statute of limitations.

6. The State denies each and every material allegation contained within the petition.

Submitted this _17TH_ day of March 2006.

*Gary R. Maxwell*
Gary R. Maxwell
Chief Assistant District Attorney

## CERTIFICATE OF SERVICE

I, Gary R. Maxwell, Chief Assistant District Attorney, hereby certify that I have placed a copy of the same in the U.S. mail, postage prepaid, to Willie C. McCray #183709, Elmore Correction, P.O. Box 8, Elmore, AL 36025 on this _17TH_ day of March 2006.

*Gary R. Maxwell*
Gary R. Maxwell
Chief Assistant District Attorney

23

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA

v.

WILLIE C. McCRAY,

Defendant.

Case No. CC 1994 - 791

## MOTION TO PRODUCE THE TRANSCRIPT FOR THE COURT'S REFERENCE

COMES NOW the Defendant, Willie McCray, and moves this Honorable Court to order the production of either the clerk's copy of the trial transcript of the second trial, or actually print another copy, for the Court's use. As grounds therefore, Defendant states:

1.     Defendant alleges the loss of his copy.

2.     Part of the Defendant's petition concerns the reading of the indictment to the jury and the Prosecutor's use of the word "intentionally" in a trial for felony murder.

3.     This Rule 32 proceeding concerns the Defendants second trial of this matter, having been convicted in the first trial of the lesser included offense of felony murder rather than capital murder.

4.     The Court has set April 19, 2006 for a hearing on the Rule 32 petition.

Respectfully submitted this the _11_ day of _April_, _2006_.

**FILED**

APR 1 1 2006

JUDY BYRD CLERK
HOUSTON CO AL

Brent H. Gourley     (GOU006)
Attorney for the Defendant
Klemm & Gourley, P.C.
128 South Oates Street
Dothan, AL 36301     (334) 677-7734

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above document upon the Counsel for the State of Alabama, the Hon. Douglas A. Valeska, Houston County District Attorney, P.O. Box 1632, Dothan, AL 36302, by either hand delivery or by placing a copy of the same in the United States Mail, postage prepaid and correctly addressed.

Done this the _11_ day of _April_, _2006_.

Brent H. Gourley

24

**FILED**

APR 1 3 2006

*Judy Byrd*

**JUDY BYRD, CLERK**
**HOUSTON CO., AL**

In The Circuit Court Of Houston County, Alabama

EXPARTE,

WILLIE C. McCRAY,

vs.                                                Case No. <u>CC 1994-791</u>

STATE OF ALABAMA

## RESPONSE TO RESPONDENT MOTION TO DISMISS

Comes now Willie C. McCray, the petitioner in the above style cause and number hereby moves this Honorable Court for a Motion to Amend to the original petition pursuant to Rule 32.7(b) Alabama Rules Criminal Procedure and in the alternate respond to the respondents Motion for Summary Disposition and states as follows:

1. Petitioner contends that a jurisdictional issue can be raised at any time see See Hamilton v. State, 328 So. 2d 957, 959-60 (Ala. Crim. App. 2002) (noting that "'the lack of subject matter jurisdiction is not waivable and may be raised at any time by the suggestion of a party or by a court ex mero motu.'See Lanier v. State, 733 So. 2d 931 (Ala. Crim. App. 1998) (noting that this Court can address an issue involving subject-matter jurisdiction at any time, even if the issue is not raised on appeal). see also 'Rule [32].1(b) provides for post-conviction relief where the court was without jurisdiction to render judgment or to impose sentence. A claim of a lack of jurisdiction to render judgment or to impose sentence is not precluded as a basis for relief by Rule [32].2 even though the question of jurisdiction could have been but was not raised at trial or on appeal.'"

Robinson v. State, 562 So. 2d 277, 278 (Ala.Cr.App. 1990), quoting Ferguson v. State, 565 So. 2d 1172, 1173 (Ala.Crim.App. 1990) (emphasis added in Robinson).

Ex parte Tuck, 707 So. 2d 292, 294 (Ala. Crim. App. 1997). subject matter jurisdiction is an issue that is reviewable at any time, whether or not it has been preserved by way of objection."

stead of reindicting the petitioner on felony-murder the State proceeded to retry him on the

25

capital murder indictment where they [State] scratched through the "Intentionally" and proceed with the felony-murder charge. The Constitution of this state, § 6, provides that no person shall be deprived of life, liberty, or property except by due process of law. The manifest purpose of this provision is to accord to every citizen security against the arbitrary action of those in authority, and to place him under the protection of the "law of the land," which is synonymous with the expression, "due process of law." see Woodham v. State, 28 Ala. App. 62, 178 so. 464 (1938). Unlike capital murder and intentional murder, as defined in § 13A-6-2(a)(1) , the crime of "felony murder requires no intent to kill, but only the intent to commit the underlying felony."  Dorsey I, So. 2d at, 2001 Ala. Crim. App. LEXIS 91 . Under § 13A-6-2(a)(3), Ala. Code 1975 , "[a] person commits the crime of [felony] murder if ... he commits ... robbery in any degree, ... and, in the course of and in furtherance of the crime ... or in immediate flight therefrom, he, or another participant if there be any, causes the death of any person.

## CERTIFICATE OF SERVICE

I do hereby certify that on this  27th  day of  March____  , 2006_ a copy of the foregiong was

served upon the following counsel of record:

Gary R. Maxwell
Cheif Assistant District Attorney
Twentieth Judicial Circuit Of Alabama
P. O. Box 1632
Dothan, Al. 36302

by depositing the same in the United States Mail, postage pre-paid.

Willie McCray, #183709

April 19, 2006. On hearing evidence, the defendant's
Rule 32 petition is denied.

Gene M. White
Judge

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

STATE OF ALABAMA

v.                                          Case No. CC 1994 - 791 .60

WILLIE C. McCRAY,

Defendant.

## NOTICE OF APPEAL TO THE COURT OF CRIMINAL APPEALS OF ALABAMA

1.    COMES NOW Defendant Willie C. McCray, by and through his undersigned counsel, and gives Notice of Appeal to the Court of Criminal Appeals of Alabama for review of this Court's denial of his Rule 32 Petition of April 19, 2006.

2.    Appellant, by and through his undersigned counsel, moves this Honorable Court for an order for appointed counsel for this appeal. This Court has previously found the Appellant to be indigent upon the Appellant's sworn application.

3.    Appellant requests a free transcript of the Rule 32 proceedings.

Respectfully submitted this the _3_ day of _May_ , _2006_ .

**FILED**

MAY 0 4 2006

_Judy Byrd_
JUDY BYRD, CLERK
HOUSTON CO., AL

Brent H. Gourley    (GOU006)
Attorney for the Defendant
Klemm & Gourley, P.C.
128 South Oates Street
Dothan, AL 36301    (334) 677-7734

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above document upon the Counsel for the State of Alabama, the Hon. Douglas A. Valeska, Houston County District Attorney, P.O. Box 1632, Dothan, AL 36302, by either hand delivery or by placing a copy of the same in the United States Mail, postage prepaid and correctly addressed.

Done this the _3_ day of _May_ , _2006_ .

Brent H. Gourley

28

| State of Alabama<br>Unified Judicial System<br>Form ARAP-26 (front)    8/91 | COURT OF CRIMINAL APPEALS<br>DOCKETING STATEMENT | Criminal Appeal Number<br><br>_____ . _____ |

## A. GENERAL INFORMATION:

☒ CIRCUIT COURT  ☐ DISTRICT COURT  ☐ JUVENILE COURT OF  _HOUSTON_____ COUNTY

_WILLIE C. McCray_____, Appellant

v.  ☒ STATE OF ALABAMA  ☐ MUNICIPALITY OF _____

| Case Number<br>CC 94-791 | Date of Complaint or Indictment<br>2 SEP 1994 | Date of Judgment/Sentence/Order<br>24 OCT 2000 |
| Number of Days of Trial/Hearing<br><br>_____ Days | Date of Notice of Appeal<br>Oral: | Written: 3 MAY 06 |

Indigent Status Requested:  ☒ Yes  ☐ No      Indigent Status Granted:  ☐ Yes  ☐ No

## B. REPRESENTATION:

Is Attorney Appointed or Retained?  ☒ Appointed  ☐ Retained.    If no attorney, will appellant represent self?  ☐ Yes  ☐ No.

Appellant's Attorney (Appellant if pro se) (Attach additional pages if necessary)
Brent H. Gourley

Telephone Number
334-677-7734

| Address<br>128 S. Oates St. | City<br>Dothan | State<br>AL | Zip Code<br>36301 |

## C. CODEFENDANTS: List each CODEFENDANT and the codefendant's case number.

| Codefendant | Case Number |
| Codefendant | Case Number |
| Codefendant | Case Number |

**FILED**
MAY 0 4 2006
JUDY BYRD, CLERK
HOUSTON CO., AL

## D. TYPE OF APPEAL: Please check the applicable block.

1 ☐ State Conviction
2 ☒ Post-Conviction Remedy
3 ☐ Probation Revocation
4 ☐ Pretrial Order
5 ☐ Contempt Adjudication
6 ☐ Municipal Conviction
7 ☐ Juvenile Transfer Order
8 ☐ Juvenile Delinquency
9 ☐ Habeas Corpus Petition
10 ☐ Other (Specify)

## E. UNDERLYING CONVICTION/CHARGE: Regardless of the type of appeal checked in Section D, please check the box beside each offense category for which the appellant has been convicted or charged as it relates to this appeal. Also include the applicable section of the Code of Alabama for State convictions.

1 ☐ Capital Offense - § _____
2 ☒ Homicide - § 13A-6-2
3 ☐ Assault - § _____
4 ☐ Kidnapping/Unlawful Imprisonment - § _____
5 ☐ Drug Possession - § _____
6 ☐ Trafficking in Drugs - § _____
7 ☐ Theft - § _____
8 ☐ Damage or Intrusion to Property - § _____
9 ☐ Escape - § _____
10 ☐ Weapons/Firearms - § _____
11 ☐ Fraudulent Practices - § _____
12 ☐ Offense Against Family - § _____
13 ☐ Traffic - DUI - § _____
14 ☐ Traffic - Other - § _____
15 ☐ Miscellaneous (Specify):
_____ - § _____

## F. DEATH PENALTY:

Does this appeal involve a case where the death penalty has been imposed?  ☐ Yes  ☒ No

## G. TRANSCRIPT:

1. Will the record on appeal have a reporter's transcript?  ☒ Yes  ☐ No
2. If the answer to question "1" is "Yes," state the date the Reporter's Transcript Order was filed. _3 MAY 06_
   (Date)
3. If the answer to question "1" is "No":
   (a) Will a stipulation of facts be filed with the circuit clerk?  ☐ Yes  ☐ No
   (b) Will the parties stipulate that only questions of law are involved and will the trial court certify the questions?  ☐ Yes  ☐ No

NOTE: If the appeal is from the district or juvenile court and the answer to question "1" is "No," then a positive response is required for question 3(a) or 3(b).

29

| Form ARAP-26 (back)    8/91 | COURT OF CRIMINAL APPEALS DOCKETING STATEMENT |

**H. POST-JUDGMENT MOTIONS:** List all post-judgment motions by date of filing, type, and date of disposition (whether by trial court order or by the provisions of Rules 20.3 and 24.4 (ARCrP)):

| DATE OF FILING | | | TYPE OF POST-JUDGMENT MOTION | DATE OF DISPOSITION | | |
|---|---|---|---|---|---|---|
| Month | Day | Year | | Month | Day | Year |
| 2 | 3 | 06 | Relief from conviction or Sentence - Rule 32 | 4 | 19 | 06 |
| | | | | | | |
| | | | | | | |

**I. NATURE OF THE CASE:** Without argument, briefly summarize the facts of the case.

McCray was tried on the charge of capital murder for the shooting death of a store customer during an armed robbery. The jury returned a verdict of guilty of felony murder, thus working an acquittal of the capital murder charge. The Court of Criminal Appeals granted a new trial on McCray's pro se appeal of Batson issues. On retrial, the Court redacted the original capital murder indictment by striking through the word "intentionally." The jury again convicted McCray of felony murder.

**J. ISSUE(S) ON APPEAL:** Briefly state the anticipated issues that will be presented on appeal. (Attach additional pages if necessary.)

Whether the Court's redaction of the word "intentionally" constituted a material amendment made without the defendant's approval.

**K. SIGNATURE:**

_____
Date

_____
Signature of Attorney/Party Filing this Form

| State of Alabama<br>Unified Judicial System<br>Form ARAP- 1C        8/91 | **(REP)ORTER'S TRANSCRIPT ORDER -- C(RIM)INAL**<br>See Rules 10(c) and 11(b) of the<br>Alabama Rules of Appellate Procedure (A.R. App.P.) | Criminal Appeal Number<br>_____ - _____ |

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

[X] CIRCUIT COURT   [ ] DISTRICT COURT   [ ] JUVENILE COURT OF _____ *Houston* _____ COUNTY

_____ *WILLIE C. McCray* _____ , Appellant

v.   [X] STATE OF ALABAMA   [ ] MUNICIPALITY OF _____

| Case Number<br>*CC 94-971* | Date of Judgment/Sentence/Order<br>*24 Oct 2000* |
| Date of Notice of Appeal<br>Oral: _____  Written: *3 MAY 06* | Indigent Status Granted:<br>[X] Yes   [ ] No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, *CODE OF ALABAMA 1975*).

_____   _____   _____
Signature                                   Date                    Print or Type Name

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.):

**MARK PROCEEDINGS REQUESTED:**

A. [ ] **TRIAL PROCEEDINGS** - Although this designation will include the judgment and sentence proceedings, a transcript of the organization of the jury and arguments of counsel must be designated separately.

B. [ ] **ORGANIZATION OF THE JURY** - This designation will include voir dire examination and challenges for cause. Note that in noncapital cases the voir dire of the jury will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

C. [ ] **ARGUMENTS OF COUNSEL** - Note that in noncapital cases the arguments of counsel will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

**COURT REPORTER(S)**

**FILED**

MAY 0 4 2006

*Judy Byrd*

**JUDY BYRD, CLERK**
**HOUSTON CO., AL**

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY.)

| ADDITIONAL PROCEEDINGS REQUESTED | DATE | COURT REPORTER(S) |
|---|---|---|
| D. *Rule 32* | *19 Apr 06* | *Carla Woodall* |
| E. _____ | _____ | _____ |
| F. _____ | _____ | _____ |
| G. _____ | _____ | _____ |

**IMPORTANT NOTICE:** The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

*Brent M. Gourley*       *5-2-06*       *Brent H. Gourley*
Signature                      Date                         Print or Type Name

**DISTRIBUTION:** Original filed with Clerk of Trial Court and copies mailed to: (1) Clerk of the Court of Criminal Appeals, (2) the District Attorney, (3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and (4) to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript.

May 8, 2006 -
Fred Bowley appointed to represent
defendant on appeal. Defendant allowed
free transcript.                    ~~ DM +cw

                                        Myron White
                                        Judge

der to

ACR371                          ALABAMA JUDICIAL DATA CENTER
            NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
                          BY THE TRIAL COURT CLERK
                    IN THE CIRCUIT COURT  OF  HOUSTON COUNTY
STATE OF ALABAMA VS MCCRAY WILLIE C          JUDGE: JERRY M. WHITE
----------------------------------------------------------------------
APPEAL DATE: 05/04/2006
----------------------------------------------------------------------
INDIGENCY STATUS:
    GRANTED INDIGENCY STATUS AT TRIAL COURT:        __X__ YES      ____ NO
    APP. TRIAL COUNSEL PERMITTED TO W/D ON APPEAL:  ____ YES   __X__ NO
    INDIGENT STATUS REVOKED ON APPEAL:              ____ YES   __X__ NO
    INDIGENT STATUS GRANTED ON APPEAL:              __X__ YES      ____ NO

DEATH PENALTY: NO

APPEAL TYPE: RULE 32 PETITION
----------------------------------------------------------------------
THIS APPEAL IS FROM AN ORDER DENYING A PETITION (I.E. RULE 32 PETITION,
WRIT OF HABEAS CORPUS, ETC) OR FROM ANY OTHER ISSUED BY THE TRIAL JUDGE.

CO/CASE NUMBER: 38/CC 1994 000791.60

ORDER ENTERED(DATE): 04192006 PETITION: __DISMISSED  X DENIED  __GRANTED
----------------------------------------------------------------------
POST-JUDGMENT MOTIONS FILED:    DT FILED        DT DENIED      CON BY AGREE
____ MOTION FOR NEW TRIAL       _____        _____       _____
____ MOTION FOR JUDG. OF ACQUIT _____        _____       _____
____ MOTION TO W/D GUILTY PLEA  _____        _____       _____
____ MOTION FOR ATTY TO W/DRAW  _____        _____       _____
____ OTHER                      _____        _____       _____
----------------------------------------------------------------------
COURT REPORTER(S):                   WOODALL, CARLA H.
ADDRESS:                             C/O HON. LARRY ANDERSON
                                     DOTHAN          ,  AL   36302

APPELLATE COUNSEL #1:                GOURLEY BRENT HOWARD
ADDRESS:                             128 SOUTH OATES

PHONE NUMBER:                        DOTHAN          ,  AL   36301
                                     334-774-3840

APPELLATE COUNSEL #2:
ADDRESS:                             _____
                                     _____
PHONE NUMBER:                        _____

APPELLANT (PRO SE):                  MCCRAY WILLIE C
ADDRESS:                             C/O ELMORE CC
                                     ELMORE          ,  AL   360250000
AIS #:                               000183709

APPELLEE (IF CITY APPEAL):           _____
ADDRESS:                             _____
                                     _____
----------------------------------------------------------------------
I CERTIFY THAT THE INFORMATION PROVIDED            OPERATOR: RHM
ABOVE IS ACCURATE TO THE BEST OF MY           PREPARED: 05/09/2006
KNOWLEDGE AND I HAVE SERVED A COPY OF
THIS NOTICE OF APPEAL ON ALL PARTIES TO
THIS ACTION ON THIS 9th DAY OF May, 06    _____
                                              CIRCUIT COURT CLERK

IN THE CIRCUIT COURT OF _Houston_ COUNTY, ALABAMA

_Willie C. McCray_
     APPELLANT,

     VS.

     \* CASE NO: _CC 1994 080791.60_

STATE OF ALABAMA,
     APPELLEE,

### NOTICE OF APPEAL TO THE COURT OF
### CRIMINAL APPEALS OF ALABAMA

_April 19, 2006_      AND      _2/3/06_
DATE OF JUDGEMENT           POST JUDGEMENT ORDER

Notice is hereby given that _Willie C. McCray_, Appeals
to the above named Court from the Judgement of Conviction ( _Rule 32_ )
                                             or other order
entered in this Case on the _19_ DAY OF _April_, 200_6_,
Adjudging the Defendant to be Guilty of the Offense of _Rule 32_,
and punishment thereof, Sentencing the Defendant as Follows; _Rule 32_
_Denied_ :

FILED _May 21, 2006_
         DATE

CERTIFIED AS A TRUE COPY.

_Willie C. McCray_
PRO-SE APPELLANT

State of Alabama
Unified Judicial System
Form ARAP-26 (front)    8/91

# COURT OF CRIMINAL APPEALS
## DOCKETING STATEMENT

Case Number

## A. GENERAL INFORMATION:

☒ CIRCUIT COURT ☐ DISTRICT COURT ☐ JUVENILE COURT OF _____ Houston _____ COUNT

_____ Willie C. McCray _____ , Appell

V. ☒ STATE OF ALABAMA ☐ MUNICIPALITY OF _____

| Case Number CC-1994 000791.60 | Date of Complaint or Indictment | Date of Judgment/Sentence/Order 4/19/04 |
|---|---|---|
| Number of Days of Trial/Hearing _____ Days | Date of Notice of Appeal Oral: _____ | Written: 5/21/06 |
| Indigent Status Requested: ☐ Yes ☐ No | | Indigent Status Granted: ☒ Yes ☐ No |

## B. REPRESENTATION:

Is Attorney Appointed or Retained? ☒ Appointed ☐ Retained.    If no attorney, will appellant represent self? ☒ Yes ☐ N

Appellant's Attorney (Appellant if pro se) (Attach additional pages if necessary)    Telephone Number

| Address P.O. Box 8 | City Elmore | State Al. | Zip Code 36025 |
|---|---|---|---|

## C. CODEFENDANTS: List each CODEFENDANT and the codefendant's case number.

| Codefendant | Case Number |
|---|---|
| Codefendant | Case Number |
| Codefendant | Case Number — |

## D. TYPE OF APPEAL: Please check the applicable block.

1 ☐ State Conviction    4 ☐ Pretrial Order    7 ☐ Juvenile Transfer Order    10 ☐ Other (Specify)
2 ☒ Post-Conviction Remedy    5 ☐ Contempt Adjudication    8 ☐ Juvenile Delinquency
3 ☐ Probation Revocation    6 ☐ Municipal Conviction    9 ☐ Habeas Corpus Petition

## E. UNDERLYING CONVICTION/CHARGE: Regardless of the type of appeal checked in Section D, please check the box beside each offens category for which the appellant has been convicted or charged as it relates to this appeal. Also include the applicable section of the Code of Alabama for State convictions.

1 ☐ Capital Offense - § _____    6 ☐ Trafficking in Drugs - § _____    11 ☐ Fraudulent Practices - § _____
2 ☒ Homicide - § _____    7 ☐ Theft - § _____    12 ☐ Offense Against Family - § _____
3 ☐ Assault - § _____    8 ☐ Damage or Intrusion to Property - § _____    13 ☐ Traffic - DUI - § _____
4 ☐ Kidnapping/Unlawful Imprisonment - § _____    9 ☐ Escape - § _____    14 ☐ Traffic - Other - § _____
5 ☐ Drug Possession - § _____    10 ☐ Weapons/Firearms - § _____    15 ☐ Miscellaneous (Specify): _____ - § _____

## F. DEATH PENALTY:

Does this appeal involve a case where the death penalty has been imposed? ☐ Yes ☐ No

## G. TRANSCRIPT:

1. Will the record on appeal have a reporter's transcript? ☒ Yes ☐ No
2. If the answer to question "1" is "Yes," state the date the Reporter's Transcript Order was filed.   5/21/06 (Date)
3. If the answer to question "1" is "No":
   (a) Will a stipulation of facts be filed with the circuit clerk? ☐ Yes ☐ No
   (b) Will the parties stipulate that only questions of law are involved and will the trial court certify the questions? ☐ Yes ☐ No

NOTE: If the appeal is from the district or juvenile court and the answer to question "1" is "No," then a positive response is required for question 3(a) or 3(b).

35

Form ARAP-26 (back)   6/91                    COURT OF CRIMINAL APPEALS DOCKETING STATEMENT

**H. POST-JUDGMENT MOTIONS:** List all post-judgment motions by date of filing, type, and date of disposition (whether by trial court order or by the provisions of Rules 20.3 and 24.4 (ARCrP)).

| DATE OF FILING | | | TYPE OF POST-JUDGMENT MOTION | DATE OF DISPOSITION | | |
|---|---|---|---|---|---|---|
| Month | Day | Year | | Month | Day | Year |
| | | | Post Conviction Rule 32 Petition | 4 | 19 | 06 |
| | | | | | | |
| | | | | | | |

**I. NATURE OF THE CASE:** Without argument, briefly summarize the facts of the case.

Petitioner received a life sentence for Murder under a Felony murder which was reversed on remand following a Batson violation for which this Petitioner was indicted for a capital murder.

**I. ISSUE(S) ON APPEAL:** Briefly state the anticipated issues that will be presented on appeal. *(Attach additional pages if necessary.)*

1. Whether or not the petitioner intentional murder is a lesser included offense of the Felony murder doctrine.?

2. Whether or not the trial court committed reversal error by allowing the petitioner to be convicted for Felony murder with intentional Murder as an element.

**SIGNATURE:**

5/21/06
Date

Willie C. Mecroy
Signature of Attorney/Party Filing this Form

| State of Alabama Unified Judicial System Form ARAP-1C      8/91 | REPORTER'S TRANSCRIPT ORDER -- CRIMINAL See Rules 10(c) and 11(b) of the Alabama Rules of Appellate Procedure (A.R. App. P.) | Criminal Appeal Number _____ - _____ |

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

☒CIRCUIT COURT  ☐DISTRICT COURT  ☐JUVENILE COURT OF ___*Houston*___ COUNTY

___*Willie C. McCray, Pro Se*___, Appellant

V.   ☒STATE OF ALABAMA   ☐MUNICIPALITY OF _____

| Case Number *CC 1994 000791.60* | Date of Judgment/Sentence/Order *4/19/06* |
| Date of Notice of Appeal Oral:          Written: *5/21/06* | Indigent Status Granted: ☒Yes   ☐No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:**

I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, CODE OF ALABAMA 1975).

x *Willie C. McCray*                    *5/21/06*                    *Willie C. McCray*
Signature                                    Date                               Print or Type Name

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

MARK PROCEEDINGS REQUESTED:

COURT REPORTER(S)

A. ☒ **TRIAL PROCEEDINGS** - Although this designation will include the judgment and sentence proceedings, a transcript of the organization of the jury and arguments of counsel must be designated separately.      *Rule 32 Post Conviction*
_____
_____

B. ☐ **ORGANIZATION OF THE JURY** - This designation will include voir dire examination and challenges for cause. Note that in noncapital cases the voir dire of the jury will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)
_____

C. ☐ **ARGUMENTS OF COUNSEL** - Note that in noncapital cases the arguments of counsel will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)
_____

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

| ADDITIONAL PROCEEDINGS REQUESTED | DATE | COURT REPORTER(S) |
| D. *Post Conviction Rule 32 Petition* | *5/21/06* | |
| E. | | |
| F. | | |
| G. | | |

**IMPORTANT NOTICE:** The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:**

I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

x *Willie C. McCray*                    *5/21/06*                    *Willie C. McCray*
Signature                                    Date                               Print or Type Name

**DISTRIBUTION: Original filed with Clerk of Trial Court and copies mailed to:** (1) Clerk of the Court of Criminal Appeals, (2) the District Attorney, (3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and (4) to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript.

| State of Alabama<br>Unified Judicial System<br>Form ARAP- 1C        8/91 | **REPORTER'S TRANSCRIPT ORDER -- CRIMINAL**<br>See Rules 10(c) and 11(b) of the<br>Alabama Rules of Appellate Procedure (A.R. App.P.) | Criminal Appeal Number<br><br>_____ - _____ |

**TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.**

☒CIRCUIT COURT  ☐DISTRICT COURT  ☐JUVENILE COURT OF _____ HOUSTON _____ COUNTY

_WILLIE C. McCray_ , Appellant

V.  ☒ STATE OF ALABAMA  ☐MUNICIPALITY OF _____

| Case Number<br>CC 94-971 | Date of Judgment/Sentence/Order<br>24 Oct 2000 |
| Date of Notice of Appeal<br>Oral:                Written: 3 MAY 06 | Indigent Status Granted:<br>☒Yes    ☐No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, *CODE OF ALABAMA 1975*).

| _____ | _____ | _____ |
| Signature | Date | Print or Type Name |

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

**MARK PROCEEDINGS REQUESTED:**

A. ☐ **TRIAL PROCEEDINGS** - Although this designation will include the judgment and sentence proceedings, a transcript of the organization of the jury and arguments of counsel must be designated separately.

B. ☐ **ORGANIZATION OF THE JURY** - This designation will include voir dire examination and challenges for cause. Note that in noncapital cases the voir dire of the jury will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

C. ☐ **ARGUMENTS OF COUNSEL** - Note that in noncapital cases the arguments of counsel will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

COURT REPORTER(S)

**FILED**

MAY 0 4 2006

*Judy Byrd*

JUDY BYRD, CLERK
HOUSTON CO., AL

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

| ADDITIONAL PROCEEDINGS REQUESTED | DATE | COURT REPORTER(S) |
|---|---|---|
| D. _Rule 32_ | _19 Apr 06_ | _Carla Woodall_ |
| E. _____ | _____ | _____ |
| F. _____ | _____ | _____ |
| G. _____ | _____ | _____ |

**IMPORTANT NOTICE:** The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

| _Brent M. Gourley_ | _5-2-06_ | _Brent H. Gourley_ |
| Signature | Date | Print or Type Name |

**DISTRIBUTION: Original filed with Clerk of Trial Court and copies mailed to:** (1) Clerk of the Court of Criminal Appeals, (2) the District Attorney, (3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and (4) to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript.

1         IN THE CIRCUIT COURT OF HOUSTON COUNTY

2               STATE OF ALABAMA

3

4  STATE OF ALABAMA,         *
                        *

v.                  *   Case No. CC-1994-791.60

5                      *

WILLIE MCCRAY,          *

6                     *

       Defendant.     *

7

8

9

10

11

12

13     REPORTER'S OFFICIAL TRANSCRIPT ON APPEAL

14

15

16

17

18

19

  Before:
20
       The Honorable Jerry M. White
21
         April 19, 2006
22

23

24

  Carla H. Woodall, CSR
25  Court Reporter

```
 1                        APPEARANCES

 2

 3    For the State:
                        Douglas A. Valeska, Esquire
 4                      District Attorney

 5                      Gary C. Maxwell, Esquire
                        Chief Assistant District Attorney
 6
                        Arthur Medley, Esquire
 7                      Assistant District Attorney

 8
      For the Defendant:
 9
                        Brent H. Gourley, Esquire
10                      Dothan, Alabama

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              I N D E X

 2       State of Alabama  v.  Willie C. McCray
              Case No. CC-1994-971.06
 3

 4                                          PAGE

 5    REPORTER'S TRANSCRIPT ORDER            1

 6    TITLE PAGE                             2

 7    APPEARANCES                            3

 8    INDEX                                  4

 9    COLLOQUY                               5

10           DEFENDANT'S TESTAMENTARY EVIDENCE

11    WITNESSES:

12        WILLIE MCCRAY

13           Direct Examination by Mr. Gourley    9
             Cross Examination by Mr. Valeska    12
14

15    DEFENSE RESTS                         16

16    PROCEEDINGS FOR APRIL 19, 2006, ENDED  16

17    REPORTER'S CERTIFICATE                17

18    CERTIFICATE OF COMPLETION             19

19

20

21

22

23

24

25
```

1          PROCEEDINGS

2          THE COURT:  This is the petition of Willie

3     C. McCray in Case No. CC-1994-791.  It's a Rule

4     32 petition.  And what I'm gathering from his

5     petition is that he is saying -- let's see.  He

6     was originally charged with capital murder, a

7     murder committed during the course of a

8     robbery.  And he was actually convicted of

9     felony murder.

10         MR. GOURLEY:  Correct.

11         THE COURT:  And it seems that he's

12    complaining in his Rule 32 petition that the

13    State didn't go back and do a new indictment.

14    As I understand it, he was originally charged

15    for capital murder and tried for capital murder,

16    but the jury found him guilty of felony murder,

17    and then that was reversed.

18         MR. GOURLEY:  Yes, sir.

19         THE COURT:  And then the second time around

20    he was tried strictly for felony murder because

21    that's all they can do.

22         MR. GOURLEY:  Correct.

23         THE COURT:  And he says that they should

24    have returned a new indictment?

25         MR. GOURLEY:  Yes, sir.  I think he's got

1     his petition worded in a manner in a way that

2     the photocopy I've seen of the petition has the

3     word intentionally lined through. And I

4     can't -- from my paperwork can't tell --

5         THE COURT: His petition?

6         MR. GOURLEY: Right. There's a copy in his

7     petition shows the indictment -- the word

8     intentionally in the indictment, that's the

9     element of a capital murder --

10        THE COURT: Yeah, that's an element of

11    murder, intentional murder.

12       MR. GOURLEY: But it's not an element of a

13    felony murder. It's an element of the

14    underlying offense of the robbery, but not of

15    the actual murder, okay. And that distinction

16    here I think may be the heart of the problem.

17    Mr. McCray would say that the -- and there's a

18    pencil line drawn through intentionally. And I

19    don't know where that got into the paperwork --

20       THE COURT: I don't know.

21       MR. GOURLEY: Whether it was drawn on the

22    original indictment or not.

23       THE COURT: I think that might have been

24    something that I did to conform the indictment

25    to the charge that he was convicted of by the

1  original jury.

2      MR. VALESKA:  That's correct.  We did not

3  re-indict.  You're correct, Judge.  Because when

4  it came back --

5      THE COURT:  And I think in order to charge

6  the jury that probably what I did -- because I

7  was the one that tried it -- was that I struck

8  through the word intentionally and then on the

9  Code section I changed the Code section to

10  conform with what the prior jury had done.

11      MR. GOURLEY:  We get, then, to the first

12  part of Mr. McCray's argument that this striking

13  through the word intentionally constitutes an

14  amendment to the indictment that was done

15  without the Defendant's approval.  And the case

16  law and that sort of thing is that amendments of

17  material items on the indictment must have the

18  Defendant's approval or it has got to go back to

19  the grand jury.  The other part of his -- let me

20  finish on that.  I think if it was amended

21  without his approval, then we have to say that

22  the Court had no jurisdiction to do it because

23  he wasn't properly --

24      THE COURT:  I understand that's what Courts

25  before have instructed us to do.

1    MR. GOURLEY:  Yes, sir.  And there's a DUI
2    case like that --
3        THE COURT:  The first jury found him guilty
4    of felony murder, so that's what I had to try
5    him on.
6        MR. GOURLEY:  Yes, sir.  Yes, sir.  Finding
7    a person guilty of a lesser offense is an
8    acquittal of the original charge.
9        THE COURT:  Is there a case that says that
10   you have to go back and re-indict?  I mean, if
11   there is, put it on me.
12       MR. GOURLEY:  I looked, Your Honor.  I
13   couldn't find it.
14       THE COURT:  I mean, that's what he's
15   saying.  I want to see what he's saying.
16       MR. GOURLEY:  I would have been delighted to
17   stand here and show them to you, but I was not
18   able to find one.  That's not to say that
19   there's not one here that if I put a different
20   word in the electronic search it would have
21   popped up, but I didn't see it.
22       I think the second part of his petition is
23   that the use of the word intentionally during
24   the trial -- and we'll probably have to ask
25   Mr. McCray to take the stand to tell us where it

```
 1        was used and how it was used.
 2              THE COURT:  Okay.
 3              MR. GOURLEY:  Go ahead.
 4                    WILLIE MCCRAY
 5        having first been duly sworn, was examined and
 6        testified as follows:
 7                    DIRECT EXAMINATION
 8   BY MR. GOURLEY:
 9   Q    Mr. McCray, you were originally tried for
10        capital murder in this matter?
11   A    Yes, I was.
12   Q    And convicted of a lesser included of felony
13        murder?
14   A    Right.
15   Q    And that conviction was set aside by the Court
16        of Criminal Appeals for Batson reasons?
17   A    Right.
18   Q    The reason --
19              THE COURT:  What was it?  For Batson?
20              MR. GOURLEY:  Batson.
21              THE COURT:  I didn't remember why it was
22        reversed.
23   Q    The retrial, was that with a new indictment or
24        on the original?
25   A    It was on an amended indictment.
```

1    Q    Was that indictment read to the jury on the
2         second trial?
3    A    Not to my knowledge.
4              MR. GOURLEY:  I had asked last week, Your
5         Honor, for a copy of that transcript --
6              THE COURT:  It's in the clerk's office.
7              MR. VALESKA:  Judge, we'll stipulate that
8         the case was tried, the jury found him guilty of
9         a lesser included offense of the felony murder,
10        it came back like you just said on appeal.  We
11        retried him on that.  We did not re-indict him.
12        We'll stipulate.  But the D.A. did not read to
13        the jury that it was the capital charge.  We did
14        the felony murder.  That's all they ever heard.
15             THE COURT:  That's exactly right.
16             MR. VALESKA:  And then he was convicted on
17        the theft case also of the car he stole.  There
18        were two cases he was found guilty of.  We'll
19        stipulate to all those.  And we'll stipulate we
20        did not re-indict him and take him back to the
21        grand jury and indict him because the jury had
22        already found him guilty of the lesser included
23        so there was no reason to take him back to the
24        grand jury and indict him on felony murder.
25             THE COURT:  Right.

1   Q   Mr. McCray, do you remember if on the second

2       trial if the indictment was read to the jury?

3   A   No, I don't.  But let me elaborate on that a

4       minute.  This whole complaint is about where the

5       D.A. crossed out intentionally in the

6       indictment.

7          THE COURT:  No, the D.A. didn't do that.

8          THE WITNESS:  Well, the Court crossed out

9       the word intentionally in the indictment.  I was

10      under the assumption that it was an

11      unintentionally act.  But in return during the

12      course of the trial the D.A. tried to prove that

13      the intention -- the act itself was

14      intentional.  He used intentionally several

15      times.  That's why I had to take the stand to

16      show -- to try to prove to the Court that it was

17      an unintentional act.  And that is in the

18      Record.  I mean, you can't say that it was an

19      unintentional act in the face of the indictment

20      and when I go to trial you say it was

21      intentionally.  That's two different things.

22   Q   Are you saying that the D.A. told the jury that

23      the shooting was intentional?

24   A   Right.  He tried to prove that it was

25      intentionally due to his witness and due to the

1    way that he said that it happened.  And I was

2    trying to reenact the incident.  And he said,

3    no, that's not what happened.  He said that it

4    was an intentional killing, which took us back

5    to the original indictment of capital murder,

6    and I think that's double jeopardy.

7    Q    Anybody else use the word intentionally?

8    A    Excuse me?

9    Q    Did anybody else use the word intentionally in

10       that manner?

11   A    Not to my knowledge.  Nothing but the D.A.  No

12       one but the D.A.

13   Q    Anything else?

14   A    That's it.

15            MR. GOURLEY:  I think that's our position.

16            THE COURT:  Mr. Valeska, do you want to ask

17       him any question?

18            MR. VALESKA:  Yes.

19                    CROSS EXAMINATION

20   BY MR. VALESKA:

21   Q    My question to you, Mr. McCray, the Court of

22       Criminal Appeals affirmed your second trial,

23       didn't they?

24   A    Yes.

25   Q    They affirmed your conviction.  Did you raise

1       that on appeal what you just told Judge White?

2       You did not, did you?

3  A   I didn't raise anything.  It was the attorney

4       that I had raised all the issues.  I told him to

5       raise that issue --

6  Q   It was not raised on appeal, was it?

7  A   He didn't raise it on appeal.

8  Q   And you didn't file any motions yourself to have

9       it changed or supplement the Record, did you?

10  A   When I got -- when I got the letter saying that

11      the case had been affirmed, this -- it was,

12      like, two weeks I had sent the letter as

13      referencing to what you're saying now to raise

14      these issues.

15  Q   The question is, you did not on the appeal raise

16      those issues, did you?  Yes or no?

17  A   I didn't.

18  Q   And my question is, after the appeal was

19      affirmed did you apply for certiori to the

20      Supreme Court and say you didn't have a chance

21      to raise those issues because your lawyer was

22      incompetent?  You didn't do that, did you?

23  A   Yes.  I did wrote a letter.

24  Q   And that was denied, correct?

25  A   Right.

14

```
 1   Q   My question to you, the jury in this courtroom
 2       that you were tried in, correct, on the original
 3       trial?  In other words, when it was reversed,
 4       the felony murder conviction was in this
 5       courtroom?
 6   A   Okay.  We somewhat deviated away from the
 7       problem.  The problem was you tried to prove to
 8       the Court that it was -- excuse me, that it was
 9       an intentional act.  You mentioned several times
10       that the act was intentionally, okay.  That's
11       not in the face of the indictment.
12   Q   Thank you.
13   A   I'm saying that you didn't give me a chance to
14       address what I was charged with.
15   Q   Mr. McCray, did you testify in the trial?  You
16       did, didn't you?
17   A   Yes, I testified --
18   Q   You got on the stand --
19   A   -- in the trial that it was an unintentional
20       act.
21   Q   -- and the jury got to hear what you said,
22       correct?  Yes or no?
23   A   That's still not the problem.  You were saying
24       that it was an intentional --
25              THE COURT REPORTER:  One at a time.
```

1    Q    Would you answer the question?  The jury got to

2         hear what you wanted to say, correct?

3    A    Yes, they did.

4    Q    And the jury found you guilty of felony murder,

5         correct?

6    A    The jury found me guilty of felony -- I don't

7         know whether they found me guilty of felony

8         murder because to me it was a first degree

9         murder trial.

10   Q    It was a first degree murder trial, then it

11        would have been a capital murder conviction?

12   A    Exactly.

13   Q    When the jury verdict was read, Mr. McCray, what

14        they found you guilty of, they say, we, the jury

15        find you guilty of the felony murder, correct?

16   A    Okay.  I'm going to answer your question.  But

17        give me a chance to elaborate.

18   Q    Your lawyer can ask you those.  My question,

19        they did find you guilty of felony murder, yes

20        or no?

21   A    They found me guilty of felony murder.  Half the

22        jury didn't know the difference between felony

23        murder and first degree murder.

24   Q    Well, the question was they found you guilty of

25        felony murder, though, right?  Yes or no?

```
 1    A    They found me guilty.

 2    Q    And they read in the jury verdict, the foreman

 3         stood up in front of this judge and in front of

 4         myself and you and your lawyer and said, we, the

 5         jury in Houston County, find you guilty of

 6         felony murder, and they signed the jury verdict,

 7         and they handed it to the Judge?  That's what

 8         was read, correct?  So there was nothing about

 9         an intentional murder they convicted you of, did

10         they?  They didn't, did they?

11    A    You was using intentional act during the whole

12         trial.

13    Q    Thank you, Mr. McCray.  But that's not what you

14         were convicted of intentional?

15              MR. VALESKA:  Thank you, Your Honor.  That's

16         all.

17              THE COURT:  Please, you may step down.

18              MR. GOURLEY:  I think that makes our point,

19         Your Honor.

20              THE COURT:  He's in your custody.

21                  (The proceedings for April 19, 2006,

22                   were concluded.)

23                  (Off the Record.)

24

25
```

```
 1              *  *  *  *  *  *  *  *  *  *  *

 2              REPORTER'S CERTIFICATE

 3              *  *  *  *  *  *  *  *  *  *  *

 4   STATE OF ALABAMA

 5   COUNTY OF HOUSTON

 6

 7         I, Carla H. Woodall, CSR, Court Reporter and

 8   Notary Public in and for the State of Alabama at

 9   Large, do hereby certify that the above-styled and

10   numbered cause was reported stenographically by me

11   and is a true and correct transcript of the

12   testimony, objections, motions, rulings of the Court,

13   and was transcribed by or under my direction and

14   control.

15         I further certify that I have filed all

16   exhibits offered in the trial of this cause, if any,

17   with the Circuit Clerk of Houston County, Dothan,

18   Alabama, for incorporation into the Record on Appeal.

19         I further certify that I have on this day

20   filed with the Clerk of the Court of Criminal

21   Appeals, the Attorney General, and the parties here

22   involved a copy of the Reporter's Index to the

23   Testimony and a Certificate of Completion of

24   Reporter's Transcript of the said cause.

25         I further certify that I have filed the
```

1  original and three copies of this transcript in the

2  office of the Circuit Clerk of the Circuit Court of

3  Houston County, Dothan, Alabama.


5  Done this the 28th day of June, 2006.




7  _____

8  Carla H. Woodall, CSR
   Court Reporter & Notary Public
   State of Alabama at Large

| State of Alabama<br>Unified Judicial System<br><br>Form ARAP 13 | CERTIFICATE OF COMPLETION<br>REPORTER'S TRANSCRIPT | Page Number<br><br>**19** |
|---|---|---|

**TO:** **The Clerk of the Court of Criminal Appeals**          **Fax: (334)242-4689**
      **P. O. Box 301555**
      **Montgomery, Alabama  36130-1555**

**Criminal Appeals Case Number**          **CR  05- 1474**

__WILLIE C. MCCRAY__          **VS.**  __STATE OF ALABAMA__
**Appellant's Name**                    **Appellee**

On appeal from the:     [ X ]  Circuit Court of      ]
                        [   ]  District Court of     ]     Houston County
                        [   ]  Juvenile Court of     ]

Trial Court Case Number   __CC-94-791.60__

Notice of Appeal Date   __May 4, 2006__

      I,  __Carla H. Woodall__ , certify that I have this date completed and filed with the clerk of the trial court an original and three copies of a true and correct transcript of all proceedings in the above referenced case that were reported by me and were specifically designated by the appellant for inclusion on the Reporter's Transcript Order.  The transcript, which is numbered serially in the upper right-hand corner of each page, begins with a copy of the Reporter's Transcript Order and an index of both the exhibits and testimony of the witnesses.  The original transcript concludes with the original of this notice and the copies of the transcript conclude with copies of this notice.  The page number appearing in the upper right-hand corner of this certificate is the last page of my portion of the transcript in this case.

      Done this the 28th day of __June__ , 2006.

__Carla H. Woodall__
Court Reporter

**FILING AND SERVICE OF THIS FORM: Pursuant to Rule 11(b), A.R.App.P., the court reporter should file a copy of this certificate with the Clerk of the Court of Criminal Appeals and should serve copies of the certificate on counsel for the appellant or the appellant if he or she is not represented by appellate counsel, the attorney general and the district attorney, unless the appeal is from a municipal appeal, in which event a copy of the form should be served on the municipal prosecutor rather than the attorney general and district attorney.**

| State of Alabama<br>Unified Judicial System<br><br>From ARAP - 14  Rev. 11 / 91 | CERTIFICATE OF COMPLETION AND<br>TRANSMITTAL OF RECORD ON<br>APPEAL BY TRIAL CLERK | Appellate Case Number<br><br>_____ |
|---|---|---|

| TO: THE CLERK OF<br>    THE COURT OF CRIMINAL APPEALS OF ALABAMA | DATE OF<br>NOTICE OF APPEAL:    05-04-06 |
|---|---|

APPELLANT
WILLIE MCCRAY

v. STATE OF ALABAMA

    I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in ( a single volume of ___57___ pages) (_____ volumes of 200 pages each and one volume of _____ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of brief.

    I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

DATED this___28TH___ day of _____JUNE_____, _2006_.


                                         JUDY BYRD
_____
        Circuit Clerk

95058

*Anders*

CR - 05 - 1474

IN THE COURT OF CRIMINAL APPEALS

of the

STATE OF ALABAMA

WILLIE C. McCRAY

APPELLANT,

vs.

STATE OF ALABAMA,

APPELLEE.

on appeal from

Houston County Circuit Court

Case No. CC 94-791 .60

Brief of Appellant

Counsel for the Appellant:

Brent Howard Gourley          GOU006
Klemm & Gourley, P.C.
128 South Oates Street
Dothan, Alabama 36301
(334) 677-7734
bgrly@comcast.net

ORAL ARGUMENT STATEMENT

Appellant does not desire oral argument.

TABLE OF CONTENTS

ORAL ARGUMENT STATEMENT . . . . . . . . . . . . . ii

TABLE OF CONTENTS . . . . . . . . . . . . . . . iii

TABLE OF AUTHORITIES . . . . . . . . . . . . . iv

STATEMENT OF THE CASE . . . . . . . . . . . . . . 1

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . 3

STATEMENT OF THE FACTS . . . . . . . . . . . . . 4

STATEMENT OF THE STANDARD OF REVIEW . . . . . . . 9

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . 11

CONCLUSION . . . . . . . . . . . . . . . . . 18

APPENDIX . . . . . . . . . . . . . . . . . . . 20

SUMMARY OF RULINGS AND ACTIONS ADVERSE TO APPELLANT
         . . . . . . . . . . . . . . . . . . . 20

TABLE OF AUTHORITIES

Cases:

Ash v. State
      843 So. 2d 213 (Ala. 2002) . . . . . . . . . .   13

Black v. State
      586 So.2d 968, 970 (Ala.Crim.App. 1991)  . . .   13

Brantley v. State
      527 So.2d 1365, 1366 (Ala.Crim.App. 1988)  . .   14

Brown v. State
      705 So.2d 871, 875 (Ala.Crim.App. 1997)  . . 9, 16

Dunn v. City of Montgomery
      515 So.2d 135, 136 (Ala.Cr.App. 1987)  . . . .   12

Eskridge v. State
      709 So.2d 1348 (Ala.Crim.App. 1997)  . . . . . .   9

Ex parte Frith
      526 So.2d 880, 882 (Ala. 1987) . . . . . . . 9, 16

Ex parte Peterson
      890 So.2d 990, 993 (Ala. 2004) . . . . . . 13, 16

Ex parte Seymour (in re Seymour v. Alabama)
      2006 WL 1793747, CR-04-1137, (Ala. 2006) . . .   13

Fitch v. State
      851 So.2d 103, 126 (Ala.Crim.App. 2001)  . . .   15

Hunt v. State
      642 So.2d 999 (Ala.Cr.App. 1993)
      aff'd, 642 So.2d 1060 (Ala. 1994)  . . . . . . .   9

McCray v. State
      738 So. 2d 911 (Crim. App. 1998)
      reh'g denied, cert. denied (Ala. 1999) . . . 1, 4

McCray v. State
      CR 00-0241, (Ala.Crim.App. 2001) . . . . . . . .   1

Mitchell v. State
      706 So.2d 787, 800 (Ala.Crim.App. 1997)  . . .   14

Newsome v. State
    570 So.2d 703, 716 (Ala.Crim.App. 1989)  . . 9, 16

Record on Appeal
    McCray v. State CR 00-241
    Houston County Case No. CC-94-791
    (Ala. Crim. App. 2001) . . . . . . . . . . 11, 12

Ross v. State
    529 So.2d 1074, 1076 (Ala.Crim.App. 1988)  . . 12

Shouldis v. State
    CR-04-1907 (Ala.Crim.App. 3-3-2006)  . . . . 9, 16

United States v. Schmidt
    947 F.2d 362, 369 (9th Cir. 1991)  . . . . . . . 9

Wesson v. State
    644 So.2d 1302, 1306 (Ala.Crim.App. 1994)   13, 14


Statutes and Other Authorities:

Code of Alabama § 13A-1-9, 1975 . . . . . . . . . . 13

Code of Alabama § 13A-1-9(b), 1975  . . . . . . . . 14

Code of Alabama § 13A-6-2(a)(3), 1975 . . . . . . . 11

STATEMENT OF THE CASE

This Appeal arises from the denial of Rule 32 relief requested by the Appellant Willie C. McCray ("McCray").

The State originally tried McCray on a charge of capital murder due to the death of another during the course of a robbery. The original trial jury found McCray guilty of the lesser included offense of felony murder.

McCray made a *pro se* appeal on Batson grounds. This Court remanded the matter for a new trial as a result of the State striking black jurors, ostensibly to prevent denial of the rights of white citizens to serve on the jury. McCray v. State, 738 So. 2d 911 (Crim. App. 1998), reh'g denied, cert. denied (Ala. 1999).

At the retrial on the original indictment, the jury again found McCray guilty of felony murder. This Court affirmed the second conviction in an unpublished memorandum. (McCray v. State, CR 00-0241 (Ala. Crim. App. 2001)

McCray sought relief pursuant to Rule 32 of the

1

Alabama Rules of Criminal Procedure on subject matter jurisdictional grounds. Judge Jerry White denied his Rule 32 after a hearing.

    This appeal follows.

## ISSUES PRESENTED FOR REVIEW

I.  WHETHER THE TRIAL COURT ERRED WHEN, WHILE READING
    THE INDICTMENT TO THE JURY, IT AMENDED THE
    INDICTMENT BY LINING OUT OR OMITTING THE WORD
    "INTENTIONAL" WITHOUT McCRAY'S APPROVAL OR MOTION
    TO AMEND OR STRIKE SURPLUSAGE? . . . . . . . . 11

II. WHETHER THE TRIAL COURT ERRED BY ALLOWING THE
    STATE TO USE THE WORD "INTENT" IN ANY OF ITS FORMS
    IN A FELONY MURDER RETRIAL? . . . . . . . . . 15

STATEMENT OF THE FACTS

We have these facts from the underlying criminal case:

> The State's evidence tended to establish that
> on August 6, 1993, the appellant and an
> accomplice stole an automobile ... and drove
> to the Country Market grocery store in Dothan.
> The appellant, armed with a pistol, entered
> the store while his accomplice stood by the
> exit. The appellant demanded two store
> employees to retrieve the money from the store
> safe. During the robbery, Michael Scott, a
> customer who had been waiting in the check-out
> line, struck the appellant in the face,
> whereupon the appellant shot Scott in the
> face. The appellant and his accomplice fled
> the scene while firing their guns as they
> left. Scott died four days later as a result
> of the gunshot to his face.

McCray v. State, 738 So. 2d 911, 912 (Ala. Crim. App.

1998), reh'g denied, cert. denied (Ala. 1999).

McCray disputed these facts during his testimony

during the retrial, claiming the victim grabbed the

firearm, causing the accidental discharge of the

weapon. (pages 391, 412, Record on Appeal, McCray v.

State CR 00-241, Houston County Case No. CC-94-791

(Ala. Crim. App. 2001)(affirmed by unpublished

memorandum of 21 Nov 2001)

McCray's Rule 32 petition alleges that, at the

second trial, the original capital murder indictment

was amended without his approval, thereby not notifying

4

him of the offense and depriving the trial court of jurisdiction. (C. 11) His petition includes a copy of the indictment with a line drawn through the word "intentionally." (C. 15)

During the Rule 32 hearing, McCray, the trial judge, and Mr. Valeska, the prosecutor, agreed on these facts set out here below.

At his first trial on charge of capital murder, a killing during a robbery, the jury returned a guilty verdict to the lesser included offense of felony murder. (R. 5) This Court remanded the matter for a new trial because of Batson violations. (R. 9) The second jury convicted him again of felony murder. (R. 15) McCray appealed his second conviction, to no avail. (R. 12)

Judge Jerry White suggests that it was the Court who lined through the word "intentionally" on the indictment during the second trial. (R. 6) Judge White stated later that the D.A. did not line through the word "intentionally." (R. 11)

As McCray began his testimony during the Rule 32 hearing, this exchange occurred:

MR. VALESKA: Judge, we'll stipulate that

5

the case was tried, the jury found guilty of
the lesser included offense of the felony
murder, it came back just like you said on
appeal. We retried him on that. We did not re-
indict him. We'll stipulate. But the D.A. did
not read to the jury that it was the capital
charge. We did the felony murder. That's all
they ever heard.

      THE COURT: That's exactly right.

      MR. VALESKA: ... And we'll stipulate we
did not re-indict him and take him back to the
grand jury and indict him because the jury had
already found guilty of the lesser included so
there was no reason to take him back to the
grand jury and indict him on felony murder.

      THE COURT: Right

Q:  [by Mr. Gourley] Mr. McCray, do you remember
if on the second trial if the indictment was
read to the jury?

A:  No, I don't. but let me elaborate on that a
minute. This whole complaint is about where
the D.A. crossed out intentionally in the
indictment.

6

THE COURT: No, the D.A. didn't do that.

THE WITNESS: Well, the Court crossed out the word intentionally in the indictment. I was under the assumption that it was an unintentionally [sic] act. But in return during the course of the trial, the D.A. tried to prove the intention -- the act itself was intentional. He used intentionally several times. That's why I had to take the stand to -- to try to prove to the court that it was an unintentional act. And that is in the Record. I mean, you can't say that it was an unintentional act in the face of the indictment and when I go to trial you say it was intentionally. ...

Q    Are you saying that the D.A. told the jury that the shooting was intentional?

A    Right. He tried to prove that it was intentionally .... He said that it was an intentional killing, which took us back to the original indictment of capital murder, and I think that's double jeopardy.

7

(R. 10)[1]

On cross examination, McCray admitted that the Court of Criminal Appeals affirmed his second trial. (R. 12) The issue was not raised on appeal. His application for certiorari on grounds of ineffective assistance was denied. (R. 13) McCray acknowledged that the jury heard his testimony that his actions were unintentional. (R. 14) He still believes he was tried for capital murder again, and found guilty of felony murder again. (R. 15)

---

[1]This writer has examined the Record on Appeal of the second trial and finds these uses of the word in question: 1) Defense counsel used it during his argument for a manslaughter instruction, (R. 381); 2) The Defendant said: "But it wasn't my intention...," (R. 412); 3) the Defendant, again: "[A]nd it was on the trigger unintentionally[;]" 3) the D.A. in his closing argument: "Whose [sic] got a reason to intentionally lie for what motive...[;]" 4) Defense counsel in his closing: "[T]he State has not proved that this man had anything to do with the theft of a car, nor the intentional murder of Michael Scott." Record on Appeal, McCray v. State CR 00-241, Houston County Case No. CC-94-791 (Ala. Crim. App. 2001)(affirmed by unpublished memorandum of 21 Nov 2001)

STATEMENT OF THE STANDARD OF REVIEW

Appellant makes these statements of the standard of review for each issue:

Indictment and Jurisdiction

> In Hunt v. State, 642 So.2d 999 (Ala.Cr.App. 1993), aff'd, 642 So.2d 1060 (Ala. 1994), this Court set out the standard of review with regard to the sufficiency of indictments:
>
>> Appellate courts review the legal sufficiency of indictments de novo. United States v. Schmidt, 947 F.2d 362, 369 (9th Cir. 1991).

Eskridge v. State, 709 So.2d 1348 (Ala.Crim.App. 1997)

Preservation for Review:

> It is well-settled that "[r]eview on appeal is limited to review of questions properly and timely raised at trial." Newsome v. State, 570 So.2d 703, 716 (Ala.Crim.App. 1989). "Even constitutional claims may be waived on appeal if not specifically presented to the trial court." Brown v. State, 705 So.2d 871, 875 (Ala.Crim.App. 1997). Further, "[t]he statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial." Ex parte Frith, 526 So.2d 880, 882 (Ala. 1987).

Shouldis v. State, CR-04-1907 (Ala.Crim.App. 3-3-2006)

(many internal cites omitted)

9

## SUMMARY OF THE ARGUMENT

McCray argues that the trial court had no subject matter jurisdiction over the retrial of his capital murder case. Because the original jury found him guilty of a lesser included charge, the indictment was therefore incorrect as worded for a capital murder charge. However, he also alleges that the court amended the indictment without his consent when it did not read the word "intentionally" to the jury, even lining it out on the original indictment. He also complains of the State's use of the word "intent" or any of its forms before the jury, as again trying to convict him of capital murder afer once being acquitted.

He argues that the indictment did not lawfully notify him of the charges which he must face during the retrial, and, therefore the trial court was without jurisdiction.

However, as he was retried on the capital murder indictment, with the word "intentionally" disregarded and the jury carefully so instructed, the court made no error and McCray suffered no harm.

10

ARGUMENT

I.   WHETHER THE TRIAL COURT ERRED WHEN, WHILE READING

THE INDICTMENT TO THE JURY, IT AMENDED THE

INDICTMENT BY LINING OUT OR OMITTING THE WORD

"INTENTIONAL" WITHOUT McCRAY'S APPROVAL OR MOTION

TO AMEND OR STRIKE SURPLUSAGE?


McCray alleges that the Court amended his original

capital murder indictment without his permission, thus,

the indictment no longer advised him of the charges and

deprived the trial court of subject matter

jurisdiction, (C. 11) He was, he claims, tried for a

second time for capital murder. (R. 15)

At his first trial, the jury acquitted McCray by

means of convicting him of a lesser included offense.

(R. 5) During the second trial, the Court lined out the

word "intentionally" in the indictment, (R. 6, 11),

because intent is not an element of felony murder, (R.

6). See Code of Alabama § 13A-6-2(a)(3) 1975. The judge

charged the jury on felony murder and not capital

murder. (R. 7) The court read the indictment to the

jury without the word "intentionally" , (Record on

Appeal, McCray v. State CR 00-241, page 472, Houston

11

County Case No. CC-94-791 (Ala. Crim. App.
2001)(affirmed by unpublished memorandum of 21 Nov
2001), and explained to the jury that the charge of
felony murder did not require "intent" as an element.
id, 475. The defense did not object to the jury
charges. id, 494.

McCray in his petition argues these indictment
principals concerning amendment. First, concerning
amendment:

> The pertinent part of Rule 15.5, subsection
> (a), reads as follows:
>
>> "AMENDMENT OF CHARGE. A charge may
>> be amended by  order of the court
>> with the consent of the defendant in
>> all cases except to change the
>> offense or to charge new offenses
>> not included in the original
>> indictment, information, or
>> complaint."
>
> "This means that (1) a charge may only be
> amended with the defendant's consent and (2) a
> charge may not be amended where the amendment
> changes the offense or charges a new offense
> not included in the original charge." Dunn v.
> City of Montgomery, 515 So.2d 135, 136
> (Ala.Cr.App. 1987).

Ross v. State, 529 So.2d 1074, 1076 (Ala.Crim.App.
1988)

Secondly, the indictment notifies the accused of
the charges made against him, and therefore is the

12

source of the subject matter jurisdiction to try a
contested criminal case. <u>Ash v. State</u>, 843 So. 2d 213
(Ala. 2002)[2]

"It is beyond cavil that felony murder is an
offense contemplated in the ... capital murder
indictment." <u>Ex parte Peterson</u>, 890 So.2d 990, 993
(Ala. 2004) From the Code: "A defendant may be
convicted of an offense included in an offense charged.
An offense is an included one if: (1) It is established
by proof of the same or fewer than all the facts
required to establish the commission of the offense
charged; ..." Code of Alabama § 13A-1-9, 1975.

But McCray presents these contradictions. First,
<u>Peterson</u> also states that "[t]he concept of a lesser
included offense does not involve . . . an amendment of
the indictment." <u>Wesson v. State</u>, 644 So.2d 1302, 1306
(Ala.Crim.App. 1994)(quoting <u>Black v. State</u>, 586 So.2d
968, 970 (Ala.Crim.App. 1991)). <u>See</u> <u>Peterson</u> at 993.
<u>Wesson</u> found that even an attempted rape was a lesser

---

[2]This writer remains aware of the as yet
unpublished opinion of <u>Ex parte Seymour (in re Seymour
v. Alabama)</u>, 2006 WL 1793747, CR-04-1137, (Ala. 2006)
(dated June 30, 2006)(overturning <u>Ash v. State</u>, 843,
213, 216 (Ala. 2002)and finding that a Court's power
originates with the Constitution and the Code).

included offense of rape. Wesson at 1306. Second, "We note that an accused may plead guilty to a lesser included offense without the necessity of amending the indictment. Brantley v. State, 527 So.2d 1365, 1366 (Ala.Crim.App. 1988) Where the matter concerns jury instructions, as with McCray, we find that "[i]t is clear that [a] defendant is entitled to a charge on a lesser included offense if there is any reasonable theory from the evidence that would support the position." Mitchell v. State, 706 So.2d 787, 800 (Ala.Crim.App. 1997) But, also that instructions on lesser included offenses may be given only where supported by the evidence. § 13A-1-9(b).

This writer finds no authority requiring re-indictment prior to retrial of a conviction of a lesser included offense. Indeed, it's clear that Judge White need not have, and, arguably, should not have, redacted the word "intentionally" from the indictment. He should have read it as the grand jury approved it. "Unnecessary allegations may be disregarded as surplusage, and, on motion of the defendant, shall be stricken by the court if prejudicial or prolix." Rule 13.2, ARCrP. But even further we find that

14

> The rule in our State is that an allegation in
> an  indictment which is but mere surplusage
> may be disregarded — it is immaterial for any
> purpose. The exception to this rule . . . is
> that if the allegation  (constituting
> surplusage) is descriptive of the fact  or
> degree of the crime, or is material to the
> jurisdiction it must be proved as alleged.

<u>Fitch v. State</u>, 851 So.2d 103, 126 (Ala.Crim.App. 2001)

(deciding the phrase "public funds" need not be defined

to the jury as it was not an element of the charged

ethics complaint and therefore surplusage)(internal

quotes and cites omitted)

McCray made no request to strike, but neither did

he object to the omission of the word nor did he object

to the court's explanation during the jury

instructions. (pages 475, 494, Record on Appeal, <u>McCray</u>

<u>v. State</u> CR 00-241, Houston County Case No. CC-94-791

(Ala. Crim. App. 2001)(affirmed by unpublished

memorandum of 21 Nov 2001)


II.  WHETHER THE TRIAL COURT ERRED BY ALLOWING THE

STATE TO USE THE WORD "INTENT" IN ANY OF ITS FORMS

IN A FELONY MURDER RETRIAL?

15

This writer, upon review of the record of the second trial and the record of the Rule 32 hearing, looking for the use of the word "intentional" and in all of its forms, sees not the offensive word. We do find the D.A. and McCray arguing about whether his actions with the firearm in close contact with the victim were volitional, that is accidental, not whether he had intent to kill. (pages 391, 412, Record on Appeal, McCray v. State CR 00-241, Houston County Case No. CC-94-791 (Ala. Crim. App. 2001)(affirmed by unpublished memorandum of 21 Nov 2001)

McCray made no objections to any of these issues at trial. It is well-settled that ""[r]eview on appeal is limited to review of questions properly and timely raised at trial." Newsome v. State, 570 So.2d 703, 716 (Ala.Crim.App. 1989). "Even constitutional claims may be waived on appeal if not specifically presented to the trial court." Brown v. State, 705 So.2d 871, 875 (Ala.Crim.App. 1997). Further, "[t]he statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial." Ex parte Frith, 526 So.2d 880, 882 (Ala. 1987)." See Shouldis V. State,

16

CR-04-1907 (Ala.Crim.App. 3-3-2006) (many internal
cites omitted)

CONCLUSION

This writer sees no errors and no possible remedy for McCray's complaints. McCray's stated positions contain great inconsistencies and contradictions. He complains that the word "intentionally" was omitted from the indictment for his second trial; but complains that it was used before the jury.

At McCray's first trial, the jury found him guilty of the lesser included offense, thus acquitting him of capital murder. He was therefore, found guilty of felony murder with the word "intentionally" in the indictment. On retrial, the court instructed the jury only on felony murder and omitted the word "intentionally."

This writer has found no requirement for the state to re-indict McCray upon his acquittal of capital murder.

Any wrongs in the second trial produced none of the errors of which McCray complains.

Respectfully submitted this ___19___ day of July, 2006.


Brent Howard Gourley          GOU006
Attorney for Defendant
Klemm & Gourley, P.C.
128 South Oates Street
Dothan, Alabama 36301-1635
(334) 677-7734
bgrly@comcast.net

19

APPENDIX

SUMMARY OF RULINGS AND ACTIONS ADVERSE TO APPELLANT


Record Page No.    Summary

27        Rule 32 Petition denied.

IN THE COURT OF CRIMINAL APPEALS
FOR
THE STATE OF ALABAMA

WILLIE C. McCRAY,

    APPELLANT,

    v.

STATE OF ALABAMA,

    APPELLEE.

Criminal Appeals No. 05-1474

Houston County Circuit Court

    Case No. CC 94-791

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above Request upon the below-named individual(s) by either hand delivery or by placing a copy of the same in the United States Mail, postage prepaid and correctly addressed:

    Attorney General of the State of Alabama, Honorable Troy King, Alabama State House, Room 303, 11 South Union Street, Montgomery, AL 36130

    Appellant Mr. Willie C. McCray, AIS 183709, Elmore Correctional Facility, PO Box 8, Elmore, AL 36025

Done this the _19_ day of July, 2006.

BRENT H. GOURLEY    (GOU006)
Attorney for Appellant
Klemm & Gourley, P.C.
128 South Oates Street
Dothan, AL 36301
(334) 677-7734
bgrly@comcast.net

21

# COURT OF CRIMINAL APPEALS
# STATE OF ALABAMA

45058
Madison

H. W. "BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges



Lane W. Mann
Clerk
Gerri Robinson
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

## CR-05-1474

Willie C. McCray v. State of Alabama  (Appeal from Houston Circuit Court:
CC94-791.60)

## <u>ORDER</u>

This Court will take judicial notice of its record in CR-00-0241, McCray's direct appeal
from his murder and theft convictions.  McCray is given an additional 21 days to file his pro
se issues.

Done this the 16th day of August, 2006.

H. W. "Bucky" McMillan, Presiding Judge
Court of Criminal Appeals

cc: Brent H. Gourley, Attorney
    Willie C. McCray, Pro Se
    Office of Attorney General



IN THE ALABAMA COURT OF CRIMINAL APPEALS

*Madison*
*9 5058*

Willie C.McCray,
Pro/Se Appellant


-Vs-


State of Alabama,
Appellee


Criminal Appeals No. CR-05-1474

---

(Appealed from the Houston County Circuit Court)
(Circuit Court Case No. CC-94-791.60)

---

Appellants "Pro/Se Issues"

---


Willie C.McCray #183709
Elmore Correctional Facility
Post Office Box 8
Elmore,Al.36025

**TABLE OF AUTHORITIES**    Pg.#

Ross v.State,529 so.2d.1074(Ala.Crim.App.1988).......1

Glen D.Johnson v.State,2006 Ala.Crim.App.LEXIS 442....1

Bester v.State,362 so.2d.1282(Ala.Crim.App.1978)......1

Ala.Code 1975 §15-8-90................................1

Murray v.State,814 so.2d.1006(Ala.Crim.App.2001)......1

Ayler v.State,2005 Ala.Crim.App.LEXIS 87.............1

## Appellants Pro/Se Issue(s)

Whether or not the Trial Court Improperly Amended the Indictment
in this Case,And Whether or not this court Must Take judicial
notice of the Jurisdictional Defect.

At [CR-14],The Amended Indictment in this case can be reviewed,
It is Obvious,That the Court Improperly Amended the Indictment,
And,Since Ju@isdiction of the trial court,In felony cases,rests
upon the utilization of a grand jury indictment or information
which encompasses the charge for which the defendant is convicted
we reach the merits of appellants claim as a jurisdictional
matter.Ross v.State,529 so.2d.1074(Ala.Crim.App.1988);

Therefore,This court must take Judicial Notice of the Jurisdictional
defect,Glen Dale Johnson v.State of Alabama,2006 Ala.Crim.App.LEXIS
442(Mar.24,2006).

Whether or not the Trial Court can remove the aggravating Circums-
tances from a Capital Murder Indictment,By simply Scratching
thru the Code section,And Writing in a different code section.

This court in;Bester v.State,362 so.2d.1282(Ala.Crim.App.1978),
Held that,"Where defendant was Indicted under death ponalty
statute,but,Pursuant to motion by state to amend Indictment
by removing allegation of aggravating circumstances,defendant
was sentenced under First Degree Murder Statute,Change was sub-
stantial and not within permissable limits of Statute governing
amendment of Indictment....."Ala.Code 1975 §15-8-90

Due to the Fact,That an 'Improper Amendment to an Indictment'
is a 'Jurisdictional Defect',Murray v.State,814 so.2d.1006(Ala.
Crim.App.2001),This court should take Judicial Notice of the
defect in the trial courts jurisdiction,Ayler v.State,2005 Ala.Crim.
App.LEXIS 87(April 27,2005).

### CONCLUSION

Wherefore,Premises considered,This Court should Reverse this
cause with the Instructions to Vacate the Appellants Conviction
and Sentence.

Respectfully Submitted, Willie C. McCray 185709
                        Willie C.McCray
                        Pro/Se Appellant

(-1-)

## CERTIFICATE OF SERVICE

This is to certify,That I have served a true and correct copy
of the foregoing pleading on:

Office of the Attorney General

State of Alabama

11 South Union Street

Montgomery,Al.36130

By placing said copy,In the U.S. Mail,Postage Pre-Paid,And properly
Addressed,On this the 4th day of September,2006.

Willie C. McCray 182709
Willie C.McCray#182709
Elmore Correctional Facility
Post Office Box 8
Elmore,Al.36025

c.c.-personal file

(-2-)

REL: 10/27/2006 McCRAY

Notice: This unpublished memorandum should not be cited as precedent. See Rule 54, Ala.R.App.P. Rule 54(d), states, in part, that this memorandum "shall have no precedential value and shall not be cited in arguments or briefs and shall not be used by any court within this state, except for the purpose of establishing the application of the doctrine of law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar."

# Court of Criminal Appeals

State of Alabama
Judicial Building, 300 Dexter Avenue
**P. O. Box 301555**
**Montgomery, AL 36130-1555**

H.W."BUCKY" McMILLAN
**Presiding Judge**
**SUE BELL COBB**
**PAMELA W. BASCHAB**
**GREG SHAW**
**A. KELLI WISE**
**Judges**

Lane W. Mann
**Clerk**
Gerri Robinson
**Assistant Clerk**
(334) 242-4590
Fax (334) 242-4689

## MEMORANDUM

CR-05-1474                    Houston Circuit Court CC-94-791.60

<u>Willie C. McCray v. State of Alabama</u>

WISE, Judge.

   The appellant, Willie C. McCray, appeals from the trial court's denial of his petition for postconviction relief, filed pursuant to Rule 32, Ala.R.Crim.P., in which he attacked his 2000 convictions for felony murder and first-degree theft, and his resulting sentences of 99 years' imprisonment for felony murder and 20 years' imprisonment for the theft conviction.   On November 11, 2001, this Court affirmed McCray's convictions and sentences, by unpublished memorandum. <u>McCray v. State</u> (No. CR-00-0241), 851 So. 2d 631

1



(Ala.Crim.App. 2001)(table).[1]  A certificate of judgment was issued on January 8, 2002.

On January 23, 2006, McCray filed this, his first, Rule 32 petition wherein he alleged that the trial court erred by: (1) allowing the indictment to be amended and (2) allowing that State to use the word "intent" in any of its forms in a felony murder retrial.  On March 17, 2006, the State filed a motion for summary disposition wherein it argued that his claims were both without merit and precluded from appellate review.  On April 19, 2006, the trial court conducted an evidentiary hearing and denied his petition on that same day. This appeal followed.

On appeal, McCray reasserts the claims he raised in his petition to the trial court as possible claims submitted in substantial compliance with Anders v. California, 386 U.S. 738 (1967).

This Court issued an Anders order on July 20, 2006.  In response, McCray filed a pro se letter brief challenging the amendment of his indictment.  Moreover, on June 30, 2006, the Alabama Supreme Court decided the matter of Ex parte Seymour, [Ms. 1050597, June 30, 2006] ___ So. 2d ___ (Ala. 2006).  In Seymour, the Supreme Court overruled Ex parte Lewis, 811 So. 2d 485 (Ala. 2001), Ash v. State, 843 So. 2d 213 (Ala. 2002), "and other Alabama cases [that] have held to the contrary." Seymour, ___ So. 2d at ___.[2]  In doing so, the Court opined:

> "The validity of Seymour's indictment is irrelevant
> to whether the circuit court had jurisdiction over
> the subject matter of this case.  A defect in an

---

[1]This was the second appeal taken by McCray.  On August 28, 1998, this Court reversed his convictions in McCray v. State, 738 So. 2d 911 (Ala.Crim.App. 1998).  Following a second trial, McCray was again convicted of both offenses.

[2]Ash held that "[a] valid indictment is the source of the subject matter jurisdiction to try a contested criminal case." Ash, 843 So. 2d at 216.  Lewis held that "[f]ailure to allege an essential element of the charged offense is a jurisdictional defect...."  Ex parte Lewis, 811 So. 2d at 487.

2

indictment may be error, <u>see</u> Rule 15.2(d), Ala. R. Crim. P. -- or even constitutional error, see Ala. Const., Art. I, § 8 -- but the defect does not divest the circuit court of the power to try the case.    A defendant who challenges a defective indictment is thus subject to the same preclusive bars as one who challenges any other nonjurisdictional error, such as illegal seizure or a violation of the Confrontation Clause."

___ So. 2d at ___.  Because McCray's challenge to the validity of his indictment is a non-jurisdictional claim, it is time-barred pursuant to Rule 32.2(c), Ala.R.Crim.P.   Thus, he is entitled to no relief on this claim.

We have likewise reviewed the record in this case and have found no error harmful to McCray's rights.  Based on the foregoing, the judgment of the trial court is affirmed.

**AFFIRMED.**

McMillan, P.J., and Cobb and Shaw, JJ., concur.  Baschab, J., concurs in the result.

3

# THE STATE OF ALABAMA - - JUDICIAL DEPARTMENT
# THE ALABAMA COURT OF CRIMINAL APPEALS

**CR-05-1474**

Willie C. McCray v. State of Alabama  (Appeal from Houston  Circuit Court:
CC94-791.60)

## CERTIFICATE OF JUDGMENT

WHEREAS, the appeal in the above referenced cause has been duly submitted and
considered by the Court of Criminal Appeals; and

WHEREAS, the judgment indicated below was entered in this cause on October 27th
2006:

### Affirmed by Memorandum.

NOW, THEREFORE, pursuant to Rule 41 of the Alabama Rules of Appellate
Procedure, it is hereby certified that the aforesaid judgment is final.

**Witness. Lane W. Mann, Clerk
Court of Criminal Appeals, on this
the 17th day of November, 2006.**

**Clerk
Court of Criminal Appeals
State of Alabama**

cc: Hon. Jerry White, Special TC Judge
    Hon. Judy Byrd, Circuit Clerk
    Brent H. Gourley, Attorney
    Willie C. McCray, Pro Se
    Office of Attorney General

